UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| LOCKWOOD INTERNATIONAL, INC.<br><br>VS.<br><br>WELLS FARGO BANK, NATIONAL ASSOCIATION; WELLS FARGO SECURITIES, LLC; and TRUSTMARK NATIONAL BANK | CIVIL ACTION NO. _____ |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW Plaintiff, Lockwood International, Inc., complaining of Defendants Wells Fargo Bank, National Association, Wells Fargo Securities, LLC, and Trustmark National Bank, respectfully showing as follows:

### I. PARTIES

1.1     Plaintiff Lockwood International, Inc. ("LII") is a Texas corporation with its principal place of business in in Harris County, Texas.

1.2     Defendant Wells Fargo Bank, National Association ("WFB") is a National Banking Association, formed under the laws of the United States, doing business in this District, Division, and the State of Texas for the purpose of accumulating monetary profit. Wells Fargo Bank, National Association's principal place of business is South Dakota. For purposes of diversity of citizenship, this Defendant is considered a citizen of the State of South Dakota. Wells Fargo Bank, National Association is both a lender involved in a revolving line of credit provided to LII, as well as the administrative agent for the lenders. This Defendant may be served with process through its


EXHIBIT C-1

registered agent, Corporation Service Company at 211 East 7th Street, Suite 620, Austin, Texas 78701-3218.

1.3     Defendant Wells Fargo Securities, LLC ("WFS"), is a Delaware limited liability doing business in this District, Division, and the State of Texas for the purpose of accumulating monetary profit. Wells Fargo Securities, LLC's principal place of business is the state of North Carolina.  For diversity of citizenship purposes, this Defendant is considered a citizen of the states of Delaware and North Carolina.  Wells Fargo Securities, LLC, served as the sole lead arranger and sole book manager for a loan provided to LII.  This Defendant may be served with process through its registered agent, Corporation Service Company d/b/a CSC - Lawyers Incorporating Service Company at 211 East 7th Street, Suite 620, Austin, Texas 78701-3218.

1.4     Defendant Trustmark National Bank ("Trustmark") is a Foreign Financial Institution formed under the laws of the United States, doing business in this District, Division, and the State of Texas for the purpose of accumulating monetary profit.  Trustmark National Bank's principal place os business is Mississippi. For purposes of diversity of citizenship, this Defendant is a citizen of the State of Mississippi.  Trustmark is a lender participant in a loan provided to LII.  This Defendant may be served with process through its registered agent, William S. Bridges, 945 Bunker Hill, Suite 175, Houston, TX 77024.

1.5     LII specifically invokes the right to institute this suit against whatever entities were conducting business using an assumed or common name, if any, with regard to the events described in this Complaint.  LII specifically invokes the right to have the true name of such parties substituted at a later time, if necessary.

1.6     All of the Defendants worked together in the actions alleged herein, participating in an ongoing goal to force LII into liquidation, and are jointly and severally liable for the damages sustained by LII.

## II.  JURISDICTION AND VENUE

2.1     The Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because the suit is between a citizens of different states, and the amount in controversy exceeds $75,000, excluding interest and costs.

2.2     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in the Southern District of Texas.

## III.  FACTS

3.1     Defendants have engaged in a course of conduct to bring a longstanding pillar of the Houston business community to the brink of financial disaster.  All of the Defendants conspired together in reaching the decision to act or fail to act as further alleged below, and as if reading from a book, following a script. The Defendants seized assets, wrongfully applied proceeds from sales, failed to fund payroll, wrongfully devalued inventory, improperly seized insurance proceeds, interfered with LII's ability to pay vendors, and ignored Wells Fargo's company-wide edict to "proactively help[] customers in FEMA-declared areas" following Hurricane Harvey.

