## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| **LOCKWOOD INTERNATIONAL, INC.,** *Plaintiff/Counter-Defendant,* | § § § | |
| **v.** | § § | |
| **WELLS FARGO BANK, N.A., WELLS FARGO SECURITIES, LLC, AND TRUSTMARK NATIONAL BANK,** *Defendants/Counterclaimants/Third-Party Plaintiffs,* | § § § § § § | **CIVIL ACTION NO. 3:17-CV-00365** |
| **v.** | § § § | |
| **LOCKWOOD ENTERPRISES, INC., LMG MANUFACTURING, INC., PIPING COMPONENTS, INC., LOCKWOOD HOLDINGS, INC., LH AVIATION, LLC, 7807 EAGLE LANE LLC, AND MICHAEL F. LOCKWOOD,** *Third-Party Defendants.* | § § § § § § § § § | |

## WELLS FARGO BANK, N.A. AND TRUSTMARK NATIONAL BANK'S COUNTERCLAIM, THIRD-PARTY CLAIMS, AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendants Wells Fargo Bank, N.A. ("Wells Fargo") and Trustmark National Bank, ("Trustmark") file their counter- and third-party claims, complaining of Plaintiff Lockwood International, Inc. and Third-Party Defendants Lockwood Enterprises, Inc., LMG Manufacturing, Inc., Piping Components, Inc., Lockwood Holdings, Inc., LH Aviation, LLC, 7807 Eagle Lane LLC, and Michael F. Lockwood, and seeking emergency injunctive relief.

## INTRODUCTION

1.     Lockwood International, Inc. ("LII") is a supplier and distributor of valves, pipes and fittings primarily for the petrochemical industry, oil and gas industry and construction industry.  LII conducts business in Texas and maintains its principal Texas office in Harris

**EXHIBIT C-2**

County, Texas. LII and its related entities Lockwood Enterprises, Inc., LMG Manufacturing, Inc., and Piping Components, Inc. have defaulted under a $72 million secured, syndicated Revolving Line of Credit owed to Wells Fargo and Trustmark, and the debt has been accelerated. Lockwood Holdings, Inc., LH Aviation, LLC, 7807 Eagle Lane LLC, and Michael F. Lockwood are guarantors.

2.  Borrowers have actively interfered with the rights of Wells Fargo, as Administrative Agent, and the Lenders as secured creditors. The Lenders have a perfected security interest in all of the Borrowers' assets in the United States, including but not limited to all accounts receivable, inventory and equipment. Wells Fargo has recently learned that LII has transferred some of Borrowers' inventory – the Banks' collateral – to one of LII's creditors to satisfy LII's debt to that creditor because LII cannot pay its debt to such creditor. These transfers are a blatant breach of LII's obligations to Wells Fargo and Trustmark, and jeopardize and deplete their collateral.

3.  Pursuant to its rights as a secured creditor, Wells Fargo, as Administrative Agent, notified Borrowers' account debtors that all payments due to Borrower should be sent to Wells Fargo per the Security Agreement. Shortly after sending the notice to account debtors, Wells Fargo learned that on November 17, 2017, LII had instructed its account debtors to remit all payments to a deposit account held at Bank of America, a violation of its obligations under the relevant loan agreements. Wells Fargo also learned that LII offered to indemnify one of its account debtors if it disregarded the notice sent by Wells Fargo and sent payments directly to LII instead of Wells Fargo. Thus, not only is LII interfering with Lenders' rights, it is also actively encouraging account debtors to violate their obligation and responsibility under the Texas Uniform Commercial Code to turn over payments to Wells Fargo.

4.     Upon learning of these infractions, Wells Fargo made demand on Borrowers to cease and desist from (i) interfering with the Lenders' collateral and directing its account debtors to make payments to LII, and (ii) disposing of the Lenders' collateral, including but not limited to, transferring inventory to pay LII's debts.  Wells Fargo also demanded an accounting of all receivables diverted and inventory used to pay LII's debts.  Borrowers failed to provide the requested information and refused to provide assurances that they will cease such wrongful activity.  Borrowers *did* however admit that they received $650,000 outside of Wells Fargo.  Thus, there is clearly a danger of ongoing violations and infractions by Borrowers and Michael Lockwood, the principal and Chief Executive Officer of Borrowers and Guarantors.

5.     Accordingly, it has become necessary to seek injunctive relief prohibiting Borrowers and Michael Lockwood from interfering with the Lenders' rights to their collateral. The Lenders do not have an adequate remedy at law because Borrowers are experiencing significant financial difficulties and may be on the brink of insolvency and incapable of responding in money damages.  Preserving and securing Lenders' collateral is necessary to preserve the status quo and remove the threat of potential loss of the collateral.

## PARTIES

6.     Defendant/Counterclaimant/Third-Party Plaintiff Wells Fargo is a national banking association with its main office in Sioux Falls, South Dakota as set forth in its articles of incorporation.

7.     Defendant/Counterclaimant/Third-Party Plaintiff Trustmark is a foreign financial institution with its principal place of business in Mississippi.

8.     Plaintiff/Counter-Defendant LII is a Texas corporation with its principal place of business in Harris County, Texas.

9. Third-Party Defendant Lockwood Enterprises, Inc. ("Lockwood Enterprises") is a Texas corporation with its principal place of business in Harris County, Texas. Lockwood Enterprises may be served via its registered agent Delaney Corporate Services, Ltd. at 823 Congress Avenue, Suite P-4, Austin, Texas 78701.

10. Third-Party Defendant LMG Manufacturing, Inc. ("LMG Manufacturing") is a Texas corporation with its principal place of business in Harris County, Texas. LMG Manufacturing may be served via its registered agent Delaney Corporate Services, Ltd. at 823 Congress Avenue, Suite P-4, Austin, Texas 78701.

11. Third-Party Defendant Piping Components, Inc. ("Piping Components") is a Texas corporation with its principal place of business in Harris County, Texas. Piping Components may be served via its registered agent Delaney Corporate Services, Ltd. at 823 Congress Avenue, Suite P-4, Austin, Texas 78701.

12. Third-Party Defendant Lockwood Holdings, Inc. ("Lockwood Holdings") is a Texas corporation with its principal place of business in Harris County, Texas. Lockwood Holdings may be served via its registered agent Delaney Corporate Services, Ltd. at 823 Congress Avenue, Suite P-4, Austin, Texas 78701.

13. Third-Party Defendant Michael F. Lockwood ("Michael Lockwood") is a resident of Harris County, Texas. He may be served at 14239 Indian Wells Drive, Houston, Texas 77069 or wherever he may be found.

14. Third-Party Defendant LH Aviation LLC is a Texas limited liability company with its principal place of business in Harris County, Texas. Upon information and belief, Michael Lockwood, a Texas citizen is the sole member of LH Aviation LLC, and accordingly, LH Aviation LLC is a citizen of Texas for diversity purposes. LH Aviation LLC may be served

via its registered agent Delaney Corporate Services, Ltd. at 823 Congress Avenue, Suite P-4, Austin, Texas 78701.

15.    Third-Party Defendant 7807 Eagle Lane LLC is a Texas limited liability company with its principal place of business in Harris County, Texas.  Upon information and belief, MFL Properties LLC is the sole member of 7807 Eagle Lane LLC.  Upon information and belief Michael Lockwood, a Texas citizen, is the sole member of MFL Properties LLC.  Accordingly, 7807 Eagle Lane LLC is a citizen of Texas for diversity purposes.  7807 Eagle Lane LLC may be served via its registered agent Delaney Corporate Services, Ltd. at 823 Congress Avenue, Suite P-4, Austin, Texas 78701.

## JURISDICTION AND VENUE

16.    Jurisdiction is proper in this Court because the Counterclaim/Third-Party Claims arise out of the same transaction and occurrences that are the subjects of the Plaintiff's Original Complaint, and pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy, excluding costs and interest, exceeds $75,000 and the parties are citizens of different states.   Venue is appropriate in this district under 28 U.S.C. § 1391(b)(1) & (2).

## FACTUAL BACKGROUND

### BORROWERS' LENDING RELATIONSHIP WITH WELLS FARGO AND TRUSTMARK

*The Credit Agreement*

17.    LII, a supplier of valves, pipes and fittings largely for the oil and gas industry, entered into an amended and restated lending relationship with Wells Fargo and Trustmark in September 2015.  On February 27, 2017, LII, and its affiliated companies Lockwood Enterprises, LMG Manufacturing, and Piping Components (collectively, "Borrowers") entered into a Second Amendment to Amended and Restated Credit Agreement and Limited Waiver of Defaults (the "Credit Agreement") with Wells Fargo and Trustmark (collectively, "Lenders" or "Banks"),

whereby Lenders agreed to extend a Revolving Line of Credit in the amount of $72,000,000 to Borrowers.[1] A true and correct copy of the Credit Agreement is attached hereto as ***Exhibit 1***. In addition to being a lender, Wells Fargo is also the Administrative Agent for the Lenders. Wells Fargo's Revolving Line of Credit commitment percentage is 77.78% and Trustmark's commitment percentage is 22.22%.

### *The Notes*

18.    In connection with the original credit agreement, Borrowers had entered into several promissory notes with Lenders, which continue to govern the lending relationship. These include (i) a Revolving Credit Note between Borrowers and Wells Fargo on September 30, 2015, in the amount of $70,000,000 (the "Wells Fargo Note"), and (ii) a Revolving Credit Note between Borrowers and Trustmark on September 30, 2015, in the amount of $20,000,000 (the "Trustmark Note").[2] Together the Wells Fargo Note and the Trustmark Note are referred to collectively herein as the "Notes", and true and correct copies are attached hereto as ***Exhibits 2 and 3***, respectively.

### *The Guaranty Agreements*

19.    Additionally, various third-party guaranty agreements were executed to secure the Indebtedness under the Credit Agreement and Notes. These include unconditional guarantees by: (i) Michael F. Lockwood dated February 27, 2017 (the "Michael Lockwood Guaranty"); (ii) Lockwood Holdings, Inc. dated August 22, 2017 (the "Lockwood Holdings Guaranty"); (iii) LH Aviation LLC dated August 22, 2017 (the "LH Aviation Guaranty"); and (iv) 7807 Eagle Lane

---

[1]    The September 30, 2015 Amended and Restated Credit Agreement was amended by a further amendment dated July 31, 2016 and by the Credit Agreement. The February 27, 2017 Credit Agreement is the operative Credit Agreement, as subsequently amended in August and September 2017.

[2]    The original revolving credit commitment in September 2015 was $90,000,000, which is why the Wells Fargo Note and Trustmark Note total that amount. The commitment was reduced to $72,000,000 in the February 2017 Credit Agreement, and the Lenders' respective commitments were reflected as percentages - 77.78% for Wells Fargo and 22.22% for Trustmark.

LLC dated August 22, 2017 (the "Eagle Lane Guaranty"). Together the Michael Lockwood Guaranty, Lockwood Holdings Guaranty, LH Aviation Guaranty, and Eagle Lane Guaranty are referred to collectively herein as the "Guaranty Agreements," and true and correct copies are attached hereto as *Exhibits 4, 5, 6,* and *7*, respectively. Together, Michael Lockwood, Lockwood Holdings, Inc., LH Aviation LLC, and 7807 Eagle Lane LLC are referred to collectively as the "Guarantors."

### *The Pledge and Security Agreements By Borrowers and Guarantors*

20.    To further secure the Indebtedness under the Credit Agreement and Notes, Borrowers executed and delivered, among other things, a Pledge and Security Agreement on September 30, 2015, which pledges an extensive array of assets as security and collateral for the Indebtedness (the "Security Agreement"), including but not limited to all accounts receivable, equipment and inventory. In connection with executing their Guaranty Agreements, on August 21, 2017 the Guarantors executed a Pledge and Security Agreement Joinder No. 1, agreeing to join as Grantors under the Security Agreement and pledging their interest in the collateral covered by the Security Agreement (the "Security Agreement Joinder"). True and correct copies of the Security Agreement and the Security Agreement Joinder are attached hereto as *Exhibits 8* and *9*.[3]

### LII's BUSINESS DETERIORATES, TRIGGERING VARIOUS EVENTS OF DEFAULT

21.    Beginning in 2016, LII began to deteriorate financially due primarily to management issues and the slow-down in the energy sector that accounted for a large volume of LII's business. In the first half of 2016, Michael Lockwood, the CEO, took a leave of absence from LII. Prior to his departure Michael Lockwood put in place new management to continue

---

[3]    Additionally, Michael Lockwood pledged his equity interest in MFL Properties, LLC and Lockwood Holdings, Inc. (affiliated companies), and MFL Properties, LLC pledged its equity interest in 7807 Eagle Lane LLC (also an affiliated company).

operations during his absence. LII's financial difficulties continued. Demonstrative of the financial troubles, LII originally forecasted profitability for 2016, which forecast changed multiple times throughout the year, and ended in a significant loss for 2016. Upon his return from his leave of absence, Michael Lockwood fired key personnel and claimed that the company had been mismanaged during his absence.

22.     In February 2017, Borrowers and Lenders entered into the Credit Agreement which, among other things, waived then existing covenant defaults and reset financial covenants. The Credit Agreement also reduced the Revolving Credit Commitment to $72 million, which would be paid down and incrementally decreased to $55 million by the third quarter of 2018, to address Borrowers' financial losses. In response to its ongoing financial issues, LII retained multiple outside consulting, accounting, and financing firms to help it navigate through its financial and financial reporting troubles, but it was soon in default again. After completing their review, the consultants presented a turnaround strategy to LII, which in turn LII presented to Lenders, that focused on making significant cuts to LII's operation expenses, executing extensive reforms, and reducing its loan obligations.

23.     However, the changes that LII implemented, or attempted to implement, did not right the ship, and the business continued its downward spiral throughout the spring and early summer of 2017. By August 2017, LII was in continuing default of several financial covenants and financial reporting provisions in the Credit Agreement, including, but not limited to, (i) failing to meet the permanent reduction of the Revolving Credit Commitment as scheduled in the Credit Agreement; (ii) failing to timely deliver a forensic accountant report relating to alleged fraud uncovered at LII; (iii) failing to timely deliver financial statements and reports; (iv) breaching the Consolidated Total Liabilities to Consolidated Tangible Net Worth ratio; (v)

failing to meet the Consolidated EBITDA requirement; and (vi) failing to meet its minimum Asset Coverage Ratio.

*The Forbearance Agreements*

24.     As a result of these various defaults, Borrowers requested and Lenders agreed to forbear from exercising their rights and remedies under the Credit Agreement, and on August 16, 2017, the Borrowers, Guarantors, Lenders, and Administrative Agent executed the Forbearance Agreement and Third Amendment to Amended and Restated Credit Agreement (the "First Forbearance Agreement").     A true and correct copy of the First Forbearance Agreement is attached hereto as ***Exhibit 10***.  A comprehensive list of the then existing defaults is included as Annex A to the First Forbearance Agreement.  The Borrowers and Guarantors acknowledged that the listed events of default existed and were continuing.  *Id.* at § 3(a).  Further, as part of the First Forbearance Agreement, Borrowers agreed that all of their collections would be deposited in an account with Wells Fargo and that they would not open or maintain any deposit accounts at any other banks (except with respect to Limited Funds Foreign Accounts, which are not at issue in this case). *Id.* at § 5(c).

25.     Yet, LII's problems continued and more events of default occurred.  As a result, at Borrowers' request, on September 29, 2017, Borrowers, Guarantors, Lenders, and the Administrative Agent entered into the Second Forbearance Agreement and Fourth Amendment to Amended and Restated Credit Agreement (the "Second Forbearance Agreement").  A true and correct copy of the Second Forbearance Agreement is attached hereto as ***Exhibit 11***.  A comprehensive list of the then existing defaults is included as Annex A to the Second Forbearance Agreement, which Borrowers and Guarantors again acknowledged were then existing and continuing.  *Id.* at § 4(a).  As with the First Forbearance Agreement, Borrowers

agreed to deposit all collections with Wells Fargo and to not open or maintain a deposit account at any other bank. *Id.* at § 6(c).

26.    Throughout the deterioration of LII's financial condition, Well's Fargo worked with LII and Michael Lockwood in their efforts to salvage the business, including but not limited to, allowing additional time to address defaults and repayments of the debt and for Michael Lockwood and advisors to solicit and entertain offers for the sale of the company as they requested deferring overdue and future interest payments, and allowing the use of the Lenders' cash collateral for working capital.  During that time, LII again failed to provide required financial statements and reports, and the statements which it did provide were marked "Draft" and LII could not vouch for the accuracy of those reports and statements.  At the end of the day, none of the existing defaults were remedied and LII's financial condition deteriorated further.

*Notice of Acceleration*

27.    The Second Forbearance Agreement expired by its own terms on October 31, 2017.  *Id.* at § 2(f).  After the Second Forbearance Agreement expired, Borrowers failed to pay the accrued interest, as required under the Credit Agreement and Notes, resulting in an additional breach and default.  On November 27, 2017, Wells Fargo sent its Notice of Acceleration to Borrower and Guarantors, notifying them that all outstanding amounts under the Credit Agreement were due in full and demanding payment therefor.  A true and correct copy of the Notice of Acceleration is attached hereto as ***Exhibit 12***.  Additionally, upon acceleration, Borrowers were required to immediately deposit in a cash collateral account an amount equal to the aggregate undrawn and unexpired amount of outstanding Letters of Credit, which as of the date of the Acceleration Notice totaled $808,591.86.[4]

---

[4]    In the Credit Agreement, Lenders had agreed to issue letters of credit for the benefit of Borrowers.  Credit Agreement at Article III, ***Exhibit 1***.

28.     Despite demand, Borrowers and Guarantors have failed to pay the outstanding Indebtedness, and Borrowers have failed to deposit the cash collateral for the outstanding Letters of Credit as required.  As of December 21, 2017, the total outstanding principal owed by Borrowers and Guarantors is $55,147,373.48, and accrued interest is $1,753,841.03.  Interest continues to accrue on the Indebtedness.  Additionally, Borrowers and Guarantors owe $808,591.86 for the outstanding Letters of Credit and $18,199.89 in Letter of Credit commissions as of December 21, 2017.

29.     In addition to the breaches and defaults above, pursuant to Section 7.6 of the Credit Agreement Borrowers were required to maintain certain insurance coverage which named the Administrative Agent as a lender loss payee.  Despite demand, Borrowers failed to provide evidence of such insurance, and as a result of Borrowers' failure and default, Wells Fargo was forced to provide collateral protection insurance to protect its interests and the interests of Lenders.  Borrowers and Guarantors are liable for this expense and cost.

30.     The Credit Agreement, Notes, Guaranty Agreements, Security Agreement, Security Agreement Joinder, First Forbearance Agreement and Second Forbearance Agreement, and any other documents executed in connection with the Credit Agreement, are hereafter collectively referred to as the "Loan Documents."

## CAUSES OF ACTION

### COUNT I – SUIT ON NOTES/BREACH OF CONTRACT

31.     The factual allegations above are incorporated herein.

32.     Lenders sue Borrowers for breach of the Credit Agreement and Notes.  Lenders are and have been at all relevant times the lawful owners and holders of the obligations evidenced by the Credit Agreement and the Notes.  Borrowers and Lenders entered into a valid, enforceable Credit Agreement and Notes.  Lenders fully performed their duties under the Credit

Agreement and Notes, including advancing the loan proceeds to Borrowers. Borrowers promised to pay all amounts due and owing under the Credit Agreement and Notes, plus interest, costs, and expenses. Borrowers have failed to honor their obligations under the Credit Agreement and Notes and pay Lenders the amounts due and owing. Borrowers have further failed to honor their obligations under the Credit Agreement by failing to maintain certain financial and reporting covenants. These failures constitute material breaches of the Credit Agreement and Notes and have injured Lenders in the amount of the outstanding debt. Lenders now seek to recover from Borrowers all amounts due and owing under the Loan Documents.

## COUNT II – BREACH OF GUARANTY AGREEMENTS

33.     The factual allegations above are incorporated herein.

34.     Lenders sue Guarantors for breach of the Guaranty Agreements. Guarantors and Lenders entered into valid, enforceable Guaranty Agreements. Lenders fully performed their duties, including advancing the loan proceeds to Borrowers. Under the Guaranty Agreements, Guarantors personally guaranteed all amounts due and owing by Borrowers, plus interest, costs, and expenses. Borrowers have defaulted under the Credit Agreement and the Notes by failing to pay the required amounts as and when due.

35.     Despite such default and Lenders' written demand, Guarantors have failed to pay Lenders the amounts due and owing under the Guaranty Agreements. This failure constitutes a material breach of the Guaranty Agreements and has injured Lenders in the amount of the outstanding debt. Consequently, Guarantors are liable for the outstanding balance due under the Credit Agreement and the Notes, and Lenders seeks to recover from Guarantors all amounts due and owing under the Loan Documents.

## ATTORNEYS' FEES

36.     As a result of Borrowers' and Guarantors' defaults under their respective agreements with Lenders, Lenders engaged legal counsel to prosecute this action to collect the amounts due and owing under the Loan Documents and agreed to pay counsel its reasonable attorneys' fees and expenses. Pursuant to the Loan Documents and Chapter 38 of the Texas Civil Practices and Remedies Code, Lenders are entitled to recover their costs and reasonable attorneys' fees from Borrowers and Guarantors, for which they sue.

## CONDITIONS PRECEDENT

37.     All conditions precedent to Lenders' recovery have been performed, have occurred, or have been waived.

## APPLICATION FOR TEMPORARY
## RESTRAINING ORDER AND PRELIMINARY INJUNCTION

38.     The factual allegations above are incorporated herein.

39.     Pursuant to FED. R. CIV. P. 65, Lenders ask this Court to issue a temporary restraining order and preliminary injunction prohibiting Borrowers and Guarantors, including Michael Lockwood, from interfering with Lenders' rights to the collateral.

**BORROWERS INSTRUCT ACCOUNT DEBTORS TO DIVERT PAYMENTS**

40.     As stated above, the Indebtedness was accelerated on November 27, 2017, and Borrowers have failed to pay the Indebtedness, and do not have the financial ability to pay the Indebtedness. Under the Security Agreement and Security Agreement Joinder, Borrowers and Guarantors pledged a broad range of assets as collateral for the Indebtedness. *Security Agreement* at § 2, **Exhibit 8**. Among the various types of collateral pledged, Borrowers and Guarantors pledged inventory and accounts receivable (the "Inventory Collateral" and the "Receivables Collateral," respectively). *Id.* at §§ 2(a), (o).

41.     On December 1, 2017, Wells Fargo sent a letter to Borrowers' fifty largest account debtors (based on information provided by Borrowers) informing them that all amounts due to Borrowers should be deposited in a Wells Fargo account, which was specified in the letter.  A true and correct copy of the December 1, 2017 letter is attached hereto as ***Exhibit 13***. On December 11, 2017, Wells Fargo sent a similar letter to the remainder of Borrowers' account debtors (once again, based on information provided by Borrowers).  A true and correct copy of the December 11, 2017 letter is attached hereto as ***Exhibit 14***.

42.     Shortly after sending the notices to account debtors, Wells Fargo learned that on November 17, 2017, LII had sent a letter to its account debtors changing its long-standing remittance instructions for Receivables Collateral Proceeds and instructing them to send payments to a Bank of America deposit account maintained by LII.  A true and correct copy of the November 17 letter is attached hereto as ***Exhibit 15***.  As set forth in the First and Second Forbearance Agreements, LII was required to cause all its collections to be deposited in an account maintained by Wells Fargo, and was prohibited from opening or maintaining a deposit account at any other financial institution.  *First Forbearance Agreement* at § 5(c), ***Exhibit 10***; *Second Forbearance Agreement* at § 6(c), ***Exhibit 11***; *see also Security Agreement* at § 5(j)(iv), ***Exhibit 8***.  Moreover, upon information and belief, LII has advised at least one of its account debtors that it will indemnify the account debtor in the event Wells Fargo pursues the account debtor for remitting payments to LII instead of Wells Fargo.  Thus, Borrowers are clearly interfering with Lenders' rights to the Receivable Collateral and the proceeds thereof by diverting funds and encouraging account debtors to violate their duties and obligations to turn over funds to Wells Fargo.

## BORROWERS MISAPPROPRIATE INVENTORY COLLATERAL

43.     Furthermore, on December 18, 2017, Wells Fargo learned that LII entered into an agreement with one of its other creditors, Global Stainless Supply ("Global Stainless"), whereby LII agreed to transfer portions of the Inventory Collateral to Global Stainless in satisfaction of LII's debt to Global Stainless.  Such transfers are direct violations of the Credit Agreement and diminish and jeopardize Lenders' collateral.  The Credit Agreement provides that Inventory Collateral may not be disposed of outside of the ordinary course of business, unless the disposal falls within one of six enumerated exceptions. *Credit Agreement* at §§ 1.1 ("Asset Disposition" definition), 8.5, *Exhibit 1*.  LII is in the business of selling valves and industrial parts for profit; transferring its inventory to debtors in satisfaction of LII's debt is neither in the ordinary course of its business nor does it fall under one of the Credit Agreement's enumerated exceptions for Asset Disposition.  By trading Lenders' Inventory Collateral, without Lenders' knowledge or consent, to pay off third-party debtors, LII is actively depleting the collateral available to satisfy Lenders' debt.

## CEASE AND DESIST LETTERS

44.     Upon learning of Borrowers' efforts to interfere with and divert Lenders' collateral, on December 14, 2017, Wells Fargo delivered a letter to Borrowers demanding that they immediately cease and desist from interfering with Lenders' rights to the Receivable Collateral.  A copy of the December 14th cease and desist letter is attached as *Exhibit 16*.  In the letter, Wells Fargo demanded certain documents and assurances from Borrowers, including assurances that they will immediately remit any and all payments sent to Borrowers, and that they have not, and will not interfere with Lenders' rights as to all collateral.  Borrowers refused and failed to provide the requested assurances.  Instead, LII indicated that it intended to collect receivables outside of Wells Fargo and to use the funds to pay its suppliers.  Notably also, LII

admitted that it had received $650,000 outside of Wells Fargo and that it had not deposited the funds in the Wells Fargo account. Thus, LII has confirmed its intent to continue interfering with and depleting Lenders' collateral.

45.     Additionally, upon learning that LII was using inventory to pay down its debts, Wells Fargo sent another cease and desist e-mail on December 18, 2017 demanding that LII immediately cease and desist from depleting and disposing of the Inventory Collateral, including transferring Inventory Collateral to LII's creditors to repay LII's debts. A copy of the December 18th cease and desist e-mail is attached as *Exhibit 17*. Wells Fargo demanded that LII provide and disclose an accounting of all inventory wrongfully transferred. LII has failed to respond to the demand and request.

46.     Due to LII's and Borrowers' precarious financial condition and apparent insolvency, the Receivable Collateral and Inventory Collateral are the most likely source for repayment of the debt.

47.     Unless restrained and ordered as prayed for herein, Borrowers, and in particular LII and Michael Lockwood, will likely continue to interfere with Lenders' rights to their collateral, thereby further injuring Lenders and their ability to obtain repayment of the debt. Furthermore, Borrowers will suffer no meaningful detriment as a result of injunctive relief. They have no right to retain any of the collateral given their default under the Credit Agreement and Notes.

THE LOAN DOCUMENTS AND APPLICABLE LAW SUPPORT INJUNCTIVE RELIEF

48.     The Security Agreement grants Lenders, upon the occurrence of an Event of Default, the right to resort to any or all security for any credit and to exercise any or all of the rights of a secured party pursuant to applicable law:

(a) <u>General Remedies</u>. Upon the occurrence of an Event of Default and during the continuation thereof, the Administrative Agent shall have . . . the rights and remedies of a secured party under the Uniform Commercial Code of the jurisdiction applicable to the affected Collateral and, further, the Administrative Agent may . . . (i) enter on any premise on which any of the Collateral may be located and, without resistance or interference by the Grantors, take possession of the Collateral, (ii) dispose of any Collateral on any such premises, (iii) require the Grantors to assemble and make available to the Administrative Agent at the expense of the Grantors any Collateral at any place and time designated by the Administrative Agent that is reasonably convenient to both parties, (iv) remove any Collateral from any such premises for the purpose of effecting sale or other disposition thereof, and/or (v) without demand and without advertisement, notice, hearing or process of law, all of which each of the Grantors hereby waives to the fullest extent permitted by Applicable Law, at any place and time or times, sell and deliver any or all Collateral held by or for it at public or private sale, by one or more contracts, in one or more parcels, for cash, upon credit or otherwise, at such prices and upon such terms as the Administrative Agent deems advisable, in its sole discretion . . . .

*Security Agreement* at § 8(a), ***Exhibit 8***. Specifically, as it relates to the Receivable Collateral,

the Security Agreement provides:

(b) <u>Remedies Relating to Accounts</u>. Upon the occurrence of an Event of Default and during the continuation thereof . . . (i) each Grantor will promptly upon request of the Administrative Agent instruct all account debtors to remit all payments in respect of Accounts to a mailing location selected by the Administrative Agent and (ii) the Administrative Agent shall have the right to enforce any Grantor's rights against its customers and account debtors, and the Administrative Agent or its designee may notify (or require any Grantor to notify) any Grantor's customers and account debtors that the Accounts of such Grantor have been assigned to the Administrative Agent or of the Administrative Agent's security interest therein, and may (either in its own name or in the name of such Grantor or both) demand, collect (including, without limitation, by way of a lockbox arrangement), receive, take receipt for, sell, sue for, compound, settle, compromise and give acquittance for any and all amounts due or to become due on any Account, and, in the Administrative Agent's discretion, file any claim or take any other action or proceeding to protect and realize upon the security interest of the Secured Parties in the Accounts. Each Grantor acknowledges and agrees that the Proceeds of its Accounts remitted to or on behalf of the Administrative Agent in accordance with the provisions hereof shall be solely for the Administrative Agent's own convenience and that such Grantor shall not have any right, title, or interest in such Accounts or in any such other amounts except as expressly provided herein.

*Id.* at § 8(b).

49.     Furthermore, Borrowers and Lenders specifically contemplated the propriety of injunctive relief in the Credit Agreement, providing that in the event that any of the Borrowers fail to perform, observe, or discharge any of their obligations or liabilities, Lenders may seek temporary or permanent injunctive relief without the need to prove actual damage or the inadequacy of other relief:

> SECTION 11.8     Injunctive Relief.  The Borrowers recognize that, in the event any Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy of law may prove to be inadequate relief to the Lenders.  Therefore, each Borrower agrees that the Lenders, at the Administrative Agent and the Lenders' option, shall be entitled to seek temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

Credit Agreement, *Exhibit 1*.

## APPLICABLE LEGAL STANDARDS SUPPORT LENDERS' ENTITLEMENT TO RELIEF

50.     Unless restrained, Borrower will likely continue to interfere with Lenders' rights to their collateral and potentially dispose of or abscond with the collateral, thereby further injuring Lenders and their ability to obtain repayment.  Lenders are entitled to a temporary restraining order under principals of equity and under the statutes and jurisprudence of the United States, in the form of a prohibitory and mandatory restraint and injunction.  In order to obtain a temporary restraining order, a party must show that (1) it faces irreparable injury; (2) there is no adequate remedy at law; (3) it has a likelihood of success on the merits; (4) the balance of hardships favors the injunctive relief; and (5) the injunctive relief will not adversely affect the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Here, Lenders are able to meet each of those elements, and therefore, Borrowers and Guarantors should be ordered to:

> i.     Refrain from interfering with Lenders' rights to take immediate possession of all Collateral (as defined in the Security Agreement), wherever located, and books and records pertaining thereto;

ii. Refrain from disposing of, transferring, removing, hiding or altering any Collateral (as defined in the Security Agreement), wherever located, and books and records pertaining thereto;

iii. Refrain from using any Collateral (as defined in the Security Agreement) to pay or offset Borrowers or Guarantors' debt(s) to third parties;

iv. Refrain from advising or instructing any of Borrowers' account debtors or customers to send payments to Borrowers or anyone other than Wells Fargo;

v. Prepare and produce to Wells Fargo, within three (3) business days an accounting of all inventory transferred to any third parties to pay or offset Borrowers or Guarantors' debts, including the identity of the third parties, the debt amount, the date of transfer, and the amount and value of the transferred inventory;

vi. Prepare and produce to Wells Fargo, within three (3) business days an accounting of all accounts receivable sent directly to Borrowers and/or any financial institution other than Wells Fargo including the identity of the account debtor, the amount paid, the date of the payment, the financial institution and account number into which the payment was deposited, and Borrowers' use of funds.

vii. Prepare and produce to Wells Fargo, within three (3) business days, a current list of all collateral (as defined in the Security Agreement), wherever located, including but not limited to, the location thereof;

viii. Prepare and produce to Wells Fargo, within three (3) business days, a current list of all deposit accounts maintained by LII and amounts on deposit in each account;

ix. Transfer to a deposit account of Wells Fargo's specification, within three (3) business days, all collateral proceeds and other amounts held in any deposit accounts maintained at financial institutions other than Wells Fargo, and turn over any future deposits.

51. Lenders will suffer immediate and irreparable injury, loss, or damage if Borrowers and, as applicable, their officers, directors, agents, servants, employees, managers, and representatives are not immediately enjoined. Specifically, Borrowers' actions described above, including its transfer of Inventory Collateral to third-parties, its unauthorized diversion of collateral proceeds to deposit accounts at financial institutions other than Wells Fargo, its blatant efforts to divert account receivable payments to said deposit account, coupled with Borrower's

apparent insolvency, reflect the injury and harm Lenders face. Borrowers are in default of more than $57 million of debt to Lenders, with little apparent ability to satisfy the debt or answer in a money judgment. An injury is irreparable if the opposing party will be unable to pay damages due to its own insolvency. *Amegy Bank N.A. v. Monarch Flight II, LLC*, 2011 U.S. Dist. LEXIS 140874, at *17-19 (S.D. Tex. Dec. 7, 2011); s*ee also, Hughes Network Sys. v. Interdigital Comm'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Accordingly, it is critical that Lenders secure the collateral in order to ensure they can recover funds to pay the indebtedness.

52.  Based on the foregoing, it is probable that Lenders will recover from Borrowers after a trial on the merits for their causes of action. The Credit Agreement and Notes are clear and unequivocal, and Lenders will be able to establish that each and every action by Borrowers complained of in its counterclaim and third-party claims are in direct contravention of such contracts and applicable law. Borrowers acknowledged in the First Forbearance Agreement and the Second Forbearance Agreement that they were in default of the Credit Agreement and Notes. There is no contesting that the outstanding debt is due and owing and that Borrowers and Guarantors have failed to pay it. However, a judgment for damages will be an inadequate remedy because Borrowers do not have the financial ability to pay money damages, and thus, without the issuance of the requested injunctive relief, there is no adequate remedy at law.

53.  Lastly, the injury that Lenders face outweighs any injury to Borrowers by granting the injunctive relief and the injunctive relief would not adversely affect public policy or interest. Borrowers freely contracted with Lenders to pledge their collateral as security for a $72 million line of credit. By failing to adhere to their obligations under that line of credit, Lenders

have a superior right to the collateral, and public policy supports enforcing collateral rights of secured lenders.

54.     Borrowers' failure and refusal to pay the amounts due and owing under the Credit Agreement and Notes and their failure to comply with their obligations relating to Lenders' collateral, reflect that in the absence of injunctive relief, Borrowers will continue to make unavailable to Lenders their collateral, may dispose of the collateral, and Lenders will lose the primary sources for repayment of the indebtedness owed to Lenders.  Consequently, in order to avoid irreparable injury, Lenders seeks a temporary restraining order as set forth above.

55.     Lenders additionally request that, after issuing a temporary restraining order, the Court set Lenders' application for hearing, and upon completion of said hearing, enter a preliminary injunction providing the same relief set forth in the temporary restraining order.

56.     Lenders are willing to post a bond if so required by the Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Counterclaimants and Third-Party Plaintiffs, Wells Fargo and Trustmark, respectfully pray that Third-Party Defendants Lockwood Enterprises, Inc., LMG Manufacturing, Inc., Piping Components, Inc., Lockwood Holdings, Inc., LH Aviation, LLC, 7807 Eagle Lane LLC, and Michael F. Lockwood be cited to appear, and that upon a trial on the merits, Wells Fargo and Trustmark have judgment against LII and Third-Party Defendants, jointly and severally, for all amounts owed under the Loan Documents, and for pre- and post-judgment interests, costs, and Wells Fargo and Trustmark's attorney fees and expenses.

Furthermore, Lenders pray that the Court grant their application for a temporary restraining order and enter an order restraining Borrowers, Guarantors and their officers, agents, servants, employees, attorneys, or those in active concert or participation with any of them, or with actual knowledge of the Order, ordering the relief outlined herein in paragraph 50.

Lenders further pray that the Court set the application for a preliminary injunction for hearing, and that after such hearing, the Court enter a preliminary injunction to the same effect as its temporary restraining order. Wells Fargo and Trustmark further pray for all other relief to which they are entitled.

Respectfully submitted,

By:  /s/ Yasmin Atasi
      Yasmin Atasi
      State Bar No. 10435150
      yatasi@winstead.com
      Scott F. Courtney Jr.
      State Bar No. 24084384
      scourtney@winstead.com
      Angela Kao
      State Bar No. 24105652
      akao@winstead.com
      **WINSTEAD PC**
      600 Travis Street, Suite 5200
      Houston, Texas 77002
      (713) 650-8400
      (713) 650-2400 (Fax)

**ATTORNEYS FOR DEFENDANTS, COUNTERCLAIMANTS, AND THIRD PARTY PLAINTIFFS, WELLS FARGO BANK, N.A., WELLS FARGO SECURITIES, LLC, AND TRUSTMARK NATIONAL BANK.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of December, 2017, a copy of the foregoing, and all exhibits and attachments thereto, was served on all counsel of record via the Court's ECF system.

/s/ Yasmin Atasi
Yasmin Atasi

## **VERIFICATION**

STATE OF TEXAS           §
                         §
COUNTY OF DALLAS         §

    BEFORE ME, the undersigned authority, on this day personally appeared Jennifer L. Norris, who after being duly sworn, did upon her oath depose and state that she is a Senior Vice President, Credit Resolution Group with Wells Fargo Bank, N.A., is authorized to provide this verification on behalf of Wells Fargo Bank, N.A., that she has read the foregoing Counterclaim, Third-Party Claims, and Application for Temporary Restraining Order and Preliminary Injunction, and that each of the facts contained therein is true and correct based on her personal knowledge.

                                   _____
                                     JENNIFER L. NORRIS

    SUBSCRIBED AN SWORN TO BEFORE ME on this the 22ᵗʰ day of December, 2017, to certify which witness my hand and seal of office.

                                     _____
                                     Notary Public in and for
                                     the States of Texas

                                     My commission expires: 6-16-2018

(Notary Seal: ARMANDO BRACAMONTE, NOTARY PUBLIC, STATE OF TEXAS, NOTARY ID 124577-0, JUNE 16, 2018)

# Exhibit 1

EXECUTION VERSION

**SECOND AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT
AND LIMITED WAIVER OF DEFAULTS**

THIS SECOND AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT AND LIMITED WAIVER OF DEFAULTS (this "***Amendment***") dated effective as of February 27, 2017 (the "***Second Amendment Effective Date***"), is by and among LOCKWOOD ENTERPRISES, INC., a Texas corporation, LOCKWOOD INTERNATIONAL, INC., a Texas corporation, LMG MANUFACTURING, INC., a Texas corporation, and PIPING COMPONENTS, INC., a Texas corporation (each a "***Borrower***" and collectively, "***Borrowers***"), and WELLS FARGO BANK, NATIONAL ASSOCIATION, as a Lender (defined below), and as Administrative Agent for itself and the other Lenders (in such capacity, "***Administrative Agent***").

## RECITALS

A.     WHEREAS, Borrowers are party to that certain Amended and Restated Credit Agreement dated as of September 30, 2015, among Borrowers, the financial institutions party thereto from time to time, as lenders (the "***Lenders***"), and Administrative Agent, as amended by that certain First Amendment to Amended and Restated Credit Agreement dated effective as of July 31, 2016, among Borrowers, Lenders and Administrative Agent (as may be further amended, restated or otherwise modified from time to time, the "***Credit Agreement***").

B.     WHEREAS, Borrowers have requested that Required Lenders and Administrative Agent waive Events of Default which currently exist and are continuing under ***Section 9.l(d)*** of the Credit Agreement as a result of Borrowers' failure to comply with the (i) Consolidated Total Liabilities to Consolidated Tangible Net Worth ratio set forth in ***Section 8.14(a)*** of the Credit Agreement for the fiscal quarters ended October 31, 2016 and January 31, 2017, and (ii) Consolidated Net Income covenant set forth in ***Section 8.14(b)*** of the Credit Agreement for the fiscal quarters ended April 30, 2016, July 31, 2016, October 31, 2016, and January 31, 2017 (collectively, the "***Existing Defaults***").

C.     WHEREAS, Borrowers, Required Lenders, and Administrative Agent have agreed, subject to the terms and conditions of this Amendment, to amend the Credit Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the undersigned hereby agree as follows:

## AGREEMENTS:

1.     <u>Incorporation of Recitals, Etc</u>.     Each of the above Recitals is expressly incorporated herein by reference and made a part of this Agreement as though set forth herein verbatim.  The Borrower acknowledges that such Recitals are true and correct on the date of this Agreement.  For clarity and avoidance of doubt, the parties confirm and agree that the Credit Agreement and the other Loan Documents continue in full force and effect except to the extent specifically amended or affected herein.

2.      <u>Definitions</u>.  Unless otherwise defined in this Amendment, capitalized terms used in this Amendment which are defined in the Credit Agreement shall have the meanings assigned to such terms in the Credit Agreement (as amended hereby).

3.      <u>Limited Waiver</u>.  Subject to the conditions of effectiveness set forth in ***Section 5*** hereof, Administrative Agent and the undersigned Lenders hereby waive the Existing Defaults. The foregoing waiver is limited as written and does not relate to any other covenant or provision of the Credit Agreement or any other Loan Document.

4.      <u>Amendments to Credit Agreement</u>.  Subject to the satisfaction of the conditions precedent set forth in Section 5 hereof, the Credit Agreement, including the Schedules and Exhibits thereto, as applicable, is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example: <u>double-underlined text</u>) as set forth in the compiled copy of the Credit Agreement attached as <u>Annex A</u> hereto.

5.      <u>Conditions</u>.  This Amendment shall be effective on the Second Amendment Effective Date once each of the following have been delivered to Administrative Agent, in each case, in form and substance acceptable to Administrative Agent:

(a)      this Amendment executed by Borrowers, Administrative Agent and Required Lenders;

(b)      a written confirmation from each holder of Subordinated Indebtedness, in form and substance satisfactory to Administrative Agent, concerning such holder's Subordinated Indebtedness;

(c)      evidence satisfactory to Administrative Agent that Borrower Lockwood International, Inc. is in good standing and is active according to the Texas Secretary of State's records, including with respect to its franchise tax account status;

(d)      payment to the Agent, for the account of the Lenders, a non-refundable amendment fee equal to $180,000;

(e)      payment of Lenders' fees and expenses (including without limitation, the fees and expenses of Lenders' outside legal counsel) in connection with the preparation and negotiations of this Amendment and any other documents prepared in connection herewith; and

(f)      such other documents and information as Administrative Agent may reasonably request.

6.      <u>Representations and Warranties</u>.  Each Borrower represents and warrants to Administrative Agent that (a) it possesses all requisite power and authority to execute, deliver and comply with the terms of this Amendment, (b) this Amendment has been duly authorized and approved by all requisite corporate actions on the part of such Borrower, (c) no other consent of any Person (other than Administrative Agent) is required for this Amendment to be effective,

(d) the execution and delivery of this Amendment does not violate its organizational documents, (e) the representations and warranties in each Loan Document are true and correct in all material respects on and as of the date of this Amendment as though made on the date of this Amendment (*except* to the extent that such representations and warranties speak to a specific date), (f) except as set forth herein, it is in full compliance with all covenants and agreements contained in each Loan Document, and (g) other than the Existing Defaults, no Event of Default has occurred and is continuing. The representations and warranties made in this Amendment shall survive the execution and delivery of this Amendment. No investigation by Administrative Agent is required for Administrative Agent to rely on the representations and warranties in this Amendment.

7. <u>Scope of Waiver; Reaffirmation; **RELEASE**</u>. Except as affected by this Amendment, the Loan Documents are unchanged and continue in full force and effect. However, in the event of any inconsistency between the terms of the Credit Agreement and any other Loan Document, the terms of the Credit Agreement shall control and such other document shall be deemed to be amended to conform to the terms of the Credit Agreement. Each Borrower hereby reaffirms its obligations under the Loan Documents and agrees that all Loan Documents to which it is a party remain in full force and effect and continue to be legal, valid, and binding obligations enforceable in accordance with their terms (as the same are affected by this Amendment). **AS A MATERIAL PART OF THE CONSIDERATION FOR ADMINISTRATIVE AGENT ENTERING INTO THIS AMENDMENT, EACH BORROWER HEREBY RELEASES AND FOREVER DISCHARGES ADMINISTRATIVE AGENT AND THE LENDERS (AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AFFILIATES, OFFICERS, MANAGERS, DIRECTORS, EMPLOYEES, AND AGENTS) FROM ANY AND ALL CLAIMS, DEMANDS, DAMAGES, CAUSES OF ACTION, OR LIABILITIES FOR ACTIONS OR OMISSIONS (WHETHER ARISING AT LAW OR IN EQUITY, AND WHETHER DIRECT OR INDIRECT) IN CONNECTION WITH THE CREDIT AGREEMENT AND THE OTHER LOAN DOCUMENTS PRIOR TO THE DATE OF THIS AMENDMENT, WHETHER OR NOT HERETOFORE ASSERTED, AND WHICH SUCH BORROWER MAY HAVE OR CLAIM TO HAVE AGAINST ADMINISTRATIVE AGENT OR ANY LENDER.**

8. <u>Miscellaneous</u>.

(a) <u>No Waiver of Defaults: Reservation of Rights</u>. Except as expressly provided in this Amendment, this Amendment does not constitute (i) a waiver of, or a consent to, (A) any provision of the Credit Agreement or any other Loan Document not expressly referred to in this Amendment, or (B) any present or future violation of, or default under, any provision of the Loan Documents; or (ii) a waiver of Administrative Agent's right to insist upon future compliance with each term, covenant, condition and provision of the Loan Documents. Borrowers acknowledge and agree that Administrative Agent and the Lenders hereby in all respects continue to reserve all of their respective rights to exercise any and all rights and remedies under the Credit Agreement, any of the Loan Documents, and at law or in equity, as described in the Reservation of Rights Letter.

(b) <u>Form</u>. Each agreement, document, instrument or other writing to be executed and delivered or otherwise furnished to Administrative Agent as

3

a condition to the effectiveness of, or as requested by Administrative Agent in connection with, this Amendment must be in form and substance satisfactory to Administrative Agent and its counsel.

(c)     <u>Headings</u>.  The headings and captions used in this Amendment are for convenience only and will not be deemed to limit, amplify or modify the terms of this Amendment, the Credit Agreement, or the other Loan Documents.

(d)     <u>Costs, Expenses and Attorneys' Fees</u>.  Borrowers agree to pay or reimburse Administrative Agent on demand for all its reasonable out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, and execution of this Amendment, including, without limitation, the reasonable fees and disbursements of Administrative Agent's counsel.

(e)     <u>Successors and Assigns</u>.  This Amendment shall be binding upon and inure to the benefit of each of the undersigned and their respective successors and assigns, and shall be enforceable against Borrowers in accordance with its terms except as enforceability may be limited by (i) equitable principles generally and (ii) bankruptcy, insolvency, liquidation, conservatorship, moratorium, rearrangement, reorganization, or other similar debtor relief laws or similar laws of general application relating to the enforcement of creditors' rights.

(f)     <u>Governmental Authorization</u>.  No approval, consent, exemption, authorization or other action by, or notice to, or filing with or approvals required under state blue sky securities laws or by any governmental authority is necessary or required in connection with the execution, delivery, performance or enforcement of this Amendment.

(g)     <u>Multiple Counterparts</u>.  This Amendment may be executed in any number of counterparts with the same effect as if all signatories had signed the same document.  All counterparts must be construed together to constitute one and the same instrument.  This Amendment may be transmitted and signed by facsimile.  The effectiveness of any such documents and signatures shall, subject to applicable law, have the same force and effect as manually-signed originals and shall be binding on each Borrower and Administrative Agent.  Administrative Agent may also require that any such documents and signatures be confirmed by a manually-signed original; provided that, the failure to request or deliver the same shall not limit the effectiveness of any facsimile document or signature.

(h)     <u>Governing Law</u>.  This Amendment and the other Loan Documents must be construed, and their performance enforced, under Texas law.

(i) **NOTICE.** THIS AMENDMENT AND THE OTHER LOAN DOCUMENTS (AS AFFECTED BY THIS AMENDMENT) RELATING TO THE INDEBTEDNESS CONSTITUTE A WRITTEN LOAN AGREEMENT WHICH REPRESENTS THE FINAL AGREEMENT AMONG BORROWERS, THE LENDERS, AND ADMINISTRATIVE AGENT AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BY THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES RELATING TO THE INDEBTEDNESS.

*[Signatures appear on the following pages.]*

This Amendment is executed and delivered as of the Second Amendment Effective Date.

**BORROWERS**:

LOCKWOOD ENTERPRISES, INC.

By:
Name: Michael F. Lockwood
Title: Chief Executive Officer

LOCKWOOD INTERNATIONAL, INC.

By:
Name: Michael F. Lockwood
Title: Chief Executive Officer

LMG MANUFACTURING, INC.

By:
Name: Michael F. Lockwood
Title: Chief Executive Officer

PIPING COMPONENTS, INC.

By:
Name: Michael F. Lockwood
Title: Chief Executive Officer

Signature Page to Second Amendment and Restated Credit Agreement
and Limited Waiver of Defaults

**ADMINISTRATIVE AGENT AND LENDERS**:

WELLS FARGO BANK, NATIONAL
ASSOCIATION,
as Administrative Agent and as a Lender

By:
     Jennifer L. Norris
     Senior Vice President

**TRUSTMARK NATIONAL BANK**

By:_____
          Michael R. Quiray
          Senior Vice President

**ADMINISTRATIVE AGENT AND LENDERS**:

WELLS FARGO BANK, NATIONAL
ASSOCIATION,
as Administrative Agent and as a Lender


By:_____
        Jennifer L. Norris
        Senior Vice President

**TRUSTMARK NATIONAL BANK**

By:_____
        Michael R. Quiray
        Senior Vice President

Signature Page to Second Amendment to Amended and Restated
Credit Agreement and Limited Waiver of Defaults

Revolving Credit CUSIP Number: _____

---

**ANNEX A TO SECOND AMENDMENT TO
AMENDED AND RESTATED CREDIT AGREEMENT
AND LIMITED WAIVER OF DEFAULTS**

**COMPILED AMENDED AND RESTATED CREDIT AGREEMENT**
dated as of September 30, 2015

by and among

**LOCKWOOD ENTERPRISES, INC.,**

**LOCKWOOD INTERNATIONAL, INC.,**

**LMG MANUFACTURING, INC.,**

and

**PIPING COMPONENTS, INC.**

as Borrowers,

**THE LENDERS REFERRED TO HEREIN,**
as Lenders,
and

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
as Administrative Agent,
Swingline Lender and Issuing Lender

**WELLS FARGO SECURITIES, LLC**
as Sole Lead Arranger and Sole Book Manager.

**as amended by First Amendment dated as of July 31, 2016
and by Second Amendment dated as of February 27, 2017**

For Reference Purposes Only
5702727v1

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ................................................................................................... 1

SECTION 1.1     Definitions .................................................................................... 1

SECTION 1.2     Other Definitions and Provisions ................................................ ~~30~~31

SECTION 1.3     Accounting Terms ....................................................................... ~~31~~32

SECTION 1.4     UCC Terms .................................................................................. ~~31~~32

SECTION 1.5     Rounding ..................................................................................... ~~31~~32

SECTION 1.6     References to Agreement and Laws ............................................ ~~31~~32

SECTION 1.7     Times of Day ............................................................................... 32

SECTION 1.8     Letter of Credit Amounts ............................................................ 32

SECTION 1.9     Guaranty Obligations .................................................................. 32

SECTION 1.10     Covenant Compliance Generally ................................................ ~~32~~33

ARTICLE II REVOLVING CREDIT FACILITY ................................................................ ~~32~~33

SECTION 2.1     Revolving Credit Loans .............................................................. ~~32~~33

SECTION 2.2     Swingline Loans ......................................................................... 33

SECTION 2.3     Procedure for Advances of Revolving Credit Loans and Swingline
Loans ......................................................................................... ~~34~~35

SECTION 2.4     Repayment and Prepayment of Revolving Credit and Swingline
Loans ......................................................................................... 36

SECTION 2.5     Permanent Reduction of the Revolving Credit Commitment ...... 37

SECTION 2.6     Termination of Revolving Credit Facility; Cash Collateral for Letters
of Credit ..................................................................................... ~~37~~38

SECTION 2.7     Treasury Management .................................................................. 38

ARTICLE III LETTER OF CREDIT FACILITY ................................................................ ~~38~~39

SECTION 3.1     L/C Commitment ......................................................................... ~~38~~39

SECTION 3.2     Procedure for Issuance of Letters of Credit ............................... 39

SECTION 3.3     Commissions and Other Charges ................................................ ~~39~~40

SECTION 3.4     L/C Participations ....................................................................... ~~40~~41

SECTION 3.5     Reimbursement Obligation of the Borrower ............................... ~~41~~42

SECTION 3.6     Obligations Absolute ................................................................... 42

SECTION 3.7     Effect of Letter of Credit Application ......................................... ~~42~~43

ARTICLE IV GENERAL LOAN PROVISIONS ................................................................ ~~42~~43

SECTION 4.1     Interest ........................................................................................ ~~42~~43

SECTION 4.2     Notice and Manner of Conversion or Continuation of Loans ..... 45

SECTION 4.3     Fees ............................................................................................. ~~45~~46

i

*For Reference Purposes Only*
5702727v1

SECTION 4.4 Manner of Payment 46

SECTION 4.5 Evidence of Indebtedness ~~46~~47

SECTION 4.6 Adjustments ~~47~~48

SECTION 4.7 Obligations of Lenders. ~~48~~ 49

SECTION 4.8 Changed Circumstances 49

SECTION 4.9 Indemnity ~~50~~51

SECTION 4.10 Increased Costs ~~50~~51

SECTION 4.11 Taxes ~~52~~53

SECTION 4.12 Mitigation Obligations; Replacement of Lenders 57

SECTION 4.13 ~~Incremental Loans~~**[Reserved]** 58

SECTION 4.14 Cash Collateral. ~~60~~ 58

SECTION 4.15 Defaulting Lenders. ~~61~~ 59

ARTICLE V CONDITIONS OF CLOSING AND BORROWING ~~64~~62

SECTION 5.1 Conditions to Closing and Initial Extensions of Credit ~~64~~62

SECTION 5.2 Conditions to All Extensions of Credit ~~68~~66

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF THE CREDIT PARTIES ~~69~~67

SECTION 6.1 Organization; Power; Qualification ~~69~~67

SECTION 6.2 Ownership ~~69~~68

SECTION 6.3 Authorization Enforceability ~~69~~68

SECTION 6.4 Compliance of Agreement, Loan Documents and Borrowing with Laws, Etc. ~~70~~ 68

SECTION 6.5 Compliance with Law; Governmental Approvals ~~70~~69

SECTION 6.6 Tax Returns and Payments ~~70~~69

SECTION 6.7 Intellectual Property Matters ~~71~~70

SECTION 6.8 Environmental Matters ~~71~~70

SECTION 6.9 Employee Benefit Matters ~~72~~71

SECTION 6.10 Margin Stock ~~74~~72

SECTION 6.11 Government Regulation ~~74~~72

SECTION 6.12 Material Contracts ~~74~~73

SECTION 6.13 Employee Relations ~~74~~73

SECTION 6.14 Burdensome Provisions ~~74~~73

SECTION 6.15 Financial Statements ~~75~~73

SECTION 6.16 No Material Adverse Change ~~75~~73

SECTION 6.17 Solvency ~~75~~74

SECTION 6.18 Titles to Properties ~~75~~74

SECTION 6.19 Litigation ~~75~~74

SECTION 6.20 Absence of Defaults ~~75~~74

SECTION 6.21 Senior Indebtedness Status ~~76~~74

*For Reference Purposes Only*
5702727v1

SECTION 6.22    Investment Bankers' and Similar Fees   ~~76~~74

SECTION 6.23    Disclosure   ~~76~~74

SECTION 6.24    EEA Financial Institutions   75

SECTION 6.25    Anti-Terrorism; Anti-Money Laundering; Etc   75

ARTICLE VII AFFIRMATIVE COVENANTS   ~~76~~75

SECTION 7.1    Financial Statements and Budgets   ~~76~~75

SECTION 7.2    Certificates; Other Reports   77

SECTION 7.3    Notice of Litigation and Other Matters   ~~79~~78

SECTION 7.4    Preservation of Corporate Existence and Related Matters   ~~80~~79

SECTION 7.5    Maintenance of Property and Licenses   80

SECTION 7.6    Insurance   ~~81~~80

SECTION 7.7    Accounting Methods and Financial Records   ~~81~~80

SECTION 7.8    Payment of Taxes and Other Obligations   ~~81~~80

SECTION 7.9    Compliance with Laws and Approvals   81

SECTION 7.10    Environmental Laws   81

SECTION 7.11    Compliance with ERISA   ~~82~~81

SECTION 7.12    Compliance with Agreements   ~~82~~81

SECTION 7.13    Visits; Inspections and Field Examinations   82

SECTION 7.14    Additional Subsidiaries and Real Property   82

SECTION 7.15    Use of Proceeds   84

SECTION 7.16    Corporate Governance   84

SECTION 7.17    Further Assurances   84

SECTION 7.18    Post Closing Matters   ~~85~~84

SECTION 7.19    Keepwell   84

SECTION 7.20    Consolidated Cash Balances   85

SECTION 7.21    Third-Party Consultant   86

ARTICLE VIII NEGATIVE COVENANTS   ~~85~~86

SECTION 8.1    Indebtedness   ~~85~~86

SECTION 8.2    Liens   87

SECTION 8.3    Investments   89

SECTION 8.4    Fundamental Changes   90

SECTION 8.5    Asset Dispositions   91

SECTION 8.6    Restricted Payments   92

SECTION 8.7    Transactions with Affiliates   92

SECTION 8.8    Accounting Changes; Organizational Documents   93

SECTION 8.9    No Further Negative Pledges; Restrictive Agreements   93

SECTION 8.10    Nature of Business   94

SECTION 8.11    Amendments of Other Documents   94

iii

| SECTION 8.12 | Sale Leasebacks | 94 |
|---|---|---|
| SECTION 8.13 | Capital Expenditures | ~~95~~94 |
| SECTION 8.14 | Financial Covenants | ~~95~~94 |
| SECTION 8.15 | Disposal of Subsidiary Interests | ~~95~~96 |
| SECTION 8.16 | Payment of Subordinated Indebtedness | 96 |

**ARTICLE IX DEFAULT AND REMEDIES** ................................................... ~~95~~96

| SECTION 9.1 | Events of Default | ~~95~~96 |
|---|---|---|
| SECTION 9.2 | Remedies | ~~98~~99 |
| SECTION 9.3 | Rights and Remedies Cumulative; Non-Waiver; etc. | ~~99~~100 |
| SECTION 9.4 | Crediting of Payments and Proceeds | ~~99~~100 |
| SECTION 9.5 | Administrative Agent May File Proofs of Claim | ~~100~~101 |
| SECTION 9.6 | Credit Bidding | ~~101~~102 |

**ARTICLE X THE ADMINISTRATIVE AGENT** ............................................ ~~101~~102

| SECTION 10.1 | Appointment and Authority | ~~101~~102 |
|---|---|---|
| SECTION 10.2 | Rights as a Lender | ~~102~~103 |
| SECTION 10.3 | Exculpatory Provisions | ~~102~~103 |
| SECTION 10.4 | Reliance by the Administrative Agent | ~~103~~104 |
| SECTION 10.5 | Delegation of Duties | ~~103~~104 |
| SECTION 10.6 | Resignation of Administrative Agent | 104 |
| SECTION 10.7 | Non-Reliance on Administrative Agent and Other Lenders | ~~105~~106 |
| SECTION 10.8 | No Other Duties, etc. | ~~105~~106 |
| SECTION 10.9 | Collateral and Guaranty Matters | ~~105~~106 |
| SECTION 10.10 | Secured Hedge Agreements and Secured Cash Management Agreements | ~~106~~107 |

**ARTICLE XI MISCELLANEOUS** ....................................................................... ~~106~~107

| SECTION 11.1 | Notices | ~~106~~107 |
|---|---|---|
| SECTION 11.2 | Amendments, Waivers and Consents | ~~108~~109 |
| SECTION 11.3 | Expenses; Indemnity | 111 |
| SECTION 11.4 | Right of Set Off | ~~113~~114 |
| SECTION 11.5 | Governing Law; Jurisdiction, Etc | ~~113~~114 |
| SECTION 11.6 | Waiver of Jury Trial | ~~114~~115 |
| SECTION 11.7 | Reversal of Payments | 115 |
| SECTION 11.8 | Injunctive Relief | ~~115~~116 |
| SECTION 11.9 | Accounting Matters | ~~115~~116 |
| SECTION 11.10 | Successors and Assigns; Participations | ~~115~~116 |
| SECTION 11.11 | Confidentiality | ~~119~~120 |
| SECTION 11.12 | Performance of Duties | ~~120~~121 |

iv

| SECTION 11.13 | All Powers Coupled with Interest | ~~120~~121 |
| SECTION 11.14 | Survival | ~~120~~121 |
| SECTION 11.15 | Titles and Captions | 121 |
| SECTION 11.16 | Severability of Provisions | 121 |
| SECTION 11.17 | Counterparts; Integration; Effectiveness; Electronic Execution | 121 |
| SECTION 11.18 | Term of Agreement | 122 |
| SECTION 11.19 | USA PATRIOT Act and OFAC | 122 |
| SECTION 11.20 | Independent Effect of Covenants | ~~122~~123 |
| SECTION 11.21 | Amendment and Restatement; No Novation | 123 |
| SECTION 11.22 | Inconsistencies with Other Documents | 123 |

*For Reference Purposes Only*
*5702727v1*

EXHIBITS

| | | |
|---|---|---|
| Exhibit A-1 | - | Form of Revolving Credit Note |
| Exhibit A-2 | - | Form of Swingline Note |
| Exhibit B | - | Form of Notice of Borrowing |
| Exhibit C | - | Form of Notice of Account Designation |
| Exhibit D | - | Form of Notice of Prepayment |
| Exhibit E | - | Form of Notice of Conversion/Continuation |
| Exhibit F | - | Form of Officer's Compliance Certificate |
| Exhibit G | - | Form of Assignment and Assumption |
| Exhibit H-1 | - | Form of U.S. Tax Compliance Certificate (Non-Partnership Foreign Lenders) |
| Exhibit H-2 | - | Form of U.S. Tax Compliance Certificate (Non-Partnership Foreign Participants) |
| Exhibit H-3 | - | Form of U.S. Tax Compliance Certificate (Foreign Participant Partnerships) |
| Exhibit H-4 | - | Form of U.S. Tax Compliance Certificate (Foreign Lender Partnerships) |


SCHEDULES

| | | |
|---|---|---|
| Schedule 1.1 | - | ~~Lender~~ Commitments |
| Schedule 1.2 | - | Existing Hedges |
| Schedule 1.3 | - | Existing Letters of Credit |
| Schedule 6.1 | - | Jurisdictions of Organization and Qualification |
| Schedule 6.2 | - | Subsidiaries and Capitalization |
| Schedule 6.9 | - | Employee Benefit Plans |
| Schedule 6.12 | - | Material Contracts |
| Schedule 6.13 | - | Labor and Collective Bargaining Agreements |
| Schedule 6.18 | - | Real Property |
| Schedule 6.19 | - | Litigation |
| Schedule 7.18 | - | Post Closing Matters |
| Schedule 8.1 | - | Existing Indebtedness |
| Schedule 8.2 | - | Existing Liens |
| Schedule 8.3 | - | Existing Loans, Advances and Investments |
| Schedule 8.7 | - | Transactions with Affiliates |

*For Reference Purposes Only*
5702727v1

AMENDED AND RESTATED CREDIT AGREEMENT, dated as of September 30, 2015, by and among LOCKWOOD ENTERPRISES, INC., a Texas corporation, LOCKWOOD INTERNATIONAL, INC., a Texas corporation, LMG MANUFACTURING, INC., a Texas corporation, and PIPING COMPONENTS, INC., a Texas corporation (each a "*Borrower*" and collectively, "*Borrowers*"), the lenders who are party to this Agreement and the lenders who may become a party to this Agreement pursuant to the terms hereof (collectively with the lenders party hereto, the "*Lenders*") and WELLS FARGO BANK, NATIONAL ASSOCIATION, as Administrative Agent for the Lenders.

STATEMENT OF PURPOSE

The Borrowers have requested, and, subject to the terms and conditions hereof, the Administrative Agent and the Lenders have agreed to extend certain credit facilities to the Borrowers on the terms and conditions of this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, such parties hereby agree as follows:

**Article I
DEFINITIONS**

SECTION 1.1          Definitions.  The following terms when used in this Agreement shall have the meanings assigned to them below:

"*12/4/2015 Note*" means that certain Revolving Promissory Note dated December 4, 2015, executed by LHI, as maker, and made payable to LII, as payee, in the original principal amount of up to $25,000,000, and that as of the First Amendment Effective Date has an outstanding principal balance of $5,600,000.  *[First Amendment]*

"*13-Week Budget*" means the thirteen-week rolling operating budget and cash flow forecast which shall reflect the good faith projection of the Borrowers of all weekly cash receipts and disbursements in connection with the operation of the Credit Parties' and their respective Subsidiaries' business during such thirteen-week period, including but not limited to, collections, payroll, capital expenditures and other major cash outlays, as such budget and forecast may be updated from time to time as required under *Section 7.1(d)* herein.

"*Administrative Agent*" means Wells Fargo, in its capacity as Administrative Agent hereunder, and any successor thereto appointed pursuant to *Section 10.6*.

"*Administrative Agent's Office*" means the office of the Administrative Agent specified in or determined in accordance with the provisions of *Section 11.1(c)*.

"*Administrative Questionnaire*" means an administrative questionnaire in a form supplied by the Administrative Agent.

"*Affiliate*" means, with respect to any Person, any other Person (other than a Subsidiary of a Borrower) which directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such first Person or any of its Subsidiaries.  The

1

For Reference Purposes Only
5702727v1

term "control" means (a) the power to vote five percent (5%) or more of the securities or other Capital Stock of a Person having ordinary voting power, or (b) the possession, directly or indirectly, of any other power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.  The terms "controlling" and "controlled" have meanings correlative thereto.

"*Agreement*" means this Credit Agreement, as amended, restated, supplemented or otherwise modified from time to time.

"*Anti-Corruption Laws*" means all laws, rules, and regulations of any jurisdiction applicable to any Credit Party or its Subsidiaries from time to time concerning or relating to bribery or corruption.

"*Anti-Terrorism Laws*" is defined in *Section 6.25*.

"*Applicable Law*" means all applicable provisions of constitutions, laws, statutes, ordinances, rules, treaties, regulations, permits, licenses, approvals, interpretations and orders of courts or Governmental Authorities and all orders and decrees of all courts and arbitrators.

"*Applicable Margin*" means the corresponding percentages per annum as set forth below ~~based on the Consolidated Total Liabilities to Consolidated Tangible Net Worth Ratio~~:

| ~~Pricing Level~~ | ~~Consolidated Total Liabilities to Tangible Net Worth Leverage Ratio~~ | Commitment Fee | Standby L/C Fee | LIBOR + | Base Rate + |
|---|---|---|---|---|---|
| ~~I~~ | ~~Less than 0.75 to 1.00~~ | ~~0.25%~~ | ~~1.25%~~ | ~~1.25%~~ | ~~0.0%~~ |
| ~~II~~ | ~~Greater than  or equal to 0.75 to 1.00, but less than 1.25 to 1.00~~ | ~~0.25%~~ | ~~1.50%~~ | ~~1.50%~~ | ~~0.0%~~ |
| ~~III~~ | ~~Greater than or equal to 1.25 to 1.00, but less than 1.75 to 1.00~~ | ~~0.25%~~ | ~~1.75%~~ | ~~1.75%~~ | ~~0.0%~~ |
| ~~IV~~ | ~~Greater than or equal to 1.75 to 1.00 but less than 2.25 to 1.00~~ | 0.25% | ~~2.00~~3.00% | ~~2.00~~3.00% | ~~0.0~~0.50% |
| ~~V~~ | ~~Greater than or equal to 2.25 to 1.00~~ | ~~0.25%~~ | ~~2.25%~~ | ~~2.25%~~ | ~~0.0%~~ |

~~The Applicable Margin shall be determined and adjusted quarterly as of the first day of the month immediately following the date by which Borrowers are required to deliver an Officer's~~

*For Reference Purposes Only*
~~5702727v1~~

Compliance Certificate pursuant to *Section 7.2(a)* for the most recently ended fiscal quarter of Borrowers (each such delivery date, a "*Calculation Date*"); *provided that* (a) the Applicable Margin shall be based on Pricing Level IV until the first Calculation Date occurring after the Closing Date and, thereafter the Pricing Level shall be determined by reference to the Consolidated Total Liabilities to Consolidated Tangible Net Worth Ratio as of the last day of the most recently ended fiscal quarter of Borrowers preceding the applicable Calculation Date, and (b) if the Borrowers fail to provide the Officer's Compliance Certificate as required by *Section 7.2(a)* for the most recently ended fiscal quarter of the Borrowers preceding the applicable Calculation Date, the Applicable Margin from such Calculation Date shall be based on Pricing Level V until such time as an appropriate Officer's Compliance Certificate is provided, at which time the Pricing Level shall be determined by reference to the Consolidated Total Liabilities to Consolidated Tangible Net Worth Ratio as of the last day of the most recently ended fiscal quarter of the Borrowers preceding such Calculation Date. The Applicable Margin shall be effective from one Calculation Date until the next Calculation Date. Any adjustment in the Applicable Margin shall be applicable to all Extensions of Credit then existing or subsequently made or issued.

Notwithstanding the foregoing, in the event that any financial statement or Officer's Compliance Certificate delivered pursuant to *Section 7.1* or *7.2(a)* is shown to be inaccurate (regardless of whether (i) this Agreement is in effect, (ii) the Revolving Credit Commitments are in effect, or (iii) any Extension of Credit is outstanding when such inaccuracy is discovered or such financial statement or Officer's Compliance Certificate was delivered), and such inaccuracy, if corrected, would have led to the application of a higher Applicable Margin for any period (an "*Applicable Period*") than the Applicable Margin applied for such Applicable Period, then (A) the Borrowers shall immediately deliver to the Administrative Agent a corrected Officer's Compliance Certificate for such Applicable Period, (B) the Applicable Margin for such Applicable Period shall be determined as if the Consolidated Total Liabilities to Consolidated Tangible Net Worth Ratio in the corrected Officer's Compliance Certificate were applicable for such Applicable Period, and (C) the Borrowers shall immediately and retroactively be obligated to pay to the Administrative Agent the accrued additional interest and fees owing as a result of such increased Applicable Margin for such Applicable Period, which payment shall be promptly applied by the Administrative Agent in accordance with *Section 4.4*. Nothing in this paragraph shall limit the rights of the Administrative Agent and Lenders with respect to *Sections 4.1(c)* and *9.2* nor any of their other rights under this Agreement. The Borrowers' obligations under this paragraph shall survive the termination of the Commitments and the repayment of all other Obligations hereunder.

The Applicable Margins set forth above shall be increased as, and to the extent, required by *Section 4.13*.

    "*Approved Fund*" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

    "*Arranger*" means Wells Fargo Securities, LLC, in its capacity as sole lead arranger and sole bookrunner, and its successors.

3

"**Asset Disposition**" means the disposition of any or all of the assets (including, without limitation, any Capital Stock owned thereby) of any Credit Party or any Subsidiary thereof whether by sale, lease, transfer or otherwise, and any issuance of Capital Stock by any Subsidiary of any Borrower to any Person that is not a Credit Party or any Subsidiary thereof. The term "Asset Disposition" shall not include (a) any Equity Issuance, (b) the sale of inventory in the ordinary course of business, (c) the transfer of assets to any Borrower or any Subsidiary Guarantor pursuant to any other transaction permitted pursuant to **Section 9.4**, (d) the write-off, discount, sale or other disposition of defaulted or past-due receivables and similar obligations in the ordinary course of business and not undertaken as part of an accounts receivable financing transaction, (e) the disposition of any Hedge Agreement, (f) dispositions of Investments in cash and Cash Equivalents, and (f) (i) the transfer by any Credit Party of its assets to any other Credit Party, (ii) the transfer by any Non-Guarantor Subsidiary of its assets to any Credit Party (provided that in connection with any new transfer, such Credit Party shall not pay more than an amount equal to the fair market value of such assets as determined in good faith at the time of such transfer) and (iv) the transfer by any Non-Guarantor Subsidiary of its assets to any other Non-Guarantor Subsidiary.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by **Section 11.10**), and accepted by the Administrative Agent, in substantially the form attached as **Exhibit G** or any other form approved by the Administrative Agent.

"**Attributable Indebtedness**" means, on any date of determination, (a) in respect of any Capital Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease, the capitalized amount or principal amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a Capital Lease.

"**Base Rate**" means, at any time, the highest of (a) the Prime Rate, (b) the Federal Funds Rate plus 1.50% and (c) except during any period of time during which a notice delivered to Borrowers under **Section 4.8** shall remain in effect, LIBOR for an Interest Period of one month plus 1.75%; each change in the Base Rate shall take effect simultaneously with the corresponding change or changes in the Prime Rate, the Federal Funds Rate, or LIBOR.

"**Base Rate Loan**" means any Loan bearing interest at a rate based upon the Base Rate as provided in **Section 4.1(a)**.

"**Borrower**" and "**Borrowers**" have the meaning assigned thereto in the introductory paragraph hereto.

"**Borrower Materials**" has the meaning assigned thereto in **Section 7.2**.

"**Business Day**" means (a) for all purposes other than as set forth in *clause (b)* below, any day other than a Saturday, Sunday or legal holiday on which banks in Houston, Texas, and New York, New York, are open for the conduct of their commercial banking business, and (b) with respect to all notices and determinations in connection with, and payments of principal and

4

interest on, any LIBOR Rate Loan, or any Base Rate Loan as to which the interest rate is determined by reference to LIBOR, any day that is a Business Day described in *clause (a)* and that is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"*Calculation Date*" has the meaning assigned thereto in the definition of Applicable Margin.

"*Capital Asset*" means, with respect to Parent and its Subsidiaries, any asset that should, in accordance with GAAP, be classified and accounted for as a capital asset on a Consolidated balance sheet of Parent and its Subsidiaries.

"*Capital Expenditures*" means, with respect to Parent and its Subsidiaries for any period, the aggregate cost of all Capital Assets acquired by Parent or its Subsidiaries during such period, as determined in accordance with GAAP.

"*Capital Lease*" means any lease of any property by Parent or its Subsidiaries, as lessee, that should, in accordance with GAAP, be classified and accounted for as a capital lease on a Consolidated balance sheet of the Parent and its Subsidiaries.

"*Capital Stock*" means (a) in the case of a corporation, capital stock, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of capital stock, (c) in the case of a partnership, partnership interests (whether general or limited), (d) in the case of a limited liability company, membership interests, (e) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person and (f) any and all warrants, rights or options to purchase any of the foregoing.

"*Cash Collateralize*" means, to pledge and deposit with, or deliver to, the Administrative Agent, for the benefit of one or more of the Issuing Lender, the Swingline Lender or the Lenders, as collateral for L/C Obligations or obligations of the Lenders to fund participations in respect of L/C Obligations or Swingline Loans, cash or deposit account balances or, if the Administrative Agent, the Issuing Lender and the Swingline Lender shall agree, in their sole discretion, other credit support, in each case pursuant to documentation in form and substance satisfactory to the Administrative Agent, the Issuing Lender and the Swingline Lender, as applicable. "*Cash Collateral*" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"*Cash Equivalents*" means, collectively, (a) marketable direct obligations issued or unconditionally guaranteed by the United States or any agency thereof maturing within one hundred twenty (120) days from the date of acquisition thereof, (b) commercial paper maturing no more than one hundred twenty (120) days from the date of creation thereof and currently having the highest rating obtainable from either S&P or Moody's, (c) certificates of deposit maturing no more than one hundred twenty (120) days from the date of creation thereof issued by commercial banks incorporated under the laws of the United States, each having combined capital, surplus and undivided profits of not less than $500,000,000 and having a rating of "A" or better by a nationally recognized rating agency; provided that the aggregate amount invested in

5

such certificates of deposit shall not at any time exceed $5,000,000 for any one such certificate of deposit and $10,000,000 for any one such bank, or (d) time deposits maturing no more than thirty (30) days from the date of creation thereof with commercial banks or savings banks or savings and loan associations each having membership either in the FDIC or the deposits of which are insured by the FDIC and in amounts not exceeding the maximum amounts of insurance thereunder.

"*Cash Management Agreement*" means any agreement to provide cash management services, including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements.

"*Cash Management Bank*" means any Person that, at the time it enters into a Cash Management Agreement, is a Lender, an Affiliate of a Lender, the Administrative Agent or an Affiliate of the Administrative Agent, in its capacity as a party to such Cash Management Agreement.

"*CFTC*" means the Commodity Futures Trading Commission.

"*Change in Control*" means an event or series of events by which, at any time, (a) Michael F. Lockwood fails to own 100% of the Capital Stock of Parent entitled to vote in the election of members of the board of directors (or equivalent governing body) of Parent, (b) Parent fails to own and control 100% of the Capital Stock of LII, (c) Parent fails to own and control 100% of the Capital Stock of LMG, (d) LMG fails to own and control 100% of the Capital Stock of PCI, or (e) Michael F. Lockwood fails to own 100% of the Capital Stock of LHI entitled to vote in the election of members of the board of directors (or equivalent governing body) of LHI.

"*Change in Law*" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and all requests, rules, guidelines or directives thereunder or issued in connection therewith shall be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"*Class*" means, when used in reference to any Loan, whether such Loan is a Revolving Credit Loan or Swingline Loan, when used in reference to any Commitment, a Revolving Credit Commitment.

"*Closing Date*" means September 30, 2015.

"*Code*" means the Internal Revenue Code of 1986, and the rules and regulations promulgated thereunder, each as amended or modified from time to time.

"*Collateral*" means the collateral security for the Secured Obligations pledged or granted pursuant to the Security Documents.

6

"*Collateral Agreement*" means the Pledge and Security Agreement of even date herewith executed by the Credit Parties in favor of the Administrative Agent, for the ratable benefit of the Secured Parties, which shall be in form and substance acceptable to the Administrative Agent, as amended, restated, supplemented or otherwise modified from time to time.

"*Commitment Fee*" has the meaning assigned thereto in *Section 4.3(a)*.

"*Commitment Percentage*" means, as to any Lender, such Lender's Revolving Credit Commitment Percentage.

"*Commitments*" means, collectively, as to all Lenders, the Revolving Credit Commitments of such Lenders.

"*Commodity Exchange Act*" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq*.), as amended, and all related rules, regulations and published interpretations.

"*Consolidated*" means, when used with reference to financial statements or financial statement items of any Person, such statements or items on a consolidated basis in accordance with applicable principles of consolidation under GAAP.

"*Consolidated Asset Coverage Ratio*" means for Parent and its Subsidiaries on a Consolidated basis and calculated in accordance with GAAP (and including LHI with respect to the LHI Pledged Equipment only), as of any date of determination, the ratio of (a) the total of (i) Domestic Trade Accounts Receivable, (ii) plus Domestic Inventory aged less than 365 days, (iii) plus Domestic Fixed Assets, and (iv) plus LHI Pledged Equipment, in each case under these *clauses (i), (ii), (iii) and (iv)*, in which the Administrative Agent for the ratable benefit of the Lenders has a valid and perfected first priority Lien securing the Obligations, (v) plus Eligible Foreign Trade Accounts Receivable, (vi) plus Foreign Trade Accounts Receivable, and (vii) plus Foreign Inventory, *provided that*, the aggregate amount of all Foreign Trade Accounts Receivable under *clause (vi)* and all Foreign Inventory under *clause (vii)* shall not exceed $7,500,000 in the aggregate, to (b) the total of (i) the aggregate amount of L/C Obligations, plus (ii) the aggregate amount of outstanding Revolving Credit Loans and Swingline Loans.

"*Consolidated Cash Balance*" means, at any time, the aggregate amount of cash, cash equivalents and investments in money market funds, in each case, held or owned by (whether directly or indirectly), credited to the account of, or otherwise reflected as an asset on the balance sheet of, the Credit Parties.

"*Consolidated EBITDA*" means, for any period, the sum of the following determined on a Consolidated basis, without duplication, for the Parent and its Subsidiaries in accordance with GAAP:

(a) Consolidated Net Income for such period, plus

(b) the sum of the following, without duplication, to the extent deducted in determining Consolidated Net Income for such period:

(i) income and franchise taxes payable during such period,

*For Reference Purposes Only*
5702727v1

(ii)     Consolidated Interest Expense for such period,

(iii)     amortization, depreciation and other non-cash charges for such period except to the extent that such non-cash charges are reserved for cash charges to be taken in the future,

(iv)     non-cash compensation charges, including any such charges arising from stock options, restricted stock grants or other equity incentive programs,

(v)     write-down of cash expenses incurred in connection with the Existing Credit Agreement,

"*Consolidated Funded Indebtedness*" means, as of any date of determination with respect to the Parent and its Subsidiaries on a Consolidated basis without duplication, the sum of all Indebtedness (other than Indebtedness in respect of obligations under any undrawn letter of credit) of the Parent and its Subsidiaries.

"*Consolidated Leverage Ratio*" means, as of any date of determination, the ratio of (a) Consolidated Funded Indebtedness on such date to (b) Consolidated EBITDA for the period of four (4) consecutive fiscal quarters ending on or immediately prior to such date.

"**Consolidated Net Income**" means, for any period, the net income (or loss) of Parent and its Subsidiaries for such period, determined on a Consolidated basis, without duplication, in accordance with GAAP; *provided that*, in calculating Consolidated Net Income of Parent and its Subsidiaries for any period, there shall be excluded (a) the net income (or loss) of any Person (other than a Subsidiary which shall be subject to *clause (c)* below), in which Parent or any of its Subsidiaries has a joint interest with a third party, except to the extent such net income is actually paid in cash to Parent or any of its Subsidiaries by dividend or other distribution during such period, (b) the net income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of Parent or any of its Subsidiaries or is merged into or consolidated with Parent or any of its Subsidiaries or that Person's assets are acquired by Parent or any of its Subsidiaries except to the extent included pursuant to the foregoing *clause (a)*, and (c) the net income (if positive), of any Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary to Parent or any of its Subsidiaries of such net income (i) is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Subsidiary or (ii) would be subject to any taxes payable on such dividends or distributions, but in each case only to the extent of such prohibition or taxes. For purposes of this Agreement, Consolidated Net Income shall be adjusted on a Pro Forma Basis.

"*Consolidated Tangible Net Worth*" means, as of any date of determination, for the Parent and its Subsidiaries on a Consolidated basis, the sum of (a) shareholders' equity of the Parent and its Subsidiaries on that date, (b) minus the Intangible Assets of the Parent and its Subsidiaries on that date, (c) plus the Subordinated Indebtedness of the Parent and its Subsidiaries on that date, and (d) minus accounts receivable due from any Affiliate of any Borrower that is more than 180 days past due. "*Consolidated Total Liabilities*" means, as of any date of determination with respect to the Parent and its Subsidiaries on a Consolidated basis,

8

~~without duplication, the sum of all current liabilities and non-current liabilities of the Parent and~~ ~~its Subsidiaries (excluding Subordinated Indebtedness).~~

"**Credit Facility**" means, collectively, the Revolving Credit Facility, the Swingline Facility and the L/C Facility.

"**Credit Parties**" means, collectively, each Borrower and the Subsidiary Guarantors.

"**Debt Issuance**" shall mean the issuance of any Indebtedness for borrowed money by any Credit Party or any of its Subsidiaries.

"**Default**" means any of the events specified in **Section 9.1** which with the passage of time, the giving of notice or any other condition, would constitute an Event of Default.

"**Defaulting Lender**" means any Lender that (a) has failed to fund any portion of the Revolving Credit Loans, participations in L/C Obligations or participations in Swingline Loans required to be funded by it hereunder within one Business Day of the date required to be funded by it hereunder, (b) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within one Business Day of the date when due, unless such amount is the subject of a good faith dispute, (c) has notified any Borrower, the Administrative Agent or any other Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply or has failed to comply with its funding obligations under this Agreement or under other agreements in which it commits or is obligated to extend credit, or (d) has become or is insolvent or has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment.

"**Dollars**" or "**$**" means, unless otherwise qualified, dollars in lawful currency of the United States.

"**Domestic Fixed Assets**" means the net book value of all fixed assets owned by any Borrower or an Eligible Subsidiary which are located at all times in the U.S. or Canada.

"**Domestic Inventory**" means all inventory (measured on the lower of cost or market basis) owned by any Borrower or an Eligible Subsidiary which is located at all times in the U.S. or Canada.

"**Domestic Subsidiary**" means any Subsidiary organized under the laws of any political subdivision of the United States.

"**Domestic Trade Accounts Receivable**" means all trade accounts receivable owned by any Borrower or any Eligible Subsidiary from a Person residing, located or organized in the U.S. or Canada (but in all cases excluding any trade accounts receivable with any Affiliates).

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA

9

Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**_EEA Member Country_**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**_EEA Resolution Authority_**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**_Eligibility Date_**" means, with respect to any Credit Party, and each Secured Hedge Agreement, the date on which this Agreement or any other Loan Document becomes effective with respect to such Secured Hedge Agreement (for the avoidance of doubt, the Eligibility Date shall be the Effective Date of such Secured Hedge Agreement if this Agreement or any other Loan Document is then in effect with respect to any Credit Party, and otherwise it shall be the Effective Date of this Agreement and/or such other Loan Documents to which such Credit Party is a party). For purposes of this defined term, "Effective Date" means the date indicated in a document or agreement to be the date on which such document or agreement becomes effective, or, if there is no such indication, the date of execution of such document or agreement.

"**_Eligible Contract Participant_**" means an "eligible contract participant" as defined in the Commodity Exchange Act and regulations thereunder.

"**_Eligible Foreign Trade Accounts Receivable_**" means trade accounts receivable owned by any Borrower or any Eligible Subsidiary from a Person residing, located or organized outside of the U.S. or Canada, to the extent such accounts receivable, unless otherwise approved in writing by the Administrative Agent, (A) are supported by a letter of credit approved by the Administrative Agent in writing, or (B) are from a Person whose senior long-term unsecured debt securities has a rating equal to or better than Baa3 by Moody's Investors Service, Inc., BBB- by Standard & Poor's Ratings Services, a division of McGraw Hill Companies Inc., or a comparable investment grade rating by any successor rating agency thereto and otherwise acceptable to the Administrative Agent (but in all cases excluding any trade accounts receivable with any Affiliates).

"**_Eligible Subsidiary_**" means a Subsidiary Guarantor that is either (a) a Domestic Subsidiary or (b) a Foreign Subsidiary that is organized under the laws of Canada or any Province thereof.

"**_Employee Benefit Plan_**" means (a) any employee benefit plan within the meaning of Section 3(3) of ERISA that is maintained for employees of any Credit Party or any ERISA Affiliate or (b) any Pension Plan or Multiemployer Plan that has at any time within the preceding seven (7) years been maintained, funded or administered for the employees of any Credit Party or any current or former ERISA Affiliate.

For Reference Purposes Only
5702727v1

"**Environmental Claims**" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, accusations, allegations, notices of noncompliance or violation, investigations (other than internal reports prepared by any Person in the ordinary course of business and not in response to any third party action or request of any kind) or proceedings relating in any way to any actual or alleged violation of or liability under any Environmental Law or relating to any permit issued, or any approval given, under any such Environmental Law, including, without limitation, any and all claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages, contribution, indemnification cost recovery, compensation or injunctive relief resulting from Hazardous Materials or arising from alleged injury or threat of injury to human health or the environment.

"**Environmental Laws**" means any and all federal, foreign, state, provincial and local laws, statutes, ordinances, codes, rules, standards and regulations, permits, licenses, approvals, interpretations and orders of courts or Governmental Authorities, relating to the protection of human health or the environment, including, but not limited to, requirements pertaining to the manufacture, processing, distribution, use, treatment, storage, disposal, transportation, handling, reporting, licensing, permitting, investigation or remediation of Hazardous Materials.

"**Equity Issuance**" means (a) any issuance by any Credit Party or any Subsidiary thereof to any Person that is not a Credit Party or a Subsidiary thereof, of (i) shares of its Capital Stock, (ii) any shares of its Capital Stock pursuant to the exercise of options or warrants or (iii) any shares of its Capital Stock pursuant to the conversion of any debt securities to equity and (b) any capital contribution from any Person that is not a Credit Party into any Credit Party or any Subsidiary thereof. The term "Equity Issuance" shall not include (A) any Asset Disposition or (B) any Debt Issuance.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, and the rules and regulations thereunder, each as amended or modified from time to time.

"**ERISA Affiliate**" means any Person who together with any Credit Party or any of its Subsidiaries is treated as a single employer within the meaning of Section 414(b), (c), (m) or (o) of the Code or Section 4001(b) of ERISA.

"**Eurodollar Reserve Percentage**" means, for any day, the percentage (expressed as a decimal and rounded upwards, if necessary, to the next higher 1/100th of 1%) which is in effect for such day as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including, without limitation, any basic, supplemental or emergency reserves) in respect of eurocurrency liabilities or any similar category of liabilities for a member bank of the Federal Reserve System in New York City.

"**Event of Default**" means any of the events specified in **Section 9.1**; provided that any requirement for passage of time, giving of notice, or any other condition, has been satisfied.

"**Excluded Hedge Liabilities**" means with respect to any Credit Party, each of its Secured Hedge Liabilities if, and only to the extent that, all or any portion of this Agreement or any other Loan Document that relates to such obligations is or becomes illegal under the

11

Commodity Exchange Act, or any rule, regulation or order of the CFTC, solely by virtue of such Credit Party's failure to qualify as an Eligible Contract Participant on the Eligibility Date for such Secured Hedge Agreement. Notwithstanding anything to the contrary contained in the foregoing or in any other provision of this Agreement or any other Loan Document, the foregoing is subject to the following provisos: (a) if any Secured Hedge Liabilities arise under a master agreement governing more than one Secured Hedge Agreement, this definition shall apply only to the portion of such Secured Hedge Liabilities that is attributable to Secured Hedge Agreements for which such guaranty or security interest is or becomes illegal under the Commodity Exchange Act, or any rule, regulations or order of the CFTC, solely as a result of the failure by such Credit Party for any reason to qualify as an Eligible Contract Participant on the Eligibility Date for such Secured Hedge Agreement; (b) if a guarantee of any Secured Hedge Liabilities would cause such obligation to be an Excluded Hedge Liability but the grant of a security interest would not cause such obligation to be an Excluded Hedge Liability, such Secured Hedge Liabilities shall constitute an Excluded Hedge Liability for purposes of the guaranty but not for purposes of the grant of the security interest; and (c) if there is more than one Credit Party executing this Agreement or the other Loan Documents and any Secured Hedge Liabilities would be Excluded Hedge Liabilities with respect to one or more of such Persons, but not all of them, the definition of Excluded Hedge Liability with respect to each such Person shall only be deemed applicable to (i) the particular Secured Hedge Liabilities that constitute Excluded Hedge Liabilities with respect to such Person, and (ii) the particular Person with respect to which such Secured Hedge Liabilities constitute Excluded Hedge Liabilities.

"***Excluded Taxes***" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, United States federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under ***Section 4.12(b)***) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to ***Section 4.11***, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with ***Section 4.11(g)*** and (d) any United States federal withholding Taxes imposed under FATCA.

"***Existing Credit Agreement***" means that certain Credit Agreement dated as of September 30, 2011, among LII, the financial institutions party thereto from time to time, as lenders, the Administrative Agent, the Swingline Lender, and the Issuing Lender (as amended by the First Amendment dated April 13, 2012, the Waiver and Second Amendment dated October 8, 2012, the Waiver and Third Amendment dated March 1, 2013, the Consent and Fourth Amendment dated August 1, 2013, and the Fifth Amendment dated effective February 10, 2015).

12

"*Existing Hedges*" means those Hedges existing on the Closing Date and identified on *Schedule 1.2*.

"*Existing Letters of Credit*" means those Letters of Credit existing on the Closing Date and identified on *Schedule 1.3*.

"*Extensions of Credit*" means, as to any Lender at any time, (a) an amount equal to the sum of (i) the aggregate principal amount of all Revolving Credit Loans made by such Lender then outstanding, (ii) such Lender's Revolving Credit Commitment Percentage of the L/C Obligations then outstanding, and (iii) such Lender's Revolving Credit Commitment Percentage of the Swingline Loans then outstanding, or (b) the making of any Loan or participation in any Letter of Credit by such Lender, as the context requires.

"*FATCA*" means Sections 1471 through 1474 of the Code (as of the date hereof) and any regulations or official interpretations thereof (including any Revenue Ruling, Revenue Procedure, Notice or similar guidance issued by the U.S. Internal Revenue Service thereunder as a precondition to relief or exemption from Taxes under such provisions); provided that FATCA shall also include any amendments to Sections 1471 through 1474 of the Code if, as amended, FATCA provides a commercially reasonable mechanism to avoid the tax imposed thereunder by satisfying the information reporting and other requirements of FATCA.

"*FDIC*" means the Federal Deposit Insurance Corporation, or any successor thereto.

"*Federal Funds Rate*" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day (or, if such day is not a Business Day, for the immediately preceding Business Day), as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, underlined provided that if such rate is not so published for any day which is a Business Day, the average of the quotation for such day on such transactions received by the Administrative Agent from three Federal Funds brokers of recognized standing selected by the Administrative Agent. Notwithstanding the foregoing, if the Federal Funds Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"*Fee Letter*" means the separate fee letter agreement dated the Closing Date, among the Borrowers and the Administrative Agent.

"*First Amendment Effective Date*" means July 31, 2016. *[First Amendment]*

"*First Tier Foreign Subsidiary*" means any Foreign Subsidiary owned directly by any Credit Party.

"*Fiscal Year*" means the fiscal year of Parent and its Subsidiaries ending on January 31.

"*Foreign Inventory*" means the aggregate amount of all inventory that is (i) owned by a Foreign Subsidiary or (ii) owned by any Borrower or an Eligible Subsidiary that is not located at all times in the U.S. or Canada.

13

"*Foreign Lender*" means any Lender that is organized under the laws of a jurisdiction other than that in which a Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"*Foreign Subsidiary*" means any Subsidiary that is not a Domestic Subsidiary.

"*Foreign Trade Accounts Receivable*" means trade accounts receivable that are (i) owned by any Foreign Subsidiary, or (ii) owned by any Borrower or any Eligible Subsidiary from a Person residing, located or organized outside of the U.S. or Canada that are not Eligible Foreign Trade Accounts Receivable (but in all cases excluding any trade accounts receivable with any Affiliates).

"*Fronting Exposure*" means, at any time there is a Defaulting Lender, (a) with respect to the Issuing Lender, such Defaulting Lender's Revolving Credit Commitment Percentage of the outstanding L/C Obligations other than L/C Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateral or other credit support acceptable to the Issuing Lender shall have been provided in accordance with the terms hereof and (b) with respect to the Swingline Lender, such Defaulting Lender's Revolving Credit Commitment Percentage of Swingline Loans other than Swingline Loans as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders, repaid by the Borrowers or for which Cash Collateral or other credit support acceptable to the Swingline Lender shall have been provided in accordance with the terms hereof.

"*Fund*" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"*GAAP*" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"*Governmental Approvals*" means all authorizations, consents, approvals, permits, licenses and exemptions of, registrations and filings with, and reports to, all Governmental Authorities.

"*Governmental Authority*" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

14

*For Reference Purposes Only*
5702727v1

"**_Guaranty Agreement_**" means an unconditional guaranty agreement executed by a Subsidiary Guarantor or by the Individual Guarantor in favor of the Administrative Agent, for the ratable benefit of the Secured Parties, which shall be in form and substance acceptable to the Administrative Agent, as such agreement may be amended, restated, supplemented or otherwise modified from time to time.

"**_Guaranty Obligation_**" means, with respect to the Borrowers and their respective Subsidiaries, without duplication, any obligation, contingent or otherwise, of any such Person pursuant to which such Person has directly or indirectly guaranteed any Indebtedness or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of any such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement condition or otherwise) or (b) entered into for the purpose of assuring in any other manner the obligee of such Indebtedness or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); provided, that the term Guaranty Obligation shall not include endorsements for collection or deposit in the ordinary course of business.

"**_Hazardous Materials_**" means any substances or materials (a) which are or become defined as hazardous wastes, hazardous substances, pollutants, contaminants, chemical substances or mixtures or toxic substances under any Environmental Law, (b) which are toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise harmful to human health or the environment and are or become regulated by any Governmental Authority, (c) the presence of which require investigation or remediation under any Environmental Law or common law, (d) the discharge or emission or release of which requires a permit or license under any Environmental Law or other Governmental Approval, (e) which are deemed to constitute a nuisance or a trespass which pose a health or safety hazard to Persons or neighboring properties, (f) which consist of underground or aboveground storage tanks, whether empty, filled or partially filled with any substance, or (g) which contain, without limitation, asbestos, polychlorinated biphenyls, urea formaldehyde foam insulation, petroleum hydrocarbons, petroleum derived substances or waste, crude oil, nuclear fuel, natural gas or synthetic gas.

"**_Hedge Agreement_**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master

15

For Reference Purposes Only
5702727v1

Agreement, or any other master agreement, all as amended, restated, supplemented or otherwise modified from time to time.

"***Hedge Bank***" means any Person that, at the time it enters into a Hedge Agreement permitted under Article VIII, is a Lender, an Affiliate of a Lender, the Administrative Agent or an Affiliate of the Administrative Agent, in its capacity as a party to such Hedge Agreement.

"***Hedge Termination Value***" means, in respect of any one or more Hedge Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedge Agreements, (a) for any date on or after the date such Hedge Agreements have been closed out and the termination value(s) have been determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in *clause (a)*, the amount(s) determined as the mark-to-market value(s) for such Hedge Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedge Agreements (which may include a Lender or any Affiliate of a Lender).

"***Increased Amount Date***" has the meaning assigned thereto in ***Section 4.13***.

"***Incremental Lender***" has the meaning assigned thereto in ***Section 4.13***.

"***Incremental Revolving Credit Commitments***" has the meaning assigned thereto in ***Section 4.13***.

"***Incremental Revolving Credit Commitment***" has the meaning assigned thereto in ***Section 4.13***.

"***Incremental Revolving Credit Increase***" has the meaning assigned thereto in ***Section 4.13***.

"***Indebtedness***" means, with respect to any Person at any date and without duplication, the sum of the following:

(a)     all liabilities, obligations and indebtedness for borrowed money including, but not limited to, obligations evidenced by bonds, debentures, notes or other similar instruments of any such Person;

(b)     all obligations to pay the deferred purchase price of property or services of any such Person (including, without limitation, all obligations under non-competition, earn-out or similar agreements), except trade payables arising in the ordinary course of business not more than ninety (90) days past due, or that are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided for on the books of such Person;

(c)     the Attributable Indebtedness of such Person with respect to such Person's obligations in respect of Capital Leases and Synthetic Leases (regardless of whether accounted for as indebtedness under GAAP);

16

(d)     all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person to the extent of the value of such property (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business);

(e)     all Indebtedness of any other Person secured by a Lien on any asset owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements except trade payable arising in the ordinary course of business), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     all obligations, contingent or otherwise, of any such Person relative to the face amount of letters of credit, whether or not drawn, including, without limitation, any Reimbursement Obligation, and banker's acceptances issued for the account of any such Person;

(g)     all net obligations of such Person under any Hedge Agreements; and

(h)     all Guaranty Obligations of any such Person with respect to any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any net obligation under any Hedge Agreement on any date shall be deemed to be the Hedge Termination Value thereof as of such date.

"*Indemnified Taxes*" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrowers under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"*Individual Guarantor*" means Michael F. Lockwood.

"*Insurance and Condemnation Event*" means the receipt by any Credit Party or any of its Subsidiaries of any cash insurance proceeds or condemnation award payable by reason of theft, loss, physical destruction or damage, taking or similar event with respect to any of their respective Property.

"*Intangible Assets*" means assets that are considered to be intangible assets under GAAP, including customer lists, goodwill, copyrights, trade names, trademarks, patents, franchises, licenses, unamortized debt discount and capitalized research and development costs.

"*Interest Period*" has the meaning assigned thereto in *Section 4.1(b)*.

"*Investments*" has the meaning assigned thereto in *Section 8.3*.

"*IRS*" means the United States Internal Revenue Service, or any successor thereto.

For Reference Purposes Only
5702727v1

"***ISP98***" means the International Standby Practices (1998 Revision, effective January 1, 1999), International Chamber of Commerce Publication No. 590.

"***Issuing Lender***" means with respect to (a) Letters of Credit issued hereunder on or after the Closing Date, Wells Fargo, in its capacity as issuer thereof, or any successor thereto, and (b) the Existing Letters of Credit, Wells Fargo, in its capacity as issuer thereof, or any successor thereto.

"***Italy Restructuring***" means the disposition or transfer of the Capital Stock of LII's wholly owned Foreign Subsidiaries which are domiciled under the laws of Italy, from LII to Michael F. Lockwood or to an entity owned and controlled by Michael F. Lockwood (or to a holding company organized under the laws of Luxembourg that is owned or controlled by Michael F. Lockwood), resulting in the Italian entities formerly owned and controlled by LII no longer being Foreign Subsidiaries of LII or any other Borrower.

"***L/C Commitment***" means the lesser of (a) ~~Thirty~~Five Million Dollars ($~~30,000,000~~5,000,000) and (b) the Revolving Credit Commitment.

"***L/C Facility***" means the letter of credit facility established pursuant to ***Article III***.

"***L/C Obligations***" means at any time, an amount equal to the sum of (a) the aggregate undrawn and unexpired amount of the then outstanding Letters of Credit and (b) the aggregate amount of drawings under Letters of Credit which have not then been reimbursed pursuant to ***Section 3.5***.

"***L/C Participants***" means the collective reference to all the Revolving Credit Lenders other than the Issuing Lender.

"***LEI***" means Parent.

"***Lender***" has the meaning assigned thereto in the introductory paragraph hereto.

"***Lender Joinder Agreement***" means a joinder agreement in form and substance reasonably satisfactory to the Administrative Agent delivered in connection with ***Section 4.13***.

"***Lending Office***" means, with respect to any Lender, the office of such Lender maintaining such Lender's Extensions of Credit.

"***Letter of Credit Application***" means an application, in the form specified by the Issuing Lender from time to time, requesting the Issuing Lender to issue a Letter of Credit.

"***Letters of Credit***" means the collective reference to letters of credit issued pursuant to ***Section 3.1*** and the Existing Letters of Credit.

"***LHA***" means LH Aviation, LLC, a Texas limited liability company. *[First Amendment]*

"***LHI***" means Lockwood Holdings, Inc., a Texas corporation.

18

For Reference Purposes Only
5702727v1

"**LHI Credit Agreement**" means that certain Amended and Restated Credit Agreement dated February 6, 2015, between LHI and Wells Fargo, as lender, together with all documents and instruments executed in connection therewith, in each case as amended, restated or otherwise modified from time to time.

"**LHI Intercompany Note**" means that certain Revolving Promissory Note, dated as of February 10, 2015, executed by LII, as maker, and made payable to LHI, as payee, in the sum of up to $15,000,000.

"**LHI Intercreditor Agreement**" means that certain Intercreditor Agreement effective February 10, 2015, between Wells Fargo, in its capacity as a lender to LHI pursuant to the LHI Credit Agreement, and the Administrative Agent, as such agreement may be amended, restated, supplemented or otherwise modified from time to time.

"**LHI Pledged Equipment**" means all equipment and fixed assets pledged as Collateral or otherwise covered by an agreement or writing pursuant to which LHI purports to pledge or grant a security interest in such equipment to secure the Secured Obligations.

"**LHI Subordination Agreement**" means that certain Subordination Agreement effective February 10, 2015, among LII, LHI, and the Administrative Agent, with respect to the LHI Intercompany Note, as such agreement may be amended, restated, supplemented or otherwise modified from time to time.

*For Reference Purposes Only*
*5702727v1*

"**LIBOR**" means,

(a)     for any interest rate calculation with respect to a LIBOR Rate Loan, the rate of interest per annum determined on the basis of the rate for deposits in Dollars for a period equal to the applicable Interest Period which appears on Reuters Screen LIBOR01 Page (or any applicable successor page) at approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of the applicable Interest Period (rounded upward, if necessary, to the nearest 1/100th of 1%).  If, for any reason, such rate does not appear on Reuters Screen LIBOR01 Page (or any applicable successor page), then "LIBOR" shall be determined by the Administrative Agent to be the arithmetic average of the rate per annum at which deposits in Dollars in minimum amounts of at least $5,000,000 would be offered by first class banks in the London interbank market to the Administrative Agent at approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of the applicable Interest Period for a period equal to such Interest Period; and

(b)     for any interest rate calculation with respect to a Base Rate Loan, the rate of interest per annum determined on the basis of the rate for deposits in Dollars in minimum amounts of at least $5,000,000 for a period equal to one month (commencing on the date of determination of such interest rate) which appears on the Reuters Screen LIBOR01 Page (or any applicable successor page) at approximately 11:00 a.m. (London time) on such date of determination, or, if such date is not a Business Day, then the immediately preceding Business Day (rounded upward, if necessary, to the nearest 1/100th of 1%).  If, for any reason, such rate does not appear on Reuters Screen LIBOR01 Page (or any applicable successor page) then "LIBOR" for such Base Rate Loan shall be determined by the Administrative Agent to be the arithmetic average of the rate per annum at which deposits in Dollars in minimum amounts of at least $5,000,000 would be offered by first class banks in the London interbank market to the Administrative Agent at approximately 11:00 a.m. (London time) on such date of determination for a period equal to one month commencing on such date of determination.  Notwithstanding the foregoing, if the LIBOR shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

Each calculation by the Administrative Agent of LIBOR shall be conclusive and binding for all purposes, absent manifest error.

"**LIBOR Market Index Rate**" means for any day, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the London interbank offered rate for one (1) month Dollar deposits as reported on Reuters Screen LIBOR01 Page (or any successor page) at approximately 11:00 a.m. (London time), on such day, or if such day is not a Business Day, then the immediately preceding Business Day (or if not so reported, then as determined by the Administrative Agent from another recognized source or interbank quotation).

"**LIBOR Market Index Rate Loan**" means a Loan bearing interest based on the LIBOR Market Index Rate.

20

*For Reference Purposes Only*
5702727v1

"***LIBOR Rate***" means a rate per annum (rounded upwards, if necessary, to the next higher 1/100th of 1%) determined by the Administrative Agent pursuant to the following formula:

$$\text{LIBOR Rate} = \frac{\text{LIBOR}}{1.00 - \text{Eurodollar Reserve Percentage}}$$

"***LIBOR Rate Loan***" means any Loan bearing interest at a rate based upon the LIBOR Rate as provided in ***Section 4.1(a)***.

"***Lien***" means, with respect to any asset, any mortgage, leasehold mortgage, lien, pledge, charge, security interest, hypothecation or encumbrance of any kind in respect of such asset. For the purposes of this Agreement, a Person shall be deemed to own subject to a Lien any asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, Capital Lease or other title retention agreement relating to such asset.

"***LII***" means Lockwood International, Inc., a Texas corporation.

"***LMG***" means LMG Manufacturing, Inc., a Texas corporation.

"***Loan Documents***" means, collectively, this Agreement, each Note, the Letter of Credit Applications, the Security Documents, the Fee Letter, the Thomas Lockwood Subordination Agreement, the LHI Intercreditor Agreement, the LHI Subordination Agreement, and each other document, instrument, certificate and agreement executed and delivered by the Credit Parties, LHI, or any of their respective Subsidiaries or the Individual Guarantor in favor of or provided to the Administrative Agent or any Secured Party in connection with this Agreement or otherwise referred to herein or contemplated hereby (excluding any Secured Hedge Agreement and any Secured Cash Management Agreement), all as may be amended, restated, supplemented or otherwise modified from time to time.

"***Loans***" means the collective reference to the Revolving Credit Loans and the Swingline Loans, and "Loan" means any of such Loans.

"***Material Adverse Effect***" means, with respect to Parent and its Subsidiaries, (a) a material adverse effect on the properties, business, operations or condition (financial or otherwise) of such Persons, taken as a whole, (b) a material impairment of the ability of any such Person to perform its obligations under the Loan Documents to which it is a party, (c) a material impairment of the rights and remedies of the Administrative Agent or any Lender under any Loan Document or (d) an impairment of the legality, validity, binding effect or enforceability against any Credit Party of any Loan Document to which it is a party.

"***Material Contract***" means (a) any contract or other agreement, written or oral, of any Credit Party or any of its Subsidiaries involving monetary liability of or to any such Person in an amount in excess of $500,000 per annum or (b) any other contract or agreement, written or oral, of any Credit Party or any of its Subsidiaries the failure to comply with which could reasonably be expected to have a Material Adverse Effect.

21

*For Reference Purposes Only*
5702727v1

***Minimum Collateral Amount*** means, at any time, (a) with respect to Cash Collateral consisting of cash or deposit account balances, an amount equal to 102% of the sum of (i) the Fronting Exposure of the Issuing Lender with respect to Letters of Credit issued and outstanding at such time and (ii) the Fronting Exposure of the Swingline Lender with respect to all Swingline Loans outstanding at such time and (b) otherwise, an amount determined by the Administrative Agent and the Issuing Lender in their sole discretion.

"***Moody's***" means Moody's Investors Service, Inc. and any successor thereto.

"***Multiemployer Plan***" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Credit Party or any ERISA Affiliate is making, or is accruing an obligation to make, or has accrued an obligation to make contributions within the preceding seven (7) years.

"***Non-Consenting Lender***" means any Lender that has not consented to any proposed amendment, modification, waiver or termination of any Loan Document which, pursuant to ***Section 11.2***, requires the consent of all Lenders or all affected Lenders and with respect to which the Required Lenders shall have granted their consent.

"***Non-Defaulting Lender***" means, at any time, each Lender that is not a Defaulting Lender at such time.

"***Non-Guarantor Subsidiary***" means any Subsidiary of any Borrower that is not a Subsidiary Guarantor.

"***Non-Qualifying Party***" means any Credit Party that on the Eligibility Date fails for any reason to qualify as an Eligible Contract Participant.

"***Notes***" means the collective reference to the Revolving Credit Notes and the Swingline Note.

"***Notice of Account Designation***" has the meaning assigned thereto in ***Section 2.3(b)***.

"***Notice of Borrowing***" has the meaning assigned thereto in ***Section 2.3(a)***.

"***Notice of Conversion/Continuation***" has the meaning assigned thereto in ***Section 4.2***.

"***Notice of Prepayment***" has the meaning assigned thereto in ***Section 2.4(c)***.

"***Obligations***" means, in each case, whether now in existence or hereafter arising: (a) the principal of and interest on (including interest accruing after the filing of any bankruptcy or similar petition) the Loans, (b) the L/C Obligations and (c) all other fees and commissions (including attorneys' fees), charges, indebtedness, loans, liabilities, financial accommodations, obligations, covenants and duties owing by the Credit Parties and each of their respective Subsidiaries to the Lenders or the Administrative Agent, in each case under any Loan Document, with respect to any Loan or Letter of Credit of every kind, nature and description, direct or indirect, absolute or contingent, due or to become due, contractual or tortious, liquidated or unliquidated, and whether or not evidenced by any note and including interest and fees that

22

For Reference Purposes Only
5702727v1

accrue after the commencement by or against any Credit Party or any Affiliate thereof of any proceeding under any federal bankruptcy laws (as now or hereafter in effect) or under any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts, naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"*OFAC*" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"*Officer's Compliance Certificate*" means a certificate of the chief financial officer or the treasurer of each Borrower substantially in the form attached as *Exhibit F*.

"*Operating Lease*" means, as to any Person as determined in accordance with GAAP, any lease of Property (whether real, personal or mixed) by such Person as lessee which is not a Capital Lease.

"*Other Connection Taxes*" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"*Other Taxes*" means all present or future stamp, court, documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to *Section 4.12*).

"*Parent*" means Lockwood Enterprises, Inc., a Texas corporation.

"*Participant*" has the meaning assigned thereto in *Section 11.10(d)*.

"*PATRIOT Act*" means the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as amended.

"*PBGC*" means the Pension Benefit Guaranty Corporation or any successor agency.

"*PCI*" means Piping Components, Inc., a Texas corporation.

"*Pension Plan*" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to the provisions of Title IV of ERISA or Section 412 of the Code and which (a) is maintained, funded or administered for the employees of any Credit Party or any ERISA Affiliate or (b) has at any time within the preceding seven (7) years been maintained, funded or administered for the employees of any Credit Party or any current or former ERISA Affiliates.

For Reference Purposes Only
5702727v1

"**Permitted Acquisition**" means any acquisition by any Borrower or any Subsidiary Guarantor in the form of the acquisition of all or substantially all of the assets, business or a line of business, or at least a majority of the outstanding Capital Stock which have the ordinary voting power for the election of directors of the board of directors (or equivalent governing body) (whether through purchase, merger or otherwise), of any other Person if each such acquisition meets all of the following requirements:

(a)    no less than thirty (30) days prior to the proposed closing date of such acquisition, Borrowers shall have delivered written notice of such acquisition to the Administrative Agent and the Lenders, which notice shall include the proposed closing date of such acquisition;

(b)    Borrowers shall have certified on or before the closing date of such acquisition, in writing and in a form reasonably acceptable to the Administrative Agent, that such acquisition has been approved by the board of directors (or equivalent governing body) of the Person to be acquired;

(c)    the Person or business to be acquired shall be in a line of business permitted pursuant to **Section 8.10**;

(d)    if such transaction is a merger or consolidation, a Borrower or a Subsidiary Guarantor shall be the surviving Person and no Change in Control shall have been effected thereby;

(e)    Borrowers shall have delivered to the Administrative Agent all documents required to be delivered pursuant to, and in accordance with, **Section 7.14**;

(f)    no later than ten (10) days prior to the proposed closing date of such acquisition, Borrowers shall have delivered to the Administrative Agent an Officer's Compliance Certificate for the most recent fiscal quarter end preceding such acquisition for which financial statements are available demonstrating, in form and substance reasonably satisfactory to the Administrative Agent, (i) that the Borrower is in compliance on a Pro Forma Basis (as of the date of the acquisition and after giving effect thereto and any Indebtedness incurred in connection therewith) with each covenant contained in **Section 8.14**;

(g)    no later than ten (10) days prior to the proposed closing date of such acquisition Borrowers, to the extent requested by the Administrative Agent, (i) shall have delivered to the Administrative Agent promptly upon the finalization thereof copies of substantially final Permitted Acquisition Documents, which shall be in form and substance reasonably satisfactory to the Administrative Agent, and (ii) shall have delivered to, or made available for inspection by, the Administrative Agent substantially complete Permitted Acquisition Diligence Information, which shall be in form and substance reasonably satisfactory to the Administrative Agent;

(h)    no Default or Event of Default shall have occurred and be continuing both before and after giving effect to such acquisition and any Indebtedness incurred in connection therewith;

(i)    Borrowers shall have obtained the prior written consent of the Administrative Agent and the Required Lenders prior to the consummation of such acquisition if the Permitted

24

Acquisition Consideration for all acquisitions (or series of related acquisitions) exceeds $30,000,000 in the aggregate in any Fiscal Year; and

(j)      Borrowers shall have (i) delivered to the Administrative Agent a certificate of a Responsible Officer certifying that all of the requirements set forth above have been satisfied or will be satisfied on or prior to the consummation of such purchase or other acquisition and (ii) provided such other documents and other information as may be reasonably requested by the Administrative Agent or the Required Lenders (through the Administrative Agent) in connection with such purchase or other acquisition.

"*Permitted Acquisition Consideration*" means the aggregate amount of the purchase price, including, but not limited to, any assumed debt, earn-outs (valued at the maximum amount payable thereunder), deferred payments, or Capital Stock of Parent, to be paid on a singular basis in connection with any applicable Permitted Acquisition as set forth in the applicable Permitted Acquisition Documents executed by the Borrower or any of its Subsidiaries in order to consummate the applicable Permitted Acquisition.

"*Permitted Acquisition Diligence Information*" means with respect to any acquisition proposed by the Borrowers or any Subsidiary Guarantor, to the extent applicable, all material financial information, all material contracts, all material customer lists, all material supply agreements, and all other material information, in each case, reasonably requested to be delivered to the Administrative Agent in connection with such acquisition (except to the extent that any such information is (a) subject to any confidentiality agreement, unless mutually agreeable arrangements can be made to preserve such information as confidential, (b) classified or (c) subject to any attorney-client privilege).

"*Permitted Acquisition Documents*" means with respect to any acquisition proposed by the Borrowers or any Subsidiary Guarantor, final copies or substantially final drafts if not executed at the required time of delivery of the purchase agreement, sale agreement, merger agreement or other agreement evidencing such acquisition, including, without limitation, all legal opinions and each other document executed, delivered, contemplated by or prepared in connection therewith and any amendment, modification or supplement to any of the foregoing.

"*Permitted Liens*" means the Liens permitted pursuant to *Section 8.2*.

"*Permitted Tax Distributions*" means with respect to each tax year or portion thereof that LHI qualifies to be treated as a partnership not taxable as a corporation for U.S. federal income tax purposes or subject to treatment on a comparable basis for purposes of state, local or foreign tax law (a "Flow Through Entity"), the distribution by LHI to the holders of its equity interests of an amount equal to the product of (i) the amount of aggregate net taxable income of LHI and its Consolidated Subsidiaries allocated to the holders of such equity interests for such period and (ii) the then applicable tax rate for such period; provided that to the extent that the aggregate net taxable income of LHI and its Consolidated Subsidiaries for a taxable year actually reported to the holders of its equity interests is less than the aggregate net taxable income assumed in calculating such amounts for a taxable year, the holders of such equity interests can return an amount equal to the product of such shortfall and such tax rate used in such calculations, or an amount equal to such product shall be deducted from the next scheduled Permitted Tax

For Reference Purposes Only
5702727v1

Distributions payable to such holders for later years.  For purposes of such computation, it will be assumed that any net operating loss carryforwards or other carryforwards or tax attributes, such as alternative minimum tax carryforwards, that arise in any period will be available to offset taxable income payable in later years (regardless of any change in status as a Flow Through Entity.

"***Person***" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

"***Platform***" has the meaning assigned thereto in **Section 7.2**.

"***Prime Rate***" means, at any time, the rate of interest per annum publicly announced from time to time by the Administrative Agent as its prime rate.  Each change in the Prime Rate shall be effective as of the opening of business on the day such change in such prime rate occurs.  The parties hereto acknowledge that the rate announced publicly by the Administrative Agent as its prime rate is an index or base rate and shall not necessarily be its lowest or best rate charged to its customers or other banks.  Notwithstanding the foregoing, if the Prime Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"***Pro Forma Basis***" means, for purposes of calculating Consolidated Net Income for any period during which one or more Permitted Acquisitions occurs, that such Permitted Acquisition (and all other Permitted Acquisitions that have been consummated during the applicable period) shall be deemed to have occurred as of the first day of the applicable period of measurement and:

(a)     all income statement items (whether positive or negative) attributable to the Property or Person acquired in a Permitted Acquisition shall be included (provided that such income statement items to be included are reflected in financial statements or other financial data reasonably acceptable to the Administrative Agent and based upon reasonable assumptions and calculations which are expected to have a continuous impact); and

(b)     non-recurring costs, extraordinary expenses and other *pro forma* adjustments attributable to such Permitted Acquisition may be included to the extent that such costs, expenses or adjustments:

(i)     are reasonably expected to be realized within twelve (12) months of such Permitted Acquisitions as set forth in reasonable detail on a certificate of a Responsible Officer of Parent delivered to the Administrative Agent;

(ii)     are calculated on a basis consistent with GAAP and are, in each case, reasonably identifiable, factually supportable, and expected to have a continuing impact on the operations of Parent and its Subsidiaries; and

(iii)     are approved by the Administrative Agent;

provided that the foregoing costs, expenses and adjustments shall be without duplication of any costs, expenses or adjustments that are already included in the calculation of Consolidated Net Income or clause (a) above.

For Reference Purposes Only
5702727v1

"*Property*" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, Capital Stock.

"*Public Lenders*" has the meaning assigned thereto in *Section 7.2*.

"*Qualified ECP Loan Party*" means any Credit Party that on the Eligibility Date is (a) a corporation, partnership, proprietorship, organization, trust, or other entity other than a "commodity pool" as defined in Section 1a(10) of the Commodity Exchange Act and CFTC regulations thereunder that has total assets exceeding $10,000,000, or (b) an Eligible Contract Participant that can cause another person to qualify as an Eligible Contract Participant on the Eligibility Date under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act by entering into or otherwise providing a "letter of credit or keepwell, support, or other agreement" for purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"*Recipient*" means (a) the Administrative Agent, (b) any Lender and (c) the Issuing Lender, as applicable.

"*Register*" has the meaning assigned thereto in *Section 11.10(c)*.

"*Reimbursement Obligation*" means the obligation of the Borrowers to reimburse the Issuing Lender pursuant to *Section 3.5* for amounts drawn under Letters of Credit.

"*Related Parties*" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"*Required Lenders*" means, at any date, any combination of Lenders holding more than fifty percent (50%) of the sum of (a) the aggregate amount of the Revolving Credit Commitment plus (b) if the Revolving Credit Commitment has been terminated, any combination of Lenders holding more than fifty percent (50%) of the aggregate Extensions of Credit; provided that the Revolving Credit Commitment of, and the portion of the Extensions of Credit, as applicable, held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"*Required Revolving Credit Lenders*" means, at any date, any combination of Revolving Credit Lenders holding more than fifty percent (50%) of the sum of the aggregate amount of the Revolving Credit Commitment or, if the Revolving Credit Commitment has been terminated, any combination of Revolving Credit Lenders holding more than fifty percent (50%) of the aggregate Extensions of Credit under the Revolving Credit Facility; provided that the Revolving Credit Commitment of, and the portion of the Extensions of Credit under the Revolving Credit Facility, as applicable, held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Revolving Credit Lenders.

"*Responsible Officer*" means, as to any Person, the chief executive officer, president, chief financial officer, chief accounting officer, controller, treasurer or assistant treasurer of such Person or any other officer of such Person reasonably acceptable to the Administrative Agent. Any document delivered hereunder or under any other Loan Document that is signed by a

27

Responsible Officer of a Person shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Person and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Person.

"*Restricted Payment*" has the meaning assigned thereto in *Section 8.6*.

"*Revolving Credit Commitment*" means (a) as to any Revolving Credit Lender, the obligation of such Revolving Credit Lender to make Revolving Credit Loans to the account of the Borrowers hereunder in an aggregate principal amount at any time outstanding not to exceed the amount set forth opposite such Revolving Credit Lender's name on the Register, as such amount may be modified at any time or from time to time pursuant to the terms hereof (including, without limitation, *Section 4.13*) and (b) as to all Revolving Credit Lenders, the aggregate commitment of all Revolving Credit Lenders to make Revolving Credit Loans, as set out on *Schedule 1.1*, as such amount may be modified at any time or from time to time pursuant to the terms hereof (including, without limitation, *Section 4.13 2.5*). The aggregate Revolving Credit Commitment of all of the Revolving Credit Lenders on the Closing Second Amendment Effective Date is Ninety Million Dollars ($90,000,000). $72,000,000. The percentage of the Revolving Credit Commitment of held by each of the Revolving Credit Lenders on the Closing Second Amendment Effective Date is set out on *Schedule 1.1*.

"*Revolving Credit Commitment Percentage*" means, as to any Revolving Credit Lender at any time, the ratio of (a) the amount of the Revolving Credit Commitment of such Revolving Credit Lender to (b) the Revolving Credit Commitment of all the Revolving Credit Lenders.

"*Revolving Credit Facility*" means the revolving credit facility established pursuant to *Article II* (including any increase in such revolving credit facility established pursuant to *Section 4.13*).

"*Revolving Credit Lenders*" means, collectively, all of the Lenders with a Revolving Credit Commitment.

"*Revolving Credit Loan*" means any revolving loan made to the Borrowers pursuant to *Section 2.1*, and all such revolving loans collectively as the context requires.

"*Revolving Credit Maturity Date*" means the earliest to occur of (a) September 30, 2018, (b) the date of termination of the entire Revolving Credit Commitment by the Borrowers pursuant to *Section 2.5*, or (c) the date of termination of the Revolving Credit Commitment pursuant to *Section 9.2(a)*.

"*Revolving Credit Note*" means a promissory note made by the Borrowers in favor of a Revolving Credit Lender evidencing the Revolving Credit Loans made by such Revolving Credit Lender, substantially in the form attached as *Exhibit A-1*, and any amendments, supplements and modifications thereto, any substitutes therefor, and any replacements, restatements, renewals or extension thereof, in whole or in part.

"*Revolving Credit Outstandings*" means the sum of (a) with respect to Revolving Credit Loans and Swingline Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Revolving Credit Loans

28

For Reference Purposes Only
5702727v1

and Swingline Loans, as the case may be, occurring on such date; plus (b) with respect to any L/C Obligations on any date, the aggregate outstanding amount thereof on such date after giving effect to any Extensions of Credit occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date, including as a result of any reimbursements of outstanding unpaid drawings under any Letters of Credit or any reductions in the maximum amount available for drawing under Letters of Credit taking effect on such date.

"***Sanction(s)***" means any sanction administered or enforced by the United States Government (including without limitation, the U.S. Department of the Treasury's The Office of Foreign Assets Control), the United Nations Security Council, the European Union, Her Majesty's Treasury or other relevant sanctions authority.

"***Sanctioned Country***" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"***Sanctioned Entity***" shall mean (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, or (d) a person or entity resident in or determined to be resident in a country, that is subject to a country sanctions program administered and enforced by OFAC described or referenced at http://www.ustreas.gov/offices/enforcement/ofac/ or as otherwise published from time to time.

"***S&P***" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"***Second Amendment Effective Date***" means February 27, 2017.

"***Secured Cash Management Agreement***" means any Cash Management Agreement that is entered into by and between any Credit Party and any Cash Management Bank.

"***Secured Hedge Agreement***" means any Hedge Agreement (a) permitted under ***Article VIII***, that is entered into by and between any Credit Party and any Hedge Bank, and (b) each Existing Hedge.

"***Secured Hedge Liabilities***" means, with respect to any Secured Hedge Agreement (a) the Hedge Termination Value for such Secured Hedge Agreement, (b) any other liabilities owed by any Credit Party to the provider under any Secured Hedge Agreement, or (c) any obligation to pay or perform under any Secured Hedge Agreement that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act. The Secured Hedge Liabilities shall, for purposes of this Agreement and all other Loan Documents be "Secured Obligations" of such Person and of each Credit Party, be guaranteed obligations under any Guaranty and secured obligations under any Security Document executed by any Guarantor, as applicable, and otherwise treated as Secured Obligations for purposes of the other Loan Documents, except to the extent constituting Excluded Hedge Liabilities of such Person.

"***Secured Obligations***" means, collectively, (a) the Obligations and (b) all existing or future payment and other obligations owing by any Credit Party under (i) any Secured Hedge

29

For Reference Purposes Only
5702727v1

Agreement (other than Excluded Hedge Liabilities), and (ii) any Secured Cash Management Agreement.

"*Secured Parties*" means, collectively, the Administrative Agent, the Lenders, the Issuing Lender, the Hedge Banks, the Cash Management Banks, each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to *Section 10.5*, any other holder from time to time of any Secured Obligations and, in each case, their respective successors and permitted assigns.

"*Security Documents*" means the collective reference to the Collateral Agreement, the Guaranty Agreements, and each other agreement or writing pursuant to which any Credit Party purports to pledge or grant a security interest in any Property or assets securing the Secured Obligations or any such Person purports to guaranty the payment and/or performance of the Secured Obligations, in each case, as amended, restated, supplemented or otherwise modified from time to time.

"*Solvent*" and "*Solvency*" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital, and (e) such Person is able to pay its debts and liabilities, contingent obligations and other commitments as they mature in the ordinary course of business.  The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"*Subordinated Indebtedness*" means the collective reference to any Indebtedness incurred by any Borrower or any of its Subsidiaries that is subordinated in right and time of payment to the Obligations on terms and conditions satisfactory to the Administrative Agent, including but not limited to the LHI Intercompany Note, the Thomas Lockwood Note, the Thomas Lockwood Non-Compete Consideration, and any of the Borrower's guarantee of obligations under the LHI Credit Agreement.

"*Subsidiary*" means as to any Person, any corporation, partnership, limited liability company or other entity of which more than fifty percent (50%) of the outstanding Capital Stock having ordinary voting power to elect a majority of the board of directors (or equivalent governing body) or other managers of such corporation, partnership, limited liability company or other entity is at the time owned by (directly or indirectly) or the management is otherwise controlled by (directly or indirectly) such Person (irrespective of whether, at the time, Capital Stock of any other class or classes of such corporation, partnership, limited liability company or other entity shall have or might have voting power by reason of the happening of any contingency).  Unless otherwise qualified, references to "Subsidiary" or "Subsidiaries" herein shall refer to those of each Borrower.

30

*For Reference Purposes Only*
5702727v1

"**Subsidiary Guarantors**" means, collectively, all direct and indirect Subsidiaries of any Borrower (other than LII, LMG and PCI, and other than Foreign Subsidiaries to the extent that and for so long as the guaranty of such Foreign Subsidiary would have adverse tax consequences for any Borrower or any other Credit Party or result in a violation of Applicable Laws) in existence on the Closing Date or which executes a Guaranty Agreement pursuant to **Section 7.14**.

"**Swingline Commitment**" means the lesser of (a) Five Million Dollars ($5,000,000) and (b) the Revolving Credit Commitment.

"**Swingline Facility**" means the swingline facility established pursuant to **Section 2.2**.

"**Swingline Lender**" means Wells Fargo in its capacity as swingline lender hereunder or any successor thereto.

"**Swingline Loan**" means any swingline loan made by the Swingline Lender to the Borrowers pursuant to **Section 2.2**, and all such swingline loans collectively as the context requires.

"**Swingline Note**" means a promissory note made by the Borrowers in favor of the Swingline Lender evidencing the Swingline Loans made by the Swingline Lender, substantially in the form attached as **Exhibit A-2**, and any amendments, supplements and modifications thereto, any substitutes therefor, and any replacements, restatements, renewals or extension thereof, in whole or in part.

"**Synthetic Lease**" means any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing product where such transaction is considered borrowed money indebtedness for tax purposes but is classified as an Operating Lease in accordance with GAAP.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, fines, additions to tax or penalties applicable thereto.

"**Termination Event**" means the occurrence of any of the following which, individually or in the aggregate, has resulted or could reasonably be expected to result in liability of any Borrower in an aggregate amount in excess of the Threshold Amount: (a) a "Reportable Event" described in Section 4043 of ERISA for which the thirty (30) day notice requirement has not been waived by the PBGC, or (b) the withdrawal of any Credit Party or any ERISA Affiliate from a Pension Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA, or (c) the termination of a Pension Plan, the filing of a notice of intent to terminate a Pension Plan or the treatment of a Pension Plan amendment as a termination, under Section 4041 of ERISA, if the plan assets are not sufficient to pay all plan liabilities, or (d) the institution of proceedings to terminate, or the appointment of a trustee with respect to, any Pension Plan by the PBGC, or (e) any other event or condition which would

31

constitute grounds under Section 4042(a) of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, or (f) the imposition of a Lien pursuant to Section 430(k) of the Code or Section 303 of ERISA, or (g) the determination that any Pension Plan or Multiemployer Plan is considered an at-risk plan or plan in endangered or critical status with the meaning of Sections 430, 431 or 432 of the Code or Sections 303, 304 or 305 of ERISA or (h) the partial or complete withdrawal of any Credit Party or any ERISA Affiliate from a Multiemployer Plan if withdrawal liability is asserted by such plan, or (i) any event or condition which results in the reorganization or insolvency of a Multiemployer Plan under Sections 4241 or 4245 of ERISA, or (j) any event or condition which results in the termination of a Multiemployer Plan under Section 4041A of ERISA or the institution by PBGC of proceedings to terminate a Multiemployer Plan under Section 4042 of ERISA, or (k) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Credit Party or any ERISA Affiliate.

"*Thomas Lockwood Non-Compete Consideration*" means the obligation to pay $1,200,000 in the aggregate by LII to Thomas Lockwood in sixty equal monthly installments commencing August 1, 2013, as consideration for certain non-compete covenants under the terms of that certain Stock Purchase Agreement dated effective August 1, 2013, among LII, LHI, Michael F. Lockwood and Thomas W. Lockwood.

"*Thomas Lockwood Note*" means that certain Promissory Note dated August 1, 2013, executed by LII and payable to the order of Thomas W. Lockwood in the original principal amount of $13,650,000, which was secured by the Thomas Lockwood Security Agreement and delivered in connection with that certain Stock Purchase Agreement dated effective August 1, 2013, among LII, LHI, Michael F. Lockwood and Thomas W. Lockwood.

"*Thomas Lockwood Security Agreement*" means that certain Security Agreement dated as of August 1, 2013, executed by LII in favor of Thomas W. Lockwood to secure the obligations of LII under the Thomas Lockwood Note and in respect of the Thomas Lockwood Non-Compete Consideration, as such agreement may be amended, restated, supplemented or otherwise modified from time to time.

"*Thomas Lockwood Subordination Agreement*" means that certain Amended and Restated Subordination Agreement effective February 10, 2015, among Thomas W. Lockwood, as subordinated creditor, Wells Fargo, as lender to LHI, and Administrative Agent, with respect to the Thomas Lockwood Note and Thomas Lockwood Non-Compete Consideration, as such agreement may be amended, restated, supplemented or otherwise modified from time to time.

"*Threshold Amount*" means Five Hundred Thousand Dollars ($500,000).

"*Transaction Costs*" means all transaction fees, charges and other amounts related to the Transactions (including, without limitation, any financing fees, legal fees and expenses, due diligence fees or any other fees and expenses in connection therewith), in each case to the extent paid within six (6) months of the closing of the Credit Facility and approved by the Administrative Agent in its reasonable discretion.

32

"***Transactions***" means, collectively, (a) the repayment in full of all Indebtedness (other than Indebtedness permitted pursuant to ***Section 8.1***) on the Closing Date, (b) the initial Extensions of Credit, and (c) the payment of the Transaction Costs incurred in connection with the foregoing.

"***UCC***" means the Uniform Commercial Code as in effect in the State of Texas, as amended or modified from time to time.

"***Uniform Customs***" means the Uniform Customs and Practice for Documentary Credits (2007 Revision), effective July, 2007 International Chamber of Commerce Publication No. 600.

"***United States***" means the United States of America.

"***Wells Fargo***" means Wells Fargo Bank, National Association, a national banking association, and its successors.

"***WF Aviation Guaranty***" means that certain Guaranty dated as of February 2, 2016, executed by LII, LEI, and Michael F. Lockwood in favor of WF Equipment Finance, and which was delivered upon closing of the WF Aviation Loan Agreement. *[First Amendment]*

"***WF Aviation Loan Agreement***" means that certain Term Loan Agreement dated February 2, 2016, between LHA, as borrower, and WF Equipment Finance, as lender. *[First Amendment]*

"***WF Equipment Finance***" means Wells Fargo Equipment Finance, Inc. *[First Amendment]*

"***Wholly-Owned***" means, with respect to a Subsidiary, that all of the shares of Capital Stock of such Subsidiary are, directly or indirectly, owned or controlled by any Borrower and/or one or more of its Wholly-Owned Subsidiaries (except for directors' qualifying shares or other shares required by Applicable Law to be owned by a Person other than such Borrower and/or one or more of its Wholly-Owned Subsidiaries).

"***Withholding Agent***" means the Borrowers and the Administrative Agent.

SECTION 1.2        Other Definitions and Provisions.        With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document: (a) the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined, (b) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms, (c) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (d) the word "will" shall be construed to have the same meaning and effect as the word "shall", (e) any reference herein to any Person shall be construed to include such Person's successors and assigns, (f) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (g) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (h) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all

33

tangible and intangible assets and properties, including cash, securities, accounts and contract rights, (i) the term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form, (j) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including" and (k) Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

SECTION 1.3        <u>Accounting Terms</u>.   All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with GAAP, applied on a consistent basis, as in effect from time to time and in a manner consistent with that used in preparing the audited financial statements required by ***Section 7.1(a)***, except as otherwise specifically prescribed herein.   Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of each Borrower and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

SECTION 1.4        <u>UCC Terms</u>.  Terms defined in the UCC in effect on the Closing Date and not otherwise defined herein shall, unless the context otherwise indicates, have the meanings provided by those definitions.  Subject to the foregoing, the term "UCC" refers, as of any date of determination, to the UCC then in effect.

SECTION 1.5        <u>Rounding</u>.  Any financial ratios required to be maintained by the Borrowers pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio or percentage is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

SECTION 1.6        <u>References to Agreement and Laws</u>.  Unless otherwise expressly provided herein, (a) references to formation documents, governing documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are not prohibited by any Loan Document; and (b) references to any Applicable Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Applicable Law.

SECTION 1.7        <u>Times of Day</u>.  Unless otherwise specified, all references herein to times of day shall be references to Central time (daylight or standard, as applicable).

SECTION 1.8        <u>Letter of Credit Amounts</u>.    Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to mean the

34

For Reference Purposes Only
5702727v1

maximum face amount of such Letter of Credit after giving effect to all increases thereof contemplated by such Letter of Credit or the Letter of Credit Application therefor (at the time specified therefor in such applicable Letter of Credit or Letter of Credit Application and as such amount may be reduced by (a) any permanent reduction of such Letter of Credit or (b) any amount which is drawn, reimbursed and no longer available under such Letter of Credit).

SECTION 1.9    Guaranty Obligations.  Unless otherwise specified, the amount of any Guaranty Obligation shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Guaranty Obligation.

SECTION 1.10    Covenant Compliance Generally.  For purposes of determining compliance under *Sections 8.1*, *8.2*, *8.3*, *8.5* and *8.6*, any amount in a currency other than Dollars will be converted to Dollars in a manner consistent with that used in calculating Consolidated Net Income in the financial statements of the Parent and its Subsidiaries delivered pursuant to *Section 7.1(a)* or *(b)*, as applicable.  Notwithstanding the foregoing, for purposes of determining compliance with *Sections 8.1*, *8.2* and *8.3*, with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no breach of any basket contained in such sections shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness or Investment is incurred; provided that for the avoidance of doubt, the foregoing provisions of this *Section 1.10* shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness or Investment may be incurred at any time under such Sections.

## Article II
## REVOLVING CREDIT FACILITY

SECTION 2.1    Revolving Credit Loans.  Subject to the terms and conditions of this Agreement and the other Loan Documents, and in reliance upon the representations and warranties set forth herein, each Revolving Credit Lender severally agrees to make Revolving Credit Loans to the Borrowers from time to time from the Closing Date through, but not including, the Revolving Credit Maturity Date as requested by the Borrowers in accordance with the terms of *Section 2.3*; *provided*, *that* (a) the Revolving Credit Outstandings shall not exceed the Revolving Credit Commitment and (b) the principal amount of outstanding Revolving Credit Loans from any Revolving Credit Lender plus such Revolving Credit Lender's Revolving Credit Commitment Percentage of outstanding L/C Obligations and outstanding Swingline Loans shall not at any time exceed such Revolving Credit Lender's Revolving Credit Commitment.  Each Revolving Credit Loan by a Revolving Credit Lender shall be in a principal amount equal to such Revolving Credit Lender's Revolving Credit Commitment Percentage of the aggregate principal amount of Revolving Credit Loans requested on such occasion.  Subject to the terms and conditions hereof, the Borrowers may borrow, repay and reborrow Revolving Credit Loans hereunder until the Revolving Credit Maturity Date.

SECTION 2.2    Swingline Loans.

(a)    Availability.  Subject to the terms and conditions of this Agreement, the Swingline Lender may in its sole discretion make Swingline

35

Loans to the Borrowers from time to time from the Closing Date through, but not including, the Revolving Credit Maturity Date; provided, that (i) after giving effect to any amount requested, the Revolving Credit Outstandings shall not exceed the Revolving Credit Commitment and (ii) the aggregate principal amount of all outstanding Swingline Loans (after giving effect to any amount requested), shall not exceed the Swingline Commitment.

(b)    Refunding.

(i)    Swingline Loans shall be refunded by the Revolving Credit Lenders on demand by the Swingline Lender. Such refundings shall be made by the Revolving Credit Lenders in accordance with their respective Revolving Credit Commitment Percentages and shall thereafter be reflected as Revolving Credit Loans of the Revolving Credit Lenders on the books and records of the Administrative Agent. Each Revolving Credit Lender shall fund its respective Revolving Credit Commitment Percentage of Revolving Credit Loans as required to repay Swingline Loans outstanding to the Swingline Lender upon demand by the Swingline Lender but in no event later than 1:00 p.m. on the next succeeding Business Day after such demand is made. No Revolving Credit Lender's obligation to fund its respective Revolving Credit Commitment Percentage of a Swingline Loan shall be affected by any other Revolving Credit Lender's failure to fund its Revolving Credit Commitment Percentage of a Swingline Loan, nor shall any Revolving Credit Lender's Revolving Credit Commitment Percentage be increased as a result of any such failure of any other Revolving Credit Lender to fund its Revolving Credit Commitment Percentage of a Swingline Loan.

(ii)    The Borrowers shall pay to the Swingline Lender on demand the amount of such Swingline Loans to the extent amounts received from the Revolving Credit Lenders are not sufficient to repay in full the outstanding Swingline Loans requested or required to be refunded. In addition, each Borrower hereby authorizes the Administrative Agent to charge any account maintained by such Borrower with the Swingline Lender (up to the amount available therein) in order to immediately pay the Swingline Lender the amount of such Swingline Loans to the extent amounts received from the Revolving Credit Lenders are not sufficient to repay in full the outstanding Swingline Loans requested or required to be refunded. If any portion of any such amount paid to the Swingline Lender shall be recovered by or on behalf of any Borrower from the Swingline Lender in bankruptcy or otherwise, the loss of the amount so recovered shall be ratably shared among all the Revolving Credit Lenders in accordance with their respective Revolving Credit Commitment Percentages (unless the amounts so recovered by or on behalf of such Borrower pertain to a Swingline Loan extended after the occurrence and during the continuance of an Event of Default of which the Administrative Agent has received notice in the manner required pursuant to **Section 11.3**

36

*For Reference Purposes Only*
5702727v1

and which such Event of Default has not been waived by the Required Lenders or the Lenders, as applicable).

(iii)    Each Revolving Credit Lender acknowledges and agrees that its obligation to refund Swingline Loans in accordance with the terms of this **Section 2.2(b)(iii)** is absolute and unconditional and shall not be affected by any circumstance whatsoever, including, without limitation, non-satisfaction of the conditions set forth in **Article V**.  Further, each Revolving Credit Lender agrees and acknowledges that if prior to the refunding of any outstanding Swingline Loans pursuant to this **Section 2.2(b)(iii)**, one of the events described in **Section 9.1(i)** or **(j)** shall have occurred, each Revolving Credit Lender will, on the date the applicable Revolving Credit Loan would have been made, purchase an undivided participating interest in the Swingline Loan to be refunded in an amount equal to its Revolving Credit Commitment Percentage of the aggregate amount of such Swingline Loan.  Each Revolving Credit Lender will immediately transfer to the Swingline Lender, in immediately available funds, the amount of its participation and upon receipt thereof the Swingline Lender will deliver to such Revolving Credit Lender a certificate evidencing such participation dated the date of receipt of such funds and for such amount.  Whenever, at any time after the Swingline Lender has received from any Revolving Credit Lender such Revolving Credit Lender's participating interest in a Swingline Loan, the Swingline Lender receives any payment on account thereof, the Swingline Lender will distribute to such Revolving Credit Lender its participating interest in such amount (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Revolving Credit Lender's participating interest was outstanding and funded).

(c)    Defaulting Lenders.  Notwithstanding anything to the contrary contained in this Agreement, this **Section 2.2** shall be subject to the terms and conditions of **Section 4.14** and **Section 4.15**.

SECTION 2.3    Procedure for Advances of Revolving Credit Loans and Swingline Loans

.

(a)    Requests for Borrowing.  The Borrowers shall give the Administrative Agent irrevocable prior written notice substantially in the form of **Exhibit B** (a "**Notice of Borrowing**") not later than 11:00 a.m. (i) on the same Business Day as each Base Rate Loan and each Swingline Loan and (ii) at least three (3) Business Days before each LIBOR Rate Loan, of its intention to borrow, specifying (A) the date of such borrowing, which shall be a Business Day, (B) the amount of such borrowing, which shall be, (x) with respect to Base Rate Loans (other than Swingline Loans) in an aggregate principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof, (y) with respect to LIBOR Rate

37

For Reference Purposes Only
5702727v1

Loans in an aggregate principal amount of $2,000,000 or a whole multiple of $500,000 in excess thereof and (z) with respect to Swingline Loans in an aggregate principal amount of $100,000 or a whole multiple of $100,000 in excess thereof, (C) whether such Loan is to be a Revolving Credit Loan or Swingline Loan, (D) in the case of a Revolving Credit Loan whether the Loans are to be LIBOR Rate Loans or Base Rate Loans, and (E) in the case of a LIBOR Rate Loan, the duration of the Interest Period applicable thereto. A Notice of Borrowing received after 11:00 a.m. shall be deemed received on the next Business Day. The Administrative Agent shall promptly notify the Revolving Credit Lenders of each Notice of Borrowing.

(b)      *Disbursement of Revolving Credit and Swingline Loans*. Not later than 1:00 p.m. on the proposed borrowing date, (i) each Revolving Credit Lender will make available to the Administrative Agent, for the account of the Borrowers, at the office of the Administrative Agent in funds immediately available to the Administrative Agent, such Revolving Credit Lender's Revolving Credit Commitment Percentage of the Revolving Credit Loans to be made on such borrowing date and (ii) the Swingline Lender will make available to the Administrative Agent, for the account of the Borrowers, at the office of the Administrative Agent in funds immediately available to the Administrative Agent, the Swingline Loans to be made on such borrowing date. Each Borrower hereby irrevocably authorizes the Administrative Agent to disburse the proceeds of each borrowing requested pursuant to this ***Section 2.3(b)*** in immediately available funds by crediting or wiring such proceeds to the deposit account of any Borrower identified in the most recent notice substantially in the form attached as ***Exhibit C*** (a "***Notice of Account Designation***") delivered by the Borrowers to the Administrative Agent or as may be otherwise agreed upon by the Borrowers and the Administrative Agent from time to time. Subject to ***Section 4.7*** hereof, during any period in which there is more than one Revolving Credit Lender under this Agreement, the Administrative Agent shall not be obligated to disburse the portion of the proceeds of any Revolving Credit Loan requested pursuant to this ***Section 2.3(b)*** to the extent that any Revolving Credit Lender has not made available to the Administrative Agent its Revolving Credit Commitment Percentage of such Loan. Revolving Credit Loans to be made for the purpose of refunding Swingline Loans shall be made by the Revolving Credit Lenders as provided in ***Section 2.2(b)***.

SECTION 2.4        *Repayment and Prepayment of Revolving Credit and Swingline Loans*.

(a)      *Repayment on Termination Date*. (i) The Borrowers hereby agree to repay the outstanding principal amount of (i) all Revolving Credit Loans in full on the Revolving Credit Maturity Date, and (ii) all Swingline Loans in accordance with ***Section 2.2(b)*** (but, in any event, no later than the Revolving Credit Maturity Date), together, in each case, with all accrued but unpaid interest thereon.

38

*For Reference Purposes Only*
5702727v1

(ii) Repayment Equal to Weekly Excess Cash Balances. The Borrowers agree to repay, or cause to be repaid, Loans as required in *Section 7.20(a)*.

(b)     Mandatory Prepayments.  If at any time the Revolving Credit Outstandings exceed the Revolving Credit Commitment, the Borrowers agree to repay immediately upon notice from the Administrative Agent, by payment to the Administrative Agent for the account of the Revolving Credit Lenders, Extensions of Credit in an amount equal to such excess with each such repayment applied first, to the principal amount of outstanding Swingline Loans, second to the principal amount of outstanding Revolving Credit Loans and third, with respect to any Letters of Credit then outstanding, a payment of Cash Collateral into a Cash Collateral account opened by the Administrative Agent, for the benefit of the Revolving Credit Lenders, in an amount equal to such excess (such Cash Collateral to be applied in accordance with *Section 9.2(b)*).

(c)     Optional Prepayments.  The Borrowers may at any time and from time to time prepay Revolving Credit Loans and Swingline Loans, in whole or in part, with irrevocable prior written notice to the Administrative Agent substantially in the form attached as *Exhibit D* (a "*Notice of Prepayment*") given not later than 11:00 a.m. (i) on the same Business Day as each Base Rate Loan and each Swingline Loan and (ii) at least three (3) Business Days before each LIBOR Rate Loan, specifying the date and amount of prepayment and whether the prepayment is of LIBOR Rate Loans, Base Rate Loans, Swingline Loans or a combination thereof, and, if of a combination thereof, the amount allocable to each.  Upon receipt of such notice, the Administrative Agent shall promptly notify each Revolving Credit Lender.  If any such notice is given, the amount specified in such notice shall be due and payable on the date set forth in such notice.  Partial prepayments shall be in an aggregate amount of $1,000,000 or a whole multiple of $500,000 in excess thereof with respect to Base Rate Loans (other than Swingline Loans), $2,000,000 or a whole multiple of $500,000 in excess thereof with respect to LIBOR Rate Loans and $100,000 or a whole multiple of $100,000 in excess thereof with respect to Swingline Loans.  A Notice of Prepayment received after 11:00 a.m. shall be deemed received on the next Business Day.  Each such repayment shall be accompanied by any amount required to be paid pursuant to *Section 4.9* hereof.

(d)     Prepayment of Excess Proceeds.  The amount of such excess proceeds shall be used on the date of the required prepayment to prepay the outstanding principal amount of the Revolving Credit Loans, without a corresponding reduction of the Revolving Credit Commitment, with the remaining proceeds, if any, being refunded to the Borrowers.

(e)     Limitation on Prepayment of LIBOR Rate Loans.  The Borrowers may not prepay any LIBOR Rate Loan on any day other than on the last day of the Interest Period applicable thereto unless such prepayment is accompanied by any amount required to be paid pursuant to *Section 4.9* hereof.

39

For Reference Purposes Only
5702727v1

(f)     Hedge Agreements.  No repayment or prepayment pursuant to this *Section 2.4(f)* shall affect any of the Borrowers' obligations under any Hedge Agreement.

SECTION 2.5          Permanent Reduction of the Revolving Credit Commitment.

(a)     Voluntary Reduction.  The Borrowers shall have the right at any time and from time to time, upon at least five (5) Business Days prior written notice to the Administrative Agent, to permanently reduce, without premium or penalty, (i) the entire Revolving Credit Commitment at any time or (ii) portions of the Revolving Credit Commitment, from time to time, in an aggregate principal amount not less than $3,000,000 or any whole multiple of $1,000,000 in excess thereof.  Any reduction of the Revolving Credit Commitment shall be applied to the Revolving Credit Commitment of each Revolving Credit Lender according to its Revolving Credit Commitment Percentage.  All commitment fees accrued until the effective date of any termination of the Revolving Credit Commitment shall be paid on the effective date of such termination.

(b)     Corresponding Payment.  Each permanent reduction permitted or required pursuant to this *Section 2.5(b)* shall be accompanied by a payment of principal sufficient to reduce the aggregate outstanding Revolving Credit Loans, Swingline Loans and L/C Obligations, as applicable, after such reduction to the Revolving Credit Commitment as so reduced and if the aggregate amount of all outstanding Letters of Credit exceeds the Revolving Credit Commitment as so reduced, the Borrowers shall be required to deposit Cash Collateral in a Cash Collateral account opened by the Administrative Agent in an amount equal to such excess.  Such Cash Collateral shall be applied in accordance with *Section 9.2(b)*.  Any reduction of the Revolving Credit Commitment to zero shall be accompanied by payment of all outstanding Revolving Credit Loans and Swingline Loans (and furnishing of Cash Collateral satisfactory to the Administrative Agent for all L/C Obligations) and shall result in the termination of the Revolving Credit Commitment and the Swingline Commitment and the Revolving Credit Facility.  If the reduction of the Revolving Credit Commitment requires the repayment of any LIBOR Rate Loan, such repayment shall be accompanied by any amount required to be paid pursuant to *Section 4.9* hereof.

(c)     Reduction Equal to Month-End Excess Cash Balances.  The Borrowers agree to repay, or cause to be repaid, Loans as required in *Section 7.20(b)*.

SECTION 2.6          Termination of Revolving Credit Facility; Cash Collateral for Letters of Credit.  The Revolving Credit Facility and the Revolving Credit Commitments shall terminate on the Revolving Credit Maturity Date.  Borrowers covenant and agree that they shall Cash Collateralize all L/C Obligations in an amount not less than 102% of all such L/C Obligations by not later than the fifth (5th) Business Day prior to the Revolving Credit Maturity Date.  After all such Letters of Credit shall have expired or been fully drawn upon, the Reimbursement Obligation shall have been satisfied and all other Obligations shall have been

40

For Reference Purposes Only
5702727v1

paid in full in accordance with the terms of this Agreement, the balance, if any, in such Cash Collateral account shall be returned to the Borrowers.

SECTION 2.7    Treasury Management.  Each Borrower and Swingline Lender may from time to time enter into a Cash Management Agreement whereby borrowings of Swingline Loans are to be authorized by such Borrower to occur automatically or via website/on-line authorization on any business day, and the Borrowers are permitted to borrow under **Section 2.3,** prepay under **Section 2.4**, and reborrow under **Section 2.3** pursuant to the terms of such Cash Management Agreements; *provided that* such Swingline Loans shall be subject to **Section 4.1(a)(ii)**.

**Article III**
**LETTER OF CREDIT FACILITY**

SECTION 3.1    L/C Commitment.

(a)    Availability.    Subject to the terms and conditions hereof, the Issuing Lender, in reliance on the agreements of the other Lenders set forth in **Section 3.4(a)**, agrees to issue letters of credit (the "**Letters of Credit**") for the account of the Borrowers or any Subsidiary thereof on any Business Day from the Closing Date through but not including the fifth (5th) Business Day prior to the Revolving Credit Maturity Date in such form as may be approved from time to time by the Issuing Lender; provided, that the Issuing Lender shall have no obligation to issue any Letter of Credit if, after giving effect to such issuance, (i) the L/C Obligations would exceed the L/C Commitment or (ii) the Revolving Credit Outstandings would exceed the Revolving Credit Commitment.  Each Letter of Credit shall (i) be denominated in Dollars in a minimum amount of $100,000, (or such lesser amount as agreed to by the Issuing Lender), (ii) be a letter of credit issued to support obligations of any Borrower or any of its Subsidiaries, contingent or otherwise, incurred in the ordinary course of business, (iii) expire on a date no later than the fifth (5th) Business Day prior to the Revolving Credit Maturity Date, and (iv) be subject to the Uniform Customs and/or ISP98, as set forth in the Letter of Credit Application or as determined by the Issuing Lender and, to the extent not inconsistent therewith, the laws of the State of Texas.  The Issuing Lender shall not at any time be obligated to issue any Letter of Credit hereunder if such issuance would conflict with, or cause the Issuing Lender or any L/C Participant to exceed any limits imposed by, any Applicable Law.    References herein to "issue" and derivations thereof with respect to Letters of Credit shall also include extensions or modifications of any outstanding Letters of Credit, unless the context otherwise requires.  As of the Closing Date, each of the Existing Letters of Credit shall constitute, for all purposes of this Agreement and the other Loan Documents, a Letter of Credit issued and outstanding hereunder.

(b)    Defaulting Lenders.    Notwithstanding anything to the contrary contained in this Agreement, **Article III** shall be subject to the terms and conditions of **Section 4.14** and **Section 4.15**.

41

For Reference Purposes Only
5702727v1

SECTION 3.2     Procedure for Issuance of Letters of Credit.  The Borrowers may from time to time request that the Issuing Lender issue a Letter of Credit by delivering to the Issuing Lender at the Administrative Agent's Office a Letter of Credit Application therefor, completed to the satisfaction of the Issuing Lender, and such other certificates, documents and other papers and information as the Issuing Lender may request.  Upon receipt of any Letter of Credit Application, the Issuing Lender shall process such Letter of Credit Application and the certificates, documents and other papers and information delivered to it in connection therewith in accordance with its customary procedures and shall, subject **to Section 3.1** and **Article V**, promptly issue the Letter of Credit requested thereby (but in no event shall the Issuing Lender be required to issue any Letter of Credit earlier than three (3) Business Days after its receipt of the Letter of Credit Application therefor and all such other certificates, documents and other papers and information relating thereto) by issuing the original of such Letter of Credit to the beneficiary thereof or as otherwise may be agreed by the Issuing Lender and the Borrowers.  The Issuing Lender shall promptly furnish to the Borrowers a copy of such Letter of Credit and promptly notify each Revolving Credit Lender of the issuance and upon request by any Revolving Credit Lender, furnish to such Lender a copy of such Revolving Credit Letter of Credit and the amount of such Revolving Credit Lender's participation therein.

SECTION 3.3     Commissions and Other Charges.

(a)     Letter of Credit Commissions.

(i)     Subject to **Section 4.15(a)(iii)(B)**, the Borrowers shall pay to the Administrative Agent, for the account of the Issuing Lender and the L/C Participants, a letter of credit commission with respect to each standby Letter of Credit in the amount equal to the daily amount available to be drawn under such Letter of Credit times the Applicable Margin with respect to Revolving Credit Loans that are LIBOR Rate Loans (determined on a per annum basis).  Such commission shall be payable quarterly in arrears on the last Business Day of each calendar quarter, on the Revolving Credit Maturity Date and thereafter on demand of the Administrative Agent.

(ii)     Subject to **Section 4.15(a)(iii)(B)**, the Borrowers shall pay to the Administrative Agent, for the account of the Issuing Lender, a commission with respect to each commercial Letter of Credit in the amount equal to the daily amount available to be drawn under such Letter of Credit times 0.125% (determined on a per annum basis); *provided that*, the amount of each such commission may not be less than $150.

(iii)     The Administrative Agent shall, promptly following its receipt thereof, distribute to the Issuing Lender and the L/C Participants all commissions received pursuant to this **Section 3.3(a)** in accordance with their respective Revolving Credit Commitment Percentages.

(b)     Issuance Fees.  The Borrowers shall pay to the Administrative Agent, for the account of the Issuing Lender, standard bank fees and charges of

42

*For Reference Purposes Only*
5702727v1

the Issuing Lender for the issuance of each Letter of Credit. Such issuance fees and charges shall be payable quarterly in arrears on the last Business Day of each calendar quarter commencing with the first such date to occur after the issuance of such Letter of Credit, on the Revolving Credit Maturity Date and thereafter on demand of the Administrative Agent.

(c)    <u>Other Costs</u>.  In addition to the foregoing fees and commissions, the Borrowers shall pay or reimburse the Issuing Lender for such normal and customary costs and expenses as are incurred or charged by the Issuing Lender in issuing, effecting payment under, amending or otherwise administering any Letter of Credit.

SECTION 3.4    <u>L/C Participations</u>.

(a)    The Issuing Lender irrevocably agrees to grant and hereby grants to each L/C Participant, and, to induce the Issuing Lender to issue Letters of Credit hereunder, each L/C Participant irrevocably agrees to accept and purchase and hereby accepts and purchases from the Issuing Lender, on the terms and conditions hereinafter stated, for such L/C Participant's own account and risk an undivided interest equal to such L/C Participant's Revolving Credit Commitment Percentage in the Issuing Lender's obligations and rights under and in respect of each Letter of Credit issued hereunder and the amount of each draft paid by the Issuing Lender thereunder. Each L/C Participant unconditionally and irrevocably agrees with the Issuing Lender that, if a draft is paid under any Letter of Credit for which the Issuing Lender is not reimbursed in full by the Borrowers through a Revolving Credit Loan or otherwise in accordance with the terms of this Agreement, such L/C Participant shall pay to the Issuing Lender upon demand at the Issuing Lender's address for notices specified herein an amount equal to such L/C Participant's Revolving Credit Commitment Percentage of the amount of such draft, or any part thereof, which is not so reimbursed.

(b)    Upon becoming aware of any amount required to be paid by any L/C Participant to the Issuing Lender pursuant to ***Section 3.4(a)*** in respect of any unreimbursed portion of any payment made by the Issuing Lender under any Letter of Credit, the Issuing Lender shall notify each L/C Participant of the amount and due date of such required payment and such L/C Participant shall pay to the Issuing Lender the amount specified on the applicable due date. If any such amount is paid to the Issuing Lender after the date such payment is due, such L/C Participant shall pay to the Issuing Lender on demand, in addition to such amount, the product of (i) such amount, <u>times</u> (ii) the daily average Federal Funds Rate as determined by the Administrative Agent during the period from and including the date such payment is due to the date on which such payment is immediately available to the Issuing Lender, <u>times</u> (iii) a fraction the numerator of which is the number of days that elapse during such period and the denominator of which is 360. A certificate of the Issuing Lender with respect to any amounts owing under this ***Section 3.4(b)*** shall be conclusive in the absence of manifest error. With respect to payment to the Issuing Lender of the unreimbursed

43

For Reference Purposes Only
5702727v1

amounts described in this **Section 3.4(b)**, if the L/C Participants receive notice that any such payment is due (A) prior to 1:00 p.m. on any Business Day, such payment shall be due that Business Day, and (B) after 1:00 p.m. on any Business Day, such payment shall be due on the following Business Day.

(c)      Whenever, at any time after the Issuing Lender has made payment under any Letter of Credit and has received from any L/C Participant its Revolving Credit Commitment Percentage of such payment in accordance with this **Section 3.4(c)**, the Issuing Lender receives any payment related to such Letter of Credit (whether directly from the Borrowers or otherwise), or any payment of interest on account thereof, the Issuing Lender will distribute to such L/C Participant its pro rata share thereof; <u>provided</u>, that in the event that any such payment received by the Issuing Lender shall be required to be returned by the Issuing Lender, such L/C Participant shall return to the Issuing Lender the portion thereof previously distributed by the Issuing Lender to it.

SECTION 3.5      Reimbursement Obligation of the Borrowers.  In the event of any drawing under any Letter of Credit, the Borrowers agree to reimburse (either with the proceeds of a Revolving Credit Loan as provided for in this **Section 3.5** or with funds from other sources), in same day funds, the Issuing Lender on each date on which the Issuing Lender notifies the Borrowers of the date and amount of a draft paid under any Letter of Credit for the amount of (a) such draft so paid and (b) any amounts referred to in **Section 3.3(c)** incurred by the Issuing Lender in connection with such payment.  Unless the Borrowers shall immediately notify the Issuing Lender that the Borrowers intend to reimburse the Issuing Lender for such drawing from other sources or funds, the Borrowers shall be deemed to have timely given a Notice of Borrowing to the Administrative Agent requesting that the Revolving Credit Lenders make a Revolving Credit Loan bearing interest at the Base Rate on such date in the amount of (a) such draft so paid and (b) any amounts referred to in **Section 3.3(c)** incurred by the Issuing Lender in connection with such payment, and the Revolving Credit Lenders shall make a Revolving Credit Loan bearing interest at the Base Rate in such amount, the proceeds of which shall be applied to reimburse the Issuing Lender for the amount of the related drawing and costs and expenses. Each Revolving Credit Lender acknowledges and agrees that its obligation to fund a Revolving Credit Loan in accordance with this **Section 3.5** to reimburse the Issuing Lender for any draft paid under a Letter of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including, without limitation, non-satisfaction of the conditions set forth in **Section 2.3(a)** or **Article V**.  If the Borrowers have elected to pay the amount of such drawing with funds from other sources and shall fail to reimburse the Issuing Lender as provided above, the unreimbursed amount of such drawing shall bear interest at the rate which would be payable on any outstanding Base Rate Loans which were then overdue from the date such amounts become payable (whether at stated maturity, by acceleration or otherwise) until payment in full.

SECTION 3.6      Obligations Absolute.  Each Borrower's obligations under this **Article III** (including, without limitation, the Reimbursement Obligation) shall be absolute and unconditional under any and all circumstances and irrespective of any set off, counterclaim or defense to payment which any Borrower may have or have had against the Issuing Lender or any beneficiary of a Letter of Credit or any other Person.  Each Borrower also agrees that the Issuing

44

For Reference Purposes Only
5702727v1

Lender and the L/C Participants shall not be responsible for, and each Borrower's Reimbursement Obligation under **Section 3.5** shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even though such documents shall in fact prove to be invalid, fraudulent or forged, or any dispute between or among any Borrower and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of any Borrower against any beneficiary of such Letter of Credit or any such transferee. The Issuing Lender shall not be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit, except for errors or omissions caused by the Issuing Lender's gross negligence or willful misconduct, as determined by a court of competent jurisdiction by final nonappealable judgment. Each Borrower agrees that any action taken or omitted by the Issuing Lender under or in connection with any Letter of Credit or the related drafts or documents, if done in the absence of gross negligence or willful misconduct shall be binding on each Borrower and shall not result in any liability of the Issuing Lender or any L/C Participant to any Borrower. The responsibility of the Issuing Lender to the Borrowers in connection with any draft presented for payment under any Letter of Credit shall, in addition to any payment obligation expressly provided for in such Letter of Credit, be limited to determining that the documents (including each draft) delivered under such Letter of Credit in connection with such presentment are in conformity with such Letter of Credit.

SECTION 3.7    Effect of Letter of Credit Application. To the extent that any provision of any Letter of Credit Application related to any Letter of Credit is inconsistent with the provisions of this **Article III**, the provisions of this **Article III** shall apply.

## Article IV
## GENERAL LOAN PROVISIONS

SECTION 4.1    Interest.

(a)    Interest Rate Options.

(i)    Subject to the provisions of this **Section 4.1**, at the election of the Borrowers, (i) Revolving Credit Loans shall bear interest at (A) the Base Rate plus the Applicable Margin or (B) the LIBOR Rate plus the Applicable Margin (provided that the LIBOR Rate shall not be available until three (3) Business Days after the Closing Date unless the Borrowers have delivered to the Administrative Agent a letter in form and substance reasonably satisfactory to the Administrative Agent indemnifying the Lenders in the manner set forth in **Section 4.9** of this Agreement) and (ii) any Swingline Loan shall bear interest at the LIBOR Market Index Rate plus the Applicable Margin. The Borrowers shall select the rate of interest and Interest Period, if any, applicable to any Loan at the time a Notice of Borrowing is given or at the time a Notice of Conversion/Continuation is given pursuant to **Section 4.2**. Any Loan or any portion thereof as to which the Borrowers have not duly specified an interest rate as provided herein shall be deemed a Base Rate Loan.

45

*For Reference Purposes Only*
5702727v1

(ii)    If a Cash Management Agreement is in effect and includes a cash management arrangement under which borrowing under, and repayment of, the Revolving Credit Facility is settled each day based on debits and credits to the applicable deposit accounts, then the Revolving Credit Loans during such time shall bear interest at the LIBOR Market Index Rate plus the Applicable Margin for LIBOR Rate Loans.  The LIBOR Market Index Rate is a daily index rate to which Interest Periods are not applicable.

(b)    <u>Interest Periods</u>.  In connection with each LIBOR Rate Loan, the Borrowers, by giving notice at the times described in ***Section 2.3*** or ***4.2***, as applicable, shall elect an interest period (each, an "***Interest Period***") to be applicable to such Loan, which Interest Period shall be a period of one (1) or three (3) months; <u>provided</u> that:

(i)    the Interest Period shall commence on the date of advance of or conversion to any LIBOR Rate Loan and, in the case of immediately successive Interest Periods, each successive Interest Period shall commence on the date on which the immediately preceding Interest Period expires;

(ii)    if any Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided, that if any Interest Period with respect to a LIBOR Rate Loan would otherwise expire on a day that is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the immediately preceding Business Day;

(iii)    any Interest Period with respect to a LIBOR Rate Loan that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the relevant calendar month at the end of such Interest Period;

(iv)    no Interest Period shall extend beyond the Revolving Credit Maturity Date, and Interest Periods shall be selected by the Borrowers so as to permit the Borrowers to make payments without payment of any amounts pursuant to ***Section 4.9***; and

(v)    there shall be no more than five (5) Interest Periods in effect at any time.

(c)    <u>Default Rate</u>.  Subject to ***Section 9.3***, (i) immediately upon the occurrence and during the continuance of an Event of Default under ***Section 9.1(a)***, (***b***), (***j***) or (***k***), or (ii) at the election of the Required Lenders, upon the occurrence and during the continuance of any other Event of Default, (A) the

46

For Reference Purposes Only
5702727v1

Borrowers shall no longer have the option to request LIBOR Rate Loans, Swingline Loans or Letters of Credit, (B) all outstanding LIBOR Rate Loans shall bear interest at a rate per annum of two percent (2%) in excess of the rate (including the Applicable Margin) then applicable to LIBOR Rate Loans until the end of the applicable Interest Period and thereafter at a rate equal to two percent (2%) in excess of the rate (including the Applicable Margin) then applicable to Base Rate Loans, (C) all outstanding Base Rate Loans and other Obligations arising hereunder or under any other Loan Document shall bear interest at a rate per annum equal to two percent (2%) in excess of the rate (including the Applicable Margin) then applicable to Base Rate Loans or such other Obligations arising hereunder or under any other Loan Document, (D) all outstanding LIBOR Market index Rate Loans shall bear interest at a rate per annum of three percent (3%) in excess of the rate (including the Applicable Margin) then applicable to LIBOR Market Index Rate Loans, and (E) all accrued and unpaid interest shall be due and payable on demand of the Administrative Agent. Interest shall continue to accrue on the Obligations after the filing by or against any Borrower of any petition seeking any relief in bankruptcy or under any act or law pertaining to insolvency or debtor relief, whether state, federal or foreign.

(d) <u>Interest Payment and Computation</u>. Interest on each Base Rate Loan shall be due and payable in arrears on the last Business Day of each month commencing October 31, 2015, interest on each LIBOR Market Index Rate Loan shall be due and payable in arrears on the last Business Day of each month commencing October 31, 2015; and interest on each LIBOR Rate Loan shall be due and payable on the last day of each Interest Period applicable thereto, and if such Interest Period extends over three (3) months, at the end of each three (3) month interval during such Interest Period. All computations of interest for Base Rate Loans when the Base Rate is determined by the Prime Rate shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest provided hereunder shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365/366-day year).

(e) <u>Maximum Rate</u>. In no contingency or event whatsoever shall the aggregate of all amounts deemed interest under this Agreement charged or collected pursuant to the terms of this Agreement exceed the highest rate permissible under any Applicable Law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. In the event that such a court determines that the Lenders have charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by Applicable Law and the Lenders shall at the Administrative Agent's option (i) promptly refund to the Borrowers any interest received by the Lenders in excess of the maximum lawful rate or (ii) apply such excess to the principal balance of the Obligations on a pro rata basis. It is the intent hereof that the Borrowers not pay or contract to pay, and that neither the Administrative Agent nor any Lender receive or contract to

47

receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by the Borrowers under Applicable Law.

SECTION 4.2          Notice and Manner of Conversion or Continuation of Loans. Provided that no Default or Event of Default has occurred and is then continuing, the Borrowers shall have the option to (a) convert at any time following the third Business Day after the Closing Date all or any portion of any outstanding Base Rate Loans (other than Swingline Loans) in a principal amount equal to $1,000,000 or any whole multiple of $100,000 in excess thereof into one or more LIBOR Rate Loans and (b) upon the expiration of any Interest Period, (i) convert all or any part of its outstanding LIBOR Rate Loans in a principal amount equal to $2,000,000 or a whole multiple of $500,000 in excess thereof into Base Rate Loans (other than Swingline Loans) or (ii) continue such LIBOR Rate Loans as LIBOR Rate Loans. Whenever the Borrowers desire to convert or continue Loans as provided above, the Borrowers shall give the Administrative Agent irrevocable prior written notice in the form attached as *Exhibit E* (a "*Notice of Conversion/Continuation*") not later than 11:00 a.m. three (3) Business Days before the day on which a proposed conversion or continuation of such Loan is to be effective specifying (A) the Loans to be converted or continued, and, in the case of any LIBOR Rate Loan to be converted or continued, the last day of the Interest Period therefor, (B) the effective date of such conversion or continuation (which shall be a Business Day), (C) the principal amount of such Loans to be converted or continued, and (D) the Interest Period to be applicable to such converted or continued LIBOR Rate Loan. The Administrative Agent shall promptly notify the affected Lenders of such Notice of Conversion/Continuation.

SECTION 4.3          Fees.

(a)          Commitment Fee. Commencing on the Closing Date, subject to *Section 4.15(a)(iii)(A)*, the Borrowers shall pay to the Administrative Agent, for the account of the Revolving Credit Lenders, a non-refundable commitment fee (the "*Commitment Fee*") at a rate per annum equal to the Applicable Margin on the average daily unused portion of the Revolving Credit Commitment of the Revolving Credit Lenders (other than the Defaulting Lenders, if any); provided, that the amount of outstanding Swingline Loans shall not be considered usage of the Revolving Credit Commitment for the purpose of calculating the Commitment Fee. The Commitment Fee shall be payable in arrears on the last Business Day of each calendar quarter during the term of this Agreement commencing December 31, 2015, and ending on the Revolving Credit Maturity Date. Such Commitment Fee shall be distributed by the Administrative Agent to the Revolving Credit Lenders (other than any Defaulting Lender) pro rata in accordance with such Revolving Credit Lenders' respective Revolving Credit Commitment Percentages.

(b)          Other Fees. The Borrowers shall pay to the Lenders such fees as shall have been separately agreed upon in writing by the Borrowers and the Administrative Agent in the amounts and at the times so specified, including, without limitation, standard annual administrative fees charged by the Administrative Agent for administering this Agreement for more than one Lender.

48

SECTION 4.4    Manner of Payment.

(a)    Sharing of Payments.  Each payment by the Borrowers on account of the principal of or interest on the Loans or of any fee, commission or other amounts (including the Reimbursement Obligation) payable to the Lenders under this Agreement shall be made not later than 1:00 p.m. on the date specified for payment under this Agreement to the Administrative Agent at the Administrative Agent's Office for the account of the Lenders entitled to such payment in Dollars, in immediately available funds and shall be made without any set off, counterclaim or deduction whatsoever.  Any payment received after such time but before 2:00 p.m. on such day shall be deemed a payment on such date for the purposes of **Section 9.1**, but for all other purposes shall be deemed to have been made on the next succeeding Business Day.  Any payment received after 2:00 p.m. shall be deemed to have been made on the next succeeding Business Day for all purposes.  Upon receipt by the Administrative Agent of each such payment, the Administrative Agent shall distribute to each such Lender at its address for notices set forth herein its Commitment Percentage in respect of the relevant Credit Facility (or other applicable share as provided herein) of such payment and shall wire advice of the amount of such credit to each Lender.  Each payment to the Administrative Agent on account of the principal of or interest on the Swingline Loans or of any fee, commission or other amounts payable to the Swingline Lender shall be made in like manner, but for the account of the Swingline Lender.  Each payment to the Administrative Agent of the Issuing Lender's fees or L/C Participants' commissions shall be made in like manner, but for the account of the Issuing Lender or the L/C Participants, as the case may be.  Each payment to the Administrative Agent of Administrative Agent's fees or expenses shall be made for the account of the Administrative Agent and any amount payable to any Lender under **Sections 4.9**, **4.10**, **4.11** or **11.3** shall be paid to the Administrative Agent for the account of the applicable Lender.  Subject to **Section 4.1(b)(ii)**, if any payment under this Agreement shall be specified to be made upon a day which is not a Business Day, it shall be made on the next succeeding day which is a Business Day and such extension of time shall in such case be included in computing any interest if payable along with such payment.

(b)    Defaulting Lenders.  Notwithstanding the foregoing *clause (a)*, if there exists a Defaulting Lender each payment by the Borrowers to such Defaulting Lender hereunder shall be applied in accordance with **Section 4.15(a)(ii)**.

SECTION 4.5    Evidence of Indebtedness.

(a)    Extensions of Credit.  The Extensions of Credit made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Extensions of Credit made by the Lenders to the Borrowers and the interest and payments

49

thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Administrative Agent, the Borrowers shall execute and deliver to such Lender (through the Administrative Agent) a Revolving Credit Note, and/or Swingline Note, as applicable, which shall evidence such Lender's Revolving Credit Loans and/or Swingline Loans, as applicable, in addition to such accounts or records. Each Lender may attach schedules to its Notes and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.

(b)   _Participations_.  In addition to the accounts and records referred to in *subsection (a)*, each Revolving Credit Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records evidencing the purchases and sales by such Revolving Credit Lender of participations in Letters of Credit and Swingline Loans. In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Revolving Credit Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

SECTION 4.6        _Adjustments_. If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations (other than pursuant to *Sections 4.9*, *4.10*, *4.11* or *11.3*) greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; <u>provided</u> that

(i)      if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and

(ii)     the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement, (B) the application of Cash Collateral provided for in *Section 4.14* or (C) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in Swingline Loans and

50

*For Reference Purposes Only*
*5702727v1*

Letters of Credit to any assignee or participant, other than to any Borrower or any of a Borrower's Subsidiaries (as to which the provisions of this paragraph shall apply).

Each Credit Party consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against each Credit Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of each Credit Party in the amount of such participation.

SECTION 4.7 <u>Obligations of Lenders.</u>

(a) <u>Funding by Lenders; Presumption by Administrative Agent</u>. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with **Section 2.3(b)** and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (i) in the case of a payment to be made by such Lender, the greater of the daily average Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation and (ii) in the case of a payment to be made by the Borrowers, the interest rate applicable to Base Rate Loans. If the Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period. If such Lender pays its share of the applicable borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such borrowing. Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(b) <u>Nature of Obligations of Lenders Regarding Extensions of Credit</u>. The obligations of the Lenders under this Agreement to make the Loans and issue or participate in Letters of Credit are several and are not joint or joint and several. The failure of any Lender to make available its Commitment Percentage of any Loan requested by the Borrowers shall not relieve it or any other Lender of its obligation, if any, hereunder to make its Commitment Percentage of such Loan available on the borrowing date, but no Lender shall be responsible for the failure of any other Lender to make its Commitment Percentage of such Loan available on the borrowing date.

For Reference Purposes Only
5702727v1

SECTION 4.8    Changed Circumstances.

(a)    Circumstances Affecting LIBOR Rate Availability.  In connection with any request for a LIBOR Rate Loan or any Base Rate Loan as to which the interest rate is determined with reference to LIBOR or a conversion to or continuation thereof, if for any reason (i) the Administrative Agent shall determine (which determination shall be conclusive and binding absent manifest error) that Dollar deposits are not being offered to banks in the London interbank Eurodollar market for the applicable amount and Interest Period of such Loan, (ii) the Administrative Agent shall determine (which determination shall be conclusive and binding absent manifest error) that reasonable and adequate means do not exist for ascertaining the LIBOR Rate for such Interest Period with respect to a proposed LIBOR Rate Loan or any Base Rate Loan as to which the interest rate is determined with reference to LIBOR or (iii) the Required Lenders shall determine (which determination shall be conclusive and binding absent manifest error) that the LIBOR Rate does not adequately and fairly reflect the cost to such Lenders of making or maintaining such Loans during such Interest Period, then the Administrative Agent shall promptly give notice thereof to the Borrowers. Thereafter, until the Administrative Agent notifies the Borrowers that such circumstances no longer exist, the obligation of the Lenders to make LIBOR Rate Loans or Base Rate Loan as to which the interest rate is determined with reference to LIBOR and the right of the Borrowers to convert any Loan to or continue any Loan as a LIBOR Rate Loan or a Base Rate Loan as to which the interest rate is determined with reference to LIBOR shall be suspended, and (i) in the case of LIBOR Rate Loans, the Borrowers shall either (A) repay in full (or cause to be repaid in full) the then outstanding principal amount of each such LIBOR Rate Loan together with accrued interest thereon (subject to **Section 4.1(d)**), on the last day of the then current Interest Period applicable to such LIBOR Rate Loan; or (B) convert the then outstanding principal amount of each such LIBOR Rate Loan to a Base Rate Loan as to which the interest rate is not determined by reference to LIBOR as of the last day of such Interest Period; or (ii) in the case of Base Rate Loans as to which the interest rate is determined by reference to LIBOR, the Borrowers shall convert the then outstanding principal amount of each such Loan to a Base Rate Loan as to which the interest rate is not determined by reference to LIBOR as of the last day of such Interest Period.

(b)    Laws Affecting LIBOR Rate Availability.  If, after the date hereof, the introduction of, or any change in, any Applicable Law or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any of the Lenders (or any of their respective Lending Offices) with any request or directive (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, shall make it unlawful or impossible for any of the Lenders (or any of their respective Lending Offices) to honor its obligations hereunder to make or maintain any LIBOR Rate Loan or any Base Rate Loan as to which the interest rate is determined by reference to LIBOR, such Lender shall promptly give notice

52

*For Reference Purposes Only*
*5702727v1*

thereof to the Administrative Agent and the Administrative Agent shall promptly give notice to the Borrowers and the other Lenders. Thereafter, until the Administrative Agent notifies the Borrowers that such circumstances no longer exist, (i) the obligations of the Lenders to make LIBOR Rate Loans or Base Rate Loans as to which the interest rate is determined by reference to LIBOR, and the right of the Borrowers to convert any Loan to a LIBOR Rate Loan or continue any Loan as a LIBOR Rate Loan or a Base Rate Loan as to which the interest rate is determined by reference to LIBOR shall be suspended and thereafter the Borrowers may select only Base Rate Loans as to which the interest rate is not determined by reference to LIBOR hereunder, (ii) all Base Rate Loans shall cease to be determined by reference to LIBOR and (iii) if any of the Lenders may not lawfully continue to maintain a LIBOR Rate Loan to the end of the then current Interest Period applicable thereto, the applicable Loan shall immediately be converted to a Base Rate Loan as to which the interest rate is not determined by reference to LIBOR for the remainder of such Interest Period.

SECTION 4.9    Indemnity.  The Borrowers hereby indemnify each of the Lenders against any loss or expense (including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain a LIBOR Rate Loan or from fees payable to terminate the deposits from which such funds were obtained) which may arise or be attributable to each Lender's obtaining, liquidating or employing deposits or other funds acquired to effect, fund or maintain any Loan (a) as a consequence of any failure by the Borrowers to make any payment when due of any amount due hereunder in connection with a LIBOR Rate Loan, (b) due to any failure of the Borrowers to borrow, continue or convert on a date specified therefor in a Notice of Borrowing or Notice of Conversion/Continuation or (c) due to any payment, prepayment or conversion of any LIBOR Rate Loan on a date other than the last day of the Interest Period therefor.  The amount of such loss or expense shall be determined, in the applicable Lender's sole discretion, based upon the assumption that such Lender funded its Commitment Percentage of the LIBOR Rate Loans in the London interbank market and using any reasonable attribution or averaging methods which such Lender deems appropriate and practical.  A certificate of such Lender setting forth the basis for determining such amount or amounts necessary to compensate such Lender shall be forwarded to the Borrowers through the Administrative Agent and shall be conclusively presumed to be correct save for manifest error.

SECTION 4.10    Increased Costs.

(a)    Increased Costs Generally.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or advances, loans or other credit extended or participated in by, any Lender (except any reserve requirement reflected in the LIBOR Rate) or the Issuing Lender;

(ii)    subject any Lender or the Issuing Lender to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit or any LIBOR Rate Loan made by it, or

53

change the basis of taxation of payments to such Lender or the Issuing Lender in respect thereof (except for Indemnified Taxes or Other Taxes covered by **Section 4.11** and the imposition of, or any change in the rate of any Excluded Tax payable by such Lender or the Issuing Lender); or

(iii)     impose on any Lender or the Issuing Lender or the London interbank market any other condition, cost or expense affecting this Agreement or LIBOR Rate Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting into or maintaining any LIBOR Rate Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or the Issuing Lender of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or the Issuing Lender hereunder (whether of principal, interest or any other amount) then, upon written request of such Lender or the Issuing Lender, the Borrowers shall promptly pay to any such Lender or the Issuing Lender, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Lender, as the case may be, for such additional costs incurred or reduction suffered.

(b)     Capital Requirements.   If any Lender or the Issuing Lender determines that any Change in Law affecting such Lender or the Issuing Lender or any lending office of such Lender or such Lender's or the Issuing Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Lender's capital or on the capital of such Lender's or the Issuing Lender's holding company, if any, as a consequence of this Agreement, the Revolving Credit Commitment of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the Issuing Lender, to a level below that which such Lender or the Issuing Lender or such Lender's or the Issuing Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Lender's policies and the policies of such Lender's or the Issuing Lender's holding company with respect to capital adequacy), then from time to time upon written request of such Lender or such Issuing Lender the Borrowers shall promptly pay to such Lender or the Issuing Lender, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Lender or such Lender's or the Issuing Lender's holding company for any such reduction suffered.

(c)     Certificates for Reimbursement.   A certificate of a Lender or the Issuing Lender setting forth the amount or amounts necessary to compensate such Lender or the Issuing Lender or its holding company, as the case may be, as specified in *paragraph (a)* or *(b)* of this **Section 4.10** and delivered to the Borrowers shall be conclusive absent manifest error.   The Borrowers shall pay such Lender or the Issuing Lender, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

For Reference Purposes Only
5702727v1

(d)     Delay in Requests.  Failure or delay on the part of any Lender or the Issuing Lender to demand compensation pursuant to this **Section 4.10** shall not constitute a waiver of such Lender's or the Issuing Lender's right to demand such compensation; provided that the Borrowers shall not be required to compensate a Lender or the Issuing Lender pursuant to this **Section 4.10** for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender or the Issuing Lender, as the case may be, notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Lender's intention to claim compensation therefor (except that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

SECTION 4.11     Taxes.

(a)     Defined Terms.  For purposes of this **Section 4.11**, the term "Lender" includes the Issuing Lender and the term "Applicable Law" includes FATCA.

(b)     Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrowers under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If any Applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrowers shall be increased as necessary so that, after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section), the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)     Payment of Other Taxes by the Borrowers.  The Borrowers shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)     Indemnification by the Borrowers.  The Borrowers shall jointly and severally indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate

For Reference Purposes Only
5702727v1

as to the amount of such payment or liability delivered to the Borrower by a Recipient (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Recipient, shall be conclusive absent manifest error.

(e)  <u>Indemnification by the Lenders</u>.  Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrowers have not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrowers to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of *Section 11.10* relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)  <u>Evidence of Payments</u>.  As soon as practicable after any payment of Taxes by any of the Borrowers to a Governmental Authority pursuant to this *Section 4.11*, such Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)  <u>Status of Lenders</u>.

(i)  Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding

56

*For Reference Purposes Only*
5702727v1

two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in **Section 4.11(g)(ii)(A)**, **(ii)(B)** and **(ii)(D)** below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing:

(A)    Any Lender that is a U.S. Person shall deliver to the Borrowers and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of any of the Borrowers or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from United States federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of any of the Borrowers or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, United States federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, United States federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed originals of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of **Exhibit H-1** to the effect that such Foreign Lender is not a "bank" within the meaning of Section

57

For Reference Purposes Only
5702727v1

881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN; or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of *Exhibit H-2* or *Exhibit H-3*, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of *Exhibit H-4* on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in United States federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to United States federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative

58

For Reference Purposes Only
5702727v1

Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)     <u>Treatment of Certain Refunds</u>.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this **Section 4.11** (including by the payment of additional amounts pursuant to this **Section 4.11**), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     <u>Survival</u>.  Each party's obligations under this **Section 4.11** shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 4.12     <u>Mitigation Obligations; Replacement of Lenders</u>.

(a)     Designation of a Different Lending Office.  If any Lender requests compensation under **Section 4.10**, or requires any Borrower to pay any additional

59

For Reference Purposes Only
5702727v1

amount to any Lender or any Governmental Authority for the account of any Lender pursuant to *Section 4.11*, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to *Section 4.10* or *Section 4.11*, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b) <u>Replacement of Lenders</u>. If any Lender requests compensation under *Section 4.10*, or if any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to *Section 4.11*, or if any Lender is a Defaulting Lender hereunder or becomes a Non-Consenting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, *Section 11.10*), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(i) the Borrowers shall have paid to the Administrative Agent the assignment fee specified in *Section 11.10*;

(ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in Letters of Credit, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under *Section 4.9*) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(iii) in the case of any such assignment resulting from a claim for compensation under *Section 4.10* or payments required to be made pursuant to *Section 4.11*, such assignment will result in a reduction in such compensation or payments thereafter; and

(iv) such assignment does not conflict with Applicable Law.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

SECTION 4.13 ~~Incremental Loans~~**[Reserved]**

60

*For Reference Purposes Only*
5702727v1

SECTION 4.14    Cash Collateral.

(a)    At any time following the Closing Date, the Borrowers may by written notice to the Administrative Agent elect to request the establishment of one or more increases in the Revolving Credit Commitments (each, an "**Incremental Revolving Credit Commitment**") to make incremental revolving credit loans (any such increase, an "**Incremental Revolving Credit Increase**"); provided that (i) the total aggregate amount for all such Incremental Revolving Credit Commitments shall not (as of any date of incurrence thereof) exceed $10,000,000, and (ii) the Borrowers may not make more than three (3) such requests.  Each such notice shall specify the date (each, an "**Increased Amount Date**") on which the Borrowers propose that any Incremental Revolving Credit Commitment shall be effective, which shall be a date not less than ten (10) Business Days after the date on which such notice is delivered to Administrative Agent.  The Borrowers may invite any Lender, any Affiliate of any Lender and/or any Approved Fund, and/or any other Person reasonably satisfactory to the Administrative Agent, to provide an Incremental Revolving Credit Commitment (any such Person, an "**Incremental Lender**").  Any Lender or any Incremental Lender offered or approached to provide all or a portion of any Incremental Revolving Credit Commitment may elect or decline, in its sole discretion, to provide such Incremental Revolving Credit Commitment.  Any Incremental Revolving Credit Commitment shall become effective as of such Increased Amount Date; provided that:

(i)    no Default or Event of Default shall exist on such Increased Amount Date before or after giving effect to (1) any Incremental Revolving Credit Commitment;

(ii)    the Administrative Agent and the Lenders shall have received from the Borrowers an Officer's Compliance Certificate demonstrating that the Borrowers will be in compliance on a *pro forma* basis with the financial covenants set forth in *Section 8.14* both before and after giving effect to (1) any Incremental Revolving Credit Commitment and (2) the making of any Incremental Revolving Credit Increase pursuant thereto;

(iii)    the proceeds of any Incremental Revolving Credit Increase shall be used for general corporate purposes of the Borrowers and any Subsidiaries;

(iv)    each Incremental Revolving Credit Commitment (and the Incremental Revolving Credit Increase made thereunder) shall constitute Obligations of the Borrowers and shall be secured and guaranteed with the other Extensions of Credit on a pari passu basis;

61

(v)    in the case of each Incremental Revolving Credit Increase (the terms of which shall be set forth the relevant Lender Joinder Agreement):

(A)    such Incremental Revolving Credit Increase shall mature on the Revolving Credit Maturity Date, shall bear interest at the rate applicable to the Revolving Credit Loans;

(B)    the outstanding Revolving Credit Loans and Revolving Credit Commitment Percentages of Swingline Loans and L/C Obligations will be reallocated by the Administrative Agent on the applicable Increased Amount Date among the Revolving Credit Lenders (including the Incremental Lenders providing such Incremental Revolving Credit Increase) in accordance with their revised Revolving Credit Commitment Percentages (and the Revolving Credit Lenders (including the Incremental Lenders providing such Incremental Revolving Credit Increase) agree to make all payments and adjustments necessary to effect such reallocation and the Borrowers shall pay any and all costs required pursuant to *Section 4.9* in connection with such reallocation as if such reallocation were a repayment); and

(C)    except as provided above, all of the other terms and conditions applicable to such Incremental Revolving Credit Increase shall, except to the extent otherwise provided in this *Section 4.13*, be identical to the terms and conditions applicable to the Revolving Credit Facility;

(vi)    any Incremental Lender with an Incremental Revolving Credit Increase shall be entitled to the same voting rights as the existing Revolving Credit Lenders under the Revolving Credit Facility and any Extensions of Credit made in connection with each Incremental Revolving Credit Increase shall receive proceeds of prepayments on the same basis as the other Revolving Credit Loans made hereunder;

(vii)    such Incremental Revolving Credit Commitments shall be effected pursuant to one or more Lender Joinder Agreements executed and delivered by the Borrowers, the Administrative Agent and the applicable Incremental Lenders (which Lender Joinder Agreement may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the opinion of the Administrative Agent, to effect the provisions of this *Section 4.13*); and(viii)    the Borrowers shall deliver or cause to be delivered any customary legal opinions or other documents (including, without limitation, a resolution duly adopted by the board of directors (or equivalent governing body) of each Credit Party authorizing such

62

Incremental Revolving Credit Increase) reasonably requested by Administrative Agent in connection with any such transaction.

(b)     The Incremental Lenders shall be included in any determination of the Required Lenders or Required Revolving Credit Lenders, as applicable, and the Incremental Lenders will not constitute a separate voting class for any purposes under this Agreement.

(c)     On any Increased Amount Date on which any Incremental Revolving Credit Increase becomes effective, subject to the foregoing terms and conditions, each Incremental Lender with an Incremental Revolving Credit Commitment shall become a Revolving Credit Lender hereunder with respect to such Incremental Revolving Credit Commitment.

SECTION 4.14      Cash Collateral.  At any time that there shall exist a Defaulting Lender, within one Business Day following the written request of the Administrative Agent, the Issuing Lender or the Swingline Lender (with a copy to the Administrative Agent), the Borrowers shall Cash Collateralize the Fronting Exposure of the Issuing Lender and/or the Swingline Lender, as applicable, with respect to such Defaulting Lender (determined after giving effect to *Section 4.15(a)(iv)* and any Cash Collateral provided by such Defaulting Lender) in an amount not less than the Minimum Collateral Amount.

(a)     Grant of Security Interest.  The Borrowers, and to the extent provided by any Defaulting Lender, such Defaulting Lender, hereby grants to the Administrative Agent, for the benefit of the Issuing Lender and the Swingline Lender, and agrees to maintain, a first priority security interest in all such Cash Collateral as security for the Defaulting Lender's obligation to fund participations in respect of L/C Obligations and Swingline Loans, to be applied pursuant to subsection (b) below.  If at any time the Administrative Agent determines that Cash Collateral is subject to any right or claim of any Person other than the Administrative Agent, the Issuing Lender and the Swingline Lender as herein provided (other than any applicable Permitted Liens), or that the total amount of such Cash Collateral is less than the Minimum Collateral Amount, the Borrower will, promptly upon demand by the Administrative Agent, pay or provide to the Administrative Agent additional Cash Collateral in an amount sufficient to eliminate such deficiency (after giving effect to any Cash Collateral provided by the Defaulting Lender).

(b)     Application.  Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under this *Section 4.14* or *Section 4.15* in respect of Letters of Credit and Swingline Loans shall be applied to the satisfaction of the Defaulting Lender's obligation to fund participations in respect of L/C Obligations and Swingline Loans (including, as to Cash Collateral provided by a Defaulting Lender, any interest accrued on such obligation) for which the Cash Collateral was so provided, prior to any other application of such property as may otherwise be provided for herein.

63

(c)    Termination of Requirement.  Cash Collateral (or the appropriate portion thereof) provided to reduce the Fronting Exposure of the Issuing Lender and/or the Swingline Lender, as applicable, shall no longer be required to be held as Cash Collateral pursuant to this **Section 4.14** following (i) the elimination of the applicable Fronting Exposure (including by the termination of Defaulting Lender status of the applicable Lender), or (ii) the determination by the Administrative Agent, the Issuing Lender and the Swingline Lender that there exists excess Cash Collateral; provided that, subject to **Section 4.15**, the Person providing Cash Collateral, the Issuing Lender and the Swingline Lender may agree that Cash Collateral shall be held to support future anticipated Fronting Exposure or other obligations; and provided further that to the extent that such Cash Collateral was provided by the Borrowers, such Cash Collateral shall remain subject to the security interest granted pursuant to the Loan Documents.

SECTION 4.15    Defaulting Lenders.

(a)    Defaulting Lender Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by Applicable Law:

(i)    Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders and **Section 11.2**.

(ii)    Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to **Article IX** or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to **Section 11.4** shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the Issuing Lender and the Swingline Lender hereunder; *third*, to Cash Collateralize the Fronting Exposure of the Issuing Lender and the Swingline Lender with respect to such Defaulting Lender in accordance with **Section 4.14**; *fourth*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan or funded participation in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fifth*, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to (A) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans and funded participations under this Agreement and (B) Cash

64

For Reference Purposes Only
5702727v1

Collateralize the Issuing Lender's future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit and Swingline Loans issued under this Agreement, in accordance with **Section 4.14**; *sixth*, to the payment of any amounts owing to the Lenders, the Issuing Lender or the Swingline Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender, the Issuing Lender or the Swingline Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *seventh*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *eighth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; <u>provided</u> that if (1) such payment is a payment of the principal amount of any Loans or funded participations in Letters of Credit or Swingline Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (2) such Loans were made or the related Letters of Credit or Swingline Loans were issued at a time when the conditions set forth in **Section 5.2** were satisfied or waived, such payment shall be applied solely to pay the Loans of, and funded participations in Letters of Credit or Swingline Loans owed to, all Non-Defaulting Lenders on a <u>pro rata</u> basis prior to being applied to the payment of any Loans of, or funded participations in Letters of Credit or Swingline Loans owed to, such Defaulting Lender until such time as all Loans and funded and unfunded participations in L/C Obligations and Swingline Loans are held by the Lenders <u>pro rata</u> in accordance with the Revolving Credit Commitments under the applicable Revolving Credit Facility without giving effect to **Section 4.15(a)(iv)**. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this **Section 4.15(a)(ii)** shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

      (iii)   <u>Certain Fees</u>.

      (A)   No Defaulting Lender shall be entitled to receive any Commitment Fee for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

      (B)   Each Defaulting Lender shall be entitled to receive letter of credit commissions pursuant to **Section 3.3** for any period during which that Lender is a Defaulting Lender only to the extent allocable to its Revolving Credit Commitment Percentage of the

For Reference Purposes Only
5702727v1

stated amount of Letters of Credit for which it has provided Cash Collateral pursuant to *Section 4.14*.

(C)     With respect to any Commitment Fee or letter of credit commission not required to be paid to any Defaulting Lender pursuant to clause (A) or (B) above, the Borrower shall (1) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in L/C Obligations or Swingline Loans that has been reallocated to such Non-Defaulting Lender pursuant to clause (iv) below, (2) pay to each Issuing Lender and Swingline Lender, as applicable, the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to such Issuing Lender's or Swingline Lender's Fronting Exposure to such Defaulting Lender, and (3) not be required to pay the remaining amount of any such fee.

(iv)     <u>Reallocation of Participations to Reduce Fronting Exposure</u>.  All or any part of such Defaulting Lender's participation in L/C Obligations and Swingline Loans shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Revolving Credit Commitment Percentages (calculated without regard to such Defaulting Lender's Revolving Credit Commitment) but only to the extent that (x) the conditions set forth in *Section 5.2* are satisfied at the time of such reallocation (and, unless the Borrower shall have otherwise notified the Administrative Agent at such time, the Borrower shall be deemed to have represented and warranted that such conditions are satisfied at such time), and (y) such reallocation does not cause the aggregate Revolving Credit Exposure of any Non-Defaulting Lender to exceed such Non-Defaulting Lender's Revolving Credit Commitment.  No reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(v)     <u>Cash Collateral, Repayment of Swingline Loans</u>.  If the reallocation described in clause (iv) above cannot, or can only partially, be effected, the Borrower shall, without prejudice to any right or remedy available to it hereunder or under law, (x) <u>first</u>, prepay Swingline Loans in an amount equal to the Swingline Lender's Fronting Exposure and (y) <u>second</u>, Cash Collateralize the Issuing Lender's Fronting Exposure in accordance with the procedures set forth in *Section 4.14*.

(b)     <u>Defaulting Lender Cure</u>.  If the Borrower, the Administrative Agent, the Issuing Lender and the Swingline Lender agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify

66

the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), such Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit and Swingline Loans to be held pro rata by the Lenders in accordance with the Commitments under the applicable Credit Facility (without giving effect to **Section 4.15(a)(iv)**), whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

## Article V
## CONDITIONS OF CLOSING AND BORROWING

SECTION 5.1        Conditions to Closing and Initial Extensions of Credit.  This Agreement shall become effective as of the date of this Agreement once signed by the Borrowers, the Administrative Agent, and Lenders.  The obligation of the Lenders to close this Agreement and to make the initial Loan or issue or participate in the initial Letter of Credit, if any, is subject to the satisfaction of each of the following conditions on or prior to the Closing Date:

(a)        Executed Loan Documents.  This Agreement, a Revolving Credit Note in favor of each Lender requesting a Revolving Credit Note, a Swingline Note in favor of the Swingline Lender (if requested thereby) and the Security Documents, together with any other applicable Loan Documents, shall have been duly authorized, executed and delivered to the Administrative Agent by the parties thereto, shall be in full force and effect and no Default or Event of Default shall exist hereunder or thereunder.

(b)        Closing Certificates; Etc.  The Administrative Agent shall have received each of the following in form and substance reasonably satisfactory to the Administrative Agent:

(i)        Officer's Certificate.  A certificate from a Responsible Officer of each Borrower to the effect that (A) all representations and warranties of the Credit Parties contained in this Agreement and the other Loan Documents are true, correct and complete in all respects (except to the extent any such representation and warranty is qualified by materiality or reference to Material Adverse Effect, in which case, such representation and warranty shall be true, correct and complete in all respects); (B) none of the Credit Parties is in violation of any of the covenants contained in this Agreement and the other Loan Documents; (C) after giving effect to

67

*For Reference Purposes Only*
*5702727v1*

the Transactions, no Default or Event of Default has occurred and is continuing; (D) since January 31, 2015, no event has occurred or condition arisen, either individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect; and (E) each of the Credit Parties, as applicable, has satisfied each of the conditions set forth in **Section 5.1** and **Section 5.2**.

(ii)     Certificate of Secretary of each Credit Party.  A certificate of a Responsible Officer of each Credit Party certifying as to the incumbency and genuineness of the signature of each officer of such Credit Party executing Loan Documents to which it is a party and certifying that attached thereto is a true, correct and complete copy of (A) the articles or certificate of incorporation or formation of such Credit Party and all amendments thereto, certified as of a recent date by the appropriate Governmental Authority in its jurisdiction of incorporation or formation, (B) the bylaws or other governing document of such Credit Party as in effect on the Closing Date, (C) resolutions duly adopted by the board of directors (or other governing body) of such Credit Party authorizing and approving the transactions contemplated hereunder and the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party, and (D) each certificate required to be delivered pursuant to **Section 5.1(b)(iii)**.

(iii)     Certificates of Good Standing.  Certificates as of a recent date of the good standing of each Credit Party under the laws of its jurisdiction of organization and, to the extent requested by the Administrative Agent, each other jurisdiction where such Credit Party is qualified to do business and, to the extent available, a certificate of the relevant taxing authorities of such jurisdictions certifying that such Credit Party has filed required tax returns and owes no delinquent taxes.

(c)     Personal Property Collateral.

(i)     Filings and Recordings.  The Administrative Agent shall have received all filings and recordations that are necessary to perfect the security interests of the Administrative Agent, on behalf of the Secured Parties, in the Collateral and the Administrative Agent shall have received evidence reasonably satisfactory to the Administrative Agent that upon such filings and recordations such security interests constitute valid and perfected first priority Liens thereon.

(ii)     Pledged Collateral.  The Administrative Agent shall have received each original promissory note pledged pursuant to the Security Documents together with an undated endorsement for each such promissory note duly executed in blank by the holder thereof.

*For Reference Purposes Only*
*5702727v1*

(iii)    <u>Lien Search</u>.  The Administrative Agent shall have received the results of a Lien search (including a search as to judgments, pending litigation, bankruptcy, tax and intellectual property matters), in form and substance reasonably satisfactory thereto, made against the Credit Parties under the Uniform Commercial Code (or applicable judicial docket) as in effect in each jurisdiction in which filings or recordations under the Uniform Commercial Code should be made to evidence or perfect security interests in all assets of such Credit Party, indicating among other things that the assets of each such Credit Party are free and clear of any Lien (except for Permitted Liens).

(iv)    <u>Hazard and Liability Insurance</u>.  The Administrative Agent shall have received evidence of property hazard, business interruption and liability insurance, evidence of payment of all insurance premiums for the current policy year of each (with appropriate endorsements naming the Administrative Agent as lender's loss payee and mortgagee, as applicable) on all policies for property hazard insurance and as additional insured on all policies for liability insurance, and if requested by the Administrative Agent, copies of such insurance policies .

(d)    <u>Consents; Defaults</u>.

(i)    <u>Governmental and Third Party Approvals</u>.  The Credit Parties shall have received all material governmental, shareholder and third party consents and approvals necessary (or any other material consents as determined in the reasonable discretion of the Administrative Agent) in connection with the transactions contemplated by this Agreement and the other Loan Documents and the other transactions contemplated hereby and all applicable waiting periods shall have expired without any action being taken by any Person that could reasonably be expected to restrain, prevent or impose any material adverse conditions on any of the Credit Parties or such other transactions or that could seek or threaten any of the foregoing, and no law or regulation shall be applicable which in the reasonable judgment of the Administrative Agent could reasonably be expected to have such effect.

(ii)    <u>No Injunction, Etc</u>.  No action, proceeding, investigation, regulation or legislation shall have been instituted, threatened or proposed before any Governmental Authority to enjoin, restrain, or prohibit, or to obtain substantial damages in respect of, or which is related to or arises out of this Agreement or the other Loan Documents or the consummation of the transactions contemplated hereby or thereby, or which, in the Administrative Agent's sole discretion, would make it inadvisable to consummate the transactions contemplated by this Agreement or the other Loan Documents or the consummation of the transactions contemplated hereby or thereby.

For Reference Purposes Only
5702727v1

(e)     Financial Matters.

(i)     Financial Statements.  The Administrative Agent shall have received (A) the audited Consolidated balance sheet of LII and its Subsidiaries as of January 31, 2015 and the related audited statements of income and retained earnings and cash flows for the Fiscal Year then ended and (B) unaudited Consolidated balance sheet of Parent and its Subsidiaries as of June 30, 2015 and related unaudited interim statements of income.

(ii)     Payment at Closing. The Borrowers shall have paid (A) to the Administrative Agent, the Arranger and the Lenders the fees set forth or referenced in **Section 4.3** and any other accrued and unpaid fees or commissions due hereunder, (B) all fees, charges and disbursements of counsel to the Administrative Agent (directly to such counsel if requested by the Administrative Agent) to the extent accrued and unpaid prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrowers and the Administrative Agent) and (C) to any other Person such amount as may be due thereto in connection with the transactions contemplated hereby, including all taxes, fees and other charges in connection with the execution, delivery, recording, filing and registration of any of the Loan Documents.

(f)     Miscellaneous.

(i)     Notice of Borrowing.  The Administrative Agent shall have received a Notice of Borrowing from the Borrowers in accordance with **Section 2.3(a)**, and a Notice of Account Designation specifying the account or accounts to which the proceeds of any Loans made on or after the Closing Date are to be disbursed.

(ii)     Due Diligence.  The Administrative Agent shall have completed, to its satisfaction, all legal, tax, environmental, business and other due diligence with respect to the business, assets, liabilities, operations and condition (financial or otherwise) of each Credit Party in scope and determination satisfactory to the Administrative Agent in its sole discretion.

(iii)     Existing Indebtedness.  All existing Indebtedness of each Credit Party (excluding Indebtedness permitted pursuant **to Section 8.1**) shall be repaid in full and terminated and all collateral security therefor shall be released, and the Administrative Agent shall have received pay-off letters in form and substance satisfactory to it evidencing such

70

For Reference Purposes Only
5702727v1

repayment, termination and release. Any existing Indebtedness permitted pursuant to *Section 8.1* shall be on terms and conditions reasonably satisfactory to the Administrative Agent.

(iv)    <u>PATRIOT Act</u>. Each Borrower and each of the Subsidiary Guarantors shall have provided to the Administrative Agent and the Lenders the documentation and other information requested by the Administrative Agent in order to comply with requirements of the PATRIOT Act.

(v)    <u>Other Documents</u>. All opinions, certificates and other instruments and all proceedings in connection with the transactions contemplated by this Agreement shall be satisfactory in form and substance to the Administrative Agent. The Administrative Agent shall have received copies of all other documents, certificates and instruments reasonably requested thereby, with respect to the transactions contemplated by this Agreement.

SECTION 5.2    <u>Conditions to All Extensions of Credit</u>. The obligations of the Lenders to make or participate in any Extensions of Credit (including the initial Extension of Credit), convert or continue any Loan and/or the Issuing Lender to issue or extend any Letter of Credit are subject to the satisfaction of the following conditions precedent on the relevant borrowing, continuation, conversion, issuance or extension date:

(a)    <u>Continuation of Representations and Warranties</u>. The representations and warranties contained in *Article VI* shall be true and correct in all material respects, except for any representation and warranty that is qualified by materiality or reference to Material Adverse Effect, which such representation and warranty shall be true and correct in all respects on and as of such borrowing, continuation, conversion, issuance or extension date with the same effect as if made on and as of such date, (except for any such representation and warranty that by its terms is made only as of an earlier date, which representation and warranty shall remain true and correct in all material respects, except for any representation and warranty that is qualified by materiality or reference to Material Adverse Effect, which such representation and warranty shall be true and correct in all respects as of such earlier date.

(b)    <u>No Existing Default</u>. No Default or Event of Default shall have occurred and be continuing (i) on the borrowing, continuation or conversion date with respect to such Loan or after giving effect to the Loans to be made, continued or converted on such date or (ii) on the issuance or extension date with respect to such Letter of Credit or after giving effect to the issuance or extension of such Letter of Credit on such date.

(c)    <u>Notices</u>. The Administrative Agent shall have received a Notice of Borrowing or Notice of Conversion/Continuation, as applicable, from the Borrowers in accordance with *Section 2.3(a)*, or *Section 4.2*, as applicable.

71

*For Reference Purposes Only*
5702727v1

(d)    Additional Documents.   The Administrative Agent shall have received each additional document, instrument, or other item reasonably requested by it.

(e)    No Excess Consolidated Cash Balances.  At the time of, and after giving effect to, the requested Loan or Letter of Credit, the Credit Parties shall be in compliance with **Section 7.20**.

**Article VI**
**REPRESENTATIONS AND WARRANTIES OF THE CREDIT PARTIES**

To induce the Administrative Agent and Lenders to enter into this Agreement and to induce the Lenders to make Extensions of Credit, the Credit Parties hereby represent and warrant to the Administrative Agent and the Lenders both before and after giving effect to the transactions contemplated hereunder, which representations and warranties shall be deemed made on the Closing Date, the Second Amendment Effective Date and as otherwise set forth in **Section 5.2**, that:

SECTION 6.1    Organization; Power; Qualification.   Each Credit Party and each Subsidiary thereof (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation, (b) has the power and authority to own its Properties and to carry on its business as now being and hereafter proposed to be conducted and (c) is duly qualified and authorized to do business in each jurisdiction in which the character of its Properties or the nature of its business requires such qualification and authorization except in jurisdictions where the failure to be so qualified under this *clause (c)* could not reasonably be expected to result in a Material Adverse Effect.  The jurisdictions in which each Credit Party and each Subsidiary thereof are organized and qualified to do business as of the Closing Date are described on **Schedule 6.1**.

SECTION 6.2    Ownership.  An ownership chart of Parent and its Subsidiaries, and of Borrowers, LHI and their Affiliates, as of the Closing Date is attached as **Schedule 6.2**.  As of the Closing Date, the capitalization of each Credit Party and its Subsidiaries consists of the number of shares, authorized, issued and outstanding, of such classes and series, with or without par value, described on **Schedule 6.2**.  All outstanding shares have been duly authorized and validly issued and are fully paid and nonassessable and not subject to any preemptive or similar rights, except as described in **Schedule 6.2**.  The shareholders or other owners, as applicable, of each Credit Party and its Subsidiaries and the number of shares owned by each as of the ~~Closing~~Second Amendment Effective Date are described on **Schedule 6.2**.  As of the ~~Closing~~Second Amendment Effective Date, there are no outstanding stock purchase warrants, subscriptions, options, securities, instruments or other rights of any type or nature whatsoever, which are convertible into, exchangeable for or otherwise provide for or require the issuance of Capital Stock of any Credit Party or any Subsidiary thereof, except as described on **Schedule 6.2**.

SECTION 6.3    Authorization Enforceability.   Each Credit Party and each Subsidiary thereof has the right, power and authority and has taken all necessary corporate and other action to authorize the execution, delivery and performance of this Agreement and each of

72

the other Loan Documents to which it is a party in accordance with their respective terms. This Agreement and each of the other Loan Documents have been duly executed and delivered by the duly authorized officers of each Credit Party and each Subsidiary thereof that is a party thereto, and each such document constitutes the legal, valid and binding obligation of each Credit Party and each Subsidiary thereof that is a party thereto, enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar state or federal debtor relief laws from time to time in effect which affect the enforcement of creditors' rights in general and the availability of equitable remedies.

SECTION 6.4 <u>Compliance of Agreement, Loan Documents and Borrowing with Laws, Etc</u>. The execution, delivery and performance by each Credit Party and each Subsidiary thereof of the Loan Documents to which each such Person is a party, in accordance with their respective terms, the Extensions of Credit hereunder and the transactions contemplated hereby do not and will not, by the passage of time, the giving of notice or otherwise, (a) require any Governmental Approval or violate any Applicable Law relating to any Credit Party or any Subsidiary thereof where the failure to obtain such Governmental Approval or such violation could reasonably be expected to have a Material Adverse Effect, (b) conflict with, result in a breach of or constitute a default under the articles of incorporation, bylaws or other organizational documents of any Credit Party or any Subsidiary thereof, (c) conflict with, result in a breach of or constitute a default under any indenture, agreement or other instrument to which such Person is a party or by which any of its properties may be bound or any Governmental Approval relating to such Person, which could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (d) result in or require the creation or imposition of any Lien upon or with respect to any property now owned or hereafter acquired by such Person other than Permitted Liens or (e) require any consent or authorization of, filing with, or other act in respect of, an arbitrator or Governmental Authority and no consent of any other Person is required in connection with the execution, delivery, performance, validity or enforceability of this Agreement other than (i) consents, authorizations, filings or other acts or consents for which the failure to obtain or make could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (ii) consents or filings under the UCC and (iii) filings with the United States Copyright Office and/or the United States Patent and Trademark Office.

SECTION 6.5 <u>Compliance with Law; Governmental Approvals</u>. Each Credit Party and each Subsidiary thereof (a) has all Governmental Approvals required by any Applicable Law for it to conduct its business, each of which is in full force and effect, is final and not subject to review on appeal and is not the subject of any pending or, to its knowledge, threatened attack by direct or collateral proceeding, (b) is in compliance with each Governmental Approval applicable to it and in compliance with all other Applicable Laws relating to it or any of its respective properties <u>(including Anti-Corruption Laws and Anti-Terrorism Laws)</u> and (c) has timely filed all material reports, documents and other materials required to be filed by it under all Applicable Laws with any Governmental Authority and has retained all material records and documents required to be retained by it under Applicable Law except in each case under *clause (a)*, *(b)* or *(c)* where the failure to have, comply or file could not reasonably be expected to have a Material Adverse Effect.

73

*For Reference Purposes Only*
*5702727v1*

SECTION 6.6 <u>Tax Returns and Payments</u>. Each Credit Party and each Subsidiary thereof has duly filed or caused to be filed all federal, state, local and other tax returns required by Applicable Law to be filed, and has paid, or made adequate provision for the payment of, all federal, state, local and other taxes, assessments and governmental charges or levies upon it and its property, income, profits and assets which are due and payable (other than any amount the validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided for on the books of the relevant Credit Party). Such returns accurately reflect in all material respects all liability for taxes of any Credit Party or any Subsidiary thereof for the periods covered thereby. There is no ongoing audit or examination or, to the knowledge of each Borrower, other investigation by any Governmental Authority of the tax liability of any Credit Party or any Subsidiary thereof. No Governmental Authority has asserted any Lien or other claim against any Credit Party or any Subsidiary thereof with respect to unpaid taxes which has not been discharged or resolved (other than (a) any amount the validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided for on the books of the relevant Credit Party and (b) Permitted Liens). The charges, accruals and reserves on the books of each Credit Party and each Subsidiary thereof in respect of federal, state, local and other taxes for all Fiscal Years and portions thereof since the organization of any Credit Party or any Subsidiary thereof are in the judgment of the Borrowers adequate, and the Borrowers do not anticipate any additional taxes or assessments for any of such years.

SECTION 6.7 <u>Intellectual Property Matters</u>. Each Credit Party and each Subsidiary thereof owns or possesses rights to use all material franchises, licenses, copyrights, copyright applications, patents, patent rights or licenses, patent applications, trademarks, trademark rights, service mark, service mark rights, trade names, trade name rights, copyrights and other rights with respect to the foregoing which are reasonably necessary to conduct its business. No event has occurred which permits, or after notice or lapse of time or both would permit, the revocation or termination of any such rights, and no Credit Party nor any Subsidiary thereof is liable to any Person for infringement under Applicable Law with respect to any such rights as a result of its business operations except as could not reasonably be expected to have a Material Adverse Effect.

SECTION 6.8 <u>Environmental Matters</u>.

(a) The properties owned, leased or operated by each Credit Party and each Subsidiary thereof now or in the past do not contain, and to their knowledge have not previously contained, any Hazardous Materials in amounts or concentrations which constitute or constituted a violation of applicable Environmental Laws;

(b) To the knowledge of each Borrower and each Subsidiary thereof, each Credit Party and each Subsidiary thereof and such properties and all operations conducted in connection therewith are in compliance, and have been in compliance, with all applicable Environmental Laws, and there is no contamination at, under or about such properties or such operations which could

74

<i>For Reference Purposes Only</i>
5702727v1

interfere with the continued operation of such properties or impair the fair saleable value thereof;

(c)     No Credit Party nor any Subsidiary thereof has received any written notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters, Hazardous Materials, or compliance with Environmental Laws, nor does any Credit Party or any Subsidiary thereof have knowledge or reason to believe that any such notice will be received or is being threatened;

(d)     To the knowledge of the each Borrower and each Subsidiary thereof, Hazardous Materials have not been transported or disposed of to or from the properties owned, leased or operated by any Credit Party or any Subsidiary thereof in violation of, or in a manner or to a location which could give rise to liability under, Environmental Laws, nor have any Hazardous Materials been generated, treated, stored or disposed of at, on or under any of such properties in violation of, or in a manner that could give rise to liability under, any applicable Environmental Laws;

(e)     No judicial proceedings or governmental or administrative action is pending, or, to the knowledge of each Borrower, threatened, under any Environmental Law to which any Credit Party or any Subsidiary thereof is or will be named as a potentially responsible party with respect to such properties or operations conducted in connection therewith, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to any Credit Party, any Subsidiary thereof or such properties or such operations that could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect; and

(f)     There has been no release, or to the best of each Borrower's knowledge, threat of release, of Hazardous Materials at or from properties owned, leased or operated by any Credit Party or any Subsidiary, now or in the past, in violation of or in amounts or in a manner that could give rise to liability under Environmental Laws that could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

SECTION 6.9     <u>Employee Benefit Matters</u>.

(a)     As of the Closing Date, no Credit Party nor any ERISA Affiliate maintains or contributes to, or has any obligation under, any Employee Benefit Plans other than those identified on ***Schedule 6.9***;

(b)     Each Credit Party and each ERISA Affiliate is in compliance with all applicable provisions of ERISA, the Code and the regulations and published interpretations thereunder with respect to all Employee Benefit Plans except for any required amendments for which the remedial amendment period as defined in

75

*For Reference Purposes Only*
5702727v1

Section 401(b) of the Code has not yet expired and except where a failure to so comply could not reasonably be expected to have a Material Adverse Effect. Each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code has been determined by the IRS to be so qualified, and each trust related to such plan has been determined to be exempt under Section 501(a) of the Code except for such plans that have not yet received determination letters but for which the remedial amendment period for submitting a determination letter has not yet expired. No liability has been incurred by any Credit Party or any ERISA Affiliate which remains unsatisfied for any taxes or penalties assessed with respect to any Employee Benefit Plan or any Multiemployer Plan except for a liability that could not reasonably be expected to have a Material Adverse Effect;

(c)      As of the Closing Date, no Pension Plan has been terminated, nor has any Pension Plan become subject to funding based benefit restrictions under Section 436 of the Code, nor has any funding waiver from the IRS been received or requested with respect to any Pension Plan, nor has any Credit Party or any ERISA Affiliate failed to make any contributions or to pay any amounts due and owing as required by Sections 412 or 430 of the Code, Section 302 of ERISA or the terms of any Pension Plan prior to the due dates of such contributions under Sections 412 or 430 of the Code or Section 302 of ERISA, nor has there been any event requiring any disclosure under Section 4041(c)(3)(C) or 4063(a) of ERISA with respect to any Pension Plan;

(d)      Except where the failure of any of the following representations to be correct could not reasonably be expected to have a Material Adverse Effect, no Credit Party nor any ERISA Affiliate has:  (i) engaged in a nonexempt prohibited transaction described in Section 406 of the ERISA or Section 4975 of the Code, (ii) incurred any liability to the PBGC which remains outstanding other than the payment of premiums and there are no premium payments which are due and unpaid, (iii) failed to make a required contribution or payment to a Multiemployer Plan, or (iv) failed to make a required installment or other required payment under Sections 412 or 430 of the Code;

(e)      No Termination Event has occurred or is reasonably expected to occur;

(f)      Except where the failure of any of the following representations to be correct in all material respects could not reasonably be expected to have a Material Adverse Effect, no proceeding, claim (other than a benefits claim in the ordinary course of business), lawsuit and/or investigation is existing or, to the best of the knowledge of each Borrower after due inquiry, threatened concerning or involving (i) any employee welfare benefit plan (as defined in Section 3(1) of ERISA) currently maintained or contributed to by any Credit Party or any ERISA Affiliate, (ii) any Pension Plan or (iii) any Multiemployer Plan.

(g)      No Credit Party nor any Subsidiary thereof is a party to any contract, agreement or arrangement that could, solely as a result of the delivery of

76

this Agreement or the consummation of transactions contemplated hereby, result in the payment of any "excess parachute payment" within the meaning of Section 280G of the Code.

SECTION 6.10    Margin Stock.  No Credit Party nor any Subsidiary thereof is engaged principally or as one of its activities in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" (as each such term is defined or used, directly or indirectly, in Regulation U of the Board of Governors of the Federal Reserve System).  No part of the proceeds of any of the Loans or Letters of Credit will be used for purchasing or carrying margin stock or for any purpose which violates, or which would be inconsistent with, the provisions of Regulation T, U or X of such Board of Governors.  Following the application of the proceeds of each Extension of Credit, not more than twenty-five percent (25%) of the value of the assets (of the Parent and its Subsidiaries on a Consolidated basis) subject to the provisions of **Section 8.2** or **Section 8.5** or subject to any restriction contained in any agreement or instrument between the Borrowers and any Lender or any Affiliate of any Lender relating to Indebtedness in excess of the Threshold Amount will be "margin stock". If requested by any Lender (through the Administrative Agent) or the Administrative Agent, the Borrowers will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U 1 referred to in Regulation U.

SECTION 6.11    Government Regulation.  No Credit Party nor any Subsidiary thereof is an "investment company" or a company "controlled" by an "investment company" (as each such term is defined or used in the Investment Company Act of 1940, as amended) and no Credit Party nor any Subsidiary thereof is, or after giving effect to any Extension of Credit will be, subject to regulation under the Interstate Commerce Act, as amended, or any other Applicable Law which limits its ability to incur or consummate the transactions contemplated hereby.

SECTION 6.12    Material Contracts.  **Schedule 6.12** sets forth a complete and accurate list of all Material Contracts of each Credit Party and each Subsidiary thereof in effect as of the Closing Date.  Other than as set forth in **Schedule 6.12**, each such Material Contract is, and after giving effect to the consummation of the transactions contemplated by the Loan Documents will be, in full force and effect in accordance with the terms thereof.  To the extent requested by the Administrative Agent, each Credit Party and each Subsidiary thereof has delivered to the Administrative Agent a true and complete copy of each Material Contract required to be listed on **Schedule 6.12** or any other Schedule hereto.  No Credit Party nor any Subsidiary thereof (nor, to the knowledge of each Borrower, any other party thereto) is in breach of or in default under any Material Contract in any material respect.

SECTION 6.13    Employee Relations.  No Credit Party or any Subsidiary thereof is party to any collective bargaining agreement or has any labor union been recognized as the representative of its employees except as set forth on **Schedule 6.13**.  No Borrower knows of any pending, threatened or contemplated strikes, work stoppage or other collective labor disputes involving its employees or those of its Subsidiaries.

SECTION 6.14    Burdensome Provisions.  The Credit Parties and their respective Subsidiaries do not presently anticipate that future expenditures needed to meet the provisions of

77

For Reference Purposes Only
5702727v1

any statutes, orders, rules or regulations of a Governmental Authority will be so burdensome as to have a Material Adverse Effect. No Subsidiary is party to any agreement or instrument or otherwise subject to any restriction or encumbrance that restricts or limits its ability to make dividend payments or other distributions in respect of its Capital Stock to any Borrower or any Subsidiary or to transfer any of its assets or properties to any Borrower or any other Subsidiary in each case other than existing under or by reason of the Loan Documents or Applicable Law.

SECTION 6.15     Financial Statements.     The audited and unaudited financial statements delivered pursuant to **Section 5.1(f)(i)** are complete and correct and fairly present on a Consolidated basis the assets, liabilities and financial position of the Parent and its Subsidiaries as at such dates, and the results of the operations and changes of financial position for the periods then ended (other than customary year-end adjustments for unaudited financial statements). All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP. Such financial statements show all material indebtedness and other material liabilities, direct or contingent, of the Parent and its Subsidiaries as of the date thereof, including material liabilities for taxes, material commitments, and Indebtedness, in each case, to the extent required to be disclosed under GAAP.

SECTION 6.16     No Material Adverse Change.     Since January 31, 2015, there has been no material adverse change in the properties, business, operations, prospects, or condition (financial or otherwise) of the Parent and its Subsidiaries and no event has occurred or condition arisen, either individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect.

SECTION 6.17     Solvency.     Each Credit Party and each Subsidiary thereof is Solvent.

SECTION 6.18     Titles to Properties.     As of the Closing Date, the real property listed on **Schedule 6.18** constitutes all of the real property that is owned, leased, subleased or used by any Credit Party or any of its Subsidiaries. Each Credit Party and each Subsidiary thereof has such title to the real property owned or leased by it as is necessary or desirable to the conduct of its business and valid and legal title to all of its personal property and assets, except those which have been disposed of by the Credit Parties and their Subsidiaries subsequent to such date which dispositions have been in the ordinary course of business or as otherwise expressly permitted hereunder.

SECTION 6.19     Litigation.     Except for matters existing on the Closing Date and set forth on **Schedule 6.19**, there are no actions, suits or proceedings pending nor, to the knowledge of each Borrower, threatened against or in any other way relating adversely to or affecting any Credit Party or any Subsidiary thereof or any of their respective properties in any court or before any arbitrator of any kind or before or by any Governmental Authority that could reasonably be expected to have a Material Adverse Effect.

SECTION 6.20     Absence of Defaults.     No event has occurred or is continuing (a) which constitutes a Default or an Event of Default, or (b) which constitutes, or which with the passage of time or giving of notice or both would constitute, a default or event of default by any Credit Party or any Subsidiary thereof under any Material Contract or judgment, decree or order

78

*For Reference Purposes Only*
5702727v1

to which any Credit Party or any Subsidiary thereof is a party or by which any Credit Party or any Subsidiary thereof or any of their respective properties may be bound or which would require any Credit Party or any Subsidiary thereof to make any payment thereunder prior to the scheduled maturity date therefore that, in any case under this *clause (b)*, could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 6.21 <u>Senior Indebtedness Status</u>. The Obligations of each Credit Party and each Subsidiary thereof under this Agreement and each of the other Loan Documents ranks and shall continue to rank at least senior in priority of payment to all Subordinated Indebtedness and all senior unsecured Indebtedness of each such Person and is designated as "Senior Indebtedness" under all instruments and documents, now or in the future, relating to all Subordinated Indebtedness and all senior unsecured Indebtedness of such Person.

SECTION 6.22 <u>Investment Bankers' and Similar Fees</u>. No Credit Party has any obligation to any Person in respect of any finders', brokers', investment banking or other similar fee in connection with any of the Transactions.

SECTION 6.23 <u>Disclosure</u>. Each Borrower and/or its Subsidiaries have disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which any Credit Party and any Subsidiary thereof are subject, and all other matters known to them, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No financial statement, material report, material certificate or other material information furnished (whether in writing or orally) by or on behalf of any Credit Party or any Subsidiary thereof to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished), taken together as a whole, contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, pro forma financial information, estimated financial information and other projected or estimated information, such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

SECTION 6.24 <u>EEA Financial Institutions</u>. None of the Credit Parties is, or will become, an EEA Financial Institution.

SECTION 6.25 <u>Anti-Terrorism; Anti-Money Laundering; Etc</u>. No Credit Party nor Guarantor nor any of its Subsidiaries or, to their knowledge, any of their Affiliates (i) is an "enemy" or an "ally of the enemy" within the meaning of Section 2 of the Trading with the Enemy Act of the United States (50 U.S.C. App. §§ 1 et seq.), (ii) is in violation of (A) the Trading with the Enemy Act, (B) any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V) or any enabling legislation or executive order relating thereto or, (C) the PATRIOT Act (collectively, the "Anti-Terrorism Laws"), or (D) any Anti-Corruption Laws, (iii) is, or is controlled or owned by a Sanctioned Entity or other Persons that are, the subject of Sanctions or (i) is, or is controlled or owned by a Sanctioned Entity or other Persons that are, located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions. No part of the proceeds of any

79

*For Reference Purposes Only*
5702727v1

Loan or Letter of Credit hereunder will be unlawfully used directly or indirectly to fund any operations in, finance any investments or activities in or make any payments to, a Sanctioned Entity or other Person that is the subject of Sanctions or a Sanctioned Country, or in any other manner that will result in any violation by any Person (including any Lender, the Arranger, the Administrative Agent or an LC Issuer) of any Anti-Terrorism Laws or any Sanctions.

## Article VII
## AFFIRMATIVE COVENANTS

Beginning on the Closing Date and continuing until all of the Obligations (other than contingent indemnification obligations not then due) have been paid and satisfied in full in cash, all Letters of Credit have been terminated or expired (or been Cash Collateralized) and the Commitments terminated, each Credit Party will, and will cause each of its Subsidiaries to:

SECTION 7.1     Financial Statements and Budgets.  Deliver to the Administrative Agent, in form and detail satisfactory to the Administrative Agent (which shall promptly make such information available to the Lenders in accordance with its customary practice):

(a)     Annual Financial Statements.  As soon as practicable and in any event within one hundred-fifty (150) days after the end of each Fiscal Year: commencing with the Fiscal Year ending January 31, 2016, an audited Consolidated balance sheet of the Parent and its Subsidiaries as of the close of such Fiscal Year and audited Consolidated statements of income, retained earnings and cash flows including the notes thereto, all of the statements provided in reasonable detail setting forth in comparative form the corresponding figures as of the end of and for the preceding Fiscal Year and prepared in accordance with GAAP and, if applicable, containing disclosure of the effect on the financial position or results of operations of any change in the application of accounting principles and practices during the year.  Such annual financial statements shall be audited by an independent certified public accounting firm reasonably acceptable to the Administrative Agent, and accompanied by a report and opinion thereon by such certified public accountants prepared in accordance with generally accepted auditing standards that is not subject to any "going concern" or similar qualification or exception or any qualification as to the scope of such audit or with respect to accounting principles followed by the Parent or any of its Subsidiaries not in accordance with GAAP.

(b)     Monthly Financial Statements.  As soon as practicable and in any event within sixty (60) days after the end of each fiscal month of each Fiscal Year (commencing with the fiscal month ending July 31, 2015), an unaudited Consolidated and consolidating balance sheet of the Parent and its Subsidiaries as of the close of such fiscal month and unaudited Consolidated and consolidating statements of income, all in reasonable detail setting forth in comparative form the corresponding figures as of the end of and for the corresponding period in the preceding Fiscal Year and prepared by the Borrowers in accordance with GAAP and, if applicable, containing disclosure of the effect on the financial position or results of operations of any change in the application of accounting principles and

80

For Reference Purposes Only
5702727v1

practices during the period, and certified by a Responsible Officer of each Borrower to present fairly in all material respects the financial condition of Parent and its Subsidiaries on a Consolidated and consolidating basis as of their respective dates and the results of operations of Parent and its Subsidiaries for the respective periods then ended, subject to normal year-end adjustments and the absence of footnotes.

(c)      Annual Business Plan and Other Information.   As soon as practicable and in any event within sixty (60) days after the end of each Fiscal Year, a business plan and operating and capital budget of Parent and its Subsidiaries for the ensuing four (4) fiscal quarters, such plan to be prepared in accordance with GAAP and to include, on a quarterly basis, the following:   a business plan, a backlog/booking report, and a projected income statement.

(d)      13-Week Cash Flow.   Until such time as the Lenders receive a Compliance Certificate reflecting that the Consolidated Leverage Ratio is less than 3.50 to 1.0, (i) on or before the Second Amendment Effective Date and on or before Wednesday of each week thereafter, a 13-Week Budget (updated after the first such 13-Week Budget) in form and substance reasonably acceptable to the Administrative Agent which shall reflect the good faith projection of the Borrowers of all weekly cash receipts and disbursements in connection with the operation of the Credit Parties' and their respective Subsidiaries' business during such thirteen-week period, including but not limited to, collections, payroll, capital expenditures and other major cash outlays, (ii) a variance report in form and substance reasonably acceptable to the Administrative Agent comparing the Credit Parties' actual receipts and disbursements for the immediately preceding week with the projected receipts and disbursements for such week as reflected in the most recently delivered 13-Week Budget, and (iii) on Wednesday of each week, a weekly cash flow report for the immediately preceding week in form and substance satisfactory to the Administrative Agent and with a certification of Consolidated Cash Balances on the last Business Day of such preceding week.

SECTION 7.2      Certificates; Other Reports.  Deliver to the Administrative Agent (which shall promptly make such information available to the Lenders in accordance with its customary practice):

(a)      (i)      with respect to the Consolidated Asset Coverage Ratio, forty-five (45) days after the end of each fiscal month of each Fiscal Year, an accounts receivable aging report of each Borrower and a duly completed Officer's Compliance Certificate signed by a Responsible Officer of each Borrower certifying as to compliance by Parent and its Subsidiaries with the Consolidated Asset Coverage Ratio, together with a detailed listing of accounts receivable that comprise Eligible Foreign Trade Accounts Receivable.

(ii)      at each time financial statements are delivered pursuant to *Sections 7.1(a)* or *(b)* and at such other times as the Administrative Agent shall reasonably request, a duly completed Officer's Compliance

81

For Reference Purposes Only
5702727v1

Certificate signed by a Responsible Officer of each Borrower; *provided that*, with respect to each Officer's Compliance Certificate delivered to Administrative Agent pursuant to Section *7.1(b)*, the Borrowers shall only be required to certify as to compliance by Parent and its Subsidiaries with respect to all financial covenants contained in *Sections 8.13* and *8.14* (other than the Consolidated Asset Coverage Ratio), for the fiscal months ending January 31, April 30, July 31, and October 31 of each Fiscal Year.

(b)       promptly upon receipt thereof, copies of all reports, if any, submitted to any Credit Party, any Subsidiary thereof or any of their respective boards of directors by their respective independent public accountants in connection with their auditing function, including, without limitation, any management report and any management responses thereto;

(c)       promptly after the furnishing thereof, copies of any statement or report furnished to any holder of Indebtedness of any Credit Party or any Subsidiary thereof in excess of the Threshold Amount pursuant to the terms of any indenture, loan or credit or similar agreement;

(d)       promptly after the assertion or occurrence thereof, notice of any action or proceeding against or of any noncompliance by any Credit Party or any Subsidiary thereof with any Environmental Law that could reasonably be expected to have a Material Adverse Effect;

(e)       promptly upon the request thereof, such other information and documentation required by bank regulatory authorities under applicable "know your customer" and Anti-Money Laundering rules and regulations (including, without limitation, the PATRIOT Act), as from time to time reasonably requested by the Administrative Agent or any Lender; ~~and~~

(f)       such other information regarding the operations, business affairs and financial condition of any Credit Party or any Subsidiary thereof as the Administrative Agent or any Lender may reasonably request; and

(g)       not later than April 30, 2017, the forensic accountant's report being prepared for the Borrowers or their counsel by Cummings & Houston, LLP or other forensic accountants reasonably satisfactory to the Administrative Agent.

Each Borrower hereby acknowledges that (a) the Administrative Agent and/or the Arranger will make available to the Lenders and the Issuing Lender materials and/or information provided by or on behalf of the Borrowers hereunder (collectively, "**Borrower Materials**") by posting the Borrower Materials on SyndTrak Online or another similar electronic system (the "**Platform**") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to Parent and its Subsidiaries or their respective securities) (each, a "**Public Lender**").  Each Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and

82

For Reference Purposes Only
5702727v1

conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrowers shall be deemed to have authorized the Administrative Agent, the Arranger, the Issuing Lender and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to Parent and its Subsidiaries or their respective securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in ***Section 11.11***); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor;" and (z) the Administrative Agent and the Arranger shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor." Notwithstanding the foregoing, the Borrowers shall be under no Obligation to mark any Borrower Materials "PUBLIC".

SECTION 7.3     Notice of Litigation and Other Matters.  Promptly (but in no event later than ten (10) days after any Responsible Officer of any Credit Party obtains knowledge thereof) notify the Administrative Agent in writing of (which shall promptly make such information available to the Lenders in accordance with its customary practice):

(a)     the occurrence of any Default or Event of Default;

(b)     the commencement of all proceedings and investigations by or before any Governmental Authority and all actions and proceedings in any court or before any arbitrator against or involving any Credit Party or any Subsidiary thereof or any of their respective properties, assets or businesses;

(c)     any notice of any violation received by any Credit Party or any Subsidiary thereof from any Governmental Authority including, without limitation, any notice of violation of Environmental Laws ;

(d)     any labor controversy that has resulted in, or threatens to result in, a strike or other work action against any Credit Party or any Subsidiary thereof;

(e)     any attachment, judgment, lien, levy or order exceeding the Threshold Amount that may be assessed against or threatened against any Credit Party or any Subsidiary thereof;

(f)     any event which constitutes or which with the passage of time or giving of notice or both would constitute a default or event of default under any Material Contract to which Parent or any of its Subsidiaries is a party or by which any Borrower or any Subsidiary thereof or any of their respective properties may be bound;

(g)     (i) any unfavorable determination letter from the IRS regarding the qualification of an Employee Benefit Plan under Section 401(a) of the Code (along with a copy thereof), (ii) all notices received by any Credit Party or any

83

ERISA Affiliate of the PBGC's intent to terminate any Pension Plan or to have a trustee appointed to administer any Pension Plan, (iii) all notices received by any Credit Party or any ERISA Affiliate from a Multiemployer Plan sponsor concerning the imposition or amount of withdrawal liability pursuant to Section 4202 of ERISA and (iv) any Borrower obtaining knowledge or reason to know that any Credit Party or any ERISA Affiliate has filed or intends to file a notice of intent to terminate any Pension Plan under a distress termination within the meaning of Section 4041(c) of ERISA; and

(h)     any event which makes any of the representations set forth in **Article VI** that is subject to materiality or Material Adverse Effect qualifications inaccurate in any respect or any event which makes any of the representations set forth in **Article VI** that is not subject to materiality or Material Adverse Effect qualifications inaccurate in any material respect.

Each notice pursuant to **Section 7.3** shall be accompanied by a statement of a Responsible Officer of the Borrowers setting forth details of the occurrence referred to therein and stating what action the Borrowers has taken or proposes to take with respect thereto.  Each notice pursuant to **Section 7.3(a)** shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

SECTION 7.4          Preservation of Corporate Existence and Related Matters.  Except as permitted by **Section 8.4**, preserve and maintain its separate corporate existence and all rights, franchises, licenses and privileges necessary to the conduct of its business, and qualify and remain qualified as a foreign corporation or other entity and authorized to do business in each jurisdiction where the nature and scope of its activities require it to so qualify under Applicable Law.

SECTION 7.5          Maintenance of Property and Licenses.

(a)     In addition to the requirements of any of the Security Documents, protect and preserve all Properties necessary in and material to its business, including copyrights, patents, trade names, service marks and trademarks; maintain in good working order and condition, ordinary wear and tear excepted, all buildings, equipment and other tangible real and personal property; and from time to time make or cause to be made all material repairs, renewals and replacements thereof and additions to such Property reasonably necessary for the conduct of its business, so that the business carried on in connection therewith may be conducted in a commercially reasonable manner.

(b)     Maintain, in full force and effect in all material respects, each and every material license, permit, certification, qualification, approval or franchise issued by any Governmental Authority (each, a "**License**") required for each of them to conduct their respective businesses as presently conducted.

SECTION 7.6          Insurance.  Maintain insurance with financially sound and reputable insurance companies against at least such risks and in at least such amounts as are

84

customarily maintained by similar businesses and as may be required by Applicable Law and as are required by any Security Documents (including, without limitation, hazard and business interruption insurance). All such insurance shall, (a) provide that no cancellation or material modification thereof shall be effective until at least 30 days after receipt by the Administrative Agent of written notice thereof, (b) name the Administrative Agent as an additional insured party thereunder and (c) in the case of each casualty insurance policy, name the Administrative Agent as lender's loss payee. On the Closing Date and from time to time thereafter deliver to the Administrative Agent upon its request information in reasonable detail as to the insurance then in effect, stating the names of the insurance companies, the amounts and rates of the insurance, the dates of the expiration thereof and the properties and risks covered thereby.

SECTION 7.7 <u>Accounting Methods and Financial Records</u>. Maintain a system of accounting, and keep proper books, records and accounts (which shall be true and complete in all material respects) as may be required or as may be necessary to permit the preparation of financial statements in accordance with GAAP and in compliance with the regulations of any Governmental Authority having jurisdiction over it or any of its Properties.

SECTION 7.8 <u>Payment of Taxes and Other Obligations</u>. Pay and perform (a) all taxes, assessments and other governmental charges that may be levied or assessed upon it or any of its Property and (b) all other indebtedness, obligations and liabilities in accordance with customary trade practices; <u>provided</u>, that the Borrowers or such Subsidiary may contest any item described in clause (a) of this **Section 7.8** in good faith so long as adequate reserves are maintained with respect thereto in accordance with GAAP.

SECTION 7.9 <u>Compliance with Laws and Approvals</u>. Observe and remain in compliance in all material respects with all Applicable Laws and maintain in full force and effect all Governmental Approvals, in each case applicable to the conduct of its business except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

SECTION 7.10 <u>Environmental Laws</u>. In addition to and without limiting the generality of **Section 7.9**, (a) substantially comply with, and ensure such compliance by all tenants and subtenants with all applicable Environmental Laws and obtain and substantially comply with and maintain, and ensure that all tenants and subtenants, if any, obtain and comply with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws, (b) conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws, and promptly comply with all lawful orders and directives of any Governmental Authority regarding Environmental Laws, and (c) defend, indemnify and hold harmless the Administrative Agent and the Lenders, and their respective parents, Subsidiaries, Affiliates, employees, agents, officers and directors, from and against any claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature known or unknown, contingent or otherwise, arising out of, or in any way relating to the presence of Hazardous Materials, or the violation of, noncompliance with or liability under any Environmental Laws applicable to the operations of any Borrower or any such Subsidiary, or any orders, requirements or demands of Governmental Authorities related thereto, including, without limitation, reasonable attorney's and consultant's fees, investigation and laboratory fees, response costs, court costs and litigation expenses, except to the extent that any of the foregoing directly result

85

from the gross negligence or willful misconduct of the party seeking indemnification therefor, as determined by a court of competent jurisdiction by final nonappealable judgment.

SECTION 7.11      Compliance with ERISA.  In addition to and without limiting the generality of **Section 7.9**, (a) except where the failure to so comply could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) comply with applicable provisions of ERISA, the Code and the regulations and published interpretations thereunder with respect to all Employee Benefit Plans, (ii) not take any action or fail to take action the result of which could reasonably be expected to result in a liability to the PBGC or to a Multiemployer Plan, (iii) not participate in any prohibited transaction that could result in any civil penalty under ERISA or tax under the Code and (iv) operate each Employee Benefit Plan in such a manner that will not incur any tax liability under Section 4980B of the Code or any liability to any qualified beneficiary as defined in Section 4980B of the Code and (b) furnish to the Administrative Agent upon the Administrative Agent's request such additional information about any Employee Benefit Plan as may be reasonably requested by the Administrative Agent.

SECTION 7.12      Compliance with Agreements.  Comply in all material respects with each term, condition and provision of all leases, agreements and other instruments entered into in the conduct of its business including, without limitation, any Material Contract; provided, that each Borrower or any such Subsidiary may contest any such lease, agreement or other instrument in good faith through applicable proceedings so long as adequate reserves are maintained in accordance with GAAP.

SECTION 7.13      Visits; Inspections and Field Examinations.  Permit representatives of the Administrative Agent or any Lender, from time to time upon prior reasonable notice and at such times during normal business hours, all at the expense of the Borrowers, to visit and inspect its properties; inspect, audit and make extracts from its books, records and files, including, but not limited to, management letters prepared by independent accountants; conduct field examinations or collateral audits; and discuss with its principal officers, and its independent accountants, its business, assets, liabilities, financial condition, results of operations and business prospects; provided that excluding any such visits and inspections during the continuation of an Event of Default, the Administrative Agent and Lenders shall not exercise such rights more often than ~~one time~~two times during any calendar year (and a field examination is required to be conducted on at least ~~an~~ a semi-annual basis) and such inspections and visits shall be at the Borrowers' expense; provided further that upon the occurrence and during the continuance of an Event of Default, the Administrative Agent and Lenders may make such visits and inspections at any time, such inspections and visits shall be at the expense of the Borrowers, and the Administrative Agent or any Lender may do any of the foregoing without advance notice.  Upon the request of the Administrative Agent or the Required Lenders, participate in a meeting of the Administrative Agent and Lenders once during each Fiscal Year, which meeting will be held at the Borrowers' corporate offices (or such other location as may be agreed to by the Borrowers and the Administrative Agent) at such time as may be agreed by the Borrowers and the Administrative Agent.

SECTION 7.14      Additional Subsidiaries and Real Property.

*For Reference Purposes Only*
*5702727v1*

(a)  <u>Additional Domestic Subsidiaries</u>.  Notify the Administrative Agent of the creation or acquisition of any Domestic Subsidiary and promptly thereafter (and in any event within thirty (30) days after such creation or acquisition), cause such Person to (i) become a Subsidiary Guarantor by delivering to the Administrative Agent a duly executed Guaranty Agreement or such other document as the Administrative Agent shall deem appropriate for such purpose, (ii) grant a security interest in all Collateral (subject to the exceptions specified in the Collateral Agreement) owned by such Subsidiary by delivering to the Administrative Agent a duly executed supplement to each Security Document or such other document as the Administrative Agent shall deem appropriate for such purpose and comply with the terms of each Security Document, (iii) deliver to the Administrative Agent such documents and certificates referred to in **Section 5.1** as may be reasonably requested by the Administrative Agent, (iv) deliver to the Administrative Agent such original Capital Stock or other certificates and stock or other transfer powers evidencing the Capital Stock of such Person, (v) deliver to the Administrative Agent such updated Schedules to the Loan Documents as requested by the Administrative Agent with respect to such Person, and (vi) deliver to the Administrative Agent such other documents as may be reasonably requested by the Administrative Agent, all in form, content and scope reasonably satisfactory to the Administrative Agent.

(b)  <u>Additional Foreign Subsidiaries</u>.  Notify the Administrative Agent at the time that any Person becomes a First Tier Foreign Subsidiary, and at the request of the Administrative Agent, promptly thereafter (and in any event within forty-five (45) days after such request), cause (i) the applicable Credit Party to deliver to the Administrative Agent Security Documents pledging sixty-six percent (66%) of the total outstanding voting Capital Stock (and one hundred percent (100%) of the non-voting Capital Stock) of any such new First Tier Foreign Subsidiary and a consent thereto executed by such new First Tier Foreign Subsidiary (including, without limitation, if applicable, original stock certificates (or the equivalent thereof pursuant to the Applicable Laws and practices of any relevant foreign jurisdiction) evidencing the Capital Stock of such new First Tier Foreign Subsidiary, together with an appropriate undated stock power for each certificate duly executed in blank by the registered owner thereof), (ii) such Person to deliver to the Administrative Agent such documents and certificates referred to in **Section 5.1** as may be reasonably requested by the Administrative Agent, (iii) such Person to deliver to the Administrative Agent such updated Schedules to the Loan Documents as requested by the Administrative Agent with regard to such Person and (iv) such Person to deliver to the Administrative Agent such other documents as may be reasonably requested by the Administrative Agent, all in form, content and scope reasonably satisfactory to the Administrative Agent.

(c)  <u>Real Property Collateral</u>.  Notify the Administrative Agent, within ten (10) days after the acquisition of any owned real property by any Credit Party that is not subject to the existing Security Documents, and within sixty (60) days of such acquisition, deliver such mortgages, deeds of trust, title insurance

87

policies, environmental reports, surveys and other documents reasonably requested by the Administrative Agent in connection with granting and perfecting a first priority Lien, other than Permitted Liens, on such real property in favor of the Administrative Agent, for the ratable benefit of the Secured Parties, all in form and substance acceptable to the Administrative Agent.

(d)    <u>Merger Subsidiaries</u>.  Notwithstanding the foregoing, to the extent any new Subsidiary is created solely for the purpose of consummating a merger transaction pursuant to a Permitted Acquisition, and such new Subsidiary at no time holds any assets or liabilities other than any merger consideration contributed to it contemporaneously with the closing of such merger transaction, such new Subsidiary shall not be required to take the actions set forth in **_Section 7.14(a)_** or **_(b)_**, as applicable, until the consummation of such Permitted Acquisition (at which time, the surviving entity of the respective merger transaction shall be required to so comply with **_Section 7.14(a)_** or **_(b)_**, as applicable, within ten (10) Business Days of the consummation of such Permitted Acquisition, as such time period may be extended by the Administrative Agent in its sole discretion).

(e)    <u>Exclusions</u>.  The provisions of this **_Section 7.14_** shall not apply to assets as to which the Administrative Agent and the Borrowers shall reasonably determine that the costs and burdens of obtaining a security interest therein or perfection thereof outweigh the value of the security afforded thereby.

SECTION 7.15    <u>Use of Proceeds</u>.  The Borrowers shall use the proceeds of the Extensions of Credit for working capital and general corporate purposes of any Borrower and its Subsidiaries to the extent permitted under this Agreement, including the payment of certain fees and expenses incurred in connection with the Transactions and this Agreement.  The Borrowers shall use the proceeds of any Incremental Revolving Credit Increase as permitted pursuant to **_Section 4.13_**, as applicable.

SECTION 7.16    <u>Corporate Governance</u>.  (a) Maintain entity records and books of account separate from those of any other entity which is an Affiliate of such entity, (b) not commingle its funds or assets with those of any other entity which is an Affiliate of such entity (except pursuant to cash management systems reasonably acceptable to the Administrative Agent) and (c) provide that its board of directors (or equivalent governing body) will hold all appropriate meetings to authorize and approve such entity's actions, which meetings will be separate from those of any other entity which is an Affiliate of such entity.

SECTION 7.17    <u>Further Assurances</u>.  Maintain the security interests created by the Security Documents in accordance with the provisions thereof, subject to the rights of the Credit Parties to dispose of the Collateral pursuant to the Loan Documents; and make, execute and deliver all such additional and further acts, things, deeds, instruments and documents as the Administrative Agent or the Required Lenders (through the Administrative Agent) may reasonably require for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of renewing the rights of the Secured Parties with respect to the Collateral as to which the Administrative Agent, for the ratable benefit of the

88

Secured Parties, has a perfected Lien pursuant hereto or thereto, including, without limitation, filing any financing or continuation statements under the UCC (or other similar laws) in effect in any jurisdiction with respect to the security interests created hereby or by the other Loan Documents.

SECTION 7.18 <u>Post Closing Matters</u>. Execute and deliver the documents and complete the tasks set forth on *Schedule 7.18*, in each case within the time limits specified on such schedule.

SECTION 7.19 <u>Keepwell</u>. If it is a Qualified ECP Loan Party, then jointly and severally, together with each other Qualified ECP Loan Party, hereby absolutely unconditionally and irrevocably (a) guarantees the prompt payment and performance of all Secured Hedge Liabilities owing by each Non-Qualifying Party (it being understood and agreed that this guarantee is a guaranty of payment and not of collection), and (b) undertakes to provide such funds or other support as may be needed from time to time by any Non-Qualifying Party to honor all of such Non-Qualifying Party's obligations under this Agreement or any other Loan Document in respect of Secured Hedge Liabilities (provided that, each Qualified ECP Loan Party shall only be liable under this *Section 7.19* for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this *Section 7.19*, or otherwise under this Agreement or any other Loan Document, voidable under Applicable Law, including fraudulent conveyance or fraudulent transfer laws, and not for any greater amount). The obligations of each Qualified ECP Loan Party under this *Section 7.19* shall remain in full force and effect until payment in full of the Obligations and termination of this Agreement and the other Loan Documents. Each Qualified ECP Loan Party intends that this *Section 7.19* constitute, and this *Section 7.19* shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of a Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

SECTION 7.20 Consolidated Cash Balances.

(a) To the extent any Loans or Letters of Credit are outstanding as of the end of the last Business Day of each week, the Credit Parties will not permit the aggregate amount of Consolidated Cash Balances held by them and their Subsidiaries as of such Business Day to exceed $5,000,000. If, as of the end of any such Business Day, any Loans or Letters of Credit are outstanding and the aggregate amount of Consolidated Cash Balances exceeds such amount, then on such Business Day, the Borrower shall, to the extent of such excess, prepay to the Administrative Agent for the ratable benefit of the Lenders the outstanding principal amount of the Loans or Cash Collateralized Letters of Credit.

(b) To the extent any Loans or Letters of Credit are outstanding as of the end of the last Business Day of each month, the Credit Parties will not permit the aggregate amount of Consolidated Cash Balances held by them and their Subsidiaries as of such Business Day to exceed $10,000,000. If, as of the end of any such Business Day when the aggregate Revolving Credit Commitment of all Lenders is greater than $55,000,000, any Loans or Letters of Credit are outstanding and the aggregate amount of Consolidated Cash Balances exceeds

89

*For Reference Purposes Only*
5702727v1

such amount, then on such Business Day, the Borrower shall, to the extent of such excess, prepay (with a concurrent Commitment reduction) to the Administrative Agent for the ratable benefit of the Lenders the outstanding principal amount of the Loans or Cash Collateralized Letters of Credit.

(c)     To effect the payments required under paragraphs (a) and (b) above, the Credit Parties hereby irrevocably authorize each Lender, in its capacity as a depository bank, to, upon written notice from the Administrative Agent, initiate debit entries to any and all such accounts held by any Credit Party or any Subsidiary thereof with such bank and to debit the amounts set forth in such written notice (which, for the avoidance of doubt, shall be an amount not to exceed the lesser of (a) the outstanding principal amount of the Loans and (b) such excess amount from such accounts. The foregoing authorizations to initiate debit entries shall remain in full force and effect until the Administrative Agent terminates such respective arrangement. The Credit Parties represent that such Credit Party or a Subsidiary thereof, or anyone or more of them, is and will be the owner(s) of all funds held in such accounts. Each of the Administrative Agent and each Credit Party, for itself and its Subsidiaries, acknowledges that (x) such debit entries may cause an overdraft of such accounts which may result in the bank's refusal to honor items drawn on such accounts until adequate deposits are made in such account, (y) such bank is under no duty or obligation to initiate any debit entry for any purpose, and (z) if the debit is not made, the payment may be late or past due.

SECTION 7.21     Third-Party Consultant.  Continue to engage a third-party consultant reasonably acceptable to Administrative Agent until the later of (a) July 31, 2017 and (b) three (3) months after the hiring of a permanent chief financial officer, such third-party consultant's duties to include (a) review of the forensic accountant's report, audit reports, 13-Week Cash Flow Reports, inventory reports with special attention to inventory aged over 365 days and monthly financial statements, borrowing base certificates and compliance certificates.

**Article VIII**
**NEGATIVE COVENANTS**

Beginning on the Closing Date and continuing until all of the Obligations (other than contingent, indemnification obligations not then due) have been paid and satisfied in full in cash, all Letters of Credit have been terminated or expired (or been Cash Collateralized) and the Commitments terminated, the Credit Parties will not, and will not permit any of their respective Subsidiaries to :

SECTION 8.1     <u>Indebtedness</u>.  Create, incur, assume or suffer to exist any Indebtedness except:

(a)     the Obligations;

90

(b)     Indebtedness and obligations owing under Hedge Agreements entered into in order to manage existing or anticipated interest rate, exchange rate or commodity price risks and not for speculative purposes;

(c)     Indebtedness existing on the ~~Closing~~ Second Amendment Effective Date and listed on **Schedule 8.1**, and the renewal, refinancing, extension and replacement (but not the increase in the aggregate principal amount) thereof;

(d)     ~~Indebtedness incurred in connection with Capital Leases and purchase money Indebtedness in an aggregate amount not to exceed $10,000,000 at any time outstanding;~~ **[Reserved]**;

(e)     ~~Indebtedness of a Person existing at the time such Person became a Subsidiary or assets were acquired from such Person in connection with an Investment permitted pursuant to~~ **Section 8.3(g)**, ~~to the extent that (i) such Indebtedness was not incurred in connection with, or in contemplation of, such Person becoming a Subsidiary or the acquisition of such assets, (ii) none of the Credit Parties (other than such Person or any other Person that such Person merges with or that acquires the assets of such Person) shall have any liability or other obligation with respect to such Indebtedness and (iii) after giving~~ **pro forma** ~~effect to the incurrence of such Indebtedness, the Borrowers shall be in compliance with all financial covenants set forth in~~ **Section 8.14**; **[Reserved]**;

(f)     Guaranty Obligations with respect to Indebtedness permitted pursuant to *subsections (a)* through *(d)* of this **Section 8.1**, and Guaranty Obligations arising under the WF Aviation Guaranty;   *[First Amendment]*

(g)     unsecured intercompany Indebtedness (i) owed by any Credit Party to another Credit Party, ~~(ii) owed by any Non-Guarantor Subsidiary to any Credit Party in an aggregate principal amount not to exceed the Threshold Amount at any time outstanding provided that any Indebtedness owed by such Non-Guarantor Subsidiary or Affiliate to any Credit Party pursuant to this~~ *clause (ii)* ~~shall be evidenced by a demand note in form and substance reasonably satisfactory to the Administrative Agent and shall be pledged and delivered to the Administrative Agent pursuant to the Security Documents, and (iii~~ and (ii) owed by any Credit Party to any Non-Guarantor Subsidiary or Affiliate provided, that such Indebtedness shall be subordinated to the Obligations in a manner reasonably satisfactory to the Administrative Agent;

(h)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or other similar instrument drawn against insufficient funds in the ordinary course of business;

(i)     Subordinated Indebtedness of the Borrowers and the Subsidiary Guarantors~~; provided, that in the case of each incurrence of such Subordinated Indebtedness, (i) no Default or Event of Default shall have occurred and be continuing or would be caused by the incurrence of such Subordinated~~

91

Indebtedness, and (ii) the Administrative Agent shall have received satisfactory written evidence that Parent and its Subsidiaries would be in compliance with the financial covenants set forth in **Section 8.14** after giving *pro forma* effect to the issuance of any such Subordinated Indebtedness existing on the Second Amendment Effective Date; and provided, further that with respect to the LHI Intercompany Note, the outstanding principal balance of the LHI Intercompany Note shall not exceed $8,000,000 at any time unless and until the Administrative Agent provides written consent to any increase;

(j) Indebtedness under performance bonds, surety bonds, release, appeal and similar bonds, statutory obligations or with respect to workers' compensation claims, in each case incurred in the ordinary course of business, and reimbursement obligations in respect of any of the foregoing; and

(k) Indebtedness of any Credit Party or any Subsidiary thereof not otherwise permitted pursuant to this **Section 8.1** in an aggregate principal amount not to exceed $10,000,000 at any time outstanding. **[Reserved].**

SECTION 8.2 <u>Liens</u>.  Create, incur, assume or suffer to exist, any Lien on or with respect to any of its Property, whether now owned or hereafter acquired, except:

(a) (i) Liens created pursuant to the Loan Documents and (ii) Liens on cash or deposits granted in favor of the Swingline Lender or the Issuing Lender to Cash Collateralize any Defaulting Lender's participation in Letters of Credit or Swingline Loans;

(b) Liens in existence on the Closing Date and described on **Schedule 8.2**, including Liens incurred in connection with any refinancing, refunding, renewal or extension of Indebtedness pursuant to **Section 8.1(c)** (solely to the extent that such Liens were in existence on the Closing Date and described on **Schedule 8.2**); provided that the scope of any such Lien shall not be increased, or otherwise expanded, to cover any additional property or type of asset, as applicable, beyond that in existence on the Closing Date, except for products and proceeds of the foregoing;

(c) Liens for taxes, assessments and other governmental charges or levies (excluding any Lien imposed pursuant to any of the provisions of ERISA or Environmental Laws) (i) not yet due or as to which the period of grace (not to exceed thirty (30) days), if any, related thereto has not expired or (ii) which are being contested in good faith and by appropriate proceedings if adequate reserves are maintained to the extent required by GAAP;

(d) the claims of materialmen, mechanics, carriers, warehousemen, processors or landlords for labor, materials, supplies or rentals incurred in the ordinary course of business, which (i) are not overdue for a period of more than thirty (30) days, or if more than thirty (30) days overdue, no action has been taken to enforce such Liens and such Liens are being contested in good faith and by

92

appropriate proceedings if adequate reserves are maintained to the extent required by GAAP and (ii) do not, individually or in the aggregate, materially impair the use thereof in the operation of the business of any Borrower or any of its Subsidiaries;

(e)    deposits or pledges made in the ordinary course of business in connection with, or to secure payment of, obligations under workers' compensation, unemployment insurance and other types of social security or similar legislation, or to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred in the ordinary course of business, in each case, so long as no foreclosure sale or similar proceeding has been commenced with respect to any portion of the Collateral on account thereof;

(f)    encumbrances in the nature of zoning restrictions, easements and rights or restrictions of record on the use of real property, which in the aggregate are not substantial in amount and which do not, in any case, detract from the value of such property or impair the use thereof in the ordinary conduct of business;

(g)    Liens arising from the filing of precautionary UCC financing statements relating solely to personal property leased pursuant to operating leases entered into in the ordinary course of business of any Borrower and its Subsidiaries;

(h)    Liens securing Indebtedness permitted under **Section 8.1(d)**; provided that (i) such Liens shall be created substantially simultaneously with the acquisition, repair, improvement or lease, as applicable, of the related Property, (ii) such Liens do not at any time encumber any property other than the Property financed by such Indebtedness, (iii) the amount of Indebtedness secured thereby is not increased and (iv) the principal amount of Indebtedness secured by any such Lien shall at no time exceed one hundred percent (100%) of the original price for the purchase, repair improvement or lease amount (as applicable) of such Property at the time of purchase, repair, improvement or lease (as applicable);

(i)    Liens securing judgments for the payment of money not constituting an Event of Default under **Section 9.1(m)** or securing appeal or other surety bonds relating to such judgments;

(j)    Liens on Property of any Subsidiary which are in existence at the time that such Subsidiary is acquired pursuant to a Permitted Acquisition; provided that, (A) such Liens are not incurred in connection with, or in anticipation of, such Permitted Acquisition, purchase or other acquisition, (B) such Liens are applicable only to specific Property, (C) such Liens are not "blanket" or all asset Liens, (D) such Liens do not attach to any other Property of any Borrower or any of its Subsidiaries and (E) the Indebtedness secured by such Liens is permitted under **Section 8.1(e)** of this Agreement;

93

*For Reference Purposes Only*
5702727v1

(k)     Liens on assets of Foreign Subsidiaries; provided that (i) such Liens do not extend to, or encumber, assets that constitute Collateral, the Capital Stock of any Borrower or any of the Subsidiaries, or any trade accounts receivable or inventory of such Foreign Subsidiary, and (ii) such Liens extending to the assets of any Foreign Subsidiary secure only Indebtedness incurred by such Foreign Subsidiary pursuant to ***Section 8.1(k)***;

(l)     (i) Liens of a collecting bank arising in the ordinary course of business under Section 4-210 of the UCC in effect in the relevant jurisdiction and (ii) Liens of any depositary bank in connection with statutory, common law and contractual rights of set-off and recoupment with respect to any deposit account of any Borrower or any Subsidiary thereof;

(m)     (i) contractual or statutory Liens of landlords to the extent relating to the property and assets relating to any lease agreements with such landlord, and (ii) contractual Liens of suppliers (including sellers of goods) or customers granted in the ordinary course of business to the extent limited to the property or assets relating to such contract;

(n)     any interest or title of a licensor, sublicensor, lessor or sublessor with respect to any assets under any license or lease agreement entered into in the ordinary course of business which do not (i) interfere in any material respect with the business of any Borrower or its Subsidiaries or materially detract from the value of the relevant assets of any Borrower or its Subsidiaries or (ii) secure any Indebtedness; and

(o)     ~~Liens not otherwise permitted hereunder on assets other than the Collateral securing Indebtedness or other obligations in the aggregate principal amount not to exceed $5,000,000 at any time outstanding.~~**[Reserved].**

SECTION 8.3     <u>Investments</u>.  Purchase, own, invest in or otherwise acquire (in one transaction or a series of transactions), directly or indirectly, any Capital Stock, interests in any partnership or joint venture (including, without limitation, the creation or capitalization of any Subsidiary), evidence of Indebtedness or other obligation or security, substantially all or a portion of the business or assets of any other Person or any other investment or interest whatsoever in any other Person, or make or permit to exist, directly or indirectly, any loans, advances or extensions of credit to, or any investment in cash or by delivery of Property in, any Person (all the foregoing, "***Investments***") except:

(a)     (i) Investments existing on the Closing Date in Subsidiaries existing on the Closing Date, (ii) Investments existing on the Closing Date (other than Investments in Subsidiaries existing on the Closing Date) and described on ***Schedule 8.3***, (iii) Investments made after the Closing Date by any Credit Party in any other Credit Party and (iv) Investments made after the Closing Date by any Non-Guarantor Subsidiary in any other Non-Guarantor Subsidiary;

(b)     Investments in cash and Cash Equivalents;

94

(c)       Investments by the Parent or any of its Subsidiaries in the form of Capital Expenditures permitted pursuant to this Agreement;

(d)       deposits made in the ordinary course of business to secure the performance of leases or other obligations as permitted by **Section 8.2**;

(e)       Hedge Agreements permitted pursuant to **Section 8.1**;

(f)       purchases of assets in the ordinary course of business;

(g)       Investments by the Borrower or any Subsidiary thereof in the form of Permitted Acquisitions to the extent that any Person or Property acquired in such acquisition becomes a part of the Borrower or a Subsidiary Guarantor or becomes (whether or not such Person is a Wholly-Owned Subsidiary) a Subsidiary Guarantor in the manner contemplated by **Section 7.14**;

(h)       Investments in the form of loans and advances to officers, directors and employees in the ordinary course of business in an aggregate amount not to exceed $1,000,000 at any time outstanding (determined without regard to any write-downs or write-offs of such loans or advances);

(i)       Investments in the form of intercompany Indebtedness permitted pursuant to **Section 8.1(g)**;

(j)       Investments (including, but not limited to, the 12/4/2015 Note) made after the Closing Date in any Non-Guarantor Subsidiary or Affiliate, provided that the aggregate amount of all such Investments shall not exceed $10,000,000 at any time; *[First Amendment]*

(k)       Guaranty Obligations permitted pursuant to **Section 8.1**;

(l)       Investments made after the Closing Date in joint ventures, <u>provided</u>, that the aggregate amount of all such Investments in joint ventures shall not exceed $2,000,000 at any time; and

(m)       Investments not otherwise permitted pursuant to this **Section 8.3** in an aggregate amount not to exceed $2,000,000 at any time outstanding; <u>provided</u> that, immediately before and immediately after giving *pro forma* effect to any such Investments, Borrowers are in compliance with the financial covenants set forth in **Section 8.14** and no Default or Event of Default shall have occurred and be continuing.

For purposes of determining the amount of any Investment outstanding for purposes of this **Section 8.3**, such amount shall be deemed to be the amount of such Investment when made, purchased or acquired (without adjustment for subsequent increases or decreases in the value of such Investment) less any amount realized in respect of such Investment upon the sale, collection or return of capital (not to exceed the original amount invested).

*For Reference Purposes Only*
*5702727v1*

SECTION 8.4 <u>Fundamental Changes</u>. Merge, consolidate or enter into any similar combination with any other Person or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution) except:

(a) (i) any Wholly-Owned Subsidiary of any Borrower may be merged, amalgamated or consolidated with or into such Borrower (<u>provided</u> that such Borrower shall be the continuing or surviving entity) or (ii) any Wholly-Owned Subsidiary of any Borrower may be merged, amalgamated or consolidated with or into any Subsidiary Guarantor (<u>provided</u> that the Subsidiary Guarantor shall be the continuing or surviving entity or simultaneously with such transaction, the continuing or surviving entity shall become a Subsidiary Guarantor and the Borrowers shall comply with ***Section 7.14*** in connection therewith);

(b) any Non-Guarantor Subsidiary that is a Foreign Subsidiary may be merged, amalgamated or consolidated with or into, or be liquidated into, any other Non-Guarantor Subsidiary;

(c) any Subsidiary may dispose of all or substantially all of its assets (upon voluntary liquidation, dissolution, winding up or otherwise) to any Borrower or any Subsidiary Guarantor; <u>provided</u> that, with respect to any such disposition by any Non-Guarantor Subsidiary, the consideration for such disposition shall not exceed the fair value of such assets;

(d) any Non-Guarantor Subsidiary that is a Foreign Subsidiary may dispose of all or substantially all of its assets (upon voluntary liquidation, dissolution, winding up or otherwise) to any other Non-Guarantor Subsidiary;

(e) dispositions permitted by ***Section 8.5***;

(f) any Wholly-Owned Subsidiary of any Borrower may merge with or into the Person such Wholly-Owned Subsidiary was formed to acquire in connection with any acquisition permitted hereunder (including, without limitation, any Permitted Acquisition permitted pursuant to <u>Section 9.3(g)</u>); <u>provided</u> that in the case of any merger involving a Wholly-Owned Subsidiary that is a Domestic Subsidiary, (i) a Subsidiary Guarantor shall be the continuing or surviving entity or (ii) simultaneously with such transaction, the continuing or surviving entity shall become a Subsidiary Guarantor and the Borrowers shall comply with ***Section 7.14*** in connection therewith; and

(g) any Person may merge into any Borrower or any of its Wholly-Owned Subsidiaries in connection with a Permitted Acquisition permitted pursuant to ***Section 8.3(g)***; provided that (i) in the case of a merger involving any Borrower or a Subsidiary Guarantor, the continuing or surviving Person shall be such Borrower or such Subsidiary Guarantor and (ii) the continuing or surviving Person shall be a Borrower or a Wholly-Owned Subsidiary of a Borrower.

For Reference Purposes Only
5702727v1

SECTION 8.5    Asset Dispositions.  Make any Asset Disposition except:

(a)    the sale of obsolete, worn-out or surplus assets no longer used or usable in the business of Parent or any of its Subsidiaries;

(b)    non-exclusive licenses and sublicenses of intellectual property rights in the ordinary course of business not interfering, individually or in the aggregate, in any material respect with the conduct of the business of Parent or any of its Subsidiaries;

(c)    leases, subleases, licenses or sublicenses of real or personal property granted by any Borrower or any of its Subsidiaries to others in the ordinary course of business not interfering in any material respect with the business of such Borrower or any of its Subsidiaries;

(d)    dispositions in connection with Insurance and Condemnation Events;

(e)    dispositions of Capital Stock of Foreign Subsidiaries domiciled under the laws of Italy as a result of the Italy Restructuring; and

(f)    Asset Dispositions not otherwise permitted pursuant to this Section; provided that (i) at the time of such Asset Disposition, no Default or Event of Default shall exist or would result from such Asset Disposition, and (ii) the aggregate fair market value of all property disposed of in reliance on this *clause (f)* shall not exceed $5,000,000 in any Fiscal Year.

SECTION 8.6    Restricted Payments.  Declare or pay any dividend on, or make any payment or other distribution on account of, or purchase, redeem, retire or otherwise acquire (directly or indirectly), or set apart assets for a sinking or other analogous fund for the purchase, redemption, retirement or other acquisition of, any class of Capital Stock of any Credit Party or any Subsidiary thereof, or make any distribution of cash, property or assets to the holders of shares of any Capital Stock of any Credit Party or any Subsidiary thereof (all of the foregoing, the "**Restricted Payments**") provided that:

(a)    each Borrower or any Subsidiary thereof may pay dividends in shares of its own Qualified Capital Stock;

(b)    any Subsidiary of any Borrower may pay cash dividends to such Borrower or any Subsidiary Guarantor; and

(c)    ~~each Borrower may declare and then pay dividends ratably to all holders of its outstanding Capital Stock if both before and after giving effect to such cash dividend, no Event of Default shall have occurred and be continuing or would be caused by giving effect to such cash dividend.~~ Permitted Tax Distributions.

97

*For Reference Purposes Only*
5702727v1

SECTION 8.7    <u>Transactions with Affiliates</u>.  Directly or indirectly enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property, the rendering of any service or the payment of any management, advisory or similar fees, with (a) any officer, director, holder of any Capital Stock in, or other Affiliate of, any Borrower or any of its Subsidiaries, or (b) any Affiliate of any such officer, director or holder other than:

(i)    transactions permitted by *Sections 8.1*, *8.3*, *8.4*, *8.5*, *8.6* and *8.13*;

(ii)    transactions existing on the Closing Date and described on *Schedule 8.7*;

(iii)    other transactions in the ordinary course of business on terms as favorable as would be obtained by it on a comparable arm's-length transaction with an independent, unrelated third party as determined in good faith by the board of directors (or equivalent governing body) of each Borrower;

(iv)    employment and severance arrangements (including equity incentive plans and employee benefit plans and arrangements) with their respective officers and employees in the ordinary course of business; and

(v)    payment of customary fees and reasonable out of pocket costs to, and indemnities for the benefit of, directors, officers and employees of each Borrower and its Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of each Borrower and its Subsidiaries.

SECTION 8.8    <u>Accounting Changes; Organizational Documents</u>.

(a)    Change its Fiscal Year end, or make (without the consent of the Administrative Agent) any material change in its accounting treatment and reporting practices except as required by GAAP.

(b)    Amend, modify or change its articles of incorporation (or corporate charter or other similar organizational documents) or amend, modify or change its bylaws (or other similar documents) in any manner materially adverse to the rights or interests of the Lenders.

SECTION 8.9    <u>No Further Negative Pledges; Restrictive Agreements</u>.

(a)    Enter into, assume or be subject to any agreement prohibiting or otherwise restricting the creation or assumption of any Lien upon its properties or assets, whether now owned or hereafter acquired, or requiring the grant of any security for some other obligation if security is given for some other obligation, except (i) pursuant to this Agreement and the other Loan Documents, (ii) pursuant to any document or instrument governing Indebtedness incurred pursuant to *Section 8.1(d)*; provided, that any such restriction contained therein relates only to the

98

For Reference Purposes Only
5702727v1

asset or assets acquired in connection therewith, (iii) restrictions contained in the organizational documents of any Credit Party as of the Closing Date and (iv) restrictions in connection with any Permitted Lien or any document or instrument governing any Permitted Lien (<u>provided</u>, that any such restriction contained therein relates only to the asset or assets subject to such Permitted Lien).

(b)     Create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Credit Party or any Subsidiary thereof to (i) pay dividends or make any other distributions to any Credit Party or any Subsidiary on its Capital Stock or with respect to any other interest or participation in, or measured by, its profits, (ii) pay any Indebtedness or other obligation owed to any Borrower or any Subsidiary Guarantor, (iii) make loans or advances to any Borrower or any Subsidiary Guarantor, (iv) sell, lease or transfer any of its properties or assets to any Borrower or any Subsidiary Guarantor or (v) act as a Guarantor pursuant to the Loan Documents or any renewals, refinancings, exchanges, refundings or extension thereof, except (in respect of any of the matters referred to in *clauses (i)* through *(v)* above) for such encumbrances or restrictions existing under or by reason of (A) this Agreement and the other Loan Documents, (B) Applicable Law, (C) any document or instrument governing Indebtedness incurred pursuant to ***Section 8.1(d)*** (<u>provided</u>, that any such restriction contained therein relates only to the asset or assets acquired in connection therewith), (D) any Permitted Lien or any document or instrument governing any Permitted Lien (provided, that any such restriction contained therein relates only to the asset or assets subject to such Permitted Lien), (E) obligations that are binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary of a Borrower, so long as such obligations are not entered into in contemplation of such Person becoming a Subsidiary, (F) customary restrictions contained in an agreement related to the sale of Property (to the extent such sale is permitted pursuant to ***Section 8.5***) that limit the transfer of such Property pending the consummation of such sale, (G) customary restrictions in leases, subleases, licenses and sublicenses or asset sale agreements otherwise permitted by this Agreement so long as such restrictions relate only to the assets subject thereto and (H) customary provisions restricting assignment of any agreement entered into in the ordinary course of business.

SECTION 8.10     <u>Nature of Business</u>.     Engage in any business other than the business conducted by Parent and its Subsidiaries as of the Closing Date and business activities reasonably related or ancillary thereto.

SECTION 8.11     <u>Amendments of Other Documents</u>.     Amend, modify, waive or supplement (or permit modification, amendment, waiver or supplement of) any of the terms or provisions of any Material Contract, in any respect which would materially and adversely affect the rights or interests of the Administrative Agent and the Lenders hereunder, in each, without the prior written consent of the Administrative Agent.

SECTION 8.12     <u>Sale Leasebacks</u>.     Directly or indirectly become or remain liable as lessee or as guarantor or other surety with respect to any lease, whether an operating lease or a

99

Capital Lease, of any Property (whether real, personal or mixed), whether now owned or hereafter acquired, (a) which any Credit Party or any Subsidiary thereof has sold or transferred or is to sell or transfer to a Person which is not another Credit Party or Subsidiary of a Credit Party or (b) which any Credit Party or any Subsidiary of a Credit Party intends to use for substantially the same purpose as any other Property that has been sold or is to be sold or transferred by such Credit Party or such Subsidiary to another Person which is not another Credit Party or Subsidiary of a Credit Party in connection with such lease.

SECTION 8.13    Capital Expenditures.   Permit the aggregate amount of all non-financed Capital Expenditures in any Fiscal Year to exceed $5,000,000750,000 in the aggregate for such Fiscal Year.

SECTION 8.14    Financial Covenants.

(a)    Consolidated Total Liabilities to Consolidated Tangible Net Worth.   Permit the ratio of Consolidated Total Liabilities to Consolidated Tangible Net Worth to be greater than 2.50 to 1.00.   The foregoing ratio of Consolidated Total Liabilities to Consolidated Tangible Net Worth shall be calculated and tested quarterly as of the last day of each fiscal quarter, beginning with the quarter ending July 31, 2015. Minimum EBITDA.  Permit Consolidated EBITDA to be less than the corresponding amount as in the table below:

| Period | Minimum Consolidated EBITDA |
|---|---|
| 3 months ended 4/30/2017 | $  1,000,000 |
| 4 months ended 5/31/2017 | $  1,000,000 |
| 5 months ended 6/30/2017 | $  1,000,000 |
| 6 months ended 7/31/2017 | $  5,000,000 |
| 7 months ended 8/31/2017 | $  5,000,000 |
| 8 months ended 9/30/2017 | $  5,000,000 |
| 9 months ended 10/31/2017 | $  9,500,000 |
| 10 months ended 11/30/2017 | $  9,500,000 |
| 11 months ended 12/31/2017 | $  9,500,000 |
| 12 months ended 1/31/2018 | $  12,500,000 |
| 12 months ended 2/28/2018 | $  12,500,000 |
| 12 months ended 3/31/2018 | $  12,500,000 |
| 12 months ended 4/30/2018 | $  15,000,000 |
| 12 months ended 5/31/2018 | $  15,000,000 |
| 12 months ended 6/30/2018 | $  15,000,000 |
| 12 months ended 7/31/2018 | $  17,500,000 |
| 12 months ended 8/31/2018 | $  17,500,000 |

(b)    Consolidated Net Income.   Permit the Consolidated Net Income (after taxes but before extraordinary items acceptable to the Administrative Agent) for the four fiscal quarter period then ending to be less than $1,000,000.

100

For Reference Purposes Only
5702727v1

~~The foregoing covenant to maintain such minimum amount of Consolidated Net Income shall be calculated and tested quarterly as of the last day of each fiscal quarter, beginning with the quarter ending July 31, 2015.~~2017 Fiscal Year Restructuring Charges.  Permit restructuring charges in Fiscal Year 2017 to exceed $3,400,000 in the aggregate.

(c)    Consolidated Asset Coverage Ratio.    Permit the Consolidated Asset Coverage Ratio at month-end to be less than ~~1.50 to 1.00~~the corresponding ratio set forth on the table below. The foregoing Consolidated Asset Coverage Ratio shall be calculated and tested monthly as of the last day of each month, beginning with the month ending ~~July 31, 2015.~~ February 27, 2017.

| Month Ending | Minimum Consolidated Asset Coverage Ratios |
|---|---|
| 2/28/2017 | 1.10 |
| 3/31/2017 | 1.10 |
| 4/30/2017 | 1.10 |
| 5/31/2017 | 1.10 |
| 6/30/2017 | 1.25 |
| 7/31/2017 | 1.25 |
| 8/31/2017 | 1.25 |
| 9/30/2017 | 1.25 |
| 10/31/2017 | 1.35 |
| 11/30/2017 | 1.35 |
| 12/31/2017 | 1.35 |
| 1/31/2018 | 1.40 |
| 2/28/2018 | 1.40 |
| 3/31/2018 | 1.40 |
| 4/30/2018 | 1.50 |
| 5/31/2018 | 1.50 |
| 6/30/2018 | 1.50 |
| 7/31/2018 | 1.50 |
| 8/31/2018 | 1.50 |

SECTION 8.15    Disposal of Subsidiary Interests.    ~~No Borrower will permit any Domestic Subsidiary to be~~Be a non-Wholly-Owned Subsidiary except (a) as a result of or in connection with a dissolution, merger, amalgamation, consolidation or disposition permitted by *Section 8.4* or *8.5* or (b) so long as such Domestic Subsidiary continues to be a Subsidiary Guarantor.

SECTION 8.16    Payment of Subordinated Indebtedness.  Pay any Subordinated Indebtedness unless the Consolidated Leverage Ratio is less than 3.50 to 1.0.

101

*For Reference Purposes Only*
5702727v1

## Article IX
## DEFAULT AND REMEDIES

SECTION 9.1 <u>Events of Default</u>. Each of the following shall constitute an Event of Default:

(a) <u>Default in Payment of Principal of Loans and Reimbursement Obligations</u>. Any Borrower shall default in any payment of principal of any Loan or Reimbursement Obligation when and as due (whether at maturity, by reason of acceleration or otherwise).

(b) <u>Other Payment Default</u>. Any Borrower or any other Credit Party shall default in the payment when and as due (whether at maturity, by reason of acceleration or otherwise) of interest on any Loan or Reimbursement Obligation or the payment of any other Obligation and such default shall continue for a period of three (3) Business Days.

(c) <u>Misrepresentation</u>. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Credit Party or any Subsidiary thereof, or LHI, in this Agreement, in any other Loan Document, or in any document delivered in connection herewith or therewith that is subject to materiality or Material Adverse Effect qualifications, shall be incorrect or misleading in any respect when made or deemed made or any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Credit Party or any Subsidiary thereof, or LHI, in this Agreement, any other Loan Document, or in any document delivered in connection herewith or therewith that is not subject to materiality or Material Adverse Effect qualifications, shall be incorrect or misleading in any material respect when made or deemed made.

(d) <u>Default in Performance of Certain Covenants</u>. Any Credit Party shall default in the performance or observance of any covenant or agreement contained in ***Sections 7.1***, ***7.2***, ***7.3***, ***7.4***, ***7.13***, ***7.14***, ***7.15***, ***7.16***, ***7.17***, ***7.18***, or ***Article VIII***.

(e) <u>Default in Performance of Other Covenants and Conditions</u>. Any Credit Party or any Subsidiary thereof, or LHI, shall default in the performance or observance of any term, covenant, condition or agreement contained in this Agreement (other than as specifically provided for in this ***Section 9.1***) or any other Loan Document and such default shall continue for a period of thirty (30) days.

(f) <u>Indebtedness Cross-Default</u>. Any Credit Party or any Subsidiary thereof shall (i) default in the payment of any Indebtedness (other than the Loans or any Reimbursement Obligation) the aggregate outstanding amount of which Indebtedness is in excess of the Threshold Amount beyond the period of grace if any, provided in the instrument or agreement under which such Indebtedness was

102

For Reference Purposes Only
5702727v1

created, or (ii) default in the observance or performance of any other agreement or condition relating to any Indebtedness (other than the Loans, any Reimbursement Obligation) the aggregate outstanding amount (or, with respect to any Hedge Agreement, the Hedge Termination Value) of which Indebtedness is in excess of the Threshold Amount or contained in any instrument or agreement evidencing, securing or relating thereto or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, with the giving of notice and/or lapse of time, if required, any such Indebtedness to become due prior to its stated maturity (any applicable grace period having expired).

(g) <u>Other Cross-Defaults</u>.  Any Credit Party or any Subsidiary thereof shall default in the payment when due, or in the performance or observance, of any obligation or condition of any Material Contract unless, but only as long as, the existence of any such default is being contested by such Credit Party or any such Subsidiary in good faith by appropriate proceedings and adequate reserves in respect thereof have been established on the books of the Borrowers or such Credit Party to the extent required by GAAP.

(h) <u>Change in Control</u>.  Any Change in Control shall occur.

(i) <u>Voluntary Bankruptcy Proceeding</u>.  Any Credit Party or any Subsidiary thereof, or LHI, shall (i) commence a voluntary case under the federal bankruptcy laws (as now or hereafter in effect), (ii) file a petition seeking to take advantage of any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or composition for adjustment of debts, (iii) consent to or fail to contest in a timely and appropriate manner any petition filed against it in an involuntary case under such bankruptcy laws or other laws, (iv) apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a receiver, custodian, trustee, or liquidator of itself or of a substantial part of its property, domestic or foreign, (v) admit in writing its inability to pay its debts as they become due, (vi) make a general assignment for the benefit of creditors, or (vii) take any corporate action for the purpose of authorizing any of the foregoing.

(j) <u>Involuntary Bankruptcy Proceeding</u>.  A case or other proceeding shall be commenced against any Credit Party or any Subsidiary thereof, or LHI, in any court of competent jurisdiction seeking (i) relief under the federal bankruptcy laws (as now or hereafter in effect) or under any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts, or (ii) the appointment of a trustee, receiver, custodian, liquidator or the like for any Credit Party or any Subsidiary thereof, or LHI, or for all or any substantial part of their respective assets, domestic or foreign, and such case or proceeding shall continue without dismissal or stay for a period of sixty (60) consecutive days, or an order granting the relief requested in such case or

103

For Reference Purposes Only
5702727v1

proceeding (including, but not limited to, an order for relief under such federal bankruptcy laws) shall be entered.

(k) <u>Failure of Agreements</u>. Any provision of this Agreement or any provision of any other Loan Document shall for any reason cease to be valid and binding on any Credit Party or any Subsidiary thereof party thereto, or LHI, or any such Person shall so state in writing, or any Loan Document shall for any reason cease to create a valid and perfected first priority Lien (subject to Permitted Liens) on, or security interest in, any of the Collateral purported to be covered thereby, in each case other than in accordance with the express terms hereof or thereof.

(l) <u>ERISA Events</u>. The occurrence of any of the following events: (i) any Credit Party or any ERISA Affiliate fails to make full payment when due of all amounts which, under the provisions of any Pension Plan or Sections 412 or 430 of the Code, any Credit Party or any ERISA Affiliate is required to pay as contributions thereto and are in excess of the Threshold Amount, (ii) a Termination Event or (iii) any Credit Party or any ERISA Affiliate as employers under one or more Multiemployer Plans makes a complete or partial withdrawal from any such Multiemployer Plan and the plan sponsor of such Multiemployer Plans notifies such withdrawing employer that such employer has incurred a withdrawal liability requiring payments in an amount exceeding the Threshold Amount.

(m) <u>Judgment</u>. A judgment or order for the payment of money which causes the aggregate amount of all such judgments or orders (net of any amounts paid or fully covered by independent third party insurance as to which the relevant insurance company does not dispute coverage) to exceed the Threshold Amount shall be entered against any Credit Party or any Subsidiary thereof, or LHI, by any court and such judgment or order shall continue without having been discharged, vacated or stayed for a period of thirty (30) consecutive days after the entry thereof.

(n) <u>LHI Credit Agreement</u>. An event of default occurs under, and as defined in, the LHI Credit Agreement.

(o) <u>Thomas Lockwood Subordination Agreement</u>. A~~A~~Other than in respect of the Thomas Lockwood Non-Compete Consideration, a default or breach of any agreement or covenant by Thomas Lockwood, LII, or LHI under the Thomas Lockwood Subordination Agreement occurs or has occurred.

(p) <u>Restatement of Prior Period Financial Statements</u>. Any financial statements delivered pursuant to **Section 7.1** for periods ending after December 31, 2014 shall be restated after issuance.

104

For Reference Purposes Only
5702727v1

SECTION 9.2 <u>Remedies</u>.  Upon the occurrence of an Event of Default, with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrowers:

(a) <u>Acceleration; Termination of Credit Facility</u>.  Terminate the Revolving Credit Commitment and declare the principal of and interest on the Loans and the Reimbursement Obligations at the time outstanding, and all other amounts owed to the Lenders and to the Administrative Agent under this Agreement or any of the other Loan Documents (including, without limitation, all L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented or shall be entitled to present the documents required thereunder) and all other Obligations, to be forthwith due and payable, whereupon the same shall immediately become due and payable without presentment, demand, protest or other notice of any kind, all of which are expressly waived by each Credit Party, anything in this Agreement or the other Loan Documents to the contrary notwithstanding, and terminate the Credit Facility and any right of the Borrowers to request borrowings or Letters of Credit thereunder; provided, that upon the occurrence of an Event of Default specified in ***Section 9.1(i)*** or ***(j)***, the Credit Facility shall be automatically terminated and all Obligations shall automatically become due and payable without presentment, demand, protest or other notice of any kind, all of which are expressly waived by each Credit Party, anything in this Agreement or in any other Loan Document to the contrary notwithstanding.

(b) <u>Letters of Credit</u>.  With respect to all Letters of Credit with respect to which presentment for honor shall not have occurred at the time of an acceleration pursuant to the preceding paragraph, the Borrowers shall at such time deposit in a Cash Collateral account opened by the Administrative Agent an amount equal to the aggregate then undrawn and unexpired amount of such Letters of Credit.  Amounts held in such Cash Collateral account shall be applied by the Administrative Agent to the payment of drafts drawn under such Letters of Credit, and the unused portion thereof after all such Letters of Credit shall have expired or been fully drawn upon, if any, shall be applied to repay the other Obligations on a pro rata basis.  After all such Letters of Credit shall have expired or been fully drawn upon, the Reimbursement Obligation shall have been satisfied and all other Obligations shall have been paid in full, the balance, if any, in such Cash Collateral account shall be returned to the Borrowers.

(c) <u>General Remedies</u>.  Exercise on behalf of the Secured Parties all of its other rights and remedies under this Agreement, the other Loan Documents and Applicable Law, in order to satisfy all of the Obligations.

SECTION 9.3 <u>Rights and Remedies Cumulative; Non-Waiver; etc</u>.  The enumeration of the rights and remedies of the Administrative Agent and the Lenders set forth in this Agreement is not intended to be exhaustive and the exercise by the Administrative Agent and the Lenders of any right or remedy shall not preclude the exercise of any other rights or remedies, all of which shall be cumulative, and shall be in addition to any other right or remedy

105

*For Reference Purposes Only*
5702727v1

given hereunder or under the other Loan Documents or that may now or hereafter exist at law or in equity or by suit or otherwise. No delay or failure to take action on the part of the Administrative Agent or any Lender in exercising any right, power or privilege shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege or shall be construed to be a waiver of any Event of Default. No course of dealing between the Borrowers, the Administrative Agent and the Lenders or their respective agents or employees shall be effective to change, modify or discharge any provision of this Agreement or any of the other Loan Documents or to constitute a waiver of any Event of Default.

SECTION 9.4 <u>Crediting of Payments and Proceeds</u>. In the event that the Obligations have been accelerated pursuant to ***Section 9.2*** or the Administrative Agent or any Lender has exercised any remedy set forth in this Agreement or any other Loan Document, all payments received by the Lenders upon the Secured Obligations and all net proceeds from the enforcement of the Secured Obligations shall be applied:

<u>First</u>, to payment of that portion of the Secured Obligations constituting fees, indemnities, expenses and other amounts, including attorney fees, payable to the Administrative Agent in its capacity as such, the Issuing Lender in its capacity as such and the Swingline Lender in its capacity as such, ratably among the Administrative Agent, the Issuing Lender and Swingline Lender in proportion to the respective amounts described in this *clause First* payable to them;

<u>Second</u>, to payment of that portion of the Secured Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders under the Loan Documents, including attorney fees, ratably among the Lenders in proportion to the respective amounts described in this *clause Second* payable to them;

<u>Third</u>, to payment of that portion of the Secured Obligations constituting accrued and unpaid interest on the Loans and Reimbursement Obligations, ratably among the Lenders in proportion to the respective amounts described in this *clause Third* payable to them;

<u>Fourth</u>, to payment of that portion of the Secured Obligations constituting unpaid principal of the Loans, Reimbursement Obligations and payment obligations then owing under Secured Hedge Agreements and Secured Cash Management Agreements, ratably among the Lenders, the Issuing Lender, the Hedge Banks and the Cash Management Banks in proportion to the respective amounts described in this *clause Fourth* held by them;

<u>Fifth</u>, to the Administrative Agent for the account of the Issuing Lender, to Cash Collateralize any L/C Obligations then outstanding; and

<u>Last</u>, the balance, if any, after all of the Secured Obligations have been indefeasibly paid in full, to the Borrowers or as otherwise required by Applicable Law.

Notwithstanding the foregoing, Secured Obligations arising under Secured Cash Management Agreements and Secured Hedge Agreements shall be excluded from the application described above if the Administrative Agent has not received written notice thereof, together

106

with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank or Hedge Bank, as the case may be. Each Cash Management Bank or Hedge Bank not a party to this Agreement that has given the notice contemplated by the preceding sentence shall, by such notice, be deemed to have acknowledged and accepted the appointment of the Administrative Agent pursuant to the terms of **Article X** for itself and its Affiliates as if a "Lender" party hereto.

SECTION 9.5      Administrative Agent May File Proofs of Claim. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Credit Party, the Administrative Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations arising under the Loan Document that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under **Sections 3.3**, **4.3** and **11.3**) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under **Sections 3.3**, **4.3** and **11.3**.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

SECTION 9.6      Credit Bidding.

(a)      The Administrative Agent, on behalf of itself and the Lenders, shall have the right to credit bid and purchase for the benefit of the Administrative Agent and the Lenders all or any portion of Collateral at any sale thereof conducted by the Administrative Agent under the provisions of the UCC,

107

For Reference Purposes Only
5702727v1

including pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the United States Bankruptcy Code, including Section 363 thereof, or a sale under a plan of reorganization, or at any other sale or foreclosure conducted by the Administrative Agent (whether by judicial action or otherwise) in accordance with Applicable Law.

(b)     Each Lender hereby agrees that, except as otherwise provided in any Loan Documents or with the written consent of the Administrative Agent and the Required Lenders, it will not take any enforcement action, accelerate obligations under any Loan Documents, or exercise any right that it might otherwise have under applicable law to credit bid at foreclosure sales, UCC sales or other similar dispositions of Collateral.

## Article X
## THE ADMINISTRATIVE AGENT

SECTION 10.1     Appointment and Authority.  Each of the Lenders and the Issuing Lender hereby irrevocably designates and appoints Wells Fargo to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this *Article X* are solely for the benefit of the Administrative Agent, the Lenders and the Issuing Lender, and no Borrower nor any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.  The Administrative Agent shall also act as the "*collateral agent*" under the Loan Documents, and each of the Lenders (including in its capacity as a potential Hedge Bank or Cash Management Bank) and the Issuing Lender hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender and the Issuing Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Credit Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to this *Article X* for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this *Article X* and *Article XI* (including *Section 11.3*, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

SECTION 10.2     Rights as a Lender.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of

For Reference Purposes Only
5702727v1

business with any Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

SECTION 10.3    Exculpatory Provisions.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), underlined provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or Applicable Law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrowers or any of their respective Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in **Section 11.2** and **Section 6.2**) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final nonappealable judgment.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by any Borrower, a Lender or the Issuing Lender.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in **Article V** or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

SECTION 10.4    Reliance by the Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice,

For Reference Purposes Only
5702727v1

request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by a Responsible Officer. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by a Responsible Officer, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the Issuing Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender or the Issuing Lender unless the Administrative Agent shall have received notice to the contrary from such Lender or the Issuing Lender prior to the making of such Loan or the issuance of such Letter of Credit. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 10.5    Delegation of Duties. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub agents appointed by the Administrative Agent. The Administrative Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this *Article X* shall apply to any such sub agent and to the Related Parties of the Administrative Agent and any such sub agent, and shall apply to their respective activities in connection with the syndication of the Credit Facility as well as activities as Administrative Agent.

SECTION 10.6    Resignation of Administrative Agent.

(a)    The Administrative Agent may at any time give notice of its resignation to the Lenders, the Issuing Lender and the Borrowers. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrowers and subject to the consent of the Borrowers (provided no Event of Default has occurred and is continuing at the time of such resignation), to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders and the Issuing Lender, appoint a successor Administrative Agent meeting the qualifications set forth above provided that if the Administrative Agent shall notify the Borrowers and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (i) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders or the Issuing Lender under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such

110

time as a successor Administrative Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender and the Issuing Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this paragraph.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this paragraph).  The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this *Article X* and *Section 12.3* shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

(b)     Any resignation by Wells Fargo as Administrative Agent pursuant to this *Section 10.6* shall also constitute its resignation as Issuing Lender and Swingline Lender.   Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Lender and Swingline Lender, (ii) the retiring Issuing Lender and Swingline Lender shall be discharged from all of their respective duties and obligations hereunder or under the other Loan Documents, and (iii) the successor Issuing Lender shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangement satisfactory to the retiring Issuing Lender to effectively assume the obligations of the retiring Issuing Lender with respect to such Letters of Credit.

SECTION 10.7     Non-Reliance on Administrative Agent and Other Lenders.  Each Lender and the Issuing Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender and the Issuing Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

SECTION 10.8     No Other Duties, etc.  Anything herein to the contrary notwithstanding, none of the syndication agents, documentation agents, co-agents, book managers, lead managers, arrangers, lead arrangers or co-arrangers listed on the cover page or

For Reference Purposes Only
5702727v1

signature pages hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, a Lender or the Issuing Lender hereunder.

SECTION 10.9    Collateral and Guaranty Matters.  Each of the Lenders (including in its or any of its Affiliate's capacities as a potential Hedge Bank or Cash Management Bank) irrevocably authorize the Administrative Agent, at its option and in its discretion:

(a)    to release any Lien on any Collateral granted to or held by the Administrative Agent, for the ratable benefit of the Secured Parties, under any Loan Document (i) upon the termination of the Revolving Credit Commitment and payment in full of all Secured Obligations (other than (A) contingent indemnification obligations and (B) obligations and liabilities under Secured Cash Management Agreements or Secured Hedge Agreements as to which arrangements satisfactory to the applicable Cash Management Bank or Hedge Bank shall have been made) and the expiration or termination of all Letters of Credit, (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing in accordance with *Section 11.2*;

(b)    to release any Subsidiary Guarantor from its obligations under any Loan Documents if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder; and

(c)    to subordinate or release any Lien on any Collateral granted to or held by the Administrative Agent under any Loan Document to the holder of any Permitted Lien.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Subsidiary Guarantor from its obligations under a Guaranty Agreement pursuant to this *Section 10.9*.  In each case as specified in this *Section 10.9,* the Administrative Agent will, at the Borrowers' expense, execute and deliver to the applicable Credit Party such documents as such Credit Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under a Guaranty Agreement, in each case in accordance with the terms of the Loan Documents and this *Section 10.9*.  In the case of any such sale, transfer or disposal of any property constituting Collateral in a transaction constituting an Asset Disposition permitted pursuant to *Section 8.5*, the Liens created by any of the Security Documents on such property shall be automatically released without need for further action by any person.

SECTION 10.10    Secured Hedge Agreements and Secured Cash Management Agreements.  No Cash Management Bank or Hedge Bank that obtains the benefits of *Section 9.4* or any Collateral by virtue of the provisions hereof or of any Security Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or

112

*For Reference Purposes Only*
5702727v.1

impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents.  Notwithstanding any other provision of this **Article  X** to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Secured Cash Management Agreements and Secured Hedge Agreements unless the Administrative Agent has received written notice of such Secured Cash Management Agreements and Secured Hedge Agreements, together with such supporting documentation as the Administrative Agent may request, from the applicable Cash Management Bank or Hedge Bank, as the case may be.

**Article XI**
**MISCELLANEOUS**

SECTION 11.1      <u>Notices</u>.

(a)      <u>Notices Generally</u>.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in *paragraph (b)* below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

If to the Borrowers:

Lockwood Enterprises, Inc.
10060 Windfern Road
Building B
Houston, Texas 77064
Attention of:  Ricardo Ibarra
Telephone No.: (713) 670-5233
Telecopy No.: (713) 670-3974
E-mail: <u>riIbarra@lockwoodei.com</u>

With copies to:

Zimmerman, Axelrad, Meyer Stern & Wise, P.C.
3040 Post Oak Blvd., 13th Floor
Houston, Texas 77056
Attention of:  Mark E. Wise
Telephone No.: (713) 212-2631
Telecopy No.: (713) 212-2730

If to Wells Fargo as Administrative Agent:

Wells Fargo Bank, National Association
~~2500 CityWest Blvd.~~5080 Spectrum Drive, Suite ~~1100~~400
~~Houston~~Addison, Texas ~~77042~~75225
Attention of:  ~~Michelle C. Tabor~~Jennifer L. Norris
Telephone No.:  (~~713~~972) ~~273-8522~~419-3119
Telecopy No.: (~~713~~866) ~~273-8536~~968-4862

With copies to:

~~Porter Hedges LLP~~Winstead PC
~~1000 Main Street, 36th Floor~~600 Travis, Suite 1100

113

Houston, Texas 77002
Attention of: ~~Joyce Kao Soliman~~Michael W. Hilliard
Telephone No.:  (713) ~~226-6685~~650-2727
Telecopy No.:  (713) ~~226-6285~~650-2400

If to any Lender:        To the address set forth on the Register.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given before 5:00 p.m. it shall be deemed to have been given at the opening of business on the next Business Day).  Notices delivered through electronic communications to the extent provided in *paragraph (b)* below, shall be effective as provided in said *paragraph (b)*.

(b)        Electronic Communications.  Notices and other communications to the Lenders and the Issuing Lender hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender or the Issuing Lender pursuant to *Article II* if such Lender or the Issuing Lender, as applicable, has notified the Administrative Agent that is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrowers may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.  Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent before 5:00 p.m., such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing *clause (i)* of notification that such notice or communication is available and identifying the website address therefor.

(c)        Administrative Agent's Office.  The Administrative Agent hereby designates its office located at the address set forth above, or any subsequent office which shall have been specified for such purpose by written notice to the Borrowers and Lenders, as the Administrative Agent's Office referred to herein, to which payments due are to be made and at which Loans will be disbursed and Letters of Credit requested

114

*For Reference Purposes Only*
*5702727v1*

(d)    <u>Change of Address, Etc</u>.  Any party hereto may change its address or telecopier number for notices and other communications hereunder by notice to the other parties hereto.

(e)    <u>Private Side Designation</u>.    Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and Applicable Law, including United States Federal and state securities Applicable Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrowers or its securities for purposes of United States Federal or state securities Applicable Laws.

SECTION 11.2    <u>Amendments, Waivers and Consents</u>.  Except as set forth below or as specifically provided in any Loan Document, any term, covenant, agreement or condition of this Agreement or any of the other Loan Documents may be amended or waived by the Lenders, and any consent given by the Lenders, if, but only if, such amendment, waiver or consent is in writing signed by the Required Lenders (or by the Administrative Agent with the consent of the Required Lenders) and delivered to the Administrative Agent and, in the case of an amendment, signed by the Borrowers; <u>provided,</u> that no amendment, waiver or consent shall:

(a)    without the prior written consent of the Required Revolving Credit Lenders, amend, modify or waive (i) *Section 5.2* or any other provision of this Agreement if the effect of such amendment, modification or waiver is to require the Revolving Credit Lenders (pursuant to, in the case of any such amendment to a provision hereof other than *Section 5.2*, any substantially concurrent request by the Borrowers for a borrowing of Revolving Credit Loans) to make Revolving Credit Loans when such Revolving Credit Lenders would not otherwise be required to do so, (ii) the amount of the Swingline Commitment or (iii) the amount of the L/C Commitment;

(b)    increase the Revolving Credit Commitment of any Revolving Credit Lender (or reinstate any Revolving Credit Commitment terminated pursuant to *Section 9.2*) or the amount of Loans of any Lender, in any case, without the written consent of such Revolving Credit Lender;

(c)    waive, extend or postpone any date fixed by this Agreement or any other Loan Document for any payment or mandatory prepayment of principal, interest, fees or other amounts due to the Lenders (or any of them) or any scheduled or mandatory reduction of the Revolving Credit Commitment hereunder or under any other Loan Document without the written consent of each Lender directly and adversely affected thereby;

115

(d)     reduce the principal of, or the rate of interest specified herein on, any Loan or Reimbursement Obligation, or (subject to *clause (iv)* of the second proviso to this *Section 11.2*) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly and adversely affected thereby; <u>provided</u> that only the consent of the Required Lenders shall be necessary (i) to waive any obligation of the Borrowers to pay interest at the rate set forth in *Section 4.1(c)* during the continuance of an Event of Default or (ii) to amend any financial covenant hereunder (or any defined term used therein) even if the effect of such amendment would be to reduce the rate of interest on any Loan or L/C Obligation or to reduce any fee payable hereunder;

(e)     change *Section 4.6* or *Section 9.4* in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender directly and adversely affected thereby;

(f)     except as otherwise permitted by this *Section 11.2* change any provision of this *Section 11.2* or reduce the percentages specified in the definitions of "Required Lenders," or "Required Revolving Credit Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender directly affected thereby;

(g)     consent to the assignment or transfer by any Credit Party of such Credit Party's rights and obligations under any Loan Document to which it is a party (except as permitted pursuant to *Section 8.4*), in each case, without the written consent of each Lender;

(h)     release (i) all of the Subsidiary Guarantors or (ii) Subsidiary Guarantors comprising substantially all of the credit support for the Secured Obligations, in any case, from any Guaranty Agreement (other than as authorized in *Section 10.9*), without the written consent of each Lender; or

(i)     release all or substantially all of the Collateral or release any Security Document (other than as authorized in *Section 10.9* or as otherwise specifically permitted or contemplated in this Agreement or the applicable Security Document) without the written consent of each Lender;

<u>provided further</u>, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Issuing Lender in addition to the Lenders required above, affect the rights or duties of the Issuing Lender under this Agreement or any Letter of Credit Application relating to any Letter of Credit issued or to be issued by it; (ii) no amendment, waiver or consent shall, unless in writing and signed by the Swingline Lender in addition to the Lenders required above, affect the rights or duties of the Swingline Lender under this Agreement; (iii) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or

116

For Reference Purposes Only
5702727v1

any other Loan Document; (iv) any waiver, amendment or modification of this Agreement that by its terms affects the rights or duties under this Agreement of Lenders holding Loans or Commitments of a particular Class (but not the Lenders holding Loans or Commitments of any other Class) may be effected by an agreement or agreements in writing entered into by the Borrowers and the requisite percentage in interest of the affected Class of Lenders that would be required to consent thereto under this *Section 11.2* if such Class of Lenders were the only Class of Lenders hereunder at the time, and (v) the Administrative Agent and the Borrowers shall be permitted to amend any provision of the Loan Documents (and such amendment shall become effective without any further action or consent of any other party to any Loan Document) if the Administrative Agent and the Borrowers shall have jointly identified an obvious error or any error or omission of a technical or immaterial nature in any such provision. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Revolving Credit Commitment of such Lender may not be increased or extended without the consent of such Lender.

Notwithstanding anything in this Agreement to the contrary, each Lender hereby irrevocably authorizes the Administrative Agent on its behalf, and without further consent, to enter into amendments or modifications to this Agreement (including, without limitation, amendments to this *Section 11.2*) or any of the other Loan Documents or to enter into additional Loan Documents as the Administrative Agent reasonably deems appropriate in order to effectuate the terms of *Section 4.13* (including, without limitation, as applicable, (1) to permit the Incremental Revolving Credit Increases to share ratably in the benefits of this Agreement and the other Loan Documents and (2) to include the Incremental Revolving Credit Increase and outstanding Incremental Revolving Credit Increase in any determination of (i) Required Lenders or (ii) similar required lender terms applicable thereto); provided that no amendment or modification shall result in any increase in the amount of any Lender's Commitment or any increase in any Lender's Commitment Percentage, in each case, without the written consent of such affected Lender.

SECTION 11.3    Expenses; Indemnity.

(a)    Costs and Expenses.  Each Borrower and any other Credit Party, jointly and severally, shall pay (i) all reasonable out of pocket expenses incurred by the Administrative Agent and its Affiliates (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent), and shall pay all fees and time charges and disbursements for attorneys who may be employees of the Administrative Agent, in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable out of pocket expenses incurred by the Issuing Lender in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iii) all out of pocket expenses incurred by the Administrative Agent, any Lender or the Issuing Lender (including the fees, charges and disbursements of any counsel for the

117

Administrative Agent, any Lender or the Issuing Lender), and shall pay all fees and time charges for attorneys who may be employees of the Administrative Agent, any Lender or the Issuing Lender, in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this ***Section 11.3***, or (B) in connection with the Loans made or Letters of Credit issued hereunder, including all such out of pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.

(b)     <u>Indemnification by the Borrowers</u>.  The Borrowers shall, jointly and severally, indemnify the Administrative Agent (and any sub-agent thereof), each Lender and the Issuing Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "***Indemnitee***") against, and hold each Indemnitee harmless from, and shall pay or reimburse any such Indemnitee for, any and all losses, claims (including, without limitation, any Environmental Claims), damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless, each Indemnitee from, and shall pay or reimburse any such Indemnitee for, all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Credit Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby (including, without limitation, the Transactions), (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the Issuing Lender to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by any Credit Party or any Subsidiary thereof, or any Environmental Claim related in any way to any Credit Party or any Subsidiary, (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Credit Party or any Subsidiary thereof, and regardless of whether any Indemnitee is a party thereto, or (v) any claim (including, without limitation, any Environmental Claims), investigation, litigation or other proceeding (whether or not the Administrative Agent or any Lender is a party hereto) and the prosecution and defense thereof, arising out of or in any way connected with the Loans, this Agreement, any other Loan Document, or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby, including without limitation, reasonable attorneys and consultant's fees, <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have

118

*For Reference Purposes Only*
5702727v1

resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by any Credit Party or any Subsidiary thereof against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if such Credit Party or such Subsidiary has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)     Reimbursement by Lenders.  To the extent that the Borrowers for any reason fail to indefeasibly pay any amount required under *clause (a)* or *(b)* of this **Section 11.3** to be paid by it to the Administrative Agent (or any sub-agent thereof), the Issuing Lender, the Swingline Lender or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), the Issuing Lender, the Swingline Lender or such Related Party, as the case may be, such Lender's Commitment Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, underlined provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), the Issuing Lender or the Swingline Lender in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), Issuing Lender or the Swingline Lender in connection with such capacity.  The obligations of the Lenders under this *clause (c)* are subject to the provisions of **Section 4.7**.

(d)     Waiver of Consequential Damages, Etc.  To the fullest extent permitted by Applicable Law, the Borrowers and each other Credit Party shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof.  No Indemnitee referred to in *clause (b)* above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)     Payments.  All amounts due under this **Section 11.3** shall be payable promptly after demand therefor.

SECTION 11.4     Right of Set Off.  If an Event of Default shall have occurred and be continuing, each Lender, the Issuing Lender, the Swingline Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, the Issuing Lender, the Swingline Lender or any

119

such Affiliate to or for the credit or the account of any Borrower or any other Credit Party against any and all of the obligations of any Borrower or any other Credit Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, the Issuing Lender or the Swingline Lender, irrespective of whether or not such Lender, the Issuing Lender or the Swingline Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of such Borrower or such Credit Party may be contingent or unmatured or are owed to a branch or office of such Lender, the Issuing Lender or the Swingline Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender, the Issuing Lender, the Swingline Lender and their respective Affiliates under this *Section 11.4* are in addition to other rights and remedies (including other rights of setoff) that such Lender, the Issuing Lender, the Swingline Lender or their respective Affiliates may have.  Each Lender, the Issuing Lender and the Swingline Lender agrees to notify the Borrowers and the Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

SECTION 11.5    Governing Law; Jurisdiction, Etc.

(a)    Governing Law.  This Agreement and the other Loan Documents, unless expressly set forth therein, shall be governed by, construed and enforced in accordance with, the law of the State of Texas, without reference to conflicts or choice of law principles thereof.

(b)    Submission to Jurisdiction.  Each Borrower and each other Credit Party irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the courts of the State of Texas sitting in Harris County and of the United States District Court for the Southern District of Texas, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Texas state court or, to the fullest extent permitted by Applicable Law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or in any other Loan Document shall affect any right that the Administrative Agent, any Lender or the Issuing Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against each Borrower or any Credit Party or their respective properties in the courts of any jurisdiction.

(c)    Waiver of Venue.  Each Borrower and each other Credit Party irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in *paragraph (b)* of this *Section 11.5*.  Each of the parties hereto hereby irrevocably waives, to the fullest

120

*For Reference Purposes Only*
*5702727v1*

extent permitted by Applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d) <u>Service of Process</u>.  Each party hereto irrevocably consents to service of process in the manner provided for notices in **Section 11.1**.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by Applicable Law.

SECTION 11.6      <u>Waiver of Jury Trial</u>.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND CONSENT AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS **SECTION 11.6**.

SECTION 11.7      <u>Reversal of Payments</u>.  To the extent any Credit Party makes a payment or payments to the Administrative Agent for the ratable benefit of the Lenders or the Administrative Agent receives any payment or proceeds of the Collateral which payments or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds repaid, the Obligations or part thereof intended to be satisfied shall be revived and continued in full force and effect as if such payment or proceeds had not been received by the Administrative Agent.

SECTION 11.8      <u>Injunctive Relief</u>.  The Borrowers recognize that, in the event any Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy of law may prove to be inadequate relief to the Lenders. Therefore, each Borrower agrees that the Lenders, at the Administrative Agent and the Lenders' option, shall be entitled to seek temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

SECTION 11.9      <u>Accounting Matters</u>.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrowers or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the

121

*For Reference Purposes Only*
5702727v.1

Borrowers shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

SECTION 11.10    Successors and Assigns; Participations.

(a)    Successors and Assigns Generally.    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Borrower nor any other Credit Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of *paragraph (b)* of this ***Section 11.10***, (ii) by way of participation in accordance with the provisions of *paragraph (d)* of this ***Section 11.0*** or (iii) by way of pledge or assignment of a security interest subject to the restrictions of *paragraph (f)* of this ***Section 11.10*** (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in *paragraph (d)* of this ***Section 11.10*** and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lenders.    Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Credit Commitment and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Revolving Credit Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in *paragraph (b)(i)(A)* of this ***Section 11.10***, the aggregate amount of the Revolving Credit Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Revolving Credit Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such

122

For Reference Purposes Only
5702727v1

assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $5,000,000, in the case of any assignment in respect of the Revolving Credit Facility, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrowers otherwise consent (each such consent not to be unreasonably withheld or delayed); provided that the Borrowers shall be deemed to have given their consent five (5) Business Days after the date written notice thereof has been delivered by the assigning Lender (through the Administrative Agent) unless such consent is expressly refused by the Borrowers prior to such fifth (5th) Business Day;

(ii)    <u>Proportionate Amounts</u>.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Revolving Credit Commitment assigned;

(iii)    <u>Required Consents</u>.  No consent shall be required for any assignment except to the extent required by *paragraph (b)(i)(B)* of this ***Section 11.10*** and, in addition:

(A)    the consent of the Borrowers (such consent not to be unreasonably withheld) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided, that the Borrowers shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 5 Business Days after having received notice thereof;

(B)    the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of the Revolving Credit Facility if such assignment is to a Person that is not a Lender with a Revolving Credit Commitment, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

(C)    the consents of the Issuing Lender and the Swingline Lender (such consents not to be unreasonably withheld or delayed) shall be required for any assignment that increases the obligation of the assignee to participate in exposure under one or more Letters of Credit (whether or not then outstanding) or for any assignment in respect of the Revolving Credit Facility.

(iv)    <u>Assignment and Assumption</u>.    The parties to each assignment shall execute and deliver to the Administrative Agent an

123

For Reference Purposes Only
5702727v1

Assignment and Assumption, together with a processing and recordation fee of $3,500 for each assignment (provided, that only one such fee will be payable in connection with simultaneous assignments to two or more Approved Funds by a Lender), and the assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)     No Assignment to Certain Persons.  No such assignment shall be made to any Borrower or any of the Borrower's Affiliates or Subsidiaries.

(vi)     No Assignment to Natural Persons.  No such assignment shall be made to a natural person.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to *paragraph (c)* of this ***Section 11.10***, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of ***Sections 4.8***, ***4.9***, ***4.10***, ***4.11*** and ***11.3*** with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with *paragraph (d)* of this ***Section 11.10***.

(c)     Register.  The Administrative Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at one of its offices in Charlotte, North Carolina, a copy of each Assignment and Assumption and each Lender Joinder Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Revolving Credit Commitment of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "***Register***").  The entries in the Register shall be conclusive, and the Borrowers, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrowers and any Lender (but only to the extent of entries in the Register that are applicable to such Lender), at any reasonable time and from time to time upon reasonable prior notice.

(d)     Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrowers or the Administrative Agent, sell participations to any Person (other than a natural person or any Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "***Participant***") in all or a portion of such

124

*For Reference Purposes Only*
5702727v1

Lender's rights and/or obligations under this Agreement (including all or a portion of its Revolving Credit Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent, Issuing Lender, Swingline Lender and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver or modification described in **Section 11.2** that directly affects such Participant and could not be affected by a vote of the Required Lenders.  Subject to *paragraph (e)* of this **Section 11.10**, the Borrowers agree that each Participant shall be entitled to the benefits of **Sections 4.8**, **4.9**, **4.10** and **4.11** to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to *paragraph (b)* of this **Section 11.10**.  To the extent permitted by law, each Participant also shall be entitled to the benefits of **Section 11.4** as though it were a Lender, provided such Participant agrees to be subject to **Section 4.6** as though it were a Lender.

(e)     Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under **Sections 4.10** and **4.11** than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrowers' prior written consent.  No Participant shall be entitled to the benefits of **Section 4.11** unless the Borrowers are notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrowers, to comply with **Section 4.11(g)** as though it were a Lender.

(f)     Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

SECTION 11.11     Confidentiality.  Each of the Administrative Agent, the Lenders and the Issuing Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and other representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by, or required to be disclosed to, any rating agency, or regulatory or similar authority purporting to have jurisdiction over it (including any self-regulatory authority,

125

such as the National Association of Insurance Commissioners), (c) to the extent required by Applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies under this Agreement, under any other Loan Document or under any Secured Hedge Agreement or Secured Cash Management Agreement, or any action or proceeding relating to this Agreement, any other Loan Document or any Secured Hedge Agreement or Secured Cash Management Agreement, or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this **Section 11.11**, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, Participant or proposed Participant, (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrowers and their obligations, (iii) to an investor or prospective investor in an Approved Fund that also agrees that Information shall be used solely for the purpose of evaluating an investment in such Approved Fund, (iv) to a trustee, collateral manager, servicer, backup servicer, noteholder or secured party in an Approved Fund in connection with the administration, servicing and reporting on the assets serving as collateral for an Approved Fund, or (v) to a nationally recognized rating agency that requires access to information regarding the Borrowers and their Subsidiaries, the Loans and the Loan Documents in connection with ratings issued with respect to an Approved Fund, (g) with the consent of the Borrowers, (h) to Gold Sheets and other similar bank trade publications, such information to consist of deal terms and other information customarily found in such publications, or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this **Section 11.11** or (y) becomes available to the Administrative Agent, any Lender, the Issuing Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrowers or (j) to governmental regulatory authorities in connection with any regulatory examination of the Administrative Agent or any Lender or in accordance with the Administrative Agent's or any Lender's regulatory compliance policy if the Administrative Agent or such Lender deems necessary for the mitigation of claims by those authorities against the Administrative Agent or such Lender or any of its subsidiaries or affiliates. For purposes of this **Section 11.11**, "**Information**" means all information received from any Credit Party or any Subsidiary thereof relating to any Credit Party or any Subsidiary thereof or any of their respective businesses, other than any such information that is available to the Administrative Agent, any Lender or the Issuing Lender on a nonconfidential basis prior to disclosure by any Credit Party or any Subsidiary thereof; provided that, in the case of information received from a Credit Party or any Subsidiary thereof after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this **Section 11.11** shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 11.12    Performance of Duties. Each of the Credit Party's obligations under this Agreement and each of the other Loan Documents shall be performed by such Credit Party at its sole cost and expense.

SECTION 11.13    All Powers Coupled with Interest. All powers of attorney and other authorizations granted to the Lenders, the Administrative Agent and any Persons designated by the Administrative Agent or any Lender pursuant to any provisions of this

For Reference Purposes Only
5702727v1

Agreement or any of the other Loan Documents shall be deemed coupled with an interest and shall be irrevocable so long as any of the Obligations remain unpaid or unsatisfied, any of the Commitments remain in effect or the Credit Facility has not been terminated.

SECTION 11.14    Survival.

(a)    All representations and warranties set forth in **Article VI** and all representations and warranties contained in any certificate, or any of the Loan Documents (including, but not limited to, any such representation or warranty made in or in connection with any amendment thereto) shall constitute representations and warranties made under this Agreement. All representations and warranties made under this Agreement shall be made or deemed to be made at and as of the Closing Date (except those that are expressly made as of a specific date), shall survive the Closing Date and shall not be waived by the execution and delivery of this Agreement, any investigation made by or on behalf of the Lenders or any borrowing hereunder.

(b)    Notwithstanding any termination of this Agreement, the indemnities to which the Administrative Agent and the Lenders are entitled under the provisions of this **Article XI** and any other provision of this Agreement and the other Loan Documents shall continue in full force and effect and shall protect the Administrative Agent and the Lenders against events arising after such termination as well as before.

SECTION 11.15    Titles and Captions.  Titles and captions of Articles, Sections and subsections in, and the table of contents of, this Agreement are for convenience only, and neither limit nor amplify the provisions of this Agreement.

SECTION 11.16    Severability of Provisions.  Any provision of this Agreement or any other Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remainder of such provision or the remaining provisions hereof or thereof or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 11.17    Counterparts; Integration; Effectiveness; Electronic Execution.

(a)    Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed signature page of this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. In the event of any conflict between the provisions of this Agreement and those of any other

127

*For Reference Purposes Only*
5702727v1

Loan Document, the provisions of this Agreement shall control; provided that the inclusion of supplemental rights or remedies in favor of the Administrative Agent or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof. Except as provided in **Section 5.1**, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.

(b) <u>Electronic Execution of Assignments</u>. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 11.18 <u>Term of Agreement</u>. This Agreement shall remain in effect from the Closing Date through and including the date upon which all Obligations (other than contingent indemnification obligations not then due) arising hereunder or under any other Loan Document shall have been indefeasibly and irrevocably paid and satisfied in full, all Letters of Credit have been terminated or expired (or been Cash Collateralized) and the Revolving Credit Commitment has been terminated. No termination of this Agreement shall affect the rights and obligations of the parties hereto arising prior to such termination or in respect of any provision of this Agreement which survives such termination.

SECTION 11.19 <u>USA PATRIOT Act and OFAC</u>.~~(a)~~ The Administrative Agent and each Lender hereby notifies each Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Borrower and the Subsidiary Guarantors, which information includes the name and address of each Borrower and each Subsidiary Guarantor and other information that will allow such Lender to identify each Borrower or such Subsidiary Guarantor in accordance with the PATRIOT Act.

~~(b) No Credit Party or any Affiliate of a Credit Party (i) is a Sanctioned Entity, (ii) has a more than 10% of its assets located in Sanctioned Entities, or (iii) derives more than 10% of its operating income from investments in, or transactions with Sanctioned Entities. The proceeds of any Loan will not be used and have not been used to fund any operations in, finance any investments or activities in or make any payments to, a Sanctioned Entity. No Credit Party or any Affiliate of a Credit Party are in violation of and shall not violate any of the country or list based economic and trade sanctions administered and enforced by OFAC that are described or referenced at~~

128

*For Reference Purposes Only*
5702727v1

http://www.ustreas.gov/offices/enforcement/ofac/ or as otherwise published from time to time.

SECTION 11.20    Independent Effect of Covenants.    The Borrowers expressly acknowledge and agree that each covenant contained in *Articles VII* or *VIII* hereof shall be given independent effect. Accordingly, the Borrowers shall not engage in any transaction or other act otherwise permitted under any covenant contained in *Articles VII* or *VIII*, before or after giving effect to such transaction or act, if any Borrower shall or would be in breach of any other covenant contained in *Articles VII* or *VIII*.

SECTION 11.21    Amendment and Restatement; No Novation.    This Agreement constitutes an amendment and restatement of the Existing Credit Agreement, effective from and after the Closing Date. The execution and delivery of this Agreement shall not constitute a novation of any indebtedness or other obligations owing to the Lenders or the Administrative Agent under the Existing Credit Agreement based on facts or events occurring or existing prior to the execution and delivery of this Agreement. On the Closing Date, the credit facilities described in the Existing Credit Agreement, shall be amended, supplemented, modified and restated in their entirety by the facilities described herein, and all loans and other obligations of LII outstanding as of such date under the Existing Credit Agreement, shall be deemed to be loans and obligations outstanding under the corresponding facilities described herein, without any further action by any Person, except that the Administrative Agent shall make such transfers of funds as are necessary in order that the outstanding balance of such Loans, together with any Loans funded on the Closing Date, reflect the respective Revolving Credit Commitment of the Lenders hereunder.

SECTION 11.22    Inconsistencies with Other Documents.    In the event there is a conflict or inconsistency between this Agreement and any other Loan Document, the terms of this Agreement shall control; underline provided that any provision of the Security Documents which imposes additional burdens on the Borrowers or any of their respective Subsidiaries or further restricts the rights of Borrowers or any of their respective Subsidiaries or gives the Administrative Agent or Lenders additional rights shall not be deemed to be in conflict or inconsistent with this Agreement and shall be given full force and effect.

**[*Signature pages follow*]**

129

*For Reference Purposes Only*
*5702727v1*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed under seal by their duly authorized officers, all as of the day and year first written above.

LOCKWOOD ENTERPRISES, INC.

By:_____
      Ricardo Ibarra
      Senior Vice President and Chief Financial Officer

LOCKWOOD INTERNATIONAL, INC.

By:_____
      Ricardo Ibarra
      Senior Vice President and Chief Financial Officer

LMG MANUFACTURING, INC.

By:_____
      Ricardo Ibarra
      Senior Vice President and Chief Financial Officer

PIPING COMPONENTS, INC.

By:_____
      Ricardo Ibarra
      Senior Vice President and Chief Financial Officer

AGENT AND LENDERS:

WELLS FARGO BANK, NATIONAL
ASSOCIATION, as Administrative Agent,
Swingline Lender, Issuing Lender and Lender

By:_____

~~Michelle C. Tabor~~Jennifer L. Norris
Senior Vice President

TRUSTMARK BANK, as a Lender


By:_____

      Michael R. Quiray
      Senior Vice President

## **EXHIBIT A-1**

### REVOLVING CREDIT NOTE

$_____                                           _____, 2015

FOR VALUE RECEIVED, the undersigned, LOCKWOOD ENTERPRISES, INC., a Texas corporation, LOCKWOOD INTERNATIONAL, INC., a Texas corporation, LMG MANUFACTURING, INC., a Texas corporation, and PIPING COMPONENTS, INC., a Texas corporation (each a "***Borrower***" and collectively, "***Borrowers***"), promise to pay to WELLS FARGO BANK, NATIONAL ASSOCIATION (the "***Lender***"), at the place and times provided in the Credit Agreement referred to below, the principal sum of _____ ($_____) or, if less, the unpaid principal amount of all Revolving Credit Loans made by the Lender from time to time pursuant to that certain Amended and Restated Credit Agreement dated as of September 30, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***") by and among Borrowers, the lenders who are or may become a party thereto, and Wells Fargo Bank, National Association, as Administrative Agent, Swingline Lender and Issuing Lender. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

The unpaid principal amount of this Revolving Credit Note from time to time outstanding is subject to mandatory repayment from time to time as provided in the Credit Agreement and shall bear interest as provided in ***Section 4.1*** of the Credit Agreement. All payments of principal and interest on this Revolving Credit Note shall be payable in lawful currency of the United States in immediately available funds to the account designated in the Credit Agreement.

This Revolving Credit Note is entitled to the benefits of, and evidences Obligations incurred under, the Credit Agreement, to which reference is made for a description of the security for this Revolving Credit Note and for a statement of the terms and conditions on which Borrowers are permitted and required to make prepayments and repayments of principal of the Obligations evidenced by this Revolving Credit Note and on which such Obligations may be declared to be immediately due and payable.

THIS REVOLVING CREDIT NOTE SHALL BE GOVERNED BY, CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REFERENCE TO CONFLICTS OR CHOICE OF LAW PRINCIPLES THEREOF.

The Indebtedness evidenced by this Revolving Credit Note is senior in right of payment to all Subordinated Indebtedness referred to in the Credit Agreement.

Each Borrower hereby waives all requirements as to diligence, presentment, demand of payment, protest and (except as required by the Credit Agreement) notice of any kind with respect to this Revolving Credit Note.

***[Signature page follows.]***

IN WITNESS WHEREOF, the undersigned has executed this Revolving Credit Note as of the day and year first above written.

**LOCKWOOD ENTERPRISES, INC.**

By:_____
Name:_____
Title:_____

**LOCKWOOD INTERNATIONAL, INC.**

By:_____
Name:_____
Title:_____

**LMG MANUFACTURING, INC.**

By:_____
Name:_____
Title:_____

**PIPING COMPONENTS, INC.**

By:_____
Name:_____
Title:_____

**EXHIBIT A-2**

SWINGLINE NOTE

$5,000,000                                                          _____, 2015

FOR VALUE RECEIVED, the undersigned, LOCKWOOD ENTERPRISES, INC., a Texas corporation, LOCKWOOD INTERNATIONAL, INC., a Texas corporation, LMG MANUFACTURING, INC., a Texas corporation, and PIPING COMPONENTS, INC., a Texas corporation (each a "**Borrower**" and collectively, "**Borrowers**"), promise to pay to WELLS FARGO BANK, NATIONAL ASSOCIATION (the "**Lender**"), at the place and times provided in the Credit Agreement referred to below, the principal sum of FIVE MILLION DOLLARS ($5,000,000) or, if less, the principal amount of all Swingline Loans made by the Lender from time to time pursuant to that certain Amended and Restated Credit Agreement dated as of September 30, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**") by and among Borrowers, the lenders who are or may become a party thereto, and Wells Fargo Bank, National Association, as Administrative Agent, Swingline Lender and Issuing Lender. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

The unpaid principal amount of this Swingline Note from time to time outstanding is subject to mandatory repayment from time to time as provided in the Credit Agreement and shall bear interest as provided in **Section 4.1** of the Credit Agreement. Swingline Loans refunded as Revolving Credit Loans in accordance with **Section 2.2(b)** of the Credit Agreement shall be payable by Borrowers as Revolving Credit Loans pursuant to the Revolving Credit Notes, and shall not be payable under this Swingline Note as Swingline Loans. All payments of principal and interest on this Swingline Note shall be payable in lawful currency of the United States in immediately available funds to the account designated in the Credit Agreement.

This Swingline Note is entitled to the benefits of, and evidences Obligations incurred under, the Credit Agreement, to which reference is made for a description of the security for this Swingline Note and for a statement of the terms and conditions on which Borrowers are permitted and required to make prepayments and repayments of principal of the Obligations evidenced by this Swingline Note and on which such Obligations may be declared to be immediately due and payable.

THIS SWINGLINE NOTE SHALL BE GOVERNED BY, CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF TEXAS, WITHOUT REFERENCE TO CONFLICTS OR CHOICE OF LAW PRINCIPLES THEREOF.

The Indebtedness evidenced by this Swingline Note is senior in right of payment to all Subordinated Indebtedness referred to in the Credit Agreement.

Each Borrower hereby waives all requirements as to diligence, presentment, demand of payment, protest and (except as required by the Credit Agreement) notice of any kind with respect to this Swingline Note.

IN WITNESS WHEREOF, the undersigned has executed this Swingline Note as of the day and year first above written.

**LOCKWOOD ENTERPRISES, INC.**

By:_____
Name:_____
Title:_____

**LOCKWOOD INTERNATIONAL, INC.**

By:_____
Name:_____
Title:_____

**LMG MANUFACTURING, INC.**

By:_____
Name:_____
Title:_____

**PIPING COMPONENTS, INC.**

By:_____
Name:_____
Title:_____

# EXHIBIT B

## NOTICE OF BORROWING

Dated as of: _____

Wells Fargo Bank, National Association,
as Administrative Agent
2500 CityWest Blvd., Suite 1100
Houston, Texas 77042
Attention:  Michelle C. Tabor

Ladies and Gentlemen:

This irrevocable Notice of Borrowing is delivered to you pursuant to *Section 2.3(a)* of the Amended and Restated Credit Agreement dated as of September 30, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*"), by and among Lockwood Enterprises, Inc., a Texas corporation, Lockwood International, Inc., a Texas corporation, LMG Manufacturing, Inc., a Texas corporation, and Piping Components, Inc., a Texas corporation (each a "*Borrower*" and collectively, "*Borrowers*"), the lenders who are or may become party thereto, and Wells Fargo Bank, National Association, as Administrative Agent, Swingline Lender and Issuing Lender.  Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

A.      Revolving Credit Loan/Swingline Loan

1.      Borrowers hereby request that the Lenders make [a Revolving Credit Loan] [a Swingline Loan] to Borrowers in the aggregate principal amount of $_____.  (Complete with an amount in accordance with *Section 2.3(a)* of the Credit Agreement.)

2.      Borrowers hereby request that such Loan be made on the following Business Day: _____.  (Complete with a Business Day in accordance with *Section 2.3(a)* of the Credit Agreement for Revolving Credit Loans or Swingline Loans).

3.      Borrowers hereby request that such Loan bear interest at the following interest rate, plus the Applicable Margin, as set forth below:

| Component of Loan | Interest Rate | Interest Period (LIBOR Rate only) | Termination Date for Interest Period (if applicable) |
|---|---|---|---|
| [Base Rate, LIBOR Rate, LIBOR Market Index Rate][1] | | | |

---

[1] Complete with the Base Rate, LIBOR Rate or the LIBOR Market Index Rate for Revolving Credit Loans or Swingline Loans.

4.      The aggregate principal amount of all Loans and L/C Obligations outstanding as of the date hereof (including the Loan requested herein) does not exceed the maximum amount permitted to be outstanding pursuant to the terms of the Credit Agreement.

5.      All of the conditions applicable to the Loan requested herein as set forth in the Credit Agreement have been satisfied as of the date hereof and will remain satisfied to the date of such Loan.

**[*Signature page follows.*]**

IN WITNESS WHEREOF, the undersigned has executed this Notice of Borrowing as of the day and year first written above.

**LOCKWOOD ENTERPRISES, INC.**

By:_____

Name:_____

Title:_____

**LOCKWOOD INTERNATIONAL, INC.**

By:_____

Name:_____

Title:_____

**LMG MANUFACTURING, INC.**

By:_____

Name:_____

Title:_____

**PIPING COMPONENTS, INC.**

By:_____

Name:_____

Title:_____

# EXHIBIT C

NOTICE OF ACCOUNT DESIGNATION

Dated as of: _____

Wells Fargo Bank, National Association,
as Administrative Agent
2500 CityWest Blvd., Suite 1100
Houston, Texas 77042
Attention:  Michelle C. Tabor

Ladies and Gentlemen:

This Notice of Account Designation is delivered to you pursuant to **Section 2.3(b)** of the Amended and Restated Credit Agreement dated as of September 30, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Lockwood Enterprises, Inc., a Texas corporation, Lockwood International, Inc., a Texas corporation, LMG Manufacturing, Inc., a Texas corporation, and Piping Components, Inc., a Texas corporation (each a "**Borrower**" and collectively, "**Borrowers**"), the lenders who are or may become party thereto, and Wells Fargo Bank, National Association, as Administrative Agent, Swingline Lender and Issuing Lender.  Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

1. The Administrative Agent is hereby authorized to disburse all Loan proceeds related to the Revolving Credit Loans and the Swingline Loans, into the following account(s):

> Bank Name: Wells Fargo Bank, N.A.
> ABA Routing Number: 121000248
> Account Number:  4123511933
> Account Name: Lockwood International, Inc.

2. This authorization shall remain in effect until revoked or until a subsequent Notice of Account Designation is provided to the Administrative Agent.

**[*Signature page follows.*]**

Exhibit C

IN WITNESS WHEREOF, the undersigned have executed this Notice of Account Designation as of the day and year first written above.

**LOCKWOOD ENTERPRISES, INC.**

By:_____
Name:_____
Title:_____


**LOCKWOOD INTERNATIONAL, INC.**

By:_____
Name:_____
Title:_____


**LMG MANUFACTURING, INC.**

By:_____
Name:_____
Title:_____


**PIPING COMPONENTS, INC.**

By:_____
Name:_____
Title:_____

# EXHIBIT D

NOTICE OF PREPAYMENT

Dated as of: _____

Wells Fargo Bank, National Association,
as Administrative Agent
2500 CityWest Blvd., Suite 1100
Houston, Texas 77042
Attention:  Michelle C. Tabor

Ladies and Gentlemen:

This irrevocable Notice of Prepayment is delivered to you pursuant to **Section 2.4(c)** of the Amended and Restated Credit Agreement dated as of September 30, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Lockwood Enterprises, Inc., a Texas corporation, Lockwood International, Inc., a Texas corporation, LMG Manufacturing, Inc., a Texas corporation, and Piping Components, Inc., a Texas corporation (each a "**Borrower**" and collectively, "**Borrowers**"), the lenders who are or may become party thereto, and Wells Fargo Bank, National Association, as Administrative Agent, Swingline Lender and Issuing Lender.  Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

1.      The Borrowers hereby provide notice to the Administrative Agent that they shall repay the following [Base Rate Loans] [LIBOR Rate Loans] and/or [LIBOR Market Index Rate Loans]: _____.  (Complete with an amount in accordance with **Section 2.4(c)** of the Credit Agreement.)

2.      The Loan to be prepaid is [check each applicable box]

    ☐      a Swingline Loan

    ☐      a Revolving Credit Loan

3.      The Borrowers shall repay the above-referenced Loans no later than 11:00 a.m. on the following Business Day: _____.  (Complete with a date no earlier than (i) the same Business Day as of the date of this Notice of Prepayment with respect to any Swingline Loan, Base Rate Loan, or LIBOR Market Index Rate Loan and (ii) three (3) Business Days subsequent to date of this Notice of Prepayment with respect to any LIBOR Rate Loan.)

**[*Signature page follows.*]**

Exhibit D

IN WITNESS WHEREOF, the undersigned have executed this Notice of Prepayment as of the day and year first written above.

**LOCKWOOD ENTERPRISES, INC.**

By:_____

Name:_____

Title:_____


**LOCKWOOD INTERNATIONAL, INC.**

By:_____

Name:_____

Title:_____


**LMG MANUFACTURING, INC.**

By:_____

Name:_____

Title:_____


**PIPING COMPONENTS, INC.**

By:_____

Name:_____

Title:_____

**EXHIBIT E**

NOTICE OF CONVERSION/CONTINUATION

Dated as of: _____

Wells Fargo Bank, National Association,
as Administrative Agent
2500 CityWest Blvd., Suite 1100
Houston, Texas 77042
Attention:  Michelle C. Tabor

Ladies and Gentlemen:

   This irrevocable Notice of Conversion/Continuation (this "*Notice*") is delivered to you pursuant to *Section 4.2* of the Amended and Restated Credit Agreement dated as of September 30, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*"), by and among Lockwood Enterprises, Inc., a Texas corporation, Lockwood International, Inc., a Texas corporation, LMG Manufacturing, Inc., a Texas corporation, and Piping Components, Inc., a Texas corporation (each a "*Borrower*" and collectively, "*Borrowers*"), the lenders who are or may become party thereto, and Wells Fargo Bank, National Association, as Administrative Agent, Swingline Lender and Issuing Lender. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

   1.  The Loan to which this Notice relates is a Revolving Credit Loan.

   2.  This Notice is submitted for the purpose of:  (Check one and complete applicable information in accordance with the Credit Agreement.)

   ☐  <u>Converting all or a portion of a Base Rate Loan into a LIBOR Rate Loan</u>

     Outstanding principal balance:       $_____

     Principal amount to be converted:    $_____

     Requested effective date of conversion:  _____

     Requested new Interest Period:     _____

   ☐  <u>Converting a portion of LIBOR Rate Loan into a Base Rate Loan</u>

     Outstanding principal balance:       $_____

     Principal amount to be converted:    $_____

     Last day of the current Interest Period:  _____

*For Reference Purposes Only*

Requested effective date of conversion: _____
_____

☐    <u>Continuing all or a portion of a LIBOR Rate Loan as a LIBOR Rate Loan</u>

Outstanding principal balance:                 $_____

Principal amount to be continued:              $_____

Last day of the current Interest Period:       _____

Requested effective date of continuation:      _____

Requested new Interest Period:                 _____

3.    The aggregate principal amount of all Loans and L/C Obligations outstanding as of the date hereof does not exceed the maximum amount permitted to be outstanding pursuant to the terms of the Credit Agreement.

[*Signature page follows.*]

IN WITNESS WHEREOF, the undersigned have executed this Notice of Conversion/Continuation as of the day and year first written above.

**LOCKWOOD ENTERPRISES, INC.**

By:_____

Name:_____

Title:_____


**LOCKWOOD INTERNATIONAL, INC.**

By:_____

Name:_____

Title:_____


**LMG MANUFACTURING, INC.**

By:_____

Name:_____

Title:_____


**PIPING COMPONENTS, INC.**

By:_____

Name:_____

Title:_____

**EXHIBIT F**

OFFICER'S COMPLIANCE CERTIFICATE

The undersigned officers, on behalf of Lockwood Enterprises, Inc., a Texas corporation, Lockwood International, Inc., a Texas corporation, LMG Manufacturing, Inc., a Texas corporation, and Piping Components, Inc., a Texas corporation (each a "***Borrower***" and collectively, "***Borrowers***"), hereby certify to the Administrative Agent and the Lenders, each as defined in the Credit Agreement referred to below, as follows:

1.        This certificate is delivered to you pursuant to ***Section 7.2(a)*** of the Amended and Restated Credit Agreement dated as of September 30, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***"), by and among Borrowers, the lenders who are or may become party thereto, and Wells Fargo Bank, National Association, as Administrative Agent, Swingline Lender and Issuing Lender.  Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

2.        I have reviewed the consolidated financial statements of Parent and its Subsidiaries dated as of _____ and for the _____ period[s] then ended and such statements fairly present in all material respects the financial condition of Parent and its Subsidiaries as of the dates indicated and the results of their operations and cash flows for the period[s] indicated.

3.        I have reviewed the terms of the Credit Agreement, and the related Loan Documents and have made, or caused to be made under my supervision, a review in reasonable detail of the transactions and the condition of Parent and its Subsidiaries during the accounting period covered by the financial statements referred to in Paragraph 2 above.  Such review has not disclosed the existence during or at the end of such accounting period of any condition or event that constitutes a Default or an Event of Default, nor do I have any knowledge of the existence of any such condition or event as at the date of this certificate [except, if such condition or event existed or exists, describe the nature and period of existence thereof and what action the Borrowers have taken, is taking and proposes to take with respect thereto.]

4.        The Applicable Margin and the calculations determining such figures are set forth on the attached ***Schedule 1***.

5.        Parent and its Subsidiaries are in compliance with the financial covenants contained in ***Sections 8.14(a)*** (Minimum Consolidated ~~Total Liabilities to Consolidated Tangible Net Worth~~EBITDA), ***8.14(b)*** (~~Consolidated Net Income~~Maximum Restructuring Charges), and ***8.14(c)*** (Consolidated Asset Coverage Ratio) of the Credit Agreement as shown on attached ***Schedule 1***.

6.        Parent and its Subsidiaries are in compliance with the financial covenants contained in ***Section 8.13*** (Capital Expenditures) of the Credit Agreement as shown on attached ***Schedule 1***, and with the other covenants and restrictions contained in the Credit Agreement.

***[Signature page follows.]***

Exhibit F

WITNESS the following signature as of the day and year first written above.

**LOCKWOOD ENTERPRISES, INC.**

By:_____
Name:_____
Title:_____


**LOCKWOOD INTERNATIONAL, INC.**

By:_____
Name:_____
Title:_____


**LMG MANUFACTURING, INC.**

By:_____
Name:_____
Title:_____


**PIPING COMPONENTS, INC.**

By:_____
Name:_____
Title:_____

Schedule 1
to
Officer's Compliance Certificate

## I.    Section 8.13 – Capital Expenditures

A.    Capital Expenditures of Credit Parties:    $_____

B.    Maximum allowed per fiscal year:    $~~5,000,000~~750,000

In Compliance?    YES or NO

## II.    Section 8.14(a) – **Minimum** Consolidated ~~Total Liabilities to Consolidated Tangible Net Worth~~**EBITDA**

A.    _____
Period Ending:

~~1.~~B.    Required Consolidated ~~Total Liabilities~~EBITDA    $_____

~~2.    Subordinated Indebtedness    $_____~~

~~3.    Line II A.1 - Line II.A.2:    $_____~~

~~B.    Consolidated Tangible Net Worth at Statement Date:~~

~~1.    Shareholders' equity    $_____~~

~~2.    Intangible Assets    $_____~~

~~3.    Subordinated Indebtedness    $_____~~

~~4.    Accounts receivable due from Affiliates more than    $_____
180    days past due~~

~~5.    Line II B.1 - Line II. B.2 + Line II.B.3 – Line    $_____
II.B.4:~~

~~C.    Ratio (Line II.A to  Line II.B.5):    ____ to 1.00~~

~~Maximum Permitted Consolidated Total Liabilities to Tangible
Net Worth:    2.50 to 1.00~~

~~In Compliance?    YES or NO~~

Schedule 1 to Officer's Compliance Certificate

**III.** ~~**Section 8.14(b) Consolidated Net Income**~~

    ~~A~~C. Actual Consolidated ~~Net Income of Credit Parties:~~EBITDA      $_____

~~B. Minimum required for each four fiscal quarter period~~      ~~$1,000,000~~

_____ In Compliance?      YES or NO

**III.**      **Section 8.14(b) Maximum Restructuring Charges**

_____ A.      Maximum Restructuring Charges in FY 2017:      $3,400,000

_____ B.      Actual Restructuring Charges to date:      $_____

In Compliance?      YES or NO

**IV.**      **Section 8.14(c) –Consolidated Asset Coverage Ratio**

     A.      Consolidated Asset Coverage Ratio

| | | |
|---|---|---|
| 1. | Aggregate amount of all Domestic Trade Accounts Receivable on which Administrative Agent has a perfected first priority lien | $_____ |
| 2. | Aggregate amount of all Domestic Inventory on which Administrative Agent has a perfected first priority lien | $_____ |
| 3. | Net book value of all Domestic Fixed Assets on which Administrative Agent has a perfected first priority lien | $_____ |
| 4. | Aggregate amount of all Eligible Foreign Trade Accounts Receivable | $_____ |
| 5. | Aggregate amount of all LHI Pledged Equipment | $_____ |
| 6. | Line IV.A.1+Line IV.A.2+Line IV.A.3+Line IV.A.4+Line IV.A.5 | $_____ |
| 7. | Aggregate amount of all Foreign Trade Accounts Receivable | $_____ |
| 8. | Aggregate amount of all Foreign Inventory | $_____ |
| 9. | Line IV.A.7 + Line IV.A.8 | $_____ |
| 10. | Lesser of Line IV.A.9 and $7,500,000 | $_____ |
| 11. | Line IV.A.6 + Line IV.A.10 | $_____ |

12.      Aggregate amount of L/C Obligations of Credit Parties      $_____

13.      Aggregate amount of outstanding Revolving Credit Loans and Swingline Loans      $_____

14.      Line IV.A.12 + Line IV.A.13      $_____

B.      Ratio (Line IV.A.11 to Line IV.A.14)      \_\_\_\_ to 1.00

Minimum Permitted Consolidated Asset Coverage Ratio:      ~~1.50~~\_\_\_\_ to 1.00

In Compliance?      YES or NO

## **EXHIBIT G**

### ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (the "***Assignment and Assumption***") is dated as of the Effective Date set forth below and is entered into by and between [*INSERT NAME OF ASSIGNOR*] (the "***Assignor***") and the parties identified on the Schedules hereto and [the] [each] Assignee identified on the Schedules hereto as "Assignee" or as "Assignees" (collectively, the "Assignees" and each an "***Assignee***"). [It is understood and agreed that the rights and obligations of [the Assignees][the Assignors] hereunder are several and not joint.] Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, restated, supplemented, or otherwise modified from time to time, the "***Credit Agreement***"), receipt of a copy of which is hereby acknowledged by [the] [each] Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to [the Assignee] [the respective Assignees], and [the] [each] Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including without limitation any letters of credit, guarantees, and swingline loans included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to *clause (i)* above (the rights and obligations sold and assigned to [the] [any] Assignee pursuant to *clauses (i)* and *(ii)* above being referred to herein collectively as, [the] [an] "***Assigned Interest***"). Each such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1. Assignor:                    [*INSERT NAME OF ASSIGNOR*]

2. Assignee(s):                 *See Schedules attached hereto*

3. Borrowers:                   Lockwood Enterprises, Inc., a Texas corporation; Lockwood International, Inc., a Texas corporation; LMG Manufacturing, Inc., a Texas corporation; and Piping Components, Inc., a Texas corporation (the

"***Borrowers***")

| 4. | Administrative Agent | Wells Fargo Bank, National Association, as the Administrative Agent under the Credit Agreement |
|---|---|---|
| 5. | Credit Agreement: | The Amended and Restated Credit Agreement dated as of September 30, 2015, among the Borrowers, the lenders parties thereto, and Wells Fargo Bank, National Association, as Administrative Agent, Swingline Lender and Issuing Lender (as amended, restated, supplemented or otherwise modified) |
| 6. | Assigned Interest: | See Schedules attached hereto |
| [7. | Trade Date: | _____]² |

[***Remainder of Page Intentionally Left Blank; Signature Page Follows.***]

---

² To be completed if the Assignor and the Assignees intend that the minimum assignment amount is to be determined as of the Trade Date.

Effective Date: _____ ___, 2____ *[TO BE INSERTED BY THE ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR]*

The terms set forth in this Assignment and Assumption are hereby agreed to:

                ASSIGNOR
                [NAME OF ASSIGNOR]


                By:_____
                Name:_____
                Title:_____


                <u>ASSIGNEES</u>

                *See Schedules attached hereto*

[Consented to and][3] Accepted:

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Administrative Agent, Issuing Lender and Swingline Lender

By:_____
Name:_____
Title:_____

[Consented to:[4]

**LOCKWOOD ENTERPRISES, INC.**

By:_____
Name:_____
Title:_____

**LOCKWOOD INTERNATIONAL, INC.**

By:_____
Name:_____
Title:_____

**LMG MANUFACTURING, INC.**

By:_____
Name:_____
Title:_____

**PIPING COMPONENTS, INC.**

By:_____
Name:_____
Title:_____

---

[3] To be added only if the consent of the Administrative Agent and/or the Swingline Lender and Issuing Lender is required by the term of the Credit Agreement.
[4] To be added only if the consent of the Borrowers are required by the terms of the Credit Agreement

SCHEDULE 1
To Assignment and Assumption

By its execution of this Schedule, the Assignee identified on the signature block below agrees to the terms set forth in the attached Assignment and Assumption.

**Assigned Interests:**

| Facility Assigned[5] | Aggregate Amount of Commitment/ Loans for all Lenders[6] | Amount of Commitment/ Loans Assigned[7] | Percentage Assigned of Commitment / Loans[8] | CUSIP Number |
|---|---|---|---|---|
| | $ | $ | % | |
| | $ | $ | % | |
| | $ | $ | % | |
| | $ | $ | % | |

[*NAME OF ASSIGNEE*]
[and is an Affiliate/Approved Fund of [*identify Lender*]]

By:_____
Name:_____
Title:_____

---

[5] Revolving Credit Facility

[6] Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[7] Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[8] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

ANNEX 1
to Assignment and Assumption

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.    Representations and Warranties.

1.1    Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrowers, any of their respective Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrowers, any of their respective Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    Assignee[s].  [The] [Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under [*Section 11.10(b)(iii)*, *(v)* and *(vi)*] of the Credit Agreement (subject to such consents, if any, as may be required under *Section 11.10(b)(iii)* of the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of [the] [the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to *Section 7.1* thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the] [such] Assigned Interest, (vi) it has, independently and without reliance upon the Administrative Agent, or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the] [such] Assigned Interest, and (vii) if it is a Foreign Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, [the] [any] the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii)

it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.      Payments.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of [the] [each] Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to [the] [the relevant] Assignee for amounts which have accrued from and after the Effective Date.

3.      General Provisions.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of Texas.

**EXHIBIT H-1**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**
**(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to the Amended and Restated Credit Agreement dated as of September 30, 2015 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Lockwood Enterprises, Inc., a Texas corporation, Lockwood International, Inc., a Texas corporation, LMG Manufacturing, Inc., a Texas corporation, and Piping Components, Inc., a Texas corporation (collectively, the "Borrowers"), Wells Fargo Bank, National Association, as Administrative Agent for the Lenders (in such capacity, the "Administrative Agent"), Swingline Lender and Issuing Lender, and the lenders from time to time party thereto (the "Lenders").

Pursuant to the provisions of Section 4.11(g)(ii)(B) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of any of the Borrowers within the meaning of Section 881(c)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to any of the Borrowers as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrowers with a certificate of its non-U.S. Person status on IRS Form W-8BEN. By executing this certificate, the undersigned agrees that (i) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrowers and the Administrative Agent, and (ii) the undersigned shall have at all times furnished the Borrowers and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two (2) calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]


By:_____
      Name:
      Title:

Date:_____

**EXHIBIT H-2**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**
**(For Foreign Participants That Are Not Partnerships**
**For U.S. Federal Income Tax Purposes)**

Reference is hereby made to the Amended and Restated Credit Agreement dated as of September 30, 2015 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Lockwood Enterprises, Inc., a Texas corporation, Lockwood International, Inc., a Texas corporation, LMG Manufacturing, Inc., a Texas corporation, and Piping Components, Inc., a Texas corporation (collectively, the "Borrowers"), Wells Fargo Bank, National Association, as Administrative Agent for the Lenders (in such capacity, the "Administrative Agent"), Swingline Lender and Issuing Lender, and the lenders from time to time party thereto (the "Lenders").

Pursuant to the provisions of Section 4.11(g)(ii)(B) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "ten percent shareholder" of any of the Borrowers within the meaning of Section 881(c)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to any of the Borrowers as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN. By executing this certificate, the undersigned agrees that (i) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (ii) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two (2) calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By:_____
　　　Name:
　　　Title:

Date:_____

**EXHIBIT H-3**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**
**(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to the Amended and Restated Credit Agreement dated as of September 30, 2015 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Lockwood Enterprises, Inc., a Texas corporation, Lockwood International, Inc., a Texas corporation, LMG Manufacturing, Inc., a Texas corporation, and Piping Components, Inc., a Texas corporation (collectively, the "Borrowers"), Wells Fargo Bank, National Association, as Administrative Agent for the Lenders (in such capacity, the "Administrative Agent"), Swingline Lender and Issuing Lender, and the lenders from time to time party thereto (the "Lenders").

Pursuant to the provisions of Section 4.11(g)(ii)(B) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of any of the Borrowers within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to any of the Borrowers as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (x) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (y) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two (2) calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By:_____
      Name:
      Title:

Date:_____

**EXHIBIT H-4**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**
**(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to the Amended and Restated Credit Agreement dated as of September 30, 2015 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Lockwood Enterprises, Inc., a Texas corporation, Lockwood International, Inc., a Texas corporation, LMG Manufacturing, Inc., a Texas corporation, and Piping Components, Inc., a Texas corporation (collectively, the "Borrowers"), Wells Fargo Bank, National Association, as Administrative Agent for the Lenders (in such capacity, the "Administrative Agent"), Swingline Lender and Issuing Lender, and the lenders from time to time party thereto (the "Lenders").

Pursuant to the provisions of Section 4.11(g)(ii)(B) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "ten percent shareholder" of any of the Borrowers within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to any of the Borrowers as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrowers with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (x) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrowers and the Administrative Agent, and (y) the undersigned shall have at all times furnished the Borrowers and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two (2) calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By:_____
     Name:
     Title:

Date:_____

**SCHEDULE 1.1**

**Lender Commitments**

| Period | Maximum Aggregate Revolving Credit Commitment of all Lenders |
|---|---|
| February 27, 2017 through July 30, 2017 | $72,000,000* |
| July 31, 2017 through October 30, 2017 | $67,000,000* |
| October 31, 2017 through January 30, 2018 | $62,000,000* |
| January 31, 2018 through April 29, 2018 | $57,000,000* |
| April 30, 2018 through September 30, 2018 | $55,000,000 |

| Lender | Revolving Credit Commitment Percentage |
|---|---|
| Wells Fargo Bank, National Association | $70,000,000.00 77.777778% |
| Trustmark National Bank | $20,000,000.00 22.222222% |
| **Total** | **$90,000,000.00 100%** |

* Subject to Sections 2.5(c) and 7.20(b)

**SCHEDULE 1.2**

**<u>Existing Hedges</u>**

None.

**SCHEDULE 1.3**

**Existing Letters of Credit as of the Closing Date**

| Beneficiary | Amount | Expiry Date |
|---|---|---|
| ING Belgium | $400,000.00 | 01/18/2018 |
| CB and I UK Limited | $ 46,390.53 | 02/01/2016 |
| CB and I UK Limited | $134,120.87 | 07/01/2016 |
| Flour Limited UK | $188,079.55 | 11/30/2016 |
| Linde Engineering – USA | $ 23,188.47 | 02/28/2019 |
| Daelim Industrial Co. Ltd | $ 68,498.85 | 12/05/2016 |
| Sasol Chemicals, LLC | $123,517.05 | 09/30/2017 |
| OMB SPA | $250,000.00 | 12/31/2015 |

**SCHEDULE 6.1**

**JURISDICTIONS OF ORGANIZATION AND QUALIFICATION**

Each Borrower is incorporated in Texas.

Lockwood International, Inc. is qualified to do business in Illinois ~~and Indiana.~~ , Ohio, Louisiana (not in good standing), Indiana, British Columbia, Canada, Alberta, Canada, and Ontario, Canada.

Except as set forth herein, Borrowers have not obtained any other foreign qualifications.

## SCHEDULE 6.2

## SUBSIDIARIES AND CAPITALIZATION

**Subsidiaries (direct ownership) of LEI:**

Lockwood International, Inc.

Lockwood PVF Canada, Inc. (Alberta, Canada)

LMG Manufacturing, Inc.

**Subsidiaries (direct ownership) of LII:**

~~Vietnam Lockwood Co. Ltd.~~

Lockwood Valves SeaAsia, PTE (in process of winding down)

Lockwood Valve Thailand, LTD (in process of winding down)

Lockwood Valve Australia, PTY, LTD

**Subsidiaries (direct ownership) of LMG:**

Piping Components, Inc.

**Subsidiaries (direct ownership) of PCI:**

None

**Other Equity Investments:**  None.

**Owners of Equity Interests in Borrowers:**

LEI's Common Stock – 1,000 shares authorized for issuance, par value of $0.01 per share

      Michael F. Lockwood – issued 1,000 shares of common stock

LII's Common Stock – 500,000 shares authorized for issuance, no par value per share

LEI – issued 340 shares of common stock

LII's Preferred Stock – 7,200 shares authorized for issuance, par value of $100.00 per share

      None currently outstanding.

<u>LMG's Common Stock</u> – 1,000 shares authorized for issuance, par value of $0.01 per share

LEI – issued 1,000 shares of common stock

<u>PCI's Common Stock</u> – 1,000 shares authorized for issuance, par value of $0.01 per share

LMG – issued 1,000 shares of common stock

**SCHEDULE 6.9**

**EMPLOYEE BENEFIT PLANS**

Group Medical, Insurance, and 401k Plans

## SCHEDULE 6.12

## MATERIAL CONTRACTS

That certain MC Goods with Incidental Services Agreement between LII and ExxonMobil Global Services Company dated October 1, 2007, and expiring on ~~September 30, 2014. (Renewed)~~March 9, 2017

That certain Master Goods Agreement between LII, Invista S.a.r.l., a Luxembourg limited liability company, and Invista Canada Company, dated July 21, 2006, and renewing on October 18, 2011. (Renewed September 24, 2015)(Evergreen)

That certain ME – Master Supply Agreement (Goods) between LII and Nova Chemicals Corporation, dated May 1, 2007, and expiring on April 30, ~~2012.~~

~~That certain Global Pricing Agreement CW11237 between LII and Air Products and Chemicals, Inc., dated May 20, 2009.That certain Revolving Promissory Note in the amount of up to $15,000,000 made by LII payable to the order of LHI dated February 10, 2015 and related agreements~~2017 (Out for Bid).

That certain Revolving Promissory Note in the amount of up to $2,000,000 made by Tomoe USA, Inc. payable to the order of LII dated January 18, 2013 and related agreements.

Stock Purchase Agreement dated August 1, 2013 with Thomas W. Lockwood and related Thomas Lockwood Note and Thomas Lockwood Security Agreement and related documents.

~~That certain Software License and Service Agreement by and between Team Total Solutions, LLC and LII dated January 16, 2015 and related agreements.~~

That certain Service Agreement by and between LII and Van Leeuwen MRO and Services, LLC dated February 1, 2015.

~~That certain Blanket Product Purchase Agreement by and between LII and Total Petrochemicals and Refining USA, Inc. and related agreements.~~

That certain Independent Consultant Agreement between LII and Trade Skills Global, Inc. (Canada) dated effective as of April 19, 2015 and related agreements.

E.I. du Pont de Nemours Maintenance, Repair, and Operating Supplies Agreement, #CW212652, Master Agreement MA-00393-12, dated March 15, 2010, expriring March 15, 2018.

Kinder Morgan Contracting Services, LLC and Kinder Morgan Canada, Inc., Pricing and Supply Agreement Number 98417, commencing January 1, 2017, expiring December 31, 2021.

Total Petrochemicals & Refining USA, Blanket Product Purchase Agreement, commencing April 27, 2015, ending April 27, 2018.

Imperial Oil, MC Goods Agreement Number A2391442, start date of March 1, 2017, ending March 8, 2018.

Big Rivers Electric Corporation, Supply Agreement, starting August 1, 2016, ending August 1, 2019

Invista S.a.r.l, Master Goods Agreement date July 21, 2006, renewed September 24, 2015, automatic renewal yearly, thereafter.

Van Leeuwen MRO and Services, LLC, Service Agreement dated February 1, 2015, ending February 1, 2022

Contract with Energy Transfer

Contract with NNG (Northern Natural Gas)

**SCHEDULE 6.13**

**LABOR AND COLLECTIVE BARGAINING AGREEMENTS**

None.

**SCHEDULE 6.18**

**REAL PROPERTY**

LEI leased locations:

10002 Windfern Rd.
Houston, TX 77065

LII leased locations:

6802 Loehrlein Drive
Evansville, IN 47715

803 Wilson Rd.
Clute, TX 77531  (lease of this property is anticipated shortly after Closing Date)

901 Wilson Rd.
Clute, TX 77531  (lease of this property is anticipated shortly after Closing Date)

6000 Deakle Rd.
Theodore, AL 36582

20435 Tillman Avenue
Carson, CA 90746

214 Amendodge Drive (Pending sale; closing is anticipated in approximately 30 days)
Shorewood, IL 60431

4650 New Middle Road
Jeffersonville, IN

7000 Exchequer Drive
Baton Rouge, LA 70809

912 John Stine Road (Property is for sale)
Westlake, LA 70669

10103 Industriplex Ave.
Gonzales, LA 70737

3888 S. Sherwood Forest Blvd, Suite 3K
Baton Rouge, LA 70816

1035 Cerise Rd
Billings, MT 59101

10203 Wallisville Rd.
Houston, TX 77013

900 South Business Park Drive
Port Arthur, TX 77640

~~15700 International Plaza~~
~~Houston, TX 77032~~

184 Turbo Drive
Sherwood Park, AB, Canada

499 Gladwish Drive
Sarnia, ONT, Canada

7015 Macleod Trial SW, Unit 605
Calgary, AB, Canada

15700 International Plaza Drive, Suites 100 & 150
Houston, TX 77032

<u>LMG leased locations</u>:

10060 Windfern Rd.
Houston, TX 77065

<u>PCI leased locations</u>:

None.

**SCHEDULE 6.19**

**LITIGATION**

1. Ferguson Enterprises, Inc., Plaintiff, vs. Glenn Hollenkamp, Keith Rager, Steven Collins, Jason Wermitt, Robert Renn, et al., and Lockwood International, Inc.; C.A.N. 3:15 – CV-656-DJH in U.S. District Court for Western District of Kentucky

2. ~~Lockwood International, Inc., Plaintiff vs. Creative Valve Solutions, Inc. Defendant; Cause No. 2015-08982 in the District Court of Harris County, Texas.~~

3. ~~Employment law claim by former Ontario, Canada employee Ruth Boyling.~~

4. ~~Claim against former employee Josh Parks for overpayment.~~

2. ~~5.~~ EEOC Claim by former employee Christopher Seymour.

6. ~~Claim by bankruptcy trustee of Hoku Corporation to recover amounts paid to LII by Hoku Corporation.~~

3. ~~7.~~ Claim by creditor of Leading Edge Logistics, LLC that LII owes payment for services rendered by Leading Edge Logistics, LLC.

8. ~~Claim by Piping and Equipment, Inc. against former employees of Piping and Equipment, Inc., now employees of LII, claiming breach of confidentiality and non-competition and non-solicitation obligations to Piping and Equipment, Inc.~~

9. ~~Wage claim by former employee Rafael Soza.~~

4. ~~10.~~ Claims relating to TY Valve Corporation's pending bankruptcy proceeding.

5. Cowboy Industrial Sales, Inc. v. Ronald Sonnier and Lockwood International Inc., Cause No. E-0195688 in the 172nd Judicial District Court of Jefferson County, Texas. [Settlement discussions are on-going.]

6. Employment law claims by former California employee Wade Lestage who was terminated in a Reduction in Force. [Settlement discussions are on-going.]

7. Employment law claims by former employee Kerri Ramos [Claims were settled; Lockwood International, Inc. to pay $15,000 to Ramos and Ramos' counsel in consideration for full release.]

8. Claim by a former Consultant for Lockwood International, Inc., Raymond Nava, for fees allegedly due prior to termination of Consulting Agreement. [Claim is for $10,900.00. Settlement discussions are on-going]

9. Claim by former Canadian employee John Fernandez [Claim settled; Lockwood International, Inc. to make remaining settlement payments on March 1, 2017 (in the amount of $50,000), April 1, 2017 (in the amount of $50,000), May 1, 2017 (in the amount of $50,000) and August 1, 2017 (in the amount of $100,000).]

10. Claims by CGCF and Signature Financial involving Lockwood International, Inc.'s seeking to terminate financing leases for JD Edwards/Oracle software and equipment that is not used by Lockwood. [Settlement discussions are on-going.]

11. Business First Bank v. Darryl L. Boudreaux [a Lockwood International employee], Parish of East Baton Rouge, Louisiana [Garnishment discovery was answered by Lockwood; Motion for Judgment Pro Confesso filed by Garnishor; Lockwood International's Louisiana counsel is negotiating with Garnishor's counsel.]

12. Lockwood International, Inc. v. Team Total Solutions, L.L.C. and William Boots v. Max Vallaro, Piping Components, Inc. and Lockwood Holdings, Inc. in the 333rd Judicial District Court of Harris County, Texas [Case settled; case abated; under the Settlement Agreement and Mutual Release effective December 30, 2016, Lockwood is to make settlement payments of $25,000 on or before March 15, 2017, April 15, 2017 and May 15, 2017 and will pay $12,500.00 per month for each month Lockwood continues to utilize Team Total Solution's 4U ERP software through June, 2017.]

13. Claims by ADP in connection with termination of foreign payroll services no longer needed by Lockwood entities. [Settlement negotiations are on-going]

14. Claim by former employee Ricardo Ibarra for severance under his Employment Agreement. [Letter from Ibarra's counsel received January 9, 2017; Lockwood International, Inc. maintains no severance is due to Ibarra.]

15. Claim by former employee Pam Gonzalez alleging wrongful termination. [Lockwood International, Inc.'s counsel investigated and found no indication of a wrongful termination.]

16. EEOC Claim filed by former employee Stephanie Bourg. [Lockwood filed its Position Statement denying any discrimination or retaliation. Lockwood also responded to an EEOC Request for Information by letter dated October 27, 2016.]

17. Claim by Bechtel relating to allegedly non-conforming valves supplied by Lockwood. [Bechtel and Lockwood are engaged in informal settlement discussions. Lockwood has sent a charge-back notice to O.M.B., the manufacturer of the subject valves.]

18. Claim by AMEC/Foster Wheeler relating to allegedly non-conforming valves supplied in Canada. [AMEC/Foster Wheeler and Lockwood International, Inc. are reviewing the claim; Lockwood International, Inc. is working with Pentair, the manufacturer of the subject valves to effect resolution.]

*The foregoing list includes proceedings and other matters which are being (or have been previously) disclosed under Section 7.3 of the Amended and Restated Credit Agreement as amended by the Fourth Amendment to Amended and Restated Credit Agreement and Limited Waiver of Defaults.

**SCHEDULE 7.18**

**POST CLOSING MATTERS**

LII will use its commercially reasonably efforts to obtain an executed Landlord Waiver from LHI, as sublessor, and Dalfen America Corp., as prime landlord, in respect of the 10203 Wallisville Rd., Houston, TX 77013 location, within ~~30~~45 days after the Closing Date (which date may be extended by Administrative Agent in its sole reasonable discretion).

**SCHEDULE 8.1**

**EXISTING INDEBTEDNESS**

Guarantees of LEI, LII, LMG and PCI in favor of Wells Fargo Bank, as lender to LHI, in respect of the LHI Credit Agreement.

**SCHEDULE 8.2**

**EXISTING LIENS**

Liens granted by LII under that certain Security Agreement dated as of August 1, 2013, executed by LII in favor of Thomas W. Lockwood to secure the obligations of LII under the Thomas Lockwood Note and in respect of the Thomas Lockwood Non-Compete Consideration, as such agreement may be amended, restated, supplemented or otherwise modified from time to time.

# SCHEDULE 8.3

## EXISTING LOANS, ADVANCES AND INVESTMENTS

~~Certain intercompany advances by LHI to LII in the amount of $2,854,003.16 (balance as of September 28, 2015) which has been advanced under the LHI Intercompany Note.~~

Certain advances by LII to Tomoe USA, Inc. in the amount of approximately ~~$1,868,968~~ $1,724,057.73 (balance as of ~~September 30, 2015~~February 24, 2017) under that certain Revolving Promissory Note in the amount of up to $~~15,000,000~~2,000,000 made by Tomoe USA, Inc. payable to the order of LII dated January 18, 2013 and related agreements.

Borrowers' Guarantees of the indebtedness of LHI under that certain Amended and Restated Credit Agreement dated as February 6, 2015 between LHI and Wells Fargo Bank, National Association (as amended from time to time).

Guarantees by Lockwood Enterprises, Inc. and Lockwood International, Inc. of the indebtedness of LH Aviation, LLC to Wells Fargo Equipment Finance, Inc. (the balance of LHI's indebtedness is $13,866,603.28 as of February 24, 2017).

**SCHEDULE 8.7**

**TRANSACTIONS WITH AFFILIATES**

See Schedule 6.18 (indicating leases between LHI and LII) and Schedule 8.3.

Exhibit 2

REVOLVING CREDIT NOTE

$70,000,000                                                        September 30, 2015

FOR VALUE RECEIVED, the undersigned, LOCKWOOD ENTERPRISES, INC., a Texas corporation, LOCKWOOD INTERNATIONAL, INC., a Texas corporation, LMG MANUFACTURING, INC., a Texas corporation, and PIPING COMPONENTS, INC., a Texas corporation (each a "*Borrower*" and collectively, "*Borrowers*"), promise to pay to WELLS FARGO BANK, NATIONAL ASSOCIATION (the "*Lender*"), at the place and times provided in the Credit Agreement referred to below, the principal sum of SEVENTY MILLION DOLLARS ($70,000,000) or, if less, the unpaid principal amount of all Revolving Credit Loans made by the Lender from time to time pursuant to that certain Amended and Restated Credit Agreement dated as of September 30, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*") by and among Borrowers, the lenders who are or may become a party thereto, and Wells Fargo Bank, National Association, as Administrative Agent, Swingline Lender and Issuing Lender. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

The unpaid principal amount of this Revolving Credit Note from time to time outstanding is subject to mandatory repayment from time to time as provided in the Credit Agreement and shall bear interest as provided in *Section 4.1* of the Credit Agreement. All payments of principal and interest on this Revolving Credit Note shall be payable in lawful currency of the United States in immediately available funds to the account designated in the Credit Agreement.

This Revolving Credit Note is entitled to the benefits of, and evidences Obligations incurred under, the Credit Agreement, to which reference is made for a description of the security for this Revolving Credit Note and for a statement of the terms and conditions on which Borrowers are permitted and required to make prepayments and repayments of principal of the Obligations evidenced by this Revolving Credit Note and on which such Obligations may be declared to be immediately due and payable.

THIS REVOLVING CREDIT NOTE SHALL BE GOVERNED BY, CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REFERENCE TO CONFLICTS OR CHOICE OF LAW PRINCIPLES THEREOF.

The Indebtedness evidenced by this Revolving Credit Note is senior in right of payment to all Subordinated Indebtedness referred to in the Credit Agreement.

Each Borrower hereby waives all requirements as to diligence, presentment, demand of payment, protest and (except as required by the Credit Agreement) notice of any kind with respect to this Revolving Credit Note.

**[*Signature page follows.*]**

IN WITNESS WHEREOF, the undersigned has executed this Revolving Credit Note as of the day and year first above written.

LOCKWOOD ENTERPRISES, INC.

By: _____
      Ricardo Ibarra
      Senior Vice President and Chief Financial Officer

LOCKWOOD INTERNATIONAL, INC.

By: _____
      Ricardo Ibarra
      Senior Vice President and Chief Financial Officer

LMG MANUFACTURING, INC.

By: _____
      Ricardo Ibarra
      Senior Vice President and Chief Financial Officer

PIPING COMPONENTS, INC.

By: _____
      Ricardo Ibarra
      Senior Vice President and Chief Financial Officer

Signature Page to Revolving Credit Note

Exhibit 3

## REVOLVING CREDIT NOTE

$20,000,000                                                          September 30, 2015

FOR VALUE RECEIVED, the undersigned, LOCKWOOD ENTERPRISES, INC., a Texas corporation, LOCKWOOD INTERNATIONAL, INC., a Texas corporation, LMG MANUFACTURING, INC., a Texas corporation, and PIPING COMPONENTS, INC., a Texas corporation (each a "**Borrower**" and collectively, "**Borrowers**"), promise to pay to TRUSTMARK NATIONAL BANK (the "**Lender**"), at the place and times provided in the Credit Agreement referred to below, the principal sum of TWENTY MILLION DOLLARS ($20,000,000) or, if less, the unpaid principal amount of all Revolving Credit Loans made by the Lender from time to time pursuant to that certain Amended and Restated Credit Agreement dated as of September 30, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**") by and among Borrowers, the lenders who are or may become a party thereto, and Wells Fargo Bank, National Association, as Administrative Agent, Swingline Lender and Issuing Lender. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

The unpaid principal amount of this Revolving Credit Note from time to time outstanding is subject to mandatory repayment from time to time as provided in the Credit Agreement and shall bear interest as provided in **Section 4.1** of the Credit Agreement. All payments of principal and interest on this Revolving Credit Note shall be payable in lawful currency of the United States in immediately available funds to the account designated in the Credit Agreement.

This Revolving Credit Note is entitled to the benefits of, and evidences Obligations incurred under, the Credit Agreement, to which reference is made for a description of the security for this Revolving Credit Note and for a statement of the terms and conditions on which Borrowers are permitted and required to make prepayments and repayments of principal of the Obligations evidenced by this Revolving Credit Note and on which such Obligations may be declared to be immediately due and payable.

THIS REVOLVING CREDIT NOTE SHALL BE GOVERNED BY, CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REFERENCE TO CONFLICTS OR CHOICE OF LAW PRINCIPLES THEREOF.

The Indebtedness evidenced by this Revolving Credit Note is senior in right of payment to all Subordinated Indebtedness referred to in the Credit Agreement.

Each Borrower hereby waives all requirements as to diligence, presentment, demand of payment, protest and (except as required by the Credit Agreement) notice of any kind with respect to this Revolving Credit Note.

**[*Signature page follows.*]**

IN WITNESS WHEREOF, the undersigned has executed this Revolving Credit Note as of the day and year first above written.

LOCKWOOD ENTERPRISES, INC.

By: _____
      Ricardo Ibarra
      Senior Vice President and Chief Financial Officer


LOCKWOOD INTERNATIONAL, INC.

By: _____
      Ricardo Ibarra
      Senior Vice President and Chief Financial Officer


LMG MANUFACTURING, INC.

By: _____
      Ricardo Ibarra
      Senior Vice President and Chief Financial Officer


PIPING COMPONENTS, INC.

By: _____
      Ricardo Ibarra
      Senior Vice President and Chief Financial Officer

Exhibit 4

EXECUTION VERSION

# GUARANTY

February 27, 2017

TO:    WELLS FARGO BANK, NATIONAL ASSOCIATION

    1.    <u>GUARANTY; DEFINITIONS</u>.  In consideration of the credit or other financial accommodation described herein and extended or made to LOCKWOOD ENTERPRISES, INC., a Texas corporation, LOCKWOOD INTERNATIONAL, INC., a Texas corporation, LMG MANUFACTURING, INC., a Texas corporation, and PIPING COMPONENTS, INC., a Texas corporation (collectively, "***Borrower***"), by WELLS FARGO BANK, NATIONAL ASSOCIATION and TRUSTMARK BANK (collectively, "***Bank***"), and for other valuable consideration, the undersigned MICHAEL F. LOCKWOOD ("***Guarantor***"), unconditionally guarantees and promises to pay to Bank, or order, on demand in lawful money of the United States of America and in immediately available funds, any and all Indebtedness of Borrower to Bank in connection with that certain Amended and Restated Credit Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "***Credit Agreement***"), dated as of September 30, 2015, among Borrower, Bank and Wells Fargo Bank, National Association, as administrative agent for Bank (the "***Administrative Agent***"), including the Obligation, under, and as defined in, the Credit Agreement, which includes, but is not limited to, any Indebtedness of Borrower to Bank under the Loans and Letters of Credit (as such terms are defined in the Credit Agreement) and any Secured Hedge Liabilities other than Excluded Hedge Liabilities (as such terms are defined in the Credit Agreement), together with all extensions, renewals and/or modifications of any of the foregoing (which Indebtedness in connection with or relating to said Credit Agreement and all such extensions, renewals and/or modifications shall be referred to herein as the "***Guaranteed Indebtedness***").  The term "Indebtedness" is used herein in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of Borrower now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and whether Borrower may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable. This Guaranty is a guaranty of payment and not collection.  In Guarantor's judgment, the value of the consideration received and to be received by Guarantor under the Loan Documents (as defined in the Credit Agreement) is reasonably worth at least as much as Guarantor's liability and obligation under this Guaranty, and such liability and obligation may reasonably be expected to benefit Guarantor directly or indirectly.

    2.    <u>LIABILITY; OBLIGATION UNDER OTHER GUARANTIES</u>.  Any obligations incurred or to be incurred by Borrower in addition to the Guaranteed Indebtedness shall not modify or otherwise affect the obligations or liability of Guarantor hereunder.  The obligations of Guarantor hereunder shall be in addition to any obligations of Guarantor under any other guaranties of any liabilities or obligations of Borrower or any other persons heretofore or hereafter given to Bank unless said other guaranties are expressly modified or revoked in writing; and this Guaranty shall not, unless expressly herein provided, affect or invalidate any such other guaranties.

3.    SEPARATE ACTIONS; WAIVER OF STATUTE OF LIMITATIONS; REINSTATEMENT OF LIABILITY.    The obligations hereunder are independent of the obligations of Borrower, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other person, or whether Borrower or any other person is joined in any such action or actions.  Guarantor acknowledges that this Guaranty is absolute and unconditional, there are no conditions precedent to the effectiveness of this Guaranty, and this Guaranty is in full force and effect and is binding on Guarantor as of the date set forth above, regardless of whether Bank obtains collateral or any guaranties from others or takes any other action contemplated by Guarantor.  Guarantor waives the benefit of any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof, and Guarantor agrees that any payment of any Guaranteed Indebtedness or other act which shall toll any statute of limitations applicable thereto shall similarly operate to toll such statute of limitations applicable to Guarantor's liability hereunder.   The liability of Guarantor hereunder shall be reinstated and revived and the rights of Bank shall continue if and to the extent that for any reason any amount at any time paid on account of any Guaranteed Indebtedness guaranteed hereby is rescinded or must otherwise be restored by Bank, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, all as though such amount had not been paid.  The determination as to whether any amount so paid must be rescinded or restored shall be made by Bank in its sole discretion; provided however, that if Bank chooses to contest any such matter at the request of Guarantor, Guarantor agrees to indemnify and hold Bank harmless from and against all costs and expenses, including reasonable attorneys' fees, expended or incurred by Bank in connection therewith, including without limitation, in any litigation with respect thereto.

4.    AUTHORIZATIONS TO BANK.  Guarantor authorizes Bank, without notice to or demand on Guarantor, and without affecting Guarantor's liability hereunder, from time to time to:  (a) alter, compromise, renew, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of, the Guaranteed Indebtedness or any portion thereof, including increase or decrease of the rate of interest thereon; (b) take and hold security for the payment of this Guaranty or the Guaranteed Indebtedness or any portion thereof, and exchange, enforce, waive, subordinate or release any such security; (c) apply such security and direct the order or manner of sale thereof, including without limitation, a non-judicial sale permitted by the terms of the controlling security agreement, mortgage or deed of trust, as Bank in its discretion may determine; (d) release or substitute any one or more of the endorsers or any other guarantors of the Guaranteed Indebtedness, or any portion thereof, or any other party thereto; and (e) apply payments received by Bank from Borrower to any Indebtedness of Borrower to Bank, in such order as Bank shall determine in its sole discretion, whether or not such Indebtedness is covered by this Guaranty, and Guarantor hereby waives any provision of law regarding application of payments which specifies otherwise.  Bank may without notice assign this Guaranty in whole or in part.  Upon Administrative Agent's request made from time to time, Guarantor agrees to provide to Bank copies of Guarantor's current financial statements and most recently filed tax returns within 10 days of such request. In addition, Guarantor shall deliver to Bank his 2015 federal tax return and a personal financial statement on a form supplied by Bank by March 31, 2017 and his 2016 federal tax return by October 31, 2017.

5.    REPRESENTATIONS AND WARRANTIES.  Guarantor represents and warrants to Bank that:   (a) this Guaranty is executed at Borrower's request; (b) Guarantor shall not,

2

without Bank's prior written consent, sell, lease, assign, encumber, hypothecate, transfer or otherwise dispose of all or a substantial or material part of Guarantor's assets other than in the ordinary course of Guarantor's business; (c) Bank has made no representation to Guarantor as to the creditworthiness of Borrower; and (d) Guarantor has established adequate means of obtaining from Borrower on a continuing basis financial and other information pertaining to Borrower's financial condition.  Guarantor agrees to keep adequately informed from such means of any facts, events or circumstances which might in any way affect Guarantor's risks hereunder, and Guarantor further agrees that Bank shall have no obligation to disclose to Guarantor any information or material about Borrower which is acquired by Bank in any manner.

6.      GUARANTOR'S WAIVERS.

(a)      Guarantor waives any right to require Bank to: (i) proceed against Borrower or any other person; (ii) marshal assets or proceed against or exhaust any security held from Borrower or any other person; (iii) give notice of the terms, time and place of any public or private sale or other disposition of personal property security held from Borrower or any other person; (iv) take any other action or pursue any other remedy in Bank's power; or (v) make any presentment or demand for performance, or give any notices of any kind, including without limitation, any notice of  nonperformance, protest, notice of protest, notice of dishonor, notice of intention to accelerate or notice of acceleration hereunder or in connection with any obligations or evidences of indebtedness held by Bank as security for or which constitute in whole or in part the Guaranteed Indebtedness guaranteed hereunder, or in connection with the creation of new or additional Indebtedness.

(b)      Guarantor waives any defense to its obligations hereunder based upon or arising by reason of:  (i) any disability or other defense of Borrower or any other person; (ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the Guaranteed Indebtedness; (iii) any lack of authority of any officer, director, partner, agent or other person acting or purporting to act on behalf of Borrower which is a corporation, partnership or other type of entity, or any defect in the formation of Borrower; (iv) the application by Borrower of the proceeds of the Guaranteed Indebtedness for purposes other than the purposes represented by Borrower to, or intended or understood by, Bank or Guarantor; (v) any act or omission by Bank which directly or indirectly results in or aids the discharge of Borrower or any portion of the Guaranteed Indebtedness by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of Bank against Borrower; (vi) any impairment of the value of any interest in any security for the Guaranteed Indebtedness or any portion thereof, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security; (vii) any modification of the Guaranteed Indebtedness, in any form whatsoever, including without limitation the renewal, extension, acceleration or other change in time for payment of, or other change in the terms of, the Guaranteed Indebtedness or any portion thereof, including increase or decrease of the rate of interest thereon; or (viii) any requirement that Bank give any notice of acceptance of this Guaranty.  Until all Guaranteed Indebtedness shall have been paid in full, Guarantor shall have no right of subrogation, Guarantor waives any right to enforce any remedy which Bank now has or may hereafter have against Borrower or any other person, and waives any benefit of, or any right to participate in, any security now or hereafter held by Bank.

3

Guarantor further waives all rights and defenses Guarantor may have arising out of (A) any election of remedies by Bank, even though that election of remedies, such as a non-judicial foreclosure with respect to any security for any portion of the Guaranteed Indebtedness, destroys Guarantor's rights of subrogation or Guarantor's rights to proceed against Borrower for reimbursement, or (B) any loss of rights Guarantor may suffer by reason of any rights, powers or remedies of Borrower in connection with any anti-deficiency laws or any other laws limiting, qualifying or discharging the Guaranteed Indebtedness, whether by operation of law or otherwise, including any rights Guarantor may have to a fair market value hearing to determine the size of a deficiency following any foreclosure sale or other disposition of any real property security for any portion of the Guaranteed Indebtedness.

(c) By signing this Guaranty, Guarantor waives (i) each and every right to which it may be entitled by virtue of any suretyship law, including without limitation, any rights arising pursuant to Section 17.001 and Chapter 43 of the Texas Civil Practice and Remedies Code and Rule 31 of the Texas Rules of Civil Procedure, as the same may be amended from time to time, and (ii) without limiting any of the waivers set forth herein, any other fact or event that, in the absence of this provision, would or might constitute or afford a legal or equitable discharge or release of or defense to Guarantor.

7. <u>BANK'S RIGHTS WITH RESPECT TO GUARANTOR'S PROPERTY IN BANK'S POSSESSION</u>. In addition to all liens upon and rights of setoff against the monies, securities or other property of Guarantor given to Bank by law, Bank shall have a lien upon and a right of setoff against all monies, securities and other property of Guarantor now or hereafter in the possession of or on deposit with Bank, whether held in a general or special account or deposit or for safekeeping or otherwise, and every such lien and right of setoff may be exercised without demand upon or notice to Guarantor. No lien or right of setoff shall be deemed to have been waived by any act or conduct on the part of Bank, or by any neglect to exercise such right of setoff or to enforce such lien, or by any delay in so doing, and every right of setoff and lien shall continue in full force and effect until such right of setoff or lien is specifically waived or released by Bank in writing.

8. <u>SUBORDINATION</u>. Any Indebtedness of Borrower now or hereafter held by Guarantor is hereby subordinated to the obligations of Borrower to Bank under the Guaranteed Indebtedness. Such Indebtedness of Borrower to Guarantor is assigned to Bank as security for this Guaranty and the Guaranteed Indebtedness and, if Bank requests, shall be collected and received by Guarantor as trustee for Bank and paid over to Bank on account of the Guaranteed Indebtedness but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty. Any notes or other instruments now or hereafter evidencing such Indebtedness of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and, if Bank so requests, shall be delivered to Bank. Bank is hereby authorized in the name of Guarantor from time to time to file financing statements and continuation statements and execute such other documents and take such other action as Bank deems necessary or appropriate to perfect, preserve and enforce its rights hereunder.

9. <u>REMEDIES; NO WAIVER</u>. All rights, powers and remedies of Bank hereunder are cumulative. No delay, failure or discontinuance of Bank in exercising any right, power or remedy hereunder shall affect or operate as a waiver of such right, power or remedy; nor shall

4

any single or partial exercise of any such right, power or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any other right, power or remedy. Any waiver, permit, consent or approval of any kind by Bank of any breach of this Guaranty, or any such waiver of any provisions or conditions hereof, must be in writing and shall be effective only to the extent set forth in writing.

10.     <u>COSTS, EXPENSES AND ATTORNEYS' FEES</u>. Guarantor shall pay to Bank immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees (to include outside counsel fees and all allocated costs of Bank's in-house counsel to the extent permissible), expended or incurred by Bank in connection with the enforcement of any of Bank's rights, powers or remedies and/or the collection of any amounts which become due to Bank under this Guaranty, and the prosecution or defense of any action in any way related to this Guaranty, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Bank or any other person) relating to Guarantor or any other person or entity.

11.     <u>SUCCESSORS; ASSIGNMENT</u>. This Guaranty shall be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties; provided however, that Guarantor may not assign or transfer any of its interests or rights hereunder without Bank's prior written consent. Guarantor acknowledges that Bank has the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in, the Guaranteed Indebtedness and any obligations with respect thereto, including this Guaranty. In connection therewith, Bank may disclose all documents and information which Bank now has or hereafter acquires relating to Guarantor and/or this Guaranty, whether furnished by Borrower, Guarantor or otherwise. Guarantor further agrees that Bank may disclose such documents and information to Borrower.

12.     <u>AMENDMENT</u>. This Guaranty may be amended or modified only in writing signed by Bank and Guarantor.

13.     <u>APPLICATION OF SINGULAR AND PLURAL</u>. In all cases where there is but a single Borrower, then all words used herein in the plural shall be deemed to have been used in the singular where the context and construction so require; and when there is more than one Borrower named herein, or when this Guaranty is executed by more than one Guarantor, the word "Borrowers" and the word "Guarantor" respectively shall mean all or any one or more of them as the context requires.

14.     <u>UNDERSTANDING WITH RESPECT TO WAIVERS; SEVERABILITY OF PROVISIONS</u>. Guarantor warrants and agrees that each of the waivers set forth herein is made with Guarantor's full knowledge of its significance and consequences, and that under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any waiver or other provision of this Guaranty shall be held to be prohibited by or invalid under applicable public policy or law, such waiver or other provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such waiver or other provision or any remaining provisions of this Guaranty.

15. <u>GOVERNING LAW</u>.  This Guaranty shall be governed by and construed in accordance with the laws of the State of Texas.

16. <u>ARBITRATION</u>.

(a) <u>Arbitration</u>.  The parties hereto agree, upon demand by any party, to submit to binding arbitration all claims, disputes and controversies between or among them (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise, in any way arising out of or relating to this Guaranty and its negotiation, execution, collateralization, administration, repayment, modification, extension, substitution, formation, inducement, enforcement, default or termination.  In the event of a court ordered arbitration, the party requesting arbitration shall be responsible for timely filing the demand for arbitration and paying the appropriate filing fee within 30 days of the abatement order or the time specified by the court.  Failure to timely file the demand for arbitration as ordered by the court will result in that party's right to demand arbitration being automatically terminated.

(b) <u>Governing Rules</u>.  Any arbitration proceeding will (i) proceed in a location in Texas selected by the American Arbitration Association ("***AAA***"); (ii) be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any of the documents between the parties; and (iii) be conducted by the AAA, or such other administrator as the parties shall mutually agree upon, in accordance with the AAA's commercial dispute resolution procedures, unless the claim or counterclaim is at least $1,000,000.00 exclusive of claimed interest, arbitration fees and costs in which case the arbitration shall be conducted in accordance with the AAA's optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes to be referred to, as applicable, as the "***Rules***").  If there is any inconsistency between the terms hereof and the Rules, the terms and procedures set forth herein shall control.  Any party who fails or refuses to submit to arbitration following a demand by any other party shall bear all costs and expenses incurred by such other party in compelling arbitration of any dispute.  Nothing contained herein shall be deemed to be a waiver by any party that is a bank of the protections afforded to it under 12 U.S.C. §91 or any similar applicable state law.

(c) <u>No Waiver of Provisional Remedies, Self-Help and Foreclosure</u>.  The arbitration requirement does not limit the right of any party to (i) foreclose against real or personal property collateral; (ii) exercise self-help remedies relating to collateral or proceeds of collateral such as setoff or repossession; or (iii) obtain provisional or ancillary remedies such as replevin, injunctive relief, attachment or the appointment of a receiver, before during or after the pendency of any arbitration proceeding.  This exclusion does not constitute a waiver of the right or obligation of any party to submit any dispute to arbitration or reference hereunder, including those arising from the exercise of the actions detailed in *sections (i)*, *(ii)* and *(iii)* of this paragraph.

(d) <u>Arbitrator Qualifications and Powers</u>.  Any arbitration proceeding in which the amount in controversy is $5,000,000.00 or less will be decided by a single arbitrator selected according to the Rules, and who shall not render an award of greater than $5,000,000.00.  Any dispute in which the amount in controversy exceeds $5,000,000.00 shall be

decided by majority vote of a panel of three arbitrators; provided however, that all three arbitrators must actively participate in all hearings and deliberations. The arbitrator will be a neutral attorney licensed in the State of Texas with a minimum of ten years experience in the substantive law applicable to the subject matter of the dispute to be arbitrated. The arbitrator will determine whether or not an issue is arbitratable and will give effect to the statutes of limitation in determining any claim. In any arbitration proceeding the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication. The arbitrator shall resolve all disputes in accordance with the substantive law of Texas and may grant any remedy or relief that a court of such state could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any award. The arbitrator shall also have the power to award recovery of all costs and fees, to impose sanctions and to take such other action as the arbitrator deems necessary to the same extent a judge could pursuant to the Federal Rules of Civil Procedure, the Texas Rules of Civil Procedure or other applicable law. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

(e) <u>Discovery</u>. In any arbitration proceeding, discovery will be permitted in accordance with the Rules. All discovery shall be expressly limited to matters directly relevant to the dispute being arbitrated and must be completed no later than 20 days before the hearing date. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

(f) <u>Class Proceedings and Consolidations</u>. No party hereto shall be entitled to join or consolidate disputes by or against others in any arbitration, except parties who have executed this Guaranty or any other contract, instrument or document relating to any Guaranteed Indebtedness, or to include in any arbitration any dispute as a representative or member of a class, or to act in any arbitration in the interest of the general public or in a private attorney general capacity.

(g) <u>Payment Of Arbitration Costs And Fees</u>. The arbitrator shall award all costs and expenses of the arbitration proceeding.

(h) <u>Miscellaneous</u>. To the maximum extent practicable, the AAA, the arbitrators and the parties shall take all action required to conclude any arbitration proceeding within 180 days of the filing of the dispute with the AAA. No arbitrator or other party to an arbitration proceeding may disclose the existence, content or results thereof, except for disclosures of information by a party required in the ordinary course of its business or by applicable law or regulation. If more than one agreement for arbitration by or between the parties potentially applies to a dispute, the arbitration provision most directly related to the documents between the parties or the subject matter of the dispute shall control. This arbitration

provision shall survive termination, amendment or expiration of any of the documents or any relationship between the parties.

(i) <u>Small Claims Court</u>. Notwithstanding anything herein to the contrary, each party retains the right to pursue in a Justice of the Peace Court any Small Claims Case (as defined in Rule 500.3 of the Texas Rules of Civil Procedure) within the jurisdictional limit (excluding attorneys' fees and costs) of a Small Claims Case.

**NOTICE: THIS DOCUMENT AND ALL OTHER DOCUMENTS RELATING TO THE GUARANTEED INDEBTEDNESS CONSTITUTE A WRITTEN LOAN AGREEMENT WHICH REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES RELATING TO THE GUARANTEED INDEBTEDNESS.**

*[**Signature appears on the following page.**]*

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty as of date first written above.

_____

Michael F. Lockwood, individually

Exhibit 5

EXECUTION VERSION

## GUARANTY

August 22, 2017

TO:     WELLS FARGO BANK, NATIONAL ASSOCIATION

1.     GUARANTY; DEFINITIONS.  In consideration of the credit or other financial accommodation described herein and extended or made to LOCKWOOD ENTERPRISES, INC., a Texas corporation, LOCKWOOD INTERNATIONAL, INC., a Texas corporation, LMG MANUFACTURING, INC., a Texas corporation, and PIPING COMPONENTS, INC., a Texas corporation (collectively, "**Borrower**"), by WELLS FARGO BANK, NATIONAL ASSOCIATION and TRUSTMARK NATIONAL BANK (collectively, "**Bank**"), and for other valuable consideration, the undersigned LOCKWOOD HOLDINGS, INC., a Texas corporation ("**Guarantor**"), unconditionally guarantees and promises to pay to Bank, or order, on demand in lawful money of the United States of America and in immediately available funds, any and all Indebtedness of Borrower to Bank in connection with that certain Amended and Restated Credit Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "**Credit Agreement**"), dated as of September 30, 2015, among Borrower, Bank and Wells Fargo Bank, National Association, as administrative agent for Bank (the "**Administrative Agent**"), including the Obligation, under, and as defined in, the Credit Agreement, which includes, but is not limited to, any Indebtedness of Borrower to Bank under the Loans and Letters of Credit (as such terms are defined in the Credit Agreement) and any Secured Hedge Liabilities other than Excluded Hedge Liabilities (as such terms are defined in the Credit Agreement), together with all extensions, renewals and/or modifications of any of the foregoing (which Indebtedness in connection with or relating to said Credit Agreement and all such extensions, renewals and/or modifications shall be referred to herein as the "**Guaranteed Indebtedness**").   The term "Indebtedness" is used herein in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of Borrower now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and whether Borrower may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable.  This Guaranty is a guaranty of payment and not collection.  In Guarantor's judgment, the value of the consideration received and to be received by Guarantor under the Loan Documents (as defined in the Credit Agreement) is reasonably worth at least as much as Guarantor's liability and obligation under this Guaranty, and such liability and obligation may reasonably be expected to benefit Guarantor directly or indirectly.

2.     LIABILITY; OBLIGATION UNDER OTHER GUARANTIES.  Any obligations incurred or to be incurred by Borrower in addition to the Guaranteed Indebtedness shall not modify or otherwise affect the obligations or liability of Guarantor hereunder.  The obligations of Guarantor hereunder shall be in addition to any obligations of Guarantor under any other guaranties of any liabilities or obligations of Borrower or any other persons heretofore or hereafter given to Bank unless said other guaranties are expressly modified or revoked in writing; and this Guaranty shall not, unless expressly herein provided, affect or invalidate any such other guaranties.

3.  SEPARATE ACTIONS; WAIVER OF STATUTE OF LIMITATIONS; REINSTATEMENT OF LIABILITY.  The obligations hereunder are independent of the obligations of Borrower, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other person, or whether Borrower or any other person is joined in any such action or actions.  Guarantor acknowledges that this Guaranty is absolute and unconditional, there are no conditions precedent to the effectiveness of this Guaranty, and this Guaranty is in full force and effect and is binding on Guarantor as of the date set forth above, regardless of whether Bank obtains collateral or any guaranties from others or takes any other action contemplated by Guarantor.  Guarantor waives the benefit of any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof, and Guarantor agrees that any payment of any Guaranteed Indebtedness or other act which shall toll any statute of limitations applicable thereto shall similarly operate to toll such statute of limitations applicable to Guarantor's liability hereunder.  The liability of Guarantor hereunder shall be reinstated and revived and the rights of Bank shall continue if and to the extent that for any reason any amount at any time paid on account of any Guaranteed Indebtedness guaranteed hereby is rescinded or must otherwise be restored by Bank, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, all as though such amount had not been paid.  The determination as to whether any amount so paid must be rescinded or restored shall be made by Bank in its sole discretion; provided however, that if Bank chooses to contest any such matter at the request of Guarantor, Guarantor agrees to indemnify and hold Bank harmless from and against all costs and expenses, including reasonable attorneys' fees, expended or incurred by Bank in connection therewith, including without limitation, in any litigation with respect thereto.

4.  AUTHORIZATIONS TO BANK.  Guarantor authorizes Bank, without notice to or demand on Guarantor, and without affecting Guarantor's liability hereunder, from time to time to:  (a) alter, compromise, renew, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of, the Guaranteed Indebtedness or any portion thereof, including increase or decrease of the rate of interest thereon; (b) take and hold security for the payment of this Guaranty or the Guaranteed Indebtedness or any portion thereof, and exchange, enforce, waive, subordinate or release any such security; (c) apply such security and direct the order or manner of sale thereof, including without limitation, a non-judicial sale permitted by the terms of the controlling security agreement, mortgage or deed of trust, as Bank in its discretion may determine; (d) release or substitute any one or more of the endorsers or any other guarantors of the Guaranteed Indebtedness, or any portion thereof, or any other party thereto; and (e) apply payments received by Bank from Borrower to any Indebtedness of Borrower to Bank, in such order as Bank shall determine in its sole discretion, whether or not such Indebtedness is covered by this Guaranty, and Guarantor hereby waives any provision of law regarding application of payments which specifies otherwise.  Bank may without notice assign this Guaranty in whole or in part.  Upon Administrative Agent's request made from time to time, Guarantor agrees to promptly provide to Bank copies of Guarantor's current financial statements.

5.  REPRESENTATIONS AND WARRANTIES.  Guarantor represents and warrants to Bank that:  (a) this Guaranty is executed at Borrower's request; (b) Guarantor shall not, without Bank's prior written consent, sell, lease, assign, encumber, hypothecate, transfer or otherwise dispose of all or a substantial or material part of Guarantor's assets other than in the

ordinary course of Guarantor's business; (c) Bank has made no representation to Guarantor as to the creditworthiness of Borrower; and (d) Guarantor has established adequate means of obtaining from Borrower on a continuing basis financial and other information pertaining to Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events or circumstances which might in any way affect Guarantor's risks hereunder, and Guarantor further agrees that Bank shall have no obligation to disclose to Guarantor any information or material about Borrower which is acquired by Bank in any manner.

6.    GUARANTOR'S WAIVERS.

(a)    Guarantor waives any right to require Bank to: (i) proceed against Borrower or any other person; (ii) marshal assets or proceed against or exhaust any security held from Borrower or any other person; (iii) give notice of the terms, time and place of any public or private sale or other disposition of personal property security held from Borrower or any other person; (iv) take any other action or pursue any other remedy in Bank's power; or (v) make any presentment or demand for performance, or give any notices of any kind, including without limitation, any notice of nonperformance, protest, notice of protest, notice of dishonor, notice of intention to accelerate or notice of acceleration hereunder or in connection with any obligations or evidences of indebtedness held by Bank as security for or which constitute in whole or in part the Guaranteed Indebtedness guaranteed hereunder, or in connection with the creation of new or additional Indebtedness.

(b)    Guarantor waives any defense to its obligations hereunder based upon or arising by reason of: (i) any disability or other defense of Borrower or any other person; (ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the Guaranteed Indebtedness; (iii) any lack of authority of any officer, director, partner, agent or other person acting or purporting to act on behalf of Borrower which is a corporation, partnership or other type of entity, or any defect in the formation of Borrower; (iv) the application by Borrower of the proceeds of the Guaranteed Indebtedness for purposes other than the purposes represented by Borrower to, or intended or understood by, Bank or Guarantor; (v) any act or omission by Bank which directly or indirectly results in or aids the discharge of Borrower or any portion of the Guaranteed Indebtedness by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of Bank against Borrower; (vi) any impairment of the value of any interest in any security for the Guaranteed Indebtedness or any portion thereof, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security; (vii) any modification of the Guaranteed Indebtedness, in any form whatsoever, including without limitation the renewal, extension, acceleration or other change in time for payment of, or other change in the terms of, the Guaranteed Indebtedness or any portion thereof, including increase or decrease of the rate of interest thereon; or (viii) any requirement that Bank give any notice of acceptance of this Guaranty. Until all Guaranteed Indebtedness shall have been paid in full, Guarantor shall have no right of subrogation, Guarantor waives any right to enforce any remedy which Bank now has or may hereafter have against Borrower or any other person, and waives any benefit of, or any right to participate in, any security now or hereafter held by Bank. Guarantor further waives all rights and defenses Guarantor may have arising out of (A) any election of remedies by Bank, even though that election of remedies, such as a non-judicial

3

foreclosure with respect to any security for any portion of the Guaranteed Indebtedness, destroys Guarantor's rights of subrogation or Guarantor's rights to proceed against Borrower for reimbursement, or (B) any loss of rights Guarantor may suffer by reason of any rights, powers or remedies of Borrower in connection with any anti-deficiency laws or any other laws limiting, qualifying or discharging the Guaranteed Indebtedness, whether by operation of law or otherwise, including any rights Guarantor may have to a fair market value hearing to determine the size of a deficiency following any foreclosure sale or other disposition of any real property security for any portion of the Guaranteed Indebtedness.

(c)     By signing this Guaranty, Guarantor waives (i) each and every right to which it may be entitled by virtue of any suretyship law, including without limitation, any rights arising pursuant to Section 17.001 and Chapter 43 of the Texas Civil Practice and Remedies Code and Rule 31 of the Texas Rules of Civil Procedure, as the same may be amended from time to time, and (ii) without limiting any of the waivers set forth herein, any other fact or event that, in the absence of this provision, would or might constitute or afford a legal or equitable discharge or release of or defense to Guarantor.

7.     **BANK'S RIGHTS WITH RESPECT TO GUARANTOR'S PROPERTY IN BANK'S POSSESSION**.  In addition to all liens upon and rights of setoff against the monies, securities or other property of Guarantor given to Bank by law, Bank shall have a lien upon and a right of setoff against all monies, securities and other property of Guarantor now or hereafter in the possession of or on deposit with Bank, whether held in a general or special account or deposit or for safekeeping or otherwise, and every such lien and right of setoff may be exercised without demand upon or notice to Guarantor.  No lien or right of setoff shall be deemed to have been waived by any act or conduct on the part of Bank, or by any neglect to exercise such right of setoff or to enforce such lien, or by any delay in so doing, and every right of setoff and lien shall continue in full force and effect until such right of setoff or lien is specifically waived or released by Bank in writing.

8.     **SUBORDINATION**.  Any Indebtedness of Borrower now or hereafter held by Guarantor is hereby subordinated to the obligations of Borrower to Bank under the Guaranteed Indebtedness.  Such Indebtedness of Borrower to Guarantor is assigned to Bank as security for this Guaranty and the Guaranteed Indebtedness and, if Bank requests, shall be collected and received by Guarantor as trustee for Bank and paid over to Bank on account of the Guaranteed Indebtedness but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.  Any notes or other instruments now or hereafter evidencing such Indebtedness of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and, if Bank so requests, shall be delivered to Bank.  Bank is hereby authorized in the name of Guarantor from time to time to file financing statements and continuation statements and execute such other documents and take such other action as Bank deems necessary or appropriate to perfect, preserve and enforce its rights hereunder.

9.     **REMEDIES; NO WAIVER**.  All rights, powers and remedies of Administrative Agent and/or Bank hereunder are cumulative.  No delay, failure or discontinuance of Bank in exercising any right, power or remedy hereunder shall affect or operate as a waiver of such right, power or remedy; nor shall any single or partial exercise of any such right, power or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any

4

other right, power or remedy. Any waiver, permit, consent or approval of any kind by Administrative Agent and/or Bank of any breach of this Guaranty, or any such waiver of any provisions or conditions hereof, must be in writing and shall be effective only to the extent set forth in writing.

10.     COSTS, EXPENSES AND ATTORNEYS' FEES. Guarantor shall pay to Bank immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees (to include outside counsel fees and all allocated costs of Bank's in-house counsel to the extent permissible), expended or incurred by Bank in connection with the enforcement of any of Administrative Agent's or Bank's rights, powers or remedies and/or the collection of any amounts which become due to Bank under this Guaranty, and the prosecution or defense of any action in any way related to this Guaranty, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Bank or any other person) relating to Guarantor or any other person or entity.

11.     SUCCESSORS; ASSIGNMENT. This Guaranty shall be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties; provided however, that Guarantor may not assign or transfer any of its interests or rights hereunder without Bank's prior written consent. Guarantor acknowledges that Bank has the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in, the Guaranteed Indebtedness and any obligations with respect thereto, including this Guaranty. In connection therewith, Bank may disclose all documents and information which Bank now has or hereafter acquires relating to Guarantor and/or this Guaranty, whether furnished by Borrower, Guarantor or otherwise. Guarantor further agrees that Administrative Agent and/or Bank may disclose such documents and information to Borrower.

12.     AMENDMENT. This Guaranty may be amended or modified only in writing signed by Administrative Agent, Bank and Guarantor.

13.     APPLICATION OF SINGULAR AND PLURAL. In all cases where there is but a single Borrower, then all words used herein in the plural shall be deemed to have been used in the singular where the context and construction so require; and when there is more than one Borrower named herein, or when this Guaranty is executed by more than one Guarantor, the word "Borrowers" and the word "Guarantor" respectively shall mean all or any one or more of them as the context requires.

14.     UNDERSTANDING WITH RESPECT TO WAIVERS; SEVERABILITY OF PROVISIONS. Guarantor warrants and agrees that each of the waivers set forth herein is made with Guarantor's full knowledge of its significance and consequences, and that under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any waiver or other provision of this Guaranty shall be held to be prohibited by or invalid under applicable public policy or law, such waiver or other provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such waiver or other provision or any remaining provisions of this Guaranty.

15.    GOVERNING LAW.  This Guaranty shall be governed by and construed in accordance with the laws of the State of Texas.

16.    ARBITRATION.

(a)    Arbitration.  The parties hereto agree, upon demand by any party, to submit to binding arbitration all claims, disputes and controversies between or among them (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise, in any way arising out of or relating to this Guaranty and its negotiation, execution, collateralization, administration, repayment, modification, extension, substitution, formation, inducement, enforcement, default or termination.  In the event of a court ordered arbitration, the party requesting arbitration shall be responsible for timely filing the demand for arbitration and paying the appropriate filing fee within 30 days of the abatement order or the time specified by the court.  Failure to timely file the demand for arbitration as ordered by the court will result in that party's right to demand arbitration being automatically terminated.

(b)    Governing Rules.  Any arbitration proceeding will (i) proceed in a location in Texas selected by the American Arbitration Association ("*AAA*"); (ii) be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any of the documents between the parties; and (iii) be conducted by the AAA, or such other administrator as the parties shall mutually agree upon, in accordance with the AAA's commercial dispute resolution procedures, unless the claim or counterclaim is at least $1,000,000.00 exclusive of claimed interest, arbitration fees and costs in which case the arbitration shall be conducted in accordance with the AAA's optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes to be referred to, as applicable, as the "*Rules*").  If there is any inconsistency between the terms hereof and the Rules, the terms and procedures set forth herein shall control.  Any party who fails or refuses to submit to arbitration following a demand by any other party shall bear all costs and expenses incurred by such other party in compelling arbitration of any dispute.  Nothing contained herein shall be deemed to be a waiver by any party that is a bank of the protections afforded to it under 12 U.S.C. §91 or any similar applicable state law.

(c)    No Waiver of Provisional Remedies, Self-Help and Foreclosure.  The arbitration requirement does not limit the right of any party to (i) foreclose against real or personal property collateral; (ii) exercise self-help remedies relating to collateral or proceeds of collateral such as setoff or repossession; or (iii) obtain provisional or ancillary remedies such as replevin, injunctive relief, attachment or the appointment of a receiver, before during or after the pendency of any arbitration proceeding.  This exclusion does not constitute a waiver of the right or obligation of any party to submit any dispute to arbitration or reference hereunder, including those arising from the exercise of the actions detailed in *sections (i)*, *(ii)* and *(iii)* of this paragraph.

(d)    Arbitrator Qualifications and Powers.  Any arbitration proceeding in which the amount in controversy is $5,000,000.00 or less will be decided by a single arbitrator selected according to the Rules, and who shall not render an award of greater than $5,000,000.00.  Any dispute in which the amount in controversy exceeds $5,000,000.00 shall be

6

decided by majority vote of a panel of three arbitrators; provided however, that all three arbitrators must actively participate in all hearings and deliberations. The arbitrator will be a neutral attorney licensed in the State of Texas with a minimum of ten years experience in the substantive law applicable to the subject matter of the dispute to be arbitrated. The arbitrator will determine whether or not an issue is arbitratable and will give effect to the statutes of limitation in determining any claim. In any arbitration proceeding the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication. The arbitrator shall resolve all disputes in accordance with the substantive law of Texas and may grant any remedy or relief that a court of such state could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any award. The arbitrator shall also have the power to award recovery of all costs and fees, to impose sanctions and to take such other action as the arbitrator deems necessary to the same extent a judge could pursuant to the Federal Rules of Civil Procedure, the Texas Rules of Civil Procedure or other applicable law. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

      (e)   <u>Discovery</u>. In any arbitration proceeding, discovery will be permitted in accordance with the Rules. All discovery shall be expressly limited to matters directly relevant to the dispute being arbitrated and must be completed no later than 20 days before the hearing date. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

      (f)   <u>Class Proceedings and Consolidations</u>. No party hereto shall be entitled to join or consolidate disputes by or against others in any arbitration, except parties who have executed this Guaranty or any other contract, instrument or document relating to any Guaranteed Indebtedness, or to include in any arbitration any dispute as a representative or member of a class, or to act in any arbitration in the interest of the general public or in a private attorney general capacity.

      (g)   <u>Payment Of Arbitration Costs And Fees</u>. The arbitrator shall award all costs and expenses of the arbitration proceeding.

      (h)   <u>Miscellaneous</u>. To the maximum extent practicable, the AAA, the arbitrators and the parties shall take all action required to conclude any arbitration proceeding within 180 days of the filing of the dispute with the AAA. No arbitrator or other party to an arbitration proceeding may disclose the existence, content or results thereof, except for disclosures of information by a party required in the ordinary course of its business or by applicable law or regulation. If more than one agreement for arbitration by or between the parties potentially applies to a dispute, the arbitration provision most directly related to the documents between the parties or the subject matter of the dispute shall control. This arbitration

7

provision shall survive termination, amendment or expiration of any of the documents or any relationship between the parties.

(i)     Small Claims Court. Notwithstanding anything herein to the contrary, each party retains the right to pursue in a Justice of the Peace Court any Small Claims Case (as defined in Rule 500.3 of the Texas Rules of Civil Procedure) within the jurisdictional limit (excluding attorneys' fees and costs) of a Small Claims Case.

**NOTICE:  THIS DOCUMENT AND ALL OTHER DOCUMENTS RELATING TO THE GUARANTEED INDEBTEDNESS CONSTITUTE A WRITTEN LOAN AGREEMENT WHICH REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES RELATING TO THE GUARANTEED INDEBTEDNESS.**

*[Signature appears on the following page.]*

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty as of date first written above.

LOCKWOOD HOLDINGS, INC.

By: _____

Michael F. Lockwood, Chief Executive Officer

Exhibit 6

EXECUTION VERSION

# GUARANTY

August 22, 2017

TO:   WELLS FARGO BANK, NATIONAL ASSOCIATION

1.    <u>GUARANTY; DEFINITIONS</u>.  In consideration of the credit or other financial accommodation described herein and extended or made to LOCKWOOD ENTERPRISES, INC., a Texas corporation, LOCKWOOD INTERNATIONAL, INC., a Texas corporation, LMG MANUFACTURING, INC., a Texas corporation, and PIPING COMPONENTS, INC., a Texas corporation (collectively, "***Borrower***"), by WELLS FARGO BANK, NATIONAL ASSOCIATION and TRUSTMARK NATIONAL BANK (collectively, "***Bank***"), and for other valuable consideration, the undersigned LH AVIATION, LLC, a Texas limited liability company ("***Guarantor***"), unconditionally guarantees and promises to pay to Bank, or order, on demand in lawful money of the United States of America and in immediately available funds, any and all Indebtedness of Borrower to Bank in connection with that certain Amended and Restated Credit Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "***Credit Agreement***"), dated as of September 30, 2015, among Borrower, Bank and Wells Fargo Bank, National Association, as administrative agent for Bank (the "***Administrative Agent***"), including the Obligation, under, and as defined in, the Credit Agreement, which includes, but is not limited to, any Indebtedness of Borrower to Bank under the Loans and Letters of Credit (as such terms are defined in the Credit Agreement) and any Secured Hedge Liabilities other than Excluded Hedge Liabilities (as such terms are defined in the Credit Agreement), together with all extensions, renewals and/or modifications of any of the foregoing (which Indebtedness in connection with or relating to said Credit Agreement and all such extensions, renewals and/or modifications shall be referred to herein as the "***Guaranteed Indebtedness***").   The term "Indebtedness" is used herein in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of Borrower now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and whether Borrower may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable.  This Guaranty is a guaranty of payment and not collection.  In Guarantor's judgment, the value of the consideration received and to be received by Guarantor under the Loan Documents (as defined in the Credit Agreement) is reasonably worth at least as much as Guarantor's liability and obligation under this Guaranty, and such liability and obligation may reasonably be expected to benefit Guarantor directly or indirectly.

2.    <u>LIABILITY; OBLIGATION UNDER OTHER GUARANTIES</u>.  Any obligations incurred or to be incurred by Borrower in addition to the Guaranteed Indebtedness shall not modify or otherwise affect the obligations or liability of Guarantor hereunder.  The obligations of Guarantor hereunder shall be in addition to any obligations of Guarantor under any other guaranties of any liabilities or obligations of Borrower or any other persons heretofore or hereafter given to Bank unless said other guaranties are expressly modified or revoked in writing; and this Guaranty shall not, unless expressly herein provided, affect or invalidate any such other guaranties.

3.  SEPARATE ACTIONS; WAIVER OF STATUTE OF LIMITATIONS; REINSTATEMENT OF LIABILITY.  The obligations hereunder are independent of the obligations of Borrower, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other person, or whether Borrower or any other person is joined in any such action or actions.  Guarantor acknowledges that this Guaranty is absolute and unconditional, there are no conditions precedent to the effectiveness of this Guaranty, and this Guaranty is in full force and effect and is binding on Guarantor as of the date set forth above, regardless of whether Bank obtains collateral or any guaranties from others or takes any other action contemplated by Guarantor.  Guarantor waives the benefit of any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof, and Guarantor agrees that any payment of any Guaranteed Indebtedness or other act which shall toll any statute of limitations applicable thereto shall similarly operate to toll such statute of limitations applicable to Guarantor's liability hereunder.  The liability of Guarantor hereunder shall be reinstated and revived and the rights of Bank shall continue if and to the extent that for any reason any amount at any time paid on account of any Guaranteed Indebtedness guaranteed hereby is rescinded or must otherwise be restored by Bank, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, all as though such amount had not been paid.  The determination as to whether any amount so paid must be rescinded or restored shall be made by Bank in its sole discretion; provided however, that if Bank chooses to contest any such matter at the request of Guarantor, Guarantor agrees to indemnify and hold Bank harmless from and against all costs and expenses, including reasonable attorneys' fees, expended or incurred by Bank in connection therewith, including without limitation, in any litigation with respect thereto.

4.  AUTHORIZATIONS TO BANK.  Guarantor authorizes Bank, without notice to or demand on Guarantor, and without affecting Guarantor's liability hereunder, from time to time to:  (a) alter, compromise, renew, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of, the Guaranteed Indebtedness or any portion thereof, including increase or decrease of the rate of interest thereon; (b) take and hold security for the payment of this Guaranty or the Guaranteed Indebtedness or any portion thereof, and exchange, enforce, waive, subordinate or release any such security; (c) apply such security and direct the order or manner of sale thereof, including without limitation, a non-judicial sale permitted by the terms of the controlling security agreement, mortgage or deed of trust, as Bank in its discretion may determine; (d) release or substitute any one or more of the endorsers or any other guarantors of the Guaranteed Indebtedness, or any portion thereof, or any other party thereto; and (e) apply payments received by Bank from Borrower to any Indebtedness of Borrower to Bank, in such order as Bank shall determine in its sole discretion, whether or not such Indebtedness is covered by this Guaranty, and Guarantor hereby waives any provision of law regarding application of payments which specifies otherwise.  Bank may without notice assign this Guaranty in whole or in part.  Upon Administrative Agent's request made from time to time, Guarantor agrees to promptly provide to Bank copies of Guarantor's current financial statements.

5.  REPRESENTATIONS AND WARRANTIES.  Guarantor represents and warrants to Bank that:  (a) this Guaranty is executed at Borrower's request; (b) Guarantor shall not, without Bank's prior written consent, sell, lease, assign, encumber, hypothecate, transfer or otherwise dispose of all or a substantial or material part of Guarantor's assets other than in the

2

ordinary course of Guarantor's business; (c) Bank has made no representation to Guarantor as to the creditworthiness of Borrower; and (d) Guarantor has established adequate means of obtaining from Borrower on a continuing basis financial and other information pertaining to Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events or circumstances which might in any way affect Guarantor's risks hereunder, and Guarantor further agrees that Bank shall have no obligation to disclose to Guarantor any information or material about Borrower which is acquired by Bank in any manner.

6.  **GUARANTOR'S WAIVERS.**

(a)  Guarantor waives any right to require Bank to: (i) proceed against Borrower or any other person; (ii) marshal assets or proceed against or exhaust any security held from Borrower or any other person; (iii) give notice of the terms, time and place of any public or private sale or other disposition of personal property security held from Borrower or any other person; (iv) take any other action or pursue any other remedy in Bank's power; or (v) make any presentment or demand for performance, or give any notices of any kind, including without limitation, any notice of nonperformance, protest, notice of protest, notice of dishonor, notice of intention to accelerate or notice of acceleration hereunder or in connection with any obligations or evidences of indebtedness held by Bank as security for or which constitute in whole or in part the Guaranteed Indebtedness guaranteed hereunder, or in connection with the creation of new or additional Indebtedness.

(b)  Guarantor waives any defense to its obligations hereunder based upon or arising by reason of: (i) any disability or other defense of Borrower or any other person; (ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the Guaranteed Indebtedness; (iii) any lack of authority of any officer, director, partner, agent or other person acting or purporting to act on behalf of Borrower which is a corporation, partnership or other type of entity, or any defect in the formation of Borrower; (iv) the application by Borrower of the proceeds of the Guaranteed Indebtedness for purposes other than the purposes represented by Borrower to, or intended or understood by, Bank or Guarantor; (v) any act or omission by Bank which directly or indirectly results in or aids the discharge of Borrower or any portion of the Guaranteed Indebtedness by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of Bank against Borrower; (vi) any impairment of the value of any interest in any security for the Guaranteed Indebtedness or any portion thereof, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security; (vii) any modification of the Guaranteed Indebtedness, in any form whatsoever, including without limitation the renewal, extension, acceleration or other change in time for payment of, or other change in the terms of, the Guaranteed Indebtedness or any portion thereof, including increase or decrease of the rate of interest thereon; or (viii) any requirement that Bank give any notice of acceptance of this Guaranty. Until all Guaranteed Indebtedness shall have been paid in full, Guarantor shall have no right of subrogation, Guarantor waives any right to enforce any remedy which Bank now has or may hereafter have against Borrower or any other person, and waives any benefit of, or any right to participate in, any security now or hereafter held by Bank. Guarantor further waives all rights and defenses Guarantor may have arising out of (A) any election of remedies by Bank, even though that election of remedies, such as a non-judicial

foreclosure with respect to any security for any portion of the Guaranteed Indebtedness, destroys Guarantor's rights of subrogation or Guarantor's rights to proceed against Borrower for reimbursement, or (B) any loss of rights Guarantor may suffer by reason of any rights, powers or remedies of Borrower in connection with any anti-deficiency laws or any other laws limiting, qualifying or discharging the Guaranteed Indebtedness, whether by operation of law or otherwise, including any rights Guarantor may have to a fair market value hearing to determine the size of a deficiency following any foreclosure sale or other disposition of any real property security for any portion of the Guaranteed Indebtedness.

(c)     By signing this Guaranty, Guarantor waives (i) each and every right to which it may be entitled by virtue of any suretyship law, including without limitation, any rights arising pursuant to Section 17.001 and Chapter 43 of the Texas Civil Practice and Remedies Code and Rule 31 of the Texas Rules of Civil Procedure, as the same may be amended from time to time, and (ii) without limiting any of the waivers set forth herein, any other fact or event that, in the absence of this provision, would or might constitute or afford a legal or equitable discharge or release of or defense to Guarantor.

7.     BANK'S RIGHTS WITH RESPECT TO GUARANTOR'S PROPERTY IN BANK'S POSSESSION.  In addition to all liens upon and rights of setoff against the monies, securities or other property of Guarantor given to Bank by law, Bank shall have a lien upon and a right of setoff against all monies, securities and other property of Guarantor now or hereafter in the possession of or on deposit with Bank, whether held in a general or special account or deposit or for safekeeping or otherwise, and every such lien and right of setoff may be exercised without demand upon or notice to Guarantor.  No lien or right of setoff shall be deemed to have been waived by any act or conduct on the part of Bank, or by any neglect to exercise such right of setoff or to enforce such lien, or by any delay in so doing, and every right of setoff and lien shall continue in full force and effect until such right of setoff or lien is specifically waived or released by Bank in writing.

8.     SUBORDINATION.  Any Indebtedness of Borrower now or hereafter held by Guarantor is hereby subordinated to the obligations of Borrower to Bank under the Guaranteed Indebtedness.  Such Indebtedness of Borrower to Guarantor is assigned to Bank as security for this Guaranty and the Guaranteed Indebtedness and, if Bank requests, shall be collected and received by Guarantor as trustee for Bank and paid over to Bank on account of the Guaranteed Indebtedness but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.  Any notes or other instruments now or hereafter evidencing such Indebtedness of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and, if Bank so requests, shall be delivered to Bank.  Bank is hereby authorized in the name of Guarantor from time to time to file financing statements and continuation statements and execute such other documents and take such other action as Bank deems necessary or appropriate to perfect, preserve and enforce its rights hereunder.

9.     REMEDIES; NO WAIVER.  All rights, powers and remedies of Administrative Agent and/or Bank hereunder are cumulative.  No delay, failure or discontinuance of Bank in exercising any right, power or remedy hereunder shall affect or operate as a waiver of such right, power or remedy; nor shall any single or partial exercise of any such right, power or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any

4

other right, power or remedy. Any waiver, permit, consent or approval of any kind by Administrative Agent and/or Bank of any breach of this Guaranty, or any such waiver of any provisions or conditions hereof, must be in writing and shall be effective only to the extent set forth in writing.

10.     COSTS, EXPENSES AND ATTORNEYS' FEES. Guarantor shall pay to Bank immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees (to include outside counsel fees and all allocated costs of Bank's in-house counsel to the extent permissible), expended or incurred by Bank in connection with the enforcement of any of Administrative Agent's or Bank's rights, powers or remedies and/or the collection of any amounts which become due to Bank under this Guaranty, and the prosecution or defense of any action in any way related to this Guaranty, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Bank or any other person) relating to Guarantor or any other person or entity.

11.     SUCCESSORS; ASSIGNMENT. This Guaranty shall be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties; provided however, that Guarantor may not assign or transfer any of its interests or rights hereunder without Bank's prior written consent. Guarantor acknowledges that Bank has the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in, the Guaranteed Indebtedness and any obligations with respect thereto, including this Guaranty. In connection therewith, Bank may disclose all documents and information which Bank now has or hereafter acquires relating to Guarantor and/or this Guaranty, whether furnished by Borrower, Guarantor or otherwise. Guarantor further agrees that Administrative Agent and/or Bank may disclose such documents and information to Borrower.

12.     AMENDMENT. This Guaranty may be amended or modified only in writing signed by Administrative Agent, Bank and Guarantor.

13.     APPLICATION OF SINGULAR AND PLURAL. In all cases where there is but a single Borrower, then all words used herein in the plural shall be deemed to have been used in the singular where the context and construction so require; and when there is more than one Borrower named herein, or when this Guaranty is executed by more than one Guarantor, the word "Borrowers" and the word "Guarantor" respectively shall mean all or any one or more of them as the context requires.

14.     UNDERSTANDING WITH RESPECT TO WAIVERS; SEVERABILITY OF PROVISIONS. Guarantor warrants and agrees that each of the waivers set forth herein is made with Guarantor's full knowledge of its significance and consequences, and that under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any waiver or other provision of this Guaranty shall be held to be prohibited by or invalid under applicable public policy or law, such waiver or other provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such waiver or other provision or any remaining provisions of this Guaranty.

15.   GOVERNING LAW.   This Guaranty shall be governed by and construed in accordance with the laws of the State of Texas.

16.   ARBITRATION.

(a)   Arbitration.   The parties hereto agree, upon demand by any party, to submit to binding arbitration all claims, disputes and controversies between or among them (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise, in any way arising out of or relating to this Guaranty and its negotiation, execution, collateralization, administration, repayment, modification, extension, substitution, formation, inducement, enforcement, default or termination.   In the event of a court ordered arbitration, the party requesting arbitration shall be responsible for timely filing the demand for arbitration and paying the appropriate filing fee within 30 days of the abatement order or the time specified by the court.   Failure to timely file the demand for arbitration as ordered by the court will result in that party's right to demand arbitration being automatically terminated.

(b)   Governing Rules.   Any arbitration proceeding will (i) proceed in a location in Texas selected by the American Arbitration Association ("*AAA*"); (ii) be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any of the documents between the parties; and (iii) be conducted by the AAA, or such other administrator as the parties shall mutually agree upon, in accordance with the AAA's commercial dispute resolution procedures, unless the claim or counterclaim is at least $1,000,000.00 exclusive of claimed interest, arbitration fees and costs in which case the arbitration shall be conducted in accordance with the AAA's optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes to be referred to, as applicable, as the "*Rules*").   If there is any inconsistency between the terms hereof and the Rules, the terms and procedures set forth herein shall control.   Any party who fails or refuses to submit to arbitration following a demand by any other party shall bear all costs and expenses incurred by such other party in compelling arbitration of any dispute.   Nothing contained herein shall be deemed to be a waiver by any party that is a bank of the protections afforded to it under 12 U.S.C. §91 or any similar applicable state law.

(c)   No Waiver of Provisional Remedies, Self-Help and Foreclosure.   The arbitration requirement does not limit the right of any party to (i) foreclose against real or personal property collateral; (ii) exercise self-help remedies relating to collateral or proceeds of collateral such as setoff or repossession; or (iii) obtain provisional or ancillary remedies such as replevin, injunctive relief, attachment or the appointment of a receiver, before during or after the pendency of any arbitration proceeding.   This exclusion does not constitute a waiver of the right or obligation of any party to submit any dispute to arbitration or reference hereunder, including those arising from the exercise of the actions detailed in *sections (i)*, *(ii)* and *(iii)* of this paragraph.

(d)   Arbitrator Qualifications and Powers.   Any arbitration proceeding in which the amount in controversy is $5,000,000.00 or less will be decided by a single arbitrator selected according to the Rules, and who shall not render an award of greater than $5,000,000.00.   Any dispute in which the amount in controversy exceeds $5,000,000.00 shall be

decided by majority vote of a panel of three arbitrators; provided however, that all three arbitrators must actively participate in all hearings and deliberations. The arbitrator will be a neutral attorney licensed in the State of Texas with a minimum of ten years experience in the substantive law applicable to the subject matter of the dispute to be arbitrated. The arbitrator will determine whether or not an issue is arbitratable and will give effect to the statutes of limitation in determining any claim. In any arbitration proceeding the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication. The arbitrator shall resolve all disputes in accordance with the substantive law of Texas and may grant any remedy or relief that a court of such state could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any award. The arbitrator shall also have the power to award recovery of all costs and fees, to impose sanctions and to take such other action as the arbitrator deems necessary to the same extent a judge could pursuant to the Federal Rules of Civil Procedure, the Texas Rules of Civil Procedure or other applicable law. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

       (e)    <u>Discovery</u>. In any arbitration proceeding, discovery will be permitted in accordance with the Rules. All discovery shall be expressly limited to matters directly relevant to the dispute being arbitrated and must be completed no later than 20 days before the hearing date. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

       (f)    <u>Class Proceedings and Consolidations</u>. No party hereto shall be entitled to join or consolidate disputes by or against others in any arbitration, except parties who have executed this Guaranty or any other contract, instrument or document relating to any Guaranteed Indebtedness, or to include in any arbitration any dispute as a representative or member of a class, or to act in any arbitration in the interest of the general public or in a private attorney general capacity.

       (g)    <u>Payment Of Arbitration Costs And Fees</u>. The arbitrator shall award all costs and expenses of the arbitration proceeding.

       (h)    <u>Miscellaneous</u>. To the maximum extent practicable, the AAA, the arbitrators and the parties shall take all action required to conclude any arbitration proceeding within 180 days of the filing of the dispute with the AAA. No arbitrator or other party to an arbitration proceeding may disclose the existence, content or results thereof, except for disclosures of information by a party required in the ordinary course of its business or by applicable law or regulation. If more than one agreement for arbitration by or between the parties potentially applies to a dispute, the arbitration provision most directly related to the documents between the parties or the subject matter of the dispute shall control. This arbitration

provision shall survive termination, amendment or expiration of any of the documents or any relationship between the parties.

    (i) <u>Small Claims Court</u>. Notwithstanding anything herein to the contrary, each party retains the right to pursue in a Justice of the Peace Court any Small Claims Case (as defined in Rule 500.3 of the Texas Rules of Civil Procedure) within the jurisdictional limit (excluding attorneys' fees and costs) of a Small Claims Case.

**NOTICE: THIS DOCUMENT AND ALL OTHER DOCUMENTS RELATING TO THE GUARANTEED INDEBTEDNESS CONSTITUTE A WRITTEN LOAN AGREEMENT WHICH REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES RELATING TO THE GUARANTEED INDEBTEDNESS.**

*[**Signature appears on the following page.**]*

8

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty as of date first written above.

LH AVIATION, LLC,
a Texas limited liability company

By: _____
Michael F. Lockwood, Chief Executive Officer

Signature Page to Guaranty

Exhibit 7

EXECUTION VERSION

# GUARANTY

August **22**, 2017

TO:    WELLS FARGO BANK, NATIONAL ASSOCIATION

1.    <u>GUARANTY; DEFINITIONS</u>.  In consideration of the credit or other financial accommodation described herein and extended or made to LOCKWOOD ENTERPRISES, INC., a Texas corporation, LOCKWOOD INTERNATIONAL, INC., a Texas corporation, LMG MANUFACTURING, INC., a Texas corporation, and PIPING COMPONENTS, INC., a Texas corporation (collectively, "***Borrower***"), by WELLS FARGO BANK, NATIONAL ASSOCIATION and TRUSTMARK NATIONAL BANK (collectively, "***Bank***"), and for other valuable consideration, the undersigned 7807 EAGLE LANE, LLC, a Texas limited liability company ("***Guarantor***"), unconditionally guarantees and promises to pay to Bank, or order, on demand in lawful money of the United States of America and in immediately available funds, any and all Indebtedness of Borrower to Bank in connection with that certain Amended and Restated Credit Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "***Credit Agreement***"), dated as of September 30, 2015, among Borrower, Bank and Wells Fargo Bank, National Association, as administrative agent for Bank (the "***Administrative Agent***"), including the Obligation, under, and as defined in, the Credit Agreement, which includes, but is not limited to, any Indebtedness of Borrower to Bank under the Loans and Letters of Credit (as such terms are defined in the Credit Agreement) and any Secured Hedge Liabilities other than Excluded Hedge Liabilities (as such terms are defined in the Credit Agreement), together with all extensions, renewals and/or modifications of any of the foregoing (which Indebtedness in connection with or relating to said Credit Agreement and all such extensions, renewals and/or modifications shall be referred to herein as the "***Guaranteed Indebtedness***").  The term "Indebtedness" is used herein in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of Borrower now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and whether Borrower may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable.  This Guaranty is a guaranty of payment and not collection.  In Guarantor's judgment, the value of the consideration received and to be received by Guarantor under the Loan Documents (as defined in the Credit Agreement) is reasonably worth at least as much as Guarantor's liability and obligation under this Guaranty, and such liability and obligation may reasonably be expected to benefit Guarantor directly or indirectly.

2.    <u>LIABILITY; OBLIGATION UNDER OTHER GUARANTIES</u>.  Any obligations incurred or to be incurred by Borrower in addition to the Guaranteed Indebtedness shall not modify or otherwise affect the obligations or liability of Guarantor hereunder.  The obligations of Guarantor hereunder shall be in addition to any obligations of Guarantor under any other guaranties of any liabilities or obligations of Borrower or any other persons heretofore or hereafter given to Bank unless said other guaranties are expressly modified or revoked in

1

writing; and this Guaranty shall not, unless expressly herein provided, affect or invalidate any such other guaranties.

3.    SEPARATE ACTIONS; WAIVER OF STATUTE OF LIMITATIONS; REINSTATEMENT OF LIABILITY.    The obligations hereunder are independent of the obligations of Borrower, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other person, or whether Borrower or any other person is joined in any such action or actions.  Guarantor acknowledges that this Guaranty is absolute and unconditional, there are no conditions precedent to the effectiveness of this Guaranty, and this Guaranty is in full force and effect and is binding on Guarantor as of the date set forth above, regardless of whether Bank obtains collateral or any guaranties from others or takes any other action contemplated by Guarantor.  Guarantor waives the benefit of any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof, and Guarantor agrees that any payment of any Guaranteed Indebtedness or other act which shall toll any statute of limitations applicable thereto shall similarly operate to toll such statute of limitations applicable to Guarantor's liability hereunder.   The liability of Guarantor hereunder shall be reinstated and revived and the rights of Bank shall continue if and to the extent that for any reason any amount at any time paid on account of any Guaranteed Indebtedness guaranteed hereby is rescinded or must otherwise be restored by Bank, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, all as though such amount had not been paid.  The determination as to whether any amount so paid must be rescinded or restored shall be made by Bank in its sole discretion; provided however, that if Bank chooses to contest any such matter at the request of Guarantor, Guarantor agrees to indemnify and hold Bank harmless from and against all costs and expenses, including reasonable attorneys' fees, expended or incurred by Bank in connection therewith, including without limitation, in any litigation with respect thereto.

4.    AUTHORIZATIONS TO BANK.  Guarantor authorizes Bank, without notice to or demand on Guarantor, and without affecting Guarantor's liability hereunder, from time to time to:   (a) alter, compromise, renew, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of, the Guaranteed Indebtedness or any portion thereof, including increase or decrease of the rate of interest thereon; (b) take and hold security for the payment of this Guaranty or the Guaranteed Indebtedness or any portion thereof, and exchange, enforce, waive, subordinate or release any such security; (c) apply such security and direct the order or manner of sale thereof, including without limitation, a non-judicial sale permitted by the terms of the controlling security agreement, mortgage or deed of trust, as Bank in its discretion may determine; (d) release or substitute any one or more of the endorsers or any other guarantors of the Guaranteed Indebtedness, or any portion thereof, or any other party thereto; and (e) apply payments received by Bank from Borrower to any Indebtedness of Borrower to Bank, in such order as Bank shall determine in its sole discretion, whether or not such Indebtedness is covered by this Guaranty, and Guarantor hereby waives any provision of law regarding application of payments which specifies otherwise.  Bank may without notice assign this Guaranty in whole or in part.  Upon Administrative Agent's request made from time to time, Guarantor agrees to promptly provide to Bank copies of Guarantor's current financial statements.

2

5.    <u>REPRESENTATIONS AND WARRANTIES</u>.  Guarantor represents and warrants to Bank that:  (a) this Guaranty is executed at Borrower's request; (b) Guarantor shall not, without Bank's prior written consent, sell, lease, assign, encumber, hypothecate, transfer or otherwise dispose of all or a substantial or material part of Guarantor's assets other than in the ordinary course of Guarantor's business; (c) Bank has made no representation to Guarantor as to the creditworthiness of Borrower; and (d) Guarantor has established adequate means of obtaining from Borrower on a continuing basis financial and other information pertaining to Borrower's financial condition.  Guarantor agrees to keep adequately informed from such means of any facts, events or circumstances which might in any way affect Guarantor's risks hereunder, and Guarantor further agrees that Bank shall have no obligation to disclose to Guarantor any information or material about Borrower which is acquired by Bank in any manner.

6.    <u>GUARANTOR'S WAIVERS</u>.

(a)    Guarantor waives any right to require Bank to: (i) proceed against Borrower or any other person; (ii) marshal assets or proceed against or exhaust any security held from Borrower or any other person; (iii) give notice of the terms, time and place of any public or private sale or other disposition of personal property security held from Borrower or any other person; (iv) take any other action or pursue any other remedy in Bank's power; or (v) make any presentment or demand for performance, or give any notices of any kind, including without limitation, any notice of nonperformance, protest, notice of protest, notice of dishonor, notice of intention to accelerate or notice of acceleration hereunder or in connection with any obligations or evidences of indebtedness held by Bank as security for or which constitute in whole or in part the Guaranteed Indebtedness guaranteed hereunder, or in connection with the creation of new or additional Indebtedness.

(b)    Guarantor waives any defense to its obligations hereunder based upon or arising by reason of: (i) any disability or other defense of Borrower or any other person; (ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the Guaranteed Indebtedness; (iii) any lack of authority of any officer, director, partner, agent or other person acting or purporting to act on behalf of Borrower which is a corporation, partnership or other type of entity, or any defect in the formation of Borrower; (iv) the application by Borrower of the proceeds of the Guaranteed Indebtedness for purposes other than the purposes represented by Borrower to, or intended or understood by, Bank or Guarantor; (v) any act or omission by Bank which directly or indirectly results in or aids the discharge of Borrower or any portion of the Guaranteed Indebtedness by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of Bank against Borrower; (vi) any impairment of the value of any interest in any security for the Guaranteed Indebtedness or any portion thereof, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security; (vii) any modification of the Guaranteed Indebtedness, in any form whatsoever, including without limitation the renewal, extension, acceleration or other change in time for payment of, or other change in the terms of, the Guaranteed Indebtedness or any portion thereof, including increase or decrease of the rate of interest thereon; or (viii) any requirement that Bank give any notice of acceptance of this Guaranty.  Until all Guaranteed Indebtedness shall have been paid in full, Guarantor shall have no right of subrogation, Guarantor waives any right to enforce any

3

remedy which Bank now has or may hereafter have against Borrower or any other person, and waives any benefit of, or any right to participate in, any security now or hereafter held by Bank. Guarantor further waives all rights and defenses Guarantor may have arising out of (A) any election of remedies by Bank, even though that election of remedies, such as a non-judicial foreclosure with respect to any security for any portion of the Guaranteed Indebtedness, destroys Guarantor's rights of subrogation or Guarantor's rights to proceed against Borrower for reimbursement, or (B) any loss of rights Guarantor may suffer by reason of any rights, powers or remedies of Borrower in connection with any anti-deficiency laws or any other laws limiting, qualifying or discharging the Guaranteed Indebtedness, whether by operation of law or otherwise, including any rights Guarantor may have to a fair market value hearing to determine the size of a deficiency following any foreclosure sale or other disposition of any real property security for any portion of the Guaranteed Indebtedness.

(c) By signing this Guaranty, Guarantor waives (i) each and every right to which it may be entitled by virtue of any suretyship law, including without limitation, any rights arising pursuant to Section 17.001 and Chapter 43 of the Texas Civil Practice and Remedies Code and Rule 31 of the Texas Rules of Civil Procedure, as the same may be amended from time to time, and (ii) without limiting any of the waivers set forth herein, any other fact or event that, in the absence of this provision, would or might constitute or afford a legal or equitable discharge or release of or defense to Guarantor.

7. **BANK'S RIGHTS WITH RESPECT TO GUARANTOR'S PROPERTY IN BANK'S POSSESSION.** In addition to all liens upon and rights of setoff against the monies, securities or other property of Guarantor given to Bank by law, Bank shall have a lien upon and a right of setoff against all monies, securities and other property of Guarantor now or hereafter in the possession of or on deposit with Bank, whether held in a general or special account or deposit or for safekeeping or otherwise, and every such lien and right of setoff may be exercised without demand upon or notice to Guarantor. No lien or right of setoff shall be deemed to have been waived by any act or conduct on the part of Bank, or by any neglect to exercise such right of setoff or to enforce such lien, or by any delay in so doing, and every right of setoff and lien shall continue in full force and effect until such right of setoff or lien is specifically waived or released by Bank in writing.

8. **SUBORDINATION.** Any Indebtedness of Borrower now or hereafter held by Guarantor is hereby subordinated to the obligations of Borrower to Bank under the Guaranteed Indebtedness. Such Indebtedness of Borrower to Guarantor is assigned to Bank as security for this Guaranty and the Guaranteed Indebtedness and, if Bank requests, shall be collected and received by Guarantor as trustee for Bank and paid over to Bank on account of the Guaranteed Indebtedness but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty. Any notes or other instruments now or hereafter evidencing such Indebtedness of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and, if Bank so requests, shall be delivered to Bank. Bank is hereby authorized in the name of Guarantor from time to time to file financing statements and continuation statements and execute such other documents and take such other action as Bank deems necessary or appropriate to perfect, preserve and enforce its rights hereunder.

4

9.   REMEDIES; NO WAIVER.  All rights, powers and remedies of Administrative Agent and/or Bank hereunder are cumulative.  No delay, failure or discontinuance of Bank in exercising any right, power or remedy hereunder shall affect or operate as a waiver of such right, power or remedy; nor shall any single or partial exercise of any such right, power or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any other right, power or remedy.  Any waiver, permit, consent or approval of any kind by Administrative Agent and/or Bank of any breach of this Guaranty, or any such waiver of any provisions or conditions hereof, must be in writing and shall be effective only to the extent set forth in writing.

10.   COSTS, EXPENSES AND ATTORNEYS' FEES.  Guarantor shall pay to Bank immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees (to include outside counsel fees and all allocated costs of Bank's in-house counsel to the extent permissible), expended or incurred by Bank in connection with the enforcement of any of Administrative Agent's or Bank's rights, powers or remedies and/or the collection of any amounts which become due to Bank under this Guaranty, and the prosecution or defense of any action in any way related to this Guaranty, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Bank or any other person) relating to Guarantor or any other person or entity.

11.   SUCCESSORS; ASSIGNMENT.  This Guaranty shall be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties; provided however, that Guarantor may not assign or transfer any of its interests or rights hereunder without Bank's prior written consent.  Guarantor acknowledges that Bank has the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in, the Guaranteed Indebtedness and any obligations with respect thereto, including this Guaranty.  In connection therewith, Bank may disclose all documents and information which Bank now has or hereafter acquires relating to Guarantor and/or this Guaranty, whether furnished by Borrower, Guarantor or otherwise.  Guarantor further agrees that Administrative Agent and/or Bank may disclose such documents and information to Borrower.

12.   AMENDMENT.  This Guaranty may be amended or modified only in writing signed by Administrative Agent, Bank and Guarantor.

13.   APPLICATION OF SINGULAR AND PLURAL.  In all cases where there is but a single Borrower, then all words used herein in the plural shall be deemed to have been used in the singular where the context and construction so require; and when there is more than one Borrower named herein, or when this Guaranty is executed by more than one Guarantor, the word "Borrowers" and the word "Guarantor" respectively shall mean all or any one or more of them as the context requires.

14.   UNDERSTANDING WITH RESPECT TO WAIVERS; SEVERABILITY OF PROVISIONS.  Guarantor warrants and agrees that each of the waivers set forth herein is made with Guarantor's full knowledge of its significance and consequences, and that under the circumstances, the waivers are reasonable and not contrary to public policy or law.  If any waiver

or other provision of this Guaranty shall be held to be prohibited by or invalid under applicable public policy or law, such waiver or other provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such waiver or other provision or any remaining provisions of this Guaranty.

15.  GOVERNING LAW.  This Guaranty shall be governed by and construed in accordance with the laws of the State of Texas.

16.  ARBITRATION.

(a)  Arbitration.  The parties hereto agree, upon demand by any party, to submit to binding arbitration all claims, disputes and controversies between or among them (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise, in any way arising out of or relating to this Guaranty and its negotiation, execution, collateralization, administration, repayment, modification, extension, substitution, formation, inducement, enforcement, default or termination.  In the event of a court ordered arbitration, the party requesting arbitration shall be responsible for timely filing the demand for arbitration and paying the appropriate filing fee within 30 days of the abatement order or the time specified by the court.  Failure to timely file the demand for arbitration as ordered by the court will result in that party's right to demand arbitration being automatically terminated.

(b)  Governing Rules.  Any arbitration proceeding will (i) proceed in a location in Texas selected by the American Arbitration Association ("*AAA*"); (ii) be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any of the documents between the parties; and (iii) be conducted by the AAA, or such other administrator as the parties shall mutually agree upon, in accordance with the AAA's commercial dispute resolution procedures, unless the claim or counterclaim is at least $1,000,000.00 exclusive of claimed interest, arbitration fees and costs in which case the arbitration shall be conducted in accordance with the AAA's optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes to be referred to, as applicable, as the "*Rules*").  If there is any inconsistency between the terms hereof and the Rules, the terms and procedures set forth herein shall control.  Any party who fails or refuses to submit to arbitration following a demand by any other party shall bear all costs and expenses incurred by such other party in compelling arbitration of any dispute.  Nothing contained herein shall be deemed to be a waiver by any party that is a bank of the protections afforded to it under 12 U.S.C. §91 or any similar applicable state law.

(c)  No Waiver of Provisional Remedies, Self-Help and Foreclosure.  The arbitration requirement does not limit the right of any party to (i) foreclose against real or personal property collateral; (ii) exercise self-help remedies relating to collateral or proceeds of collateral such as setoff or repossession; or (iii) obtain provisional or ancillary remedies such as replevin, injunctive relief, attachment or the appointment of a receiver, before during or after the pendency of any arbitration proceeding.  This exclusion does not constitute a waiver of the right or obligation of any party to submit any dispute to arbitration or reference hereunder, including those arising from the exercise of the actions detailed in *sections (i), (ii)* and *(iii)* of this paragraph.

6

(d)  Arbitrator Qualifications and Powers.  Any arbitration proceeding in which the amount in controversy is $5,000,000.00 or less will be decided by a single arbitrator selected according to the Rules, and who shall not render an award of greater than $5,000,000.00. Any dispute in which the amount in controversy exceeds $5,000,000.00 shall be decided by majority vote of a panel of three arbitrators; provided however, that all three arbitrators must actively participate in all hearings and deliberations.  The arbitrator will be a neutral attorney licensed in the State of Texas with a minimum of ten years experience in the substantive law applicable to the subject matter of the dispute to be arbitrated.  The arbitrator will determine whether or not an issue is arbitratable and will give effect to the statutes of limitation in determining any claim.  In any arbitration proceeding the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication. The arbitrator shall resolve all disputes in accordance with the substantive law of Texas and may grant any remedy or relief that a court of such state could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any award. The arbitrator shall also have the power to award recovery of all costs and fees, to impose sanctions and to take such other action as the arbitrator deems necessary to the same extent a judge could pursuant to the Federal Rules of Civil Procedure, the Texas Rules of Civil Procedure or other applicable law. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction.  The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

(e)  Discovery.  In any arbitration proceeding, discovery will be permitted in accordance with the Rules.  All discovery shall be expressly limited to matters directly relevant to the dispute being arbitrated and must be completed no later than 20 days before the hearing date. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

(f)  Class Proceedings and Consolidations.  No party hereto shall be entitled to join or consolidate disputes by or against others in any arbitration, except parties who have executed this Guaranty or any other contract, instrument or document relating to any Guaranteed Indebtedness, or to include in any arbitration any dispute as a representative or member of a class, or to act in any arbitration in the interest of the general public or in a private attorney general capacity.

(g)  Payment Of Arbitration Costs And Fees.  The arbitrator shall award all costs and expenses of the arbitration proceeding.

(h)  Miscellaneous.  To the maximum extent practicable, the AAA, the arbitrators and the parties shall take all action required to conclude any arbitration proceeding within 180 days of the filing of the dispute with the AAA.  No arbitrator or other party to an arbitration proceeding may disclose the existence, content or results thereof, except for disclosures of information by a party required in the ordinary course of its business or by

7

applicable law or regulation. If more than one agreement for arbitration by or between the parties potentially applies to a dispute, the arbitration provision most directly related to the documents between the parties or the subject matter of the dispute shall control. This arbitration provision shall survive termination, amendment or expiration of any of the documents or any relationship between the parties.

(i) <u>Small Claims Court</u>. Notwithstanding anything herein to the contrary, each party retains the right to pursue in a Justice of the Peace Court any Small Claims Case (as defined in Rule 500.3 of the Texas Rules of Civil Procedure) within the jurisdictional limit (excluding attorneys' fees and costs) of a Small Claims Case.

**NOTICE: THIS DOCUMENT AND ALL OTHER DOCUMENTS RELATING TO THE GUARANTEED INDEBTEDNESS CONSTITUTE A WRITTEN LOAN AGREEMENT WHICH REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES RELATING TO THE GUARANTEED INDEBTEDNESS.**

*[Signature appears on the following page.]*

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty as of date first written above.

7807 EAGLE LANE, LLC

By: _____

Michael F. Lockwood, Chief Executive Officer

Signature Page to Guaranty

Exhibit 8

## PLEDGE AND SECURITY AGREEMENT

**THIS PLEDGE AND SECURITY AGREEMENT**, dated as of September 30, 2015 (as amended, modified, restated or supplemented from time to time, this "*Agreement*"), is by and among the parties identified as "Grantors" on the signature pages hereto and such other parties as may become Grantors hereunder after the date hereof (individually, a "*Grantor*" and, collectively, the "*Grantors*"), and Wells Fargo Bank, National Association, as administrative agent for the Secured Parties (in such capacity, together with any successor, the "*Administrative Agent*").

W I T N E S S E T H

**WHEREAS**, a revolving line of credit has been established in favor of Lockwood Enterprises, Inc., a Texas corporation, Lockwood International, Inc., a Texas corporation, LMG Manufacturing, Inc., a Texas corporation, and Piping Components, Inc., a Texas corporation (each a "*Borrower*" and collectively, "*Borrowers*"), pursuant to the terms of that certain Amended and Restated Credit Agreement, dated as the date hereof (as amended, modified, restated, supplemented or extended from time to time, the "*Credit Agreement*"), among the Borrowers, the lenders from time to time party thereto (the "*Lenders*"), and the Administrative Agent; and

**WHEREAS**, pursuant to the terms of the Credit Agreement, the Lenders and the Administrative Agent (collectively, the "*Secured Parties*") have each required that the Grantors enter into this Agreement;

**NOW, THEREFORE**, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      **Definitions**.

(a)      Capitalized terms used and not otherwise defined herein shall have the meanings provided in the Credit Agreement.

(b)      The following terms shall have the meanings assigned thereto in the UCC: Accession, Account, As-Extracted Collateral, Chattel Paper, Commercial Tort Claim, Commodity Account, Consumer Goods, Deposit Account, Document, Electronic Chattel Paper, Equipment, Farm Products, Financial Asset, Fixtures, General Intangible, Goods, Instrument, Inventory, Investment Property, Letters of Credit, Letter-of-Credit Right, Manufactured Home, Proceeds, Promissory Notes, Securities Account, Security, Software, Standing Timber, Supporting Obligation and Tangible Chattel Paper.

(c)      As used herein, the following terms shall have the meanings set forth below:

"*Certificated Equipment*" means any Equipment the ownership of which is required by Applicable Law to be evidenced by a certificate of title.

"**CFC**" means a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code.

"**CFC Holdco**" means a Domestic Subsidiary substantially all of the assets of which consist of Equity Interests of CFCs.

"**Collateral**" has the meaning provided in **Section 2**.

"**Contract Rights**" means all rights of a Grantor under or in respect of a Contract, including, without limitation, (a) all rights to payment, damages, liquidated damages, and enforcement, (b) all rights to make elections, and (c) all rights to exercise remedies.

"**Contracts**" means all contracts to which any Grantor now is, or hereafter will be bound, or to which such Grantor is or hereafter will be a party, beneficiary or assignee, and all exhibits, schedules and other attachments to such contracts, as the same may be amended, supplemented or otherwise modified or replaced from time to time.

"**Copyright License**" means any agreement, written or oral, providing for the grant by or to any Grantor of any right under any Copyright.

"**Copyrights**" means (a) all copyrights registered in the United States or any other country in all works, now existing or hereafter created or acquired, all registrations and recordings thereof, and all applications in connection therewith, including, without limitation, registrations, recordings and applications in the United States Copyright Office or in any similar office or agency of the United States, any state thereof or any other country or political subdivision thereof, and (b) all renewals thereof.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**DRE Holdco**" means a Domestic Subsidiary treated as a disregarded entity for U.S. federal income tax purposes holding the Equity Interests of one or more CFCs.

"**Equity Interests**" means, with respect to any Person, all of the shares of Capital Stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of Capital Stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of Capital Stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

2

"***Governmental Approvals***" means all governmental approvals, permits, licenses, authorizations, consents, rulings, tariffs, rates, certifications, waivers, exemptions, filings, claims, orders, judgments and decrees.

"***Patent License***" means any agreement, whether written or oral, providing for the grant by or to any Grantor of any right to manufacture, use or sell any invention covered by a Patent.

"***Patents***" means (a) all letters patent of the United States or any other country or any political subdivision thereof and all reissues and extensions thereof, and (b) all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof.

"***Receivables***" means the Accounts, Chattel Paper, Documents, Investment Property, Instruments, or Commercial Tort Claims, and any other rights or claims to receive money which are General Intangibles or which are otherwise included as Collateral, together with all of the applicable Grantor's rights, if any, in all Supporting Obligations related thereto.

"***Secured Obligations***" has the meaning assigned to such term in the Credit Agreement.

"***Trademark License***" means any agreement, written or oral, providing for the grant by or to any Grantor of any right to use any Trademark.

"***Trademarks***" means (a) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, and the goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States or any other country, any state thereof or any political subdivision thereof, or otherwise and (b) all renewals thereof.

"***UCC***" means the Uniform Commercial Code as in effect from time to time in the State of Texas.

**2.** **Pledge and Grant of Security Interest in the Collateral**. To secure the prompt and unconditional payment and performance in full when due, whether by lapse of time, acceleration, mandatory prepayment or otherwise, of the Secured Obligations, each Grantor hereby grants, pledges and assigns to the Administrative Agent, for the benefit of the Secured Parties, a continuing security interest in, and Lien on, any and all right, title and interest of such Grantor in and to all of the following, whether now owned or existing or owned, acquired or arising hereafter (collectively, the "***Collateral***"):

(a) all Accounts, including, but not limited to, (i) all accounts, receivables and accounts receivable regardless of form (including all choses or things in action, trade names, trademarks, patents, patents pending, infringement claims, service marks, licenses, copyrights, blueprints, drawings, plans, diagrams, schematics, computer programs, computer tapes, computer discs, reports, catalogs, customer lists, purchase orders, goodwill, route lists, monies due or recoverable from pension funds, tax refunds and all rights to any of the foregoing), book debts, contract rights and rights to payment no matter how evidenced; (ii) all notes, drafts, acceptances,

4914176v5

payments under leases of equipment or sale of inventory, and other forms of obligations received by or belonging to such Grantor for goods sold or leased and/or services rendered by such Grantor; (iii) all purchase orders, instruments and other documents (including all documents of title) evidencing obligations to such Grantor, including those for or representing obligations for goods sold or leased and/or services rendered by such Grantor; (iv) all monies due or to become due to such Grantor under all contracts, including those for the sale or lease of goods and/or performance of services by such Grantor no matter how evidenced and whether or not earned by performance; and (v) all accounts, receivables, accounts receivable, contract rights, and general intangibles arising as a result of such Grantor having paid accounts payable (or having had goods sold or leased to Debtor or services performed for such Grantor giving rise to accounts payable) which accounts payable were paid for or were incurred by such Grantor on behalf of any third parties pursuant to an agreement or otherwise;

(b)      all money, cash, currency, and cash equivalents;

(c)      all Chattel Paper, including, but not limited to, Tangible Chattel Paper;

(d)      all Contracts and Contract Rights, including, but not limited to (i) (A) all policies of insurance now or hereafter held by or on behalf of such Grantor, including casualty, liability, key man life insurance, business interruption, foreign credit insurance and any title insurance, (B) all proceeds of insurance, and (C) all rights, now or hereafter held by such Grantor to any warranties of any manufacturer or contractor of any other Person, and (ii) all interest rate swap agreements, interest rate cap agreements and interest rate collar agreements, and all other agreements or arrangements designed to protect such Grantor against fluctuations in interest rates or currency exchange rates and all commodity hedge, commodity swap, exchange, forward, future, floor, collar or cap agreements, fixed price agreements and all other agreements or arrangements designed to protect such Grantor against fluctuations in commodity prices;

(e)      those Commercial Tort Claims identified on *Schedule 2(e)* attached hereto;

(f)      all Copyrights and Copyright Licenses;

(g)      all Deposit Accounts;

(h)      all Documents, including, but not limited to, any bills of lading, dock warrants, dock receipts, warehouse receipts or orders for delivery of goods and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of such document and the goods it covers;

(i)      all Equipment, including, but not limited to, all present and future automobiles, trucks, truck tractors, trailers, semi-trailers, or other motor vehicles or rolling stock;

(j)      all Fixtures;

(k)      all General Intangibles;

(l)      all Goods;

4

(m)    all Government Approvals, to the extent a security interest may be granted therein; provided that any Governmental Approval that by its terms or by operation of Applicable Law would be void, voidable, terminable or revocable if mortgaged, pledged, assigned or otherwise encumbered hereunder is expressly excepted and excluded from the Liens and terms of this Agreement, including the grant of security interest in this *Section 2*;

(n)    all Instruments and Promissory Notes;

(o)    all Inventory, including, but not limited to, all goods, merchandise, raw materials, work in process, finished goods, and other tangible personal property of whatever nature now owned by such Grantor or hereafter from time to time existing or acquired, wherever located and held for sale or lease, including those held for display or demonstration or out on lease or consignment, or furnished or to be furnished under contracts of service or used or usable or consumed or consumable in such Grantor's business or which are finished or unfinished goods and all accessions and appurtenances thereto, together with all warehouse receipts and other documents evidencing any of the same and all containers, packing, packaging, shipping and similar materials;

(p)    all Investment Property;

(q)    all Letters of Credit and Letter-of-Credit Rights;

(r)    all Patents and Patent Licenses;

(s)    all Software;

(t)    all Supporting Obligations;

(u)    all Trademarks and Trademark Licenses;

(v)    (i) one hundred percent (100%) (or, if less, the full amount owned by such Grantor) of the issued and outstanding Equity Interests owned by such Grantor of each Domestic Subsidiary set forth on *Schedule 2(v)* attached hereto and (ii) sixty-five percent (65%) (or, if less, the full amount owned by such Grantor) of the issued and outstanding Equity Interests entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) ("*Voting Equity*") and one hundred percent (100%) (or, if less, the full amount owned by such Grantor) of the issued and outstanding Equity Interests not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) ("*Non-Voting Equity*") owned by such Grantor of each Foreign Subsidiary (or CFC Holdco or DRE Holdco, as applicable) directly owned by such Grantor set forth on *Schedule 2(v)* attached hereto, in each case together with the certificates (or other agreements or instruments), if any, representing such Equity Interests, and all options and other rights, contractual or otherwise, with respect thereto (collectively, together with the Equity Interests described in *Sections 2(w)* and *(z)* below, the "*Pledged Shares*"), including, but not limited to, the following:

(i)    all shares, securities, membership interests and other Equity Interests or other property representing a dividend or other distribution (cash or otherwise) on or in respect of any of the Pledged Shares, or representing a distribution or return of capital

upon or in respect of the Pledged Shares, or resulting from a stock split, revision, rearrangements, reclassification or other exchange therefor, and any other dividends, distributions, subscriptions, warrants, cash, securities, instruments, rights, options, profits, income surplus, money, credit, claims, demands or other property (real or personal) issued to or received or receivable by the holder of, or otherwise in respect of, the Pledged Shares and revenues of any kind or character now or hereafter relating to, accruing or arising under or in respect of the Pledged Shares; and

(ii)    without affecting the obligations of the Grantors under any provision prohibiting such action hereunder or under the Credit Agreement, in the event of any consolidation or merger involving the issuer of any Pledged Shares and in which such issuer is not the surviving entity, all Equity Interests of the successor entity formed by or resulting from such consolidation or merger;

(w)    (i) one hundred percent (100%) (or, if less, the full amount owned by such Grantor) of the issued and outstanding Equity Interests hereafter owned by such Grantor of any Person that is not a Foreign Subsidiary or, if applicable, a CFC Holdco or DRE Holdco and (ii) sixty-five percent (65%) (or, if less, the full amount owned by such Grantor) of the Voting Equity and one hundred percent (100%) (or, if less, the full amount owned by such Grantor) of the Non-Voting Equity owned by such Grantor of any Person that hereafter becomes a Foreign Subsidiary or, if applicable, a CFC Holdco or DRE Holdco directly owned by such Grantor, including, without limitation, the certificates (or other agreements or instruments) representing such Equity Interests;

(x)    (i) any and all Liens and security interests (together with the documents evidencing such security interests) granted to such Grantor by an obligor to secure such obligor's obligations owing under any Instrument, Promissory Note, Chattel Paper or Contract that is pledged hereunder or with respect to which a security interest in such Grantor's rights in such Instrument, Promissory Note, Chattel Paper or Contract is granted hereunder and (ii) any and all guarantees given by any Person for the benefit of such Grantor which guarantees the obligations of an obligor under any Instrument, Promissory Note, Chattel Paper or Contract which are pledged hereunder;

(y)    all books, correspondence, credit files, records, invoices, tapes, cards, computer runs, writings, data bases, information in all forms, paper and documents and other property relating to, used or useful in connection with, evidencing, embodying, incorporating or referring to, any of the foregoing; and

(z)    to the extent not otherwise included, all Accessions, substitutions, replacements, products, rents, issues, profits, returns, income and Proceeds of any and all of the foregoing.

Notwithstanding anything to the contrary contained herein, the security interests granted under this Agreement shall not extend to, and the term Collateral (and each defined term used in the definition of Collateral) shall be deemed not to include any of the following, (a) any General Intangible, permit, lease, license, contract or other Instrument of a Grantor if the grant of a security interest in such General Intangible, permit, lease, license, contract or other Instrument in the manner contemplated by this Agreement, under the terms thereof or under Applicable Law, is

prohibited and would result in the termination thereof or give the other parties thereto the right to terminate, accelerate or otherwise alter such Grantor's rights, titles and interests thereunder (including upon the giving of notice or the lapse of time or both); *provided that* (i) any such limitation described in this paragraph on the security interests granted hereunder shall only apply to the extent that any such prohibition could not be rendered ineffective pursuant to the UCC or any other Applicable Law (including Debtor Relief Laws) or principles of equity and (ii) in the event of the termination or elimination of any such prohibition or the requirement for any consent contained in any Applicable Law, General Intangible, permit, lease, license, contract or other Instrument, to the extent sufficient to permit any such item to become Collateral hereunder, or upon the granting of any such consent, or waiving or terminating any requirement for such consent, a security interest in such General Intangible, permit, lease, license, contract or other Instrument shall be automatically and simultaneously granted hereunder and shall be included as Collateral hereunder; (b) any waste or other materials which have been or may be designated as toxic or hazardous by the Administrative Agent; and (c) any United States intent-to-use trademark applications for which an amendment to allege use has not been submitted to and accepted by the United States Patent and Trademark Office pursuant to 15 U.S.C. Section 1060(a) (or any successor provision); *provided that* after such acceptance, such intent-to-use trademark application shall be included as Collateral hereunder.

The Grantors and the Administrative Agent, on behalf of the Secured Parties, hereby acknowledge and agree that the security interest created hereby in the Collateral (i) constitutes continuing collateral security for all of the Secured Obligations, whether now existing or hereafter arising, and (ii) is not and shall not be construed as an assignment of any Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks or Trademark Licenses.

3.    **Provisions Relating to Accounts**.

(a)    Anything herein to the contrary notwithstanding, each of the Grantors shall remain liable under each of the Accounts to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise to each such Account. Neither the Administrative Agent nor any other Secured Party shall have any obligation or liability under any Account (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by the Administrative Agent or any other Secured Party of any payment relating to such Account pursuant hereto, nor shall the Administrative Agent or any other Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Account (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party under any Account (or any agreement giving rise thereto), to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts that may have been assigned to it or to which it may be entitled at any time or times.

(b)    At any time after the occurrence and during the continuation of an Event of Default, (i) the Administrative Agent shall have the right, but not the obligation, to make test verifications of the Accounts in any manner and through any medium that it reasonably considers advisable, and the Grantors shall furnish all such assistance and information as the Administrative Agent may require in connection with such test verifications, (ii) upon the

7

Administrative Agent's request and at the expense of the Grantors, the Grantors shall cause independent public accountants or others satisfactory to the Administrative Agent to furnish to the Administrative Agent reports showing reconciliations, aging and test verifications of, and trial balances for, the Accounts, and (iii) the Administrative Agent in its own name or in the name of others may communicate with account debtors on the Accounts to verify with them to the Administrative Agent's satisfaction the existence, amount and terms of any Accounts.

## 4. **Provisions Relating to the Pledged Shares**.

(a)     Delivery of Certificates. Each Grantor shall deliver to the Administrative Agent (i) simultaneously with or prior to the execution and delivery of this Agreement, all certificates representing the Pledged Shares owned by such Grantor and (ii) promptly upon the receipt thereof by or on behalf of any Grantor, all other certificates and instruments constituting Pledged Shares owned by such Grantor. Prior to delivery to the Administrative Agent, all such certificates and instruments constituting Pledged Shares owned by any Grantor shall be held in trust by such Grantor for the benefit of the Administrative Agent pursuant hereto. All such certificates and instruments shall be delivered in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment in blank, in form and substance reasonably satisfactory to the Administrative Agent.

(b)     Additional Securities. If such Grantor shall receive (or become entitled to receive) by virtue of its being or having been the owner of any Pledged Shares, any (i) certificate or instrument, including, without limitation, any certificate representing a dividend or distribution in connection with any increase or reduction of capital, reclassification, merger, consolidation, sale of assets, combination of shares or membership or other Equity Interests, stock splits, spin-off or split-off, promissory notes or other instruments; (ii) option or right, whether as an addition to, substitution for, conversion of, or an exchange for, any Pledged Shares or otherwise in respect thereof; (iii) dividends payable in securities; or (iv) distributions of securities or other Equity Interests, cash or other property in connection with a partial or total liquidation, dissolution or reduction of capital, capital surplus or paid-in surplus, then such Grantor shall accept and receive each such certificate, instrument, option, right, dividend or distribution in trust for the benefit of the Administrative Agent, shall segregate it from such Grantor's other property and shall deliver it forthwith to the Administrative Agent in the exact form received together with any necessary endorsement and/or appropriate stock power duly executed in blank, in form and substance reasonably satisfactory to the Administrative Agent, to be held by the Administrative Agent as Pledged Shares and as further collateral security for the Secured Obligations.

## 5. **Representations and Warranties**. Each Grantor hereby represents and warrants to the Administrative Agent, for the benefit of the Secured Parties, that so long as any of the Secured Obligations (other than contingent indemnification obligations for which no underlying claim has been asserted) remains outstanding and until the Credit Agreement has been terminated:

(a)     Ownership. Each Grantor is the legal and beneficial owner of, and has good and indefeasible title to its Collateral, free and clear of all Liens (other than Permitted Liens) and has the right to pledge, sell, assign or transfer the same.

(b)     Validity, etc. This Agreement and the other Loan Documents to which such Grantor is a party constitute the legal, valid and binding obligations of such Grantor, enforceable against such Grantor in accordance with their respective terms (except, in any case, as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by principles of equity (whether enforcement is sought by proceedings in equity or at law).

(c)     Security Interest and Priority. This Agreement creates a valid security interest in favor of the Administrative Agent, for the benefit of the Secured Parties, in the Collateral of such Grantor and, when properly perfected by filing, shall constitute a valid, perfected security interest in such Collateral, to the extent such security interest can be perfected by filing under the UCC, free and clear of all Liens except for Permitted Liens, and, except for the proper filing of the applicable financing statements with the filing offices located in each Grantor's state of organization, and all filings and other actions necessary to perfect and protect such security interest in those portions of Collateral that can be perfected by, amongst other things, the (i) filing of a financing statement, (ii) entering into of an account control agreement, or (iii) evidencing of the Administrative Agent's first priority Lien on a certificate of title, have been duly taken and such security interest shall be a first priority security interest. No effective UCC financing statement or other filing similar in effect covering all or any part of the Collateral is on file in any recording office, except those filed in favor of the Administrative Agent relating to this Agreement or in favor of the Administrative Agent or other holders of Permitted Liens or as to which a duly authorized termination statement relating to such UCC financing statement or other instrument has been delivered to the Administrative Agent on the Closing Date. The taking of possession by the Administrative Agent of the certificates representing the Pledged Shares and all other certificates and instruments constituting Collateral will perfect and establish the first priority of the Administrative Agent's security interest in the Pledged Shares consisting of certificated securities of Persons that are not Foreign Subsidiaries and, when properly perfected by filing or registration, in all other Collateral represented by such certificates and instruments securing the Secured Obligations.

(d)     Types of Collateral. None of the Collateral consists of, or is the Accessions or the Proceeds of, As-Extracted Collateral, Consumer Goods, Farm Products, Manufactured Homes or Standing Timber.

(e)     Accounts. (i) Each Account of the Grantors and the papers and documents relating thereto are in all material respects what they purport to be, (ii) each Account of the Grantors arises out of (A) a bona fide sale of goods sold and delivered by such Grantor (or is in the process of being delivered) or (B) services theretofore actually rendered by such Grantor to the account debtor named therein, (iii) any Account of a Grantor evidenced by any Instrument or Chattel Paper has, to the extent reasonably requested by the Administrative Agent, been endorsed over and delivered to, or submitted to the control of, the Administrative Agent and (iv) no surety bond was required or given in connection with any Account of a Grantor or the contracts or purchase orders out of which they arose.

(f)     Inventory. No Inventory of the Grantors with a sales value in excess of $500,000 in the aggregate is held by any Person other than the Grantors pursuant to consignment, sale on return, sale on approval or similar arrangement. Each Grantor has exclusive possession and

control, subject to Permitted Liens, of the Equipment and Inventory except as permitted hereunder and under the Credit Agreement.

(g)     Copyrights, Patents and Trademarks.

(i)     Each Copyright, Patent and Trademark that is reasonably necessary for the operation of the business of such Grantor is valid, subsisting, unexpired, enforceable and has not been abandoned.

(ii)     None of the Copyrights, Patents and Trademarks of any Grantor is the subject of any licensing or franchise agreement.

(iii)     No Grantor has made any assignment or agreement in conflict with the security interest in the Copyrights, Patents or Trademarks of any Grantor hereunder.

(h)     Commercial Tort Claims. Such Grantor has no commercial tort claims other than those listed on *Schedule 2(e)*.

(i)     Pledged Shares.

(i)     Authorization. The Pledged Shares are duly authorized and validly issued, are fully paid and nonassessable and are not subject to the preemptive rights of any Person.

(ii)     Title. There exists no "adverse claim" within the meaning of Section 8-102 of the UCC with respect to the Pledged Shares of such Grantor.

(iii)     Partnership and Membership Interests. None of the Pledged Shares consisting of partnership or limited liability company interests (i) is dealt in or traded on a securities exchange or in a securities market, (ii) by its terms expressly provides that it is a security governed by Article 8 of the UCC, (iii) is an investment company security, (iv) is held in a securities account or (v) constitutes a Security or a Financial Asset.

(iv)     No Other Interests. As of the Closing Date, no Grantor owns any Equity Interests in any Subsidiary other than as set forth on *Schedule 2(v)* attached hereto.

(j)     Grantor's Name, Location, etc.

(i)     Other than as otherwise permitted pursuant to any Loan Document, (i) the jurisdiction in which such Grantor is located for purposes of Sections 9-301 and 9-307 of the UCC is set forth on *Schedule 5(j)*, (ii) the place of business of such Grantor or, if such Grantor has more than one place of business, the chief executive office of such Grantor and the office where such Grantor keeps its records concerning the Receivables and the other Collateral, and all originals of all Chattel Paper which evidence Receivables, is set forth on *Schedule 5(j)*, and (iii) such Grantor's federal taxpayer identification number is set forth on *Schedule 5(j)*.

10

(ii)     In the past five years, such Grantor has not been known by any legal name different from the one set forth on the signature page hereto, nor has such Grantor been the subject of any merger or other corporate reorganization, except as set forth on **Schedule 5(j)**.

(iii)     Such Grantor is not a party to any federal, state or local government contract, except as set forth on **Schedule 5(j)** (as such schedule may be amended or supplemented from time to time).

(iv)     Such Grantor does not maintain any Deposit Accounts, Securities Accounts or Commodity Accounts with any Person, in each case, except as set forth on **Schedule 5(j)** (as such schedule may be amended or supplemented from time to time).

(v)     None of the Receivables is evidenced by a promissory note or other instrument other than a promissory note or instrument that has been delivered to the Administrative Agent (with appropriate endorsements).

(vi)     Such Grantor is not the beneficiary of any Letters of Credit, except as set forth on **Schedule 5(j)** (as such schedule may be amended or supplemented from time to time). Such Grantor has obtained a legal, valid and enforceable consent of each issuer to the assignment to the Administrative Agent of the Proceeds of any Letter of Credit which has a stated amount in excess of $250,000.

(vii)     As of the Closing Date, the name set forth on the signature page attached hereto is the true and correct legal name (as defined in the UCC) of such Grantor. Such Grantor shall not change its name except as permitted by, and in strict accordance with the terms and conditions of, the Credit Agreement.

(viii)     Except pursuant to the Loan Documents, such Grantor has not consented to, and is otherwise unaware of, any Person (other than the Administrative Agent pursuant hereto) having control (within the meaning of Section 9-104 or Section 8-106 of the UCC) over any Collateral, or any other interest in any of such Grantor's rights in respect thereof.

(k)     Negotiable Documents, Instruments and Chattel Paper. Such Grantor has, contemporaneously herewith, delivered to the Administrative Agent possession of all originals of all Documents, Instruments, Promissory Notes, and Tangible Chattel Paper owned or held by such Grantor (duly endorsed, in blank, if requested by the Administrative Agent).

(l)     Best Interests. It is in the best interests of each Grantor to execute this Agreement in as much as such Grantor will, as a result of being the Borrower or a Subsidiary of the Borrower, derive substantial direct and indirect benefits from the making of the Loans pursuant to the Credit Agreement, and each Grantor agrees that the Secured Parties are relying on this representation in entering into the Credit Agreement and agreeing to make such Loans pursuant to the Credit Agreement to the Borrower. Furthermore, the making of such Loans under the Credit Agreement is (i) in furtherance of each Grantor's corporate or limited liability purposes, and (ii) necessary or convenient to the conduct, promotion or attainment of each Grantor's business.

4914176v5

(m)    _Representations and Warranties Contained in the Credit Agreement_. The representations and warranties as to such Grantor and its Subsidiaries made in Article VI of the Credit Agreement are true and correct in all material respects (without duplication of any materiality qualifier contained therein) on each date as required by the Credit Agreement, with the same force and effect as if such representations and warranties had been made on and as of such date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date.

**6.    Covenants**. Each Grantor covenants that, so long as any of the Secured Obligations (other than contingent indemnification obligations for which no underlying claim has been asserted) remains outstanding and until the Credit Agreement has been terminated, such Grantor shall:

(a)    _Other Liens_. Defend the Collateral against Liens therein other than Permitted Liens, upon becoming aware thereof.

(b)    _Instruments; Tangible Chattel Paper; Documents_. If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument or Tangible Chattel Paper, or if any property constituting Collateral shall be stored or shipped subject to a Document, (i) ensure that such Instrument, Tangible Chattel Paper or Document is either in the possession of such Grantor at all times or, if reasonably requested by the Administrative Agent, is promptly delivered to the Administrative Agent, duly endorsed in a manner reasonably satisfactory to the Administrative Agent and (ii) ensure that any Collateral consisting of Tangible Chattel Paper is marked with a legend reasonably acceptable to the Administrative Agent indicating the Administrative Agent's security interest in such Tangible Chattel Paper.

(c)    _Perfection of Security Interest_. Subject to the provisions of the Credit Agreement, execute and deliver to the Administrative Agent such agreements, assignments or instruments (including affidavits, notices, reaffirmations and amendments and restatements of existing documents, as the Administrative Agent may reasonably request) and do all such other things as the Administrative Agent may reasonably deem necessary, appropriate or convenient (i) to assure to the Administrative Agent the effectiveness, perfection and priority of its security interests hereunder, including (A) such instruments as the Administrative Agent may from time to time reasonably request in order to perfect and maintain the security interests granted hereunder in accordance with the UCC, (B) with regard to Copyrights registered with the United States Copyright Office, a Notice of Grant of Security Interest in Copyrights for filing with the United States Copyright Office in the form of **_Exhibit 6(c)(i)_** attached hereto, (C) with regard to Patents registered with the United States Patent and Trademark Office, a Notice of Grant of Security Interest in Patents for filing with the United States Patent and Trademark Office in the form of **_Exhibit 6(c)(ii)_** attached hereto and (D) with regard to Trademarks registered with the United States Patent and Trademark Office, a Notice of Grant of Security Interest in Trademarks for filing with the United States Patent and Trademark Office in the form of **_Exhibit 6(c)(iii)_** attached hereto, (ii) to consummate the transactions contemplated hereby, and (iii) to otherwise protect and assure the Administrative Agent of its rights and interests hereunder. To that end, each Grantor authorizes the Administrative Agent to file one or more financing statements (with

12

collateral descriptions broader, including, without limitation, "all assets" and/or "all personal property" collateral descriptions, and/or less specific than the description of the Collateral contained herein) disclosing the Administrative Agent's security interest in any or all of the Collateral of such Grantor without such Grantor's signature thereon, and further each Grantor also hereby irrevocably makes, constitutes and appoints the Administrative Agent, its nominee or any other Person whom the Administrative Agent may designate as such Grantor's attorney-in-fact with full power and for the limited purpose to sign in the name of such Grantor any such financing statements (including renewal statements), amendments and supplements, notices or any similar documents that in the Administrative Agent's reasonable discretion would be necessary, appropriate or convenient in order to perfect and maintain perfection of the security interests granted hereunder, such power, being coupled with an interest, being and remaining irrevocable so long as the Secured Obligations remain unpaid and until the Credit Agreement shall have been terminated. Each Grantor hereby agrees that a carbon, photographic or other reproduction of this Agreement or any such financing statement is sufficient for filing as a financing statement by the Administrative Agent without notice thereof to such Grantor wherever the Administrative Agent may in its sole discretion desire to file the same. In the event for any reason the Applicable Law of any jurisdiction other than Texas becomes or is applicable to the Collateral of any Grantor or any part thereof, or to any of the Secured Obligations, such Grantor agrees to execute and deliver all such instruments and to do all such other things as the Administrative Agent reasonably requests as necessary and appropriate to preserve, protect and enforce the security interests of the Administrative Agent under the Applicable Law of such other jurisdiction (and, if any Grantor shall fail to do so promptly upon the request of the Administrative Agent, then the Administrative Agent may execute any and all such requested documents on behalf of such Grantor pursuant to the power of attorney granted hereinabove). If any Collateral is in the possession or control of any Grantor's agents and the Administrative Agent so requests at any time after the occurrence and during the continuance of an Event of Default, such Grantor agrees to notify such agents in writing of the Administrative Agent's security interest therein and, upon the Administrative Agent's request, instruct them to hold all such Collateral for the account of the Secured Parties, subject to the Administrative Agent's instructions. Upon the reasonable request of the Administrative Agent, each Grantor agrees to mark its books and records to reflect the security interest of the Administrative Agent in the Collateral.

(d)     Control. Subject to the provisions of the Credit Agreement, execute and deliver (and cause to be executed and delivered) all agreements, assignments, instruments or other documents as the Administrative Agent shall reasonably request for the purpose of obtaining and maintaining control within the meaning of the UCC with respect to any Collateral consisting of (i) Deposit Accounts (to the extent required by the Credit Agreement) and (ii) Investment Property, Letter-of-Credit Rights and Electronic Chattel Paper with a value in excess of $250,000 in the aggregate.

(e)     Collateral held by Warehouseman, Bailee. If any Collateral with a value in excess of $250,000 in the aggregate is at any time in the possession or control of a warehouseman, bailee, agent or processor of such Grantor and is expected to remain in possession and control of such third party for more than thirty (30) days, notify the Administrative Agent of such possession or control and, upon the reasonable request of the Administrative Agent, (i) notify such Person of the Administrative Agent's security interest in such Collateral, (ii) instruct such

13

Person to hold all such Collateral for the Administrative Agent's account and subject to the Administrative Agent's instructions and (iii) obtain a written acknowledgment from such Person that it is holding such Collateral for the benefit of the Administrative Agent.

(f)     <u>Treatment of Accounts</u>. At any time upon the request of the Administrative Agent after the occurrence and during the continuation of an Event of Default, not grant or extend the time for payment of any Account, or compromise or settle any Account for less than the full amount thereof, or release any Person or property, in whole or in part, from payment thereof, or allow any credit or discount thereon, in each case other than as normal and customary in the ordinary course of any Grantor's business or as required by Applicable Law.

(g)     <u>Covenants Relating to Copyrights</u>.

(i)     Except as could not reasonably be expected to have a Material Adverse Effect, (A) not do any act or knowingly omit to do any act whereby any Copyright may become invalidated; (B) not do any act, or knowingly omit to do any act, whereby any Copyright may become injected into the public domain; (C) notify the Administrative Agent immediately if it knows that any Copyright may become injected into the public domain or of any adverse determination or development (including, without limitation, the institution of, or any such determination or development in, any court or tribunal in the United States or any other country) regarding any Grantor's ownership of any such Copyright or its validity; and (D) take all necessary steps as such Grantor shall deem appropriate under the circumstances, to maintain and pursue each application (and to obtain the relevant registration) of each Copyright owned by any Grantor and to maintain each registration of each Copyright owned by any Grantor including, without limitation, filing of applications for renewal where necessary.

(ii)     Promptly notify the Administrative Agent of any infringement of any material Copyright of any Grantor of which it becomes aware and take such actions as it shall reasonably deem appropriate under the circumstances to protect such material Copyright, including, where appropriate, the bringing of suit for infringement, seeking injunctive relief and seeking to recover any and all damages for such infringement.

(iii)     Not make any assignment or agreement in conflict with the security interest in the Copyrights of each Grantor hereunder (other than in connection with a Permitted Lien or as otherwise provided in the Credit Agreement).

(h)     <u>Covenants Relating to Patents and Trademarks</u>.

(i)     (A) Maintain its material Trademarks in full force free from any claim of abandonment for non-use, (B) maintain as in the past the quality of products and services offered under such Trademarks, and (C) not (and not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby any such material Trademarks may become invalidated.

(ii)     Not do any act, or omit to do any act, whereby any material Patent may become abandoned or dedicated.

14

(iii)     Notify the Administrative Agent promptly if it knows that any application or registration relating to any material Patent or Trademark may become abandoned or dedicated, or of any adverse determination or development (including, without limitation, the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office or any court or tribunal in any country) regarding any Grantor's ownership of any material Patent or Trademark or its right to register the same or to keep and maintain the same.

(iv)     Take all reasonable and necessary steps, including, without limitation, in any proceeding before the United States Patent and Trademark Office, or any similar office or agency in any other country or any political subdivision thereof, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of each material Patent and Trademark, including, without limitation, filing of applications for renewal, affidavits of use and affidavits of incontestability, except for those the failures which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(v)     Not make any assignment or agreement in conflict with the security interest in the Patents or Trademarks of each Grantor hereunder (other than in connection with a Permitted Lien or as otherwise provided in the Credit Agreement).

(i)     <u>Insurance</u>. Insure, repair and replace the Collateral of such Grantor as set forth in the Credit Agreement. All insurance proceeds shall be subject to the security interest of the Administrative Agent hereunder.

(j)     <u>Commercial Tort Claims</u>. Execute and deliver such statements, documents and notices and do and cause to be done all such things as the Administrative Agent may reasonably deem necessary, appropriate or convenient, or as are required by Applicable Law, to create, perfect and maintain the Administrative Agent's security interest in any Commercial Tort Claim in excess of $250,000.

(k)     <u>Covenants Relating to Pledged Shares</u>.

(i)     <u>Compliance with Securities Laws</u>. File all reports and other information now or hereafter required to be filed by such Grantor with the United States Securities and Exchange Commission and any other Governmental Authority in connection with the ownership of the Pledged Shares of such Grantor.

(ii)     <u>Pledged Shares of Foreign Subsidiaries</u>. Take all actions necessary or advisable and reasonably requested by the Administrative Agent to assure the effectiveness, perfection and priority of the security interest in any Pledged Shares of Foreign Subsidiaries in any applicable foreign jurisdiction, including any filings, agreements, documents and instruments and any other actions in such foreign jurisdictions as may be required by applicable foreign law or as the Administrative Agent may otherwise reasonably request;

(iii)     <u>Issuance or Acquisition of Equity Interests</u>. Not, without executing and delivering, or causing to be executed and delivered, to the Administrative Agent such

15

agreements, documents and instruments as the Administrative Agent may reasonably request for the purpose of perfecting its security interest therein, issue or acquire any Equity Interests constituting Collateral consisting of an interest in a partnership or a limited liability company that (i) is dealt in or traded on a securities exchange or in a securities market, (ii) by its terms expressly provides that it is a security governed by Article 8 of the UCC, (iii) is an investment company security, (iv) is held in a securities account or (v) constitutes a Security or a Financial Asset.

(l)     <u>As to Equipment and Inventory and Goods</u>.

(i)     <u>Generally</u>. Each Grantor hereby agrees that it shall (a) keep all of the Equipment and Inventory (other than Inventory sold in the ordinary course of business) and Goods located in a jurisdiction within the United States of America or its offshore waters where all representations and warranties set forth in *Section 6* shall be true and correct, and all action required pursuant to the *second sentence* of *Section 6(m)* shall have been taken with respect to the Equipment and Inventory and Goods, and (b) pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against, the Equipment and Inventory and Goods, except to the extent the validity thereof is being contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP have been set aside.

(ii)     <u>As to Certificated Equipment</u>. Each Grantor shall cause all Certificated Equipment to be properly titled in the name of the appropriate Grantor and to have the Administrative Agent's Lien granted hereunder on such Certificated Equipment properly noted on the certificate of title with respect thereof and shall hold such certificates, in trust, as custodian for the Administrative Agent.

(m)     <u>Further Assurances, etc.</u> Each Grantor shall warrant and defend the right and title herein granted unto the Administrative Agent, for the benefit of the Secured Parties, in and to the Collateral (and all right, title and interest represented by the Collateral) against the claims and demands of all Persons whomsoever, subject to Permitted Liens. Each Grantor agrees that, from time to time at its own expense, it will promptly execute and deliver all further instruments and documents, and take all further action, that the Administrative Agent may reasonably request, in order to perfect, preserve and protect any security interest granted or purported to be granted hereby or to enable the Administrative Agent and the other Secured Parties to exercise and enforce its rights and remedies hereunder with respect to any Collateral subject to the terms hereof. Each Grantor agrees that, upon the acquisition after the date hereof by such Grantor of any Collateral, with respect to which the security interest granted hereunder is not perfected automatically upon such acquisition, to take such actions with respect to such Collateral or any part thereof as required by the Loan Documents.

(n)     <u>Covenants Contained in the Credit Agreement</u>.  Comply with the covenants, terms and conditions set forth in the Credit Agreement which such Grantor is to comply with or which is otherwise applicable to such Grantor.

16

7. **Advances by Administrative Agent**. Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent may, at its sole option and in its sole discretion, perform any of the covenants and agreements contained herein and in so doing may expend such sums as the Administrative Agent may reasonably deem advisable in the performance thereof, including, without limitation, the payment of any insurance premiums, the payment of any taxes, any payment to obtain a release of a Lien or potential Lien, expenditures made in defending against any adverse claim and all other expenditures that the Administrative Agent may make for the protection of the security hereof or may be compelled to make by operation of Applicable Law. All such sums and amounts so expended shall be repayable by the Grantors on a joint and several basis (subject to *Section 24* hereof) promptly upon timely notice thereof and demand therefor, shall constitute additional Secured Obligations and shall bear interest from the date said amounts are expended at the Default Rate. No such performance of any covenant or agreement by the Administrative Agent on behalf of any Grantor, and no such advance or expenditure therefor, shall relieve the Grantors of any default under the terms of this Agreement, the other Loan Documents or any other documents relating to the Secured Obligations. At any time on failure of any Grantor to pay after ten (10) Business Days' notice of nonpayment from the Administrative Agent, the Administrative Agent may make any payment hereby authorized in accordance with any bill, statement or estimate procured from the appropriate public office or holder of the claim to be discharged, without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax assessment, sale, forfeiture, tax lien, title or claim except to the extent such payment is being contested in good faith by any Grantor in appropriate proceedings and against which adequate reserves are being maintained in accordance with GAAP.

8. **Remedies**.

(a) General Remedies. Upon the occurrence of an Event of Default and during the continuation thereof, the Administrative Agent shall have, in addition to the rights and remedies provided herein, in the other Loan Documents, in any other documents relating to the Secured Obligations or by Applicable Law (including, without limitation, levy of attachment and garnishment), the rights and remedies of a secured party under the Uniform Commercial Code of the jurisdiction applicable to the affected Collateral and, further, the Administrative Agent may, with or without judicial process or the aid and assistance of others, in each case, subject to the rights of any third parties, (i) enter on any premises on which any of the Collateral may be located and, without resistance or interference by the Grantors, take possession of the Collateral, (ii) dispose of any Collateral on any such premises, (iii) require the Grantors to assemble and make available to the Administrative Agent at the expense of the Grantors any Collateral at any place and time designated by the Administrative Agent that is reasonably convenient to both parties, (iv) remove any Collateral from any such premises for the purpose of effecting sale or other disposition thereof, and/or (v) without demand and without advertisement, notice, hearing or process of law, all of which each of the Grantors hereby waives to the fullest extent permitted by Applicable Law, at any place and time or times, sell and deliver any or all Collateral held by or for it at public or private sale, by one or more contracts, in one or more parcels, for cash, upon credit or otherwise, at such prices and upon such terms as the Administrative Agent deems advisable, in its sole discretion (subject to any and all mandatory legal requirements, including, without limitation, in the event of a private sale of any of the securities constituting Pledged Shares, limiting such sale to a restricted group of purchasers who will be obligated to agree,

17

among other things, to acquire such Pledged Shares for their own account, for investment and not with a view to the distribution or resale thereof). Each of the Grantors acknowledges that any private sale referenced above may be at prices and on terms less favorable to the seller than the prices and terms that might have been obtained at a public sale and agrees that such private sale shall be deemed to have been made in a commercially reasonable manner. Neither the Administrative Agent's compliance with Applicable Law nor its disclaimer of warranties relating to the Collateral shall be considered to adversely affect the commercial reasonableness of any sale. In addition to all other sums due the Administrative Agent and the Secured Parties with respect to the Secured Obligations, the Grantors shall pay the Administrative Agent and each of the Secured Parties all reasonable documented costs and expenses incurred by the Administrative Agent or any such Secured Party, including, but not limited to, attorneys' fees and court costs, in obtaining or liquidating the Collateral, in enforcing payment of the Secured Obligations, or in the prosecution or defense of any action or proceeding by or against the Administrative Agent or the other Secured Parties or the Grantors concerning any matter arising out of or connected with this Agreement, any Collateral or the Secured Obligations, including, without limitation, any of the foregoing arising in, arising under or related to a case under the Debtor Relief Laws. To the extent the rights of notice cannot be legally waived hereunder, each Grantor agrees that any requirement of reasonable notice shall be met if such notice is personally served on or mailed, postage prepaid, to the Grantors in accordance with the notice provisions of Section 11.1 of the Credit Agreement at least ten (10) Business Days before the time of sale or other event giving rise to the requirement of such notice. The Administrative Agent shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given. To the extent permitted by Applicable Law, any Secured Party may be a purchaser at any such sale. To the extent permitted by Applicable Law, each of the Grantors hereby waives all of its rights of redemption with respect to any such sale. Subject to the provisions of Applicable Law, the Administrative Agent and the Secured Parties may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, to the extent permitted by Applicable Law, be made at the time and place to which the sale was postponed, or the Administrative Agent may further postpone such sale by announcement made at such time and place. Notwithstanding anything to the contrary contained herein, the Grantors hereby acknowledge that the Administrative Agent shall have no obligation to delay sale of any Pledged Shares for the period of time necessary to permit the issuer of such Pledged Shares to register such Pledged Shares for public sale under the Securities Act of 1933, as amended (the "*Securities Act*"), or under applicable state securities laws. Each Grantor further acknowledges and agrees that any offer to sell such Pledged Shares that has been (i) publicly advertised on a bona fide basis in a newspaper or other publication of general circulation in the financial community of Houston, Texas (to the extent that such offer may be advertised without prior registration under the Securities Act) or (ii) made privately in the manner described above shall be deemed to involve a "public sale" under the UCC, notwithstanding that such sale may not constitute a "public offering" under the Securities Act, and the Administrative Agent may, in such event, bid for the purchase of such Pledged Shares.

(b)     Remedies Relating to Accounts. Upon the occurrence of an Event of Default and during the continuation thereof, whether or not the Administrative Agent has exercised any or all of its rights and remedies hereunder, (i) each Grantor will promptly upon request of the Administrative Agent instruct all account debtors to remit all payments in respect of Accounts to

18

a mailing location selected by the Administrative Agent and (ii) the Administrative Agent shall have the right to enforce any Grantor's rights against its customers and account debtors, and the Administrative Agent or its designee may notify (or require any Grantor to notify) any Grantor's customers and account debtors that the Accounts of such Grantor have been assigned to the Administrative Agent or of the Administrative Agent's security interest therein, and may (either in its own name or in the name of such Grantor or both) demand, collect (including, without limitation, by way of a lockbox arrangement) receive, take receipt for, sell, sue for, compound, settle, compromise and give acquittance for any and all amounts due or to become due on any Account, and, in the Administrative Agent's discretion, file any claim or take any other action or proceeding to protect and realize upon the security interest of the Secured Parties in the Accounts. Each Grantor acknowledges and agrees that the Proceeds of its Accounts remitted to or on behalf of the Administrative Agent in accordance with the provisions hereof shall be solely for the Administrative Agent's own convenience and that such Grantor shall not have any right, title or interest in such Accounts or in any such other amounts except as expressly provided herein. The Administrative Agent and the other Secured Parties shall have no liability or responsibility to any Grantor for acceptance of a check, draft or other order for payment of money bearing the legend "payment in full" or words of similar import or any other restrictive legend or endorsement or be responsible for determining the correctness of any remittance. Each Grantor hereby agrees to indemnify the Administrative Agent and the other Secured Parties from and against all liabilities, damages, losses, actions, claims, judgments, costs, expenses, charges and attorneys' fees suffered or incurred by the Administrative Agent or the other Secured Parties (each, an "**_Indemnified Party_**") because of the maintenance of the foregoing arrangements except as relating to or arising out of the material breach in bad faith of such Indemnified Party's obligations hereunder or under any other Loan Document, or the gross negligence or willful misconduct of an Indemnified Party or its officers, employees or agents. In the case of any investigation, litigation or other proceeding, the foregoing indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by a Grantor, its directors, shareholders or creditors or an Indemnified Party or any other Person or any other Indemnified Party is otherwise a party thereto.

(c)     Access. Subject the rights of any third parties, in addition to the rights and remedies hereunder, upon the occurrence of an Event of Default and during the continuation thereof, the Administrative Agent shall have the right to enter and remain upon the various premises of the Grantors without cost or charge to the Administrative Agent, and use the same, together with materials, supplies, books and records of the Grantors for the purpose of collecting and liquidating the Collateral, or for preparing for sale and conducting the sale of the Collateral, whether by foreclosure, auction or otherwise. In addition, the Administrative Agent may remove Collateral, or any part thereof, from such premises and/or any records with respect thereto, in order to effectively collect or liquidate such Collateral.

(d)     Nonexclusive Nature of Remedies. Failure by the Administrative Agent or the other Secured Parties to exercise any right, remedy or option under this Agreement, any other Loan Document or any other documents relating to the Secured Obligations or as provided by Applicable Law, or any delay by the Administrative Agent or the other Secured Parties in exercising the same, shall not operate as a waiver of any such right, remedy or option. No waiver hereunder shall be effective unless it is in writing, signed by the party against whom such waiver is sought to be enforced and then only to the extent specifically stated, which in the case of the

Administrative Agent or the other Secured Parties shall only be granted as provided herein. To the extent permitted by Applicable Law, neither the Administrative Agent, the other Secured Parties, nor any party acting as attorney for the Administrative Agent or the other Secured Parties, shall be liable hereunder for any acts or omissions or for any error of judgment or mistake of fact or law other than their material breach in bad faith of their obligations hereunder or under any other Loan Document, gross negligence or willful misconduct. The rights and remedies of the Administrative Agent and the other Secured Parties under this Agreement shall be cumulative and not exclusive of any other right or remedy that the Administrative Agent or the other Secured Parties may have.

(e)     <u>Retention of Collateral</u>. To the extent permitted under Applicable Law, in addition to the rights and remedies hereunder, upon the occurrence and during the continuation of an Event of Default, the Administrative Agent may, after providing the notices required by Sections 9-620 and 9-621 of the UCC or otherwise complying with the requirements of Applicable Law of the relevant jurisdiction, accept or retain all or any portion of the Collateral in satisfaction of the Secured Obligations. Unless and until the Administrative Agent shall have provided such notices, however, the Administrative Agent shall not be deemed to have accepted or retained any Collateral in satisfaction of any Secured Obligations for any reason.

(f)     <u>Deficiency</u>. In the event that the proceeds of any sale, collection or realization are insufficient to pay all amounts to which the Administrative Agent or the other Secured Parties are legally entitled, the Grantors shall be jointly and severally liable for the deficiency (subject to **Section 24** hereof), together with interest thereon at the Default Rate, together with the costs of collection and attorneys' fees. Any surplus remaining after the full payment and satisfaction of the Secured Obligations shall be returned to the Grantors or to whomsoever a court of competent jurisdiction shall determine to be entitled thereto.

## 9.     **Rights of the Administrative Agent**.

(a)     <u>Power of Attorney</u>. In addition to other powers of attorney contained herein, each Grantor hereby designates and appoints the Administrative Agent, on behalf of the Secured Parties, and each of its designees or agents, as attorney-in-fact of such Grantor, irrevocably and with power of substitution, with authority to take any or all of the following actions upon the occurrence and during the continuation of an Event of Default:

(i)     to demand, collect, settle, compromise and adjust, and give discharges and releases concerning the Collateral, all as the Administrative Agent may reasonably deem appropriate;

(ii)     to commence and prosecute any actions at any court for the purposes of collecting any of the Collateral and enforcing any other right in respect thereof;

(iii)     to defend, settle or compromise any action, suit or proceeding brought and, in connection therewith, give such discharge or release as the Administrative Agent may reasonably deem appropriate;

(iv)     to endorse checks, notes, drafts, acceptances, money orders, bills of lading, warehouse receipts or other instruments or documents evidencing payment,

4914176v5

shipment or storage of the goods giving rise to the Collateral on behalf of and in the name of such Grantor, or securing, or relating to such Collateral;

(v)    unless being contested as permitted by, and in strict accordance with the terms and conditions of, the Credit Agreement, to pay or discharge taxes, Liens, security interests or other encumbrances levied or placed on or threatened against the Collateral;

(vi)    to direct any parties liable for any payment in connection with any of the Collateral to make payment of any and all monies due and to become due thereunder directly to the Administrative Agent or as the Administrative Agent shall direct;

(vii)    to receive payment of and receipt for any and all monies, claims and other amounts due and to become due at any time in respect of or arising out of any Collateral;

(viii)    to sell, assign, transfer, make any agreement in respect of, or otherwise deal with or exercise rights in respect of, any Collateral or the goods or services that have given rise thereto, as fully and completely as though the Administrative Agent were the absolute owner thereof for all purposes;

(ix)    to adjust and settle claims under any insurance policy relating thereto;

(x)    to execute and deliver all assignments, conveyances, statements, financing statements, renewal financing statements, security and pledge agreements, affidavits, notices and other agreements, instruments and documents that the Administrative Agent may reasonably deem appropriate in order to perfect and maintain the security interests and Liens granted in this Agreement and in order to fully consummate all of the transactions contemplated therein;

(xi)    to exchange any of the Collateral constituting Pledged Shares or other property upon any merger, consolidation, reorganization, recapitalization or other readjustment of the issuer thereof and, in connection therewith, deposit any of the Collateral constituting Pledged Shares with any committee, depository, transfer agent, registrar or other designated agency upon such terms as the Administrative Agent may deem appropriate;

(xii)    to vote for a shareholder or member resolution, or to sign an instrument in writing, sanctioning the transfer of any or all of the Collateral constituting Pledged Shares into the name of the Administrative Agent or one or more of the Secured Parties or into the name of any transferee to whom the Collateral constituting Pledged Shares or any part thereof may be sold pursuant to *Section 8*;

(xiii)    to institute any foreclosure proceedings that the Administrative Agent may reasonably deem appropriate; and

(xiv)    to do and perform all such other acts and things as the Administrative Agent may reasonably deem appropriate or convenient in connection with the Collateral.

This power of attorney is a power coupled with an interest and shall be irrevocable for so long as any of the Secured Obligations (other than contingent indemnification obligations for which no underlying claim has been asserted) shall remain outstanding and until the Credit Agreement has been terminated. The Administrative Agent shall be under no duty to exercise or withhold the exercise of any of the rights, powers, privileges and options expressly or implicitly granted to the Administrative Agent in this Agreement, and shall not be liable for any failure to do so or any delay in doing so. The Administrative Agent shall not be liable for any act or omission or for any error of judgment or any mistake of fact or law in its individual capacity or its capacity as attorney-in-fact except acts or omissions resulting from its material breach in bad faith of its obligations hereunder, gross negligence or willful misconduct. This power of attorney is conferred on the Administrative Agent solely to protect, preserve and realize upon its security interest in the Collateral.

(b)     <u>Assignment by the Administrative Agent</u>. The Administrative Agent may from time to time assign the Collateral and any portion thereof to a successor agent in accordance with the Credit Agreement, and the assignee shall be entitled to all of the rights and remedies of the Administrative Agent under this Agreement in relation thereto.

(c)     <u>The Administrative Agent's Duty of Care</u>. Other than the exercise of reasonable care to assure the safe custody of the Collateral while being held by the Administrative Agent hereunder, the Administrative Agent shall have no duty or liability to preserve rights pertaining thereto, it being understood and agreed that the Grantors shall be responsible for preservation of all rights in the Collateral, and the Administrative Agent shall be relieved of all responsibility for the Collateral upon surrendering it or tendering the surrender of it to the Grantors. The Administrative Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Administrative Agent accords its own property, it being understood that the Administrative Agent shall not have responsibility for (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Collateral, whether or not the Administrative Agent has or is deemed to have knowledge of such matters, or (ii) taking any necessary steps to preserve rights against any parties with respect to any of the Collateral. In the event of a public or private sale of Collateral pursuant to **Section 8**, the Administrative Agent shall have no obligation to prepare the Collateral for sale.

(d)     <u>Voting Rights in Respect of the Pledged Shares</u>.

(i)     So long as no Event of Default shall have occurred and be continuing, each Grantor may exercise any and all voting and other consensual rights pertaining to the Pledged Shares of such Grantor or any part thereof for any purpose; and

(ii)     Upon the occurrence and during the continuance of an Event of Default and receipt of notice from the Administrative Agent by such Grantor, all rights of any Grantor to exercise the voting and other consensual rights that it would otherwise be entitled to exercise pursuant to **Section 9(d)(i)** shall cease and all such rights shall thereupon become vested in the Administrative Agent, upon its election, which shall then have the sole right to exercise such voting and other consensual rights.

22

(e)  <u>Dividend Rights in Respect of the Pledged Shares</u>.

(i)  So long as no Event of Default shall have occurred and be continuing and subject to *Section 4(b)*, each Grantor may receive and retain any and all dividends and distributions (other than stock dividends and other dividends and distributions constituting Collateral addressed hereinabove) or interest paid in respect of the Pledged Shares to the extent they are allowed under the Credit Agreement.

(ii)  Upon the occurrence and during the continuance of an Event of Default and receipt of notice from the Administrative Agent by such Grantor, (A) all rights of a Grantor to receive the dividends, distributions and interest payments that it would otherwise be authorized to receive and retain pursuant to *Section 9(e)(i)* shall cease and all such rights shall thereupon be vested in the Administrative Agent, which shall then have the sole right to receive and hold as Collateral such dividends, distributions and interest payments; and (B) all dividends and interest payments that are received by any Grantor contrary to the provisions of the preceding clause (A) shall be received in trust for the benefit of the Administrative Agent, shall be segregated from other property or funds of such Grantor, and shall be forthwith paid over to the Administrative Agent as Collateral in the exact form received, to be held by the Administrative Agent as Collateral and as further collateral security for the Secured Obligations.

(f)  <u>Release of Collateral</u>. The Administrative Agent may release any of the Collateral from this Agreement or may substitute any of the Collateral for other Collateral without altering, varying or diminishing in any way the force, effect, lien, pledge or security interest of this Agreement as to any Collateral not expressly released or substituted, and this Agreement shall continue as a Lien on all Collateral not expressly released or substituted.

**10.  Rights of Required Lenders**. All rights hereunder may be exercised by the Administrative Agent and shall be exercised by the Administrative Agent at the request of the Required Lenders.

**11.  Application of Proceeds**. Upon the occurrence and during the continuation of an Event of Default, any payments in respect of the Secured Obligations and any proceeds of the Collateral, when received by the Administrative Agent or any of the other Secured Parties in cash or its equivalent, will be applied in reduction of the Secured Obligations in the order set forth in Section 9.4 of the Credit Agreement, and each Grantor irrevocably waives the right to direct the application of such payments and proceeds and acknowledges and agrees that the Administrative Agent shall have the continuing and exclusive right to apply and reapply any and all such payments and proceeds in the Administrative Agent's sole discretion, notwithstanding any entry to the contrary upon any of its books and records.

**12.  Continuing Agreement**.

(a)  This Agreement shall be a continuing agreement in every respect and shall remain in full force and effect so long as any of the Secured Obligations (other than contingent indemnification obligations for which no underlying claim has been asserted) remains outstanding and until the Credit Agreement has been terminated. Upon payment of all Secured

Obligations (other than contingent indemnification obligations for which no underlying claim has been asserted) and termination of the Credit Agreement, this Agreement and the Liens and security interests of the Administrative Agent hereunder shall be automatically terminated (other than any obligations expressly stated to survive such termination), and the Administrative Agent shall, upon the request and at the expense of the Grantors, execute and deliver all UCC termination statements and/or other documents reasonably requested by the Grantors evidencing such termination. Notwithstanding the foregoing, all releases and indemnities provided hereunder shall survive termination of this Agreement.

(b)     This Agreement shall continue to be effective or be automatically reinstated, as the case may be, if at any time payment, in whole or in part, of any of the Secured Obligations is rescinded or must otherwise be restored or returned by the Administrative Agent or any other Secured Party as a preference, fraudulent conveyance or otherwise under any Debtor Relief Law, all as though such payment had not been made; provided that in the event payment of all or any part of the Secured Obligations is rescinded or must be restored or returned, all documented costs and expenses (including, without limitation, attorneys' fees and disbursements) incurred by the Administrative Agent or any other Secured Party in defending and enforcing such reinstatement shall be deemed to be included as a part of the Secured Obligations.

**13.**     **Amendments and Waivers**. This Agreement and the provisions hereof may not be amended, waived, modified, changed, discharged or terminated except as set forth in Section 11.2 of the Credit Agreement.

**14.**     **Successors in Interest**. This Agreement shall create a continuing security interest in the Collateral and shall be binding upon each Grantor, its successors and assigns, and shall inure, together with the rights and remedies of the Administrative Agent hereunder, to the benefit of the Administrative Agent and the other Secured Parties and their successors and permitted assigns; *provided that* none of the Grantors may assign its rights or delegate its duties hereunder without the prior written consent of the requisite Lenders under the Credit Agreement. To the fullest extent permitted by Applicable Law, each Grantor hereby releases the Administrative Agent and each other Secured Party, their respective successors and assigns and their respective officers, attorneys, employees and agents, from any liability for any act or omission or any error of judgment or mistake of fact or of law relating to this Agreement or the Collateral, except for any liability arising from the material breach in bad faith of such party's obligations hereunder or under any other Loan Document, or the gross negligence or willful misconduct of such party or its officers, attorneys, employees or agents.

**15.**     **Notices**. All notices required or permitted to be given under this Agreement shall be given as provided in Section 11.1 of the Credit Agreement.

**16.**     **Counterparts**. This Agreement may be executed in any number of counterparts, each of which where so executed and delivered shall be an original, but all of which shall constitute one and the same instrument. It shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart. Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

24

    **17.**    **Headings**. The headings of the sections and subsections hereof are provided for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

    **18.**    **Governing Law; Submission to Jurisdiction; Venue**.

    (a)    GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF TEXAS.

    (b)    SUBMISSION TO JURISDICTION. EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF TEXAS SITTING IN HARRIS COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF TEXAS, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH TEXAS STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY OTHER SECURED PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY BORROWER OR ANY OTHER GRANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

    (c)    WAIVER OF VENUE. EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN ***SECTION 18(B)***. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

    (d)    SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.1 OF THE CREDIT AGREEMENT. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

4914176v5

19.     **Waiver of Right to Trial by Jury**. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS *SECTION 19*.

20.     **Severability**. If any provision of this Agreement is determined to be illegal, invalid or unenforceable, such provision shall be fully severable and the remaining provisions shall remain in full force and effect and shall be construed without giving effect to the illegal, invalid or unenforceable provisions.

21.     **Entirety**. This Agreement, the other Loan Documents and the other documents relating to the Secured Obligations represent the entire agreement of the parties hereto and thereto, and supersede all prior agreements and understandings, oral or written, if any, including any commitment letters or correspondence relating to the Loan Documents, any other documents relating to the Secured Obligations, or the transactions contemplated herein and therein.

22.     **Survival**. All representations and warranties of the Grantors hereunder shall survive the execution and delivery of this Agreement, the other Loan Documents and the other documents relating to the Secured Obligations, the delivery of the Notes and the extension of credit thereunder or in connection therewith.

23.     **Other Security**. To the extent that any of the Secured Obligations are now or hereafter secured by property other than the Collateral (including, without limitation, real and other personal property owned by any Grantor), or by a guarantee, endorsement or property of any other Person, then the Administrative Agent shall have the right to proceed against such other property, guarantee or endorsement upon the occurrence of any Event of Default, and the Administrative Agent shall have the right, in its sole discretion, to determine which rights, security, Liens, security interests or remedies the Administrative Agent shall at any time pursue, relinquish, subordinate, modify or take with respect thereto, without in any way modifying or affecting any of them or the Secured Obligations or any of the rights of the Administrative Agent or the other Secured Parties under this Agreement, under any of the other Loan Documents or under any other document relating to the Secured Obligations.

24.     **Joint and Several Obligations of Grantors**.

(a)     Subject to *Section 24(c)*, each of the Grantors is accepting joint and several liability hereunder in consideration of the financial accommodation to be provided by the

26

Secured Parties, for the mutual benefit, directly and indirectly, of each of the Grantors and in consideration of the undertakings of each of the Grantors to accept joint and several liability for the obligations of each of them.

(b)     Subject to *Section 24(c)*, each of the Grantors jointly and severally hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Grantors with respect to the payment and performance of all of the Secured Obligations arising under this Agreement, the other Loan Documents and any other documents relating to the Secured Obligations, it being the intention of the parties hereto that all the Secured Obligations shall be the joint and several obligations of each of the Grantors without preferences or distinction among them.

(c)     Notwithstanding any provision to the contrary contained herein, in any other Loan Document or in any other document relating to the Secured Obligations, the obligations of each Grantor under the Credit Agreement, the other Loan Documents and the other documents relating to the Secured Obligations shall be limited to an aggregate amount equal to the largest amount that would not render such obligations subject to avoidance under Section 548 of the Bankruptcy Code or any comparable provisions of any applicable state law.

[*Signatures are on the following pages*]

Each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

GRANTORS:

**LOCKWOOD ENTERPRISES, INC.**

By: _____
Ricardo Ibarra
Senior Vice President and Chief Financial Officer

**LOCKWOOD INTERNATIONAL, INC.**

By: _____
Ricardo Ibarra
Senior Vice President and Chief Financial Officer

**LMG MANUFACTURING, INC.**

By: _____
Ricardo Ibarra
Senior Vice President and Chief Financial Officer

**PIPING COMPONENTS, INC.**

By: _____
Ricardo Ibarra
Senior Vice President and Chief Financial Officer

Accepted and agreed to as of the date first above written

**WELLS FARGO BANK, NATIONAL ASSOCIAITON**,
as Administrative Agent

By: _____
     Michelle C. Tabor
     Senior Vice President

**<u>SCHEDULE 2(e)</u>**

**COMMERCIAL TORT CLAIMS**

None.

**SCHEDULE 2(v)**

**EQUITY INTERESTS**

| Grantor | Issuer | Number of Shares/Units | Certificate Number | Percentage Ownership |
|---|---|---|---|---|
| Lockwood Enterprises, Inc. | Lockwood International, Inc. | 340 | 23 | 100% |
| Lockwood Enterprises, Inc. | LMG Manufacturing, Inc. | 1,000 | 1 | 100% |
| LMG Manufacturing, Inc. | Piping Components, Inc. | 1,000 | 1 | 100% |

## SCHEDULE 5(j)

| Name | Lockwood Enterprises, Inc. | Lockwood International, Inc. | LMG Manufacturing, Inc. | Piping Components, Inc. |
|---|---|---|---|---|
| Jurisdiction | Texas | Texas | Texas | Texas |
| Type of Entity | Corporation | Corporation | Corporation | Corporation |
| Principal Place of Business; Books and Records | 10002 Windfern Road, Houston, Texas 77064 | 10203 Wallisville Road, Houston, Texas 77013 | 10060 Windfern Road, Houston, Texas 77064 | 15700 International Plaza Drive, Suites 100 & 150, Houston, Texas 77032 |
| US Tax ID# | 30-0836504 | | | 38-3950197 |
| Org ID# | 802033121 | 42296600 | 801687730 | 802125649 |
| Any Change in Legal Name | None. | None. | Prior: LMG Manufacturing, LLC | None. |
| Any Change in State of Formation | None. | None. | None. | None. |
| Party to Merger, Consolidation, or Change in Structure | None. | None. | Merger of Lockwood Manufacturing, LLC into LMG Manufacturing, LLC; conversion from limited liability company to corporation | N/A |

**All of the Borrowers' bank accounts are at Wells Fargo Bank except as follows:**

| Bank | Type of Account | Beneficiary | Account Number |
|---|---|---|---|
| Royal Bank of Canada | Operating | Lockwood International, Inc. | 05259-1008044 |
| Royal Bank of Canada | Payroll | Lockwood International, Inc. | 05259-1008309 |
| Bank of America, N.A., Singapore Branch | Operating | Lockwood International, Inc. | 58365010 |

**Federal State and Local Government Contracts**:

Lockwood Enterprises, Inc.:  None.

Lockwood International, Inc.: None.

LMG Manufacturing, Inc.: None.

Piping Components, Inc.: None.

**Letters of Credit (as Beneficiary)**:

Lockwood Enterprises, Inc.: None.

Lockwood International, Inc.: None.

LMG Manufacturing, Inc.: None.

Piping Components, Inc.: None.

**EXHIBIT 6(c)(i)**

**NOTICE OF**
**GRANT OF SECURITY INTEREST IN**
**COPYRIGHTS**

United States Copyright Office

Ladies and Gentlemen:

Please be advised that, pursuant to the Pledge and Security Agreement, dated as of _____, 2015 (as the same may be amended, modified, restated or supplemented from time to time, the "*Agreement*"), among the undersigned and each of the other Grantors from time to time party thereto (each, a "*Grantor*" and, collectively, the "*Grantors*") and Wells Fargo Bank, National Association, as agent for the Secured Parties referenced therein (in such capacity, together with any successor, the "*Administrative Agent*"), the undersigned Grantor has granted a continuing security interest in and continuing lien upon the copyrights and copyright applications shown on *Schedule 1* attached hereto to the Administrative Agent, for the benefit of the Secured Parties.

The undersigned Grantor and the Administrative Agent, on behalf of the Secured Parties, hereby acknowledge and agree that the security interest in the copyrights and copyright applications set forth on *Schedule 1* attached hereto (i) may only be terminated in accordance with the terms of the Agreement and (ii) is not to be construed as an assignment of any copyright or copyright application.

[NAME OF GRANTOR]

By: _____
Name: _____
Title: _____

Acknowledged and Accepted:

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Administrative Agent

By: _____
Name: _____
Title: _____

Exhibit 6(c)(i)

**EXHIBIT 6(c)(ii)**

**NOTICE OF**
**GRANT OF SECURITY INTEREST IN**
**PATENTS**

United States Patent and Trademark Office

Ladies and Gentlemen:

      Please be advised that, pursuant to the Pledge and Security Agreement, dated as of _____, 2015 (as the same may be amended, modified, restated or supplemented from time to time, the "*Agreement*"), among the undersigned and each of the other Grantors from time to time party thereto (each, a "*Grantor*" and, collectively, the "*Grantors*") and Wells Fargo Bank, National Association, as agent for the Secured Parties referenced therein (in such capacity, together with any successor, the "*Administrative Agent*"), the undersigned Grantor has granted a continuing security interest in and continuing lien upon the patents and patent applications shown on *Schedule 1* attached hereto to the Administrative Agent, for the benefit of the Secured Parties.

      The undersigned Grantor and the Administrative Agent, on behalf of the Secured Parties, hereby acknowledge and agree that the security interest in the patents and patent applications set forth on *Schedule 1* attached hereto (i) may only be terminated in accordance with the terms of the Agreement and (ii) is not to be construed as an assignment of any patent or patent application.

[NAME OF GRANTOR]

By: _____
Name: _____
Title: _____

Acknowledged and Accepted:

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Administrative Agent

By: _____
Name: _____
Title: _____

Exhibit 6(c)(ii)

**EXHIBIT 6(c)(iii)**

**NOTICE OF
GRANT OF SECURITY INTEREST IN
TRADEMARKS**

United States Patent and Trademark Office

Ladies and Gentlemen:

Please be advised that, pursuant to the Pledge and Security Agreement, dated as of _____, 2015 (as the same may be amended, modified, restated or supplemented from time to time, the "*Agreement*"), among the undersigned and each of the other Grantors from time to time party thereto (each, a "*Grantor*" and, collectively, the "*Grantors*") and Wells Fargo Bank, National Association, as agent for the Secured Parties referenced therein (in such capacity, together with any successor, the "*Administrative Agent*"), the undersigned Grantor has granted a continuing security interest in and continuing lien upon the trademarks and trademark applications shown on *Schedule 1* attached hereto to the Administrative Agent, for the benefit of the Secured Parties.

The undersigned Grantor and the Administrative Agent, on behalf of the Secured Parties, hereby acknowledge and agree that the security interest in the trademarks and trademark applications set forth on *Schedule 1* attached hereto (i) may only be terminated in accordance with the terms of the Agreement and (ii) is not to be construed as an assignment of any trademark or trademark application.

[NAME OF GRANTOR]

By: _____
Name: _____
Title: _____

Acknowledged and Accepted:

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Administrative Agent

By: _____
Name: _____
Title: _____

Exhibit 6(c)(iii)

Exhibit 9

## PLEDGE AND SECURITY AGREEMENT JOINDER NO. 1

PLEDGE AND SECURITY AGREEMENT JOINDER NO. 1 (this "*Joinder*") dated as of August 21, 2017, to the Pledge and Security Agreement dated as of September 30, 2015 (such agreement, together with all amendments and restatements and joinders, the "*Security Agreement*"), among the initial signatories thereto (being LOCKWOOD ENTERPRISES, INC., LOCKWOOD INTERNATIONAL, INC., LMG MANUFACTURING, INC. and PIPING COMPONENTS, INC.) and each other Person who from time to time thereafter became or becomes a party thereto (each, individually, a "*Grantor*" and collectively, the "*Grantors*"), in favor of WELLS FARGO BANK, NATIONAL ASSOCIATION, as Administrative Agent (in such capacity, "*Administrative Agent*"), for its benefit and the benefit of each Secured Party.

BACKGROUND.

Capitalized terms not otherwise defined herein have the meaning specified in the Security Agreement. The Security Agreement contemplates that additional parties may become Grantors under the Security Agreement by execution and delivery of a joinder. As contemplated by the Security Agreement, each of the undersigned is becoming a Grantor under the Security Agreement. Each of the undersigned desires to become a Grantor under the Security Agreement in order to induce Secured Parties to continue to make and maintain financial accommodations under the Loan Documents and to satisfy the requirements of the Forbearance Agreement and Third Amendment to Amended and Restated Credit Agreement, dated effective as of August 16, 2017, by and among the Grantors, the Administrative Agent, Trustmark National Bank, as a lender, and Wells Fargo Bank, National Association, as a lender (the "*Forbearance Agreement*").

AGREEMENT.

NOW, THEREFORE, in consideration of the premises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce Secured Parties to continue to make and maintain financial accommodations under the Loan Documents and to satisfy the requirements of the Forbearance Agreement, each of the undersigned hereby agree with Administrative Agent, for its benefit and the benefit of Secured Parties, as follows:

1.      *Joinder*.  Each of the undersigned hereby agrees to, become, and becomes, a Grantor under the Security Agreement with the same force and effect as if it were an original signatory thereto as a Grantor and the undersigned hereby (a) agrees to all the terms and provisions of the Security Agreement applicable to it as a Grantor thereunder and (b) represents and warrants that the representations and warranties made by it as a Grantor thereunder are true and correct on and as of the date hereof. Each reference to a "Grantor" in the Security Agreement shall be deemed to include each of the undersigned.

2.      *Assignment and Grant of Security Interest*.  As security for the payment and performance, as the case may be, in full of the Secured Obligations, each of the undersigned hereby assigns, and pledges and grants, to Administrative Agent, for itself and for the benefit of Secured Parties, a security interest in the entire right, title, and interest of such undersigned in and to all Collateral, whether now or hereafter existing, owned, arising or acquired.

3.      *Representations and Warranties*.  On and as of the date hereof, each of the undersigned makes each representation and warranty set forth in the Security Agreement.

4.      *Notices*.  All communications and notices hereunder shall be in writing and given as provided in <u>Section 15</u> of the Security Agreement.

5. *GOVERNING LAW*. THIS JOINDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF TEXAS APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE, EXCEPT TO THE EXTENT THE VALIDITY OR PERFECTION OF THE SECURITY INTERESTS HEREUNDER OR THE REMEDIES HEREUNDER, IN RESPECT OF ANY COLLATERAL ARE GOVERNED BY THE LAW OF A JURISDICTION OTHER THAN TEXAS; *PROVIDED*, THAT THE ADMINISTRATIVE AGENT AND EACH SECURED PARTY SHALL RETAIN ALL RIGHTS ARISING UNDER FEDERAL LAW.

6. *Full Force of Security Agreement*. Except for the addition of each of the undersigned as Grantors and as expressly supplemented hereby, the Security Agreement remains in full force and effect in accordance with its terms.

7. *Schedules*. Each of the Schedules to the Security Agreement is hereby supplemented by the addition of the Schedules hereto as to each of the undersigned.

8. *Severability*. If any provision of this Joinder is held to be illegal, invalid, or unenforceable under present or future laws during the term thereof, such provision shall be fully severable, this Joinder shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof, and the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom. Furthermore, *in lieu* of such illegal, invalid, or unenforceable provision there shall be added automatically as a part of this Joinder a legal, valid, and enforceable provision as similar in terms to the illegal, invalid, or unenforceable provision as may be possible.

9. *Counterparts*. This Joinder may be executed in any number of counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed signature page of this Joinder by facsimile or electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

10. *ENTIRE AGREEMENT*. THIS JOINDER AND EACH RELATED AGREEMENT REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.

IN **WITNESS WHEREOF**, the undersigned has caused this Joinder to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

LOCKWOOD HOLDINGS, INC.

By: _____
Name: Michael F. Lockwood
Title: Chief Executive Officer

LH AVIATION, LLC

By: _____
Name: Michael F. Lockwood
Title: Chief Executive Officer

7807 EAGLE LANE LLC

By: _____
Name: Michael F. Lockwood
Title: Chief Executive Officer

ACCEPTED BY:

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Administrative Agent

By: _____
Jennifer L. Morris
Senior Vice President

## Schedule 2(e)

### Commercial Tort Claims

(Schedule Effective Date: August 21, 2017)

**Lockwood Holdings, Inc.:**

| Case Name or Style | Case Number | Court in Which Pending |
|---|---|---|
| None known | N/A | N/A |

**LH Aviation, LLC:**

| Case Name or Style | Case Number | Court in Which Pending |
|---|---|---|
| None known | N/A | N/A |

**7807 Eagle Lane LLC:**

| Case Name or Style | Case Number | Court in Which Pending |
|---|---|---|
| None known | N/A | N/A |

Schedule 2(v)

**EQUITY INTERESTS**

(Schedule Effective Date: August 21, 2017)

| Grantor | Issuer | Number of Shares/Unit | Certificate Number | Percentage Ownership |
|---------|--------|----------------------|--------------------|----------------------|
| Lockwood Holdings, Inc. | N/A | N/A | N/A | N/A |
| LH Aviation, LLC | N/A | N/A | N/A | N/A |
| 7807 Eagle Lane, LLC | N/A | N/A | N/A | N/A |

## SCHEDULE 5(i)

## ADDRESSES

(Schedule Effective Date: August 21, 2017)

**Lockwood Holdings, Inc. (FEIN: 76-0139726):**

(a) Chief Executive Office:

| Street Address and Zip or Postal Code | Mailing Address and Zip or Postal Code | County | State | Country |
|---|---|---|---|---|
| 10002 Windfern Road Houston, TX 77064 | Same as street address | Harris | Texas | United States |

(b) Locations where books and records are kept:

| Street Address and Zip or Postal Code | Mailing Address and Zip or Postal Code | County | State | Country |
|---|---|---|---|---|
| 10002 Windfern Road Houston, TX 77064 | Same as street address | Harris | Texas | United States |

(c) Locations where tangible personal property is kept:

| Street Address and Zip or Postal Code | Mailing Address and Zip or Postal Code | County | State | Country |
|---|---|---|---|---|
| (Owned) 912 John Stine Road, Westlake, LA 70669 | Same as street address | Calcasieu | Louisiana | United States |
| (Owned) 10002 Windfern Road, Houston, TX 77064 | Same as street address | Harris | Texas | United States |
| (Owned) 10060 Windfern Road, Houston, TX 77064 | Same as street address | Harris | Texas | United States |

Schedule 5(i)

| | | Lambton | Ontario | Canada |
|---|---|---|---|---|
| (Owned) 499 Gladwish Drive, Sarnia, Ontario Canada | Same as street address | | | |
| (Owned) 182 Turbo Drive, Sherwood Park, AB | Same as street address | Strathcona County | Alberta | Canada |
| (Leased) 10203 Wallisville Road, Houston, TX 77013 | Same as street address | Harris | Texas | United States |
| (Leased) 3663 Oates Rd, Houston, TX 77013 | Same as street address | Harris | Texas | United States |
| (Leased) 1035 Cerise Rd, Lots 5 & 6 Block 2, Billings, Mt 59101 | Same as street address | Yellowstone | Montana | United States |
| (Leased) 15700 International Plaza Dr, Suite 100 & 150, Houston, TX 77032 | Same as street address | Harris | Texas | United States |
| (Leased) 11135 Ashburn Rd, Forest Park, Ohio 45240 | Same as street address | Hamilton | Ohio | United States |
| (Leased) 11372 Business Park Circle, Firestone, CO 80504 | Same as street address | Weld | Colorado | United States |
| (Leased) 2404 Reeves Road, Joliet, IL 60436 | Same as street address | Will | Illinois | United States |

Schedule 5(j)

| (Leased)<br>7015 MACLEOD<br>TRAIL SW, SUITE<br>611, Calgary, Alberta | Same as street address | | Alberta | Canada |
| --- | --- | --- | --- | --- |

(d)   Locations of owned and leased real property:

| Street Address and Zip<br>or Postal Code | Mailing Address and Zip<br>or Postal Code | County | State | Country |
| --- | --- | --- | --- | --- |
| (Owned)<br>912 John Stine Road,<br>Westlake, LA 70669 | Same as street address | Calcasieu | Louisiana | United States |
| (Ownded)<br>10002 Windfern Road,<br>Houston, TX 77064 | Same as street address | Harris | Texas | United States |
| (Owned)<br>10060 Windfern Road,<br>Houston, TX 77064 | Same as street address | Harris | Texas | United States |
| (Owned)<br>499 Gladwish Drive,<br>Sarnia, Ontario Canada | Same as street address | Lambton | Ontario | Canada |
| (Owned)<br>182 Turbo Drive,<br>Sherwood Park, AB | Same as street address | Strathcona County | Alberta | Canada |
| (Leased)<br>10203 Wallisville<br>Road, Houston, TX<br>77013 | Same as street address | Harris | Texas | United States |
| (Leased)<br>3663 Oates Rd,<br>Houston, TX 77013 | Same as street address | Harris | Texas | United States |
| (Leased)<br>1035 Cerise Rd. Lots 5<br>& 6 Block 2, Billings,<br>Mt 59101 | Same as street address | Yellowstone | Montana | United States |

| (Leased) 15700 International Plaza Dr, Suite 100 & 150, Houston, TX 77032 | Same as street address | Harris | Texas | United States |
|---|---|---|---|---|
| (Leased) 11135 Ashburn Rd, Forest Park, Ohio 45240 | Same as street address | Hamilton | Ohio | United States |
| (Leased) 11372 Business Park Circle, Firestone, CO 80504 | Same as street address | Weld | Colorado | United States |
| (Leased) 2404 Reeves Road, Joliet, IL 60436 | Same as street address | Will | Illinois | United States |
| (Leased) 7015 MACLEOD TRAIL SW, SUITE 611, Calgary, Alberta | Same as street address | | Alberta | Canada |

LH Aviation, LLC (FEIN: 46-5266984):

(a)  Chief Executive Office:

| Street Address and Zip or Postal Code | Mailing Address and Zip or Postal Code | County | State | Country |
|---|---|---|---|---|
| 10002 Windfern Road Houston, TX 77064 | Same as street address | Harris | Texas | United States |

(b)  Locations where books and records are kept:

| Street Address and Zip or Postal Code | Mailing Address and Zip or Postal Code | County | State | Country |
|---|---|---|---|---|
| 10002 Windfern Road Houston, TX 77064 | Same as street address | Harris | Texas | United States |

(c)  Locations where tangible personal property is kept:

| Street Address and Zip or Postal Code | Mailing Address and Zip or Postal Code | County | State | Country |
|---|---|---|---|---|
| 7807 Eagle Lane, Spring, TX 77379 | Same as street address | Harris | Texas | United States |
| Miller Air Aviation 610 Forbes Field Topeka, KS 66619 | Same as street address | Shawnee | Kansas | United States |

(d)  Locations of owned and leased real property:

| Street Address and Zip or Postal Code | Mailing Address and Zip or Postal Code | County | State | Country |
|---|---|---|---|---|
| N/A | N/A | | | |
| | | | | |

Schedule 5(j)

**7807 Eagle Lane LLC (FEIN: 47-1807382):**

(a)  Chief Executive Office:

| Street Address and Zip or Postal Code | Mailing Address and Zip or Postal Code | County | State | Country |
|---|---|---|---|---|
| 10002 Windfern Road Houston, TX 77064 | Same as street address | Harris | Texas | United States |

(b)  Locations where books and records are kept:

| Street Address and Zip or Postal Code | Mailing Address and Zip or Postal Code | County | State | Country |
|---|---|---|---|---|
| 10002 Windfern Road Houston, TX 77064 | Same as street address | Harris | Texas | United States |

(c)  Locations where tangible personal property is kept:

| Street Address and Zip or Postal Code | Mailing Address and Zip or Postal Code | County | State | Country |
|---|---|---|---|---|
| 7807 Eagle Lane, Spring, TX 77379 | Same as street address | Harris | Texas | United States |

(d)  Locations of owned and leased real property:

| Street Address and Zip or Postal Code | Mailing Address and Zip or Postal Code | County | State | Country |
|---|---|---|---|---|
| (Owned) 7807 Eagle Lane, Spring, TX 77379 | Same as street address | Harris | Texas | United States |

Schedule 5(j)

Exhibit 10

# FORBEARANCE AGREEMENT AND
## THIRD AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT

THIS FORBEARANCE AGREEMENT AND THIRD AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT (this "**Forbearance Agreement**") dated effective as of August 16, 2017 (the "**Forbearance Effective Date**"), is by and among LOCKWOOD ENTERPRISES, INC., a Texas corporation, LOCKWOOD INTERNATIONAL, INC., a Texas corporation, LMG MANUFACTURING, INC., a Texas corporation, and PIPING COMPONENTS, INC., a Texas corporation (each a "**Borrower**" and collectively, "**Borrowers**"), MICHAEL F. LOCKWOOD, an individual ("**Individual Guarantor**"*/*, LOCKWOOD HOLDINGS, INC., a Texas corporation ("**LHI**"), LH AVIATION, LLC, a Texas limited liability company ("LHA"), 7807 EAGLE LANE, LLC, a Texas limited liability company ("**7807**" and together with the Borrowers, LHI, LHA, and the Individual Guarantor the "**Obligors**" and each an "**Obligor**"), TRUSTMARK NATIONAL BANK, as a Lender (defined below) and WELLS FARGO BANK, NATIONAL ASSOCIATION, as a Lender (defined below) and as Administrative Agent for itself and the other Lenders (in such capacity, the "**Administrative Agent**").

## RECITALS:

A.    WHEREAS, reference is made to that certain Amended and Restated Credit Agreement, dated as of September 30, 2015, among the Borrowers, the financial institutions party thereto from time to time as lenders (the "**Lenders**"), and the Administrative Agent, as amended by that certain First Amendment to Amended and Restated Credit Agreement dated effective as of July 31, 2016, and by that certain Second Amended and Restated Credit Agreement and Limited Waiver of Defaults dated effective as of February 27, 2017, in each case among the Borrowers, the Lenders and the Administrative Agent (as may be further amended, restated or otherwise modified from time to time, the "**Credit Agreement**").

B.    WHEREAS, Events of Default listed on Annex A hereto currently exist and are continuing under the Credit Agreement (each an "**Acknowledged Default**" and collectively, the "**Acknowledged Defaults**").

C.    WHEREAS, the Obligors have requested that the Administrative Agent and the Lenders forbear from exercising their rights and remedies under the Credit Agreement and the other Loan Documents.

D.    WHEREAS, the Required Lenders and the Administrative Agent have agreed subject to the terms and conditions of this Forbearance Agreement, to forbear as set forth below and only as set forth below.

NOW, THEREFORE, in consideration of the premises and the mutual covenants, representations, warranties and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

AGREEMENTS:

1. **Definitions**.  Capitalized terms used and not otherwise defined herein shall have the same meanings as set forth in the Credit Agreement.  In addition, the following terms shall, for the purposes of this Forbearance Agreement, have the following meanings:

(a) "**Dormant Foreign Accounts**" means the foreign bank accounts listed on Annex B as inactive and dormant accounts and any other foreign bank accounts discovered after the Forbearance Effective Date.

(b) "**Focus**" means Focus Management Group USA, Inc.

(c) "**Forbearance Period**" means the period of time commencing on the Forbearance Effective Date and continuing through and including the earlier of (i) the occurrence of a Termination Event and (ii) Termination Date, unless earlier terminated pursuant to the terms and provisions of this Forbearance Agreement.

(d) "**Limited Funds Foreign Accounts**" means the bank accounts listed on Annex B hereto as active accounts so long as, and only for so long as, such accounts do not have balances therein exceeding the applicable amount set forth next to the name of the applicable depository bank on Annex B.

(e) "**Minimum Collateral Ratio**" means, at all times, the ratio of gross accounts receivable and gross inventory to outstanding Revolving Credit Loans and Letters of Credit.

(f) "**Minimum Rolling 4-Week Revenue**" is defined in Section 5(w) of this Forbearance Agreement.

(g) "**Sales Milestones**" means (i) in respect of the engagement of Imperial Capital, LLC, the dates and periods of time set forth on Annex C to the Forbearance Agreement, (ii) in respect of the sale of real estate owned by LHI and 7807, the dates and periods of time set forth on Annex D to this Forbearance Agreement and (iii) in respect to the airplane owned by LHA, the dates and periods of time set forth on Annex E to this Forbearance Agreement.

(h) "**Termination Date**" means 5:00 p.m. (prevailing Texas time) on the date that is 30 days after the Forbearance Effective Date.

(i) "**Termination Event**" means the occurrence of any of the following:

(i) any representation or warranty made or deemed made by any Obligor in this Forbearance Agreement shall be false, misleading or erroneous in any material respect when made or deemed to have been made,

(ii) any Obligor shall fail to perform, observe or comply timely with any covenant, agreement or term contained in this Forbearance Agreement,

(iii) any Default or Event of Default, other than the Acknowledged Defaults, shall occur or shall have occurred under this Forbearance Agreement or any of the Loan Documents,

(iv) any Obligor shall commence a voluntary proceeding seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official of it or a substantial part of its property or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it or shall make a general assignment for the benefit of creditors or shall generally fail to pay its debts as they become due or shall take any action to authorize any of the foregoing,

(v) an involuntary proceeding shall be commenced against any Obligor seeking liquidation, reorganization, or other relief with respect to it or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official for it or a substantial part of its property, in each case that remains undismissed or unstayed for five (5) consecutive calendar days,

(vi) any event or condition shall occur after the Forbearance Effective Date which shall have a Material Adverse Effect, as determined by the Administrative Agent,

(vii) the exercise by any creditor or holder of material indebtedness of any Obligor (excluding the Obligors under the Loan Documents or the LHI Credit Agreement) of any right or remedy available to them in connection with any default under the documents governing such material indebtedness, including, but not limited to any foreclosure or enforcement action against any Collateral,

(viii) the initiation of any action by any Obligor to invalidate or limit the enforceability of any of the acknowledgments set forth in Section 2, the release set forth in Section 12 or the covenant not to sue set forth in Section 13,

(ix) the Permitted Variance is exceeded,

(x) the Minimum Collateral Ratio is less than 115% at any time,

(xi) Failure to deliver to the Administrative Agent on a timely basis copies of all major documentation developed and received by Imperial during the investment banking process, including copies of teasers, investor presentations, confidential information memorandums, investor lists, indications of interest, proposals, letters of intent, weekly written status

updates, or other similar types of material documentation reasonably requested by the Administrative Agent to monitor progress during the investment banking process,

(xii) Failure to provide the Administrative Agent with timely and continuous view-only access to the electronic data room used for due diligence throughout the investment banking process, or

(xiii) failure to meet Sales Milestones unless extended by the Lenders in writing in their sole discretion.

## 2. **Acknowledgments**

(a) **Acknowledgment of Obligations**.  Each Obligor hereby acknowledges, confirms, and agrees that as of the close of business on August 14, 2017:  (a) Borrowers are indebted to the Revolving Credit Lenders in respect of the Revolving Credit Loans in the principal amount of $64,116,693.44, (b) Borrowers are indebted to Issuing Bank in respect of the Letters of Credit in the face amount of $838,920.91 and (c) LHI is indebted to Wells Fargo in respect of its Term Loan (as defined in the LHI Credit Agreement) in the principal amount of $23,025,833.35.  Each Obligor hereby acknowledges, confirms, and agrees that all such Obligations together with interest accrued and accruing thereon, and all fees, costs, expenses, and other charges now or hereafter payable to the Administrative Agent or Lenders, in each case in accordance with the terms of the Loan Documents, are unconditionally owing by each Obligor, without offset, defense, or counterclaim of any kind, nature, or description whatsoever.

(b) **Acknowledgment of Security Interests**.  Each Obligor hereby acknowledges, confirms, and agrees that the Administrative Agent has, and will continue to have, valid, enforceable, and perfected first-priority continuing Liens upon and security interests in the Collateral heretofore granted to the Administrative Agent, for the benefit of the Administrative Agent and Lenders, pursuant to the Security Documents and the other Loan Documents or otherwise granted to or held by the Administrative Agent, for the benefit of the Administrative Agent and Lenders.

(c) **Binding Effect of Documents**.  Each Obligor hereby acknowledges, confirms and agrees that:  (a) this Forbearance Agreement constitutes a Loan Document; (b) each of the Credit Agreement and the other Loan Documents to which it is a party has been duly executed and delivered to the Administrative Agent by such Obligor, and each is and will remain in full force and effect as of the date hereof except as modified pursuant hereto; (c) the agreements and obligations of such Obligor contained in such documents and in this Forbearance Agreement constitute legal, valid, and binding Obligations, enforceable in accordance with their respective terms, and such Obligor has no valid defense to the enforcement of such Obligations; (d) the Administrative Agent and Lenders are and will be entitled to the rights, remedies, and benefits provided for under the Credit Agreement and the other Loan Documents and applicable law; and (e) during the Forbearance Period, such Obligor shall comply with all limitations, restrictions, or prohibitions that would otherwise be effective or applicable under the Credit Agreement or

any of the other Loan Documents during the continuance of any Event of Default, and except to the extent expressly provided otherwise in this Forbearance Agreement, any right or action of such Obligor set forth in the Credit Agreement or the other Loan Documents that is conditioned on the absence of any Event of Default may not be exercised or taken as a result of the Acknowledged Defaults.

3.    **Forbearance in Respect of Acknowledged Defaults**.

(a)    **Acknowledgment of Default**.  Each Obligor hereby acknowledges and agrees that the Acknowledged Defaults have occurred and are continuing (or are expected to occur and be continuing), each of which constitutes (or will constitute) an Event of Default and entitles the Administrative Agent and Lenders to exercise their respective rights and remedies under the Credit Agreement and the other Loan Documents, applicable law, or otherwise.  Each Obligor represents and warrants that as of the date hereof, no Events of Default exist other than the Acknowledged Defaults.  Each Obligor hereby acknowledges and agrees that the Administrative Agent and Lenders have the exercisable right to declare the Obligations to be immediately due and payable under the terms of the Credit Agreement and the other Loan Documents based on the Acknowledged Defaults.  Each Obligor acknowledges that, immediately prior to the effectiveness of this Forbearance Agreement, Revolving Credit Lenders are no longer obligated to make any further Revolving Credit Loans as a result of the Acknowledged Defaults.

(b)    **Forbearance**.  Subject to, and in reliance on, the terms of this Forbearance Agreement and only so long as no Termination Event shall have occurred, the Administrative Agent and the Lenders hereby agree to forbear until the Termination Date from exercising their rights and remedies under the Loan Documents arising from Acknowledged Defaults.  Notwithstanding the foregoing, the forbearance granted by the Administrative Agent and Lenders pursuant hereto shall not constitute and shall not be deemed to constitute a waiver of any of the Acknowledged Defaults or of any other Default or Event of Default under the Loan Documents.  On and after the Termination Date, or such earlier date on which a Termination Event occurs, the Administrative Agent's and the Lenders' agreement hereunder to forbear shall terminate automatically without further act or action by the Administrative Agent or the Lenders, and the Administrative Agent and the Lenders shall be entitled to exercise any and all rights and remedies available to it or them under the Loan Documents and this Forbearance Agreement, at law, in equity, or otherwise, including, but not limited to, (i) ceasing to make any further Revolving Credit Loans or issuing any further Letters of Credit and (ii) accelerating all of the Obligations under the Credit Agreement and the other Loan Documents, in all events, without any further notice to Obligors, passage of time, or forbearance of any kind.

(c)    **No Waivers; Reservation of Rights**.

(i)    The Administrative Agent and the Lenders have not waived, are not by this Forbearance Agreement waiving, and have no intention of waiving, any Events of Default which may be continuing on the date hereof or any Events of Default which may occur after the date hereof (whether the same or similar to the Acknowledged Defaults or otherwise), and the Administrative

Agent and the Lenders have not agreed to forbear with respect to any of their rights or remedies concerning any Events of Default (other than, during the Forbearance Period, the Acknowledged Defaults to the extent expressly set forth herein) occurring at any time.

(ii)     Subject to Section 3(b) above (solely with respect to the Acknowledged Defaults), the Administrative Agent and the Lenders reserve the right, in their discretion, to exercise any or all of their rights and remedies under the Credit Agreement and the other Loan Documents as a result of any other Events of Default occurring at any time.  The Administrative Agent and the Lenders have not waived any of such rights or remedies, and nothing in this Forbearance Agreement, and no delay on their part in exercising any such rights or remedies, may or will be construed as a waiver of any such rights or remedies.

(d)     **Additional Events of Default**.  The parties hereto acknowledge, confirm, and agree that any misrepresentation by any Obligor, or any failure of any Obligor to comply with the covenants, conditions and agreements contained in this Forbearance Agreement will constitute an immediate default under this Forbearance Agreement and an immediate Event of Default under the Credit Agreement and the other Loan Documents. Notwithstanding the existence of the Forbearance Period, in the event that any Person, other than the Administrative Agent or the Lenders, at any time exercises for any reason (including, without limitation, by reason of any Acknowledged Defaults, any other present or future Event of Default, or otherwise) any of its rights and remedies against any Obligor or any other Person providing credit support for the Obligations, or against any Obligor's or such other Person's property or assets, in each case, of the type that would constitute an Event of Default under the terms of the Credit Agreement and the other Loan Documents, then such occurrence shall also be deemed to constitute an immediate Event of Default hereunder and under the Credit Agreement and the other Loan Documents.

(e)     **Other Payments**.  Each Credit Party also agrees to reimburse the Administrative Agent and the Lenders upon demand for all out-of-pocket expenses (including reasonable attorneys' fees, settlement costs and fees and expenses of Focus as the financial advisor engaged by the Administrative Agent's counsel) incurred in connection with the negotiation of this Forbearance Agreement, any further restructuring or "workout" with Obligors, whether or not consummated, of any Secured Obligations, and any enforcement of any Secured Obligations.  Each Credit Party acknowledges and agrees that all such expenses are being incurred in connection with a restructuring or workout, as these terms are used in Section 11.03(a) of the Credit Agreement.

4.     **Representations and Warranties**.  To induce the Administrative Agent and the Lenders to enter into this Forbearance Agreement, Obligors hereby jointly and severally represent and warrant as follows:

(a)     **Duly Organized**.  Obligors which are not natural persons are duly organized, validly existing and in good standing under the laws of the jurisdiction in which

they were organized and formed, and Obligors have the power and authority to perform their respective obligations under this Forbearance Agreement and the Loan Documents.

(b) **Authority**. The execution, delivery and performance of this Forbearance Agreement (i) have been duly authorized by all requisite action on the part of Obligors which are not natural persons and (ii) do not and will not violate the organizational documents of Obligors, any other material agreement to which any Obligor is a party, or any law, rule or regulation, or any order of any court, governmental authority or arbitrator, by which any Obligor or any of its respective properties is bound.

(c) **No Defenses**. The outstanding principal balance of the Revolving Credit Loans is $64,116,693.44, the aggregate amount of outstanding Letters of Credit is $838,920.91, and the outstanding principal amount of the Term Loan (as defined in the LHI Credit Agreement) is $23,025,833.35, in each case as of August 14, 2017. None of Obligors has any defenses to payment, counterclaims, or rights of setoff with respect to the Loans or any other Secured Obligations existing as of the Forbearance Effective Date.

(d) **No Other Defaults**. Except for the Acknowledged Defaults, no Default or Event of Default under the Loan Documents has occurred and is continuing.

(e) **Taxes**. All payments due to all taxing authorities with respect to the Collateral are current as of the Forbearance Effective Date.

5. **Forbearance Covenants**. Notwithstanding any provisions to the contrary contained in the Loan Documents, Obligors hereby covenant and agree that, during the Forbearance Period, each of them will perform, observe and comply with each of the following covenants:

(a) **Compliance with Related Documents and this Forbearance Agreement**. The Obligors will perform, observe and comply with each covenant, agreement and term contained in this Forbearance Agreement and each of the Loan Documents, including, without limitation, the fees and payments required thereunder, except for the Acknowledged Defaults.

(b) **Prepayment of Loans from Net Proceeds**. The Borrowers agree to pay, immediately upon receipt thereof, the Net Proceeds of the sale of all real Property of LHI and 7807 to the Administrative Agent for application as follows: first, to the principal amount of outstanding Revolving Credit Loans (with a concurrent permanent reduction in the amount of the Revolving Credit Commitment equal to the Net Proceeds so received) and second, with respect to any Letters of Credit outstanding after payment in full of the Revolving Credit Loans, a payment of Cash Collateral into a Cash Collateral account opened by the Administrative Agent, for the benefit of the Revolving Credit Lenders, in an amount equal to such excess.

(c) **Deposit of Funds**. Except with respect to Limited Funds Foreign Accounts, the Credit Parties shall cause all of their collections to be deposited in deposit accounts that are covered by a deposit account control agreement in favor of the Administrative Agent, and shall not open, or maintain, unless a deposit account control

agreement satisfactory to the Administrative Agent is in effect, any deposit account other than deposit accounts that are maintained with Wells Fargo Bank, N.A.

(d) **Additional Financial Statements**. With 30 days after the end of each calendar month, each of LHI and LHA shall deliver to the Administrative Agent, in form and detail satisfactory to the Administrative Agent an unaudited Consolidated and consolidating balance sheet of each of LHI and its Subsidiaries, if any, and LHA and its Subsidiaries, if any, as of the close of such fiscal month and unaudited Consolidated and consolidating statements of income, all in reasonable detail setting forth in comparative form the corresponding figures as of the end of and for the corresponding period in the preceding Fiscal Year and prepared in accordance with GAAP and, if applicable, containing disclosure of the effect on the financial position or results of operations of any change in the application of accounting principles and practices during the period, and certified by a Responsible Officer of each of LHI and LHA to present fairly in all material respects the financial condition of LHI, LHA and each of their respective Subsidiaries, if any, on a Consolidated and consolidating basis as of their respective dates and the results of operations of LHI, LHA and each of their respective Subsidiaries, if any, for the respective periods then ended, subject to normal year-end adjustments and the absence of footnotes.

(e) **Cash Flow Forecasts**. The CRO shall deliver to the Administrative Agent and the Lenders, by no later than noon prevailing Central time on Wednesday of each week beginning on the first Wednesday after the Forbearance Effective Date, an updated Budget setting forth all sources and uses of cash and beginning and ending cash balances, including balance sheet roll-forward calculations for accounts receivable, inventory, and accounts payable, a detailed breakdown of professional fees, and a calculation for the Minimum Collateral Ratio, an initial copy of which shall be delivered on or prior to the Forbearance Effective Date. The Credit Parties shall operate strictly in accordance with the Budget and shall pay only those actual, ordinary and necessary operating expenses of their business in compliance with the Budget (subject to the variances identified above).

(f) **Reconciliation Reports**. The CRO shall deliver to the Administrative Agent and the Lenders concurrently with each Budget (i) a variance report reconciling the prior week's cash flow forecast to the actual sources and uses of cash for the prior week, along with a line-by-line reconciliation and explanation of material variances, (ii) a listing of each Credit Parties' accounts receivable, including invoices aged by invoice date and due date (with an explanation of the terms offered), together with a summary specifying the name, address, and balance due for each account debtor, and a schedule and aging of each Credit Party's accounts payable, (iii) a backlog report and (iv) a report from the CRO and management of the Credit Parties setting forth detailed explanations for variance in actual results as compared to forecasted performance under the Budget.

(g) **Daily Operating and Excess Cash Reports**. The CRO shall deliver, by e-mail, to the Administrative Agent, the Lenders and Focus copies of the daily operating reports of the Obligors at the same time they are distributed to members of the management team of the Obligors, or any of them, such reports to include at least the invoice sales-daily, bookings-daily and the month-to-date executive summary. In addition, the CRO shall deliver, by e-mail, not later than 10:00 a.m. prevailing Texas time on each Business Day, a

report of the Consolidated Cash Balances of the Credit Parties, the aggregate amount of outstanding check for Budget Items and the amount, if any, of Excess Cash, in each case as of the end of the immediately preceding Business Day.

(h) **Weekly Status Calls**. The Obligors and the CRO shall participate in weekly Thursday status calls with the Administrative Agent, the Lenders and the Administrative Agent's professionals, which calls shall include the restructuring professionals (Gardere, CR3 and Imperial) assisting the Obligors.

(i) **Weekly Written Status Updates**. The CRO shall provide to the Administrative Agent, Focus and the Lenders written status reports and updates at least weekly from CR3 on right-sizing efforts as well as written status reports from CR3 and Imperial on sale processes, including (without limitation):

      (i) list of prospects to whom books have been sent,

      (ii) dates of proposed on-site meetings,

      (iii) names and other details of persons accessing data site,

      (iv) dates NDA's, LOI's, PSA's, etc. are received and proposed closing dates,

      (v) information similar to the above for proposed airplane and real estate sales/refinancings.

(j) **Status of Aircraft Sale**. The CRO shall provide weekly broker updates to the Administrative Agent, Focus, the Lenders and WFEF on the LHA aircraft sale process to include list price, sale strategy, inquiries from potential buyers, actual showings, and offers, if any.

(k) **Timing of Status Report**. Status reports and updates under clauses (i) and (j) above shall be due by 5:00 p.m. prevailing Central Time each Wednesday to allow for review before the Thursday morning status and update calls.

(l) **No CEO Legal Fees**. None of the Credit Parties shall pay any legal fees or expenses of the Individual Guarantor.

(m) **Prohibition on Certain Expenses**. None of the Obligors shall pay any fees or expenses related to forensic accounting and/or fraud detection efforts, or subsequent legal fees or expenses related to civil or criminal litigation resulting from those efforts.

(n) **LHI Prohibited Payments**. LHI shall not make loans or advances, distributions (including Individual Guarantor equity draws) or dividends.

(o) **Management Salaries**. No Obligor shall increase any executive management compensation or benefits without the written approval of the Administrative Agent.

(p)    **Information**.  The Obligors shall cooperate with Focus in performing its work as financial advisor to the Administrative Agent and its counsel, and each of them will fully cooperate with the Advisors and fully authorize the Advisors to disclose all information about themselves and their financial condition, assets and operations to the Administrative Agent, the Lenders, Focus and their respective counsel.  In addition to any notices required to be given under the Loan Documents, Obligors and their Advisors will provide the Administrative Agent, Lenders and Focus with such other information as may be requested by the Administrative Agent or Focus from time to time, within one Business Day of such request, including, without limitation, copies of any bank or other financial institution statements; financial statements; accounts receivable and accounts payable agings; transactional documentation; litigation pleadings, depositions, related documents and transcripts; letters of intent or offers to purchase, lease or license any portion, all or substantially all of the assets or ownership interests of any of Obligors; and letters of intent or commitments for any capital investment, loan or other financing in or to any of the Obligors.  Each Obligor hereby acknowledges the Administrative Agent's right under the Credit Agreement to engage Focus in its sole discretion under these circumstances and agrees to reimburse the Administrative Agent for the fees and expenses of Focus.

(q)    **Access**.  The Administrative Agent, Focus, the Lenders, and their agents shall have access during normal business hours to Obligors' business premises, to all data rooms maintained by Obligors or their Advisors, and to the Collateral to review, appraise and evaluate the physical condition of the Collateral and to inspect the books, records and reports of Obligors concerning the operation of Obligors' businesses, financial condition, the transfers and expenditures of funds generated therefrom, the accrual of expenses relating thereto, and any and all other records relating to the operations of Obligors.  The Obligors and their Advisors will fully cooperate with the Administrative Agent, Lenders and Focus regarding such reviews, evaluations, and inspections, and the Obligors shall make their employees, consultants and professionals reasonably available to the Administrative Agent, the Lenders, Focus, and the Administrative Agent's other professionals and consultants in conducting such reviews, evaluations, and inspections.

(r)    **No Control**.  No act committed or action taken by the Administrative Agent or the Lenders under this Forbearance Agreement or the Loan Documents will be used, construed, or deemed to hold the Credit Parties to be in control of any Obligor, or the governance, management or operations of any Obligor for any purpose, without limitation, or to be participating in the management of any Obligor or acting as a "responsible person" or "owner or operator" or a person in "control" with respect to the governance, management or operation of any Obligor or their respective businesses (as such terms, or any similar terms, are used in the U.S. Bankruptcy Code, the Code, or CERCLA, each as may be amended from time to time, or any other federal or state statute, at law, in equity, or otherwise) by virtue of the interests, rights, and remedies granted to or conferred upon the Administrative Agent or the Lenders under this Forbearance Agreement or the other Loan Documents.

(s)    **Obligors' Advisors**.  The Credit Parties shall maintain their engagement of their Advisors at all times during the Forbearance Period.  Obligors authorize the

10

Administrative Agent, Focus, and their agents and professionals to communicate with their Advisors without notice to, or the presence of, Obligors.

(t) **Restricted Payments; Affiliate Transactions**. Notwithstanding anything in the Credit Agreement or any other Loan Documents to the contrary, during the Forbearance Period, Credit Parties will not make or agree to make, and no Obligor shall receive, (i) any Restricted Payments, (ii) any loans, advances or payments otherwise permitted under Section 8.3 or 8.7 of the Credit Agreement or Sections 5.6 and 5.7 of the LHI Credit Agreement, or (iii) any other payments to the extent on account of accrued or accruing expenses, in each case that are not primarily for the benefit of the Credit Parties and for which the Credit Parties do not seek reimbursement from one or more of their Affiliates on at least a monthly basis.

(u) **Additional Collateral Updates**. During the Forbearance Period, each Obligor will (a) notify the Administrative Agent of any written letters of intent, indications of interest, offers and agreements related to any sale or other disposition of any assets of any Credit Party, in each case, promptly upon becoming aware of same, (b) provide the Administrative Agent with such updates and reports relating to the foregoing and Dormant Foreign Accounts as and when the Administrative Agent may reasonably request from time to time and (c) include in the Budget line items setting forth the Minimum Collateral Ratio.

(v) **Forbearance Period Loans**. Notwithstanding anything to the contrary in the Credit Agreement or any other Loan Document (and in all events subject to the terms of this Section 5(v)), each Credit Party acknowledges and agrees that, during the Forbearance Period, the Borrowers shall only be entitled to request, and the Revolving Lenders only agree to make, Loans (a) to the extent necessary to enable Credit Parties to pay the expenses set forth in the Budget as and when such expenses are due and payable, (b) to the extent the aggregate Loans outstanding at any time do not exceed the aggregate Revolving Credit Commitment, (c) subject to Loan Parties' timely compliance with the terms and provisions of this Forbearance Agreement, and (d) to the extent at the time of and immediately after giving effect to each Loan, (i) the Credit Parties shall not have any Excess Cash and (ii) as of the end of the Business Day on which such Loan will be funded, the Credit Parties shall not have any Excess Cash.

(w) **Minimum Rolling 4-Week Revenue**. The Credit Parties shall not permit rolling 4-week Consolidated revenue  to be less than the corresponding amount as set forth in the table below ("Minimum Rolling 4-Week Revenue"):

| Week Ending | Minimum Rolling 4-Week Revenue |
|---|---|
| 8/20/2017 | $10,169,377 |
| 8/27/2017 | $ 9,930,344 |
| 9/3/2017 | $ 9,468,000 |
| 9/10/2017 | $ 9,846,000 |
| 9/17/2017 | $10,476,000 |

The failure of Obligors to timely comply with the terms of this Section 5 shall constitute (i) a Default and an Event of Default under and for all purposes of the Credit Agreement and (ii) a Termination Event hereunder.

6. **Credit Agreement Amendments**.

(a) **Changes to Certain Definitions**. Section 1.1 is amended by amending and restating the definitions of "Applicable Margin" and "Credit Parties" in their entireties to read as follows:

"**Applicable Margin**" means the corresponding percentages per annum set forth below:

| Commitment Fee | Standby LC Fee | LIBOR + | Base Rate + |
|---|---|---|---|
| 0.25% | 5.00% | 5.00% | 3.50% |

"**Credit Parties**" means, collectively, each Borrower, LHI, LHA, 7807 and each Subsidiary Guarantor.

(b) **Definition of Permitted Tax Distributions**. The definition of "Permitted Tax Distributions" found in Section 1.1 changing the word "can" in proviso found after clause (ii) to read as "shall".

(c) **Definition of Revolving Credit Commitment**. Section 1.1 is amended by amending and restating the penultimate sentence of the definition of "**Revolving Credit Commitment**" read as follows:

The aggregate Revolving Credit Commitment of all Revolving Credit Lenders on the Forbearance Effective Date is $64,955,931.52.

(d) **Additional Definitions**. Section 1.1 is amended by adding the following definitions in appropriate alphabetical order:

"**Advisors**" means CR3 and Imperial or replacement advisors of comparable standing or reputation to which the Administrative Agent may consent in writing, such consent not to be unreasonably withheld.

"**CR3**" means CR3 Partners, LLC.

12

"**CRO**" means Mr. Brandon Smith of CR3 (or such other professional acceptable to the Administrative Agent).

"**CRO Engagement Agreement**" means the Engagement Agreement, dated March 28, 2017, between CR3 and LII, which retained CR3, as supplemented by Addendum A dated May 3, 2017 and Addendum B dated as May 31, 2017 and amended by Amendment to Engagement Agreement dated effective July 5, 2017.

"**Disposition**" means the sale, lease, conveyance, transfer or other disposition of Property.

"**Excess Cash**" means, at any time, the amount of Consolidated Cash Balances in excess of the Consolidated Cash Balance Threshold other than any cash set aside to pay in the ordinary course of business Budgeted Items then due and owing to unaffiliated third-parties and for which a Credit Party has issued checks in order to pay such amounts.

"**Excess Cash Threshold**" means aggregate Consolidated Cash Balances greater than $1,250,000.

"**Forbearance Agreement**" means the Forbearance Agreement and Third Amendment to Amended and Restated Credit Agreement, dated effective the Forbearance Effective Date, and the Borrowers, LHI, the Individual Guarantor, the Lenders and the Administrative Agent.

"**Forbearance Effective Date**" means August 16, 2017.

"**Imperial**" means Imperial Capital, LLC.

"**Net Proceeds**" means proceeds in cash, checks or other cash equivalent financial instruments (including cash equivalents) as and when received by the Person making a Disposition, as well as insurance proceeds and condemnation, governmental seizure or taking, eminent domain, requisition or use and similar awards received net of: (a) in the event of a Disposition (i) the direct costs relating to such Disposition excluding amounts payable to an Obligor or any Affiliate of an Obligor, (ii) sale, use or other transaction Taxes paid or payable as a result thereof, and (iii) amounts required to be applied to repay principal, interest and prepayment premiums and penalties on Indebtedness secured by a Lien on the asset which is the subject of such Disposition.

"**Permitted Variance**" means, with respect revenue, an unfavorable variance of 10% or more during the applicable 4-week period on a cumulative basis, yielding a reported actual result less than the Minimum Rolling 4-Week Revenue.

(e)  **Amendment of Section 2.4(a)(ii)**.    Section 2.4(a)(ii) of the Credit Agreement is amended and restated in its entirety to read as follows:

(ii)    Repayment Equal to Daily Excess Cash.  If, as of 10:00 a.m. on any Business Day, the Credit Parties have any Excess Cash, the Borrowers shall (or shall cause other Credit Parties to) immediately prepay, to the extent of such Excess Cash, the outstanding principal amount of the Loans and/or Cash Collateralize Letters of Credit.

(f)  **Amendment of Section 2.4(d)**.  Section 2.4(d) is amended and restated to read as follows:

The amount of Net Proceeds from all Asset Dispositions permitted under ***Section 8.5*** shall be used on the date of receipt to prepay outstanding principal amounts on the Revolving Credit Loans, with a corresponding reduction of the aggregate Revolving Credit Commitment.

(g)  **Amendment of Section 2.5(b)**.  Section 2.5(b) is amended by deleting from the first sentence thereof the words "this Section 2.5(b)" and inserting in lieu thereof the words "Section 2.4(b), Section 2.4(d), and Section 2.4(f)."

(h)  **Amendment of Section 6.15**.  The reference in Section 6.15 of the Credit Agreement to "Section 5.1(f)(i)" is changed to a reference to "Section 5.1(e)(i)."

(i)  **Amendment of Section 7.20**.  Section 7.20 of the Credit Agreement is amended and restated in its entire to read as follows:  **"[Reserved]"**

(j)  **Amendment of Section 7.21**.  Section 7.21 of the Credit Agreement is amended and restated in its entirety to read as follows:

**Advisors**.  Continue to engage CR3 and the CRO unless the Administrative Agent otherwise consents in writing, CR3's and the CRO's duties to include those set forth in CR3's Engagement Letters and continue to engage Imperial to perform the duties set forth in Annex C to the Forbearance Agreement at least through the earlier of (i) the end of the Forbearance Period and (ii) a sale or refinancing of the Obligors.

(k)  **New Article VIII Section**.  Article VIII of the Credit Agreement is amended by adding thereto a new section reading as follows:

Section 8.17  **No Excess Cash**.  To the extent any Loans or Letters of Credit are outstanding not permit any Excess Cash to exist as of the end of any Business Day.

(l)  **Amendment of Schedule 1.1**.  The first table on Schedule 1.1 of the Credit Agreement is amended and restated in its entirety to read as follows:

| **Period** | **Maximum Aggregate Revolving** |
|---|---|

14

|  | Credit Commitment of All Lenders |
|---|---|
| Forbearance Effective Date through Termination Date | $64,955,931.52 |

7. **Post-Closing Covenants**.

(a)    **Deposit Accounts**.  By August 21, 2017, the Credit Parties and Wells Fargo, as depositary, shall have entered into one or more deposit account control agreements with the Administrative Agent covering the accounts maintained by the Obligors with Wells Fargo.

(b)    **Affidavit**.  By August 18, 2017, the Administrative Agent shall have received an Affidavit of the Individual Guarantor in the form of Annex F hereto.

(c)    **Additional Guaranties**.  By August 22, 2017, each of LHI, LHA and 7807 shall have guaranteed the Obligation and executed and delivered Guaranty Agreements to the Administrative Agent.

(d)    **Additional Security Documents**.  By August 22, 2017, to the extent requested by the Lenders, each of LHI, LHA and 7807 shall have executed and delivered to the Administrative Agent Security Documents granting Liens on all of their Property not presently subject to Liens in favor of the Administrative Agent.

(e)    **Tax Returns**. By August 21, 2107, the Obligors shall have delivered to the Administrative Agent true and correct copies of their federal income tax returns,  or if not yet filed, extensions of the due date thereof for the past two years.

The failure of Obligors to timely comply with the terms of this Section 7 shall constitute (i) a Default and an Event of Default under and for all purposes of the Credit Agreement and (ii) a Termination Event hereunder.

8.    **Conditions Precedent**.  As a condition to the commencement of the Forbearance Period on the Forbearance Effective Date, each of the following conditions shall have been fulfilled by Obligors:

(a)    **Forbearance Agreement**.  The Obligors, the Administrative Agent and the Majority Lenders have each executed and delivered this Forbearance Agreement.

(b)    **Payments**.  The Borrowers shall have paid in cash all invoiced and unpaid fees and expenses reasonably incurred by and owing to the Administrative Agent's counsel, Winstead PC, and to Focus and Paul Boston & Associates, Inc., consultants to Winstead PC.

(c)    **Budget**.  Borrowers shall have delivered the initial Budget.

(d)    **Evidence of Authority**.  The Credit Parties, LHI, LHA and 7807 shall have delivered to the Administrative Agent certificates of duly authorized officers of the Credit

Parties, and such other documents, instruments and agreements as the Administrative Agent shall require, to evidence the due authorization, execution and delivery of this Forbearance Agreement and their other Loan Documents, each of which shall be in form and substance satisfactory to the Administrative Agent.

The failure of Obligors to timely comply with the terms of this Section 8 shall constitute (i) a Default and an Event of Default under and for all purposes of the Credit Agreement and (ii) a Termination Event hereunder.

9. **Ratification of Related Documents and Collateral**. Obligors hereby acknowledge that each of them has received from the Administrative Agent proper notice of Default with respect to the Acknowledged Defaults. Each of the Obligors hereby waives (a) any further notice of Default, notice of intent to accelerate, or demand for payment and (b) any further opportunity to cure any of the Acknowledged Defaults. Except as modified by this Forbearance Agreement, each Obligor hereby acknowledges, ratifies, reaffirms, and agrees that each of the Loan Documents, and the first priority, perfected liens and security interests created thereby in favor of the Administrative Agent in the Collateral, are and will remain in full force and effect and binding on Obligors, and are enforceable in accordance with their respective terms and applicable law. Each of the Obligors acknowledges, ratifies, and reaffirms all of the terms and provisions of the Loan Documents, except as modified herein, which are incorporated by reference as of the Forbearance Effective Date as if set forth herein including, without limitation, all promises, agreements, warranties, representations, covenants, releases, indemnifications, and waivers of jury trials contained therein. The Obligors hereby acknowledge, ratify, and confirm the Credit Agreement, the Notes, the Security Instruments, the Guaranties, the other Loan Documents, and all of their respective debts and obligations to Credit Parties thereunder. The Obligors acknowledge and agree that in the event the Administrative Agent seeks to take possession of any or all of the Collateral securing any of the Secured Obligations by court process, the Obligors each irrevocably waive, to the fullest extent permitted by law, any bonds and any surety or security relating thereto required by any statute, court rule or otherwise as an incident to such possession.

10. **Remedies Upon Termination Event**. Upon the occurrence of a Termination Event, (a) the Forbearance Period will terminate without further act or action by the Administrative Agent or any Lender, (b) the Administrative Agent will be entitled immediately to accelerate the Secured Obligations, institute foreclosure proceedings against the Collateral and to exercise any and all of the Administrative Agent's or any Lender's rights and remedies available to the Administrative Agent or any Lender under the Loan Documents and this Forbearance Agreement, at law, in equity, or otherwise, without further opportunity to cure, demand, presentment, notice of dishonor, notice of Default, notice of intent to accelerate, notice of intent to foreclose, notice of protest or other formalities of any kind, all of which are hereby expressly waived by the Obligors.

11. **Acknowledgment of Defaults**. The Obligors specifically acknowledge the existence and continuation of the Acknowledged Defaults.

12. **WAIVER AND RELEASE**. EACH OF OBLIGORS (IN ITS OR HIS OWN RIGHT AND ON BEHALF OF ITS PREDECESSORS, SUCCESSORS, LEGAL REPRESENTATIVES AND ASSIGNS) HEREBY EXPRESSLY AND UNCONDITIONALLY

ACKNOWLEDGES AND AGREES THAT IT HAS NO SETOFFS, COUNTERCLAIMS, ADJUSTMENTS, RECOUPMENTS, DEFENSES, CLAIMS, CAUSES OF ACTION, ACTIONS OR DAMAGES OF ANY CHARACTER OR NATURE, WHETHER CONTINGENT, NONCONTINGENT, LIQUIDATED, UNLIQUIDATED, FIXED, MATURED, UNMATURED, DISPUTED, UNDISPUTED, LEGAL, EQUITABLE, SECURED OR UNSECURED, KNOWN OR UNKNOWN, ACTUAL OR PUNITIVE, FORESEEN OR UNFORESEEN, DIRECT, OR INDIRECT, AGAINST EACH OF THE ADMINISTRATIVE AGENT AND EACH LENDER, ANY OF THEIR AFFILIATES OR ANY OF THEIR OFFICERS, DIRECTORS, AGENTS, EMPLOYEES, ATTORNEYS OR REPRESENTATIVES OR ANY OF THEIR RESPECTIVE PREDECESSORS, SUCCESSORS OR ASSIGNS (COLLECTIVELY, WITH THE ADMINISTRATIVE AGENT AND THE LENDERS, THE "LENDER-RELATED PARTIES" AND EACH INDIVIDUALLY, A "LENDER-RELATED PARTY") OR ANY GROUNDS OR CAUSE FOR REDUCTION, MODIFICATION, SET ASIDE OR SUBORDINATION OF THE SECURED OBLIGATIONS OR ANY LIENS OR SECURITY INTERESTS OF THE CREDIT PARTIES. IN PARTIAL CONSIDERATION FOR THE AGREEMENT OF THE ADMINISTRATIVE AGENT AND THE LENDERS TO ENTER INTO THIS FORBEARANCE AGREEMENT, EACH OF OBLIGORS HEREBY KNOWINGLY AND UNCONDITIONALLY WAIVES AND FULLY AND FINALLY RELEASES AND FOREVER DISCHARGES THE LENDER-RELATED PARTIES FROM, AND COVENANTS NOT TO SUE THE LENDER-RELATED PARTIES FOR, ANY AND ALL SETOFFS, COUNTERCLAIMS, ADJUSTMENTS, RECOUPMENTS, CLAIMS, CAUSES OF ACTION, ACTIONS, GROUNDS, CAUSES, DAMAGES, COSTS AND EXPENSES OF EVERY NATURE AND CHARACTER, WHETHER CONTINGENT, NONCONTINGENT, LIQUIDATED, UNLIQUIDATED, FIXED, MATURED, UNMATURED, DISPUTED, UNDISPUTED, LEGAL, EQUITABLE, SECURED OR UNSECURED, KNOWN OR UNKNOWN, ACTUAL OR PUNITIVE, FORESEEN OR UNFORESEEN, DIRECT OR INDIRECT, ARISING OUT OF OR FROM OR RELATED TO ANY OF THE LOAN DOCUMENTS, WHICH ANY OBLIGOR NOW OWNS AND HOLDS, OR HAS AT ANY TIME HERETOFORE OWNED OR HELD, SUCH WAIVER, RELEASE AND DISCHARGE BEING MADE WITH FULL KNOWLEDGE AND UNDERSTANDING OF THE CIRCUMSTANCES AND EFFECTS OF SUCH WAIVER, RELEASE AND DISCHARGE AND AFTER HAVING CONSULTED LEGAL COUNSEL OF ITS OWN CHOOSING WITH RESPECT THERETO. THIS SECTION IS IN ADDITION TO ANY OTHER RELEASE OF ANY OF THE LENDER-RELATED PARTIES BY ANY OF OBLIGORS AND SHALL NOT IN ANY WAY LIMIT ANY OTHER RELEASE, COVENANT NOT TO SUE, OR WAIVER BY ANY OF OBLIGORS IN FAVOR OF ANY OF THE LENDER-RELATED PARTIES.

13.  **Covenant Not to Sue**.  Each Obligor hereby absolutely, unconditionally and irrevocably covenants and agrees with and in favor of each Lender-related Party that it will not sue (at law, in equity, in any regulatory proceeding, or otherwise) any Lender-related Party on the basis of any Claim released, remised, and discharged by any Releasing Party pursuant to Section 12(a) above.  If any Releasing Party violates the foregoing covenant, each Obligor, for itself and its successors and assigns, and its present and former members, managers, shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents, legal representatives, and other representatives, agrees to pay, in addition to such other damages as

any Lender-related Party may sustain as a result of such violation, all attorneys' fees and costs incurred by any Lender-related Party as a result of such violation.

14. **No Obligation of Credit Parties**.  The Obligors hereby acknowledge and understand that upon the expiration or termination of the Forbearance Period, if all the Acknowledged Defaults have not been cured or waived by written agreement in accordance with the Credit Agreement, or if there shall at such time exist a Default or Event of Default, then the Administrative Agent and the Lenders shall have the right to proceed to exercise any or all available rights and remedies, which may include foreclosure on the Collateral and/or institution of legal proceedings.  The Administrative Agent and the Lenders shall have no obligation whatsoever to extend the maturity of the Secured Obligations, waive any Events of Default or Defaults, defer any payments, or further forbear from exercising its rights and remedies.

15. **No Implied Waivers**.  No failure or delay on the part of the Administrative Agent or the Lenders in exercising, and no course of dealing with respect to, any right, power or privilege under this Forbearance Agreement, the Credit Agreement, the Notes, the Security Instruments, the Guaranties, or any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Forbearance Agreement, the Credit Agreement, the Notes, the Guaranties, or any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

16. **INDEMNIFICATION**.  IN ADDITION TO, AND WITHOUT LIMITATION OF, ANY AND ALL INDEMNITIES PROVIDED IN THE LOAN DOCUMENTS, OBLIGORS HEREBY, JOINTLY AND SEVERALLY, INDEMNIFY AND HOLD EACH OF THE LENDER-RELATED PARTIES HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, LIABILITIES, LOSSES, DAMAGES, CAUSES OF ACTION, SUITS, JUDGMENTS, COSTS, AND EXPENSES, INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES, ARISING OUT OF OR FROM OR RELATED TO ANY OF THE LOAN DOCUMENTS OR THIS FORBEARANCE AGREEMENT. IF ANY ACTION, SUIT, OR PROCEEDING IS BROUGHT AGAINST ANY OF THE LENDER-RELATED PARTIES, OBLIGORS SHALL, AT SUCH LENDER-RELATED PARTIES' REQUEST, DEFEND THE SAME AT THEIR SOLE COST AND EXPENSE, SUCH COST AND EXPENSE TO BE A JOINT AND SEVERAL LIABILITY OF OBLIGORS, BY COUNSEL SELECTED BY SUCH LENDER-RELATED PARTY. NOTWITHSTANDING ANY PROVISION OF THIS FORBEARANCE AGREEMENT OR ANY OTHER LOAN DOCUMENT, THIS SECTION 16 SHALL REMAIN IN FULL FORCE AND EFFECT AND SHALL SURVIVE ANY DELIVERY AND PAYMENT ON THE SECURED OBLIGATIONS, THIS FORBEARANCE AGREEMENT AND THE OTHER LOAN DOCUMENTS.

17. **Survival of Representations and Warranties**.  All representations and warranties made in this Forbearance Agreement or any other Loan Document will survive the execution and delivery of this Forbearance Agreement, and no investigation by Credit Parties or any closing will affect the representations and warranties or the right of Credit Parties to rely upon them.

18. **Review and Construction of Documents**.  Each of the Obligors hereby acknowledges, represents, and warrants to the Administrative Agent and the Lenders that (a) the Obligors have had the opportunity to consult with legal counsel of their own choice and have been

afforded an opportunity to review this Forbearance Agreement with their legal counsel, (b) Obligors have reviewed this Forbearance Agreement and fully understand the effects thereof and all terms and provisions contained herein, and (c) the Obligors have executed this Forbearance Agreement of their own free will and volition. The recitals contained in this Forbearance Agreement shall be construed to be part of the operative terms and provisions of this Forbearance Agreement.

19. **ENTIRE AGREEMENT; AMENDMENT**. THIS FORBEARANCE AGREEMENT AND THE RELATED DOCUMENTS AS INCORPORATED HEREIN EMBODY THE FINAL, ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO REGARDING THE ADMINISTRATIVE AGENT'S AND THE LENDERS' FORBEARANCE WITH RESPECT TO THEIR RIGHTS AND REMEDIES ARISING AS A RESULT OF THE ACKNOWLEDGED DEFAULTS AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES HERETO. The provisions of this Forbearance Agreement may be amended or waived only by an instrument in writing signed by the parties hereto. The Loan Documents, as modified by this Forbearance Agreement, continue to evidence the agreement of the parties with respect to the subject matter thereof.

20. **Notices**. All notices, requests, demands and other communications under this Forbearance Agreement will be given in accordance with the provisions of the Credit Agreement, except that notices to the Administrative Agent shall be given to the following:

Wells Fargo Bank, N.A.
5080 Spectrum Drive, Suite 400
Addison, Texas 75225
Attention: Jennifer L. Norris, CFA
Fax: 866-968-4862
Email: Jennifer.norris@wellsfargo.com

21. **Successors and Assigns**. This Forbearance Agreement will be binding upon, and will inure to the benefit of, the parties hereto and their respective successors and assigns, provided that none of Obligors may assign any rights or obligations under this Forbearance Agreement without the prior written consent of the Administrative Agent.

22. **Tolling of Statutes of Limitation**. The parties hereto agree that all applicable statutes of limitations with respect to the Loan Documents shall be tolled and not begin running until the Termination Date.

23. **Arms-Length/Good Faith**. This Forbearance Agreement has been negotiated at arms-length and in good faith by the parties hereto.

24. **Governing Law**. This Forbearance Agreement shall be governed by and construed in accordance with the laws of the State of Texas and applicable laws of the United States of America.

25. **Interpretation**. Wherever the context hereof will so require, the singular shall include the plural, the masculine gender shall include the feminine gender and the neuter and vice versa. The headings, captions and arrangements used in this Forbearance Agreement are for convenience only and shall not affect the interpretation of this Forbearance Agreement.

26. **Severability**. In case any one or more of the provisions contained in this Forbearance Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Forbearance Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

27. **Counterparts**. This Forbearance Agreement may be executed and delivered in any number of counterparts, and by different parties hereto on separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute one and the same instrument; provided that no party shall be bound by this Forbearance Agreement until each of the parties has executed a counterpart hereof. Execution of this Forbearance Agreement via facsimile or other electronic means shall be effective, and signatures received via facsimile or other electronic means shall be binding upon the parties hereto and shall be effective as originals.

28. **Further Assurances**. The Obligors each agree to execute, acknowledge, deliver, file and record such further certificates, instruments and documents, and to do all other acts and things, as may be reasonably requested by the Administrative Agent as necessary or advisable to carry out the intents and purposes of this Forbearance Agreement.

29. **Loan Document**. This Forbearance Agreement is a Loan Document for all purposes of the Credit Agreement and the other Loan Documents.

30. **No Effect on Rights Under Subordination and Intercreditor Agreements**. The Administrative Agent's and the Lenders' agreement to forbear pursuant to this Forbearance Agreement shall not extend to any of their respective rights or remedies under any subordination, intercreditor, or similar agreement to which the Administrative Agent or any Lender is party, it being understood that the Acknowledged Defaults shall at all times constitute Events of Default for purposes of any and all such agreements notwithstanding such agreement to forbear in this Forbearance Agreement, and the Administrative Agent and the Lenders shall at all times be permitted to enforce all rights and remedies in respect thereof (including, without limitation, blocking payments to any holders of subordinated obligations in accordance with the terms of such agreements).

31. **Mutual Waiver of Jury Trial**. THE PARTIES HERETO WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE BETWEEN AGENT OR ANY LENDER AND ANY LOAN PARTY ARISING OUT OF, CONNECTED

WITH, RELATED OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS FORBEARANCE AGREEMENT OR THE CREDIT AGREEMENT OR THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.

[Remainder of page intentionally blank]

IN WITNESS WHEREOF, the parties hereto have executed this Forbearance Agreement as of the Effective Date.

<b>BORROWERS</b>:

LOCKWOOD ENTERPRISES, INC.

By:_____

Name: Michael F. Lockwood
Title: Chief Executive Officer

LOCKWOOD INTERNATIONAL, INC.

By:_____

Name: Michael F. Lockwood
Title: Chief Executive Officer

-and-

By:_____

Name: Brandon Smith
Title: Chief Restructuring Officer

Signature Page to Forbearance Agreement and Third Amendment to Amended and Restated
Credit Agreement

LMG MANUFACTURING, INC.

By: _____

Name: Michael F. Lockwood
Title:  Chief Executive Officer

PIPING COMPONENTS, INC.

By: _____

Name: Michael F. Lockwood
Title:  Chief Executive Officer

LHI:

LOCKWOOD HOLDINGS, INC.

By: _____

Name: Michael F. Lockwood
Title:  Chief Executive Officer

**LHA**:

LH AVIATION, LLC

By: _____

Name: Michael F. Lockwood
Title:  Chief Executive Officer

**7807**:

7807 EAGLE LANE LLC

By: _____

Name:
Title:

**INDIVIDUAL GUARANTOR:**

Michael F. Lockwood

Signature Page to Forbearance Agreement and Third Amendment to Amended and Restated
Credit Agreement

**ADMINISTRATIVE AGENT AND LENDERS**:

WELLS FARGO BANK,
NATIONAL ASSOCIATION,
as Administrative Agent and as a Lender

By: _____
Jennifer L. Norris
Senior Vice President

**TRUSTMARK NATIONAL BANK**

By: _Reed C. Cook_____

Name: Reed C. Cook

Title: Sr Vice President

Signature Page to Forbearance Agreement and Third Amendment to Amended and Restated Credit Agreement

**ANNEX A**
**ACKNOWLEDGED DEFAULTS**

Each of the existing and prospective breaches of the Loan Documents set forth below are Acknowledged Defaults:

1. Under *Section 9.1(a)* of the Credit Agreement, failure to meet permanent reduction of the Revolving Credit Commitment in accordance with Schedule 1.1 of the Credit Agreement and *Sections 2.5(c) and 7.20(b)*.

2. Under *Section 9.1(c)* of the Credit Agreement, as a result of breaches under:
   a. *Section 6.16* relating to events and conditions that could reasonably be expected to have a Material Adverse Effect;
   b. *Section 6.20* relating to the absence of Defaults and Events of Default;
   c. *Section 6.23* relating to disclosure.

3. Under *Section 9.l(d)* of the Credit Agreement:
   a. Failure to timely deliver information required under *Sections 7.1 and 7.2*;
   b. Failure of delivered information under *Sections 7.1(a) and (b)* to fairly represent in all material respects of the financial condition of the Parent and its Subsidiaries and the results of their operations as of their respective dates;
   c. Failure to deliver the forensic accountant's report by April 30, 2017 pursuant to *Section 7.2(g)*;
   d. Failure to comply with *Sections 7.2(f) and 7.17* as requested in the May 22, 2017 letter;
   e. Failure to maintain LII's qualification to do business in Illinois as a foreign corporation in accordance with *Sections 6.1 and 7.4* of the Credit Agreement[1];
   f. Failure to comply with *Section 8.6,* including any equity draws made to Mike Lockwood from October 2016 through July 2017;
   g. Failure to comply with the Consolidated Total Liabilities to Consolidated Tangible Net Worth ratio set forth in *Section 8.14(a)* of the Credit Agreement for the fiscal quarters ended October 31, 2016, and January 31, 2017;
   h. Failure to achieve minimum Consolidated EBITDA set forth in *Section 8.14(a)*[2] for the periods ending April 30, 2017, May 31, 2017, and July 31, 2017;
   i. Failure to comply with the Consolidated Net Income covenant set forth in *Section 8.14(b)* of the Credit Agreement for the fiscal quarters ended April 30, 2016, July 31, 2016, October 31, 2016, and January 31, 2017;
   j. Failure to comply with *Section 8.14(b)*[3] relating to maximum restructuring changes in Fiscal Year 2017;

---

[1] LII is working to get the appropriate documentation submitted to the State of Illinois to get back in good standing.

[2] Section 8.14(a) was changed from a Consolidated Total Liabilities to Consolidated Tangible Net Worth ratio to a Minimum EBITDA with the February 2017 amendment.

     k. Failure to company with **Section 8.14(c)** as a result of Asset Coverage Ratio being the less than the minimum amount required for the months ending February 2017, March 2017, April 2017, May 2017, June 2017, July 2017, and August 2017.

4. Under **Section 9.1(n)** of the Credit Agreement
     a. As a result of the occurrence of an event of default under the LHI Credit Agreement due to a sale of LHI's sale of its Shorewood, Illinois property outside the ordinary course of business; and
     b. As a potential default under the LHI Credit Agreement for the executed subleases at the Clute, Texas location and the Gonzales, Louisiana location.

5. Under **Sections 6.1 and 7.4** of the Credit Agreement, Lockwood International, Inc.'s qualification to do business in Illinois as a foreign corporation has been revoked.

---

[3] Section 8.14(b) was changed from a Consolidated Net Income covenant to maximum restructuring charges with the February 2017 amendment.

Signature Page to Forbearance Agreement and Third Amendment to Amended and Restated Credit Agreement

**ANNEX B**

**LIMITED FOREIGN FUNDS ACCOUNTS**

1. List of Limited Foreign Funds Accounts (active) – See attached spreadsheet

2. List of Dormant Foreign Accounts – See attached spreadsheet

**ANNEX B-1**

Lockwood International Dormant Foreign Bank Accounts

| Bank Name | Acct. Number | Account Name | Currency | Balance | Balance As of | Type | Bank ID | Branch | Account Type |
|---|---|---|---|---|---|---|---|---|---|
| **Dormant Foreign Accounts** | | | | | | | | | |
| Wells Fargo Bank | 99009901 | Lockwood International Inc. | | Unknown | | International | | London | ACH Clearing |
| Techcombank | 19026647027016 | Vietnam Lockwood Co. LTD | VND | 194,401,158.00 đ | 6/26/2017 | International | | Vietnam | |
| Techcombank | 19026647027024 | Vietnam Lockwood Co. LTD | USD | 412.07 | 6/26/2017 | International | | Vietnam | |
| JP Morgan Chase | 1591468341 | Lockwood International | USD | Unknown | | Domestic | | US | |
| Banca Galileo S.p.A. | 000000000890 | Lockwood International | EUR | Unknown | | International | | Italy | |
| Banca Galileo S.p.A. | 000076300015 | Lockwood International | USD | Unknown | | International | | Italy | |
| Banca Intesa SanPaolo S.p.A. | 100000004469 | Lockwood International | EUR | Unknown | | International | | Italy | |
| Banca Intesa SanPaolo S.p.A. | 161009371612 | Lockwood International | USD | Unknown | | International | | Italy | |
| Banca Popolare Milano | 000000000075 | Lockwood International | EUR | Unknown | | International | | Italy | |
| Banca Unicredit S.p.A. | 000102159043 | Lockwood International | EUR | Unknown | | International | | Italy | |
| Banca Unicredit S.p.A. | 000102161415 | Lockwood International | USD | Unknown | | International | | Italy | |
| Banca Unicredit S.p.A. | 000102160963 | Lockwood International | USD | Unknown | | International | | Italy | |
| Shin Han Bank | 200-152-917721 | Lockwood International | KRW | Unknown | | International | | Korea | |
| Korean Exchange Bank | 650-008008-011 | Lockwood International | USD | Unknown | | International | | Korea | |
| Bank of America, N.A. Seoul Branch | 6070-41862-132 | Lockwood International | USD | Unknown | | International | | Korea | |
| Bank of America, N.A. Seoul Branch | 6070-41862-033 | Lockwood International | KRW | Unknown | | International | | Korea | |
| Korean Exchange Bank | 611-020487-846 | Lockwood International | KRW | Unknown | | International | | Korea | |
| Korean Exchange Bank | 611-020559-295 | Lockwood International | KRW | Unknown | | International | | Korea | |
| Wells Fargo Bank | 0008-001341-01-2 | Lockwood Valves SEAsia Pte Ltd | USD | Unknown | | International | | Singapore | |
| Wells Fargo Bank | 008-902408-6 | Lockwood Valves SEAsia Pte Ltd | SGD | Unknown | | International | | Singapore | |
| Wells Fargo Bank | 033-902962-9 | Lockwood Holdings Pte Ltd | SGD | Unknown | | International | | Singapore | |
| Wells Fargo Bank | 033-903162-3 | Lockwood Valves SEA Pte Ltd | SGD | Unknown | | International | | Singapore | |

**ANNEX B - LIMITED FOREIGN FUNDS ACCOUNTS**

*Note: Bank Balances Provided unless otherwise noted*

| Bank Name | Acct. Number | Account Name | Local Currency | Local Currency Balance | Conversion Rate to USD | USD Balance | Balance As of | Type | Bank ID | Branch | Account Type | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Lockwood Operating Accounts** | | | | | | | | | | | | |
| Wells Fargo Bank | 7776036836 | Lockwood International Inc | SGD | 290.47 | 0.73 | $ 216.23 | 8/10/2017 | Multi-Currency | | Cayman | | |
| Wells Fargo Bank | 00003375 | Lockwood International Inc | GBP | 71,669.51 | 1.30 | $ 92,986.95 | 8/15/2017 | Multi-Currency | | London | | Book Balance, net of checks outstanding |
| Wells Fargo Bank | 00003376 | Lockwood International Inc | EUR | 380,721.70 | 1.17 | $ 447,301.55 | 8/15/2017 | Multi-Currency | | London | | Book Balance, net of checks outstanding |
| ING | NL82INGB0020104896GBP | Lockwood International Inc | GBP | 310.84 | 1.30 | $ 403.36 | 8/10/2017 | International | | GB | | |
| ING | NL88IN45B0024549885EUR | Lockwood International Inc | EUR | 94,266.38 | 1.17 | $ 110,751.50 | 8/10/2017 | International | | GB | | |
| Bank of America, N.A. | 621256365010 | Lockwood Int'l, Inc. S9 Branch | SGD | 14,882.25 | 0.73 | $ 10,914.78 | 8/10/2017 | International | BOFAS02X | US | Operating | |
| Bank of America, N.A. | 621256366228 | Lockwood Int'l, Inc. S9 Branch | SGD | 76,183.41 | 0.73 | $ 55,873.60 | 8/10/2017 | International | BOFAS02X | US | Receivables | |
| Royal Bank Of Canada | 05259-100-804-4 | Lockwood International, Inc. | CAD | 229,730.65 | 0.79 | $ 180,787.69 | 8/10/2017 | International | | Canada | Operating | Book Balance, net of checks outstanding |
| Royal Bank Of Canada | 05259-100-830-9 | Lockwood International, Inc. | CAD | 51,420.06 | 0.79 | $ 40,465.90 | 8/10/2017 | International | | Canada | Payroll | |
| Royal Bank Of Canada | 05489-102-631-9 | Lockwood Holdings, Inc. | CAD | 93,736.21 | 0.79 | $ 73,766.18 | 8/11/2017 | International | | Canada | LHI Canada Operating | |
| Siam Commercial Bank | 9653001051 | Lockwood Valve (Thailand) Co. LTD | THB | 1,152,072.17 | 0.03 | $ 34,521.90 | 8/6/2017 | International | | Thailand | | |
| Siam Commercial Bank | 9653058592 | Lockwood Valve (Thailand) Co. LTD | THB | 5,000.00 | 0.03 | $ 150.16 | 8/6/2017 | International | | Thailand | | |
| National Bank of Australia | 141306346 | Lockwood International | AUD | 80,130.38 | 0.79 | $ 63,478.09 | 8/6/2017 | International | | Australia | | |
| National Bank of Australia | LVAUSD/SD01 | Lockwood International | USD | 46,270.24 | 1.00 | $ 46,270.24 | 8/6/2017 | International | | Australia | | |
| National Bank of Australia | LVAUSEUR01 | Lockwood International | EUR | 66,232.22 | 1.17 | $ 77,864.78 | 8/6/2017 | International | | Australia | | |
| **Total** | | | | | | $ 1,235,800.89 | | | | | | |

# ANNEX C
## SALE MILESTONES

- **Weeks 1-2**:  Information Review/Data Room Preparation – The following will be reviewed in order to prepare a short investor presentation, teaser and a data room:

  - √  Updated executive / board presentations outlining recent performance, potential opportunities, etc.

  - √  Review Balance Sheet and Cash Flow historicals and forecast projections

  - √  2 year financial forecast

  - √  Listing of all assets and inventory, with the following information (asset name, type, appraisals Real Estate/Fixed Assets/Plane)

  - √  Quarterly customer breakdown on sales with details on product type (PVF and EP) and service (Project Management, MRO, Field Service)

- **Weeks 2-3**:  Preparation of Investor Presentation, Teaser, Dataroom and Investor List

  - √  Imperial will work with the Company and through its network to develop an investor list of the highest probability potential strategic buyers / investors / refinancing candidates

  - √  Initial contact will occur with conference calls and meetings scheduled

- **Weeks 3-4**:  Launch of Process & Solicitation of Letters of Intent

  - –  Imperial will continue to market and monitor interest with investors/buyers, conduct discussions (involving the Obligors' team, as needed), furnish additional diligence and drive the process of soliciting indications of interest

- • **Weeks 4-6**:  Review of Proposals / Documentation

  - –  After indications of interest are received, Imperial will work with the Company, the Board and its attorneys to evaluate all proposals received to present the best outcome(s) to the Lenders

  - –  Proposal Deadline:  September 30, 2017

  - –  If the proposals received do not satisfy the Company's obligations, the Company would move to negotiations with the Lenders and its other key creditors to effectuate a consensual plan of restructuring or consent to a receivership; provided however, that prior to the end of the forbearance period, Imperial and the Obligors shall report to Lenders with respect to the current sale and/or refinance prospects.  Based on such prospects, the Lenders may grant, but will not be obligated to grant, a 30 day extension of the Forbearance Period.  Prior to the expiration of any such 30 day extension,

Lenders and Obligors agree to again meet with Imperial for a current review of negotiations with prospective parties to a transaction to evaluate whether an additional extension is warranted.

_____

√ = Completed

ANNEX C

## ANNEX D

## TIMELINE FOR REAL PROPERTY SALES

- Properties listed for sale with local brokers as follows:
  - 912 John Stine Road, Westlake, LA 70669
    - o Owned by Lockwood Holdings, Inc.
    - o Broker/Agent – Reinauer Real Estate
  - Beltway Land
    - o 66.7177 Gross Acres (58.388 Net Acres) Of Vacant Land, Harris County, Texas 77044
    - o Owned by Lockwood Holdings, Inc.
    - o Broker/Agent - CBRE
  - Airport Hangar
    - o 7807 Eagle Lane, Spring, TX 77379
    - o Owned by 7807 Eagle Lane, LLC
    - o Broker/Agent - CBRE

- Sale/Leaseback Process
  - o Broker Stan Johnson & Co hired ("Sale/Leaseback Broker")
  - o Form of nondisclosure agreement completed
  - o Sale/Leaseback Broker has sent nondisclosure agreements to various parties
  - o Timeline:
    - Marketing materials – sent to 95 groups active in industrial real estate
    - Initial indications of interest by September 8, 2017
    - Letters of Intent – to follow

  Properties included sale/leaseback process:
  - 10002 Windfern Road, Houston, TX 77064
  - 10060 Windfern Road, Houston, TX 77064
  - 900 Business Park South Drive, Port Arthur, TX 77640
  - 901 Wilson Rd.  Clute, TX 77531
  - 182 Turbo Drive Sherwood Park AB, Canada
  - 499 Gladwish Drive Sarnia Ontario, Canada

## ANNEX E

## TIMELINE FOR LHA AIRCRAFT SALE

- Listed with airplane broker– Completed
- Increased marketing efforts – Completed
- Reassessment of the marketing activities to occur by end of August 2017 (including determination of whether to have aircraft on static display at the NBAA regional event in Morristown, NJ on September 7.

# ANNEX F

# FINANCIAL CONDITION AFFIDAVIT

**[Attached]**

**AFFIDAVIT OF FINANCIAL CONDITION**
**OF MICHAEL F. LOCKWOOD**

**SUBMITTED TO**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**
**AND**
**TRUSTMARK NATIONAL BANK**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

  I am over the age of 21 years and reside at _____.
My Social Security Number is _____. My driver's license number and state of
issuance are _____. I make this Affidavit at the request of Wells Fargo Bank,
National Association and Trustmark National Bank (each a "Bank" and collectively, "Banks"), for
the purpose of informing the Banks of my present financial condition. I know that the acceptance
of this Affidavit by the Banks will be in reliance upon the accuracy and truth of the statements and
representations made by me herein.

  I understand that in accepting this Affidavit and in relying upon its contents, the Banks may
pursue one or more of the following courses of action with regard to any indebtedness (whether
one or more) presently owed or guaranteed by me to either or both Banks: forbear or refrain from
exercising rights and remedies; alter, modify, extend or amend such indebtedness; forgive, release
or acquit me of all or a part of such indebtedness; take or relinquish liens on collateral securing
payment of such indebtedness; take or relinquish security interests pledged as collateral for such
indebtedness; elect not to offset balances in one or more bank accounts in which I have an
ownership interest against such indebtedness; allow the statute of limitations to continue to run on
such indebtedness without causing the statute to be tolled; or take or refrain from taking such other
action which may constitute a postponement or the relinquishment of one or more rights or
remedies which the Bank may have or hold against me with regard to such indebtedness.

  I have personal knowledge of the facts stated in this Affidavit and such facts are true,
accurate and complete in all material respects. I understand that the Banks are relying upon the
accuracy and truth of the statements and representations made by me and that based on the facts
and circumstances surrounding the negotiations pursuant to which this Affidavit is made, the full
and complete reliance of the Banks on the statements and representations made herein is
reasonable and justified.

  Should either Bank take or refrain from taking any courses of action in reliance on one or
more answers provided by this Affidavit, and should it later be determined that such answer or
answers are in whole or in part false, inaccurate or misleading, any such change in such Bank's
position regarding my indebtedness may, at such Bank's sole discretion, be voided and declared to
be of no force or effect and such Bank shall be entitled to assert in full its position toward me as it
existed prior to my delivery of this Affidavit.

I further affirm that should my financial condition change in such a manner to make any information or answer I have in this Affidavit incorrect or inaccurate I will immediately supplement such answer in writing to describe the means and nature of such change, and deliver such supplemental answer to the Banks.

I have no property or assets, have no income and have not disposed of or transferred assets except as hereinafter stated. [*In connection with all listings and descriptions of assets owned, include the cost or current value, whichever is higher, of acquisition of each asset.*]

When this Affidavit describes assets that I "owe", "hold," or "disposed of or transferred", or income that I "receive," the description includes without limitation (i) assets or properties which are owned or held, or which were disposed of or transferred, by trustees, agents or nominees for my benefit, or on my behalf, and income received by such persons for my benefit or on my behalf; and (ii) assets or properties which are owned or held, or which were disposed of or transferred, by my spouse, and income received by my spouse, except for assets, properties and income which constitute the separate property of my spouse under applicable laws.

The balance sheet attached hereto as Schedule 1 is true and correct in all respects, properly and fairly presents my financial condition and describes or includes all of my assets and liabilities (including, without elimination, contingent liabilities) as of the date set forth thereon. Since the date of such balance sheet, there have been no material adverse, or material positive, changes in my financial condition or position.

1.      I receive no income from any source whatsoever, except [*list amount(s) and source(s)*].

2.      I have no savings account in any bank, domestic or foreign, except [*list name and address of institution and outstanding balance of account*].

3.      I have no checking account in any bank, domestic or foreign, except [*list name and address of institution and outstanding balance of account*].

4.      I receive no salary, except [*list amount and source*].

5.      I receive no fees for management assistance or other services rendered to any individual, partnership, firm or corporation, except [*list amount and source*].

ANNEX C

6.      I receive no commissions from any source, except [*list amount and source*].

7.      I receive no stock dividends from any corporation, domestic or foreign, except [*list amount and source*].

8.      I am entitled to no bonus from any business, except [*list amount and source*].

9.      I have no safe deposit box or access to any safe deposit box, except [*list name and address of each institution, each safe deposit box number and the contents thereof*].

10.      I own no real estate of any nature whatsoever, except [*list address, legal description and date and cost of acquisition of all real estate owned*].

11.      I have no ownership interest in any partnership, legal entity or corporation owning real estate, except [*list name of partnership, firm, legal entity or corporation, interest owned and date and cost of acquisition*].

12.      I do not own any mortgages or have any interest in any mortgages, except [*list amount, interest, description property mortgaged and identity of mortgagor*].

13.      I own no building or loan certificates, or any shares in or assets in any savings and loan association, except [*list name of institution and ownership interest*].

14.      I own no stocks, bonds, mutual funds or other securities, except [*list, including date and cost of acquisition*].

ANNEX C

15.     I have no brokerage account with any broker, except [*list name of broker, account number and outstanding balance in each account*].

16.     I own no commodities, except [*list, including date and cost of acquisition*].

17.     I have no commodity account with any broker, except [*list name of broker, account number and outstanding balance in each account*].

18.     I have no account with any financial institution whatsoever, except [*list name of institution, account number and outstanding balance in each account*].

19.     I have no power of attorney or authority of any nature whatsoever, either over stocks, bonds, commodity accounts, or other form of securities, except [*identify and describe any such property and beneficial owner thereof*].

20.     I do not act as a trustee or fiduciary with respect to any property, either real or personal, except [*identify and describe any such property and beneficial owner thereof*].

21.     I do not own any bonds or evidence of debt of any governments, except [*list all governmental debt issues owned and date and cost of acquisition*].

22.     I own no insurance policy of any type, except [*list name of company, face amount of policy, type of insurance, beneficiary and amounts borrowed thereon*].

23.     I receive no dividends from any insurance company, except [*list as in 22 above*].

ANNEX C

24.     I pay no premiums on any insurance policy, except [*list as in 22 above*].


25.     I am not the beneficiary of any insurance policy, except [*list as in 22 above*].


26.     I have no interest in any patents, inventions, trade names, trademarks, copyrights, or royalty agreements, except [*identify*].


27.     I have no claim against any insurance company except [*identify company, amount of claim and description of claim*].


28.     I have no claim against or interest in any estate or any trust of any person, whether living or dead, except [*identify estate or trust, amount of claim and description claim*].


29.     I have no claim against any person, whether living or dead, or any firm or corporation, except [*identify individual or entity, amount of claim and description of claim*].


30.     I am not a plaintiff or defendant in or otherwise prosecuting any action or proceeding now pending in any court, except [*list the style of each case, case number, and court in which each case is pending*].


31.     I am not a party to any arbitration proceeding now pending before any Arbitrator or Board of Arbitration, except [*identify each proceeding*].


32.     I have no interest in any promissory notes, drafts or other commercial paper, except [*identify maker or drawer and amount*].


ANNEX C

33.     I am not entitled to receive any money from any State, City or Federal government, or agency or department thereof, except [*identify agency or department and amount*].

34.     I am not entitled to any Federal, State or City income tax refund, except [*identify and list*].

35.     There are no judgments or decrees outstanding against me except [*list style of each case, case number and court which entered each judgment or decree*].

36.     I have executed no guaranties of the indebtedness or obligation of any individual, corporation, partnership or other entity, except [*identify debtor, amount and holder of each guaranty*].

37.     I have made no gifts within the preceding two (2) years, except [*list property given, approximate value thereof in terms of cost of acquisition, date of gift and identity of recipient*].

38.     I have made no conveyance of real or personal property for less than full value within the preceding two (2) years, except [*list property transferred, approximate value thereof in terms of cost of acquisition, property or money received for such transfer (if any), date of transfer and identity of recipient*].

The foregoing statement includes not only outright conveyances of assets but also releases or waivers of any valuable claims or contract rights which I owned or held against other parties.

39.     During the past twenty-four (24) months, I have not made any payments to my trade creditors, outside of the ordinary course of my business, except: [*identify creditor and list amount and date of payment*].

ANNEX C

40.     During the past twenty-four (24) months, I have not made any payments to banks, financial institutions or other holders of my notes, bonds or funded indebtedness, except for: (i) payments to Bank; (ii) payments to creditors whose claims were, at the time of payment, fully secured by valid and perfected security interest in assets having a value at least as great as the amount of the indebtedness; and (iii) the following; [*list any other payments and dates*].

41.     No real or personal property is held by others for my benefit, except [*list property so held, approximate value thereof in terms of cost of acquisition, date of acquisition and identity of holder*].

42.     I am not indebted to any bank, savings and loan association, credit union, finance company, brokerage house or individual, except [*list name of institution or individual, amount of indebtedness and date indebtedness was incurred*].

43.     I own no airplane, automobile, boat, trailer or any motor vehicle of any nature whatsoever, except [*list serial number and date and cost of acquisition*].

44.     I have no personal property other than any clothing and personal effects, except [*include description, serial number (if any) and date and cost of acquisition*].

45.     I do not own or have any interest in any work of art, except [*include description, date and cost of acquisition*].

46.     I own no house, dwelling place, condominium apartment or co-operative apartment, except [*list address, date and cost of acquisition*].

47.     I have not had any financial statement prepared for or by me, nor have I issued any financial statement to any bank, financial institution, banking corporation, firm, or person within the last two (2) years, except [*attach a copy of any such financial statement*].

ANNEX C

48.     I am not a custodian of property for any minor or other individual or entity, except [*include description of such property and identity of beneficial owner*].

49.     I own no property, real or personal, in Switzerland or any other foreign country or territory of the United States, except [*include description of each item and its location, address and legal description of real property, serial numbers (if any), and date and cost of acquisition*].

50.     I have no bank accounts, savings accounts or deposit accounts in banks in any foreign countries, except [*list name and address of institution and outstanding balance of account*].

51.     I own no jewelry or like property having a value in excess of $1,000, except [*list description and date and cost of acquisition*].

52.     Except for the property herein set forth above, I own no property of any nature whatsoever having a value in excess of $1,000, except [*list description and date and cost of acquisition*].

53.     My fixed monthly expenses are as follows: [*list amount and description of each fixed expense*].

54.     My annual salary from all sources is [*list amounts and sources*].

55.     I have delivered to Banks true and correct copies of the tax returns (and all extensions thereof and amendments thereto) which I have filed with the Internal Revenue Service for the following years: _____.

ANNEX C

56. I know of no other material facts relating to my financial condition, except _____.

I make the following representations:

57. That neither I nor my spouse has transferred, conveyed, gifted or assigned any property to a trust, including trusts created as part of estate planning, at any time within the two (2) years preceding the execution of this Affidavit, except as stated below:

58. That neither I nor my spouse have transferred, conveyed, gifted or assigned any real property or interests in real property to our relatives, including, but not limited to, parents, in-laws, cousins, children, and/or significant others at any time within the two (2) years preceding this Affidavit, except as stated below:

59. That neither I nor my spouse have transferred, conveyed, gifted or assigned any cash, stocks, bonds, personal property or interests in personal property to our relatives, including, but not limited to, parents, in-laws, cousins, children, and/or significant others at any time within the two (2) years preceding the execution of this Affidavit, except as stated below:

60. That neither I nor my spouse has made gifts with a value greater than $1,000 to a family member within the two (2) years preceding the execution of this Affidavit, except:

| Name | Gift | Value of Gift |
|------|------|---------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

61. That neither I nor my spouse have created a business entity, including partnerships, limited liability companies, limited liability partnerships or otherwise, into which we have transferred property, including, but not limited to, cash in the two (2) years preceding the date of this Affidavit;

62. That neither I nor my spouse own or have an ownership interest in artwork, gun collections, antiques, patents or other unique property with an aggregate value of $10,000 or more, except as follows:

Type of Property                    Value of Property

ANNEX C

_____     _____

_____     _____

63.     That neither I nor my spouse have property in a safe deposit box, except [*describe, including value*]:

64.     That neither I nor my spouse have an interest in any oil and gas property or other mineral interest, except [*describe, including value*]:

65.     That neither I nor my spouse are beneficiaries of any trust created for our benefit, except [*describe, including value of trust assets*]:

66.     That no creditor has repossessed property from me in the last two (2) years preceding the date of this Affidavit;

67.     That neither I nor my spouse has inherited any property in the last two (2) years; and

68.     That neither I nor my spouse has disclaimed any interest in property that we would otherwise have inherited in the two (2) years preceding the execution of this Affidavit.

_____
Michael F. Lockwood

SUBSCRIBED AND SWORN TO before me on this _____ day of _____, 2017, to certify which witness my hand and official seal.

My commission expires:            _____
                                   Notary Public, State of Texas

_____          _____
                                   Name:

ANNEX C

Exhibit 11

## SECOND FORBEARANCE AGREEMENT AND
## FOURTH AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT

THIS SECOND FORBEARANCE AGREEMENT AND FOURTH AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT (this "**Forbearance Agreement**") dated effective as of September 29, 2017 (the "**Forbearance Effective Date**"), is by and among LOCKWOOD ENTERPRISES, INC., a Texas corporation, LOCKWOOD INTERNATIONAL, INC., a Texas corporation, LMG MANUFACTURING, INC., a Texas corporation, and PIPING COMPONENTS, INC., a Texas corporation (each a "**Borrower**" and collectively, "**Borrowers**"), MICHAEL F. LOCKWOOD, an individual ("**Individual Guarantor**"), LOCKWOOD HOLDINGS, INC., a Texas corporation ("**LHI**"), LH AVIATION, LLC, a Texas limited liability company ("**LHA**"), 7807 EAGLE LANE, LLC, a Texas limited liability company ("**7807**" and together with the Borrowers, LHI, LHA, and the Individual Guarantor the "**Obligors**" and each an "**Obligor**"), TRUSTMARK NATIONAL BANK, as a Lender (defined below) and WELLS FARGO BANK, NATIONAL ASSOCIATION, as a Lender (defined below) and as Administrative Agent for itself and the other Lenders (in such capacity, the "**Administrative Agent**").

RECITALS:

A.     WHEREAS, reference is made to that certain Amended and Restated Credit Agreement, dated as of September 30, 2015, among the Borrowers, the financial institutions party thereto from time to time as lenders (the "**Lenders**"), and the Administrative Agent, as amended by that certain First Amendment to Amended and Restated Credit Agreement dated effective as of July 31, 2016, by that certain Second Amended and Restated Credit Agreement and Limited Waiver of Defaults dated effective as of February 27, 2017, and by that certain Forbearance Agreement and Third Amendment to Amended and Restated Credit Agreement dated effective as of August 16, 2017 (the "**Initial Forbearance Agreement**"), in each case among the Borrowers, the Lenders and the Administrative Agent (as may be further amended, restated or otherwise modified from time to time, the "**Credit Agreement**").

B.     WHEREAS, the Obligors acknowledge the continued existence of the Acknowledged Defaults outlined in the Initial Forbearance Agreement and requests that the Administrative Agent and the Lenders continue to forbear from exercising their rights and remedies under the Credit Agreement and the other Loan Documents in respect thereof and of any additional Acknowledged Defaults (defined below).

C.     WHEREAS, Events of Default listed on Annex A hereto currently exist and are continuing under the Credit Agreement (each an "**Acknowledged Default**" and collectively, the "**Acknowledged Defaults**").

D.     WHEREAS, the Required Lenders and the Administrative Agent have agreed subject to the terms and conditions of this Forbearance Agreement, to continue to forbear from taking enforcement action permitted under the Loan Documents as a result of the Acknowledged Defaults for a period beginning as of the date hereof through the earlier of (i) the Termination Date

or (ii) the occurrence of a Termination Event upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants, representations, warranties and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

AGREEMENTS:

1.    **Incorporation of Recitals, Etc**.    Each of the above Recitals is expressly incorporated herein by reference and made a part of this Agreement as though set forth herein verbatim.  The Obligors acknowledge that such Recitals are true and correct on the date of this Forbearance Agreement.  For clarity and avoidance of doubt, the parties confirm and agree that the amendments to Loan Documents found in the Initial Forbearance Agreement continue in full force and effect except to the extent specifically amended herein.

2.    **Definitions**.  Capitalized terms used and not otherwise defined herein shall have the same meanings as set forth in the Credit Agreement and the Initial Forbearance Agreement, as applicable.  In addition, the following terms shall, for the purposes of this Forbearance Agreement, have the following meanings:

(a)    "**Forbearance Period**" means the period of time commencing on the Second Forbearance Effective Date and continuing through and including the earlier of (i) the occurrence of a Termination Event and (ii) Termination Date, unless earlier terminated pursuant to the terms and provisions of this Forbearance Agreement.

(b)    "**LOI**" means a written or electronic expression of interest, letter of intent, or other form of indication of interest relating to the recapitalization of the Borrowers or sale of the Borrowers or their assets (the "**Transaction**") which contains the following information:  (i) identity of the proposed counterparty; (ii) value proposed and form of payment; (iii) proposed treatment of all interested parties, including the Lenders, trade payables, employees, equity, and other interested parties; and (iv) timeline to close the Transaction.

(c)    "**Limited Funds Foreign Accounts**" means the bank accounts listed on Annex B hereto as active accounts so long as, and only for so long as, such accounts do not have balances therein exceeding the applicable amount set forth next to the name of the applicable depository bank on Annex B.

(d)    "**Minimum Collateral Ratio**" means, at all times, the ratio of gross accounts receivable and gross inventory to outstanding Revolving Credit Loans and Letters of Credit.

(e)    "**Sales Milestones**" means (i)  in respect of the sale of real estate owned by LHI and 7807, the dates and periods of time set forth on Annex C to this Forbearance Agreement and (ii) in respect to the airplane owned by LHA, the dates and periods of time set forth on Annex D to this Forbearance Agreement.

(f)  "**Termination Date**" means 5:00 p.m. (prevailing Texas time) on October 31, 2017.

(g)  "**Termination Event**" means the occurrence of any of the following:

(i)  any representation or warranty made or deemed made by any Obligor in this Forbearance Agreement shall be false, misleading or erroneous in any material respect when made or deemed to have been made,

(ii)  any Obligor shall fail to perform, observe or comply timely with any covenant, agreement or term contained in this Forbearance Agreement,

(iii)  any Default or Event of Default, other than the Acknowledged Defaults, shall occur or shall have occurred under this Forbearance Agreement or any of the Loan Documents,

(iv)  any Obligor shall commence a voluntary proceeding seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official of it or a substantial part of its property or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it or shall make a general assignment for the benefit of creditors or shall generally fail to pay its debts as they become due or shall take any action to authorize any of the foregoing,

(v)  an involuntary proceeding shall be commenced against any Obligor seeking liquidation, reorganization, or other relief with respect to it or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian, or other similar official for it or a substantial part of its property, in each case that remains undismissed or unstayed for five (5) consecutive calendar days,

(vi)  any event or condition shall occur after the Forbearance Effective Date which shall have a Material Adverse Effect, as determined by the Administrative Agent,

(vii)  the exercise by any creditor or holder of material indebtedness of any Obligor (excluding the Obligors under the Loan Documents or the LHI Credit Agreement) of any right or remedy available to them in connection with any default under the documents governing such material indebtedness, including, but not limited to any foreclosure or enforcement action against any Collateral,

(viii)  the initiation of any action by any Obligor to invalidate or limit the enforceability of any of the acknowledgments set forth in Section 3, the

3

release set forth in Section 13 or the covenant not to sue set forth in Section 14,

(ix)    the Minimum Collateral Ratio is less than 115% at any time,

(x)    failure to deliver to the Administrative Agent on a timely basis copies of all major documentation developed and received by Imperial during the investment banking process, including copies of teasers, investor presentations, confidential information memorandums, investor lists, indications of interest, proposals, letters of intent, weekly written status updates, or other similar types of material documentation reasonably requested by the Administrative Agent to monitor progress during the investment banking process,

(xi)    failure to provide the Administrative Agent with timely and continuous view-only access to the electronic data room used for due diligence throughout the investment banking process,

(xii)    failure to meet Sales Milestones, or

(xiii)    failure to deliver an LOI by October 20, 2017, unless extended by the Lenders in writing in their sole discretion.

3.    **Acknowledgments**

(a)    **Acknowledgment of Obligations**.  Each Obligor hereby acknowledges, confirms, and agrees that as of the close of business on September 28, 2017:  (a) Borrowers are indebted to the Revolving Credit Lenders in respect of the Revolving Credit Loans in the principal amount of $63,453,305.76, (b) Borrowers are indebted to Issuing Bank in respect of the Letters of Credit in the face amount of $838,920.91 and (c) LHI is indebted to Wells Fargo in respect of its Term Loan (as defined in the LHI Credit Agreement) in the principal amount of $26,741,327.86.  Each Obligor hereby acknowledges, confirms, and agrees that all such Obligations together with interest accrued and accruing thereon, and all fees, costs, expenses, and other charges now or hereafter payable to the Administrative Agent or Lenders, in each case in accordance with the terms of the Loan Documents, are unconditionally owing by each Obligor, without offset, defense, or counterclaim of any kind, nature, or description whatsoever.

(b)    **Acknowledgment of Security Interests**.  Each Obligor hereby acknowledges, confirms, and agrees that the Administrative Agent has, and will continue to have, valid, enforceable, and perfected first-priority continuing Liens upon and security interests in the Collateral heretofore granted to the Administrative Agent, for the benefit of the Administrative Agent and Lenders, pursuant to the Security Documents and the other Loan Documents or otherwise granted to or held by the Administrative Agent, for the benefit of the Administrative Agent and Lenders.

(c)    **Binding Effect of Documents**.  Each Obligor hereby acknowledges, confirms and agrees that:  (a) this Forbearance Agreement constitutes a Loan Document;

(b) each of the Credit Agreement and the other Loan Documents to which it is a party has been duly executed and delivered to the Administrative Agent by such Obligor, and each is and will remain in full force and effect as of the date hereof except as modified pursuant hereto; (c) the agreements and obligations of such Obligor contained in such documents and in this Forbearance Agreement constitute legal, valid, and binding Obligations, enforceable in accordance with their respective terms, and such Obligor has no valid defense to the enforcement of such Obligations; (d) the Administrative Agent and Lenders are and will be entitled to the rights, remedies, and benefits provided for under the Credit Agreement and the other Loan Documents and applicable law; and (e) during the Forbearance Period, such Obligor shall comply with all limitations, restrictions, or prohibitions that would otherwise be effective or applicable under the Credit Agreement or any of the other Loan Documents during the continuance of any Event of Default, and except to the extent expressly provided otherwise in this Forbearance Agreement, any right or action of such Obligor set forth in the Credit Agreement or the other Loan Documents that is conditioned on the absence of any Event of Default may not be exercised or taken as a result of the Acknowledged Defaults.

4.     **Forbearance in Respect of Acknowledged Defaults**.

(a)     **Acknowledgment of Default**.  Each Obligor hereby acknowledges and agrees that the Acknowledged Defaults have occurred and are continuing (or are expected to occur and be continuing), each of which constitutes (or will constitute) an Event of Default and entitles the Administrative Agent and Lenders to exercise their respective rights and remedies under the Credit Agreement and the other Loan Documents, applicable law, or otherwise.  Each Obligor represents and warrants that as of the date hereof, no Events of Default exist other than the Acknowledged Defaults.  Each Obligor hereby acknowledges and agrees that the Administrative Agent and Lenders have the exercisable right to declare the Obligations to be immediately due and payable under the terms of the Credit Agreement and the other Loan Documents based on the Acknowledged Defaults. Each Obligor acknowledges that, immediately prior to the effectiveness of this Forbearance Agreement, Revolving Credit Lenders are no longer obligated to make any further Revolving Credit Loans as a result of the Acknowledged Defaults.

(b)     **Forbearance**.  Subject to, and in reliance on, the terms of this Forbearance Agreement and only so long as no Termination Event shall have occurred, the Administrative Agent and the Lenders hereby agree to forbear until the Termination Date from exercising their rights and remedies under the Loan Documents arising from Acknowledged Defaults.  Notwithstanding the foregoing, the forbearance granted by the Administrative Agent and Lenders pursuant hereto shall not constitute and shall not be deemed to constitute a waiver of any of the Acknowledged Defaults or of any other Default or Event of Default under the Loan Documents.  On and after the Termination Date, or such earlier date on which a Termination Event occurs, the Administrative Agent's and the Lenders' agreement hereunder to forbear shall terminate automatically without further act or action by the Administrative Agent or the Lenders, and the Administrative Agent and the Lenders shall be entitled to exercise any and all rights and remedies available to it or them under the Loan Documents and this Forbearance Agreement, at law, in equity, or otherwise, including, but not limited to, (i) ceasing to make any further Revolving Credit

Loans or issuing any further Letters of Credit and (ii) accelerating all of the Obligations under the Credit Agreement and the other Loan Documents, in all events, without any further notice to Obligors, passage of time, or forbearance of any kind.

(c) **No Waivers; Reservation of Rights**.

(i) The Administrative Agent and the Lenders have not waived, are not by this Forbearance Agreement waiving, and have no intention of waiving, any Events of Default which may be continuing on the date hereof or any Events of Default which may occur after the date hereof (whether the same or similar to the Acknowledged Defaults or otherwise), and the Administrative Agent and the Lenders have not agreed to forbear with respect to any of their rights or remedies concerning any Events of Default (other than, during the Forbearance Period, the Acknowledged Defaults to the extent expressly set forth herein) occurring at any time.

(ii) Subject to Section 4(b) above (solely with respect to the Acknowledged Defaults), the Administrative Agent and the Lenders reserve the right, in their discretion, to exercise any or all of their rights and remedies under the Credit Agreement and the other Loan Documents as a result of any other Events of Default occurring at any time. The Administrative Agent and the Lenders have not waived any of such rights or remedies, and nothing in this Forbearance Agreement, and no delay on their part in exercising any such rights or remedies, may or will be construed as a waiver of any such rights or remedies.

(d) **Additional Events of Default**. The parties hereto acknowledge, confirm, and agree that any misrepresentation by any Obligor, or any failure of any Obligor to comply with the covenants, conditions and agreements contained in this Forbearance Agreement, will constitute an immediate default under this Forbearance Agreement and an immediate Event of Default under the Credit Agreement and the other Loan Documents. Notwithstanding the existence of the Forbearance Period, in the event that any Person, other than the Administrative Agent or the Lenders, at any time exercises for any reason (including, without limitation, by reason of any Acknowledged Defaults, any other present or future Event of Default, or otherwise) any of its rights and remedies against any Obligor or any other Person providing credit support for the Obligations, or against any Obligor's or such other Person's property or assets, in each case, of the type that would constitute an Event of Default under the terms of the Credit Agreement and the other Loan Documents, then such occurrence shall also be deemed to constitute an immediate Event of Default hereunder and under the Credit Agreement and the other Loan Documents.

(e) **Other Payments**. Each Credit Party also agrees to reimburse the Administrative Agent and the Lenders upon demand for all out-of-pocket expenses (including reasonable attorneys' fees, settlement costs and fees and expenses of Focus as the financial advisor and Paul Boston & Associates, Inc., as the collateral examiner, in each case engaged by the Administrative Agent's counsel) incurred in connection with the negotiation of this Forbearance Agreement, any further restructuring or "workout" with

Obligors, whether or not consummated, of any Secured Obligations, and any enforcement of any Secured Obligations. Each Credit Party acknowledges and agrees that all such expenses are being incurred in connection with a restructuring or workout, as these terms are used in <u>Section 11.03(a)</u> of the Credit Agreement.

5. **Representations and Warranties**. To induce the Administrative Agent and the Lenders to enter into this Forbearance Agreement, Obligors hereby jointly and severally represent and warrant as follows:

(a) **Duly Organized**. Obligors which are not natural persons are duly organized, validly existing and in good standing under the laws of the jurisdiction in which they were organized and formed, and Obligors have the power and authority to perform their respective obligations under this Forbearance Agreement and the Loan Documents.

(b) **Authority**. The execution, delivery and performance of this Forbearance Agreement (i) have been duly authorized by all requisite action on the part of Obligors which are not natural persons and (ii) do not and will not violate the organizational documents of Obligors, any other material agreement to which any Obligor is a party, or any law, rule or regulation, or any order of any court, governmental authority or arbitrator, by which any Obligor or any of its respective properties is bound.

(c) **No Defenses**. The true and correct amounts of the outstanding principal balance of the Revolving Credit Loans, the aggregate amount of outstanding Letters of Credit, and the outstanding principal amount of the Term Loan (as defined in the LHI Credit Agreement) are, in each case, set forth in Section 3(a) hereof. None of Obligors has any defenses to payment, counterclaims, or rights of setoff with respect to the Loans or any other Secured Obligations existing as of the Forbearance Effective Date.

(d) **No Other Defaults**. Except for the Acknowledged Defaults, no Default or Event of Default under the Loan Documents has occurred and is continuing.

(e) **Taxes**. All payments due to all taxing authorities with respect to the Collateral are current as of the Forbearance Effective Date.

(f) **Certain Personnel-related Matters**. Messrs. Whaley and Spillard are no longer contractors of the Borrowers and are not owed any monies. Effective September 10, 2017, the Individual Guarantor's salary has been, with his consent, reduced by the Credit Parties to two times the federally-mandated minimum wage, with the first payroll reflecting such change to be paid on September 28, 2017, for the two-week period ending September 23, 2017.

6. **Forbearance Covenants**. Notwithstanding any provisions to the contrary contained in the Loan Documents, Obligors hereby covenant and agree that, during the Forbearance Period, each of them will perform, observe and comply with each of the following covenants:

(a) **Compliance with Related Documents and this Forbearance Agreement**. Save and except for the Acknowledged Defaults during the Forbearance

Period, the Obligors will perform, observe and comply with each covenant, agreement and term contained in this Forbearance Agreement and each of the other Loan Documents, including, without limitation, the fees and payments required thereunder.

(b) **Prepayment of Loans from Net Proceeds**. The Obligors agree to pay, or cause to be paid, immediately upon receipt thereof, the Net Proceeds of the sale of all real Property of LHI and 7807 to the Administrative Agent for application as follows: first, to the principal amount of outstanding Revolving Credit Loans (with a concurrent permanent reduction in the amount of the Revolving Credit Commitment equal to the Net Proceeds so received) and second, with respect to any Letters of Credit outstanding after payment in full of the Revolving Credit Loans, a payment of Cash Collateral into a Cash Collateral account opened by the Administrative Agent, for the benefit of the Revolving Credit Lenders, in an amount equal to such excess.

(c) **Deposit of Funds**. Except with respect to Limited Funds Foreign Accounts, the Credit Parties shall cause all of their collections to be deposited in deposit accounts that are covered by a deposit account control agreement in favor of the Administrative Agent, and shall not open, or maintain, unless a deposit account control agreement satisfactory to the Administrative Agent is in effect, any deposit account other than deposit accounts that are maintained with Wells Fargo Bank, N.A.

(d) **Additional Financial Statements**. With 30 days after the end of each calendar month, each of LHI and LHA shall deliver to the Administrative Agent, in form and detail satisfactory to the Administrative Agent an unaudited Consolidated and consolidating balance sheet of each of LHI and its Subsidiaries, if any, and LHA and its Subsidiaries, if any, as of the close of such fiscal month and unaudited Consolidated and consolidating statements of income, all in reasonable detail setting forth in comparative form the corresponding figures as of the end of and for the corresponding period in the preceding Fiscal Year and prepared in accordance with GAAP and, if applicable, containing disclosure of the effect on the financial position or results of operations of any change in the application of accounting principles and practices during the period, and certified by a Responsible Officer of each of LHI and LHA to present fairly in all material respects the financial condition of LHI, LHA and each of their respective Subsidiaries, if any, on a Consolidated and consolidating basis as of their respective dates and the results of operations of LHI, LHA and each of their respective Subsidiaries, if any, for the respective periods then ended, subject to normal year-end adjustments and the absence of footnotes.

(e) **Cash Flow Forecasts**. The CRO shall deliver to the Administrative Agent and the Lenders, by no later than noon prevailing Central time on Wednesday of each week beginning on the first Wednesday after the Forbearance Effective Date, an updated Budget setting forth all sources and uses of cash and beginning and ending cash balances, including balance sheet roll-forward calculations for accounts receivable, inventory, and accounts payable, a detailed breakdown of professional fees, and a calculation for the Minimum Collateral Ratio, an initial copy of which shall be delivered on or prior to the Forbearance Effective Date. The Credit Parties shall operate strictly in accordance with the Budget and shall pay only those actual, ordinary and necessary operating expenses of their business in compliance with the Budget (subject to the variances identified above).

(f)   **Reconciliation Reports**.  The CRO shall deliver to the Administrative Agent and the Lenders concurrently with each Budget (i) a variance report reconciling the prior week's cash flow forecast to the actual sources and uses of cash for the prior week, along with a line-by-line reconciliation and explanation of material variances, (ii) a listing of each Credit Parties' accounts receivable, including invoices aged by invoice date and due date (with an explanation of the terms offered), together with a summary specifying the name, address, and balance due for each account debtor, and a schedule and aging of each Credit Party's accounts payable, (iii) a backlog report and (iv) a report from the CRO and management of the Credit Parties setting forth detailed explanations for variance in actual results as compared to forecasted performance under the Budget.

(g)   **Daily Operating, Excess Cash and Collateral Base Reports**.  The CRO shall deliver, by e-mail, to the Administrative Agent, the Lenders and Focus copies of the daily operating reports of the Obligors at the same time they are distributed to members of the management team of the Obligors, or any of them, such reports to include at least the invoice sales-daily, bookings-daily and the month-to-date executive summary. In addition, the CRO shall deliver, by e-mail, not later than 10:00 a.m. prevailing Texas time on each Business Day, (1) a report of the Consolidated Cash Balances of the Credit Parties, the aggregate amount of outstanding check for Budget Items and the amount, if any, of Excess Cash, in each case as of the end of the immediately preceding Business Day, and (2) a report detailing such information as the Administrative Agent may request about the Collateral.

(h)   **Weekly Status Calls**.  The Obligors and the CRO shall participate in weekly Thursday status calls with the Administrative Agent, the Lenders and the Administrative Agent's professionals, which calls shall include the restructuring professionals (Gardere, CR3 and Imperial) assisting the Obligors.

(i)   **Weekly Written Status Updates**.  The CRO shall provide to the Administrative Agent, Focus and the Lenders written status reports and updates at least weekly from CR3 on right-sizing efforts as well as written status reports from CR3 and Imperial on sale processes, including (without limitation):

      (i)      list of prospects to whom books have been sent,

      (ii)      dates of proposed on-site meetings,

      (iii)      names and other details of persons accessing data site,

      (iv)      dates NDA's, LOI's, PSA's, etc. are received and proposed closing dates,

      (v)      information similar to the above for proposed airplane and real estate sales/refinancings.

(j)   **Status of Aircraft Sale.** The CRO shall provide weekly broker updates to the Administrative Agent, Focus, the Lenders and WFEF on the LHA aircraft sale process,

such updates to include the list price, sale strategy, any price reductions, inquiries from potential buyers, actual showings, and offers (if any).

(k)    **Timing of Status Report**.  Status reports and updates under clauses (i) and (i) above shall be due by 5:00 p.m. prevailing Central Time each Wednesday to allow for review before the Thursday morning status and update calls.

(l)    **Prohibition on Certain Expenses**.  None of the Obligors shall pay any fees or expenses related to forensic accounting and/or fraud detection efforts, or legal fees or expenses accruing or payable after August 16, 2017, related to civil or criminal litigation resulting from those efforts.

(m)    **Prohibited Payments**.  No Obligor shall make any loans or advances nor, unless turned-over to the Administrative Agent for application to the Loans, any distributions (including Individual Guarantor equity draws) or dividends. No Credit Party shall pay any legal fees or expenses of the Individual Guarantor.

(n)    **Management Salaries, Etc**.  No Obligor shall increase any executive management compensation or benefits without the written approval of the Administrative Agent.

(o)    **Information**.  The Obligors shall cooperate with Focus in performing its work as financial advisor to the Administrative Agent and its counsel, and each of them will fully cooperate with the Advisors and fully authorize the Advisors to disclose all information about themselves and their financial condition, assets and operations to the Administrative Agent, the Lenders, Focus and their respective counsel.  In addition to any notices required to be given under the Loan Documents, Obligors and their Advisors will provide the Administrative Agent, Lenders and Focus with such other information as may be requested by the Administrative Agent or Focus from time to time, within one Business Day of such request, including, without limitation, copies of any bank or other financial institution statements; financial statements; accounts receivable and accounts payable agings; transactional documentation; litigation pleadings, depositions, related documents and transcripts; letters of intent or offers to purchase, lease or license any portion, all or substantially all of the assets or ownership interests of any of Obligors; and letters of intent or commitments for any capital investment, loan or other financing in or to any of the Obligors.  Each Obligor hereby acknowledges the Administrative Agent's right under the Credit Agreement to engage Focus in its sole discretion under these circumstances and agrees to reimburse the Administrative Agent for the fees and expenses of Focus.

(p)    **Access**.  The Administrative Agent, Focus, the Lenders, and their agents shall have access during normal business hours to Obligors' business premises, to all data rooms maintained by Obligors or their Advisors, and to the Collateral to review, appraise and evaluate the physical condition of the Collateral and to inspect the books, records and reports of Obligors concerning the operation of Obligors' businesses, financial condition, the transfers and expenditures of funds generated therefrom, the accrual of expenses relating thereto, and any and all other records relating to the operations of Obligors.  The Obligors and their Advisors will fully cooperate with the Administrative Agent, Lenders

and Focus regarding such reviews, evaluations, and inspections, and the Obligors shall make their employees, consultants and professionals reasonably available to the Administrative Agent, the Lenders, Focus, and the Administrative Agent's other professionals and consultants in conducting such reviews, evaluations, and inspections.

(q)  **No Control**.  No act committed or action taken by the Administrative Agent or the Lenders under this Forbearance Agreement or the Loan Documents will be used, construed, or deemed to hold the Credit Parties to be in control of any Obligor, or the governance, management or operations of any Obligor for any purpose, without limitation, or to be participating in the management of any Obligor or acting as a "responsible person" or "owner or operator" or a person in "control" with respect to the governance, management or operation of any Obligor or their respective businesses (as such terms, or any similar terms, are used in the U.S. Bankruptcy Code, the Code, or CERCLA, each as may be amended from time to time, or any other federal or state statute, at law, in equity, or otherwise) by virtue of the interests, rights, and remedies granted to or conferred upon the Administrative Agent or the Lenders under this Forbearance Agreement or the other Loan Documents.

(r)  **Obligors' Advisors**.  The Credit Parties shall engage and maintain the engagement of the Advisors at all times during the Forbearance Period.  The Obligors authorize the Administrative Agent, Focus, and their agents and professionals to communicate with their Advisors without notice to, or the presence of, Obligors.

(s)  **Restricted Payments; Affiliate Transactions**.  Notwithstanding anything in the Credit Agreement or any other Loan Documents to the contrary, during the Forbearance Period, Credit Parties will not make or agree to make, and no Obligor shall receive, (i) any Restricted Payments, (ii) any loans, advances or payments otherwise permitted under Section 8.3 or 8.7 of the Credit Agreement or Sections 5.6 and 5.7 of the LHI Credit Agreement, or (iii) any other payments to the extent on account of accrued or accruing expenses, in each case that are not primarily for the benefit of the Credit Parties and for which the Credit Parties do not seek reimbursement from one or more of their Affiliates on at least a monthly basis.

(t)  **Additional Collateral Updates**.  During the Forbearance Period, each Obligor will (a) notify the Administrative Agent of any written letters of intent, indications of interest, offers and agreements related to any sale or other disposition of any assets of any Credit Party, in each case, promptly upon becoming aware of same, (b) provide the Administrative Agent with such updates and reports relating to the foregoing and Dormant Foreign Accounts as and when the Administrative Agent may reasonably request from time to time and (c) include in the Budget line items setting forth the Minimum Collateral Ratio.

(u)  **Forbearance Period Loans**.  Notwithstanding anything to the contrary in the Credit Agreement or any other Loan Document (and in all events subject to the terms of this Section 6(w)), each Credit Party acknowledges and agrees that, during the Forbearance Period, the Borrowers shall only be entitled to request, and the Revolving Lenders only agree to make, Loans (a) to the extent necessary to enable Credit Parties to pay the

expenses set forth in the Budget as and when such expenses are due and payable, (b) to the extent the aggregate Loans outstanding at any time do not exceed the aggregate Revolving Credit Commitment, (c) subject to Loan Parties' timely compliance with the terms and provisions of this Forbearance Agreement, and (d) to the extent at the time of and immediately after giving effect to each Loan, (i) the Credit Parties shall not have any Excess Cash and (ii) as of the end of the Business Day on which such Loan will be funded, the Credit Parties shall not have any Excess Cash.

The failure of Obligors to timely comply with the terms of this Section 6 shall constitute (i) a Default and an Event of Default under and for all purposes of the Credit Agreement and (ii) a Termination Event hereunder.

7. **Credit Agreement Amendments**.

(a) **Additional Definitions**. In addition to the definitions added to Section 1.1 in the Initial Forbearance Agreement, Section 1.1 is further amended by adding the following definitions in appropriate alphabetical order:

"**Engagement Agreements**" mean the CRO Engagement Agreement and the engagement agreements being entered into with the CRO by the Credit Parties other than LII on the Second Forbearance Effective Date.

"**Second Forbearance Agreement**" means the Second Forbearance Agreement and Fourth Amendment to Amended and Restated Credit Agreement, dated effective the Forbearance Effective Date, and the Borrowers, LHI, the Individual Guarantor, the Lenders and the Administrative Agent.

"**Second Forbearance Effective Date**" means September 29, 2017.

(b) **Amendment of Section 7.21**. Section 7.21 is amended and restated in its entirety to read as follows:

**Advisors**. Unless the Administrative Agent consents otherwise in writing, engage and continue engage, in the case of each Credit Party, CR3 and the CRO to perform the duties set out in the Engagement Letters and, in the case of LII, continue to engage Imperial to perform the duties set forth in Annex C to the Forbearance Agreement at least through the Termination Date (as defined in the Second Forbearance Agreement).

8. **Post-Closing Covenants**.

(a) **Deposit Accounts**. Within three Business Days of presentation of one or more deposit account control agreements by the Administrative Agent, the Credit Parties and Wells Fargo, as depositary, shall have entered into such deposit account control agreements with the Administrative Agent covering the accounts maintained by the Obligors with Wells Fargo.

(b) **Vehicle Title Applications**. Within five Business Days of presentment by the Administrative Agent, each of LHI and LII shall have executed applications to change the titles to their Texas vehicles to reflect the Lien in favor of the Administrative Agent, submitted such applications and the original titles to the County Clerk of Harris County, Texas, along with a check for the fees necessary to effect the title change, and delivered evidence of such actions to the Administrative Agent. In additional, by October 10, 2017 (unless otherwise agreed to by the Administrative Agent), LHI shall have taken such action and paid such fees as may be necessary to reflect the Lien in favor of the Administrative Agent on vehicles titled in jurisdictions other than Texas and shall have delivered evidence thereof to the Administrative Agent. Each of LII and LHI agree to provide, at least weekly, to the Administrative Agent an update on the status of missing titles and progress being made in noting the Lien on titles from jurisdictions other than Texas.

(c) **Tomoe**. LII has, with the consent of Tomoe, offset $1 million of inventory from Tomoe against the outstanding indebtedness between Tomoe and LII, which reduced the outstanding balance. Not later than September 29, 2017, LII shall enter into a new promissory note on terms and conditions, and with acknowledgments, satisfactory to the Administrative Agent for the remaining balance to replace that certain Revolving Promissory Note made by Tomoe payable to the order of LII dated January 18, 2013 and related agreements.

The failure of Obligors to timely comply with the terms of this Section 8 shall constitute (i) a Default and an Event of Default under and for all purposes of the Credit Agreement and (ii) a Termination Event hereunder.

9. **Conditions Precedent**. As a condition to the commencement of the Forbearance Period on the Forbearance Effective Date, each of the following conditions shall have been fulfilled by Obligors:

(a) **Forbearance Agreement**. The Obligors, the Administrative Agent and the Majority Lenders have each executed and delivered this Forbearance Agreement.

(b) **Payments**. The Borrowers shall have paid in cash all invoiced and unpaid fees and expenses reasonably incurred by and owing to the Administrative Agent's counsel, Winstead PC, and to Focus and Paul Boston & Associates, Inc., consultants to Winstead PC.

(c) **Pledge of Certain Equity**. The Administrative Agent shall have received executed Security Documents granting Liens on (1) all of the stock of LHI and (2) all of the member interests of 7807 and the proceeds of such stock and membership interests, in each case subject to no other Liens, and the Individual Guarantor shall have delivered to the Administrative Agent all certificates evidencing such equity interests and executed blank stock powers.

(d) **Lockwood Affidavit Update**. The Administrative Agent shall have received additional information required by it in its sole discretion from Individual Guarantor in connection with the Affidavit delivered by Individual Guarantor in

connection with the Initial Forbearance Agreement, including without limitation, information regarding the direct and indirect ownership, structure and value of TIV Valves SRL (with its direct and indirect parent companies, "**TIV**")**,** the amount of any salary, benefits or distributions the Individual Guarantor receives from TIV, and any monies owed by TIV to Individual Guarantor and regarding the beneficial interest in, and value of, trusts included on the Individual Guarantor's Affidavit of Financial Condition delivered in connection with the Initial Forbearance Agreement.

(e)   **Evidence of Authority**. The Credit Parties, LHI, LHA and 7807 shall have delivered to the Administrative Agent such certificates of duly authorized officers of the Credit Parties, and such other documents, instruments and agreements as the Administrative Agent shall require, to evidence the due authorization, execution and delivery of this Forbearance Agreement and their other Loan Documents, each of which shall be in form and substance satisfactory to the Administrative Agent.

(f)   **Amendment of LHA Loan Papers**. All of the conditions precedent, including payment of appraisal costs and legal fees, to the effectiveness of the September 6, 2017, Second Amendment to Term Loan Agreement between LHA and WFEF shall have been satisfied.

The failure of Obligors to timely comply with the terms of this Section 9 shall constitute (i) a Default and an Event of Default under and for all purposes of the Credit Agreement and (ii) a Termination Event hereunder.

10.   **Ratification of Related Documents and Collateral**.   Obligors hereby acknowledge that each of them has received from the Administrative Agent proper notice of Default with respect to the Acknowledged Defaults. Each of the Obligors hereby waives (a) any further notice of Default, notice of intent to accelerate, or demand for payment and (b) any further opportunity to cure any of the Acknowledged Defaults. Except as modified by this Forbearance Agreement, each Obligor hereby acknowledges, ratifies, reaffirms, and agrees that each of the Loan Documents, and the first priority, perfected liens and security interests created thereby in favor of the Administrative Agent in the Collateral, are and will remain in full force and effect and binding on Obligors, and are enforceable in accordance with their respective terms and applicable law. Each of the Obligors acknowledges, ratifies, and reaffirms all of the terms and provisions of the Loan Documents, except as modified herein, which are incorporated by reference as of the Forbearance Effective Date as if set forth herein including, without limitation, all promises, agreements, warranties, representations, covenants, releases, indemnifications, and waivers of jury trials contained therein. The Obligors hereby acknowledge, ratify, and confirm the Credit Agreement, the Notes, the Security Instruments, the Guaranties, the other Loan Documents, and all of their respective debts and obligations to Credit Parties thereunder. The Obligors acknowledge and agree that in the event the Administrative Agent seeks to take possession of any or all of the Collateral securing any of the Secured Obligations by court process, the Obligors each irrevocably waive, to the fullest extent permitted by law, any bonds and any surety or security relating thereto required by any statute, court rule or otherwise as an incident to such possession.

11.   **Remedies Upon Termination Event**. Upon the occurrence of a Termination Event, (a) the Forbearance Period will terminate without further act or action by the

Administrative Agent or any Lender, (b) the Administrative Agent will be entitled immediately to accelerate the Secured Obligations, institute foreclosure proceedings against the Collateral and to exercise any and all of the Administrative Agent's or any Lender's rights and remedies available to the Administrative Agent or any Lender under the Loan Documents and this Forbearance Agreement, at law, in equity, or otherwise, without further opportunity to cure, demand, presentment, notice of dishonor, notice of Default, notice of intent to accelerate, notice of intent to foreclose, notice of protest or other formalities of any kind, all of which are hereby expressly waived by the Obligors.

12. **Acknowledgment of Defaults**. The Obligors specifically acknowledge the existence and continuation of the Acknowledged Defaults.

13. **WAIVER AND RELEASE**. EACH OF OBLIGORS (IN ITS OR HIS OWN RIGHT AND ON BEHALF OF ITS PREDECESSORS, SUCCESSORS, LEGAL REPRESENTATIVES AND ASSIGNS) HEREBY EXPRESSLY AND UNCONDITIONALLY ACKNOWLEDGES AND AGREES THAT IT HAS NO SETOFFS, COUNTERCLAIMS, ADJUSTMENTS, RECOUPMENTS, DEFENSES, CLAIMS, CAUSES OF ACTION, ACTIONS OR DAMAGES OF ANY CHARACTER OR NATURE, WHETHER CONTINGENT, NONCONTINGENT, LIQUIDATED, UNLIQUIDATED, FIXED, MATURED, UNMATURED, DISPUTED, UNDISPUTED, LEGAL, EQUITABLE, SECURED OR UNSECURED, KNOWN OR UNKNOWN, ACTUAL OR PUNITIVE, FORESEEN OR UNFORESEEN, DIRECT, OR INDIRECT, AGAINST EACH OF THE ADMINISTRATIVE AGENT AND EACH LENDER, ANY OF THEIR AFFILIATES OR ANY OF THEIR OFFICERS, DIRECTORS, AGENTS, EMPLOYEES, ATTORNEYS OR REPRESENTATIVES OR ANY OF THEIR RESPECTIVE PREDECESSORS, SUCCESSORS OR ASSIGNS (COLLECTIVELY, WITH THE ADMINISTRATIVE AGENT AND THE LENDERS, THE "LENDER-RELATED PARTIES" AND EACH INDIVIDUALLY, A "LENDER-RELATED PARTY") OR ANY GROUNDS OR CAUSE FOR REDUCTION, MODIFICATION, SET ASIDE OR SUBORDINATION OF THE SECURED OBLIGATIONS OR ANY LIENS OR SECURITY INTERESTS OF THE CREDIT PARTIES. IN PARTIAL CONSIDERATION FOR THE AGREEMENT OF THE ADMINISTRATIVE AGENT AND THE LENDERS TO ENTER INTO THIS FORBEARANCE AGREEMENT, EACH OF OBLIGORS HEREBY KNOWINGLY AND UNCONDITIONALLY WAIVES AND FULLY AND FINALLY RELEASES AND FOREVER DISCHARGES THE LENDER-RELATED PARTIES FROM, AND COVENANTS NOT TO SUE THE LENDER-RELATED PARTIES FOR, ANY AND ALL SETOFFS, COUNTERCLAIMS, ADJUSTMENTS, RECOUPMENTS, CLAIMS, CAUSES OF ACTION, ACTIONS, GROUNDS, CAUSES, DAMAGES, COSTS AND EXPENSES OF EVERY NATURE AND CHARACTER, WHETHER CONTINGENT, NONCONTINGENT, LIQUIDATED, UNLIQUIDATED, FIXED, MATURED, UNMATURED, DISPUTED, UNDISPUTED, LEGAL, EQUITABLE, SECURED OR UNSECURED, KNOWN OR UNKNOWN, ACTUAL OR PUNITIVE, FORESEEN OR UNFORESEEN, DIRECT OR INDIRECT, ARISING OUT OF OR FROM OR RELATED TO ANY OF THE LOAN DOCUMENTS, WHICH ANY OBLIGOR NOW OWNS AND HOLDS, OR HAS AT ANY TIME HERETOFORE OWNED OR HELD, SUCH WAIVER, RELEASE AND DISCHARGE BEING MADE WITH FULL KNOWLEDGE AND UNDERSTANDING OF THE CIRCUMSTANCES AND EFFECTS OF SUCH WAIVER, RELEASE AND DISCHARGE AND AFTER HAVING CONSULTED LEGAL COUNSEL OF ITS OWN

CHOOSING WITH RESPECT THERETO. THIS SECTION IS IN ADDITION TO ANY OTHER RELEASE OF ANY OF THE LENDER-RELATED PARTIES BY ANY OF OBLIGORS AND SHALL NOT IN ANY WAY LIMIT ANY OTHER RELEASE, COVENANT NOT TO SUE, OR WAIVER BY ANY OF OBLIGORS IN FAVOR OF ANY OF THE LENDER-RELATED PARTIES.

14. **Covenant Not to Sue**. Each Obligor hereby absolutely, unconditionally and irrevocably covenants and agrees with and in favor of each Lender-related Party that it will not sue (at law, in equity, in any regulatory proceeding, or otherwise) any Lender-related Party on the basis of any Claim released, remised, and discharged by any Releasing Party pursuant to Section 13(a) above. If any Releasing Party violates the foregoing covenant, each Obligor, for itself and its successors and assigns, and its present and former members, managers, shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents, legal representatives, and other representatives, agrees to pay, in addition to such other damages as any Lender-related Party may sustain as a result of such violation, all attorneys' fees and costs incurred by any Lender-related Party as a result of such violation.

15. **No Obligation of Credit Parties**. The Obligors hereby acknowledge and understand that upon the expiration or termination of the Forbearance Period, if all the Acknowledged Defaults have not been cured or waived by written agreement in accordance with the Credit Agreement, or if there shall at such time exist a Default or Event of Default, then the Administrative Agent and the Lenders shall have the right to proceed to exercise any or all available rights and remedies, which may include foreclosure on the Collateral and/or institution of legal proceedings. The Administrative Agent and the Lenders shall have no obligation whatsoever to extend the maturity of the Secured Obligations, waive any Events of Default or Defaults, defer any payments, or further forbear from exercising its rights and remedies.

16. **No Implied Waivers**. No failure or delay on the part of the Administrative Agent or the Lenders in exercising, and no course of dealing with respect to, any right, power or privilege under this Forbearance Agreement, the Credit Agreement, the Notes, the Security Instruments, the Guaranties, or any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Forbearance Agreement, the Credit Agreement, the Notes, the Guaranties, or any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

17. **INDEMNIFICATION**. IN ADDITION TO, AND WITHOUT LIMITATION OF, ANY AND ALL INDEMNITIES PROVIDED IN THE LOAN DOCUMENTS, OBLIGORS HEREBY, JOINTLY AND SEVERALLY, INDEMNIFY AND HOLD EACH OF THE LENDER-RELATED PARTIES HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, LIABILITIES, LOSSES, DAMAGES, CAUSES OF ACTION, SUITS, JUDGMENTS, COSTS, AND EXPENSES, INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES, ARISING OUT OF OR FROM OR RELATED TO ANY OF THE LOAN DOCUMENTS OR THIS FORBEARANCE AGREEMENT. IF ANY ACTION, SUIT, OR PROCEEDING IS BROUGHT AGAINST ANY OF THE LENDER-RELATED PARTIES, OBLIGORS SHALL, AT SUCH LENDER-RELATED PARTIES' REQUEST, DEFEND THE SAME AT THEIR SOLE COST AND EXPENSE, SUCH COST AND EXPENSE TO BE A JOINT AND SEVERAL LIABILITY OF OBLIGORS, BY COUNSEL SELECTED

BY SUCH LENDER-RELATED PARTY. NOTWITHSTANDING ANY PROVISION OF THIS FORBEARANCE AGREEMENT OR ANY OTHER LOAN DOCUMENT, THIS SECTION 17 SHALL REMAIN IN FULL FORCE AND EFFECT AND SHALL SURVIVE ANY DELIVERY AND PAYMENT ON THE SECURED OBLIGATIONS, THIS FORBEARANCE AGREEMENT AND THE OTHER LOAN DOCUMENTS.

18.  **Survival of Representations and Warranties**.  All representations and warranties made in this Forbearance Agreement or any other Loan Document will survive the execution and delivery of this Forbearance Agreement, and no investigation by Credit Parties or any closing will affect the representations and warranties or the right of Credit Parties to rely upon them.

19.  **Review and Construction of Documents**.  Each of the Obligors hereby acknowledges, represents, and warrants to the Administrative Agent and the Lenders that (a) the Obligors have had the opportunity to consult with legal counsel of their own choice and have been afforded an opportunity to review this Forbearance Agreement with their legal counsel, (b) Obligors have reviewed this Forbearance Agreement and fully understand the effects thereof and all terms and provisions contained herein, and (c) the Obligors have executed this Forbearance Agreement of their own free will and volition.  The recitals contained in this Forbearance Agreement shall be construed to be part of the operative terms and provisions of this Forbearance Agreement.

20.  **ENTIRE AGREEMENT; AMENDMENT**.  THIS FORBEARANCE AGREEMENT AND THE RELATED DOCUMENTS AS INCORPORATED HEREIN EMBODY THE FINAL, ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO REGARDING THE ADMINISTRATIVE AGENT'S AND THE LENDERS' FORBEARANCE WITH RESPECT TO THEIR RIGHTS AND REMEDIES ARISING AS A RESULT OF THE ACKNOWLEDGED DEFAULTS AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES HERETO.  The provisions of this Forbearance Agreement may be amended or waived only by an instrument in writing signed by the parties hereto.  The Loan Documents, as modified by this Forbearance Agreement, continue to evidence the agreement of the parties with respect to the subject matter thereof.

21.  **Notices**.  All notices, requests, demands and other communications under this Forbearance Agreement will be given in accordance with the provisions of the Credit Agreement, except that notices to the Administrative Agent shall be given to the following:

Wells Fargo Bank, N.A.
5080 Spectrum Drive, Suite 400
Addison, Texas 75225
Attention:  Jennifer L. Norris, CFA
Fax:  866-968-4862
Email: jennifer.norris@wellsfargo.com

22.    **Successors and Assigns**.  This Forbearance Agreement will be binding upon, and will inure to the benefit of, the parties hereto and their respective successors and assigns, provided that none of Obligors may assign any rights or obligations under this Forbearance Agreement without the prior written consent of the Administrative Agent.

23.    **Tolling of Statutes of Limitation**.  The parties hereto agree that all applicable statutes of limitations with respect to the Loan Documents shall be tolled and not begin running until the Termination Date.

24.    **Arms-Length/Good Faith**.  This Forbearance Agreement has been negotiated at arms-length and in good faith by the parties hereto.

25.    **Governing Law**.  This Forbearance Agreement shall be governed by and construed in accordance with the laws of the State of Texas and applicable laws of the United States of America.

26.    **Interpretation**.  Wherever the context hereof will so require, the singular shall include the plural, the masculine gender shall include the feminine gender and the neuter and vice versa.  The headings, captions and arrangements used in this Forbearance Agreement are for convenience only and shall not affect the interpretation of this Forbearance Agreement.

27.    **Severability**.  In case any one or more of the provisions contained in this Forbearance Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Forbearance Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

28.    **Counterparts**.  This Forbearance Agreement may be executed and delivered in any number of counterparts, and by different parties hereto on separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute one and the same instrument; provided that no party shall be bound by this Forbearance Agreement until each of the parties has executed a counterpart hereof. Execution of this Forbearance Agreement via facsimile or other electronic means shall be effective, and signatures received via facsimile or other electronic means shall be binding upon the parties hereto and shall be effective as originals.

29.    **Further Assurances**.  The Obligors each agree to execute, acknowledge, deliver, file and record such further certificates, instruments and documents, and to do all other acts and things, as may be reasonably requested by the Administrative Agent as necessary or advisable to carry out the intents and purposes of this Forbearance Agreement.

30.    **Loan Document**.  This Forbearance Agreement is a Loan Document for all purposes of the Credit Agreement and the other Loan Documents.

31.    **No Effect on Rights Under Subordination and Intercreditor Agreements**.  The Administrative Agent's and the Lenders' agreement to forbear pursuant to this Forbearance Agreement shall not extend to any of their respective rights or remedies under any subordination, intercreditor, or similar agreement to which the Administrative Agent or any Lender is party, it

being understood that the Acknowledged Defaults shall at all times constitute Events of Default for purposes of any and all such agreements notwithstanding such agreement to forbear in this Forbearance Agreement, and the Administrative Agent and the Lenders shall at all times be permitted to enforce all rights and remedies in respect thereof (including, without limitation, blocking payments to any holders of subordinated obligations in accordance with the terms of such agreements).

       32.    **Mutual Waiver of Jury Trial**. THE PARTIES HERETO WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE BETWEEN AGENT OR ANY LENDER AND ANY LOAN PARTY ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS FORBEARANCE AGREEMENT OR THE CREDIT AGREEMENT OR THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.

[Remainder of page intentionally blank]

IN WITNESS WHEREOF, the parties hereto have executed this Forbearance Agreement as of the Effective Date.

**BORROWERS**:

LOCKWOOD ENTERPRISES, INC.

By: _____

Name: Michael F. Lockwood
Title:   Chief Executive Officer

LOCKWOOD INTERNATIONAL, INC.

By: _____

Name: Michael F. Lockwood
Title:   Chief Executive Officer

-and-

By: _____

Name:  Brandon Smith
Title:   Chief Restructuring Officer

IN WITNESS WHEREOF, the parties hereto have executed this Forbearance Agreement as of the Effective Date.

**BORROWERS**:

LOCKWOOD ENTERPRISES, INC.

By: _____
Name: Michael F. Lockwood
Title:  Chief Executive Officer

LOCKWOOD INTERNATIONAL, INC.

By: _____
Name: Michael F. Lockwood
Title:  Chief Executive Officer

-and-

By: _____
Name:  Brandon Smith
Title:  Chief Restructuring Officer

Signature Page to Forbearance Agreement and Third Amendment to Amended and Restated Credit Agreement

LMG MANUFACTURING, INC.

By: _____
Name: Michael F. Lockwood
Title:   Chief Executive Officer

PIPING COMPONENTS, INC.

By: _____
Name: Michael F. Lockwood
Title:   Chief Executive Officer

LHI:

LOCKWOOD HOLDINGS, INC.

By: _____
Name: Michael F. Lockwood
Title:   Chief Executive Officer

**LHA**:

LH AVIATION, LLC

By: _____
Name: Michael F. Lockwood
Title:   Chief Executive Officer

**7807**:

7807 EAGLE LANE LLC

By: _____
Name:
Title:

Signature Page to Second Forbearance Agreement and Fourth Amendment to Amended and Restated Credit Agreement

**INDIVIDUAL GUARANTOR:**

_____

Michael F. Lockwood

Signature Page to Second Forbearance Agreement and Fourth Amendment to Amended and Restated Credit Agreement

**ADMINISTRATIVE AGENT AND LENDERS**:

WELLS FARGO BANK,
NATIONAL ASSOCIATION,
as Administrative Agent and as a Lender

By: _____
Jennifer L. Norris
Senior Vice President

**TRUSTMARK NATIONAL BANK**

By: _____

Name: Reed C. Cook

Title: Senior Vice President

Signature Page to Second Forbearance Agreement and Fourth Amendment to Amended and
Restated Credit Agreement

**ANNEX A**

**ACKNOWLEDGED DEFAULTS**

Each of the existing and prospective breaches of the Loan Documents set forth below are Acknowledged Defaults:

1. Under *Section 9.1(a)* of the Credit Agreement, failure to meet permanent reduction of the Revolving Credit Commitment in accordance with Schedule 1.1 of the Credit Agreement and *Sections 2.5(c) and 7.20(b)* and to pay interest on August 31, 2017, in accordance with *Section 4.1(d)*.

2. Under *Section 9.1(c)* of the Credit Agreement, as a result of breaches under:
   a. *Section 6.16* relating to events and conditions that could reasonably be expected to have a Material Adverse Effect;
   b. *Section 6.20* relating to the absence of Defaults and Events of Default;
   c. *Section 6.23* relating to disclosure.

3. Under *Section 9.l(d)* of the Credit Agreement**:**
   a. Failure to timely deliver information required under *Sections 7.1 and 7.2*;
   b. Failure of delivered information under *Sections 7.1(a) and (b)* to fairly represent in all material respects of the financial condition of the Parent and its Subsidiaries and the results of their operations as of their respective dates;
   c. Failure to deliver Officer's Compliance Certificates in accordance with *Sections 7.1 and 7.2* for February 2017, March 2017, April 2017, May 2017, June 2017, and July 2017;
   d. Failure to deliver the forensic accountant's report by April 30, 2017 pursuant to *Section 7.2(g)*;
   e. Failure to comply with *Sections 7.2(f) and 7.17* as requested in the May 22, 2017 letter;
   f. Failure to maintain LII's qualification to do business in Illinois as a foreign corporation in accordance with *Sections 6.1 and 7.4* of the Credit Agreement[1];
   g. Failure to comply with *Section 8.6,* including any equity draws made to Mike Lockwood from October 2016 through July 2017;
   h. Failure to comply with the Consolidated Total Liabilities to Consolidated Tangible Net Worth ratio set forth in *Section 8.14(a)* of the Credit Agreement for the fiscal quarters ended October 31, 2016, and January 31, 2017;
   i. Failure to achieve minimum Consolidated EBITDA set forth in *Section 8.14(a)*[2] for the periods ending April 30, 2017, May 31, 2017, July 31, 2017, and August 31, 2017;

---

[1] LII is working to get the appropriate documentation submitted to the State of Illinois to get back in good standing.

[2] Section 8.14(a) was changed from a Consolidated Total Liabilities to Consolidated Tangible Net Worth ratio to a Minimum EBITDA with the February 2017 amendment.

    j.   Failure to comply with the Consolidated Net Income covenant set forth in ***Section 8.14(b)*** of the Credit Agreement for the fiscal quarters ended April 30, 2016, July 31, 2016, October 31, 2016, and January 31, 2017;

    k.   Failure to comply with ***Section 8.14(b)***[3] relating to maximum restructuring changes in Fiscal Year 2017;

    l.   Failure to company with ***Section 8.14(c)*** as a result of Asset Coverage Ratio being the less than the minimum amount required for the months ending February 2017, March 2017, April 2017, May 2017, June 2017, July 2017, and August 2017.

4.  Under ***Section 9.1(n)*** of the Credit Agreement:

    a.   As a result of the occurrence of an event of default under the LHI Credit Agreement due to a sale of LHI's sale of its Shorewood, Illinois property outside the ordinary course of business;

    b.   As a potential default under the LHI Credit Agreement for the executed subleases at the Clute, Texas location and the Gonzales, Louisiana location.

    c.   Default under the LHI Credit Agreement for failure to deliver required certificates and reports.

5.  Under ***Sections 6.1 and 7.4*** of the Credit Agreement, Lockwood International, Inc.'s qualification to do business in Illinois as a foreign corporation has been revoked.

6.  Under ***Section 6*** of the Initial Forbearance Agreement, failure (due to Hurricane Harvey and its effect on, and subsequent flooding in, the Greater Houston Metropolitan Area) to:

    a.   Provide cash flow forecasts under ***Section 6(d)*** on September 6, 2017;

    b.   Provide reconciliation report under ***Section 6(f)***;

    c.   Provide daily operating, excess cash, and collateral base reports under ***Section 6(g)*** for August 28 to 31, 2017; and

    d.   Meet the Minimum Rolling 4-Week Revenue under ***Section 6(w)***.

7.  Under ***Section 6*** of the Initial Forbearance Agreement, failure to timely deliver the daily operating, excess cash and collateral reports under ***Section 6(g)*** for September 28, 2017 due to systems being down.

---

[3]   Section 8.14(b) was changed from a Consolidated Net Income covenant to maximum restructuring charges with the February 2017 amendment.

ANNEX A

# ANNEX B

## LIMITED FOREIGN FUNDS ACCOUNTS

1. List of Limited Foreign Funds Accounts (active) – See attached spreadsheet

2. List of Dormant Foreign Accounts – See attached spreadsheet

# ANNEX B-1

Lockwood International Dormant Foreign Bank Accounts

| Bank Name | Acct. Number | Account Name | Currency | Balance | Balance As of | Type | Bank ID | Branch | Account Type |
|---|---|---|---|---|---|---|---|---|---|
| **Dormant Foreign Accounts** | | | | | | | | | |
| Wells Fargo Bank | 99009901 | Lockwood International Inc. | | Unknown | | International | | London | ACH Clearing |
| Techcombank | 19026647027016 | Vietnam Lockwood Co. LTD | VND | 194,401,158.00 ₫ | 6/26/2017 | International | | Vietnam | |
| Techcombank | 19026647027024 | Vietnam Lockwood Co. LTD | USD | 412.07 | 6/26/2017 | International | | Vietnam | |
| JP Morgan Chase | 1591468341 | Lockwood International | USD | Unknown | | Domestic | | US | |
| Banca Galileo S.p.A. | 000000000890 | Lockwood International | EUR | Unknown | | International | | Italy | |
| Banca Galileo S.p.A. | 000076300015 | Lockwood International | USD | Unknown | | International | | Italy | |
| Banca Intesa SanPaolo S.p.A. | 100000004469 | Lockwood International | EUR | Unknown | | International | | Italy | |
| Banca Intesa SanPaolo S.p.A. | 161009371612 | Lockwood International | USD | Unknown | | International | | Italy | |
| Banca Popolare Milano | 000000000075 | Lockwood International | EUR | Unknown | | International | | Italy | |
| Banca Unicredit S.p.A. | 000102159043 | Lockwood International | EUR | Unknown | | International | | Italy | |
| Banca Unicredit S.p.A. | 000102161415 | Lockwood International | USD | Unknown | | International | | Italy | |
| Banca Unicredit S.p.A. | 000102160963 | Lockwood International | USD | Unknown | | International | | Italy | |
| Shin Han Bank | 200-152-917721 | Lockwood International | KRW | Unknown | | International | | Korea | |
| Korean Exchange Bank | 650-008008-011 | Lockwood International | USD | Unknown | | International | | Korea | |
| Bank of America, N.A. Seoul Branch | 6070-41862-132 | Lockwood International | USD | Unknown | | International | | Korea | |
| Bank of America, N.A. Seoul Branch | 6070-41862-033 | Lockwood International | KRW | Unknown | | International | | Korea | |
| Korean Exchange Bank | 611-020487-846 | Lockwood International | KRW | Unknown | | International | | Korea | |
| Korean Exchange Bank | 611-020559-295 | Lockwood International | KRW | Unknown | | International | | Korea | |
| Wells Fargo Bank | 0008-001341-01-2 | Lockwood Valves SEAsia Pte Ltd | USD | Unknown | | International | | Singapore | |
| Wells Fargo Bank | 008-902408-6 | Lockwood Valves SEAsia Pte Ltd | SGD | Unknown | | International | | Singapore | |
| Wells Fargo Bank | 033-902962-9 | Lockwood Holdings Pte Ltd | SGD | Unknown | | International | | Singapore | |
| Wells Fargo Bank | 033-903162-3 | Lockwood Valves SEA Pte Ltd | SGD | Unknown | | International | | Singapore | |

**ANNEX B - LIMITED FOREIGN FUNDS ACCOUNTS**

*Note: Bank Balances Provided unless otherwise noted*

| Bank Name | Acct. Number | Account Name | Local Currency | Local Currency Balance | Conversion Rate to USD | USD Balance | Balance As of | Type | Bank ID | Branch | Account Type | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Lockwood Operating Accounts** | | | | | | | | | | | | |
| Wells Fargo Bank | 7779236838 | Lockwood International Inc | SGD | 293.47 | 0.73 | 215.23 | 8/10/2017 | Multi-Currency | | Cayman | | |
| Wells Fargo Bank | 88003375 | Lockwood International Inc | GBP | 71,959.51 | 1.30 | 92,985.95 | 8/10/2017 | Multi-Currency | | London | | Book Balance, net of checks outstanding |
| Wells Fargo Bank | 88003376 | Lockwood International Inc | EUR | 380,721.70 | 1.17 | 447,301.55 | 8/10/2017 | Multi-Currency | | London | | Book Balance, net of checks outstanding |
| ING | NUI2/ING/B002/048990/GBP | Lockwood International Inc | GBP | 310.84 | 1.30 | 403.35 | 8/10/2017 | International | | GB | | |
| ING | NUBI/ING/B052454968/EUR | Lockwood International Inc | EUR | 94,266.38 | 1.17 | 110,751.50 | 8/10/2017 | International | | GB | | |
| Bank of America, N.A. | 621258365010 | Lockwood Int'l, Inc. SG Branch | SGD | 14,982.25 | 0.73 | 10,914.78 | 8/10/2017 | International | BOFASG2X | US | Operating | |
| Bank of America, N.A. | 621258365028 | Lockwood Int'l, Inc. SG Branch | SGD | 76,183.41 | 0.73 | 55,873.60 | 8/10/2017 | International | BOFASG2X | US | Receivables | |
| Royal Bank Of Canada | 05259 100-804-4 | Lockwood International, Inc. | CAD | 229,730.65 | 0.79 | 180,787.69 | 8/10/2017 | International | | Canada | Operating | Book Balance, net of checks outstanding |
| Royal Bank Of Canada | 05259-100-830-9 | Lockwood International, Inc. | CAD | 51,420.86 | 0.79 | 40,465.90 | 8/10/2017 | International | | Canada | Payroll | |
| Royal Bank Of Canada | 05489-102-631-9 | Lockwood Holdings, Inc. | CAD | 93,736.21 | 0.79 | 73,766.18 | 8/11/2017 | International | | Canada | LHI Canada Operating | |
| Siam Commercial Bank | 9653001051 | Lockwood Valve (Thailand) Co. LTD. | THB | 1,152,072.17 | 0.03 | 34,621.90 | 8/6/2017 | International | | Thailand | | |
| Siam Commercial Bank | 9652056592 | Lockwood Valve (Thailand) Co. LTD. | THB | 5,000.00 | 0.03 | 150.16 | 8/6/2017 | International | | Thailand | | |
| National Bank of Australia | 141306345 | Lockwood International | AUD | 80,130.38 | 0.79 | 63,478.09 | 8/6/2017 | International | | Australia | | |
| National Bank of Australia | LVAUSUSD01 | Lockwood International | USD | 46,270.24 | 1.00 | 46,270.24 | 8/6/2017 | International | | Australia | | |
| National Bank of Australia | LVAUSEUR01 | Lockwood International | EUR | 66,232.22 | 1.17 | 77,814.78 | 8/6/2017 | International | | Australia | | |
| **Total** | | | | | | **1,235,888.89** | | | | | | |

## ANNEX C

## TIMELINE FOR REAL PROPERTY SALES

- Properties listed for sale with local brokers as follows:
  - 912 John Stine Road, Westlake, LA 70669
    - Owned by Lockwood Holdings, Inc.
    - Broker/Agent – Reinauer Real Estate
  - Beltway Land
    - 66.7177 Gross Acres (58.388 Net Acres) Of Vacant Land, Harris County, Texas 77044
    - Owned by Lockwood Holdings, Inc.
    - Broker/Agent - CBRE
  - Airport Hangar
    - 7807 Eagle Lane, Spring, TX 77379
    - Owned by 7807 Eagle Lane, LLC
    - Broker/Agent - CBRE

- Sale/Leaseback Process
  - Broker Stan Johnson & Co hired ("Sale/Leaseback Broker")
  - Form of nondisclosure agreement completed
  - Sale/Leaseback Broker sent nondisclosure agreements to various parties
  - Timeline:
    - Marketing materials – sent to 95 groups active in industrial real estate
    - Due diligence – being completed by interested parties
    - Initial indications of interest  – expected to be provided by October 31, 2017

  Properties included sale/leaseback process:
  - 10002 Windfern Road, Houston, TX 77064
  - 10060 Windfern Road, Houston, TX 77064
  - 900 Business Park South Drive, Port Arthur, TX 77640
  - 901 Wilson Rd.  Clute, TX 77531
  - 182 Turbo Drive Sherwood Park AB, Canada
  - 499 Gladwish Drive Sarnia Ontario, Canada

ANNEX C

## ANNEX D

## TIMELINE FOR LHA AIRCRAFT SALE

- Listed with airplane broker– Completed
- Increased marketing efforts – Completed
- Placement of the aircraft in the NBAA Business Aviation Convention & Exhibition to be held October 10-12, 2017, in Las Vegas, NV, unless aircraft is refinanced, under contract of sale prior to such date, or under repair by manufacturer.

# Exhibit 12



**WINSTEAD**

Austin | Charlotte | Dallas | Fort Worth | Houston | San Antonio | The Woodlands

---

500 Winstead Building    214.745.5400 OFFICE
2728 N. Harwood Street    214.745.5390 FAX
Dallas, Texas 75201    winstead.com

Rakhee V. Patel
direct dial: 214.745.5250
rpatel@winstead.com

November 27, 2017

***Via Certified Mail, Return Receipt Requested***
***and Facsimile (713) 670-3974***

**CMRRR#9414726699042009354752**
Lockwood International, Inc.
10060 Windfern Road
Building B
Houston, Texas 77064

**CMRRR#9414726699042009354790**
Michael F. Lockwood
10060 Windfern Road
Building B
Houston, Texas 77064

**CMRRR#9414726699042009354769**
Lockwood Enterprises, Inc.
10060 Windfern Road
Building B
Houston, Texas 77064

**CMRRR#9414726699042009354806**
Lockwood Holdings, Inc.
10060 Windfern Road
Building B
Houston, Texas 77064

**CMRRR#9414726699042009354776**
LMG Manufacturing, Inc.
10060 Windfern Road
Building B
Houston, Texas 77064

**CMRRR#9414726699042009354608**
LH Aviation, LLC
10060 Windfern Road
Building B
Houston, Texas 77064

**CMRRR#9414726699042009354783**
Piping Components, Inc.
10060 Windfern Road
Building B
Houston, Texas 77064

**CMRRR#9414726699042009354615**
7807 Eagle Lane, LLC
10060 Windfern Road
Building B
Houston, Texas 77064

Ladies and Gentlemen,

We are counsel for the Administrative Agent (defined below). This letter is being sent to the notice address specified in the Credit Agreement (defined below) and is also being transmitted to Messrs. Melko and Wise and Ms. Beausoleil in their capacity as legal counsel for the Borrowers or Obligors, or both.

WINSTEAD PC | ATTORNEYS

November 27, 2017
Page 2

Reference is made to that certain Amended and Restated Credit Agreement (as amended, restated, supplemented or modified from time to time, the "***Credit Agreement***") dated as of September 30, 2015, among Lockwood Enterprises, Inc., Lockwood International, Inc., LMG Manufacturing, Inc. and Piping Components, Inc. as borrowers ("***Borrowers***"), the financial institutions party thereto from time to time, as lenders (the "***Lenders***"), and Wells Fargo Bank, National Association, as Administrative Agent (in such capacity, ***"Administrative Agent"***). Capitalized terms used but not defined in this letter agreement have the meaning given them in the Credit Agreement unless otherwise stated and section references are to the Credit Agreement unless otherwise stated.

Reference is also made to that certain Forbearance Agreement and Third Amendment to Amended and Restated Credit Agreement dated effective as of August 16, 2017 (the "***First Forbearance Agreement***") and to that certain Second Forbearance Agreement and Fourth Amendment to Amended and Restated Credit Agreement, dated as of September 29, 2017, among the Borrowers, the Lenders, Administrative Agent and the other Obligors named therein (the "***Second Forbearance Agreement***" and collectively, "***Forbearance Agreements"***). As used herein, "***Obligors***" has the meaning assigned to such term in the Second Forbearance Agreement and "***Loan Documents***" means the Credit Agreement, the Forbearance Agreements, the Security Documents and all other instruments, agreements, and documents evidencing, securing, or otherwise executed in connection with the Revolving Credit Facility.

Reference is also made to the various reservations of rights found in the Forbearance Agreements and in e-mails and letters transmitted to the Borrowers and to counsel for Borrowers.

Pursuant to Section 3(a) of the First Forbearance Agreement and Section 4(a) of the Second Forbearance Agreement, Obligors have acknowledged Events of Default under the Loan Documents (collectively, the "***Existing Defaults***"). In addition to the Existing Defaults, there is a failure to timely pay interest that accrued through the date hereof (individually the "***Payment Defaults***" and together with the Existing Defaults, the "***Enumerated Defaults***"). In addition to the Enumerated Defaults, there may be other Defaults or Events of Default of which the Administrative Agent and Lenders are currently unaware. As of the date hereof, the Enumerated Defaults have not been cured or waived by the Administrative Agent and Lenders and remain in existence.

Further, under the Second Forbearance Agreement, any agreement by Lenders and Administrative Agent to forbear on the exercise of rights and remedies under the Loan Documents has terminated automatically based, *inter alia*, on the occurrence of the Termination Date (as defined in the Second Forbearance Agreement), and each of the Obligors waived (i) any further notice of Default, notice of intent to accelerate, or demand for payment and (ii) any further opportunity to cure any of the Acknowledged Defaults and each Obligor acknowledged and agreed that the Administrative Agent and Lenders have the exercisable right to declare the Obligations to be immediately due and payable under the terms of the Credit Agreement and the other Loan Documents based on the Acknowledged Defaults. The Second Forbearance Agreement also provides that the Administrative Agent will be entitled immediately to accelerate the Secured Obligations, to institute foreclosure proceedings against the Collateral and to exercise any and all of the Administrative Agent's or any Lender's rights and remedies available

November 27, 2017
Page 3

to the Administrative Agent or any Lender under the Loan Documents and the Second Forbearance Agreement, at law, in equity, or otherwise, without further opportunity to cure, demand, presentment, notice of dishonor, notice of Default, notice of intent to accelerate, notice of intent to foreclose, notice of protest or other formalities of any kind, all of which were expressly waived by the Obligors.

This letter constitutes formal notice to the Borrowers that the Administrative Agent, with the consent of the Required Lenders, hereby (i) terminates any obligation of each Lender and the Issuing Bank to make extensions of credit (including making advances and issuing Letters of Credit) under the Credit Agreement and (ii) accelerates the balance of all outstanding Obligations under the Credit Agreement (including, but not limited to, and together with principal, interest, fees, reimbursements, indemnifications and all other amounts payable under the Credit Documents) in light of the Enumerated Defaults. Accordingly, (a) the full amount of all outstanding Obligations under the Credit Agreement are immediately due and payable in full and (b) Borrowers shall immediately deposit in a Cash Collateral account opened by the Administrative Agent an amount equal to the aggregate undrawn and unexpired amount of the Letters of Credit, and the Administrative Agent demands immediate payment of both as provided in the Loan Documents.

Section 4.1(c) the Credit Agreement relating to interest after Default is in effect.

As permitted under the Loan Documents and the Uniform Commercial Code, available cash collateral funds on deposit in pledged Wells Fargo Bank, N.A. deposit account ending in 1933 have been and may be swept at the discretion of Administrative Agent and applied to the Obligations.

You are hereby notified that Administrative Agent and Lenders do not and have not waived any of their rights and remedies resulting from any Events of Default, including but not limited to, the Enumerated Defaults. Administrative Agent and Lenders may immediately, without further notice of any kind, assert any and/or exercise all remedies or rights that may be available to them including, without limitation, offset of deposit accounts, foreclosure of Collateral securing payment of the Obligations, and the pursuit through legal proceedings of all parties obligated on or guaranteeing the Obligations. Obligors should not rely upon the Administrative Agent or Lenders continuing to refrain from pursuing any of their rights, remedies and recourses as may be otherwise available to the Administrative Agent or Lenders.

Please be advised that any litigation may include not only the full amount of principal and accrued interest due under the Obligations, but also may include expenses, attorneys' fees and costs of court, or other charges allowable or payable under the Loan Documents, applicable law or in equity as well.

In the event the election is made to proceed with foreclosure and the Collateral is sold at foreclosure sale for an amount insufficient to satisfy the entire unpaid balance of principal, accrued interest and any other amounts payable pursuant to the terms of the Credit Agreement and the other Loan Documents, Borrowers will be liable for the deficiency to the extent permitted by law.

November 27, 2017
Page 4

The existence or continuance of Enumerated Defaults or additional Events of Default, or both, do not relieve the Borrowers and the other Obligors of their payment, reporting and covenant obligations under the Loan Documents.

Administrative Agent's and Lenders' past or future failure to exercise available rights and remedies or acceptance of any payment(s) is not intended to (i) operate as a waiver of (a) rights and remedies available to Administrative Agent or Lenders pursuant to the Loan Documents including, without limitation, all rights, remedies and powers granted under the Credit Agreement, any other Loan Document, the Uniform Commercial Code, applicable federal or state law or at law or in equity or (b) any default, including the Enumerated Defaults, which may exist under the Credit Agreement or any other Loan Document, (ii) indicate agreement of the part of Administrative Agent or Lenders to forbear from exercising rights and remedies, (iii) indicate agreement by the Administrative Agent or Lender to renew, extend or refinance any of the Obligations or (iv) establish or operate as a course of dealing between the parties. Further, any single or partial exercise by Administrative Agent or Lenders shall not act as a waiver of, nor prevent Administrative Agent or Lenders from exercising any right, remedy, or power available to them, including, without limitation, all rights, remedies and powers granted under the Credit Agreement, any other Loan Document, and at law or in equity.

This letter is being transmitted as a courtesy to you, and is not an admission that any written notice regarding the Event of Default is otherwise due to Obligors, nor is it an election or waiver of the rights and remedies of Administrative Agent or Lenders. This letter further does not waive, abrogate or supersede the First Reservation of Rights or the Second Reservation of Rights.

Any future negotiations or discussions (whether written or oral) with any agent or representative of the Administrative Agent or Lenders regarding the Credit Agreement or the other Loan Documents shall not be binding upon the Administrative Agent or Lenders and the Obligors may not rely on any such negotiations or discussions (whether written or oral) unless and until it is in writing and signed by an authorized agent or representative of the Administrative Agent and Lenders.

Nothing in this letter shall be deemed to be or construed as a demand for payment of any sum in excess of the amounts which are lawfully owed to Lenders pursuant to the Loan Documents. The intention is to demand on behalf of Lenders payment for only the amount provided for in the Loan Documents.

IMPORTANT NOTE: Notwithstanding anything herein, to the extent that any party related to this matter or to whom this correspondence is addressed is subject to the protection or proceedings of a bankruptcy court acting under the United States Bankruptcy Code (Title 11 of the U.S. Code), such party is advised that this communication is transmitted to such party for informational purposes only and is not intended to violate any stay or injunction or to constitute a demand for payment or an attempt to collect any indebtedness that may have been discharged or is currently being administered in connection with a pending bankruptcy proceeding. To that

November 27, 2017
Page 5

end, if any party related to this matter in receipt of this correspondence is subject to the protection or proceedings of a bankruptcy court acting under the United States Bankruptcy Code, please notify the undersigned, or direct your counsel to notify the undersigned, if represented by counsel, in writing immediately.  Regardless of the pendency of any bankruptcy proceeding, if any party to which this correspondence is addressed is represented by counsel, please direct your counsel to contact the undersigned.

Sincerely,

Rakhee V. Patel

cc:  Mr. Michael Hilliard (*via* email)
     Mr. John Melko (*via* email jmelko@gardere.com)
     Ms. Sharon Beausoleil (*via* email sbeausoleil@gardere.com)
     Mr. Mark Wise (*via* email mwise@zimmerlaw.com)

Exhibit 13



**Wells Fargo Bank, N.A.**
5080 Spectrum Drive
Suite 400
Addison, TX 75001

wellsfargo.com

### NOTICE TO ACCOUNT DEBTOR AND DIRECTION

December 1, 2017

**Via Certified Mail, Return Receipt Requested #9414726699042060161368
and First Class U.S. Mail**



*Re:*     Lockwood International, Inc., Lockwood Enterprises, Inc., LMG Manufacturing, Inc. and Piping
Components, Inc. (each a *"Borrower"* and collectively, the *"Borrowers"*)

To Whom It May Concern,

YOU MUST FOLLOW THE INSTRUCTIONS IN THIS LETTER.

Please be advised that Wells Fargo Bank, National Association, as Administrative Agent, (*"Wells Fargo"*) is a
secured creditor with respect to the accounts receivable of the Borrowers, has the right to notify and direct account
debtors to make payments due or to become due to be remitted to Wells Fargo, and is entitled to receive all
payments on those obligations.

**PURSUANT TO THE TERMS OF THE SECURITY AGREEMENT (DEFINED BELOW) AND THE
UNIFORM COMMERCIAL CODE, YOU, AS AN ACCOUNT DEBTOR OF ONE OR MORE OF THE
BORROWERS, ARE HEREBY NOTIFIED AND DIRECTED TO REMIT ALL AMOUNTS DUE AND
OWING, AND THAT HEREAFTER BECOME DUE AND OWING, UNDER YOUR ACCOUNT
OBLIGATIONS TO ONE OR MORE OF THE BORROWERS AS FOLLOWS:**

A.     If you ordinarily pay by check, money order or cashier's check, send your payment immediately and
directly to Wells Fargo at the following address:

> Wells Fargo Bank
> 123 S Broad St
> MC: Y1375-084
> Philadelphia, PA 19109
> Attention: Rowena Overton

Checks should continue to be made payable to the applicable Borrower(s).

B.    If you pay by electronic funds transfer, wire transfer or automated clearing house payment, you should continue to remit payments to the Wells Fargo account to which you were previously instructed by one or more of the Borrowers in your ordinary course of dealings with them unless otherwise directed by Wells Fargo in writing.

*NOTE THAT YOU SHOULD NOT ACCEPT NEW ELECTRONIC PAYMENT INSTRUCTIONS FROM ANY OF THE BORROWERS AND SHOULD IMMEDIATELY CONTACT WELLS FARGO FOR PAYMENT INSTRUCTIONS IF ANY SUCH REQUEST IS MADE BY ANY OF THE BORROWERS.*

As used herein, the term "**Security Agreement**" means the Pledge and Security Agreement dated as of September 30, 2015, as amended, restated, supplemented, modified or replaced from time to time, entered into by the Borrowers, among other parties, and Wells Fargo.

**Please note that Section 9.406 of the Uniform Commercial Code provides that once an account debtor has been notified of the assignment of accounts, the account debtor may *not* discharge its obligation by paying the assignor (in this case, the Borrowers) and, thus, remitting payment to anyone other than Wells Fargo will not absolve your obligation to Wells Fargo as assignee of such accounts.**

Should you fail to comply with this notice, Wells Fargo will proceed with any and all available legal remedies against you pursuant to applicable law.

Thank you in advance for your cooperation. Future written communications with Wells Fargo regarding this matter should be directed to Jennifer Norris at the address listed below, and should you have any questions regarding this notification and direction, please do not hesitate to call Ms. Norris at (972) 419-3119.

Sincerely,

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Administrative Agent

By: _____
Jennifer L. Norris
Senior Vice President
5080 Spectrum Drive
Suite 400
Addison, TX 75225

Exhibit 14



**Wells Fargo Bank, N.A.**
5080 Spectrum Drive
Suite 400
Addison, TX 75001

**wellsfargo.com**

## NOTICE TO ACCOUNT DEBTOR AND DIRECTION

December 11, 2017

<u>**Via Certified Mail, Return Receipt Requested # 9314869904300041296817**</u>
<u>**and First Class U.S. Mail**</u>



*Re:*   Lockwood International, Inc., Lockwood Enterprises, Inc., LMG Manufacturing, Inc. and Piping Components, Inc. (each a "***Borrower***" and collectively, the "***Borrowers***")

To Whom It May Concern,

**YOU MUST FOLLOW THE INSTRUCTIONS IN THIS LETTER.**

Please be advised that Wells Fargo Bank, National Association, as Administrative Agent, ("Wells Fargo") is a secured creditor with respect to the accounts receivable of the Borrowers. Wells Fargo has the right to notify and direct account debtors to remit payments due or to become due to Wells Fargo and is entitled to receive all payments on those obligations.

**PURSUANT TO THE TERMS OF THE SECURITY AGREEMENT (DEFINED BELOW) AND THE UNIFORM COMMERCIAL CODE, YOU, AS AN ACCOUNT DEBTOR OF ONE OR MORE OF THE BORROWERS, ARE HEREBY NOTIFIED AND DIRECTED TO REMIT ALL AMOUNTS DUE AND OWING, AND THAT HEREAFTER BECOME DUE AND OWING, UNDER YOUR ACCOUNT OBLIGATIONS TO ONE OR MORE OF THE BORROWERS AS FOLLOWS:**

A.   <u>If you ordinarily pay by check, money order or cashier's check</u>, send your payment directly to Wells Fargo at the following address:

> Wells Fargo Bank
> 123 S Broad St
> MC: Y1375-084
> Philadelphia, PA  19109
> Attention: Rowena Overton

Checks should continue to be made payable to the applicable Borrower(s).

B.      If you pay by electronic funds transfer, wire transfer or automated clearing house payment, send your payment
directly to Wells Fargo as follows:

        ABA or ACH#: ███████
        Account #: ███████
        Ref: Lockwood International
        Attn: Jennifer Norris

***NOTE THAT YOU SHOULD NOT ACCEPT NEW ELECTRONIC PAYMENT INSTRUCTIONS FROM ANY OF
THE BORROWERS AND YOU SHOULD IMMEDIATELY CONTACT WELLS FARGO FOR PAYMENT
INSTRUCTIONS IF THE BORROWER MAKES ANY SUCH REQUEST. YOU SHOULD DISREGARD ANY
PAYMENT INSTRUCTIONS OTHER THAN THE INSTRUCTIONS CONTAINED IN THIS LETTER.***

As used herein, the term "**Security Agreement**" means the Pledge and Security Agreement dated as of September 30,
2015, as amended, restated, supplemented, modified or replaced from time to time, entered into by the Borrowers, among
other parties, and Wells Fargo.

**Please note that Section 9.406 of the Uniform Commercial Code provides that once an account debtor has been
notified of the assignment of accounts, the account debtor may *not* discharge its obligation by paying the assignor
(in this case, the Borrowers) and, thus, remitting payment to anyone other than Wells Fargo will not absolve your
obligation to Wells Fargo as assignee of such accounts.**

Should you fail to comply with this notice, Wells Fargo will proceed with any and all available legal remedies against you
pursuant to applicable law.

Thank you in advance for your cooperation. Future written communications with Wells Fargo regarding this matter should
be directed to Jennifer Norris at the address listed below, and should you have any questions regarding this notification
and direction, please do not hesitate to call Ms. Norris at (972) 419-3119.

        Sincerely,

        WELLS FARGO BANK, NATIONAL ASSOCIATION,
        as Administrative Agent

        By: _____
        Jennifer L. Norris
        Senior Vice President
        5080 Spectrum Drive
        Suite 400
        Addison, TX 75225

Exhibit 15



November 17, 2017

Re:     Remittance Address Change
        Lockwood International, Inc.

To Whom It May Concern,

Please be advised that Lockwood International's remittance information has changed.  Please update your systems with the new details as follows:

Remittance by Mail:

Lockwood International, Inc.
PO Box 53466
Houston, TX 77052

Remittance by Wire or ACH:

Bank of America
9006 West Sam Houston Parkway N.
Houston, TX

Account:      █████████████
Routing:      026009593
SWIFT:        BOAFAUS3N

Thank you for your assistance in this matter.

Exhibit 16



**WINSTEAD**

Austin | Charlotte | Dallas | Fort Worth | Houston | San Antonio | The Woodlands

600 Travis Street
Suite 5200
Houston, Texas 77002

713.650.8400 *OFFICE*
713.650.2400 *FAX*
winstead.com

December 14, 2017

Yasmin Atasi
direct dial: 713.650.2735
yatasi@winstead.com

### *DEMAND TO CEASE AND DESIST*
### *AND*
### *DEMAND TO PROVIDE INFORMATION AND DOCUMENTS*

Mr. Francis I. Spagnoletti
Mr. David S. Toy
Mr. Eric J. Rhine
Spagnoletti & Co.
401 Louisiana, 8th Floor
Houston, TX 77002

Via email: fspagnoletti@spaglaw.com
dtoy@spaglaw.com
erhine@spaglaw.com
Facsimile: 713-653-5656

Re: Civil Action No. 3-17-cv-00365; *Lockwood International, Inc. v. Wells Fargo Bank, National Association; Wells Fargo Securities, LLC; and Trustmark National Bank;* In the Southern District of Texas, Galveston Division

Gentlemen:

As you know, this Firm represents Wells Fargo Bank, National Association ("Wells Fargo"). As I discussed with Mr. Frank Spagnoletti yesterday, Lockwood International, Inc. ("Lockwood") has instructed some or all of its account debtors to direct payments to an address or bank account other than Wells Fargo. A copy of one of those notices is attached hereto as Exhibit A. Additionally, on information and belief, Lockwood has further advised one, some or all of its account debtors that it will indemnify the respective account debtor in the event Wells Fargo pursues the account debtor for remitting payments directly to Lockwood instead of Wells Fargo. **We hereby demand that Lockwood immediately cease and desist from interfering with Wells Fargo's rights to the accounts receivable of the Borrowers (as defined below), all of which are pledged to Wells Fargo.**

Wells Fargo, as the secured creditor of Lockwood International, Inc., Lockwood Enterprises, Inc., LMG Manufacturing, Inc. and Piping Components, Inc. (collectively "Borrowers"), and as permitted by, *inter alia,* Section 8(b)(ii) of the Pledge and Security Agreement dated September 30, 2015 by and between Borrowers and Wells Fargo (the "Pledge and Security Agreement") and the Uniform Commercial Code, sent notices to Borrowers' account debtors instructing them to remit all amounts due and owing to Wells Fargo. Pursuant to Section 9 of the Pledge and Security Agreement, Wells Fargo is appointed attorney-in-fact for Lockwood with authority to demand, collect, settle, compromise and adjust all Collateral (as defined in the Pledge and Security Agreement), including, but not limited to, the Accounts.

December 14, 2017
Page 2

Furthermore, Borrowers represented and warranted in Section 5(j)(iv) of the Pledge and Security Agreement that so long as any Secured Obligations are outstanding, they will not maintain any bank accounts other than as specified on Schedule 5(j) thereof. No bank account in the U.S. with Bank of America is listed on such schedule.

Additionally, Section 5(c) of the Forbearance Agreement dated August 16, 2017 and Section 6(c) of the Second Forbearance Agreement dated September 29, 2017 require that all collections be deposited with Wells Fargo. The Borrowers' breaches of their contractual agreements, and ongoing efforts to interfere with Wells Fargo's Collateral and encourage account debtors to violate their obligations under the UCC by offering to indemnify them if they remit payments to Borrowers, are serious infractions which must cease immediately.

To that end, Wells Fargo hereby demands as follows:

1. Provide and disclose an accounting of all accounts receivable sent directly to Borrowers and/or any financial institution other than Wells Fargo. The accounting should include: the identity of the account debtor, the amount paid, the date of the payment, the financial institution and deposit account number into which the payment was deposited, and Borrowers' use of the funds.

2. Provide and disclose a list of all deposit accounts (as such term is defined in the UCC) maintained at financial institutions other than Wells Fargo.

3. Borrowers shall immediately turn over all cash proceeds now or hereafter in the Borrowers' possession, custody or control, including those funds deposited with Bank of America. Any funds collected by Borrowers in derogation of Wells Fargo's rights are held in trust for Wells Fargo and must be turned over immediately.

4. Provide written assurances from Borrowers that (a) they will immediately remit to Wells Fargo any and all payments sent by any account debtor to Borrowers or any financial institution other than Wells Fargo, and (b) they have not interfered, and will not interfere, in any other way with Wells Fargo's rights as a secured creditor with respect to any and all collateral.

5. Immediately instruct all account debtors to remit all payments to Wells Fargo. Payments by check, money order or cashier's check should be sent to:

> Wells Fargo Bank
> 123 S Broad St
> MC: Y1375-084
> Philadelphia, PA 19109
> Attention: Rowena Overton

Checks should continue to be made payable to the applicable Borrower(s).

Electronic funds transfer, wire transfer or automated clearing house payments should be sent to Wells Fargo as follows:

> ABA or ACH#: ███████
> Account #: ███████
> Ref: Lockwood International
> Attn: Jennifer Norris

December 14, 2017
Page 3


Please respond to this letter with the requested information by no later than <u>5:00pm on Friday,</u> <u>December 15th</u>. We trust that we can resolve this serious matter immediately without the need for seeking injunctive relief from the Court. Thank you, and we look forward to hearing from you.

Very truly yours,

Yasmin Atasi


cc:

| | |
|---|---|
| **CMRRR** | **CMRRR** |
| Lockwood International, Inc. | Michael F. Lockwood |
| 10060 Windfern Road, Building B | 14239 Indian Wells Drive |
| Houston, Texas 77064 | Houston, Texas 77069 |
| | |
| **CMRRR** | **CMRRR** |
| Lockwood Enterprises, Inc. | Lockwood Holdings, Inc. |
| 10060 Windfern Road, Building B | 10060 Windfern Road, Building B |
| Houston, Texas 77064 | Houston, Texas 77064 |
| | |
| **CMRRR** | **CMRRR** |
| LMG Manufacturing, Inc. | LH Aviation, LLC |
| 10060 Windfern Road, Building B | 10002 Windfern Road |
| Houston, Texas 77064 | Houston, Texas 77064 |
| | |
| **CMRRR** | **CMRRR** |
| Piping Components, Inc. | 7807 Eagle Lane, LLC |
| 10060 Windfern Road, Building B | 10060 Windfern Road, Building B |
| Houston, Texas 77064 | Houston, Texas 77064 |

# EXHIBIT A



November 17, 2017

Re:     Remittance Address Change
        Lockwood International, Inc.

To Whom It May Concern,

Please be advised that Lockwood International's remittance information has changed. Please update your systems with the new details as follows:

Remittance by Mail:

Lockwood International, Inc.
PO Box 53466
Houston, TX 77052

Remittance by Wire or ACH:

Bank of America
9006 West Sam Houston Parkway N.
Houston, TX

Account:     ████████████████
Routing:     026009593
SWIFT:       BOAFAUS3N

Thank you for your assistance in this matter.

Exhibit 17

**From:** Atasi, Yasmin
**Sent:** Monday, December 18, 2017 6:06 PM
**To:** 'fspagnoletti@spaglaw.com'; 'dtoy@spaglaw.com'; 'erhine@spaglaw.com'
**Cc:** Hilliard, Mike; Patel, Rakhee
**Subject:** RE: Lockwood International - CEASE AND DESIST

Counsel, we have just learned that Lockwood has been using its inventory – the Bank's collateral – to satisfy and pay debts it owes to Lockwood's creditors.  This is yet another violation of Lockwood's obligation under the Credit Agreement and Pledge and Security Agreement: Lockwood agreed that it would not to sell any inventory other than in the ordinary course of business.  Accordingly, in addition to ceasing from interfering with Wells Fargo's rights to the accounts receivable of the Borrowers, **demand is hereby made that Lockwood immediately cease and desist from depleting and disposing of the  inventory (and any other Collateral), including, but not limited to, transferring inventory to any creditors to repay any debts owed by Lockwood to its creditors.**

We also demand that Lockwood provide and disclose  an accounting of all inventory transferred to any creditors / customers in satisfaction of Lockwood's debt, including the identity of all creditors / customers, the debt amount and date incurred, the purpose of the debt, the date(s) on which inventory was transferred and the nature and amount of inventory transferred.

**Please respond by no later than Tuesday at 10:00am**.  Thank you.

**Yasmin Atasi, Shareholder**
Winstead PC | 600 Travis Street |  Suite 5200 | Houston, Texas 77002
713.650.2735 *direct* | 713.650.2400 *fax* | yatasi@winstead.com | www.winstead.com

PLEASE NOTE NEW ADDRESS

---

**From:** Atasi, Yasmin
**Sent:** Thursday, December 14, 2017 4:48 PM
**To:** 'fspagnoletti@spaglaw.com'; 'dtoy@spaglaw.com'; 'erhine@spaglaw.com'
**Cc:** Hilliard, Mike; Patel, Rakhee
**Subject:** Lockwood International - Cease & Desist Letter

Gentlemen, please see the attached letter.
Frank, thank you for calling today, and I look forward to hearing back following your meeting with Mike Lockwood tomorrow.
Thank you, Yasmin.

**Yasmin Atasi, Shareholder**
Winstead PC | 600 Travis Street |  Suite 5200 | Houston, Texas 77002
713.650.2735 *direct* | 713.650.2400 *fax* | yatasi@winstead.com | www.winstead.com

PLEASE NOTE NEW ADDRESS

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### GALVESTON DIVISION

| | | |
|---|---|---|
| **LOCKWOOD INTERNATIONAL, INC.,** | § | |
| *Plaintiff/Counter-Defendant,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **WELLS FARGO BANK, N.A., WELLS** | § | |
| **FARGO SECURITIES, LLC, AND** | § | |
| **TRUSTMARK NATIONAL BANK,** | § | |
| *Defendants/Counterclaimants/Third-* | § | |
| *Party Plaintiffs,* | § | **CIVIL ACTION NO. 3:17-CV-00365** |
| | § | |
| **v.** | § | |
| | § | |
| **LOCKWOOD ENTERPRISES, INC.,** | § | |
| **LMG MANUFACTURING, INC.,** | § | |
| **PIPING COMPONENTS, INC.,** | § | |
| **LOCKWOOD HOLDINGS, INC.,** | § | |
| **LH AVIATION, LLC,** | § | |
| **7807 EAGLE LANE LLC, AND** | § | |
| **MICHAEL F. LOCKWOOD,** | § | |
| *Third-Party Defendants.* | § | |

## TEMPORARY RESTRAINING ORDER AND
## ORDER SETTING HEARING FOR PRELIMINARY INJUNCTION

Before the Court is Defendants/Counterclaimants/Third-Party Plaintiffs Wells Fargo Bank, N.A. ("Wells Fargo") and Trustmark National Bank's ("Trustmark") (Wells Fargo and Trustmark are collectively referred to as "Lenders") Application for Temporary Restraining Order (the "Application"). Having considered the Application, the pleadings, evidence, and the arguments of counsel, the Court finds that Lenders face imminent harm, and if the Court does not issue a temporary restraining order, Lenders will be irreparably injured. Accordingly, the Court finds that the Application should be and is **GRANTED** and, for the reasons set forth below, the following orders should be entered.

### FINDINGS IN SUPPORT OF TEMPORARY RESTRAINING ORDER

*The Loan Documents*

1.    On February 27, 2017, Lockwood International, Inc. ("LII"), Lockwood Enterprises, Inc., LMG Manufacturing, Inc., and Piping Components, Inc. (collectively, "Borrowers") entered into a Second Amendment to Amended and Restated Credit Agreement and Limited Waiver  of Defaults (the "Credit Agreement") with Lenders, whereby Lenders agreed to extend a Revolving Line of Credit in the amount of $72,000,000 to Borrowers.  The Credit Agreement amended and restated an existing lending relationship with Lenders.

2.    In connection with the original credit agreement, Borrowers had entered into several promissory notes with Lenders, which continue to govern the lending relationship.  These include (i) a Revolving Credit Note between Borrowers and Wells Fargo on September 30, 2015, in the amount of $70,000,000 (the "Wells Fargo Note"), and (ii) a Revolving Credit Note between Borrowers and Trustmark on September 30, 2015, in the amount of $20,000,000 (the "Trustmark Note").  Together the Wells Fargo Note and the Trustmark Note are referred to collectively herein as the "Notes."

3.    Additionally, various third-party guaranty agreements were executed relating to the Notes and Credit Agreements.  These included unconditional guarantees by: (i) Michael F. Lockwood dated February 27, 2017 (the "Michael Lockwood Guaranty"); (ii) Lockwood Holdings, Inc. dated August 22, 2017 (the "Lockwood Holdings Guaranty"); (iii) LH Aviation LLC dated August 22, 2017 (the "LH Aviation Guaranty"); and (iv) 7807 Eagle Lane LLC dated August 22, 2017 (the "Eagle Lane Guaranty").  Together the Michael Lockwood Guaranty, Lockwood Holdings Guaranty, LH Aviation Guaranty, and Eagle Lane Guaranty are referred to collectively herein as the "Guaranty Agreements."  Together, Michael Lockwood, Lockwood

Holdings, Inc., LH Aviation LLC, and 7807 Eagle Lane LLC are referred to collectively as the "Guarantors."

4.     To further secure the Indebtedness under the Credit Agreement and Notes, Borrowers executed and delivered, among other things, a Pledge and Security Agreement on September 30, 2015, which pledges an extensive array of assets as security and collateral for the Indebtedness (the "Security Agreement"), including but not limited to all accounts receivable, equipment and inventory.   In connection with executing their Guaranty Agreements, on August 21, 2017, the Guarantors executed a Pledge and Security Agreement Joinder No. 1, agreeing to join as Grantors under the Security Agreement and pledging their interest in the collateral covered by the Security Agreement (the "Security Agreement Joinder").

### *The Forbearance Agreements*

5.     After an extended period of financial trouble, on August 16, 2017, Borrowers, Guarantors, Lenders, and the Administrative Agent executed the Forbearance Agreement and Third Amendment to Amended and Restated Credit Agreement (the "First Forbearance Agreement"), whereby Borrowers acknowledged that several events of default had occurred and were then existing under the Credit Agreement.

6.     On September 29, 2017, Borrowers, Lenders, and the Administrative Agent entered into the Second Forbearance Agreement and Fourth Amendment to Amended and Restated Credit Agreement (the "Second Forbearance Agreement"), whereby Borrowers again acknowledged that several events of default had occurred and were then existing under the Credit Agreement.

7.     In the First and Second Forbearance Agreements Borrowers agreed to deposit all collections with Wells Fargo and to not open or maintain any deposit accounts at any other banks.

*Default and Acceleration*

8.     The Second Forbearance Agreement expired by its own terms on October 31, 2017.  After the Second Forbearance Agreement expired, Borrowers failed to pay the accrued interest, as required under the Credit Agreement and Notes, resulting in an additional breach and default.  On November 27, 2017, Wells Fargo sent a Notice of Acceleration to Borrowers and Guarantors, notifying them that all outstanding amounts under the Credit Agreement were due in full and demanding payment thereof.  Additionally, upon acceleration, Borrowers were required to immediately deposit in a cash collateral account an amount equal to the aggregate undrawn and unexpired amount of outstanding Letters of Credit, which as of the date of the Acceleration Notice totaled $808,591.86.  Despite demand, Borrowers and Guarantors have failed to pay the outstanding debts, and Borrowers have not deposited the cash collateral for the Letters of Credit as required.   Lenders now seek recovery of more than $57 million from Borrowers and Guarantors under their respective agreements.

*Borrowers' Interference With and Diversion of Collateral*

9.     On December 1 and 11, 2017 Wells Fargo sent letters to Borrowers' account debtors informing them that all amounts due to Borrowers should be deposited in a Wells Fargo account.  Shortly thereafter, Wells Fargo learned that on November 17, 2017, LII had sent a letter to its account debtors changing its long-standing remittance instructions for Receivables Collateral Proceeds and instructing them to send payments to a Bank of America deposit account maintained by LII.  LII's instructions to its account debtors are inconsistent with its obligations under the First and Second Forbearance Agreements, which required Borrowers to cause all collateral to be deposited in an account maintained by Wells Fargo, and which prohibited them from opening or maintaining an account at any other financial institution.

10.     Moreover, Lenders have presented evidence that LII has advised at least one of its account debtors that it will indemnify the account debtor in the event Wells Fargo pursues the account debtor for remitting payments to LII instead of Wells Fargo.  Thus, Borrowers are interfering with Lenders' rights to the accounts receivable by diverting funds and encouraging account debtors to violate their duties and obligations to turn over funds to Wells Fargo.

11.     Furthermore, Lenders have presented evidence that LII has entered into an agreement with one of its other creditors, Global Stainless Supply ("Global Stainless"), whereby LII agreed to transfer portions of the inventory to Global Stainless in satisfaction of LII's debt to Global Stainless.  The Credit Agreement provides that inventory may not be disposed of outside of the ordinary course of business, unless the disposal falls into one of six enumerated exceptions for Asset Disposition.  Transferring inventory to debtors is neither in the ordinary course of LII's business nor does it fall under one of the Credit Agreement's enumerated exceptions for Asset Disposition.

*Cease and Desist Letters*

12.     Upon learning of Borrowers' efforts to interfere with and divert Lenders' collateral, on December 14, 2017, Wells Fargo delivered a letter to Borrowers demanding that they immediately cease and desist from interfering with Lenders' rights to the accounts receivable.  In the letter, Wells Fargo demanded certain documents and assurances from Borrowers, including assurances that they will immediately remit any and all payments sent to Borrowers, and that they have not, and will not interfere with Lenders' rights as to all collateral.  Borrowers refused and failed to provide the requested assurances.  Instead, LII indicated that it intended to collect receivables outside of Wells Fargo and to use the funds to pay its suppliers.  LII also admitted that it had received $650,000 outside of Wells Fargo and that it had not deposited the funds in the Wells Fargo account.

13.     Additionally, upon learning that LII was using inventory to pay down its debts, Wells Fargo sent another cease and desist e-mail on December 18, 2017 demanding that LII immediately cease and desist from depleting and disposing of the inventory, including transferring inventory to LII's creditors to repay LII's debts.  Wells Fargo demanded that LII provide and disclose an accounting of all inventory wrongfully transferred.  LII has failed to respond to the demand and request.

14.     Based upon the foregoing, the Court finds that Lenders have a substantial likelihood of success on the merits of their claims against Borrowers and Guarantors to recover the indebtedness owed under the Credit Agreement, Notes, and Guaranty Agreements.

15.     The Court also finds that Lenders will suffer immediate and irreparable injury for which there is no adequate remedy at law if a temporary restraining order is not issued because Borrowers' conduct and behavior confirms that they will continue to dispose of, transfer, hide, or otherwise interfere with Lenders' rights to the collateral.  Moreover, due to Borrowers' precarious financial condition and apparent inability to pay its bill, the collateral is the most likely source for repayment of the debt.

16.     The Court further finds that the threatened injury to Lenders outweighs any harm that will result if a temporary restraining order is granted and that granting a temporary restraining order does not disserve the public interest.

## **TEMPORARY RESTRAINING ORDER**

IT IS, THEREFORE, ORDERED that to preserve the status quo and Lenders' rights, Borrowers and Guarantors, including Michael Lockwood, as well as their officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with any of them, are hereby enjoined, restrained, and prohibited from:

(i)     Interfering with Lenders' rights to take immediate possession of all Collateral (as defined in the Security Agreement), wherever located, and books and records pertaining thereto;

(ii)    Disposing of, transferring, removing, hiding or altering any Collateral (as defined in the Security Agreement), wherever located, and books and records pertaining thereto;

(iii)   Using any Collateral (as defined in the Security Agreement) to pay or offset Borrowers or Guarantors' debt(s) to third parties;

(iv)    Advising or instructing any of Borrowers' account debtors or customers to send payments to Borrowers or anyone other than Wells Fargo;

IT IS FURTHER ORDERED that Borrowers and Guarantors, including Michael Lockwood, as well as their officers, agents, servants, employees, and attorneys, are hereby ordered to:

(v)     Prepare and produce to Wells Fargo, within three (3) business days an accounting of all inventory transferred to any third parties to pay or offset Borrowers or Guarantors' debts, including the identity of the third parties, the debt amount, the date of transfer, and the amount and value of the transferred inventory;

(vi)    Prepare and produce to Wells Fargo, within three (3) business days an accounting of all accounts receivable sent directly to Borrowers and/or any financial institution other than Wells Fargo including the identity of the account debtor, the amount paid, the date of the payment, the financial

institution and account number into which the payment was deposited, and Borrowers' use of funds.

(vii)    Prepare and produce to Wells Fargo, within three (3) business days, a current list of all collateral (as defined in the Security Agreement), wherever located, including but not limited to, the location thereof;

(viii)   Prepare and produce to Wells Fargo, within three (3) business days, a current list of all deposit accounts maintained by LII and amounts on deposit in each account;

(ix)     Transfer to a deposit account of Wells Fargo's specification, within three (3) business days, all collateral proceeds and other amounts held in any deposit accounts maintained at financial institutions other than Wells Fargo, and turn over any future deposits.

IT IS FURTHER ORDERED that Lenders shall file a surety bond or cash deposit in lieu of bond in the amount of $_____ to support the issuance of this Temporary Restraining Order.

IT IS FURTHER ORDERED that a hearing on Lenders' Application for Preliminary Injunction will be heard on _____ at _____ before Judge George C. Hanks, Jr. in the United States District Court for the Southern District of Texas, Galveston Division, to determine whether a preliminary injunction should issue in this matter.

This Order expires after fourteen (14) days, unless further extended by this Court or by agreement of the parties.

SIGNED on this _____ day of _____, 2017, at _____ o'clock a.m./p.m.

_____
JUDGE GEORGE C. HANKS, JR.