# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| LOCKWOOD HOLDINGS, INC., *et al.*,[1] | § | Case No. 18-30197 (DRJ) |
|  | § |  |
| Debtors. | § | Jointly Administered |
|  | § |  |

**DEBTORS' EXPEDITED MOTION PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004, AND 6006 FOR ORDER (A) APPROVING COMPREHENSIVE SALE PROCESS, (B) APPROVING BIDDING PROCEDURES AND CERTAIN BID PROTECTIONS, (C) SCHEDULING AN AUCTION AND A SALE HEARING, (D) APPROVING FORM AND MANNER OF NOTICE RELATED THERETO, (E) AUTHORIZING SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (F) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND PROPOSED CURE AMOUNTS WITH RESPECT THERETO AND (G) GRANTING RELATED RELIEF**

> THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.
>
> A HEARING HAS BEEN SET ON THIS MATTER ON JULY 17, 2018 AT 3:00 P.M. (CT) BEFORE THE HONORABLE DAVID R. JONES, 515 RUSK STREET, COURTROOM 400, HOUSTON, TEXAS 77002.
>
> REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number are: Lockwood Holdings, Inc. (9726); LH Aviation, LLC (6984); Piping Components, Inc. (0197); Lockwood International, Inc. (8597); LMG Manufacturing, Inc. (9468); Lockwood Enterprises, Inc. (6504); and 7807 Eagle Lane, LLC (7382).

Lockwood Holdings, Inc. and certain of its affiliates, the above-captioned debtors and debtors in possession (collectively, the "Debtors"), submit their Expedited Motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), pursuant to sections 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (A) approving a comprehensive sale process, (B) approving the bidding procedures (the "Bidding Procedures") attached as **Exhibit 1** to the Bidding Procedures Order and certain bidding protections set forth therein and described herein, (C) scheduling an auction to be held on August 15, 2018 (the "Auction") and a hearing to approve the results of the Auction on August 20, 2018 or as soon thereafter as the Court's calendar permits (the "Sale Hearing"), and (D) approving the form and notice related to the Sale Hearing.[2]  The Debtors further request that, at the Sale Hearing, the Court (i) approve a sale of all or a portion of the Debtors' assets, including a sale of only real estate or a sale of the businesses as a going concern, free and clear of liens, claims, interests, and encumbrances; (ii) approve the assumption and assignment of such executory contracts and unexpired leases of the Debtors (if any) (collectively, the "Assumed Contracts") as may be requested by the Stalking Horse (if any) or the Successful Bidder and the proposed cure amounts with respect thereto; (iii) approve the assumption of certain liabilities (the "Assumed Liabilities"); and (iv) grant related relief.  In support of the Motion, the Debtors respectfully represent:

---

[2] As set forth below and in the Bidding Procedures, the Debtors reserve the right to cancel the Sale Hearing if at, or prior to, the Auction, a Plan Transaction (as defined in the Bidding Procedures) is accepted and will be pursued.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## PROCEDURAL HISTORY

3.      On January 18, 2018, Lockwood Holdings, Inc.; LH Aviation, LLC; and Piping Components, Inc. filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On January 24, 2018, Lockwood International, Inc.; Lockwood Enterprises, Inc.; LMG Manufacturing, Inc.; and 7807 Eagle Lane, LLC filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors each remain in possession of their property and each is managing its business as a debtor in possession.

5.      On February 20, 2018, the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee"), which was amended on March 2, 2018.  [Docket Nos. 131 and 171].  No trustee or examiner has been appointed.

## BACKGROUND

6.      Founded in 1977 in Houston, Texas, Lockwood International, Inc., along with its related Debtors, is an international supplier of valves and valve automation, offering pipe, valves, fittings, and flanges, as well as engineered products for liquid handling and transfer, liquid management, and access and safety equipment.   LII primarily supplies customers in the petrochemical, oil and gas, and construction industries.  A detailed description of the Debtors and their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Emergency Motion for Interim and Final Orders (A) Authorizing Use*

3

*of Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code and (B) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* [Docket No. 14].

7.      The Debtors are double-tracking, seeking a transaction ("Transaction") incorporating both or either of: (A)(i) a sale of all or a portion of the Debtors' assets, including a sale of real estate only or (ii) a going concern sale (together, a "Sale" or "Sale Transaction"), or (B) a restructuring transaction under a confirmed chapter 11 plan of reorganization (a "Plan Transaction").  To that end, the Court previously approved the Debtors' retention of Imperial Capital, LLC ("Imperial") as their investment banker, to facilitate a going concern sale or other sale (or sales) of the Debtors' assets.  [Docket No. 251].  Similarly, the Court has approved Keen-Summit Capital Partners LLC ("Keen") as the Debtors' real estate broker.  [Docket No. 476].

8.      Imperial has already begun the marketing process.  Specifically, Imperial has identified (and continues to work to identify) and contacted (and continues to contact) potential buyers; has provided (and continues to provide) nondisclosure agreements to numerous interested parties who have been or will be granted access to information regarding the Debtors' assets; and has finalized and provided a Confidential Information Memorandum ("CIM") to multiple parties.

## RELIEF REQUESTED

9.      By this Motion, the Debtors seek approval of a process designed to generate the greatest value for their constituents, whether through a going concern sale of the business to potential strategic or financial buyers, the sale of a portion of the Debtors' assets to one or more buyers, or a restructuring of the business.  Imperial, Keen, and the Debtors have been pursuing and will continue to pursue, a dual-track process to facilitate the above as a means to maximize both value and restructuring optionality.

4

10.     The Debtors propose to solicit bids, conduct an auction, and have a Sale Transaction approved on the following timeline:[3]

| | |
|---|---|
| Deadline to submit bids (the "Bid Deadline"): | August 10, 2018 at 4:00 p.m. (CT) |
| Notifications to Qualified Bidders: | August 13, 2018 |
| Return of Deposits to non-Qualified Bidders: | By August 15, 2018 |
| Auction (if one or more Qualified Bids is received and a Plan Transaction is not pursued): | August 15, 2018 at 10:00 a.m. |
| Deadline to object to Sale: | August 17, 2018 |
| Deadline to file Cure Notice: | August 17, 2018 |
| Sale Hearing, to approve the results of the Auction: | August 20, 2018 at 2:00 p.m. (CT)[4] |
| Deadline to object to assumption and assignment of the Assumed Contracts, to the Cure Notice, and any Cure Amount: | August 24, 2018 |

11.     The Debtors believe that the above timeline is reasonable.  Imperial was retained effective as of February 21, 2018, and its marketing process has been under way since that date. Thus, by the time the Bid Deadline arrives, marketing will have been under way for over five months, and the proposed auction date will be almost six months after Imperial's retention.  These deadlines are consistent with deadlines often established for asset sales in other chapter 11 cases.

12.     Following entry of the Bidding Procedures Order, and in the exercise of their business judgment and in their sole and absolute discretion, the Debtors may, without any obligation to do so, select one or more bidders to act as a stalking horse (each being a "Stalking Horse Bidder" with the relevant bid being a "Stalking Horse Bid"), after consultation with the Committee and Wells Fargo Bank, N.A. ("Wells Fargo").  Further, as contemplated by the Bidding

---

[3] As previously stated and as set forth in the Bidding Procedures, a Plan Transaction will be subject to the plan and disclosure statement process and timeline, and the Debtors will not seek approval of a Plan Transaction at the Sale Hearing.

[4] If the Debtors ultimately decide to pursue a Plan Transaction, the Sale Hearing will be cancelled, and the Debtors will promptly file a chapter 11 plan and pursue confirmation thereof.

Procedures Order, the Debtors will be permitted, but not directed, to incur and pay a break-up fee in an amount not to exceed 3.0% of the cash component of a Stalking Horse Bid (the "Break-Up Fee").  At the Auction, to the extent a Stalking Horse Bidder has been named, the initial overbid must exceed such Stalking Horse Bid by at least the amount of the Break-Up Fee.  Thereafter, or in the event no Stalking Horse Bidder has been named, the minimum bidding increment (the "Subsequent Bids" and each a "Subsequent Bid") shall be $350,000.00.  The amount of the Subsequent Bids may be increased or decreased by the Debtors, in their sole discretion, in consultation with Wells Fargo and the Committee.  The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit one or more additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid or bids.

13.     Attached to the Bidding Procedures Order as **Exhibit 2** is a general form asset purchase agreement ("APA") for use by potential bidders.  The Debtors seek approval of the APA, subject to such modifications as may be submitted by potential bidders and accepted by the Debtors, after consultation with the Committee and Wells Fargo, in connection with a Sale Transaction and in the exercise of the Debtors' business judgment.

14.     If the Debtors declare one or more Stalking Horse Bidders, they will promptly file a notice of the same with the Court, along with a copy of the Stalking Horse Bid(s).  Thereafter, the related Break-Up Fee will be paid as part of any order of the Bankruptcy Court approving a Sale or confirming a chapter 11 plan, as applicable.

15.     The Break-Up Fee shall only be payable if (i) a Stalking Horse Bidder, being ready, willing, and able to close its transaction, is not the Successful Bidder at the Auction, (ii) the Court authorizes the Debtors to enter into an alternative transaction, and (iii)(A) if such alternative

6

Transaction is a Sale Transaction, such Sale Transaction actually closes or (B) if such alternative

Transaction is a Plan Transaction, a disclosure statement is approved by the Court.

## BASIS FOR RELIEF

**A.    The APA is typical, customary, and reasonable and entering into the APA is an exercise of the Debtors' reasonable business judgment.**

16.    The APA attached hereto is a basic form of asset purchase agreement for a sale of the Debtors' assets.  It provides a base from which interested parties may work when formulating the terms of their respective bids, and is a form with which the Debtors are comfortable and which the Debtors believe is fair to both the Debtors and prospective bidders.

17.    The Debtors further believe, and respectfully submit, that the terms of the APA are typical, customary, and reasonable under the circumstances, in the exercise of their business judgment.  Given that there is no current Stalking Horse Bidder, however, the Debtors presume that modifications will be submitted by not only by potential Stalking Horse Bidders, but also by general bidders.  The Debtors thus request authorization to accept such modifications and edits to the form of APA as may be submitted by potential bidders and as the Debtors may agree to in their discretion and business judgment, after consultation with the Committee and Wells Fargo.

**B.    The Break-Up Fee is reasonable and necessary to ensure maximum value for the Debtors' assets.**

18.    As has been demonstrated repeatedly over the years, obtaining a stalking horse bidder is key to a successful, efficient, and value-maximizing sale process.  The presence of a stalking horse sets a floor for the auction and encourages bidding, thereby maximizing the seller's return.  To receive this benefit, however, the Debtors need to be able to compensate a Stalking Horse Bidder for the risk it takes by (i) entering into an agreement that is subject to higher and better offers without any assurances that its transaction will ultimately be consummated, (ii)

exposing its bid to the market, and (iii) standing by its bid commitment while the marketing and process plays itself out.  The Debtors, therefore, request that the Court approve the Break-Up Fee, to the extent that the Debtors declare one or more Stalking Horse Bidders.

19.     Break-up fees and other bid protections are a normal and customary — and sometimes necessary — component of sales outside the ordinary course.  *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659-60 (S.D.N.Y. 1992) ("[B]ecause the directors of a corporation have a duty to encourage bidding, break-up fees can be *necessary* to discharge the directors' duties to maximize value.") (emphasis in original); *See, e.g., In re Stone Energy Corp*., Case No 16-26390 (MI) (Bankr. S.D. Tex. Jan. 18, 2017) [Docket No. 316] (approving a break-up fee in the amount of $10,800,00, or three percent of the purchase price); *In re CXM, Inc.,* 307 B.R. 94, 104 (Bankr. N.D. Ill. 2004) (approving a $200,000 break-up fee protecting stalking horse bidder); *In re Outboard Marine Corp*., Case No. 00-37405-EIK-11 (Bankr. N.D. Ill. Jan. 10, 2001) [Docket No. 217] (authorizing payment of a 3% break-up fee to potential bidders); *In re Fin. News Network, Inc.*, 126 B.R. 152, 157 (S.D.N.Y. 1991), *appeal dismissed*, 931 F.2d 217 (2d Cir. 1991) (refusing to impose strict comparability where the original bidding party had the benefit of a break-up fee); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990) (approving break-up fees in merger agreement); *In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28-29 (Bankr. S.D.N.Y. 1989) (finding that $500,000 break-up fee was not unreasonable absent evidence that it chilled the bidding).

20.     To warrant approval of break-up fees and expenses, the Fifth Circuit in *Asarco* required a showing that the requested fees and expenses are supported by a sound business justification.  *Asarco, Inc., v. Elliot Mgmt. (In re Asarco, LLC)*, 650 F.3d 593, 597-98, 602-03 n. 9 (5th Cir. 2011) (favoring business judgment standard governing use of assets outside of ordinary

course of business, rather than the standard for administrative expenses, in assessing propriety of fees and expenses incurred by bidders).

21.     Here, the proposed Break-Up Fee of 3.0% is well within the range of reasonableness and supported by a sound business justification.  Generally speaking, courts have found break-up fees to be reasonable, and approved the same, ranging up to approximately five percent (5%) of the consideration to be received.  *See Integrated Res.*, 147 B.R. at 662 (noting expert testimony that 3.3% is industry average for break-up fees); *see also, e.g.*, *In re Stone Energy Corp.*, No. 16-36390 (MI) (Bankr. S.D. Tex. Jan. 18, 2017) (approving 3% break-up fee); *In re UGHS Senior Living, Inc.*, No. 15-80399 (DRJ) (Bankr. S.D. Tex. Nov. 24, 2015) (approving 3% break-up fee and 1% expense reimbursement); *In re Enron Corp.*, No. 01-16034 (AJG) (Bankr. S.D.N.Y., Apr. 8, 2004) (approving break-up fee equal to 5% of the purchase price); *In re TransCom USA Mgmt Co., L.P.*, No. 01-35158 (KKB) (Bankr. S.D. Tex., Feb. 12, 2002) (approving a break-up fee of more than 3.6% of the purchase price for the assets).

22.     If one or more Stalking Horse Bids is submitted and accepted by the Debtors, the Break-Up Fee will be beneficial to the Debtors' estates and creditors, as such Stalking Horse Bid(s) will set a floor for further bidding, and establish a metric against which all other bids may be measured.  The Debtors, in their business judgment, believe it is reasonable and appropriate to provide the requested 3.0% Break-Up Fee, which is consistent with other break-up fees approved in this District, as set forth above.

**C.     The Bidding Procedures are appropriate and ensure that the bidding process is fair, reasonable, and will yield the maximum value to their estates, creditors, stakeholders, and other parties in interest.**

23.     The Debtors request that the Court approve the overall Bidding Procedures, attached to the Bidding Procedures Order as **Exhibit 1**.  The Bidding Procedures are designed to

4759013.9

maximize value for the Debtors' estates while ensuring an orderly process. The Bidding Procedures describe, among other things, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of any Auction (as defined below), the ultimate selection of the Successful Bidder, and the Court's approval thereof. The Bidding Procedures also address the various combinations and permutations that may occur during the process, *to wit*, an all-asset going concern sale, a piecemeal sale of various assets to multiple bidders, a real estate-only sale, and a restructuring pursuant to a chapter 11 plan. To the extent the Debtors decide to pursue a Plan Transaction, the Sale Hearing, and/or the Auction will be cancelled.

24.     The proposed Bidding Procedures provide, in summary fashion, as follows :[5]

(a)     Sale of Assets or Going Concern Transaction: The Debtors are entertaining bids for a proposed (A)(i) sale of all or a portion of their assets, including a sale of real estate only or (ii) going concern sale, or (B) restructuring transaction under a confirmed chapter 11 plan of reorganization. The Debtors may enter into one Transaction or several Transactions with multiple parties, depending upon the bids received.