3.2     Jennifer Norris a lead member of WFB's Workout Group, proudly displays this quote on her LinkedIn Professional Profile:  **"Honesty is an expensive gift, don't expect it from cheap people."**  Apparently, Ms. Norris, as a lead member of WFB's Workout Group, adhered to this motto in pursuing a course of systematic destruction of LII.  Unfortunately for LII, despite the vast and unlimited resources that Defendants possess, it was not enough to instill honesty in any of the

actions of the Wells Fargo group of companies or Trustmark. WFB and its affiliates and Trustmark have now extracted everything of value from LII. Indeed, as in the Merchant of Venice, they are trying to extract the last pound of flesh. It remains to be seen if the amount that was taken is enough for the Defendants to honestly admit in this litigation their systematic and relentless destruction of an iconic Houston business, even in the face of its struggles following Hurricane Harvey.

3.3 Lockwood was founded in 1977, and grew into an international supplier of valves and valve automation, offering pipe, valves, fittings and flanges, as well as engineered products for liquid handling and transfer, liquid measurement, as well as access and safety equipment. LII has been damaged by actions of Defendants during the relevant times alleged herein.

3.4 On or about September 30, 2015, LII, together with other entities, and as part of an ongoing relationship with Defendants, agreed to borrow funds from Defendants, including from WFB and Trustmark as a lender participant, through a line of credit. Over the ensuing course of the parties' relationship, the Defendants began to exert more and more control over LII's business, and ultimately damaged LII's ability to conduct business day to day.

3.5 On or around November 2016, LII began to experience significant financial difficulties following a series of events perpetrated by LII's then-auditors, Chief Financial Officer, and others. As these difficulties became more pronounced, LII asked to meet with representatives of Defendants regarding the operation of the company going forward.

3.6 Following this meeting, LII's loan was moved from the "relationship" side of the WFB to its "workout group," a department within WFB that handles special assets. Wells Fargo reassigns some commercial loans to this internal department to handle the negotiation and management of the bank's forbearance agreements. Contrary to its name, once a commercial loan

has been sent to the Workout Group, the goal of Wells Fargo is not to "work out" loans with its customers. Instead, the move signals the beginning of a process orchestrated by Defendants to remove the customer's loan from WFB's existing loan portfolio, and in the case of LII, to destroy its business.

3.7    As part of this purported "workout" process, and at Defendants' insistence, LII agreed to hire various restructuring consultants, auditors and other service providers. LII relied on the recommendations of Defendants in choosing these consultants, and in following their suggested courses of action, all with the goal of guiding LII through its financial difficulties, and to emerge from the workout process, and return to the prior beneficial relationship it enjoyed with Defendants. Defendants were in a special position to provide guidance to LII during this period. However, Defendants used this special position to exert additional influence over LII, and abuse that influence while forcing LII to operate in such a way that its ruin was certain.

3.8    From the point LII entered the workout process with Defendants, it continued to operate to the best of its ability, and despite the strictures placed on it by Defendants. Relying in part on information supplied to it by the consultants and auditors Defendants obligated LII to retain and pay, Defendants began a systematic process of devaluing LII's inventory, eliminating its borrowing ability and thus its ability to generate revenue, all while more and more aggressively sweeping LII's accounts receivable collections of revenue and starving it of needed operating capital.

3.9    By devaluing LII's inventory, Defendants caused LII to suffer an "inventory default," and began to refer to LII's assets and loan as "distressed." This designation was specifically chosen by Defendants to further its goals of destroying LII's business. The default caused by Defendants'

unreasonable and unfounded devaluation or reclassification of inventory as "distressed" resulted in further restrictions on LII's ability to operate.

3.10    The basis for the reclassification was that the inventory had been in the company's possession for over 365 days. The reclassification completely ignored the realities of the business that LII is engaged. The items sold by LII require in many cases six to nine months to manufacture. The normal course of business requires production of pipes and flanges in advance of when they will be needed by the end consumer. As a result, LII routinely carries inventory for more than one year, but which has a high value. The lead time and relative rarity of this inventory benefits LII because it is able to charge a premium for this inventory.