Any Successful Bidder(s) will be obligated to assume the assumed liabilities as may be set forth in any purchase agreement and the Debtors will assume and assign the assumed contracts to the Successful Bidder(s), as may be set forth in any purchase agreement(s) accepted by the Debtor.

(b)     "As Is, Where Is": Any Transaction(s) entered into with the Debtors will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents, or estates, except as may be set forth in a purchase agreement(s) with a Successful Bidder(s) or chapter 11 plan approved by the Bankruptcy Court.

(c)     Free of Any and All Claims and Interests: Any Transaction entered into with the Debtors will be free and clear of all liens, claims, interests, and encumbrances (collectively, the "Claims and Interests"), with such Claims and Interests to attach to the net proceeds of the sale.

---

[5] This summary is qualified in its entirety by reference to the provisions of the Bidding Procedures themselves. In the event of any inconsistencies between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern. Unless otherwise defined, capitalized terms shall have the meanings ascribed to them in the Bidding Procedures.

(d)     <u>Participation and Bid Requirements</u>: Any person or entity who wishes to participate in the Bidding Process (a "<u>Potential Bidder</u>") must become a Qualified Bidder as indicated within the Bidding Procedures.

(e)     <u>Due Diligence</u>: Following execution of a Confidentiality Agreement, the Debtors will afford each interested party an opportunity to perform due diligence with respect to their businesses and assets.  The Debtors have designated Imperial to coordinate all reasonable requests for additional information and due diligence access from interested parties about the business.  All inquiries about Real Estate will be directed to Keen.

(f)     <u>Bid Deadline</u>: A Qualified Bidder (other than a potential Stalking Horse Bidder and Wells Fargo) who desires to make a bid must deliver written copies of its bid, along with the Required Bid Documents (as defined within the Bidding Procedures) to the Debtors, Imperial, Keen, Wells Fargo, and the Committee at the addresses contained within the Bidding Procedures no later than 4:00 p.m. Central Time on August 10, 2018 (the "<u>Bid Deadline</u>").

(g)     <u>Qualified Bids</u>: Wells Fargo is deemed to be a Qualified Bidder.  A bid (other than that proposed by Wells Fargo) will be deemed a "Qualified Bid" and considered by the Debtors only if the bid:

i.      is on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to the Debtors than, those contained in the APA;

ii.     contains no contingencies of any type, other than Bankruptcy Court approval of the Transaction;

iii.    other than any Stalking Horse Bid(s) that may be designated by the Debtors, is not conditioned upon any bid protections (such as a topping fee, termination fee, expense reimbursement, or similar type of payment);

iv.     contains the acknowledgements and representations as listed in the Bidding Procedures;

v.      includes a list of assumed contracts and assumed liabilities (if any), and a commitment to consummate the Transaction and the assumption of the assumed liabilities (if any) within not more than ten (10) days after entry of an order by the Bankruptcy Court approving such Transaction;

vi.     discloses (i) the identity of the Potential Bidder and each entity participating in connection with the Potential Bidder and the complete terms of such participation, and (ii) any other term sheets and other written or oral understandings between the Potential Bidder and its affiliates on one hand, and any insider (as defined in section 101(31) of the Bankruptcy Code) of the Debtors, on the other;

11

vii.      is received by the Bid Deadline; and

viii.      contemplates payment in cash, in full, upon the closing of the Transaction, unless the Debtors agree otherwise, after consultation with Wells Fargo and the Committee.

(h)      Stalking Horse Declaration and Break-Up Fee:  Following entry of the Bidding Procedures Order, and in the exercise of their business judgment and in their sole and absolute discretion, the Debtors may, without any obligation to do so, after consulting with the Committee and Wells Fargo, select one or more bidders to act as a Stalking Horse Bidder.  The Debtors may, but are not required to, incur the Break-Up Fee.  The Break-Up Fee will only be payable if certain conditions have been met, as explained in the Bidding Procedures.  To the extent a determination is made to provide a Break-Up Fee, the Debtors will file notice of the same with the Bankruptcy Court.

(i)      Auction: If the Debtors receive more than one Qualified Bid, an auction (the "Auction") will be conducted, upon notice to all Qualified Bidders who have submitted Qualified Bids, at 10:00 a.m. Central Time on August 15, 2018, at the offices of Gray Reed & McGraw LLP, 1300 Post Oak Boulevard, Suite 2000, Houston Texas 77056, in accordance with the terms of the Bidding Procedures.

(j)      Closing of Auction Selection of Successful Bid:  The Auction will continue until there is only one bid that the Debtors determine, in their sole and absolute discretion and business judgment, after consultation with Wells Fargo and the Committee, is the highest or otherwise best Qualified Bid for each asset or group of assets (such bid being the "Successful Bid" and the bidder making such bid, the "Successful Bidder").

(k)      Back-Up Bidder.  If there is an Auction, the Qualified Bidder that submits the second highest Bid at the Auction shall be required to serve as the back-up bidder (the "Back-Up Bidder") and keep such Back-Up Bidder's last Bid (the "Back-Up Bid") open and irrevocable until the earlier of (i)(A) if a Sale Transaction, 5:00 p.m. Central Time on the date which is thirty (30) days after the date of the Sale Hearing or (B) if a Plan Transaction, the date of entry of an order approving a disclosure statement for a chapter 11 plan (the "Disclosure Statement Approval Date"), and (ii) the closing of the Transaction with the Successful Bidder (the "Outside Back-Up Date").  If, (x) after the Sale Hearing but prior to the Outside Back-Up Date for a Sale Transaction or (y) after the conclusion of the Auction but prior to the Outside Back-up Date for a Plan Transaction, the Successful Bidder fails to consummate or proceed with the relevant Transaction because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to have the new Successful Bid, and the Debtors will be authorized, without further order of the Bankruptcy Court, to consummate the Transaction with the Back-Up Bidder.  The Debtors will provide notice to the Committee and Wells Fargo of any failure by the Successful Bidder to close the Transaction and the election to proceed to close a Transaction with the Back-Up Bidder.

(l)      Right to Credit Bid.  Any creditor that has a valid, perfected, unavoidable, and enforceable security interest (a "Security Interest") in the Debtors' assets (any such

creditor, a "Secured Party") may make one or more credit bids for all or any portion of the secured claim(s) held by such Secured Party at the Auction, subject to the requirements of section 363(k) of the Bankruptcy Code (a "Credit Bid"). Wells Fargo shall be permitted to Credit Bid in an amount up to (i) the amount then-outstanding under the terms of that certain *Agreed Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Superpriority Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 359] and the related credit agreement, plus (ii) the amount of Wells Fargo's allowed prepetition secured claim, *provided, however*, that Wells Fargo must allocate its credit bid among the various loans it holds and the collateral securing such loans. In order to qualify to Credit Bid, a Secured Party must be a Qualified Bidder and a Credit Bid must qualify as a Qualified Bid.

(m)     All bidders will be deemed to have consented to the core and exclusive jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any and all disputes relating to, arising from or connected with the Auction, the marketing process, the Transaction, and the construction and enforcement of any purchase agreement.

(n)     By submitting a bid, a Potential Bidder will be deemed to indemnify, defend and hold harmless the Debtors, Imperial, and Keen from and against any and all claims, damages, losses and liabilities, costs and expenses (including reasonable attorneys' fees and disbursements) arising out of any claim or claims by any broker, finder, or similar agent for commissions, fees, or other compensation who allege that they have dealt with the Debtors, Imperial, and/or Keen in connection with the Transaction.

(o)     If the Debtors choose to move forward with a Plan Transaction, the Auction and Sale Hearing may be cancelled.

(p)     Reservation of Rights:  Notwithstanding any term to the contrary in the Bidding Procedures, the Debtors, in consultation with Wells Fargo and the Committee, reserve the right to: (i) modify the Bidding Procedures at any time; (ii) determine which Qualified Bid, if any, is the highest or otherwise best offer; (iii) reject at any time, any bid that is: (a) inadequate or insufficient (in the Debtors' sole and absolute discretion); (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the APA; or (c) contrary to the best interests of the Debtors, their estates, and creditors as determined by the Debtors in their sole discretion; and (iv) pursue a sale or other transaction through a chapter 11 plan.

25.     The Debtors respectfully submit that the Bidding Procedures meet the standard set forth in 363(b) for sales outside of the ordinary course of a debtor's business. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

13

26.     This Court's power under Bankruptcy Code section 363 is supplemented by section 105(a), which provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  As set forth below, the Debtors submit that they have satisfied the requirements of sections 105 and 363 as those sections have been construed by courts in the Fifth Circuit.

27.     To approve a sale under section 363(b)(1) of the Bankruptcy Code, the Fifth Circuit requires a debtor to show that the decision to sell the property outside of the ordinary course of business was based on the debtor's business judgment.  *See Inst'l Creditors of Cont'l Airlines, Inc. v Cont'l Airlines, Inc.* (*In re Cont'l Airlines, Inc.*), 780 F.2d 1223, 1226 (5th Cir. 1986); *In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988).  A bankruptcy court is to give deference to the business judgment of the trustee or debtor in possession when it deems the sale to be appropriate.  *See Esposito v. Title Ins. Co. of Pa.* (*In re Fernwood*), 73 B.R. 616, 621 n.2 (Bankr. E.D. Pa. 1987).

28.     Once the Debtors articulate a valid business justification, their decision to sell property out of the ordinary course of business enjoys a strong presumption "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company."  *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Therefore, any party objecting to the Debtors' proposed asset sale must make a showing of "bad faith, self-interest, or gross negligence."  *See id.* at 656.

29.     The paramount goal in any proposed sale of property of a debtor's estate is to maximize the proceeds received by the estate.  *See Cadle Co. v. Moore (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010) (debtor in possession "has the duty to maximize the value of the estate");

14

*Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985) (same). Thus, it is appropriate to approve bidding procedures that benefit a debtor's estate by maximizing the value of the debtor's assets. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. N.D. Pa. 1998); *In re Tex. Rangers Baseball Partners*, 431 B.R. 706, 711 (Bankr. N.D. Tex. 2010); *Integrated Res. Inc.*, 147 B.R. at 659.

30.     The Debtors have sound business justifications for pursuing a Transaction and seeking approval of the Bidding Procedures at this time. The Debtors believe that the Bidding Procedures will set the parameters by which the value of the Debtors' assets and the overall transaction value may be established and tested. The Bidding Procedures will thus ensure a competitive and fair bidding process and increase the likelihood that the Debtors will receive the greatest possible consideration for their assets.

31.     The Debtors also believe that the Bidding Procedures will promote active bidding from seriously interested parties, and will dispel any doubt as to the highest and best offer reasonably available for the Debtors' assets (or the business, to the extent there is a going concern transaction or a Plan Transaction). The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate an ability to close the Sale. The Debtors believe that the Bidding Procedures will encourage bidding, are consistent with other procedures previously approved by courts in this and other districts, and are appropriate under the relevant legal standards.

**D.     The form and manner of notice of the Bidding Procedures, the Auction, and the Sale Hearing are reasonable, adequate, and appropriate.**

32.     The Debtors request that the Court schedule two hearings in connection with this Motion: first, a hearing to consider and approve the Bidding Procedures and schedule the Auction, Sale Hearing, and related deadlines; and second, the Sale Hearing itself.

15

33.     The Debtors propose that, within three (3) days after entry of the Bidding Procedures Order, the Debtors serve this Motion, the APA, the Bidding Procedures, and a copy of the Bidding Procedures Order (the "Bid Package"), via first class U.S. mail, postage prepaid, upon: (a) all entities known to have expressed an interest in an asset purchase or going concern sale transaction with the Debtors during the past year; (b) the U.S. Trustee; (c) counsel to the Committee; (d) counsel to Wells Fargo; (d) counterparties to the Debtors' executory contracts and unexpired leases; (h) all parties who have requested notice in these chapter 11 cases; and (i) all parties with whom Imperial and Keen have been in contact and who have expressed an interest in potentially making a bid.[6]

34.     The date proposed for the Sale Hearing — August 20, 2018 at 2:00 p.m. (CT) — complies with Bankruptcy Rules 2002(a)(2), 6004, and 6006(c), as such date will be more than twenty one (21) days after service of the Bid Package.  Further, the materials in the Bid Package will comply with Bankruptcy Rules 2002(c)(1) and 6004(f)(1), as the same will contain the information required by such Bankruptcy Rules.  As a result, the Debtors respectfully submit that the Bid Package and notice of the Sale Hearing and Auction (the "Sale Notice") satisfy the notice and information requirements of Bankruptcy Rules 2002, 6004 and 6006(c), and section 363 of the Bankruptcy Code, and that such notice is good and sufficient that no other or further notice is required.

**E.     The assumption, assignment, and cure relating to the Assumed Contracts are appropriate and should be approved.**

35.     In connection with the proposed Sale, the Debtors seek authority to assume and assign the Assumed Contracts (if any) to the Successful Bidder.  In the event the Debtors seek to

---

[6] All such entities will also be served by electronic mail to the extent the Debtors, Imperial, or Keen have electronic mail addresses for such parties.

assume and assign any contracts or leases, the Debtors propose to file with the Court and serve upon affected counterparties to the Assumed Contracts a "Notice of Cure Amounts" (the "Cure Notice," with such amounts set forth therein being "Cure Amounts") no later than August 17, 2018, subject to amendment and supplementation prior to the Sale Hearing.  The Debtors request that objections, if any, to the assumption and assignment of the Assumed Contracts or to the Cure Notice and any Cure Amount be filed and served so as to be actually received no later than August 24, 2018.  If an objection to the assumption and assignment of the Assumed Contracts or to the Cure Notice and any Cure Amount cannot be resolved consensually among the parties, then the Debtors request that the Court set a hearing to determine such matters as soon thereafter as is practicable, with notice only to the objecting party and those parties who have filed a notice of appearance.  The Cure Amounts set forth in the Cure Notice shall be binding on all parties unless an objection thereto is timely filed and served.  The failure to timely file and serve an objection shall be deemed consent to the assumption and assignment of the Assumed Contracts and to the Cure Amount, and any and all objections thereto shall be deemed forever released and waived as of the date of the Sale Hearing.

36.     Section 365(f)(2) of the Bankruptcy Code provides that:

[t]he trustee may assign an executory contract or unexpired lease of the Debtors only if –

(A)     the trustee assumes such contract or lease in accordance  with  the provisions of this section; and

(B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

37.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a

17

debtor's decision to assume or reject executory contracts or unexpired leases of nonresidential real property is whether the debtor's reasonable business judgment supports assumption or rejection. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *see also Tex. Health Enters. Inc. v. Lytle Nursing Home (In re Tex. Health Enters. Inc.)*, 72 F. App'x 122, 127 (5th Cir. 2003) ("[T]he bankruptcy code makes it clear that it is the choice of the debtor-in-possession, and not the bankruptcy court, to assume or reject an executory contract"); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 162 (Bankr D. Del. 2006).

38.     Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> > (A)     cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
> >
> > (B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C)     provides adequate assurance of future performance under such contract or lease.

39.     Courts give the phrase "adequate assurance of future performance" in section 365(b)(1) a "practical, pragmatic construction."  *See, e.g., Appeal of Ill. Inv. Tr. v. Allied Waste Indus., Inc. (In re Res. Tech. Corp.)*, 624 F.3d 376, 383-84 (7th Cir. 2010) (adequate assurance required showing that performance was more likely to occur than not); *EBG Midtown S. Corp. v. McLaren/Hart Envtl Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (the presence of adequate assurance should be "determined under the facts of each particular case"); *In re Fifth Ave. Originals*, 32 B.R. 648, 652 (Bankr. S.D.N.Y. 1983) (holding that adequate assurance was furnished on two separate grounds).  Courts have consistently held that the phrase

18

does not provide "total" assurances.  *See, e.g., In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D. N.J. 1988) ("the required assurance will fall considerably short of an absolute guarantee of performance"); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) ("[I]t does not mean absolute insurance that the debtor will thrive and make a profit").