3.11    In February 2017, while under substantial financial duress, LII entered into a new credit agreement with Defendants, ostensibly to protect LII from foreclosure by Defendants, but which applied further restrictions on LII's operation, and strengthened Defendants' control over LII's business. This agreement obligated LII to an aggressive reduction of the outstanding balance of the credit line, and required an aggressive pay down schedule. LII was required to pay $5,400,000 to the Defendants in order to pay down the credit line to $72,000,000. The credit agreement included certain criteria and formulas that were required to be met by the company. One of the formulas was an asset-coverage threshold that LII was required to meet. One part of this formula relied on the inventory possessed by LII, but for an unjustified reason excluded any inventory held longer than 365 days. The inventory held by LII longer than 365 days was reclassified by the Defendants as "distressed." This marked the first time that the Defendants began to strip liquidity from the company. The removal of this cash began to severely restrict LII's ability to pay it vendors, which directly impacted its ability to provide material to its customers, the main source of LII's revenues.

3.12     In the months that followed, Defendants began to exercise even further control, ostensibly to maintain a debt level Defendants found acceptable. However, this level was not consistent with the survival of LII as a going concern. LII had limited cash to pay vendors as a result of unreasonable restrictions placed on LII's operations by Defendants, and this inevitably resulted in lower sales volumes. This further resulted in a spiral of increased debt levels, further cash reductions by Defendants, and even further limits in sales. Despite all of this, LII continued to do business, and was successful in servicing LII's debt, even with the restrictions placed on it. In May 2017, LII had revenues approaching $21,000,000 which it hoped would demonstrate to Defendants its operating capabilities, its ability to sustain itself and make its debt payments going forward.

3.13     In a further move to solidify its operations, in late May 2017, LII undertook the sale of a substantial amount of its assets in a single transaction from its Midwest operations to generate enough cash to make payments to Defendants, a decision which was explained to Defendants, and approved by them. Prior to the sale of these Midwest assets, Defendants hired a consultant to evaluate the merits of the transaction. Although Defendants to date have refused to provide this evaluation to LII, these consultants recommended Defendants should approve the Midwest transaction so it could generate much needed capital to fund vendor payments, as well as fund an upcoming payment to Defendants.

3.14     Defendants did not object to the transaction, and the sale of the Midwest assets proceeded in the ordinary course of business, and when concluded in June 2017, it generated $4,800,000 for inventory sales, which together with the other revenue generated, was sufficient to make the quarterly payment to Defendants. LII disclosed this sale as an ordinary course transaction on its books, which Defendants were provided. Yet after the sale closed, Defendants collected the

entire amount of the proceeds, released none for the payment of vendors, and refused to apply any of the proceeds to the $5,000,000 payment due to Defendants as agreed, the main reason for the transaction in the first instance.

3.15    In further injury to LII, after the sale Defendants proclaimed the sale of Midwest assets to not be in the ordinary course of business (even though the buyers purchased other inventory outside of the larger transaction), and Defendants used this proclamation to support a further declaration of default, even after Defendants' own consultants recommended the sale be approved. This further declaration of default by Defendants and the failure to apply the proceeds of an approved sale to the pending payment due, caused the necessary liquidity of the business to be compromised, and vendor debt to increase, in short causing a substantial cash crisis for LII.

3.16    At the same time LII was selling its Midwest assets, it received interest from Tenex, a private equity group with a portfolio of companies operating in similar markets as LII, about potentially buying LII. Tenex submitted a proposal and requested a 30- day due diligence period. Prior to this Defendants repeatedly represented to LII that its goal was to assist LII in any attempt to either sell the company or refinance the credit agreements that were in place. Despite potential interest from a buyer, who at the time was prepared to make an offer that would repay Defendants 100%, Defendants unilaterally and unreasonably rejected Tenex's proposal, and instead required LII to hire an investment banking firm to look for other potential purchasers.

3.17    Despite the blows being dealt to it by Defendants, LII continued to show not just signs of life, but signs of recovery. July 2017 was a record month. Revenue exceeded $14,900,000. Margins were up 5% over historical averages, and LII showed profit for the month. For the six

month period ending in July 2017, LII had generated over $100,000,000 in revenue and had a positive EBITDA. The company was anything but "distressed".