40.    To the extent the Successful Bidder desires that the Debtors assume and assign some or all of the Debtors' executory contracts or unexpired leases, the Debtors have determined that such assumption and assignment is an exercise of sound business judgment and is in the best interest of the Debtors, their estates, and their creditors.  To the extent that any defaults exist under any Assumed Contract, the Debtors will cure, or make provisions for the cure of, any such default, as set forth in the Cure Notice.

**F.    Any Sale Should be Approved Free and Clear of Liens, Claims, Interests and Encumbrances.**

41.    Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any lien, claim, interest or encumbrance in such property if, among other things:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

19

42.     Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale.  *See, e.g., In re Partners Oil Co.*, 216 B.R. 399, 401 (Bankr. S.D. Tex. 1998) (allowing a sale free and clear of liens when just one of the subsections of 363(f) were met); *In re Collins*, 180 B.R. 447, 449-50 (Bankr. E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only one of the enumerated conditions must be met in order for the Court to approve the proposed sale"); *Scherer v. Fed. Nat'l Mortg. Ass'n (In re Terrace Chalet Apts., Ltd.)*, 159 B.R. 821, 827 (N.D. Ill. 1993) (sale extinguishes liens under section 363(f) as long as one of the five specified exceptions applies).

43.     Section 363(f) permits the Sale to proceed free and clear of all liens, claims, interests, and encumbrances, except for any liabilities specifically assumed by the Successful Bidder.  Each lien, claim, interest or encumbrance that is not the result of an Assumed Liability satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code.  Indeed, the Debtors believe that their primary secured lender with an alleged lien on substantially all of their assets, Wells Fargo, will likely not oppose the underlying Sale at the Sale Hearing.  Assuming such, any proposed sales of Wells Fargo's collateral free and clear of liens, claims, mortgages, encumbrances, and other interests would satisfy the requirements of section 363(f)(2) of the Bankruptcy Code.  To the extent the Debtors seek to sell any Assets on which an entity other than Wells Fargo has a lien, such party will receive the Sale Notice and will have an opportunity to object.  Further, to the extent Wells Fargo or any other entity with a lien on any assets to be sold has an objection to the Sale, but the Debtors nonetheless decide to proceed with the Sale over such objection, the Debtors will present appropriate evidence and lay the necessary foundation at the Sale Hearing to support approval of the Sale.

44.     The Debtors further submit that any lien, claim, interest, or encumbrance will be adequately protected by attachment to the net proceeds of the Sale.  Accordingly, the Debtors request that the Sale to the Successful Bidder be free and clear of all liens, claims, interest and encumbrances, with such liens, claims, and encumbrances to attach to the proceeds of the Sale.

**G.     The Stalking Horse, or the Successful Bidder, is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code, and the Sale should be deemed not avoidable pursuant to section 363(n) of the Bankruptcy Code.**

45.     Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

46.     While the Bankruptcy Code does not define "good faith," the Fifth Circuit has held that a good faith purchaser is one who "purchases the assets for value, in good faith, and without notice of adverse claims."  *Hardage v. Herring Nat'l Bank,* 837 F.2d 1319, 1323 (5th Cir. 1988) (quoting *Willemain v. Kivitz (In re Willemain),* 764 F.2d 1019, 1023 (4th Cir. 1985)). Furthermore, the good faith status of a purchaser can be destroyed with evidence of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *TMT Procurement Corp. v. Vantage Drilling Co.* (*In re TMT Procurement Corp.*), 764 F.3d 512, 521 (5th Cir. 2014).

47.     The Debtors submit, and will present evidence at the Sale Hearing that, the proposed Sale is an arms' length transaction, in which the Successful Bidder and the Debtors at all times acted in good faith.  In connection with approval of the proposed Sale, the Debtors request that the Court make a finding that the Successful Bidder is a good faith purchaser and entitled to the protections of section 363(m) of the Bankruptcy Code.

## NO PRIOR REQUEST

48.     No prior request for the relief sought in this Motion has been made to this or any other court.

## WAIVER OF BANKRUPTCY RULE 6004(h)

49.     The Debtors request that the Court waive the fourteen (14) day stay period under Bankruptcy Rule 6004(h).

## NOTICE

50.     The Debtors will provide notice of this Motion to (i) the Office of the United States Trustee for the Southern District of Texas, (ii) counsel to Wells Fargo as agent for the Debtors' prepetition and DIP lenders, (iii) counsel to the Committee, and (iv) all other persons who have filed a notice of appearance and request for service of documents.  Under Bankruptcy Local Rule 9003-1 and in light of the nature of the relief requested, the Debtors submit that no other or further notice is required.

WHEREFORE, the Debtors respectfully request that the Court (A) enter an Order (i) approving the Bidding Procedures and the Break-Up Fee; (ii) scheduling the Auction, Sale Hearing, and associated deadlines; and (iii) approving the form and manner of notice of the Auction and the Sale Hearing and certain bidding protections as described herein; (B) enter a second Order, at the Sale Hearing (to the extent a Sale Hearing occurs), (x) authorizing and approving the Sale free and clear of liens, claims, interests, and encumbrances to the Successful Bidder, (y) approving the assumption and assignment of the Assumed Contracts, and (z) approving the assumption of the Assumed Liabilities by the Successful Bidder; and (C) grant such other and further relief as may be just and proper.

4759013.9

Respectfully submitted this 29th day of June, 2018.

**GRAY REED & McGRAW LLP**

By: */s/ Jason S. Brookner*_____
    Jason S. Brookner
    Texas Bar No. 24033684
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:  (713) 986-7000
Facsimile:  (713) 986-7100
Email:      jbrookner@grayreed.com

-and-

    Amber M. Carson
    Texas Bar No. 24075610
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:      acarson@grayreed.com

**COUNSEL TO THE DEBTORS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 29th day of June, 2018, he caused a true and correct copy of the foregoing Motion to be served via CM/ECF on all parties who have subscribed for electronic notice in this case, and via electronic mail on the Office of the United States Trustee, counsel to Wells Fargo, and counsel to the Committee.

    */s/ Jason S. Brookner*_____
    Jason S. Brookner

**Exhibit A**

**Proposed Order**

4759013.9

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| | § | Chapter 11 |
| In re: | § | |
| | § | |
| LOCKWOOD HOLDINGS, INC., *et al.,*[1] | § | Case No. 18-30197 (DRJ) |
| | § | |
| Debtors. | § | Jointly Administered |
| | § | |
| | § | |

**ORDER GRANTING DEBTORS' EXPEDITED MOTION PURSUANT
TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE AND
BANKRUPTCY RULES 2002, 6004, AND 6006 FOR ORDER (A) APPROVING
COMPREHENSIVE SALE PROCESS, (B) APPROVING BIDDING PROCEDURES
AND CERTAIN BID PROTECTIONS, (C) SCHEDULING AN AUCTION
AND A SALE HEARING, (D) APPROVING FORM AND MANNER OF NOTICE
RELATED THERETO, (E) AUTHORIZING SALE FREE AND CLEAR OF ALL
LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (F) AUTHORIZING
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES AND PROPOSED CURE
<u>AMOUNTS WITH RESPECT THERETO AND (G) GRANTING RELATED RELIEF</u>**

Upon the expedited motion (the "<u>Motion</u>"),[2] filed by Lockwood Holdings, Inc. and certain

of its affiliates, the above-captioned debtors and debtors in possession (collectively, the

"<u>Debtors</u>"), for entry of an order pursuant to 11 U.S.C. §§ 363 and 365 and Rules 2002, 6004, and

6006 of the Federal Rules of Bankruptcy Procedure (A) approving a comprehensive sale process,

(B) approving the bidding procedures attached hereto as **<u>Exhibit 1</u>** (the "<u>Bidding Procedures</u>") and

certain bid protections, (C) scheduling an auction and sale hearing (the "<u>Sale Hearing</u>"),

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number are: Lockwood Holdings, Inc. (9726); LH Aviation, LLC (6984); Piping Components, Inc. (0197); Lockwood International, Inc. (8597); LMG Manufacturing, Inc. (9468); Lockwood Enterprises, Inc. (6504); and 7807 Eagle Lane, LLC (7382).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

(D) approving the form and manner of the notice related to the Sale Hearing, (E) authorizing the Sale of the Debtors' business as a going concern or of certain (or all) of its assets, free and clear of liens, claims, interests and encumbrances, and (F) authorizing the assumption and assignment of executory contracts and unexpired leases of the Debtors as may be requested by the Stalking Horse (if any) or the Successful Bidder (collectively, the "Assumed Contracts") and the proposed cure amounts with respect thereto; and G) granting related relief; and the Court being satisfied that the relief requested in the Motion is necessary and in the best interests of the Debtors and their estates and creditors; and it appearing that sufficient notice of the Motion has been given, and that no other or further notice is required; and upon the hearing on the Motion conducted on July 17, 2018 (the "Bidding Procedures Hearing") and all of the other proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, the Court hereby finds that:

A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334.

B.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).

C.      The relief requested in the Motion is in the best interest of the Debtors, their estates, creditors, and other parties in interest.

D.      The Debtors have provided due and sufficient notice of the Motion and the Bidding Procedures Hearing under the circumstances, and no other or further notice is required.

E.      The Debtors have articulated good and sufficient reasons for (i) approving the Bidding Procedures, (ii) the grant of certain bid protections in favor of one or more potential Stalking Horse Bidders, (iii) approving the manner of notice of the Motion, and establishing the

Bid Deadline, the Auction, the Sale Hearing, and the assumption and assignment of the Assumed Contracts and proposed cure relating thereto, and (iv) the scheduling of the Sale Hearing.

      F.      The Debtors' payment to a Stalking Horse Bidder (if any) of the Break-Up Fee on the terms set forth in this Order (i) is an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, (ii) is of substantial benefit to the Debtors' estates, (iii) is reasonable and appropriate, in light of the size and nature of the potential Sale and the efforts that have been and will be expended by a potential Stalking Horse Bidder notwithstanding that the proposed Sale is subject to higher or better offers, (iv) was negotiated by the parties at arms' length and in good faith, and (v) is necessary to ensure that a potential Stalking Horse Bidder will continue to pursue its proposed acquisition of the Debtors' assets.

      G.      The Bidding Procedures are reasonable and appropriate and represent the best method for maximizing the realizable value of the Debtors' assets in part, in total, or as a going concern transaction.

      It is hereby **ORDERED** that:

**<u>Auction and Bidding Procedures</u>**

      1.      The Bidding Procedures attached hereto as **<u>Exhibit 1</u>** and incorporated herein by reference as if fully set forth herein, are hereby approved and shall govern the bidding and Auction proceedings.

      2.      The Bid Deadline shall be August 10, 2018 at 4:00 p.m. (prevailing Central Time), Qualified Bidders will be notified by August 13, 2018, Deposits will be returned to non-Qualified

3

Bidders by August 15, 2018, the Auction shall be conducted on August 15, 2018, and the sale hearing will be held on August 20, 2018 at 2:00 p.m. (the "Sale Hearing").

3.    The Debtors are authorized to terminate the bidding process or the Auction at any time if they determine, in their business judgment, that the bidding process will not maximize value for the Debtors' estates.

4.    The general form APA attached hereto as **Exhibit 2** and incorporated herein by reference as if fully set forth herein, is hereby approved and may be modified by the Debtors subject to consultation with the Committee and Wells Fargo.

**Sale Hearing and Auction**

5.    An Auction is scheduled to take place on **August 15, 2018** commencing at **10:00 a.m**. **(CST)** at the offices of Gray Reed & McGraw LLP, 1300 Post Oak Blvd., Suite 2000, Houston, TX 77056.  To the extent the Debtors decide to pursue a Plan Transaction, the Sale Hearing, and/or the Auction shall be cancelled.  The Sale Hearing shall take place on August 20, 2018 at 2:00 p.m. (prevailing Central Time) in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, 515 Rusk Street, Courtroom 400, Houston, Texas 77002, at which time the Court shall consider the Motion, the proposed Sale, and confirm the results of the Auction, if any.[3]  Objections to the Motion and the proposed Sale shall be filed with the Bankruptcy Court and served on the following parties so as to be actually received no later than 4:00 p.m. (prevailing Central Time) on August 16, 2018 (one day after the Auction) (the "Objection Deadline"): (a) counsel to the Debtors, Gray Reed & McGraw LLP, 1601 Elm Street, Suite 4600,

---

[3] As set forth in the Bidding Procedures, the Debtors may cancel the Sale Hearing if th Plan Transaction is ultimately accepted.

Dallas, TX 75201 (Attn: Jason S. Brookner) jbrookner@grayreed.com; (b) the Debtors' Chief Restructuring Officer, GlassRatner Advisory and Capital Group, 3500 Maple Avenue, Suite 350, Dallas, Texas 75219 (Attn: Mark Shapiro) mshapiro@glassratner.com; (b) counsel to the Committee, McKool Smith, 600 Travis Street, Suite 7000, Houston, Texas 77002 (Attn: Christopher D. Johnson) cjohnson@mckoolsmith.com; (c) the Office of the U.S. Trustee, 515 Rusk Street, Suite 3516,  Houston, TX 77002 (Attn: Hector Duran) Hector.Duran.Jr@usdoj.gov; and (d) counsel to Wells Fargo, Winstead PC, 500 Winstead Building, 2728 N. Harwood Street, Dallas, Texas 75201 (Attn: Rakhee V. Patel) rpatel@winstead.com and 600 Travis Street, Suite 5200, Houston, Texas 77002 (Attn: Sean B. Davis) sdavis@winstead.com.

6.     The failure to timely file and serve an objection by the Objection Deadline shall be a bar to the assertion, prior to, at the Sale Hearing, or thereafter, of any such objection to the Motion, the Sale, or the Debtors' consummation of the Sale.  Notwithstanding the foregoing, the Objection Deadline shall not apply to any objection based upon any event occurring at the Auction.

7.     The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment made in open court.

**Bid Protections**

8.     The Break-Up Fee to be paid to a Stalking Horse Bidder, as more fully described in the Motion and the Bidding Procedures, is hereby approved pursuant to the terms and conditions set forth in the Motion and Bidding Procedures, and shall be paid pursuant to the terms of an order approving a Sale Transaction, or a confirmation order approving a Plan Transaction, as applicable; *provided, however*, that notwithstanding any term to the contrary set forth in the APA, the Bidding Procedures, or this Order, any potential Stalking Horse Bidder shall only be entitled to receive the

5

Break-Up Fee if (i) a Stalking Horse Bidder, being ready, willing and able to close its transaction, is not the Successful Bidder at the Auction, (ii) the Court authorizes the Debtors to enter into an alternative transaction, and (iii)(A) if such alternative Transaction is a Sale Transaction, such Sale Transaction actually closes or (B) if such alternative Transaction is a Plan Transaction, a disclosure statement is approved by the Court.  Payment of the Break-Up Fee as set forth herein, if a Stalking Horse Bidder is declared, shall survive termination of the APA and shall constitute an administrative expense of the Debtors' estates.