3.18    August 2017 began at a standard pace for the company. Historically, the company invoices 30 to 40% of its revenue during the last week of the month. On August 25, 2017, Hurricane Harvey struck the Gulf Coast inflicting billions of dollars of damage on Texas, and effectively shutting down Houston's economy for weeks. For LII, this could not have come at a worse time. Areas affected by the hurricane represent half of LII's revenues, and approximately 60% of its profits.

3.19    Despite the state of the Gulf Coast, and an inability to conduct business at the beginning of September, LII still generated revenue in excess of $9,000,000. In addition, damages to LII's business interruption and materials were heavily insured, and estimates of these claims were a minimum of $6,200,000 for business interruption, and a minimum of $7,300,000 for material and property damage.

3.20    On September 10, 2017, WFB emailed LII regarding the bank's intentions following the devastating hurricane. "Our hearts are with everyone impacted by the hurricane, and Wells Fargo is doing everything we can to support recovery efforts. We know this can be a stressful time financially, so we are committing to give affected customers additional support." This hollow promise could not have been further from the truth.

3.21    On October 26, 2017, during a phone call with LII representatives, Defendants advised they were disappointed in LII's past results and the performance of its management. Defendants took this position despite the record results of July, and positive performance in August

and September despite the damage inflicted by Hurricane Harvey on LII and its customers, and the lingering effects on Houston's economy.

3.22 On November 1, 2017, LII received $3,850,000 from one of its insurers as an advance payment for loss to property and material, and to assist the company with recovery. In establishing the loss, the insurer verified the value of the damaged material was on average 27% higher than what LII had recorded as its cost. This is in stark contrast to Defendants' reclassification of this inventory as distressed. On the same date, Defendants began requiring LII obtain authorizations for every single company expenditure. It became impossible for LII to pay its vendors, or even its employees.

3.23 Defendants over the course of the relationship with LII have arbitrarily designated its valuable assets and inventory as "distressed," declared defaults based on Defendants' own activities, and effectively took control of the company and placed it on a path towards liquidation. But despite these efforts to drive LII to ruin, LII managed to exceed expectations. The starting balance on the line of credit on November 1, 2016, was $76,384,833. The balance on November 16, 2017, was $59,700,000.

3.24 During 2017 LII made all required debt service payments and continued to deposit receivables into its account at WFB. As of November 1, 2017, Defendants applied all money to principal and interest on the loan, and prohibited LII from paying any vendors or employees. Defendants have seized the assets of the company, refused to apply those assets to debt requirements, and created events of default which would not otherwise have existed except for Defendants' actions.

3.25 In a particularly egregious example of the treatment of LII's vendors, Defendants were well aware of an agreement between LII and one of its important customers, Zachary, in which Zachary would pay LII invoices, but only if LII immediately paid other important vendors on a large

project. This process was followed for months, but in November 2017, Defendants refused to allow LII to make such a payment, and instead swept the Zachary payment to LII. This caused and continues to cause damage to LII's relationship with Zachary, other vendors, and current customers of LII.

3.26 Unfortunately, Defendants' refusal to allow vendor payments in November 2017, in particular the refusal to allow payment on the Zachary project, has forced LII to the brink of liquidation. Wells Fargo will not approve vendor payments, as a result LII cannot obtain products to provide its customers, and without those sales, LII cannot operate.

3.27 After Hurricane Harvey hit, Defendants had two choices. They could either work with a 40-year Houston-based corporation that employs over 250 people, or they could decide to strangle the company and force it into liquidation. Defendants chose the latter.

## IV. CAUSES OF ACTION

### A. Conversion

4.1 LII re-alleges paragraphs 1.1 through 3.27 as though fully again set forth.

4.2 LII had a right to funds that were held by Defendants in LII's accounts at WFB.

4.3 The funds were the personal property of LII.

4.4 The Defendants wrongfully exercised dominion or control over the funds, wrongfully preventing LII from paying vendors and running the day to day operations of the company.