## Cure Notice

9.      In the event the Debtors seek to assume and assign any contracts or leases, the Debtors shall file with the Court and serve upon affected counter-parties to the Assumed Contracts (if any) a "Notice of Cure Amounts" (the "Cure Notice," with such amounts set forth therein being "Cure Amounts") no later than August 17, 2018, subject to amendment and supplementation prior to the Sale Hearing.  Objections, if any, to the assumption and assignment of the Assumed Contracts or to the Cure Notice and any Cure Amount shall be filed and served so as to be actually received by August 24, 2018.  If an objection to the assumption and assignment of the Assumed Contracts or to the Cure Notice and any Cure Amount cannot be resolved consensually among the parties, the Court will set a hearing to determine such matters as soon thereafter as is practicable, and the Debtors are permitted to give notice only to the objecting party and those parties who have filed a notice of appearance.  The Cure Amounts set forth in the Cure Notice shall be binding on all parties unless an objection thereto is timely filed and served.  The failure to timely file and serve an objection shall be deemed consent to the assumption and assignment of the Assumed

Contracts and to the Cure Amounts, and any and all objections thereto shall be deemed forever released and waived.

**Notice**

10.     Within three (3) business days after entry of this Order (the "Mailing Date"), the Debtors shall serve the Motion, the APA, the Bidding Procedures, a copy of the Bidding Procedures Order, and the Sale Notice (attached hereto as **Exhibit 3**), by U.S. first-class mail, postage prepaid, upon: (a) all entities known to have expressed an interest in acquiring any of the Debtors' assets, or otherwise entering into a going concern sale transaction with the Debtors during the past year; (b) the U.S. Trustee; (c) counsel to the Committee; (d) counsel to the Debtors' secured lender, Wells Fargo; (e) counterparties to the Debtors' executory contracts and unexpired leases; (f) all parties who have requested notice in this case; and (g) all parties with whom Imperial has been in contact and who have expressed an interest in potentially making a bid.  Such notice shall be, and is hereby deemed to be, good and sufficient notice of the Auction, the Sale, the Sale Hearing, and the Bid Procedures and requirements applicable thereto.

**Additional Provisions**

11.     This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

12.     The fourteen (14) day stay period established by Bankruptcy Rule 6004(h) is waived, and this Order shall be effective immediately.

**Signed:**_____

_____
**David R. Jones**
**United States Bankruptcy Judge**

7

**<u>Exhibit 1</u>**

**Bidding Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| LOCKWOOD HOLDINGS, INC., *et al.*,[1] | § § | Case No. 18-30197 (DRJ) |
| Debtors. | § § § § | Jointly Administered |

## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be used with respect to a proposed transaction ("Transaction") of: (A)(i) a sale of all or a portion of the assets of Lockwood Holdings, Inc. and its affiliates, the above-captioned debtors and debtors in possession (collectively, "Lockwood" or the "Debtors"), including a sale of real estate only or (ii) a going concern sale (together, a "Sale" or "Sale Transaction"), or (B) a restructuring transaction under a confirmed chapter 11 plan of reorganization (a "Plan Transaction"). The Transaction contemplated by these Bidding Procedures is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court (as defined herein) pursuant to either (x) Sections 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") or (y) a confirmed chapter 11 plan of reorganization.

On June 29, 2018, the Debtors filed their *Expedited Motion Pursuant to Sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006 for Order (A) Approving Comprehensive Sale Process, (B) Approving Bidding Procedures and Certain Bid Protections, (C) Scheduling an Auction and a Sale Hearing, (D) Approving Form and Manner of Notice Related Thereto, (E) Authorizing Sale Free and Clear of all Liens, Claims, Interests, and Encumbrances, (F) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Proposed Cure Amounts with Respect Thereto and (G) Granting Related Relief* [Docket No. ___] (the "Sale Motion"). On _____, 2018, the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") entered its *Order Granting Debtors' Expedited Motion Pursuant to Sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006 for Order (A) Approving Comprehensive Sale Process, (B) Approving Bidding Procedures and Certain Bid Protections, (C) Scheduling an Auction and a Sale Hearing, (D) Approving Form and Manner of Notice Related Thereto, (E) Authorizing Sale Free and Clear of all Liens, Claims, Interests, and Encumbrances, (F) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Proposed Cure Amounts with Respect*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Lockwood Holdings, Inc. (9726); LH Aviation, LLC (6984); Piping Components, Inc. (0197); Lockwood International, Inc. (8597); LMG Manufacturing, Inc. (9468); Lockwood Enterprises, Inc. (6504); and 7807 Eagle Lane, LLC (7382).

*Thereto and (G) Granting Related Relief* [Docket No. __] (the "Bidding Procedures Order") approving these Bidding Procedures.

The Bidding Procedures set forth herein describe, among other things, the manner in which bidders and bids become "Qualified Bidders" and "Qualified Bids," respectively, the receipt and negotiation of bids received, the conduct of any Auction (as defined herein), the ultimate selection of the Successful Bidder (as defined herein) and the Bankruptcy Court's approval thereof (collectively, the "Bidding Process").

Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Sale Motion.

## I.
## Key Dates

The Debtors have already begun the marketing process and have provided multiple parties with a Confidential Information Memorandum ("CIM"). Before being provided with a copy of the CIM or any other diligence materials, interested parties must sign and return a confidentiality agreement, in a form acceptable to the Debtors in their sole discretion (a "Confidentiality Agreement"). **Requests for a Confidentiality Agreement should be made to Ken Morris of Imperial Capital Advisors, LLC ("Imperial") at 277 Park Avenue, 48th Floor, New York, New York 10172, kmorris@imperialcapital.com.** Once an interested party signs and returns a Confidentiality Agreement, it will receive a copy of the CIM as well as access to an electronic data room. Further diligence information is set forth in Section VIII, below. In addition, **questions about Real Estate (defined below) should be directed to either or both of the following: Harold Bordwin, Keen-Summit Capital Advisors LLC ("Keen") at 555 Madison Ave, 5th Floor, New York, NY 10022, hbordwin@keen-summit.com, and/or Matt Bordwin at 1 Huntington Quadrangle. Suite 2C04, Melville, NY 11747, mbordwin@keen-summit.com.[2]**

The deadlines and target dates from the CIM, and the other deadlines set forth in these Bidding Procedures, are as follows:[3]

---

[2] Keen has been retained as the Debtors' exclusive broker for the following parcels of real estate (collectively, the "Real Estate"): (i) 182 Turbo Dr., Strathcona County, Alberta, Canada; (ii) 499 Gladwish Drive, Sarnia, Ontario, Canada; and (iii) 66.79 acres at the south-east corner of Beltway 8 and South Lake Houston Parkway, Houston, TX. Parties may, however, bid on any or all of the real estate owned by the Debtors, whether being marketed by Keen or otherwise.

[3] Not all of the deadlines in the CIM are set forth above, as some are being displaced by the dates set forth in these Bidding Procedures and some have already passed.

| Indications of interest [CIM]: | June 13, 2018 |
|---|---|
| Bid Deadline: | August 10, 2018 at 4:00 p.m. (CT) |
| Notifications to Qualified Bidders: | August 13, 2018 |
| Return of Deposits to non-Qualified Bidders: | Before August 15, 2018 |
| Auction: | August 15, 2018 |
| Deadline to object to Sale: | August 17, 2018 |
| Deadline to file Cure Notice: | August 17, 2018 |
| Sale Hearing: | August 20, 2018 at 2:00 p.m. (CT)[4] |
| Deadline to object to assumption and assignment of the Assumed Contracts, to the Cure Notice, and any Cure Amount: | August 24, 2018 |

## II.
## Sale of Assets or Going Concern Transaction

The Debtors are entertaining bids for (A)(i) a going concern transaction, (ii) a sale of all or substantially all of their assets, and (iii) a sale of such smaller portion of the Debtors' assets as may be subject to a purchase agreement and as may be bid upon at Auction; and (B) a Plan Transaction.  The Debtors may enter into one Transaction or several Transactions with multiple parties, depending upon the bids received.

In addition, (i) the Successful Bidder(s) in any Sale Transaction shall assume the assumed liabilities as may be set forth in any purchase agreement and (ii) the Debtors shall assume and assign the assumed contracts to such Successful Bidder(s), as may be set forth in any purchase agreement(s) accepted by the Debtors.

## III.
## "As Is, Where Is"

Any Transaction(s) entered into by the Debtors shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents, or estates, except as may be set forth in a purchase agreement(s) with a Successful Bidder(s) or chapter 11 plan, approved by the Bankruptcy Court.

---

[4] If the Debtors ultimately decide to pursue a Plan Transaction, the Sale Hearing will be cancelled, and the Debtors will promptly file a chapter 11 plan and pursue confirmation thereof.

## IV.
## Free of Any and All Claims and Interests

Any Transaction entered into by the Debtors shall be free and clear of all liens, claims, interests, and encumbrances (collectively, the "Claims and Interests"), with such Claims and Interests to attach to the net proceeds of the sale.

## V.
## Participation and Bid Requirements

Any person or entity who wishes to participate in the Bidding Process (a "Potential Bidder") must become a Qualified Bidder.  As a prerequisite to becoming a Qualified Bidder, a Potential Bidder must deliver the following documents to the Debtors, Wells Fargo Bank, N.A. (as prepetition and DIP financing agent) ("Wells Fargo"), Imperial, Keen, and the Official Committee of Unsecured Creditors (the "Committee"), at the addresses set forth below, no later than the Bid Deadline (as defined below), in a form and substance acceptable to the Debtors and their advisors (the "Required Bid Documents"):

(a)      Evidence of the Potential Bidder's financial ability to close a Transaction, in a form and substance acceptable to the Debtors in their sole discretion in consultation with Wells Fargo and the Committee.  Such evidence may take the form of, among other things, current audited financial statements, bank statements, evidence of a non-contingent financing commitment, or such other documentation as the Debtors may accept in their sole discretion;

(b)      A letter stating that the Potential Bidder's offer is irrevocable until immediately following the closing of the Sale or confirmation of a chapter 11 plan, as applicable, and setting forth (i) the nature of the proposed Transaction, and if a Sale Transaction, whether such is a going concern or asset sale, which specifically identifies the assets or groups of assets to be purchased, and which includes the proposed consideration and the liabilities (if any) to be assumed, (ii) any assets expected to be excluded from the Sale, and (iii) the structure and financing of the Transaction (including, but not limited to, the sources of financing);

(c)      If a Sale Transaction, a binding, executed, and definitive copy of the form Asset Purchase Agreement attached to the Sale Motion (the "APA"), together with all schedules marked to show changes to the APA and schedules that the Potential Bidder proposes (a "Marked APA"), including the purchase price in U.S. dollars for each asset or group of assets subject to the applicable bid, and a specific allocation of consideration among the groups of assets being bid upon (all asset bids must also contain an allocation);

(d)      If a Plan Transaction, an executed binding term sheet (the "Term Sheet"), together with such additional information as may be necessary to fully describe the elements of the proposed Plan Transaction, including the consideration to be paid;

4

(e)      A good faith earnest money cash deposit (the "Deposit") in an amount equal 20% of the total purchase price of the proposed Transaction; *provided, however,* that if the Transaction is limited to the sale of real estate only, the Deposit shall be 10% of the purchase price;

(f)      Evidence of corporate authority to enter into the Transaction;

(g)      An executed Confidentiality Agreement; and

(h)      Any additional information reasonably requested by the Debtors.

## VI.
## Qualified Bidders and Qualified Bids

A Potential Bidder (i) who delivers the documents described in Section V above, (ii) whose financial information and credit-quality support or enhancement demonstrate the financial capability of such Potential Bidder to consummate the Transaction if selected as the Successful Bidder, (iii) who the Debtors determine is likely (based on availability of financing, experience, and other considerations) to be able to consummate the Transaction within the time frame provided by the APA or otherwise applicable in the above-captioned chapter 11 cases (the "Cases"), and (iv) whose bid constitutes a "**Qualified Bid**" pursuant to these Bidding Procedures, shall be deemed a "**Qualified Bidder**."  The Debtors will determine whether a Potential Bidder is a Qualified Bidder after such consultation with Wells Fargo and the Committee.  By August 13, 2018, the Debtors will notify Potential Bidders if they are Qualified Bidders, and will provide copies of all Qualified Bids to counsel to Wells Fargo and the Committee.  Wells Fargo is deemed to be a Qualified Bidder.

A bid will be deemed a "Qualified Bid" and considered by the Debtors only if the bid:

(a)      is on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to the Debtors than, those contained in the APA;

(b)      contains no contingencies of any type, other than Bankruptcy Court approval of the Transaction;

(c)      other than any Stalking Horse Bid(s) that may be designated by the Debtors, is not conditioned upon any bid protections (such as a topping fee, termination fee, expense reimbursement, or similar type of payment);

(d)      contains an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Debtors and their assets and businesses prior to making its offer, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the businesses and assets of the Debtors in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Debtors' businesses or assets, or the

completeness of any information provided in connection therewith or the Auction, except as expressly stated in the APA, the Marked APA or the Term Sheet;

(e)      includes a list of assumed contracts and assumed liabilities (if any), and a commitment to consummate the Transaction and the assumption of the assumed liabilities (if any) within not more than ten (10) days after entry of an order by the Bankruptcy Court approving such Transaction;

(f)      discloses (i) the identity of the Potential Bidder and each entity participating in connection with the Potential Bidder and the complete terms of such participation, and (ii) any other term sheets and other written or oral understandings between the Potential Bidder and its affiliates on one hand, and any insider (as defined in section 101(31) of the Bankruptcy Code) of the Debtors, on the other; and

(g)      is received by the Bid Deadline.

***All bids for a Transaction must contemplate payment in cash, in full, upon the closing of the Transaction, unless the Debtors agree otherwise, after consultation with Wells Fargo and the Committee.***  Any bid that is not for cash, and does not otherwise comply with the above requirements, shall not be deemed to be a Qualified Bid.

Notwithstanding the foregoing, the Debtors shall have the right, in their sole and absolute discretion, after consultation with Wells Fargo and the Committee, to entertain bids that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids.  A Qualified Bid will be valued, among other things, based upon factors such as the net value provided by such bid, the likelihood and timing of consummating the Transaction in question, and any other factors that the Debtors may deem relevant to the Transaction.  Wells Fargo is entitled to participate in any Auction as a Qualified Bidder pursuant and subject to the terms and provisions of these Bidding Procedures.

Between the times the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by the Qualified Bid, or otherwise enhance the terms of the Qualified Bid.

The Debtors reserve the right to cancel, and not conduct, the Auction (as defined below) if the Debtors do not receive any Qualified Bids by the Bid Deadline.  In such event, the Debtors will file a Notice of No Auction with the Bankruptcy Court.

By submitting a bid, a Potential Bidder warrants and represents that it is a principal acting on its own behalf, and not as a broker, finder or agent acting on another's behalf.  Such Potential Bidder acknowledges that it will not look to the Debtors, Imperial, or Keen for the payment of any fee or commission.  In addition, the Potential Bidder agrees to be responsible for the payment of any fee, commission, or other compensation payable to any broker, finder, or agent who alleges it

6

has dealt with or through the Potential Bidder.  By submitting a bid, a Potential Bidder will be deemed to indemnify, defend, and hold harmless the Debtors, Imperial, and Keen from and against any and all claims, damages, losses and liabilities, costs, and expenses (including reasonable attorneys' fees and disbursements) arising out of any claim or claims by any broker, finder, or similar agent for commissions, fees, or other compensation who allege that they have dealt with the Debtors, Imperial, and/or Keen in connection with the Transaction.