4.5 As a result of Defendants' actions, LII suffered injury.

4.6 As a result of sweeping funds out of LII's accounts and preventing the company from functioning in the ordinary course of business, LII was unable to continue its day-to-day

operation and fund. If Defendants are able to force liquidation of the company, it will cause significant injury to LII, all proximately caused by the Defendants' wrongful exercise of dominion or control over LII's funds.

### B. Negligence

4.7 LII re-alleges paragraphs 1.1 through 3.27 as though fully again set forth.

4.8 Defendants had a duty to exercise ordinary care in the control exerted over LII's operations. Defendants actions have been taken based on fundamental misunderstandings of LII's business, and Defendants have further engaged in negligent acts and/or omissions resulting in the injuries and damages suffered by LII. By exerting the degree of influence and control over LII's business, Defendants were under a duty to exercise that degree of influence and control without causing harm to LII.

4.9 Defendants' conduct constituted a breach of this duty, and of the duty of ordinary care. Defendants were negligent in one or more of the following respects:

    (a)    Failing to follow standard banking practices;

    (b)    Failing to allow LII to function normally;

    (c)    Failing to have adequate policies and procedures in place to ensure LII operations proceeded in a commercially reasonable manner;

    (d)    Wrongfully and arbitrarily reclassifying inventory;

    (e)    Failing to understand the business of LII;

    (f)    Providing injurious business advice to LII;

    (g)    Causing LII to hire consultants and agents who, while paid for by LII, operated in the best interest of Defendants, and against the best interest of LII;

  (h) Refusing to authorize payments to vendors; and,

  (i) Additional acts and omissions which will be identified during the prosecution of this matter.

4.10 Each of the above listed acts and/or omissions, taken singularly or in combination, constitute negligence.

4.11 Each of the above listed acts and/or omissions were an actual and proximate cause of the damages made the basis of this lawsuit, and the injuries and damages suffered by LII.

  **C.** **Breach of Special Relationship**

4.12 LII re-alleges paragraphs 1.1 through 3.27 as though fully again set forth.

4.13 LII and Defendants had a special relationship that existed between them as a result of their lengthy course of dealing. LII was wholly dependent on the Defendants to adequately safeguard LII's financial interests, in particular following Defendants' imposition of its judgment in LII's operations.

4.14 Defendants required LII to hire an "impartial" consultant and Chief Restructuring Officer. Instead of recommending consultants who would place LII's interests first, and execute a plan to restructure LII's business in a manner that ensured its success, Defendants recommended entities which it controlled, and which were expected, and did, report to Defendants in a manner which suited Defendants' purposes. Having acquired this influence over LII, Defendants abused that influence and operated their control over LII in a manner that would lead not to its restructuring, but to its ruin.

13

4.15   Prior to coming under the control of the workout group, the parties worked together toward a mutual goal of success and prosperity for a lengthy period of time.  Defendants were aware that LII relied on it for advice.

4.16   Based on their longstanding relationship with LII, and the control and influence it exerted over LII, Defendants had reason to know LII placed is trust and confidence in Defendants, and relied on Defendants to counsel and inform.

4.17   Defendants and LII both understood a special trust or confidence had been reposed.

4.18   LII was dependent on the actions of Defendants, and the Defendants voluntarily assumed a duty to advise, counsel, and protect LII.

4.19   Defendants breached their obligations to LII, and are responsible for all damages that resulted from such breach.

**D.   Tortious Interference with an Existing Contract**

4.20   LII re-alleges paragraphs 1.1 through 3.27 as though fully again set forth.

4.21   LII and a non party TIV Valves have a longstanding contractual relationship. The relationship was extremely valuable and lucrative for LII.  The valves and equipment provided by TIV Valves are an essential part of LII's business.

4.22   Despite the Defendants' actual awareness of agreements between LII and TIV Valves, Defendants have willfully and intentionally interfered with the agreements by seizing money from LII accounts which Defendants knew were vital to continuing the flow of goods from TIV Valves to LII for sale to customers, and refusing to authorize payment of outstanding invoices.