## VII.
## Bid Deadline and Bid Recipients

A Qualified Bidder (other than a potential Stalking Horse and Wells Fargo) who desires to make a bid shall deliver written copies of its bid to each of the following, no later than 4:00 p.m. Central Time on August 10, 2018 (the "Bid Deadline"):

1. **Debtors' Counsel:**

| | | |
|---|---|---|
| Gray Reed & McGraw LLP | | Gray Reed & McGraw LLP |
| 1300 Post Oak Boulevard | | 1601 Elm Street |
| Suite 2000 | | Suite 4600 |
| Houston, Texas 77056 | -and- | Dallas, Texas 75201 |
| Attn.: Jason S. Brookner | | Attn.: Amber M. Carson |
| Email: jbrookner@grayreed.com | | Email: acarson@grayreed.com |

2. **Debtors' Investment Banker and Real Estate Advisor:**

| | |
|---|---|
| Imperial Capital | Keen-Summit Capital Advisors LLC |
| 277 Park Avenue, 48th Floor | 555 Madison Ave, 5th Floor |
| New York, New York 10172 | New York, NY 10022 |
| Attn: Ken Morris, Managing Director | Attn: Harold Bordwin, Managing Director |
| Email:  kmorris@imperialcapital.com | Email: hbordwin@keen-summit.com |
| | |
| | -and- |
| | |
| | 1 Huntington Quadrangle |
| | Suite 2C04 |
| | Melville, NY 11747 |
| | Attn: Matt Bordwin, Managing Director |
| | Email: mbordwin@keen-summit.com |

3. **Debtors' Chief Restructuring Officer:**

GlassRatner Advisory and Capital Group
3500 Maple Avenue
Suite 350
Dallas, Texas 75219
Attn: Mark Shapiro
Email: mshapiro@glassratner.com

**4.**     **Counsel to Wells Fargo:**

Winstead PC                                   Winstead PC
500 Winstead Building                 600 Travis Street
2728 N. Harwood Street             Suite 5200
Dallas, Texas 75201                     Houston, Texas 77002
Attn: Rakhee V. Patel                  Attn: Sean B. Davis
Email: rpatel@winstead.com      Email: sdavis@winstead.com

**5.**     **Counsel to the Official Committee of Unsecured Creditors:**

McKool Smith
600 Travis Street
Suite 7000
Houston, Texas 77002
Attn: Christopher D. Johnson
Email: cjohnson@mckoolsmith.com

**VIII.**
**Due Diligence**

Following execution of a Confidentiality Agreement, the Debtors shall afford each interested party an opportunity to perform due diligence with respect to their businesses and assets. Due diligence access may include management presentations as may be scheduled by the Debtors, on-site inspections, and such other matters which an interested party may reasonably request and as to which the Debtors, in their sole discretion, may agree.  The Debtors shall designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from interested parties.  No due diligence shall continue after the Bid Deadline.  The Debtors may, in their discretion, coordinate diligence efforts such that multiple interested parties have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.

**All diligence requests (other than with respect to Real Estate) should be made to Ken Morris of Imperial at 277 Park Avenue, 48th Floor, New York, New York 10172, kmorris@imperialcapital.com.**

**All diligence requests with respect to Real Estate should be made to Chris Mahoney and Heather Milazzo of Keen, cmahoney@keen-summit.com and hmilazzo@keen-summit.com, respectively, and by phone at (646) 381-9222.**

Each Qualified Bidder shall be deemed to acknowledge and represent that (i) it has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and assets prior to making its offer, (ii) it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the business and assets in making its bid, (iii) it did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business or

8

assets, or the completeness of any information provided in connection therewith, the Bidding Process or the Auction (as defined herein), except, as to any Stalking Horse, as expressly stated in the APA, and as to a Successful Bidder other than a potential Stalking Horse, as expressly stated in the definitive agreement with such Successful Bidder approved by the Bankruptcy Court, and (iv) that it has not engaged and will not engage in collusion in connection with the bidding process at any time.

## IX.
## Stalking Horse Declaration and Break-Up Fee

Following entry of the Bidding Procedures Order, and in the exercise of their business judgment and in their sole and absolute discretion, the Debtors may, without any obligation to do so after consulting with the Committee and Wells Fargo, select one or more bidders to act as a stalking horse (each being a "Stalking Horse Bidder" with the relevant bid being a "Stalking Horse Bid").  The Debtors may, but are not required to incur and pay a break-up fee in an amount not to exceed 3% of the cash component of the Stalking Horse Bid (the "Break-Up Fee"); *provided that* the Break-Up Fee shall only be paid pursuant to the terms of an order approving a Sale Transaction or a confirmation order approving a Plan Transaction, as applicable.  The Break-Up Fee shall only be payable if (i) a Stalking Horse Bidder, being ready, willing, and able to close its Transaction is not the Successful Bidder at the Auction, (ii) the Bankruptcy Court authorizes the Debtors to enter into an alternative Transaction, and (iii)(A) if such alternative Transaction is a Sale Transaction, such Sale Transaction actually closes or (B) if such alternative Transaction is a Plan Transaction, a disclosure statement is approved by the Court.

To the extent a determination is made to provide a Break-Up Fee, the Debtors will file notice of the same with the Bankruptcy Court, and such Break-Up Fee may be paid without further action or order of the Bankruptcy Court.

## X.
## Auction

If the Debtors receive more than one Qualified Bid, an auction (the "Auction") will be conducted, upon notice to all Qualified Bidders who have submitted Qualified Bids, at 10:00 a.m. Central Time on August 15, 2018, at the offices of Gray Reed & McGraw LLP, 1300 Post Oak Boulevard, Suite 2000, Houston Texas 77056, in accordance with the following procedures:

(a)     Only the following persons shall be entitled to attend the Auction: (i) professionals and principals or members of the Debtors, (ii) Imperial, (iii) Keen, (iv) counsel to, and business persons from, Wells Fargo, (v) counsel to the Committee and its financial advisor, and a Committee representative, (vi) the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), and (vii) professionals and principals or members of any Qualified Bidder who has timely submitted a Qualified Bid (collectively, the "Participating Parties").  Only Qualified Bidders will be entitled to make any Subsequent Bids (as defined below) at the Auction.

(b)     At the commencement of the Auction, Qualified Bidders in attendance will be

9

informed of which Qualified Bid or combination of Qualified Bids the Debtors believe is the highest or otherwise best offer(s), and from which bidding will begin.

(c)     All Participating Parties shall be entitled to be present for all Subsequent Bids (as defined below) with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Subsequent Bid shall be fully disclosed to all Participating Parties throughout the entire Auction.

(d)     The Debtors may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make Subsequent Bids) for conducting the Auction, *provided that* such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court entered in connection herewith, and after consulting with Wells Fargo and the Committee regarding the same.

(e)     Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids as identified by the Debtors at the onset of the Auction (the "Baseline Bid").  To the extent a Stalking Horse Bidder has been named, the initial overbid must exceed the Baseline Bid by the amount of the Break-Up Fee.  Thereafter, or in the event no Stalking Horse Bidder has been named, the minimum bidding increment (the "Subsequent Bids" and each a "Subsequent Bid") shall be $350,000.00 (which increments may be increased or decreased by the Debtors, in their sole discretion, in consultation with Wells Fargo and the Committee, depending on the nature of the Transactions presented).  The Auction shall continue in one or more rounds of bidding and shall conclude after each Participating Party has had the opportunity to submit one or more additional Subsequent Bids with full knowledge and written confirmation of the then-existing highest bid or bids.

The Debtors reserve the right, in the exercise of their business judgment in consultation with Wells Fargo and the Committee, to adjourn the Auction at one or more times to, among other things (i) facilitate discussions among the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) allow Qualified Bidders the opportunity to provide the Debtors with such additional information or evidence, as the Debtors may require in the exercise of their business judgment, that the Qualified Bidder has sufficient resources and sufficient non-contingent debt and/or equity funding commitments to consummate the Transaction at the then-prevailing Subsequent Bid amount.

The Debtors shall maintain a transcript of the proceedings at the Auction, including the Baseline Bid, all Subsequent Bids, and the Successful Bid (as defined below).

## XI.
## Closing of Auction and Selection of Successful Bid

The Auction shall continue until there is only one bid that the Debtors determine, in their sole and absolute discretion and business judgment, after consultation with Wells Fargo and the Committee, is the highest or otherwise best Qualified Bid for a Transaction or multiple

Transactions, after taking into account factors such as the speed and certainty of consummating the transaction (such bid being the "Successful Bid" and the bidder making such bid, the "Successful Bidder").

All bidders will be deemed to have consented to the core and exclusive jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any and all disputes relating to, arising from, or connected with the Auction, the marketing process, the Transaction, and the construction and enforcement of any purchase agreement.

## XII.
## Back-Up Bidder

If there is an Auction, the Qualified Bidder that submits the second highest Bid at the Auction shall be required to serve as the back-up bidder (the "Back-Up Bidder") and keep such Back-Up Bidder's last Bid (the "Back-Up Bid") open and irrevocable until the earlier of (i) (A) if a Sale Transaction, 5:00 p.m. Central Time on the date which is thirty (30) days after the date of the Sale Hearing or (B) if a Plan Transaction, the entry of an order approving a disclosure statement for a chapter 11 plan (the "Disclosure Statement Approval Date"), and (ii) the closing of the Transaction with the Successful Bidder (the "Outside Back-Up Date").  If, (x) after the Sale Hearing but prior to the Outside Back-Up Date for a Sale Transaction or (y) after the conclusion of the Auction but prior to the Outside Back-up Date for a Plan Transaction, the Successful Bidder fails to consummate or proceed with the relevant Transaction because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to have the new Successful Bid, and the Debtors will be authorized, without further order of the Bankruptcy Court, to consummate the Transaction with the Back-Up Bidder.  The Debtors will provide notice to the Committee and Wells Fargo of any failure by the Successful Bidder to close the Transaction and the election to proceed to close a Transaction with the Back-Up Bidder.

## XIII.
## Right to Credit Bid

Any creditor that has a valid, perfected, unavoidable, and enforceable security interest (a "Security Interest") in the Debtors' assets (any such creditor, a "Secured Party") may make one or more credit bids for all or any portion of the secured claim(s) held by such Secured Party at the Auction, subject to the requirements of section 363(k) of the Bankruptcy Code (a "Credit Bid"). Wells Fargo shall be permitted to Credit Bid in an amount up to (i) the amount then-outstanding under the terms of that certain *Agreed Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Superpriority Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 359] and the related DIP credit agreement, plus (ii) the amount of Wells Fargo's allowed prepetition secured claim; *provided, however*, that Wells Fargo shall allocate its credit bid among the various loans it holds (and/or for which it is agent) and the collateral securing such loans.

In order to qualify to Credit Bid, a Secured Party must be a Qualified Bidder and a Credit Bid must qualify as a Qualified Bid.  Wells Fargo is deemed to be a Qualified Bidder.

11

## XIV.
## The Sale Hearing and Return of Deposits

In the event one or more Sale Transactions are accepted by the Debtors, a hearing to approve the Sale(s) will take place before the Honorable David R. Jones, Chief United States Bankruptcy Judge, on August 20, 2018 at 2:00 p.m. Central Time, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, 515 Rusk Street, Courtroom 400, Houston, Texas 77002.  The Sale Hearing may be adjourned or rescheduled by the Debtors without notice other than by an announcement made at the Sale Hearing.

The Debtors will not be bound by a Successful Bid for a Sale Transaction or a Back-Up Bid for a Sale Transaction unless and until the Bankruptcy Court has approved the same. Following Bankruptcy Court approval of a Sale Transaction with the Successful Bidder, if the Successful Bidder fails to consummate the Sale Transaction for any reason, then the Back-Up Bidder will be deemed to the Successful Bidder and the Debtors will enter into a Sale Transaction with the Back-Up Bidder on the terms of the Back-Up Bid without any further order of the Bankruptcy Court, and the Debtors may pursue any and all available remedies against the Successful Bidder in connection with its failure to consummate the Sale.

If the Debtors choose to move forward with a Plan Transaction, the Sale Hearing will be cancelled and notice of the same will be filed with the Bankruptcy Court.

The Deposit (together with interest, if any, thereon) of the Back-Up Bidder for a Sale Transaction will not be returned until two (2) business days following the closing of the Sale to the Successful Bidder.  The Deposit (together with interest, if any, thereon) of all other Qualified Bidders will be returned within 48 hours of the Auction concluding. The Deposit of the Successful Bidder (together with interest, if any, thereon) shall be applied against the payment of the Sale Transaction consideration upon the closing of the Sale.  In the event a Bidder fails to close as a result of its own default, its Deposit shall be released to, and retained by, the Debtors.

The Deposit (together with interest, if any, thereon) of the Back-Up Bidder for a Plan Transaction will not be returned until two (2) business days following the Disclosure Statement Approval Date.  The Deposit (together with interest, if any, thereon) of all other Qualified Bidders will be returned within 48 hours of the Auction concluding.  The Deposit of the Successful Bidder for a Plan Transaction (together with interest, if any, thereon) shall be applied against the payment of the Plan Transaction consideration at the time a chapter 11 plan is confirmed.  In the event a Bidder fails to close as a result of its own default, its Deposit shall be released to, and retained by, the Debtors.

Deposits made by Potential Bidders who are not determined to be Qualified Bidders will be returned within three (3) business days after the Bid Deadline.

## XV.
## Reservation of Rights and Fiduciary Obligation

Notwithstanding any term to the contrary herein, the Debtors, in consultation with Wells Fargo and the Committee, reserve the right to: (i) modify the Bidding Procedures at any time; (ii) determine which Qualified Bid, if any, is the highest or otherwise best offer; (iii) reject at any time, any bid that is: (a) inadequate or insufficient (in the Debtors' sole and absolute discretion); (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the APA; or (c) contrary to the best interests of the Debtors, their estates, and creditors as determined by the Debtors in their sole discretion; and (iv) pursue a sale or other transaction through a chapter 11 plan.

Nothing in these Bidding Procedures shall require the Debtors, the Debtors' Chief Restructuring Offer, the board of directors or similar governing body of any of the Debtors, or any individual board member or officer of any of the Debtors to take any action, or to refrain from taking any action, with respect to these Bidding Procedures or the Auction, to the extent such persons or entities determine, on the advice of counsel, that taking or refraining from taking such action, is required to comply with applicable law or its fiduciary obligations.

**Exhibit 2**

**Asset Purchase Agreement**

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is entered into this ___ day of ___, 2018 by and between _____, a _____ ("Buyer"), and _____, a _____ ("Seller").  Buyer and Seller are each referred to herein individually as a "Party," and collectively as the "Parties."

RECITALS:

A.      Seller is engaged in the business of manufacturing and distributing pipe, valves, fittings and flanges, primarily in the petrochemical, oil and gas, and construction industries (the "Business").

B.      On January 18, 2018 (the "First Petition Date"), Lockwood Holdings, Inc., LH Aviation, LLC and Piping Components, Inc. filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On January 24, 2018 (the "Second Petition Date," and together with January 18, 2018 the "Petition Dates"), Lockwood International, Inc., Lockwood Enterprises, Inc., LMG Manufacturing, Inc., and 7807 Eagle Lane, LLC filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code On April 29, 2015.  All of the chapter 11 referenced chapter 11 cases are pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, and are being jointly administered under Case No. 18-30197 (DRJ) (the "Chapter 11 Case").

C.      The Parties desire that Buyer acquire and purchase from Seller, and that Seller sell, convey transfer and assign to Buyer, certain assets of Seller used in the operation of the Business, on the terms and conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the premises and of their mutual covenants and agreements set forth in this Agreement, the Parties do hereby agree as follows:

ARTICLE I.

DEFINITIONS AND INTERPRETATION

1.1     Definitions.

Accounting terms used and not otherwise defined herein shall have the meanings given to them under GAAP.  When used in this Agreement, the following terms in all of their tenses and cases shall have the meanings assigned to them below or elsewhere in this Agreement as indicated below:

"Acquisition Proposal" means a proposal relating to disposition of the Purchased Assets pursuant to one or more transactions.

1

"Affiliate" of any Person means any Person directly or indirectly controlling, controlled by or under common control with any such Person and any shareholder, officer or director of such Person.