14

4.23     Since the Defendants have required preapproval of all expenditures, LII has requested authorization of payment of these invoices.  Defendants have refused.

4.24     The relationship has deteriorated to the point that TIV Valves made demand on LII for payment, and threatened it with legal action.  Unfortunately, LII is powerless to pay TIV Valves because of the control which Defendants exercise over LII.

4.25     The Defendants had no interest in the contract with TIV Valves, and no legitimate justification or excuse for the interference.  TIV Valves has also been pushed to the edge of bankruptcy, and is unable to fund payroll.  Because LII cannot pay TIV Valves, TIV Valves' sub-vendors have halted shipments to TIV Valves, material ultimately destined for LII and its customers.  TIV Valves' machinists and operators are leaving the company because they have no work.  Production on projects related to Kinder Morgan, Williams, and Northern Natural Gas, have all been impacted by delays.  Without TIV Valves, the entire manufacturing potion of LII's business will be destroyed.

4.26     The actions of the Defendants directly and proximately caused LII to suffer monetary damages and loss.

**E.     Tortious Interference with Prospective Business Relations with Vendors**

4.27     LII re-alleges paragraphs 1.1 through 3.27 as though fully again set forth.

4.28     Although the Defendants are currently refusing to authorize any payments to LII's vendors, LII is still attempting to operate.

4.29     There was a reasonable probability that LII and TIV Valves would have entered into future agreements for valve and equipment manufacture and purchase.  Absent interference

from the Defendants, LII would have continued its business relationship with these and other vendors in the future.

4.30    Defendants had actual awareness of the ongoing relationships and future business opportunities between LII and its vendors, and knew or should have known that their failure to allow payment to these and other vendors would damage or destroy those relationships, as well as the vendors' businesses themselves.

4.31    In reality, because Defendants have continually failed and refused wrongfully to fund vendor payments, particularly when they had done so before, but recently stopped such funding, Defendants have or will destroy LII's relationships with its vendors.  The interference with these relationships has or will soon result in LII being replaced on ongoing and lucrative projects because of LII inability to pay its vendors, a circumstance caused solely by Defendants failure and refusal to allow these payments.  Even if LII forestalls this economic disaster and is not forced into liquidation, it will take years to repair the damage inflicted on vendor relationships.

        **F.**    **Tortious Interference with Prospective Business Relations with Clients**

4.32    LII re-alleges paragraphs 1.1 through 3.27 as though fully again set forth.

4.33    The Defendants' refusal to authorize vendor payments has also jeopardized LII's ability to enter future business relationships with longtime customers, including but not limited to Zacharys and CB&I.

4.34    There was a reasonable probability that LII would have entered into future agreements at least with Zacharys and CB&I for valve and equipment purchase.  Absent

16

interference from the Defendants, LII and these customers would have continued their business relationships in the future.

4.35    Despite the Defendants' actual awareness of the ongoing relationship and future business opportunities between LII and its major customers, it has interfered with LII's ability to operate with them, forcing a loss and destruction of that business.

**G.    Fraud**

4.36    LII re-alleges paragraphs 1.1 through 3.27 as though fully again set forth.

4.37    Throughout their relationship, Defendants and its agents made multiple representations to LII. Defendants have repeatedly indicated that money earned by LII, for example through the sale of the Midwest assets, could be utilized in the day to day operation of the business, and for payments to the bank. LII relied on this representation and completed the Midwest sale. However, contrary to its representations, Defendants did not apply funds from that sale to the operation of the business, and even used the sale as a basis to declare a default on a sale it had approved.

4.38    The Defendants and its agents have also made representations regarding insurance advances that have been received by LII. To date, one of LII's insurers has advanced $6,300,000.00 to LII for repairs and restoration efforts related to the business. Prior to receiving the insurance, LII discussed the payments with Defendants. Defendants on multiple occasions agreed to allow all of the insurance payments to be used to repair the business. The money was critical for payment of vendors in the aftermath of the hurricane, but when the money was transferred into LII's account, it was taken by the Defendants. This was contrary to the repeated representations that had been made.