"Agreement" is defined in the Preamble.

"Allocation" is defined in Section 3.3.

"Alternative Transaction" means (a) a transaction contemplated by an Acquisition Proposal from a third party, or (b) a plan of reorganization of Seller not involving the sale of the Purchased Assets to Buyer.

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement executed by Buyer and Seller, substantially in the form attached hereto as Exhibit B.

"Bankruptcy Code" means title 11 of the United States Code, as amended, 11 U.S.C. §§ 101, *et. seq.*

"Bankruptcy Court" means the United States Bankruptcy court for the Southern Distreict of Texas, Houston Division, or such other court exercising competent jurisdiction over the Chapter 11 Case involving Seller.

"Bid Procedures Order" means the Bankruptcy Court's [*insert full and correct name of BP Order*] [Docket No. ---], signed on _____, 2018.

"Bill of Sale" means a Bill of Sale executed by Seller, substantially in the form attached hereto as Exhibit A.

"Business" is defined in the Recitals.

"Buyer" is defined in the Preamble.

"Cash Deposit" is defined in Section 3.2(a).

"Chapter 11 Case" is defined in the Recitals.

"Closing" and "Closing Date" are defined in Section 8.1.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Contemplated Transactions" means all of the transactions contemplated by this Agreement.

2

"Contract" means any written commitment, understanding, instrument, lease, pledge, mortgage, indenture, license, agreement, purchase or sale order, contract, promise or similar arrangement evidencing or creating any legally binding obligation.

"GAAP" means generally accepted accounting principles, as in effect in the United States from time to time and consistently applied.

"Governmental Authority" means any foreign, federal, state, regional or local authority, agency, body, court or instrumentality, regulatory or otherwise, which, in whole or in part, was formed by or operates under the auspices of any foreign, federal, state, regional or local government.

"Law" means any federal, state, regional, local or foreign law, rule, statute, ordinance, rule, Order or regulation.

"Lien" means any lien, charge, covenant, condition, easement, adverse claim, demand, encumbrance, limitation, security interest, option, pledge, or any other title defect or restriction of any kind.

"Order" shall mean any order, judgment, injunction, award, decree or writ of any Governmental Authority.

"Party" and "Parties" are defined in the Preamble.

"Periodic Taxes" is defined in Section 9.3.

"Person" means any individual, corporation, partnership, limited liability company, association or any other entity or organization.

"Proration Periods" is defined in Section 9.3.

"Purchase Price" is defined in Section 3.1.

"Purchased Assets" is defined in Section 2.1.

"Sale Date" means the date that the Sale Order is entered by the Bankruptcy Court.

"Sale Order" means the order of the Bankruptcy Court, in form and substance reasonably satisfactory to Buyer and Seller, to be issued by the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code (a) approving this Agreement and the Contemplated Transactions, (b) approving the sale of the Purchased Assets to Buyer free and clear of all liens, claims and encumbrances pursuant to Section 363(f) of the Bankruptcy Code, (c) approving the assumption and assignment to Buyer of any Assumed Liabilities and (d) finding that Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code.

3

"Seller" is defined in the Preamble.

"Settlement Statement" is defined in Section 3.3.

"Tax" means any tax, charge or assessment by or liability to any Governmental Authority, including, but not limited to, any deficiency, interest or penalty.

"Tax Returns" means any return, report or declaration filed with or submitted to any Governmental Authority in connection with the assessment, collection or payment of any Tax.

"Termination Fee" is defined in Section 8.3(d).

"Transaction Taxes" is defined in Section 9.2.

1.2     Interpretation.   When a reference is made in this Agreement to a Section, Schedule or Exhibit, such reference shall be to a Section, Schedule or Exhibit of this Agreement unless otherwise indicated.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  Whenever the words "included," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the phrase "without limitation."  When used in this Agreement, the word "primarily" shall be deemed to be followed by the phrase "or exclusively."  Unless otherwise indicated, all references to dollars refer to United States dollars.  The Parties acknowledge that both Parties have participated in the drafting and preparation of this Agreement and agree that any rule of construction to the effect that ambiguities are to be construed against the drafting party shall not be applied to the construction or interpretation of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

2.1     Purchased Assets.   Subject to the terms and conditions of this Agreement and pursuant to Section 363 of the Bankruptcy Code, effective as of the Closing, Seller shall sell, convey, transfer, assign and deliver to Buyer, free and clear of all Liens, and Buyer shall purchase, all right, title and interest in and to the assets of Seller described on Schedule 2.1 hereto (collectively, the "Purchased Assets").

2.2     Assumed Contracts.   Subject to the terms and conditions of this Agreement, effective as of the Closing, Seller shall assign all of its rights, and Buyer shall assume all of Seller's obligations, under the contracts listed on Schedule 2.2 hereto (the "Assumed Liabilities").

2.3     Retained Assets.   Notwithstanding anything to the contrary in this Agreement, Seller shall not sell, convey, transfer, assign or deliver, and Buyer shall not purchase or acquire any assets of Seller other than the Purchased Assets.

4

2.4     Deemed Consents and Cures.  For all purposes of this Agreement (including all representations and warranties of Seller contained herein), Seller shall be deemed to have obtained all required consents, as applicable, in respect of the assignment of any Purchased Asset and to have cured all defaults thereunder if, and to the extent that, pursuant to the Sale Order, Seller is authorized to assign any Purchased Assets to Buyer pursuant to Section 365 of the Bankruptcy Code.

ARTICLE III

CONSIDERATION

3.1     Purchase Price.  The total consideration to be paid by Buyer to Seller for the Purchased Assets is (a) $_____ (the "Purchase Price") and (b) the assumption by Buyer of the Assumed Liabilities.  Prior to or on the Closing Date, Buyer and Seller shall jointly conduct a reconciliation of the existence of the Purchased Assets.  To the extent any Purchased Asset is not available to be conveyed to Buyer on the Closing Date, the Purchase Price shall be adjusted pursuant to the procedures set forth on Schedule 3.1; provided, however, that no adjustment shall be made due to the condition of any of the Purchased Assets.  Notwithstanding anything herein to the contrary, in no event shall any adjustment result in the Purchase Price attributable to any category or item of Purchased Assets being zero, or less.

3.2     Payment.  Buyer shall pay the Purchase Price to Seller as follows:

(a)     The cash deposit required by the Bid Procedures Order in the amount of $_____ (the "Cash Deposit") is to be held by Seller against payment of the Purchase Price and as security for the performance by Buyer of its obligations under this Agreement.  The Cash Deposit shall be applied to the Purchase Price as set forth in Section 6.2.4 hereof.

(b)     The Purchase Price, as it may be adjusted, less the Cash Deposit, will be paid at the Closing by wire transfer of immediately available funds.

3.3     Settlement Statement; Allocation of Purchase Price.  Prior to or on the Closing Date, the Parties shall agree upon a settlement statement setting forth the calculation of the Purchase Price as of the Sale Date (the "Settlement Statement").  Prior to or on the Closing Date, the Parties shall agree to the allocation of the appropriate portions of the Purchase Price, Assumed Liabilities and other relevant items among the Purchased Assets, in accordance with Code Section 1060 and the Treasury regulations promulgated thereunder and any comparable provisions of state or local law, as appropriate (the "Allocation"), which Allocation shall be binding upon the Parties and which will be attached to this Agreement as Schedule 3.3.  The Parties and their respective Affiliates shall report, act and file Tax Returns (including, but not limited to Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such Allocation.  Each Party shall furnish the other Party with such cooperation and existing information as is reasonably requested by the other Party in connection with the preparation of

5

the Allocation described in this Section 3.3. The Parties covenant and agree that (a) neither Buyer nor Seller shall assert that this Section 3.3 was not separately bargained for at arm's length and in good faith, and (b) neither Buyer nor Seller will take any position before any Governmental Authority, in any judicial proceeding, or in any Tax Return that is in any way inconsistent with such Allocation unless otherwise required by Law.

3.4     Alternative Transaction Provisions.  Seller shall be entitled to consider proposals for Alternative Transactions from third parties consistent with its fiduciary obligations as a debtor in possession in the Chapter 11 Case.

3.5     Risk of Loss.  Notwithstanding anything to the contrary herein, Buyer shall assume all risk of loss with respect to the Purchased Assets and shall become fully obligated with respect to the Assumed Liabilities on and as of the Sale Date.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows:

4.1     Organization and Power of Seller.  Seller is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Texas.  Seller has requisite corporate power to:  (a) own, lease and operate the Purchased Assets and carry on the Business as and where such assets are now owned or leased and as the Business is presently being conducted; and (b) execute, deliver and perform this Agreement and all other agreements and documents to be executed and delivered by it in connection herewith, subject to and after giving effect to the approval of the Bankruptcy Court (including satisfying any conditions imposed by the Bankruptcy Court) and compliance with all requirements of the Bankruptcy Code.

4.2     Enforceability.  All requisite corporate action to approve, execute, deliver and perform this Agreement has been taken by Seller.  This Agreement and each other agreement and document delivered by Seller in connection herewith have been duly executed and delivered by Seller, subject to entry of the Sale Order by the Bankruptcy Court, constitute the binding obligation of Seller, enforceable in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, and other laws affecting creditors' rights generally and by principles of equity.

4.3     No Implied or Other Representations or Warranties.  EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, IT IS THE EXPLICIT INTENT OF EACH PARTY HERETO THAT SELLER AND ANY OF ITS AFFILIATES ARE NOT MAKING ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, BEYOND THOSE EXPRESSLY GIVEN IN THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OR REPRESENTATION AS TO CONDITION, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE AS TO ANY OF THE ASSETS, AND IT IS UNDERSTOOD THAT EXCEPT AS EXPRESSLY

6

STATED IN THIS AGREEMENT, BUYER TAKES ALL OF SUCH PROPERTIES AND ASSETS ON AN "AS IS" AND "WHERE IS" BASIS.

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

5.1     Organization and Power.  Buyer is a _____ duly organized, validly existing and in good standing under the laws of the State of _____.  Buyer has full power to execute, deliver and perform this Agreement and all other agreements and documents to be executed and delivered by it in connection herewith.

5.2     Enforceability.  All requisite action to approve, execute, deliver and perform this Agreement and each other agreement and document delivered by Buyer in connection herewith has been taken by Buyer.  This Agreement and each other agreement and document delivered by Buyer in connection herewith have been duly executed and delivered by Buyer and constitute the binding obligations of Buyer enforceable in accordance with their respective terms.

5.3     Consents.  Except for the approval of the Bankruptcy Court, no approval or consent of, or filing with, any Person or Governmental Authority is required in connection with the transactions contemplated hereby or the execution, delivery or performance by Buyer of this Agreement or any other agreement or document delivered by or on behalf of Buyer in connection herewith.

5.4     No Conflicts.  No action taken by or on behalf of Buyer in connection herewith, including, but not limited to, the execution, delivery and performance of this Agreement, and each other agreement and document delivered by it in connection herewith, and consummation of the Contemplated Transactions, (a) gives rise to a right of termination or acceleration under any Contract to which Buyer is a party or by which Buyer is bound; (b) conflicts with or violates (i) any Law; (ii) Buyer's organizational documents; or (iii) any Order to which Buyer is subject; or (c) constitutes an event which, after notice or lapse of time or both, could result in any of the foregoing.

5.5     Litigation.  Except for the required approval of the Bankruptcy Court to the consummation of the Contemplated Transactions, no litigation or administrative proceeding is pending, or to the knowledge of Buyer, threatened against Buyer which could prevent Buyer from entering into, or performing its obligations under, this Agreement.

5.6     Brokers or Finders.  Except as set forth on Schedule 5.6, no Person is or will become entitled, by reason of any agreement or arrangement entered into or made by or on behalf of Buyer to receive any commission, brokerage, finder's fee or other similar compensation arrangement in connection with the consummation of the Contemplated Transactions.

5.7     Financing.  Buyer has adequate financing from internally-generated sources and has adequate cash on hand, or will obtain adequate financing on or prior to the Sale Date, and will continue to have adequate financing on the Closing Date, to enable it to fulfill its obligations under this Agreement.  Buyer acknowledges and agrees that Buyer's obligations under this agreement are not contingent on obtaining adequate financing.

5.8     Buyer's Investigation.  Buyer represents that it is a sophisticated entity that was advised by knowledgeable counsel and financial advisors and hereby acknowledges that it has conducted an investigation of the Purchased Assets.  Notwithstanding anything in this Agreement to the contrary, Buyer acknowledges that it is accepting the Purchased Assets in their present condition and locations and with their present operating capabilities.  Buyer acknowledges that Seller make no warranty, express or implied, as to the condition of the Purchased Assets except as expressly set forth in this Agreement.  Buyer has not relied upon, and Seller shall not be liable for or bound in any manner by, any express or implied verbal or written information, warranties, guarantees, promises, statements, inducements, representations or opinions pertaining to the Business or the Purchased Assets, except as may be contained in this Agreement.  Buyer has inspected, or waived its right to inspect, the Purchased Assets for all purposes and satisfied itself as to their condition.  Buyer is relying solely upon its own inspection of the Purchased Assets, and Buyer shall accept all of the same in their as is, where is, condition.  Buyer acknowledges that the representations and warranties of Seller contained in this Agreement constitute the sole and exclusive representations and warranties of Seller to Buyer in connection with this Agreement and the Contemplated Transactions, and Buyer acknowledges that all other representations and warranties are specifically disclaimed and may not be relied upon or serve as a basis for a claim against Seller or its Affiliates.

ARTICLE VI

CONDITIONS TO CLOSING

6.1     Conditions to Buyer's Obligations.  The obligation of Buyer to consummate the Contemplated Transactions on the Closing Date is subject to the fulfillment on or prior to the Sale Date of the following conditions, any one or more of which may be waived by Buyer:

6.1.1     Representations and Covenants.     Each of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the Sale Date with the same effect as though made on the Sale Date.  Seller shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Seller on or prior to the Sale Date.  Seller shall have delivered to Buyer a certificate, dated the Sale Date and signed by an authorized officer of Seller, to the foregoing effect and stating that all conditions to Buyer's obligations hereunder, to the extent required to be performed by Seller, have been satisfied or waived.

8

6.1.2    No Orders.  On the Sale Date, there shall be no Order of any nature which directs that the Contemplated Transactions, in whole or in part, not be consummated.

6.1.3    Bankruptcy Court Approval.  The Sale Order shall have been entered by the Bankruptcy Court, and such order shall be in form and substance reasonably satisfactory to Buyer.  At a minimum, the Sale Order shall (a) provide that the Purchased Assets are being sold to Buyer free and clear of all liens, claims and encumbrances pursuant to Section 363(f) of the Bankruptcy Code, and (b) find that Buyer is a good faith purchaser entitled to the protection of Section 363(m) of the Bankruptcy Code.

6.1.4    Closing Deliveries. Seller shall have delivered, or caused to be delivered, to Buyer the following documents, duly executed by Seller (where appropriate):

(a)    Transfer Instruments.  The Bill of Sale, the Assignment and Assumption Agreement, and such other transfer instruments in form and substance reasonably satisfactory to Buyer and signed by Seller, as shall be required to enable Buyer to acquire the Purchased Assets and cause Buyer to assume the Assumed Liabilities;

(b)    Officer's Certificate.  The officer's certificates contemplated by Section 6.1.1;

(c)    Sale Order.  A copy of the Sale Order;

(d)    Settlement Statement.  A copy of the Settlement Statement; and

(e)    Other.  Such other document(s) or instruments required to be delivered by Seller to Buyer hereunder.