17

4.39    The Defendants representations were material.  LII would not have sold its Midwest assets if it knew that the Defendants intended to seize the proceeds, not apply them as represented, refuse to accept the proceeds as payment for an existing obligation, and then use their own failure to apply those proceeds to the existing obligation to declare a default.

4.40    The representations from Defendants were false when made, and the Defendants knew they were false.

4.41    The Defendants made the representations with the intent LII act on them.

4.42    LII relied on Defendants' representations.

4.43    The representation caused LII injury.

**H.    Breach of Duty of Good Faith and Fair Dealing**

4.44    LII re-alleges paragraphs 1.1 through 3.27 as though fully again set forth.

4.45    As a result of the special relationship of trust and confidence that existed between LII and  Defendants, Defendants were under a duty to exercise good faith and fair dealing in their interactions with LII.

4.46    In the alternative, as a result of the excessive lender control, and influence in, LII's business activities, a special relationship existed.

4.47    Defendants breached their duty to LII by, among other things, refusing to allow LII to pay its vendors, as more fully alleged above.

4.48    Defendants' breach cause proximately caused LII damages.

**I.    Unjust Enrichment**

4.49    LII re-alleges paragraphs 1.1 through 3.27 as though fully again set forth.

4.50    Defendants have wrongfully secured a benefit by stripping value from LII which it would be unconscionable for Defendants to retain.

4.51    By their wrongful acts and omissions of material facts, Defendants were unjustly enriched at the expense of LII.

4.52    The LII was unjustly deprived of its capital, value, and livelihood by the acts of Defendants.

4.53    It would be inequitable and unconscionable for Defendants to retain the profit, benefit and other compensation they obtained from their fraudulent, deceptive, and misleading conduct alleged herein.

**J.    Gross Negligence**

4.54    LII re-alleges paragraphs 1.1 through 3.27 as though fully again set forth.

4.55    The Defendants' acts and/or omissions rose to the level of gross negligence and warrant the imposition of exemplary damages.

4.56    The acts and omissions of the Defendants involved an extreme degree of risk, considering the probability and magnitude of harm to others, including the outright destruction of a 40 year old Houston business, and the Defendants had actual, subjective awareness of the risks but proceeded with conscious indifference to the rights, safety, and welfare of others.

## V.  DAMAGES

5.1    LII incorporates by reference the factual allegations contained in the preceding paragraphs.

5.2    As a result of Defendants' actions, LII has suffered actual damages in an amount exceeding $1,500,000,000.

5.3     Furthermore, given that Defendants' conduct was committed intentionally, knowingly, and with callous disregard of LII's legitimate rights, LII is entitled to seek and does seek exemplary damages in the amount of $1,500,000,000, or what is in the conscience of the jury.

## VI.  REQUEST FOR JURY TRIAL

6.1     LII demands a trial by jury herein.

WHEREFORE, Lockwood International, Inc. prays for judgment against Defendants Wells Fargo Bank, National Association; Wells Fargo Securities, LLC; and Trustmark National Bank for: actual damages in an amount exceeding the jurisdictional limits of this Court; exemplary damages; prejudgment and post-judgment interest; costs of suit; and for all such and further relief to which they may show themselves justly entitled, in law or in equity.

Respectfully submitted,

*/s/ Francis I. Spagnoletti*
Francis I. Spagnoletti
Texas SBN 18869600
fspagnoletti@spaglaw.com
David S. Toy
Texas SBN 24048029
dtoy@spaglaw.com
Eric J. Rhine
Texas SBN 24060485
erhine@spaglaw.com
SPAGNOLETTI & CO.
401 Louisiana, 8th Floor
Houston, TX 77002
Telephone:     713 653 5600
Facsimile:     713 653 5656

**ATTORNEYS FOR PLAINTIFF**