6.2    Conditions to Seller' Obligations.  The obligation of Seller to consummate the Contemplated Transactions on the Closing Date is subject to the fulfillment on or prior to the Sale Date of the following conditions, any one or more of which may be waived by Seller:

6.2.1    Representations and Covenants.    Each of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on and as of the Sale Date with the same effect as though made on the Sale Date.  Buyer shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Buyer on or prior to the Sale Date.  Buyer shall have delivered to Seller a certificate, dated the Sale Date and signed by an authorized officer of Buyer, to the foregoing effect and stating that all conditions to Seller's obligations hereunder, to the extent required to be performed by Buyer, have been satisfied or waived.

6.2.2    No Orders.  On the Sale Date, there shall be no Order of any nature which directs that the Contemplated Transactions, in whole or in part, not be consummated.

9

6.2.3    <u>Bankruptcy Court Approval</u>.  The Sale Order shall have been entered by the Bankruptcy Court, and such order shall be in form and substance reasonably satisfactory to Buyer and Seller.  At a minimum, the Sale Order shall (a) provide that the Purchased Assets are being sold to Buyer free and clear of all liens, claims and encumbrances pursuant to Section 363(f) of the Bankruptcy Code, and (b) find that Buyer is a good faith purchaser entitled to the protection of Section 363(m) of the Bankruptcy Code.

6.2.4    <u>Purchase Price</u>.  Buyer shall have delivered the Purchase Price to Seller as specified in Article III.  The Cash Deposit shall be applied to such amount at Closing.

6.2.5    <u>Closing Deliveries</u>.  Buyer shall have delivered to, or caused to be delivered, to Seller the following documents, duly executed by Buyer (where appropriate):

(a)    <u>Officer's Certificate</u>.  The officer's certificate contemplated by Section 6.2.1;

(b)    <u>Assignment and Assumption Agreement</u>.  The Assignment and Assumption Agreement; and

(c)    <u>Other</u>.  Each other document required to be delivered by Buyer to Seller hereunder.

ARTICLE VII

<u>COVENANTS</u>

7.1    <u>Effectiveness of Representations and Warranties</u>.  Subject to the restrictions set forth in the Bankruptcy Code or Orders of the Bankruptcy Court, from the date hereof through the Sale Date, Seller shall use its reasonable efforts to conduct the Business in such a manner so that the representations and warranties contained in Article IV shall continue to be true and correct on and as of the Sale Date as if made on and as of the Sale Date.

7.2    <u>Conduct of Business</u>.  Except to the extent required by the Bankruptcy Court, Seller shall not, with respect to the Business, except as otherwise permitted by the Bankruptcy Code or an Order of the Bankruptcy Court:

(a)    permit any of the Purchased Assets to be subjected to any additional Lien, other than Liens that will be released as of the Closing; or

(b)    sell or dispose of any Purchased Assets other than in the ordinary course of the operation of the Business.

7.3    <u>Access</u>.  From the date hereof until the Closing Date, Seller shall provide Buyer and its representatives reasonable access during normal business hours to Seller's personnel,

10

facilities and all books and records and such other information and Persons relating to the Business as Buyer may reasonably request.

7.4     <u>Bankruptcy Filings</u>.  From the date hereof until the Closing Date, Seller shall promptly deliver to Buyer's counsel copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers which relate to or may affect this Agreement or the Purchased Assets that Seller files in the Chapter 11 Case.

7.5     <u>Publicity</u>.  Copies of the text of all public announcements (whether pre-Closing or post-Closing) relating to this Agreement or the Contemplated Transactions will be provided to the other Party prior to public release of the disclosure to be made.

7.6     <u>Expenses</u>.  Except to the extent otherwise specifically provided in this Agreement, each Party shall bear its respective expenses incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives, counsel and accountants.  Buyer shall be solely responsible for all fees and expenses incurred or otherwise payable to all Persons listed on <u>Schedule 5.6</u>.

7.7     <u>Further Assurances</u>.

7.7.1     Seller agrees that, at any time and from time to time after the Closing, it will, upon the request of Buyer, do all such further acts as may be reasonably required to further transfer and assign to Buyer any of the Purchased Assets, or to vest in Buyer good and marketable title to the Purchased Assets.

7.7.2     Buyer agrees that, at any time and from time to time after the Closing, it will, upon the request of Seller, do all such further acts as may be reasonably required to cause Buyer to assume the Assumed Liabilities in accordance with this Agreement and as may otherwise be appropriate to carry out the transactions contemplated by this Agreement.

7.8     <u>Accounts Receivable</u>.  Except to the extent such account receivable constitutes part of the Purchased Assets, if Buyer receives a payment from an account debtor for which there is an outstanding account receivable both before and after the Sale Date, such payment shall be applied to the oldest outstanding invoice(s), the payment of which the account debtor is not disputing.  In the event a customer claims that it is disputing an account receivable, Buyer agrees:  (a) to promptly inform Seller of such dispute and forward to Seller any information or documents it has in connection therewith; and (b) to cooperate reasonably with Seller in its efforts to resolve such dispute in such manner as Seller shall reasonably request in light of Seller's goal to collect the disputed receivables.  On the 30th day after the Sale Date, and each 30th day thereafter, Buyer shall deliver to Seller all payments collected from each account debtor with respect to the accounts receivable of Seller, along with all documentation with respect thereto that Seller reasonably requests.

11

7.9     <u>Vehicles</u>.  Buyer agrees to use its commercially reasonable efforts to file promptly the appropriate vehicle title applications and registrations to change the name of the titled owner on each vehicle title certificate and change the motor vehicle registration (with respect to license plate information) on each vehicle being transferred to Buyer from Seller pursuant to this Agreement.  Buyer agrees that it shall remove and destroy Seller's existing license plates from all vehicles received upon the earlier of receipt of new license plates or 60 days following Closing.

## ARTICLE VIII

## CLOSING AND TERMINATION

8.1     <u>Closing</u>.  The closing (the "<u>Closing</u>") of the Contemplated Transactions shall be held on or within fifteen days after the Sale Date (or such other date as the Parties may agree in writing), at the offices of Gray Reed & McGraw LLP, 1300 Post Oak Boulevard, Suite 2000, Houston, Texas 77056, at 10:00 a.m. Central Time.  The date on which the Closing occurs is referred to as the "<u>Closing Date</u>."  The transfers and deliveries described in Article VI shall be mutually interdependent and regarded as occurring simultaneously, and no such transfer or delivery shall become effective until all the other transfers and deliveries provided for in Article VI have also been made.  Seller and Buyer shall meet on the date preceding the Closing Date at the offices of Gray Reed & McGraw LLP to conduct a pre-Closing at which all deliveries to be made at Closing will be reviewed by the parties and placed in escrow.  At 10:00 a.m. Central Time on the Closing Date, or as soon thereafter as is practicable, all instruments and payments shall be distributed and disbursed to Seller and Buyer, and the Closing shall be consummated.

8.2     <u>Termination</u>.  This Agreement and the Contemplated Transactions may not be terminated except as follows:

(a)     Upon the mutual written consent of Seller and Buyer;

(b)     By Seller, if (i) Buyer is in material breach of this Agreement and (ii) such breach has not been cured on or before the Closing Date;

(c)     By Buyer, if (i) Seller is in material breach of this Agreement and (ii) such breach has not been cured on or before the Closing Date;

(d)     By Seller, if the Closing has not occurred on or before _____, 2018;

(e)     By Seller, if Seller enters into and consummates an Alternative Transaction pursuant to a sale order comparable to the Sale Order or if Seller, pursuant to such a sale order, agrees or determines to enter into an Alternative Transaction; or

(f)     By either Seller or Buyer, if there shall be in effect a final non-appealable court order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

8.3     Effect of Termination.

(a)     Upon the termination of this Agreement in accordance with Section 8.2 hereof, and except as set forth in Section 8.3(d) below, the Parties shall be relieved of any further obligations or liability under this Agreement other than obligations or liabilities in accordance with (i) the expense allocation provisions under Section 7.6, (ii) the jurisdiction provisions of Section 10.7 and (iii) obligations for breaches of this Agreement occurring prior to such termination.

(b)     Upon any termination pursuant to Sections 8.2(b) or 8.2(d), Seller shall be entitled to retain the Cash Deposit as liquidated damages for expenses incurred in connection with this Agreement.

(c)     Upon any termination pursuant to Sections 8.2(a), 8.2(c), 8.2(e), or 8.2(f), Seller shall return the Cash Deposit to Buyer.

(d)     Upon any termination pursuant to Section 8.2(e), if Buyer has been declared a "Stalking Horse Bidder" as such term is defined in the Bid Procedures Order, then in addition to the return of the Cash Deposit, Seller shall pay to Buyer a fee equal to [two and one-half percent (2.5%)] [three percent (3%)] of the Purchase Price (the "Termination Fee"). The Termination Fee shall be payable in immediately available funds by wire transfer no later than three business days after the closing and funding of an Alternative Transaction. Notwithstanding anything to the contrary in this Agreement, Buyer's right to receive the return of the Cash Deposit, plus payment of the Termination Fee shall be the sole and exclusive remedy of Buyer and its Affiliates against Seller or any of its Affiliates for any and all losses that may be suffered based upon, resulting from or arising out of such termination, and upon return of the Cash Deposit and payment of the Termination Fee, none of Seller or any of its Affiliates shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated by this Agreement.

(e)     Notwithstanding anything to the contrary contained herein, the provisions of this Section 8.3 and Article VIII shall survive any termination of this Agreement.

ARTICLE IX

TAX MATTERS

9.1     Filing of Returns.  In connection with the preparation and filing of Tax Returns as of and after the Sale Date, Buyer and Seller shall cooperate and exchange information as reasonably required to accomplish the matters contemplated by this Article IX.

9.2     Transaction Taxes.  Buyer shall bear and be responsible for paying any sales, use, stamp, transfer, documentary, registration, business and occupation and other similar taxes (including related penalties (civil or criminal), additions to tax and interest) imposed by any

13

Governmental Authority with respect to the transfer of the Purchased Assets to Buyer ("Transaction Taxes"), regardless of whether any Tax authority seeks to collect such taxes from Seller or Buyer.  Buyer shall also be responsible for (a) administering the payment of such Transaction Taxes, (b) defending or pursuing any proceedings related thereto, and (c) paying any expenses related thereto.  Seller shall give prompt written notice to Buyer of any proposed adjustment or assessment of any Transaction Taxes with respect to the transactions contemplated hereby.  In any proceedings, whether formal or informal, Seller shall permit Buyer to participate and control the defense of such proceeding with respect to such Transaction Taxes, and shall take all actions and execute all documents required to allow such participation, so long as Buyer is diligently pursuing the resolution thereof.

9.3     Tax Prorations.  As to any Purchased Assets acquired by Buyer, Seller and Buyer shall apportion the liability for property taxes and ad valorem taxes ("Periodic Taxes") for all Tax periods including but not beginning or ending on the Sale Date (the "Proration Periods"). The Periodic Taxes described in this Section 9.3 shall be apportioned between Seller and Buyer as of the Sale Date, with Buyer liable for that portion of the Periodic Taxes equal to the Periodic Tax for the Proration Period multiplied by a fraction, the numerator of which is the number of days remaining in the Proration Period including and after the Sale Date, and the denominator of which is the total number of days covered by such Proration Period.  Seller shall be liable for that portion of the Periodic Taxes for the Proration Period for which Buyer is not liable under the preceding sentence.  Buyer and Seller shall pay or be reimbursed for property taxes (including instances in which such property taxes have been paid before the Sale Date) on this prorated basis.  If a payment on a tax bill is due after the Closing, the Party that is legally required to make such payment shall make such payment and promptly forward an invoice to the other Party for its pro rata share, if any.  If the other Party does not pay the invoice within 30 calendar days of receipt, the amount of such payment shall bear interest at the rate of 6% per annum.  The Party responsible for paying a tax described in this Section 9.3 shall be responsible for administering the payment of (and any reimbursement for) such Tax.  For purposes of this Section 9.3, the Proration Period for ad valorem taxes and property taxes shall be the fiscal period for which such taxes were assessed by the relevant Tax jurisdiction.

9.4     Tax Refunds.  Any Tax refunds, credits, or rebates (including any interest related thereto) received by Buyer, its Affiliates or successors relating to the Purchased Assets and to Tax periods or portions thereof ending on or before the Sale Date shall be for the account of Seller, and Buyer shall pay over to Seller any such amount within five days of receipt thereof. Buyer shall, if Seller so requests and at Seller's direction and expense, file or cause its Affiliates to file for and obtain any Tax refunds with respect to the Purchased Assets and to Tax periods or portions thereof ending on or before the Sale Date.

9.5     Cooperation regarding Taxes.  Buyer and Seller will work together to resolve any dispute with taxing authorities regarding taxes, assessments and tax levies to the extent commercially reasonable.  Upon receipt from any governmental authority of any levy, notice, assessment, or withholding of any tax, fee, or other charge for which Seller may be obligated pursuant to this section, Buyer shall promptly provide written notice to Seller.  In no case shall any settlement or other disposition of such a levy, notice, assessment or withholding of any tax, fee or other charge

14

for which Seller may be obligated pursuant to this section be entered or otherwise reached by Buyer without Seller's prior written consent; otherwise, Seller shall not be responsible for such settled amounts, and Buyer shall indemnify and hold harmless Seller for such amounts, including any interest and penalties, and shall reimburse Seller to the extent Seller has previously paid such taxes.

9.6    <u>Survival</u>.  This Article IX, including all subsections, shall survive any termination or expiration of this Agreement:  (a) for the period of time during which either Seller or Buyer may be liable for any type of tax, fee, duty, surcharge, levy, assessment, withholding or other similar governmental charge based upon or arising out of the transactions effectuated pursuant to this Agreement under any applicable statute of limitations; or (b) where any audit, contest or controversy based upon or arising out of the transactions effectuated pursuant to this Agreement is pending, throughout the duration of such audit, contest or controversy.

ARTICLE X

<u>MISCELLANEOUS; CONSTRUCTION</u>

10.1    <u>Notices:</u>

All notices shall be in writing delivered as follows:

(a)    If to Buyer, to:

_____

_____

_____

_____
Attn:  _____
Facsimile:_____

With a copy to:

_____

_____

_____

_____
Attn:  _____
Facsimile:_____

(b)    If to Seller, to:

15

Lockwood Holdings, Inc. *et al.*
c/o GlassRatner Advisory and Capital Group
3500 Maple Avenue
Suite 350
Dallas, Texas 75219
Attn: Mark Shapiro
Facsimile:
Email: mshapiro@glassratner.com

With a copy to:

Gray Reed & McGraw LLP
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Attn:  Jason S. Brookner
Facsimile: (214) 953-1332
Email: jbrookner@grayreed.com

or to such other address as may have been designated in a prior notice. Notices sent by registered or certified mail, postage prepaid, return receipt requested, shall be deemed to have been given two business days after being mailed; notices sent by a nationally recognized commercial overnight carrier shall be effective the next business day after receipted delivery to such courier specifying overnight delivery; notices sent by facsimile shall be effective upon confirmation of receipt at the number specified above; notices sent by e-mail shall be effective upon receipt confirmation to the address specified; otherwise, notices shall be deemed to have been given when received at the address specified above (or other address specified in accordance with the foregoing).

10.2   <u>Survival of Representations, Warranties, Covenants and Agreements</u>.   All representations and warranties made by Seller in this Agreement shall terminate on the Closing Date upon the purchase of the Purchased Assets by Buyer, and Seller shall have no liability after the Closing Date for any breach of any representation or warranty.  Except as specifically set forth otherwise in the Agreement, all covenants and agreements of Seller shall lapse at, and be of no further force and effect following, the Closing.

10.3   <u>Binding Effect</u>.  Except as may be otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including, without limitation, any trustee, responsible person, estate administrator, representative or similar Person appointed for or in connection with the Chapter 11 Case or in any subsequent case under the Bankruptcy Code in which any Seller is a debtor. Except as otherwise provided in this Agreement, nothing in this Agreement is intended or shall be construed to confer on any Person other than the Parties any rights or benefits hereunder.

10.4   <u>Headings</u>.  The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

16

10.5    Exhibits and Schedules.    The Exhibits and Schedules referred to in this Agreement shall be deemed to be an integral part of this Agreement.

10.6    Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same document.

10.7    Governing Law and Venue.    Except to the extent inconsistent with the Bankruptcy Code (in which case the Bankruptcy Code shall govern), this Agreement shall be governed by and construed under the laws of the State of Texas, without regard to conflict of laws principles.  The Bankruptcy Court shall have exclusive jurisdiction over the interpretation and enforcement of this Agreement.  In the event the Bankruptcy Court declines to exercise jurisdiction over any dispute arising under, relating to or connected with this Agreement, the parties shall submit to jurisdiction in the federal and state courts sitting in Houston, Texas.

10.8    Waivers.  Compliance with the provision of this Agreement may be waived only by a written instrument specifically referring to this Agreement and signed by the Party waiving compliance.  No course of dealing, nor any failure or delay in exercising any right, shall be construed as a waiver, and no single or partial exercise of a right shall preclude any other or further exercise of that or any other right.

10.9    Pronouns. The use of a particular pronoun herein shall not be restrictive as to gender or number but shall be interpreted in all cases as the context may require.

10.10    Modification.  No supplement, modification or amendment of this Agreement shall be binding unless made in a written instrument which is signed by the Parties and which specifically refers to this Agreement.

10.11    Assignment.  No assignment by any Party of this Agreement or any right or obligation hereunder may be made without the prior written consent of the other Party, and any assignment attempted without such consent will be void *ab initio*.

10.12    Entire Agreement.  This Agreement and the agreements and documents referred to in this Agreement or delivered hereunder are the exclusive statement of the agreement among the Parties concerning the subject matter hereof.  All negotiations among the Parties are merged into this Agreement, and there are no representations, warranties, covenants, understandings or agreements, oral or otherwise, in relation thereto among the Parties other than those incorporated herein and to be delivered hereunder.

10.13    Severability. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, the legality, validity, and enforceability of the remaining provisions of this Agreement shall not be affected thereby, and in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically

17

as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be legal, valid, and enforceable.

[*Remainder of page intentionally left blank.*]

18

INTENDING TO BE LEGALLY BOUND, the Parties have signed this Agreement as of the date first above written.

**BUYER:**

_____

By: _____

Name:_____

Title:_____

**SELLER:**

By: _____

Name:  Mark Shapiro

Title:   Chief Restructuring Officer

19

INDEX OF SCHEDULES

Schedule 2.1 - Purchased Assets
Schedule 2.2 - Assumed Liabilities
Schedule 3.1 - Purchase Price Adjustment
Schedule 4.3 - Allocation
Schedule 6.6 - Brokers or Finders

INDEX OF EXHIBITS
Exhibit A                Bill of Sale
Exhibit B                Assignment and Assumption Agreement

4761192.1

**Schedule 2.1**

**<u>Purchased Assets</u>**

**Schedule 2.2**

**<u>Assumed Liabilities</u>**

## Schedule 3.1

## <u>Purchase Price Adjustment</u>

To the extent that <u>Schedule 2.1</u> contains an itemized list of categories of Purchased Assets, including, (a) minimum quantities per category desired to be purchased and (b) a price per category or per unit, then the Purchase Price shall be adjusted on a per unit basis, to the extent the quantity in any category available to be conveyed to Buyer on the Closing Date is less than the minimum quantity specified on <u>Schedule 2.1</u>.

To the extent that <u>Schedule 2.1</u> does not contain an itemized list of categories of Purchased Assets, including minimum quantities and a price per category or unit, then the Purchase Price shall be adjusted on a pro rata basis, to the extent the quantity in any category available to be conveyed to Buyer on the Closing Date is less than the quantity specified in the **[document being provided to Buyers]** (the "<u>Asset List</u>").  For purposes of calculating the adjustment, the aggregate Purchase Price per category shall be deemed to equal (a) the book value of all Purchased Assets as specified in the Asset List, <u>divided</u> by the aggregate Purchase Price for all Purchased Assets, prior to adjustment, <u>multiplied</u> by (b) the book value of the Purchased Assets included in such asset category as specified in the Asset List.

**Schedule 4.3**

**<u>Allocation</u>**

**Schedule 6.6**

**<u>Brokers or Finders</u>**

**Exhibit A**

**Bill of Sale**

This Bill of Sale (the "Bill of Sale") is made and entered into by and between _____, a Texas corporation ("Seller"), and _____, a _____ ("Buyer").

**W I T N E S S E T H:**

WHEREAS, pursuant to that certain Asset Purchase Agreement dated _____, 2018 (the "Agreement") by and between Seller and Buyer, Seller is conveying to Buyer all rights, title and interests of Seller in and to any and all Purchased Assets (as such term is defined in the Agreement) and as further described on Exhibit A.

NOW, THEREFORE, in consideration of the mutual promises contained in the Agreement, the receipt and sufficiency of which are hereby acknowledged and confessed by Seller, effective as of 12:01 a.m. on the Sale Date (the "Effective Time"), Seller does hereby ASSIGN, TRANSFER, SET OVER, CONVEY, and DELIVER to Buyer, its successors and assigns, all of its rights, title, and interests in and to the Purchased Assets.

TO HAVE AND TO HOLD the Purchased Assets unto Buyer, its successors and assigns, forever, free and clear of all liens, security interests and encumbrances, so that neither Seller, its successors or assigns or any third parties shall have, claim or demand any right or title thereto as of the Effective Time.

Seller and Buyer may execute this Bill of Sale in any number of counterparts, separately or together.

Except as provided in the Agreement, this is the final and exclusive expression of the agreement of Seller and Buyer as to the subject matter hereof, and no course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any term expressed in this Bill of Sale. In the event of a conflict between the terms of this Bill of Sale and the Agreement, the Agreement shall control. Capitalized terms used in this Bill of Sale shall, unless defined herein, have the meanings given to such terms in the Agreement.

[ *Remainder of page intentionally left blank.*]

A-1

4761192.1

IN WITNESS WHEREOF, Seller and Buyer have executed this Bill of Sale to be effective as of the Effective Time.

**SELLER:**

By: _____

Name:  Mark Shapiro

Title:   Chief Restructuring Officer

**BUYER:**

_____

By: _____

Name: _____

Title: _____

A-2

4761192.1

**Exhibit B**

**Assignment and Assumption Agreement**

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated _____ _____, 2018, is between _____, a Texas corporation ("Assignor"), and _____, a _____ ("Assignee"). Assignor and Assignee are sometimes collectively referred to as the "Parties" and individually referred to as a "Party".

WHEREAS, pursuant to that certain Asset Purchase Agreement dated July \_\_\_, 2018 (the "Purchase Agreement") by and between Assignor and Assignee, Assignor desires to assign its rights, and Assignee desires to assume Assignor's obligations, under the contracts listed or described on Exhibit A hereto (the "Assumed Liabilities") pursuant to the terms hereof.

NOW, THEREFORE, in consideration of the foregoing, the covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby covenant and agree as follows:

1.      Effective Time.  This Agreement and the assignment and assumption provided for in this Agreement shall be effective at 12:01 a.m. on the Sale Date (the "Effective Time").

2.      Assignment by Assignor.  As of the Effective Time, Assignor hereby transfers, assigns, conveys and delivers to Assignee, all of its rights under contracts listed on Exhibit A.

3.      Assumption by Assignee.  Assignee hereby fully and completely assumes and agrees to perform all of the duties, liabilities, and obligations of Assignor arising from and after the Effective Time.

4.      Counterparts; Further Assurances.  The Parties may execute this Agreement in any number of counterparts, separately or together.  The Parties shall from time to time execute and deliver to each other such other documents, in form and substance satisfactory to the other, as may be necessary or appropriate to more fully accomplish the assignment and assumption contemplated hereby.

5.      Severability.  If any provision of this Agreement is held to be illegal, invalid, or unenforceable, such provision shall be fully severable and this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision never comprised a part hereof; the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as part of this Agreement a provision as similar in its terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

B-1

6.      <u>Entire Agreement, Etc.</u>  This Agreement and the Purchase Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof.  In the event of a conflict between the terms of this Agreement and the Purchase Agreement, the Purchase Agreement shall control. Capitalized terms used in this Agreement shall, unless defined herein, have the meaning given to such terms in the Purchase Agreement.

7.      <u>Governing Law; Venue</u>.  This Agreement and the rights and obligations of the Parties shall be governed by, construed, and enforced in accordance with laws of Texas.  The Bankruptcy Court shall have exclusive jurisdiction over the interpretation and enforcement of this Agreement.  In the event the Bankruptcy Court declines to exercise jurisdiction over any dispute arising under, relating to or connected with this Agreement, the parties shall submit to jurisdiction in the federal and state courts sitting in Houston, Texas.

IN WITNESS WHEREOF, the Parties have duly executed and delivered this Agreement to be effective as of the Effective Time.

**ASSIGNOR:**

By: _____

Name:  Mark Shapiro

Title:   Chief Restructuring Officer

**ASSIGNEE:**

_____

By: _____

Name:_____

Title:_____

B-2

4761192.1

**<u>Exhibit 3</u>**

**Sale Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| LOCKWOOD HOLDINGS, INC., *et al.*,[1] | § | Case No. 18-30197 (DRJ) |
| | § | |
| Debtors. | § | Jointly Administered |
| | § | |
| | § | |

**NOTICE OF SALE HEARING,**
**POTENTIAL AUCTION, AND OBJECTION DEADLINE**

     **PLEASE TAKE NOTICE** that on June 29, 2018, Lockwood Holdings, Inc. and certain of its affiliates, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed their *Expedited Motion Pursuant to Sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006 for Order (A) Approving Comprehensive Sale Process, (B) Approving Bidding Procedures and Certain Bid Protections, (C) Scheduling an Auction and a Sale Hearing, (D) Approving Form and Manner of Notice Related Thereto, (E) Authorizing Sale Free and Clear of all Liens, Claims, Interests, and Encumbrances, (F) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Proposed Cure Amounts with Respect Thereto and (G) Granting Related Relief* [Docket No. __] the ("Sale Motion") with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

     **PLEASE TAKE FURTHER NOTICE** that on _____, 2018, the Bankruptcy Court entered its *Order Granting Debtors' Expedited Motion Pursuant to Sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006 for Order (A) Approving Comprehensive Sale Process, (B) Approving Bidding Procedures and Certain Bid Protections, (C) Scheduling an Auction and a Sale Hearing, (D) Approving Form and Manner of Notice Related Thereto, (E) Authorizing Sale Free and Clear of all Liens, Claims, Interests, and Encumbrances, (F) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Proposed Cure Amounts with Respect Thereto and (G) Granting Related Relief* [Docket No. __] (the "Bidding Procedures Order"), approving certain bidding procedures attached thereto as Exhibit 1.

     **PLEASE TAKE FURTHER NOTICE** that, in accordance with the Bidding Procedures Order, unless cancelled, an Auction will take place on **August 15, 2018** commencing at **10:00 a.m. (CST)** at the offices of Gray Reed & McGraw LLP, 1300 Post Oak Blvd., Suite 2000, Houston, TX

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Lockwood Holdings, Inc. (9726); LH Aviation, LLC (6984); Piping Components, Inc. (0197); Lockwood International, Inc. (8597); LMG Manufacturing, Inc. (9468); Lockwood Enterprises, Inc. (6504); and 7807 Eagle Lane, LLC (7382).

77056.  The Auction will proceed, and be conducted, pursuant to the terms of the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the sale of the Debtors' assets, including the assumption and assignment of any executory contracts (the "Sale Hearing"), will take place on **August 20, 2018 at 2:00 p.m. (CST)** in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, 515 Rusk Street, Courtroom 400, Houston, Texas 77002.  As set forth in the Bidding Procedures, the Auction and the Sale Hearing may be cancelled, with a notice of cancellation to be filed by the Debtors with the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that any objection to the assumption and assignment of any executory contract or unexpired lease, or any cure amount related thereto, shall be filed by **August 24, 2018** and served upon the Notice Parties designated below.  To the extent any such objection is filed, a subsequent hearing will be scheduled with notice to the objecting party.

**PLEASE TAKE FURTHER NOTICE** that the deadline for filing objections to the Sale(s) is **August 17, 2018**.  Objections, if any, must (a) be in writing, (b) state with specificity the nature of such objection, (c) comply with the Federal Rules of Bankruptcy Procedure, and (d) be filed with the Court and served on undersigned counsel for the Debtors, the United States Trustee for the Southern District of Texas, the Official Committee of Unsecured Creditors, and Wells Fargo Bank, N.A. (as prepetition and DIP financing agent) at the addresses listed below (the "Notice Parties").

1. **Debtors' Counsel:**

   Gray Reed & McGraw LLP          Gray Reed & McGraw LLP
   1300 Post Oak Boulevard          1601 Elm Street
   Suite 2000                       Suite 4600
   Houston, Texas 77056    -and-    Dallas, Texas 75201
   Attn: Jason S. Brookner          Attn: Amber M. Carson
   Email: jbrookner@grayreed.com    Email: acarson@grayreed.com

2. **United States Trustee for the Southern District of Texas :**

   Office of the United States Trustee
   515 Rusk Street
   Suite 3516
   Houston, Texas 77002
   Attn: Hector Duran
   Email: Hector.Duran.Jr@usdoj.gov

3. **Counsel to Wells Fargo:**

   Winstead PC                      Winstead PC
   500 Winstead Building            600 Travis Street
   2728 N. Harwood Street           Suite 5200
   Dallas, Texas 75201     -and-    Houston, Texas 77002
   Attn: Rakhee V. Patel            Attn: Sean B. Davis
   Email: rpatel@winstead.com       Email: sdavis@winstead.com

**4.      Counsel to the Official Committee of Unsecured Creditors:**
McKool Smith
600 Travis Street
Suite 7000
Houston, Texas 77002
Attn: Christopher D. Johnson
Email: cjohnson@mckoolsmith.com

**PLEASE TAKE FURTHER NOTICE** that copies of pleadings related to the proposed sale(s), including the Bidding Procedures Order (and attached bid procedures) approved by the Bankruptcy Court, are available on the Debtors' website at www.omnimgt.com/lockwoodholdings or on the Bankruptcy Court's website at https://ecf.txs.uscourts.gov/.

Respectfully submitted this __th day of July, 2018.

**GRAY REED & McGRAW LLP**

By: /s/ _____
      Jason S. Brookner
      Texas Bar No. 24033684
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:  (713) 986-7000
Facsimile:  (713) 986-7100
Email:       jbrookner@grayreed.com

-and-

      Amber M. Carson
      Texas Bar No. 24075610
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:       acarson@grayreed.com

**COUNSEL TO THE DEBTORS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on _____, 2018, a true and correct copy of this *Notice of Sale Hearing, Potential Auction, and Objection Deadline* has been served (i) electronically via CM/ECF on all parties who have subscribed for electronic notice in this case, (ii) via U.S. first-class mail on all parties listed on the Debtors' Official Service List and (iii) via U.S. first-class mail or email if available to (a) all entities known to have expressed an interest in an asset purchase or going concern sale transaction with the Debtors during the past year; (b) counterparties to the Debtors' executory contracts and unexpired leases; and (c) all parties with whom Imperial and Keen have been in contact and who have expressed an interest in potentially making a bid.

*/s/*
Jason S. Brookner